[FILED UNDER SEAL]

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

FEB 0 6 2023

FILED

FEB 0 6 2023

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

| | |
|---|---|
| STATE OF TENNESSEE, *ex rel.* JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER, | ) ) ) ) |
| *and* | ) ) |
| COMMONWEALTH OF KENTUCKY, *ex rel.* DANIEL CAMERON, ATTORNEY GENERAL, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) JURY TRIAL DEMANDED ) |
| IDEAL HORIZON BENEFITS, LLC d/b/a SOLAR TITAN USA, *a Tennessee Limited Liability Company,* | ) ) ) ) |
| CRAIG KELLEY, RICHARD ATNIP, and SARAH KIRKLAND, *individually and as officers of Solar Titan USA,* | ) ) ) ) |
| *and* | ) ) |
| SOLAR MOSAIC, LLC d/b/a MOSAIC, *a California Limited Liability Company,* | ) CASE NO. 3:23-cv-46 ) ) Corker/McCook ) |
| Defendants, | ) ) |
| *and* | ) ) |
| SOLAR TITAN CHARTERS, LLC d/b/a TITAN CHARTERS, *a Florida Limited Liability Company,* | ) ) ) ) |
| Relief Defendant. | ) ) |

---

## CIVIL ENFORCEMENT COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, RECEIVERSHIP, AND OTHER EQUITABLE AND STATUTORY RELIEF

---

[FILED UNDER SEAL]

1.     Plaintiffs, State of Tennessee, by and through Jonathan Skrmetti, its Attorney General and Reporter ("Tennessee"), and the Commonwealth of Kentucky, by and through Daniel Cameron, its Attorney General ("Kentucky") (collectively, "Plaintiffs"), bring this civil law enforcement proceeding pursuant to their enforcement powers under state and federal law to bring an immediate stop to the pervasive and ongoing deceptive and unfair business practices committed by Defendants in the operation of their residential solar photovoltaic system ("solar system") sales, installation, and lending businesses.

2.     The Plaintiffs bring this action pursuant to 12 U.S.C §§ 5552, and 5565(b) of the Consumer Financial Protection Act of 2010 ("CFPA"), and 15 U.S.C. § 45b(e) of the Consumer Review Fairness Act ("CRFA"). The Plaintiffs also bring this action pursuant to Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A), which authorizes the Plaintiffs to bring actions for violations of other Federal consumer financial laws set forth in the CFPA, including the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*. ("TILA").

3.     Tennessee also brings this action pursuant to Tennessee Code Annotated § 47-18-108 of the Tennessee Consumer Protection Act of 1977 ("TCPA") and other state consumer protection laws.

4.     Kentucky also brings this action pursuant to Kentucky Revised Statutes Annotated § 367.190 of the Kentucky Consumer Protection Act ("KCPA") and other state consumer protection laws.

5.     The Plaintiffs bring this action to seek a temporary restraining order, the appointment of a temporary and permanent receiver over Defendant Ideal Horizon Benefits, LLC d/b/a Solar Titan USA ("Solar Titan"), preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, refund of monies paid, disgorgement of ill-gotten gains, civil

1

penalties, attorney fees, and other equitable and statutory relief for Defendants' violations of federal and state consumer protection laws governing unfair and deceptive business practices and consumer financing.

6. The Plaintiffs also bring this action against Solar Mosaic, LLC d/b/a Solar Mosaic ("Mosaic") to seek preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, refund of monies paid, disgorgement of ill-gotten gains, civil penalties, attorney fees, and other equitable and statutory relief for Defendant's violations of federal and state consumer protection laws governing unfair and deceptive business practices and consumer financing.

7. Due to the exigent nature of these proceedings, the Plaintiffs have determined that it is not feasible to notify the Consumer Financial Protection Bureau ("CFPB") about this suit prior to filing. Plaintiffs will provide the requisite notice of their intent to bring CFPA and TILA claims to the CFPB shortly after initiating this action in accordance with 12 U.S.C. § 5552(b) and 15 U.S.C. § 1640(e).

8. Due to the exigent nature of these proceedings, Plaintiffs have determined that it is not feasible to notify the Federal Trade Commission ("FTC") about this action prior to filing. Plaintiffs will provide the requisite notice of their intent to bring CRFA claims to the FTC shortly after initiating this action in accordance with 15 U.S.C. § 45b(e)(2).

9. Pursuant to TENN. CODE ANN. § 47-18-108(a)(2), Attorney General Skrmetti has determined that the purposes of the TCPA would be substantially impaired by delay in instituting legal proceedings and thus has not provided Defendants with ten days' notice of Tennessee's intention to initiate legal proceedings against them when this action was filed.

2

# I. NATURE OF THE CASE

10.     Since 2019, Defendants Solar Titan, Craig Kelley ("Kelley"), Richard Atnip ("Atnip"), and Sarah Kirkland ("Kirkland") (collectively, "Solar Titan Defendants"), individually and together, have managed and operated a Knoxville, Tennessee-based solar system sales and installation business. Using online advertisements through social media platforms like Facebook, Instagram, YouTube, and the company's website, the Solar Titan Defendants promise 50-90% energy bill savings if consumers purchase the systems Solar Titan sells. Transactions for these systems occur at consumers' homes. During these sales pitches, Solar Titan sales representatives mislead consumers about the potential energy savings these systems offer and other potential savings, incentives, and discounts, such as tax credits or "energy buyback" programs.[1] The below image is taken directly from Solar Titan's marketing materials:



SOLAR TITAN USA

## Why Solar

Solar Power is:

**CLEAN**

**UNLIMITED**

**INDEPENDENT**

**& FREE**

**A Solid Financial Investment**
Most Residential and Commercial buyers will see a return on their investment
after 7-10 years and enjoy a 25+ year asset.

**Rising Utility Rates-No Longer Your Problem**
Going Solar will reduce your monthly electric bill and improve your
seasonal or peak consumption. You are no longer at the mercy of the electric company's rate hikes.
You own your power!

**Federal Tax Incentives**
With the large Federal Tax Credit, NOW is the time to Go Solar!

**Be a Solar Powerhouse and Lead by Example**
Going Solar demonstrates sustainability and environmental responsibility to the
next generation. Giving you the power to control the cost of electricity and making you a Power
Producer instead of an Energy Consumer.

**Empowering the Future with SOLAR Today**

---

[1] An "energy buyback" is when an electric utility provider (commonly referred to as a local power company or "LPC") buys any excess solar power created by the consumer's solar system.

3

11.     The Solar Titan Defendants have marketed and sold these systems as "turnkey," requiring the buyer to take no additional steps beyond agreeing to purchase the system. In theory, this "turnkey" service covers not only the costs of the solar system equipment but also the labor costs for installation, coordination of permitting and inspections with the inspectors and local power companies ("LPCs"), and assistance securing financing through a third-party finance company, like Mosaic. Solar Titan representatives also tout that their company has one of the fastest timelines in the country for installations, claiming its installation crews will complete any given installation in just four to six weeks. The below image is taken directly from Solar Titan marketing materials:

   

**SOLAR TITAN USA**                                    **SOLAR TITAN USA**

## LEARN MORE ABOUT US!

- We are **Veteran** Owned.
- We are a **Full-service** Turnkey operation based out of Knoxville, TN with offices across Tennessee, Kentucky, Alabama and Georgia.
- Solar Titan USA has one of the quickest installation times **nationwide**.
- NABCEP Certified.

12.     Contrary to Solar Titan's representatives' claims, many consumers eventually learn that they do not qualify for a tax credit, Tennessee consumers cannot participate in a buyback program, and "turnkey" instead means substandard (and sometimes dangerous) solar systems, delayed installations, failed inspections, shoddy workmanship, and unexpectedly pricey monthly loan payments. Due to Solar Titan's incompetence, many consumers are forced to work directly

4

with their LPC and/or Homeowners Association ("HOA") in order to get approval for these installations.

13.     Solar Titan relies on Mosaic as its primary consumer lending partner. Mosaic allows Solar Titan, as its agent and/or service provider, to solicit its loan customers and help consumers apply for loans. Mosaic also authorizes Solar Titan to help consumers consummate their loans without providing effective TILA disclosures during the sales process that would inform consumers of their total repayment obligation to Mosaic.

14.     Upon information and belief, Mosaic has structured its financing in a way that facilitates Solar Titan's misrepresentations to consumers. For example, every Mosaic loan financing a Solar Titan sale includes a spike in the consumer's monthly payment after 18 months if the consumer fails to make payments equal to 26%-30% of their total loan balance. This is approximately the amount the Federal Tax Credit[2] would be for consumers who actually qualify. On its website, Mosaic promotes this loan structure as a way to give consumers the "CHOICE to take advantage of the Federal Solar Investment Tax Credit," as if that "CHOICE" is available to every consumer. The below image is taken directly from Mosaic's website:



MOSAIC®                    Contractors     Technology     Home

**PowerSwitch CHOICE**

For homeowners who want to add solar energy systems and/or battery storage to their home — and have the CHOICE to take advantage of the Federal Solar Investment Tax Credit.

The CHOICE product has an amortization schedule designed for homeowners planning to pay down at least 30% (potentially received by the Solar Investment Tax Credit or other funds) in the first 18 months. After month 18, payments are adjusted higher if less than 30% is paid, or lower if more than 30% has been paid.

---

[2] Consumers who purchase a residential solar system may be eligible to receive a nonrefundable tax credit equal to 26%-30% of the cost of the purchased solar system (hereinafter, "the Federal Tax Credit). The Federal Tax Credit is derived from the Energy Savings Act of 2005 and is codified in the IRS tax code at 26 U.S.C. § 25D(g).

5

15.     Mosaic also disregards its status as a holder in due course, misrepresenting to consumers that they are still fully indebted to Mosaic even if the sale was procured through unfair, deceptive, or misleading marketing and sales practices.

16.     Solar Titan and Mosaic also routinely ignore cancellation requests made within three days, the time period for consumers' statutory right to rescind. Many of these cancellations occurred when, after signing these installation and financing agreements, consumers learned about the hundreds of online complaints against the company, the company's "F" rating with the Better Business Bureau, and the negative media resulting from the company's unfair and deceptive business practices.

17.     Kelley, Atnip, and Kirkland, having realized healthy profits from their illegal conduct, have used their ill-gotten gains to purchase or lease expensive items such as luxury vehicles, multi-million-dollar homes, large boats, and even a jet airplane. They have also used this money to launch a new business endeavor, Solar Titan Charters, LLC d/b/a Titan Charters ("Titan Charters"). Titan Charters allegedly rents lodging and recreational fishing boats in Destin, Florida, a popular vacation destination.

## II. JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 to enforce the CFPA, TILA, and CRFA (collectively, the "Federal Law Claims").

19.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to enforce the TCPA, KCPA, and other state statutory claims (collectively, the "State Law Claims"). The State Law Claims are so related to the Federal Law Claims that they form part of the same case or controversy under Article III of the United States Constitution.

6

20.     Venue is proper in this Court pursuant to 12 U.S.C. § 5564(f) because Defendants are located, reside, and/or do business in this district. Venue is further proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because, as set forth in this Complaint, this district is where a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred and a substantial part of the property that is the subject of this action is situated.

### III. THE PARTIES

#### A. PLAINTIFFS

21.     Jonathan Skrmetti, Attorney General and Reporter of the State of Tennessee, is the chief law enforcement officer of the State of Tennessee and may exercise such authority as the public interest requires and may file suits necessary for the enforcement of the law and public protection. The Attorney General is also empowered by the Federal Law Claims, the Tennessee State Law Claims, and his common law authority to bring an action in the name of Tennessee to enforce these laws and protect the public.

22.     Daniel Cameron, Attorney General of the Commonwealth of Kentucky, is the chief law enforcement officer of the Commonwealth and may exercise such authority as the public interest requires and may file suits necessary for the enforcement of the law and public protection. The Attorney General is also empowered by the Federal Law Claims, the Kentucky State Law Claims, and his common law authority to bring an action in the name of Kentucky to enforce these laws and protect the public.

#### B. INDIVIDUAL DEFENDANTS

23.     Kelley is a Tennessee resident and one of the founders of Solar Titan and Titan Charters.

7

24.     At all times relevant to this Complaint, acting alone or in concert with others, Kelley formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In connection with the matters alleged herein, Kelley transacts or has transacted business in this district. Upon information and belief, Kelley resides at 12500 Limerick Lane, Knoxville, Tennessee 37934.

25.     Atnip is a Tennessee resident and one of the founders of Solar Titan and Titan Charters. Atnip is listed as Solar Titan's registered agent on its original Articles of Organization, which he signed as a managing member. Atnip has a 90% ownership interest in Solar Titan. According to Solar Titan, Mr. Atnip serves in a general advisory role for Solar Titan, and Kelley reports to Atnip. Atnip is also listed as an authorized managing member on Titan Charters' Articles of Organization.

26.     At all times relevant to this Complaint, acting alone or in concert with others, Atnip formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In connection with the matters alleged herein, Atnip transacts or has transacted business in this district. Upon information and belief, Atnip resides at 12500 Limerick Lane, Knoxville, Tennessee 37934.

27.     Kirkland is a resident of the state of Tennessee. Kirkland is listed as Solar Titan's President on a Change of Mailing Address form filed with the Tennessee Secretary of State on January 11, 2022. She is also listed as the company's CEO on Solar Titan's Application for Registration of Assumed Limited Liability Company form, filed on January 17, 2022. Kirkland has a 10% ownership interest in Solar Titan. Kirkland is also listed as an authorized managing member in Titan Charters' Articles of Organization.

8

28.     At all times relevant to this Complaint, acting alone or in concert with others, Kirkland formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In connection with the matters alleged herein, Kirkland transacts or has transacted business in this district.

29.     Upon information and belief, Kirkland resides at 822 Fox Road, Knoxville, Tennessee 37922.

## C. CORPORATE DEFENDANTS

30.     Upon information and belief, in 2019, Kelley, Kirkland, and Atnip launched Solar Titan USA, LLC.

31.     On January 17, 2022, Solar Titan USA, LLC was dissolved and reorganized under the name Ideal Horizon Benefits, LLC d/b/a Solar Titan USA.

32.     Ideal Horizon Benefits, LLC d/b/a Solar Titan USA's registered agent is Registered Agent Solutions, Inc. Service upon the Registered Agent can be effectuated at 992 Davidson Drive, Suite B, Nashville, Tennessee 37205-1051.

33.     For purposes of this lawsuit, Plaintiffs will use the term "Solar Titan" to refer to both Solar Titan USA, LLC, (and any potential successors) and Ideal Horizon Benefits, LLC d/b/a Solar Titan USA. Upon information and belief, the principals, operations, and assets of the companies are one and the same.

34.     Solar Titan is a limited liability company organized under the laws of Tennessee.

35.     Upon information and belief, Solar Titan conducts business in Tennessee, Kentucky, Georgia, Alabama, and Florida.

36.     Mosaic is a limited liability company organized under the laws of the state of Delaware.

9

37.     Mosaic is a nationwide firm that specializes in consumer financing for residential home improvement projects. Mosaic underwrites and funds thousands of consumer loans each year and has entered into agreements with dozens of residential solar system installers, including Solar Titan, to finance their solar system sales.

38.     Mosaic primarily operates out of Oakland, California. Its Principal Office Address is 601 12th Street, Suite 325, Oakland, CA 94607.

39.     Mosaic's registered agent is CT Corporation System. Service upon the Registered Agent can be effectuated at 28 Liberty Street, New York, New York 10005.

**D. RELIEF DEFENDANT**

40.     Titan Charters is a limited liability company organized under the laws of the State of Florida and headquartered in Tennessee.

41.     Titan Charters' website says it provides deep sea fishing, bay fishing, and cruise boat charters for individuals and groups in Destin, Florida.

42.     On Titan Charters' Articles of Organization, which were filed on February 25, 2021, the company lists its principal office address and mailing address as 11205 Outlet Drive, Knoxville, Tennessee, 37932, the same address used for Solar Titan.

43.     Kirkland and Atnip are also listed as Authorized Managing Members on Titan Charters' Articles of Organization. Thus, Kirkland and Atnip have full control over both companies.

44.     Titan Charters' Registered Agent is Swart Baumruk & Company, LLP. Service upon the Registered Agent can be effectuated at 1101 Miranda Lane, Kissimmee, Florida, 34741.

45.     Upon information and belief, the Solar Titan Defendants used funds from Solar Titan to launch Titan Charters.

## IV. GENERAL FACTUAL ALLEGATIONS

46. Solar Titan markets and sells solar systems to Tennessee and Kentucky homeowners through online advertisements, lead generation, telemarketing, and door-to-door sales.

47. These solar system installations are priced well above the average cost of a residential solar system.

48. Solar Titan charges consumers anywhere from $20,000-$100,000 for its residential solar systems.

49. Because most Solar Titan customers cannot afford to pay such high prices upfront, Solar Titan sales representatives sign consumers up for financing through Solar Titan's primary lending partner, Mosaic.

50. Mosaic then funds the contract, transmitting payment directly to Solar Titan for the sales price.

51. To induce consumers to purchase these high-priced systems, Solar Titan drastically exaggerates the amount of electric utility bill savings consumers will experience.

52. Solar Titan representatives also claim that consumers will start experiencing those significant savings on their bills well before they are obligated to start making monthly payments to the finance company.

53. Because Solar Titan's installation process is heavily flawed, the systems are often not operational until months after the consumer has started receiving bills from Mosaic. Thus, consumers experience no savings for those months but instead have the added expense of the Mosaic loan payment.

11

54.     If a Solar Titan customer is lucky enough to have their solar system installed and made operational, these systems rarely, if ever, perform as promised.

55.     Solar Titan installers are often inexperienced and lack proper training. They also lack appropriate oversight from licensed professionals.

56.     Solar Titan also has difficulty retaining qualified individuals because the company is routinely late with payroll and refuses to pay its employees as promised.

57.     As a result, many installations fail the inspections and/or cause damage to the consumer's home.

58.     Solar Titan not only misrepresents to consumers the benefits of the system, the timeliness of its installations, and the quality of its products and services but also holds the funds Mosaic pays on the consumers' behalf.

59.     Once a consumer signs an installation agreement and signs up for financing, Solar Titan immediately submits paperwork to Mosaic so that funds will be disbursed to Solar Titan before the consumer's three-day statutory right of rescission has expired.

60.     If a consumer properly cancels the contract within the three-day statutory period, Solar Titan seeks to avoid returning the funds to Mosaic by routinely deceiving consumers, claiming they have not properly canceled the contract. After misleading the consumer, Solar Titan keeps the consumer locked in and retains the money that Mosaic paid to fund the contract.

61.     Solar Titan often also relies on the falsehood that a consumer did not properly cancel their contract (*e.g.*, asserting that the consumer did not send the cancellation notice to the proper address) to then insist that the consumer pay Solar Titan the same amount that Mosaic has already paid to Solar Titan to fund the contract. Having collected the loan funding twice, it can repay Mosaic and still pocket revenue from the sale. Other times, Solar Titan just tells consumers

that it has canceled the contract when it has not and keeps the funds, such that Mosaic continues to expect payment from the consumer.

62.     Kelley and Kirkland have told Solar Titan employees not to cancel contracts even when consumers have properly exercised their three-day right to rescind their contract.

63.     Upon information and belief, Atnip, the signatory for the bank accounts, knew or should have known that Solar Titan is not properly canceling contracts for consumers who have properly exercised their three-day right to rescind their contract.

64.     Kelley, Atnip, and Kirkland are using the funds from these canceled contracts to pay their own personal expenses.

65.     Kelley, Atnip, and Kirkland lead a lavish lifestyle that includes several multi-million-dollar homes, yachts, a private jet, and luxury vehicles.

66.     Kelley, Atnip, and Kirkland have used the ill-gotten gains from Solar Titan to pay for Titan Charters' "business expenses," such as boats and beachfront property.

67.     Upon information and belief, despite being aware of the large volume and egregious nature of consumer complaints against Solar Titan, Mosaic has continued to conduct business with the company. This partnership has allowed Mosaic to reap enormous profits while facing no consequences for its participation in this harmful and unlawful business scheme.

68.     Loans for Solar Titan systems typically carry terms of 20-25 years and add thousands of dollars in finance charges.  Financing often doubles the cost of the system itself.

69.     Mosaic facilitates Solar Titan's unfair and deceptive business practices, as the company knows or should know that Solar Titan requests the first portion of loan funding before consumers' statutory three-day right of cancellation period expires.

70.     Mosaic's payment schedule to Solar Titan also incentivizes Solar Titan's failure to deliver functional solar systems to consumers. Despite consumers' complaints about their system not working, Mosaic pays Solar Titan the last portion of the loan funding regardless of whether Solar Titan has fulfilled its sales promise of providing an operational solar system.

71.     Instead, Mosaic fully funds consumers' contracts as soon as "glass is on the roof," which is an industry term that means some components of the system have been installed (namely, the panels), regardless of whether the system has been turned on or commissioned by the LPC so it can generate power for the consumer.

72.     Rather than using a consumer's loan funds to complete the solar system installation, Solar Titan focuses on procuring new customers and signing them up for loan agreements with Mosaic; meanwhile, the consumer is obligated to continue making monthly payments to the financing company, despite not having received what he's paying for.

73.     Defendants' unlawful business practices have harmed hundreds of consumers throughout the Southeast. Plaintiffs respectfully bring this suit in an effort to avoid future harm to the public and mitigate the damage caused by Defendants' illegal conduct.

## V.  SPECIFIC FACTUAL ALLEGATIONS

### A.  THE RESIDENTIAL SOLAR INDUSTRY

74.     Solar industry operators install solar systems as part of general residential and commercial contracting services.

75.     Heavy advertising that emphasizes tax incentives has caused a swell of consumer-level demand for solar system installations.

76.     According to the United States Department of Energy, over the last 20 years, the cumulative capacity of residential solar power installed in the U.S. has increased by more than

500%.[3] In the last decade, the industry has also seen an average annual revenue growth of 42% across the United States.[4]

77.     Increased consumer-level demand has attracted many new providers of residential solar systems to enter the market.

78.     These new entrants are often eager to close as many sales as possible, sometimes by adopting high-pressure, misleading sales tactics.

79.     To make matters worse, most consumers finance the costs of their solar system and its installation with long-term, high-interest-rate loans. The total cost of these loans is often hidden from the consumer.

80.     As more consumers began to purchase residential solar systems, federal and state consumer protection agencies experienced an uptick in consumer complaints. Since 2016, state and federal agencies have brought many investigations and enforcement actions against companies engaging in unfair and deceptive marketing and sales practices for solar systems. There have also been numerous warnings by law enforcement agencies, consumer watchdog organizations, and LPCs across the country about the deceptive and predatory practices of many solar system installers and lenders.

81.     These investigations and lawsuits have not deterred the Solar Titan Defendants, whose business model is built upon misrepresentations to consumers about savings on their energy bills, the availability of tax credits, and the capabilities and functionality of the systems themselves.

---

[3] G. Barbose, A.J. Satchwell, *Benefits and costs of a utility-ownership business model for residential rooftop solar photovoltaics.*, Nat Energy 5, 750–758 (2020).
[4] Al Bari Shahool, *Sunny days: The residential market is anticipated to create strong demand for solar installations*, IBISWorld Industry Report OD4494, pg. 12 (2022).

## B. SOLAR TITAN

82.     Solar Titan is one of the thousands of new residential solar system operators founded in the last five years.

83.     Upon information and belief, Solar Titan was founded in 2019 and has been managed and/or operated by Kelley, Atnip, and Kirkland since its founding.

84.     Prior to starting Solar Titan, in December 2012, Kelley was convicted of wire fraud (18 U.S.C. § 1323) in the United States District Court, District of Nevada.

85.     Kelley's sentence for this crime included, among other things, a five-year probation term and the payment of restitution to Merrill Lynch in the amount of $195,000.

86.     Because of Kelley's criminal history, Atnip and Kirkland did not want Kelley's name on the company documents.

87.     Atnip, Kirkland, and Kelley knew that Kelley's status as a felon convicted of federal wire fraud could preclude Kelley from operating a business reliant on consumer loans because lenders could be unwilling to work with someone with a history of financial crimes.

88.     Atnip, who is married to Kelley, agreed to sign all of the company documents and act as a managing member of the business, concealing Kelley's role in managing and operating the business.

89.     Although Atnip originally handled significant administrative tasks for the business, Kelley and Kirkland persuaded Atnip to disengage from the operations. However, Atnip continued to control Solar Titan's finances as the signatory on most company documents.

90.     Atnip has continuously misrepresented to various Secretaries of State and Solar Titan's business partners (including the consumer lenders) that he was the company's primary operational manager.

91.     While Atnip's name may have been used to procure funds to help launch Solar Titan and expand the business, the company has always been primarily managed and operated by Kelley and Kirkland, especially in recent years.

92.     In an effort to conceal Kelley's role in the business, Kelley impersonates Atnip on the phone in conversations with Solar Titan's lending partners.

93.     Upon information and belief, Kelley's impersonation of Atnip has been done with Atnip's knowledge and consent.

94.     Upon information and belief, Solar Titan's applications for credit have given creditors the false impression that Atnip and Kirkland are primarily responsible for managing the company and handling the company's finances.

95.     While Solar Titan, on paper, is owned by Atnip and Kirkland, Kelley routinely represents himself to consumers as the company's owner, president, and/or CEO.

96.     Kelley has intentionally misled business partners and creditors by failing to disclose his position as the company's primary operational manager.

## C. THE SOLAR TITAN SALES PROCESS

97.     Solar Titan uses social media platforms to advertise its solar systems. These advertisements prompt consumers to provide their contact information. Solar Titan customer service representatives then call the consumers and schedule in-home meetings where representatives give a sales presentation.

98.     To promote confidence in the company, Solar Titan falsely suggests through its advertisements and sales materials that it partners with various solar energy professionals in the industry.

99.     For example, for several months, Solar Titan represented itself on its website as a partner of the Solar Energy Industries Association ("SEIA").

100.     The SEIA is a national trade organization made up of solar system installers and other parties with the goal of self-governance and improving consumer experiences.

101.     Solar Titan has never been a member of the SEIA and has never otherwise partnered with the SEIA.

102.     The SEIA issued the Solar Titan Defendants a cease-and-desist notice demanding that Solar Titan stop making the false statement that the company was a SEIA partner.

103.     Another example of Solar Titan falsely claiming to partner with solar energy professionals is Solar Titan touting that the company is partnered with the North American Board of Certified Energy Practitioners ("NABCEP").

104.     Upon information and belief, Solar Titan is not partnered with NABCEP, though it has one employee, Kirkland, who is NABCEP-certified.

105.     However, Solar Titan proudly boasts on its website that it is a NABCEP partner. The below image was taken directly from Solar Titan's website:

## OUR PARTNERS

  

106.     Even though Kirkland has a NABCEP certification, she fails to comply with the obligations associated with being certified by NABCEP.

107.     According to NABCEP's website, NABCEP certifications "offer the public a high degree of protection because practitioners have to voluntarily meet standards and qualifications and pass an exam."

18

108.     Indeed, NABCEP certification requires certified professionals to abide by its Code of Ethics and Standards of Conduct to maintain certification. These standards include obligations by the certificate holder to, among other things:

- Deal with all clients, consumers, and other professionals and professional organizations fairly and in a timely manner;
- Provide safe and quality services to clients and consumers;
- Engage in moral and ethical business practices, including accurate and truthful representations concerning professional information and system performance expectations.

109.     As detailed below, Kirkland's involvement with Solar Titan violates nearly every ethical obligation imposed upon NABCEP certificate holders.

110.     Solar Titan sales representatives also mislead consumers about the qualities and characteristics of the solar system and installation services they are selling to consumers.

111.     For instance, during the presentation, the sales representative makes a pitch to the consumer that the money they would pay for the system is money that consumers would pay "anyway" towards their electricity bill. This is known as the "anyway money" sales pitch.

112.     Sales representatives use a sheet that purports to calculate the "anyway money" consumers could be spending on a solar system instead of their monthly electric bill. This misleads many consumers to believe they will, on average, pay the same amount each month for their solar system as it would cost to pay their electricity bill. A copy of the "anyway money" calculation sheet is reproduced on the next page:

19

Name_____          Date:_____

# ANYWAY MONEY

15 Years $ _____  Monthly Bill _____

30 Years $ _____  Monthly Bill _____

$_____ Prior 12 Month Avg Bill (If Available)        Average Monthly Kwh Usage _____

| Preferred | Suggested Smart Plans | Premier |
|---|---|---|
| **Up to 50% Annual Offset Consumption** <br> <u>without Battery</u> | | **Up to 90% Annual Offset Consumption** <br> <u>with Battery</u> |
| _____ | KW Size | _____ |
| _____ | Cost | _____ |
| _____ | 26 % Federal Tax Credit Refer to Energy.gov | _____ |
| _____ | Cost after tax credit | _____ |
| _____ | **With Tax Credit** <br> **(1st 18 Months )** | _____ |
| _____ | **Without Tax Credit** <br> **(After 18 Months)** | _____ |
| _____ | Homeowner's Signature | _____ |
| _____ | | _____ |
| Print Name         Date | | Print Name         Date |

### Which option works best for you to start off with Today?

*We suggest system sizes based on annual average consumption to start producing your own power. We recommend starting with the size system that is financially manageable for you

** All production estimates are based on annual averages; variances will occur with panel placement option and weather patterns

**What is a Tax Credit? Refer to Energy.gov**

113.     During the sales pitch, Solar Titan sales representatives also review the consumers' electric bills to determine their average monthly usage and costs. They typically suggest that they will choose a solar system size that will, at the very least, cut their electrical bill in half.  And they often promise consumers that these solar systems will almost completely eliminate their monthly electric bill.

114.     These are the same representations that Solar Titan makes to consumers on its website, stating that consumers can "Become a Power Producer and Save 50-90% off your Monthly Electric Bill."  One such advertisement is reproduced below:



115.     However, Solar Titan sales representatives routinely overstate the amount of energy the solar system will produce and the amount electrical providers will pay to buy back any

surplus energy the solar system produces, thus exaggerating the amount of energy bill savings consumers will realize from purchasing a Solar Titan system.

116.    Sales representatives also mislead consumers into thinking that the overall cost of the system will be reduced by 26% from a Federal Tax Credit.

117.    Sales representatives regularly omit material information about eligibility requirements for the Federal Tax Credit; for example, consumers may not qualify for the Federal Tax Credit if they do not have a tax liability in the year of purchase, or may only qualify for a lesser credit than the amount Solar Titan representatives described. Moreover, the consumer can only receive a maximum tax credit in the amount of their tax liability. Even if a consumer is eligible to claim the Federal Tax Credit, the nonrefundable credit can only be claimed once; therefore, if a consumer's tax liability the year the system was purchased is less than the tax credit they are entitled to, the consumer will not receive the full tax credit amount represented by Solar Titan employees.

118.    Additionally, many sales representatives emphasize a total purchase price that assumes the consumer received the Federal Tax Credit, suggesting that it is available to them regardless of whether the consumer qualifies for it.

119.    Solar Titan sales representatives also tell consumers that they will get buyback discounts and discounts from the Tennessee Valley Authority ("TVA"), even though many consumers do not qualify for such discounts.

120.    Solar Titan also claims it will coordinate everything for the consumer once the consumer has signed on the dotted line. This includes helping consumers procure financing, the labor for installing the solar system, having the electric company and any other governing body inspect the systems, and getting them connected so that they are generating power. When selling

the system, the representatives promise that Solar Titan is a full-service turnkey operation. The below is taken directly from Solar Titan marketing materials:



o Our team of professionals will begin processing your account.
HOA, Permits, Funding, Ordering, Utility paperwork, Etc.

121.    Yet many consumers have complained that Solar Titan goes weeks and sometimes months without even attempting to secure the proper permits or schedule an inspection. Many consumers report having to pull their own permits, get their own approvals, and schedule their own inspections to get their solar systems operational.

122.    The materials that Solar Titan gives consumers falsely boast that due to Solar Titan's "efficiencies," Solar Titan completes installations much faster than the purported six-to-nine-month national average. The below is taken directly from Solar Titan's marketing materials:



SOLAR TITAN USA

# Next Steps...

Updates or Questions during this process please call Customer Service at 865-392-1036

The National average for a solar installation from start to finish is 6 - 9 months. At Solar Titan USA, our efficiencies allow us to get the job done faster for many of our customers. However, to help you better understand what to expect, we want to give you a step-by-step layout of the process.

123.    Solar Titan representatives also misrepresent to consumers that it would take six to eight weeks or, at most, eight to twelve weeks for their solar system to be operational. Because of Solar Titan's inefficiencies, including its substandard installation practices and failure to coordinate with the LPCs as promised, the company rarely meets this timeline for installations.

124. For consumers who cannot afford to pay Solar Titan out of pocket, Solar Titan assures them they will only pay the finance company once the installation is complete. Solar Titan sales representatives fail to explain that by "complete," they only mean the solar panels are on top of the homeowner's roof, not that the system is connected and operational.

125. Solar Titan representatives also deceive consumers about the qualities and characteristics of the battery they sell consumers as an additional component to the solar system.

126. Solar Titan uses Generac Power Systems, Inc. ("Generac") as the company's primary battery supplier. Solar Titan purchases batteries from Generac and sells them to consumers.

127. Solar Titan makes a large profit from selling Generac batteries, and they add about $20,000 to the price of a Solar Titan solar system.

128. Solar Titan tells consumers that adding a battery to their system will give them access to a power source during a power outage. Although such batteries do store excess energy when installed properly, Solar Titan's substandard installation practices mean that consumers frequently cannot access the stored energy in the battery during a power outage.

129. Another example of Solar Titan's misrepresentations is that the company tells consumers that they will experience greater energy savings if they purchase a battery because they can "use stored power at night to reduce nighttime energy demands from the grid."

130. However, batteries do not increase the production of the solar system, and only store energy that the solar systems have produced beyond the consumers' usage; thus, if the consumer's solar systems produce less energy than the consumer uses, there will be no energy stored in the battery.

24

131.    Solar Titan sales representatives also do not disclose the amount of energy consumers lose when transferring energy to and from the battery.  Most consumers lose 10% of the energy they produce from their system when it is transferred to the battery and lose an additional 10% when it is transferred from the battery.

132.    When promoting the sale of batteries, Solar Titan suggests that consumers who lack a proper location inside their house to install it should place the battery outside instead. Solar Titan representatives fail to mention that Generac batteries will not function when subjected to external temperatures below 41 degrees Fahrenheit. Thus, the Generac batteries Solar Titan sells to consumers often will malfunction for several months out of the year.

133.    Solar Titan offers sales tax breaks, but only if the consumer agrees to purchase the system when the sales representative is making the pitch.

134.    Upon information and belief, Solar Titan makes up discounts to try to close the sale.  The company sometimes offers consumers what it calls a "Veteran's Discount," but the amount of the discount that it grants to each veteran who requests it is arbitrary.

135.    Solar Titan uses the "Veteran's Discount" and its emphasis on being a "Veteran-Owned Company" to target veterans and their families.

136.    After closing a sale, the Solar Titan sales representative has the consumer sign an agreement (the "Solar Titan Agreement") wherein the consumer agrees to pay Solar Titan for the system and installation services. The Solar Titan Agreement is one page with a front and back.

137.    The front page of the Solar Titan Agreement lists the purchase price for system and installation services, the buyer's name and address, the size of the system the consumer is purchasing, what type of roof the consumer has, and where the solar system will be mounted. At the bottom of Solar Titan's Agreement is a space for the consumer and the sales representative to

sign. Importantly, a notice of the buyer's right to cancel is not included on the front page of the contract or anywhere near the consumer's signature line, as required by law. Instead, that notice is buried in small print between several other contract terms on the back.

138. The back of this adhesion contract contains many important contractual terms, including terms about warranties, the arbitration clause, the right to cancel notice, and a term prohibiting the consumer from posting negative online reviews about the company.

139. The contractual terms printed on the back of the contract are written in eight-point font with no spacing and half-inch margins. A copy of the back page of the Solar Titan Agreement is reproduced on the next page:

26

10 year workmanship warranty 10-Year Limited Workmanship and Installation Warranty. Ideal Horizon Benefits, LLC/ Solar Titan USA. warrants that the System will be constructed and installed in a good workmanlike manner according to the standards of care and diligence generally practiced by solar engineering, construction, and installation companies when installing residential photovoltaic solar power systems of a similar size and type as the System in the geographic region where your Property is located, and pursuant to (i) good engineering design practices, (i) manufacturer's instructions, (ii) applicable law (including local codes and standards), (iv) required governmental approvals and permits, and (v) applicable requirements of the local utility. This 10-Year Limited Workmanship and Installation Warranty will extend for a period of ten (10) years from the date installation of the System is completed by Ideal Horizon Benefits, LLC.".

5 Year Roof Warranty with no Radius 5-Year Limited Roofing Penetration Warranty. Ideal Horizon Benefits, LLC/ Solar Titan USA warrants your roof against damage and water infiltration at each roofing penetration made by Ideal Horizon Benefits, LLC/ Solar Titan USA in connection with the installation of the System and the surrounding area of each such penetration (collectively, the "Covered Roof Areas"). Ideal Horizon Benefits, LLC/ Solar Titan USA will repair damage to your roof and repair or compensate You for actual physical damage to your property resulting from any water infiltration in the event of failure or defects in the Covered Roof Areas. Customer understands that any modifications not performed by The Ideal Horizon Benefits/ Solar Titan USA or Authorized agent will render all warranties null and void

Proposal Requirements

Regulation Z disclosure: "The first monthly payment on the loan is due approximately 60 days after installation. The calculation of the monthly payments for the first 18 months following installation (which includes the first 17 payments) (the "Initial Period") assumes that you will pay down the loan during the Initial Period by 26%. If you make aggregate principal payments in such amount during the Initial Period, your monthly payments following the Initial Period will remain the same as during the Initial Period. If during the Initial Period you elect to pay principal in any amount that is less than 26% of your loan amount, your monthly payment beginning upon conclusion of the Initial Period and throughout the rest of the term of the loan will be increased to amortize the full principal loan balance (which would be greater than the originally assumed amount) over a period which is effectively 18 months shorter. Conversely, if you pay down greater than 26% of the principal balance during the Initial Period, your monthly payments following the conclusion of the Initial Period will be reduced to reflect the payment of a lesser principal balance than originally assumed for the balance of the term. Please carefully review the details of your loan, including the payment amounts, provided in your loan agreement." Tax Credit Disclosure: As the purchaser and owner of a solar photovoltaic system, you may qualify for certain federal, state, local or other rebates, tax credits or incentives (collectively, "incentives"). If you have any questions as to whether and when you qualify for any Incentives and the amount of such Incentives, please consult and discuss with your personal tax or financial advisor. [Installers] make no representation, warranty or guaranty as to the availability or amount of such incentives

The buyer(s) listed above hereby jointly and severally agree to purchase the goods and/or services listed, in accordance with the prices and terms described on the front and reverse side of this agreement. Buyer(s) have requested that such goods or services be installed or provided at the buyer(s) address listed on the front side of this agreement. Ideal Horizon Benefits, LLC/Solar Titan USA hereby agrees to install or cause to be installed the goods or services listed in the agreement, at the buyer(s) address listed on the front side of this agreement. The buyer(s) agrees to pay the cost of goods and service purchased as described herein. The buyer(s) accept such financing agreement for the purchase as is contained on separate financing documents. Buyer(s) agrees to allow reasonable access to the property in the area on which is contracted, and the work will be performed, including access to all electrical outlets as may be required by the contractor. Manufacturer warrants function and reliability of the solar panels. Installation contractor warrants all labor and specific penetration points for 60 months. There are no implied warrants other than those stated in writing by the manufacturer of the panels provided. In the event that the owner fails to provide payment as required upon completion of the installation of the panels, Ideal Horizon Benefits, LLC/ Solar Titan USA has the right to remove panels. In the case of this transaction being a cash or financed transaction, Ideal Horizon Benefits, LLC/ Solar Titan USA all rights to remedy payment in full as well as all additional means available under state law. Final payment shall be made the day of completion if a cash transaction. Financed agreements must be signed off via email or verbally confirmed on the same day as the installation with the given financing company. The owner shall provide Ideal Horizon Benefits, LLC/ Solar Titan USA a written description of work believed by owner to be defective or incomplete within 24 hours of completion. Ideal Horizon Benefits, LLC will repair or correct or complete the work included in their written description if deemed appropriate.

Buyer(s) agree to pay any expenses incurred by Ideal Horizon Benefits, LLC/ Solar Titan USA to collect any unpaid balance including attorney's fees. The Buyer(s) have the right to cancel this agreement by midnight on the third business day following the date on the front of this agreement, written cancellation by email to info@theidealhorizon.com or, by U.S. Certified mail, addressed to Ideal Horizon Benefits, LLC/ Solar Titan USA are the only two forms of accepted notification. The request for financing with the finance company will be made by Ideal

Horizon Benefits, LLC/ Solar Titan USA following the receipt of this request within the agreed upon and given timeframe.

If financing terms have been approved, materials ordered, and buyer(s) attempt to cancel subsequent to midnight of the third business day after the date of the arrangement, and Ideal Horizon Benefits, LLC/ Solar Titan USA agrees to accept such late cancellation, then buyer(s) agrees to pay Ideal Horizon Benefits, LLC/ Solar Titan USA a cancellation fee equal to 30% of the purchase price to offset a portion of materials, labor and administrative costs.

If buyer(s) are in default of the Agreement, Buyer(s) agrees to pay Ideal Horizon Benefits, LLC's/ Solar Titan USA's attorney fees equal as otherwise allowed by law. Buyer also agrees to pay any other costs or expenses of repossession, collection, or realization on a security including court costs, to any extent not prohibited by law. If financing is involved with this purchase agreement and buyer does not complete the purchase, the loan and documents will be adjusted to thirty percent of purchase price as agreed within the terms and conditions of the cancellation of this agreement. The buyer(s) agree to sign the new loan documents with this adjusted amount.

Arbitration of Disputes: Ideal Horizon Benefits, LLC/ Solar Titan USA and buyer(s) agrees that any and all disputes, claims, or controversies, arising under or relating to the contract and any related documents, loans, security instruments, accounts, including by way of example and not as a limitation: (I) the relationships and the transaction arising from this contract; (II) The terms of this contract, (III) the validity of this contract or the validity or enforceability of this arbitration agreement, shall be subject to binding arbitration to be determined by one arbitrator, in accordance with and pursuant to the then prevailing rules and procedures of commercial rules of the American Arbitration Association, to be held and arbitrated in a judicial district in which the buyer resides. The buyer agree that they will not assert a claim on the behalf of, or as a member of, a group or class period the findings of the arbitrator and any award or finding of the arbitration will be specifically enforceable under the prevailing law of any court having jurisdiction. Notice of the demand for arbitration will be filed by the party asserting the claim with the other to the contract and with the American arbitration Association. Any arbitration proceeding brought under this contract, and any award, finding or verdict or from such proceeding shall remain confidential between the parties and shall not be made public. Both buyers and Ideal Horizon Benefits, LLC are hereby agreeing to use arbitration rather than litigation or some other means of dispute resolution, to address their grievances or alleged grievances. By entering into this contract and this arbitration provision, both parties are giving up their constitutional right to have any dispute decided in a court of law before a jury, instead are accepting the use of arbitration, other than set forth immediately.

The buyers agree that Ideal Horizon Benefits LLC/ Solar Titan USA may utilize photographs of property and installation on social media and in promotional advertising. Buyer(s) grant Ideal Horizon Benefits, LLC/ Solar Titan USA the right to place signage on the property during the installation process. Buyer agrees not to use any form of social media to express their opinion that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits. Breaching acceptance of this clause by buyer can and will deem monetary compensation benefits to Ideal Horizon Benefits, LLC/ Solar Titan USA. Buyer(s) clearly understands that standard solar systems do not include a battery backup or generator unless specifically added and written in detailed notes.

Any previously existing electrical code violations that require additional labor to be compliant will be covered by the homeowner not Ideal Horizon Benefits, LLC/ Solar Titan UAS. Rebates and incentives: Ideal Horizon Benefits, LLC/ Solar Titan USA and buyer(s) agree that any rebates, tax credits and power company incentives are not guaranteed by Ideal Horizon Benefits, LLC/ Solar Titan USA all items known to exist to the best of our knowledge will be presented but it is the responsibility of the buyer(s) to ensure incentives are available and they will qualify. There are qualifications for all programs and if the buyer(s) do not qualify or if the item is unavailable at the time of application, Ideal Horizon Benefits, LLC/ Solar Titan USA will not be held liable. All examples and recommendations by energy sales consultants are explicitly deemed as an example and figures. There are many variables and usage, weather patterns, electricity company programs, etc. Buyer(s) in no capacity shall hold Ideal Horizon Benefits, LLC/ Solar Titan USA liable for actual production of the system or expectation. Delay: Unknown conditions: Events beyond the control of the contractor, such as power company delays, homeowner Association delays, acts of nature, labor strikes, act of God, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, general shortage of labor, equipment, materials or supplies in the open market, failure of transportation, lock out, action of labor unions, condemnation, requisition, order of government or civil or naval authorities, pandemics, inclement weather, terrorism. buyer(s) inability to qualify for or obtaining financing, or other events resulting and delays in performance of this agreement do not constitute abandonment or a breach by Ideal Horizon Benefits, LLC/ Solar Titan USA and are not included in the circulation time frames for performance by Ideal Horizon Benefits, LLC/ Solar Titan USA In the event that Ideal Horizon Benefits, LLC/ Solar Titan USA determines that this agreement cannot be performed as intended by the parties due to incorrect pricing/ measurements, unforeseen structural defects or pre existing conditions to the buyer's property, Ideal Horizon Benefits, LLC/ Solar Titan USA may cancel this agreement within 90 days of its execution notify the buyer(s) of such cancellation in writing, and return all monies paid by the buyer(s).

## D. FINANCING THE LOAN

140.     Most consumers sold Solar Titan solar systems cannot afford to pay out of pocket the price for the company's solar system and installation services.

141.     Solar Titan, as a seller of solar systems, has business relationships with financing companies to ensure consumers can fund Solar Titan's products and services.

142.     Mosaic is Solar Titan's primary lending partner.

143.     Upon information and belief, an agreement between Solar Titan and Mosaic ("Merchant Agreement") allows Solar Titan sales representatives to help consumers apply for loans with Mosaic. Mosaic then transmits money directly to Solar Titan after Solar Titan shows that certain requirements ("also known as stipulations" or "stips") have been met.

144.     At or around the same time the consumer signs the Solar Titan Agreement, the sales representative helps the consumer apply for financing and leads the consumer through the process of getting approved.

145.     The sales representative completes an online application on behalf of the consumer using an electronic device; this is sometimes a tablet, and sometimes just a mobile phone.

146.     The consumer must have an email address to apply for financing.

147.     When consumers do not have an email address, the sales representative is trained to create an email address on behalf of the consumer.

148.     The consumer usually does not receive paper copies of the loan paperwork, but only receives them via email.

149.     In order to get approval, the sales representative helps consumers fill in their identifying information and income information online.

150.    Solar Titan trains its sales representatives to inflate the credit applicant's household income section if it is believed the consumer would not be approved based on their actual household income.

151.    Upon information and belief, Kelley has trained or told sales representatives to inflate credit applicants' income so that Solar Titan's finance partners will approve the consumer's application for a loan.

152.    The Solar Titan sales representative informs the consumer if they are approved for a loan with Mosaic during the sales presentation.

153.    After learning that the loan amount is approved, some sales representatives have consumers sign the loan agreement with Mosaic ("Mosaic Agreement") on the spot. The Mosaic Agreement includes the required TILA disclosures, which show the annual percentage interest rate ("interest rate"), finance charge, amount financed, total amount of payments, and number of payments.

154.    The sales representative controls access to the tablet, phone, or computer which has the screen with the TILA disclosures, and sales representatives often have consumers sign the loan terms with Mosaic before consumers have a chance to review the disclosures.

155.    Other times, the sales representative leaves the consumer's home before financing is finalized with Mosaic. In these cases, the sales representative can tell the consumer the interest rate and the monthly payment amount but does not disclose the total amount the consumer will pay on the loan after the interest rate and other charges are applied.

156.    If the sales representative leaves before the consumer signs the Mosaic Agreement, Mosaic emails the consumer to finalize the loan consummation process.

29

157.    Mosaic representatives also perform a "welcome call" with the consumer to review the loan terms, including the finance charge, interest rate, and the total amount of payments; however, Mosaic typically completes this call only after consumers are already bound to the purchase price in the Solar Titan Agreement. Some consumers are also bound to the Mosaic Agreement terms well before Mosaic's "welcome call" because they have already signed it from the sales representative's tablet or phone.

158.    When promoting itself to retail partners like Solar Titan, Mosaic boasts about how easy it is for consumers to get credit approval from the company because of its low stipulation rate. The below image was taken directly from Mosaic's website:

 

## MOSAIC QUICK REFERENCE GUIDE

| 600 FICO Floor | $175,000 Max Approval Amount | Low Stip Rate |
|---|---|---|
| **Soft Credit Check** | **No DTI** | **Fast Stip Resolution** |
| Hardens only when the borrower decides to move forward and loan is funded | Debt to income is not evaluated as part of the credit decision | Over 90% of stips are reviewed in less than 10 minutes! |
| **Household Income** | **No LTV** | **Loans For Non-Primary Residences** |
| Every resident of the home benefits from the solar system. Every resident's verifiable income can be included. | Underlying credit decision not subject to Loan to Value | Second homes, vacation homes, and investment properties are all eligible — borrower must be on title |

159.    Boasting its "low stip rate" is a way for Mosaic to say that it has minimal requirements to approve a consumer's loan application.  For example, as shown above, Mosaic

does not look at a consumer's debt-to-income ratio, which is a commonly used indicator of a consumer's ability to repay their loans.

160.     Mosaic also looks at the income of every person in the household. Upon information and belief, they consider every household member's income without ensuring that the household member has agreed to accept responsibility for repaying the loan.

161.     The fact that Mosaic has a "low stip rate" as compared to other finance companies is used as a major selling point in Mosaic's marketing to companies like Solar Titan. Solar Titan prefers Mosaic because of its high approval rate for loan applications.

162.     Although Mosaic's website claims to require verifiable income, Solar Titan's practice of routinely inflating consumers' income on their applications suggests that Mosaic does not carefully verify consumer income, but may be complicit in Solar Titan's inflation of consumer income for consumer loan applications.

163.     Mosaic's "low stip rate" and "fast stip approval," along with the fact that Mosaic does not evaluate a consumer's debt-to-income ratio or the product's loan-to-value ratio, is indicative of its lack of due diligence.

164.     Although the majority of Solar Titan consumers need financing to purchase the solar systems, some can pay for the systems by writing a check.

165.     In these instances, Kelley trained Solar Titan sales representatives to take the check to a U.S. Bank location for immediate deposit. Former Solar Titan sales representatives have told the Plaintiffs that they believe such checks are deposited into an individual account (not a Solar Titan account) and that the name on the account is not a name known to be associated with Solar Titan.

## E. MOSAIC

166.    Per the Merchant Agreement, Mosaic agrees to pay Solar Titan the amounts Solar Titan charges consumers for its "turnkey" operation.

167.    Through the parties' partnership, Mosaic authorizes Solar Titan representatives to help consumers fill in Mosaic's proprietary credit applications, walk consumers through Mosaic's financing process and requirements, and consummate the transactions that obligate consumers to payment terms under the Mosaic Agreement.

168.    Solar Titan representatives help Mosaic decide upon a consumer's monthly payment obligation to Mosaic, which they typically set to mirror the amount of that consumer's average electric bill.

169.    Solar Titan and Mosaic try to make the monthly financing payment mimic the consumer's monthly electric utility bill because consumers are told that they will no longer have to pay the electric utility bill once the solar system is installed.

170.    Per the parties' partnership, Solar Titan representatives also direct consumers on the type of loan product Mosaic will use for the consumer. For example, most or all of the loans that Mosaic funds for Solar Titan require the consumer to make a prepayment(s) towards the beginning of the loan in order to avoid re-amortization with a higher monthly payment.

171.    Solar Titan represents that consumers are eligible for a Federal Tax Credit, and Mosaic roughly calculates the prepayment(s) based on the amount the consumer would receive if they were to qualify for that credit. Under the agreement, the consumer is to apply the Federal Tax Credit to the loan as prepayment(s) to reduce their overall obligation to Mosaic. However, many consumers are not actually eligible for this credit and thus cannot make the prepayment(s) to reduce their loan balance. If a consumer fails to make this prepayment within the first eighteen

32

months of the loan, the consumer's monthly loan payment increases under the terms of the loan agreement. Provisions of the Mosaic Agreement explaining this prepayment(s) are reproduced below:

> You acknowledge that in order to avoid an increase in your Monthly Payment, you must make one or more voluntary prepayments equal to approximately **26%** of your Total Loan Amount within 18 months following your Loan Start Date. So long as you are not in default under this Agreement, and provided that you reduce your unpaid Total Loan Amount to the Principal Balance Target by the Re-amortization Date by making sufficient voluntary prepayments, your monthly payment will not increase. If you pay more than **26%** of your Total Loan Amount, your monthly payments will be adjusted to a lower amount. If you do not make any prepayments, or if your prepayments are less than **26%** of your Total Loan Amount, your monthly payments will be adjusted to a higher amount.

> **Loan Re-Amortization at Eighteen Months**
> Your Loan will automatically re-amortize on the Re-amortization Date stated on the Summary Page. This re-amortization event will take place 18 months after the Loan Start Date. During the re-amortization, the monthly loan payment will be adjusted in a manner to fully repay the Loan by the Maturity Date. Any new adjusted monthly loan payment will become due on the 19th month after the Loan Start Date. You are strongly encouraged to review the monthly loan statements to stay informed about the Re-amortization Date of the Loan and any adjustments to the monthly loan payments. Please note that the re-amortization of the Loan and any adjustments to the monthly loan payment amount assumes you are not in default or in breach of this Loan Agreement.

172. The prepayment(s) is often approximately 26%-30% of the total loan amount. Consumers are told that the Federal Tax Credit for residential solar systems is also 26%-30% of the system's cost.

173. Consumers are signed up with the prepayment loan structure regardless of whether they are likely to qualify for the Federal Tax Credit because Solar Titan largely relies on the promise of a tax credit and lower monthly loan payments as one of its main selling points.

174. The prepayment(s) loan structure further misleads consumers to believe they will qualify for the Federal Tax Credit.

175. In accordance with the Merchant Agreement, Mosaic transmits payments directly to Solar Titan in separate installments for the amounts Solar Titan charges the consumers. Mosaic remits the installment payments to Solar Titan after it performs certain steps or stipulations associated with a given consumer. Solar Titan and Mosaic refer to the stipulations that Solar Titan is supposed to complete as "Milestones."

33

176.    Similar to Mosaic's low stipulation rate for approving consumers' loan applications, the company's "Milestones" for funding a loan are also less rigorous than those used by other lenders in the residential solar industry.

177.    To complete the first Milestone, Solar Titan informs Mosaic that the consumer has signed the Solar Titan Agreement. Solar Titan also shares a copy of the consumer's signed Solar Titan Agreement. Once this Milestone has been met, Mosaic transmits the first installment payment to Solar Titan.

178.    Former Solar Titan employees have cautioned Kelley and Kirkland that Solar Titan should not seek funding from Mosaic until a consumer's statutory right of cancellation has expired.

179.    Despite these warnings, Kelley and Kirkland require their employees to get the first round of funding from Mosaic as soon as possible.

180.    In fact, the Solar Titan Defendants have hired employees for the sole purpose of submitting Solar Titan Agreements to Mosaic and meeting its first Milestone as soon as possible.

181.    If a consumer signs these agreements after business hours, Solar Titan employees submit these Agreements to Mosaic first thing the next morning. These employees are also expected to work weekends to ensure Solar Titan receives its first installment payments as soon as possible.

182.    Mosaic knows or should know when a consumer's three-day right to cancel has expired because the Solar Titan Agreements are dated. Mosaic should not fund a purchase before the consumer's statutory right of cancellation has expired, but routinely does so.

34

183.    For Solar Titan to complete the second Milestone and receive the second loan installment payment from Mosaic, Solar Titan is only required to meet Mosaic's insubstantial installation requirements.

184.    Solar Titan's completion of the second Milestone does not require Solar Titan to fully complete the installation such that the system is operational; instead, Mosaic considers the second Milestone complete when the solar panels are placed on a consumer's roof.

185.    This Milestone also triggers the beginning of the consumer's loan repayment obligation. Mosaic requires a consumer to begin repaying the loan fifteen days after Solar Titan reports that the solar panels have been placed on the consumer's roof.

186.    Initially, Solar Titan had to complete three Milestones before receiving full funding for a given loan: (1) submit the installation agreement; (2) show the panels are on the roof; and (3) submit the interconnection agreement between the consumer and the consumer's LPC. The interconnection agreement is a prerequisite to a solar system becoming operational.

187.    Because Mosaic initially required Solar Titan to show that the installed system had permission to operate from the consumer's LPC, Mosaic knew or should have known that Solar Titan's installation-related shortcomings were delaying its systems actually becoming operational.

188.    Despite knowing that Solar Titan frequently failed to get solar systems operational prior to consumers' first loan payments coming due, Mosaic eliminated the requirement that Solar Titan completes the third Milestone before fully the consumer's loan.

189.    Rather than requiring Solar Titan to complete all three Milestones, Mosaic began to fully fund the loan after Solar Titan achieved the first two Milestones. In other words, Mosaic

disburses the consumer's loan proceeds to Solar Titan even before the consumer receives an operational solar system.

190.    This incentivizes Solar Titan to merely install some components of the solar panels without taking the additional steps to make the system operational.

191.    At one time, Mosaic required Solar Titan to submit photographs showing that the solar panels had been installed on the homeowner's roof, but Mosaic has even dropped that requirement and now Solar Titan only needs to click a button to attest that an installation is complete.

192.    Solar Titan Defendants and Mosaic fail to inform consumers that they may be required to make payments to Mosaic before their systems are operational. Solar Titan represents to consumers in written advertisements and in person that they will experience large savings on their electric bill when they purchase a Solar Titan system.

193.    When Solar Titan fails to fully complete a solar system installation within 120 days of the Solar Titan Agreement being signed, Mosaic is supposed to rescind or "claw back" the disbursements it made to Solar Titan. Mosaic regularly fails to claw back these payments, creating another incentive for Solar Titan to focus on procuring new customers without completing the installations for consumers the company has already signed up and for whom they have received funding.

194.    Mosaic has reduced the Milestones Solar Titan must complete before receiving loan disbursements because Mosaic makes substantial profits from Solar Titan's sales.

195.    Per the Mosaic Agreement, Mosaic can, if it chooses, undertake to complete an incomplete installation if the consumer faces significant delays in having their solar system made operational.

36

196.    Despite receiving numerous complaints from Solar Titan customers about inoperable systems, Mosaic rarely, if ever, assists the consumer to make the solar system operational. Instead, Mosaic treats the complaints as a dispute between Solar Titan and the homeowner and continues to demand payment from the consumer.

## F. TENNESSEE CONSUMERS

197.    Solar Titan's unfair and deceptive business practices have affected hundreds of consumers.

198.    Solar Titan maintains an 'F' Rating with the Better Business Bureau because of numerous consumer complaints, delayed or non-response to complaints, and consumers' dissatisfaction with Solar Titan's failure to address issues.

199.    At least 123 consumers have complained to the BBB about Solar Titan. These complaints were from consumers in Tennessee, Kentucky, and the neighboring states where Solar Titan sells solar systems.

200.    Kelley and Kirkland are aware of the pattern of complaints from consumers to the BBB because they met with Tony Binkley, CEO of the BBB of Greater East Tennessee, about the BBB complaint process and the large number of complaints lodged against the Company. After that meeting, upon Kirkland's request, the BBB started emailing new consumer complaints directly to Kirkland.

201.    To date, the Tennessee Division of Consumer Affairs ("DCA"), Tennessee's clearinghouse for consumer complaints about unfair or deceptive acts or practices, has received 72 consumer complaints about Solar Titan.

202.    DCA received 66 consumer complaints about Solar Titan in 2022 alone.

37

203. Complaints to DCA typically concern at least one of three issues:

    a. Solar Titan induced the sale by exaggerating the consumer's energy bill savings;

    b. Solar Titan failed to timely install the solar system, and/or the workmanship on the installation is substandard and thus it failed inspections;

    c. Solar Titan incorrectly represented that the customer would be eligible for tax credits to offset the cost of the solar system.

204. Some consumers even complain that Solar Titan has installed their system without making the consumer's local power company aware that the installation is occurring. For example, Tennessee consumer Billy Graves had a solar system from Solar Titan installed on his house; however, Solar Titan made no attempt to have the local utility company install the proper "bi-directional" meter before turning on his system.

205. Mr. Graves had to call the local utility company himself to come out and install the correct meter. Mr. Graves is under the impression that his local utility company was unaware that the Solar Titan installation was taking place before it was completed.

206. Tennessee consumers also complain that Solar Titan sales representatives falsely say consumers are eligible for net metering or "buyback" programs that would further offset the consumer's energy bill each month. In Tennessee, no local utility company offers residential buybacks.

207. Tennessee consumer Jonathan Snow purchased and financed a Solar Titan solar system because Solar Titan told him that TVA would buy back the excess power produced by his panels.

38

208.    Mr. Snow, who uses Mosaic as his finance company, had to begin making monthly payments even before his system was operational.

209.    Mr. Snow called Solar Titan and spoke with Kirkland and Kelley. During his conversations with Kirkland and Kelley, they represented themselves as the owners of Solar Titan.

210.    Mr. Snow complains that he paid for a solar system that was not operational. When he complained to Kirkland and Kelley, they said the contract he signed obligates him to start making monthly payments when the panels are "installed," not when the system is operational. Like many consumers, Mr. Snow was not told this during his sales presentation.

211.    Once his system became operational, Mr. Snow inquired with Kirkland about what was needed to sign up for the TVA buyback program Solar Titan talked about during the sales presentation.

212.    Kirkland told Mr. Snow that signing up for the buyback program was not worth doing because he would have to have a special meter installed on his property.

213.    Mr. Snow also complained to Kelley about the many misrepresentations the company made to him and the fact that Solar Titan was not coordinating with the local power company. Mr. Snow told Kelley that he intended to post negative reviews online.

214.    In response to Mr. Snow's complaints, Kelley told Mr. Snow he is legally prohibited from posting negative online reviews under the terms of the Solar Titan Agreement.

215.    Mr. Snow was surprised to see that his Solar Titan Agreement contained a provision prohibiting him from "[using] any form of social media to express opinions that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits LLC/Solar Titan USA LLC...".

39

216.	Mr. Snow has abstained from posting negative online reviews out of fear of breaching the contract he signed with Solar Titan.

217.	Other consumers complain about faulty equipment Solar Titan sells consumers.

218.	For example, Knoxville resident Bruce Whitehead paid Solar Titan for a battery with his solar system because he was told the battery would help keep his refrigerator running even during interruptions in service from the utility company.

219.	Solar Titan misled him about the availability of power from the battery when the power grid is down.

220.	Also, the battery that Solar Titan sold Mr. Whitehead does not work when it is colder than 41 degrees Fahrenheit outside.

221.	The fact that the battery would not provide electricity when the grid was down or in cooler temperatures is problematic for Mr. Whitehead, who wanted a reliable power source for the refrigerator where he keeps his diabetic son's medicine.

222.	Although Solar Titan knew or should have known about this limitation of the batteries the company sold Mr. Whitehead, Solar Titan did not disclose that information to him.

223.	Another Tennessee consumer, Ronnie Smith, complains that Solar Titan's solar system installation caused his roof to leak.

224.	Mr. Smith previously complained about the issue to Solar Titan, but Solar Titan refused to fix the leaks.

225.	The Solar Titan Agreement contains a workmanship warranty and a roof warranty, but Solar Titan routinely refuses to honor those warranties.

226.	Mr. Smith, who also uses Mosaic as his finance company, further complains that he was never given a copy of his Mosaic Agreement.

227. Solar Titan promised Mr. Smith that his electric bill would decrease by over 50%, but Mr. Smith has not seen any significant decrease in his monthly power bill.

228. Many Tennessee consumers complain that they attempted to cancel their contracts with Solar Titan within the statutory three-day cooling-off period, but Solar Titan has refused to honor their right to cancel.

229. On August 27, 2022, pursuant to TENN. CODE ANN. § 47-18-106, the Office of the Tennessee Attorney General conducted an oral examination of Sarah Dorismar, Solar Titan's former Finance and Administration Manager. The Office of the Tennessee Attorney General refers to this investigative oral examination as a Sworn Statement.

230. A Sworn Statement is given under oath and is subject to the penalties of perjury.

231. Ms. Dorismar stated that Solar Titan routinely refused to honor cancellations made within the TCPA, KCPA, and TILA's statutory three-day cooling-off period.

232. In fact, Kelley and Kirkland only allowed Ms. Dorismar to process three to four cancellations per week, even though Solar Titan had a backlog of over 90 consumers who had properly requested cancellations.

233. Consumers who did not have their cancellations processed were still billed by Mosaic.

234. Consumer Charles Oschner timely sent his cancellation notice to the address specified in the Mosaic Agreement, but both Solar Titan and Mosaic initially refused to honor his cancellation.

235. Despite canceling the loan in February 2022, Mosaic withdrew money from Mr. Ochsner's bank account in May 2022. Mr. Ochsner did not even have a solar system installed on his property when Mosaic withdrew this money.

41

236.    Despite his protests to Mosaic and Solar Titan, Mosaic again withdrew money directly from his bank account in June 2022 and July 2022.

237.    After three months of complaints from Mr. Ochsner to Mosaic and Solar Titan, Mosaic finally stopped withdrawing money from Mr. Ochsner's bank account.

## G. KENTUCKY CONSUMERS

238.    Solar Titan has also used misrepresentations to induce transactions with Kentucky consumers. These misleading and/or false representations include, but are not limited to, the following:

a.  exaggerating consumers' energy bills savings if they switch to solar energy,

b.  misrepresenting consumers' eligibility for the Federal Tax Credit, and

c.  giving incorrect information about how long the installation process will take, and that if they financed the purchase, they are only obligated to make payments to the finance company when the system is operational.

239.    For example, one consumer, M.C., agreed to pay $36,000 for his solar system after Solar Titan's sales representative promised he would receive an 85% reduction on his electric bill. However, after the panels were installed, that consumer only saw a reduction in his electric bill of, at most, 20%.

240.    Solar Titan also told J.C. and C.C. that they were guaranteed to receive a $6,000 Federal Tax Credit for the solar system that was sold to them for $36,800. However, J.C. and CC received less than $6,000 for their tax credit. Because their loan with Mosaic required a prepayment of $6,000, J.C. and C.C.'s monthly payment increased when Mosaic re-amortized their loan after eighteen months.

241.    J.C. and C.C. also asked Mosaic to delay their payment start date because they were scheduled to start making payments in February 2021, but their solar system was not fully installed until April 2022.

242.    Mosaic refused to push back the start date for their first monthly payment. During the time that they paid Mosaic while seeing no reduction in their monthly electric bill, they paid a combined monthly total of about $400-$500 towards their electrical expenses.

243.    Moreover, Solar Titan sold a Generac battery to J.C. and C.C. without disclosing that the battery would not work when the battery reached temperatures below 41 degrees Fahrenheit. Thus, for several months every year they cannot store energy or use energy previously stored on their batteries.

244.    As another example of Solar Titan using false representations regarding consumers' eligibility for Federal Tax Credits, a Solar Titan sales representative guaranteed Kentucky consumer O.E. that she would receive a 26% Federal Tax Credit on her system that she purchased for $30,500. However, O.E. did not qualify at all for the Federal Tax Credit.

245.    Additionally, O.E.'s solar system is still inoperable as of January 2023 because Solar Titan has failed to fully complete the installation. O.E. purchased her solar system in July 2021, and her monthly payments to the financing company began in November 2021. By purchasing a solar system from Solar Titan based on the company's false representations, O.E. has doubled her monthly electric expenses. Solar Titan promised O.E. her electric bill would be eliminated, but instead O.E. is paying double what she was paying for electricity before.

246.    When Kentucky consumers B.K. and T.K. attempted to cancel their contract because they received a poorly functioning solar system, Solar Titan told them they are still bound

to the contract and are required to pay Solar Titan's sales price for its solar system and "turnkey" services.

247.     Solar Titan has made no effort to remedy the problems B.K. and T.K. are experiencing, despite the fact that the Solar Titan Agreement contains a ten-year workmanship warranty and the panels they install contain multiyear product performance warranties.

248.     Solar Titan has done more than inflict financial harm but has also caused consumers to bear the emotional toll stemming from the financial stress. One heartbreaking example is that of S. N., whose seven-year-old daughter overheard her crying when she realized that she would not be able to buy her children Christmas presents because she had no savings left after having to make her monthly solar loan payments on top of her utility bill.

249.     The examples provided above are non-exhaustive illustrations of the harm caused by Solar Titan's and Mosaic's business practices in Kentucky. Since Solar Titan began selling to Kentucky consumers and facilitating Mosaic's loans, the Kentucky Office of the Attorney General (KYOAG) has uncovered more than 90 complaints about Solar Titan's unfair, deceptive, and abusive marketing and sales acts and practices either submitted by consumers directly or obtained by the KYOAG over the course of its investigation into Solar Titan and Mosaic.

**H.  INSTALLATIONS AND PERMITTING**

250.     Consumers are not the only ones who have had problems with the Solar Titan Defendants.

251.     LPCs and inspection authorities have voiced numerous concerns about Solar Titan's business practices and the quality of their work.

252.     As previously mentioned, Solar Titan offers consumers a "turnkey" solar system. This means that Solar Titan agrees to handle all the permits and inspections required to complete the installation and make the system operational.

253.     Such a commitment requires Solar Titan to work closely with LPCs when completing these installations and to ensure that all requisite paperwork is provided in a timely fashion.

254.     Though the procedures may vary slightly between LPCs, each LPC has basic requirements and steps that the installer must follow.

255.     For example, in order to get a system approved and operational in Knoxville, Solar Titan must first send the Knoxville Utility Board ("KUB") a drawing of the system, an equipment "cut-sheet," and the model number(s) of the battery and/or equipment to be installed on the consumer's house.

256.     KUB then reviews these submissions and, if approved, requires submission of an interconnection application. Because Solar Titan promises to coordinate permitting and inspections with the LPC, the company should facilitate the submission of the interconnection application.

257.     After KUB approves an interconnection application, Solar Titan is then to apply for all requisite permitting; this is a process that can be done online.

258.     After obtaining permits, Solar Titan can proceed to installation. But before a consumer's system can start working, Solar Titan must arrange for a final safety check with KUB. KUB also verifies that an electrical inspection has been completed and that the system has passed inspection.

45

259.    If the system passes the electrical inspection and KUB's safety check, a KUB technician installs a bi-directional meter on the consumer's home; after that, the system can be safely turned on.

260.    According to KUB, Solar Titan often completes its installations before even notifying KUB that the consumer is having a solar system installed at their house.

261.    When KUB is not notified in advance that an installation is complete, KUB has no opportunity to install a bi-directional meter and thus does not know that the solar system is producing energy. Bi-directional meters are required so the LPC can see when "back-feeding"[5] is occurring. Without bi-directional meters, KUB electrical staff who are working on the power lines during an outage may be unaware that energy is flowing from a home to the electric grid, putting them at risk of being electrocuted.

262.    Also, without the proper bi-directional meter installed, back-feeding will cause any excess generation from a consumer's solar system to be added to the consumer's bill as consumption. This is because the typical meter installed cannot properly account for forward and reverse electrical flow, and instead counts both forward and reverse flow as the same.

263.    KUB representatives have also expressed concerns over the way Solar Titan treats its consumers.

264.    KUB estimates that it receives complaints from half of Solar Titan customers. Many complaints involve issues like the consumer's difficulty reaching Solar Titan staff, the company's lack of responsiveness, the inexplicable delays in getting paperwork submitted, and the company's failure to complete the installation.

---

[5] Back-feeding refers to the flow of power from the electrical circuits of a house to the utility lines, rather than in the normal direction from the utility lines to the electrical circuits of the house.

46

265. KUB's most common consumer complaint is that the solar system is not producing what was promised by Solar Titan's salesperson.

266. When KUB receives these complaints, they sometimes learn that Solar Titan has falsely blamed the solar system's underperformance on a malfunctioning KUB meter.

267. TVA representatives have also expressed concerns about Solar Titan installations.

268. TVA is a U.S. Government Agency and public company created by the U.S. Congress in 1933 to control floods, improve navigation and the living standards for farmers, and produce energy along the Tennessee River and its tributaries.

269. Today, TVA provides electricity to 153 LPCs across Tennessee and parts of six of the surrounding states.

270. TVA operates a program known as the Green Connect Quality Contractor Network ("QCN"). The QCN helps consumers find "trustworthy licensed and insured contractors trained to meet TVA's quality guidelines."

271. In exchange for being a part of the program and agreeing to abide by the program's rules and guidelines, TVA gives installers a one-time $250 payment for each installation.

272. TVA received so many complaints about Solar Titan from local power companies and consumers that it dropped Solar Titan from its QCN program.

273. Despite being removed from TVA's QCN program, Solar Titan continued to represent itself as a "TVA partner," prompting TVA to send the Solar Titan Defendants a cease-and-desist letter demanding that the company stop making this misrepresentation.

274. Middle Tennessee Electric Membership Corporation ("MTE"), Tennessee's largest electric cooperative responsible for providing electricity to more than 750,000 Tennesseans, has also complained about issues with Solar Titan.

47

275. Like KUB, MTE requires the submission of drawings and an interconnection application before the solar system installation can begin. Like KUB, MTE often sees Solar Titan installations being performed without these prerequisites being completed.

276. Tim Suddoth, MTE's Distributed Energy Resources ("DER") and Energy Services Supervisor, reports that MTE has received multiple complaints from Solar Titan customers. These complaints include concerns about significant delays in system installation and making the system operational, systems not generating at the levels represented to consumers, the installations causing the consumers' roofs to leak, and a general lack of communication.

277. Mr. Suddoth estimates that 60-70% of Solar Titan customers call him to report issues. Mr. Suddoth says Solar Titan does not meaningfully communicate with its consumers and passes them from person to person.

278. Mr. Suddoth has also noted significant problems with the installations themselves, including: (i) systems being installed without written MTE approval or without approval from the local Authority Having Jurisdiction, (ii) the use of poor-quality conduits, roof anchors, and unused attachments left on the roofs, and (iii) the use of other subquality materials that are not likely to last the 25+ year lifespan of the system.

279. MTE has even discovered several electrical disconnects[6] wired incorrectly in ways that create a risk of electrocution.

280. Perhaps most egregiously, MTE has detected "reverse rotation" of Solar Titan solar systems before the system has been commissioned and passed the required safety test. In other words, systems were back-feeding electricity onto the grid without the LPC's knowledge. Unknown reverse rotation poses a significant safety risk to anyone working on the electrical grid.

---

[6] An electrical disconnect is a safety device used to easily shut off power in case of emergencies.

281.    Solar Titan's use of unqualified installation personnel poses a risk to the homeowner and the installers themselves. Mr. Suddoth notes that, in addition to the potential for electrical shock, Solar Titan's use of unqualified installation personnel and its failure to abide by industry standards increases the risk of damage to the consumer's home and the increased danger of onsite fires or damage to MTE equipment.

282.    During a Sworn Statement of Shawna Helton, Solar Titan's former Vice President of Sales, Ms. Helton said that a Solar Titan installer shocked herself after drilling into a "live" breaker box. Ms. Helton believes this employee was not properly trained and had no prior experience working on electrical components.

283.    Mr. Suddoth has been frustrated by his interactions with Solar Titan employees. He notes that Solar Titan's installers "do not have the proper tools or the knowledge to answer questions [that] MTE or customers have. They generally do not know how to troubleshoot issues… Solar Titan USA employees display little knowledge of how the systems function and seem to be equally as frustrated, oftentimes complaining of no clear direction (they just show up), lack of training, lack of organization, and lots of blame on equipment or other employees not onsite."

284.    Mr. Suddoth also notes that "Solar Titan USA's drawing packages do not include the person who is designing the systems along with their qualifications. Most contractors will provide their license number and professional certifications (NABCEP #, engineering license, etc.) on their drawings."

285.    Solar Titan does not include this information on its drawings because they are done by wholly unqualified individuals.

286.    According to Ms. Helton, the person Solar Titan put in charge of creating and submitting drawings to LPCs is Kirkland's son, Matt Kirkland.

49

287. During a Sworn Statement of Mike Hill, a former Solar Titan sales and training manager, Mr. Hill said that Matt Kirkland's title at Solar Titan has been "Design Engineer." Mr. Hill believes this title does not reflect Matt Kirkland's actual qualifications and that Solar Titan uses that title "to make it sound fancy and more professional than it was."

288. In reality, Matt Kirkland is not an engineer and maintains no qualifications for creating and submitting Solar Titan's drawing packages.

289. Despite this, some Solar Titan drawing packages have been submitted to LPCs with a cover page that said, "Engineered by Matt K."

290. Mr. Suddoth has also had difficulties with Solar Titan's Technical Operations Officer, Dale Roden. Upon information and belief, Mr. Roden has been in charge of training installers and overseeing Solar Titan's installations.

291. Mr. Suddoth describes Mr. Roden as "confrontational and unwilling to help with problem-solving."

292. In short, LPCs and other electrical providers have had continuous problems with Solar Titan's approach to installation. Solar Titan relies upon inexperienced personnel, and ignores the procedural requirements and industry standards put in place to ensure the safety of the public and every person involved in the installation process. This corner-cutting has resulted in actual, physical harm in the form of damage to property and injuries to its workers.

293. Per Tennessee Public Chapter 177, the Tennessee State Fire Marshal's Office ("SFMO") requires that all equipment delivering electricity to the point of interconnection with a power grid (such as a residential solar system) be inspected by a state-certified inspector before it can be made operational.

50

294. Michael Morelli, the SFMO's Director of Electrical, Residential, and Marina Sections, oversees permitting and inspections for solar systems installed within SFMO's jurisdiction.

295. Mr. Morelli states that his experiences with Solar Titan have raised serious concerns.

296. Mr. Morelli reports that Solar Titan installations fail inspection at an unusually high rate.

297. A failed inspection is indicative of a failure to follow proper procedures and applicable electrical code sections. This increases the potential for electrical shock, fire, and the loss of life.

298. Mr. Morelli also notes that the inspectors he oversees have complained about the training and experience of Solar Titan's installers and the quality of their work.

299. Again, using unqualified and/or poorly trained installers increases the likelihood that something could go wrong and poses an additional health and safety risk, on top of the normal health and safety risks associated with electric work by qualified professionals.

300. Like their Tennessee counterparts, Kentucky electric providers frequently experience issues with Solar Titan failing to obtain proper permits or have qualified personnel present during the installation. Kentucky utility providers also report a pattern of Solar Titan installed solar systems repeatedly failing safety inspections due to shoddy workmanship. And, as in Tennessee, there have been multiple instances of Solar Titan connecting a solar system to the main power grid without authorization and thereby creating a serious and unacceptable risk to life and property.

301. As described by Stephen Miller, the Manager of Operational Services for Warren Rural Electric Cooperative Corporation ("WRECC") in Bowling Green, Kentucky, WRECC has encountered numerous problems in regards to Solar Titan installations.

302. These problems include having solar system installations being connected to the electric grid before the system has passed inspection and is commissioned by the LPC.

303. According to Mr. Miller, when a system is connected to the grid before going through the commissioning process, "there is an increased risk of injury and/or death to property occupants, electric utility line workers, and other personnel who service the grid."

304. If Solar Titan is allowed to continue operating in this manner and posing these types of substantial risks to the health and safety of consumers and LPC employees, damage to property and injuries to people will continue to occur.

305. Beyond not getting the proper permits to conduct installations, Solar Titan does not even maintain the proper permits required to conduct home improvement contracting work.

306. Under the Tennessee Home Improvement Contractors Act (TENN. CODE ANN. § 62-5-501, *et seq.*), Solar Titan is required to have a home improvement contractor license to perform these types of home improvement services.

307. Solar Titan also does not maintain the proper amount of liability insurance and has not posted the legally required bond needed to conduct home improvement services and electrical contracting work (Tenn. Comp. R. & Reg. 0680-01).

## I. ILL-GOTTEN GAINS

308. As described above, rather than waiting until a consumer's statutory right to cancel the Solar Titan Agreement has expired, Solar Titan immediately submits the Solar Titan Agreement to Mosaic the day the consumer signs. If the consumer signs the Solar Titan Agreement

52

after business hours, Solar Titan immediately submits the Solar Titan Agreement the very next morning. This allows Solar Titan to get the first portion of the consumer's loan disbursement from Mosaic.

309.     Former Solar Titan employees like Ms. Helton and Ms. Dorismar have provided sworn statements to Tennessee and explained they have concerns about the company using consumer funds, including those from canceled contracts, to pay for expenses unrelated to the solar system the consumer purchased from the company. Ms. Helton talked about Solar Titan "floating the books" when the company decided to submit the Solar Titan Agreement to Mosaic immediately after the consumer signed.

310.     Ms. Dorismar stated that she suggested for years that Solar Titan wait the three-day cooling-off period before submitting the Solar Agreement to Mosaic. She said whenever she suggested this, she was told Solar Titan could not wait for the cooling-off period to expire because waiting would cause a "cash flow" issue.

311.     Although Mosaic knows when consumers have signed the Solar Titan Agreement, and thus when the consumers' three-day cooling-off period expires, Mosaic transmits the first payment to Solar Titan before the cooling-off period expires.

312.     Solar Titan routinely receives funding from Mosaic before the consumer's statutory right to cancellation period has lapsed, and often refuses to let consumers who have exercised their rescission rights out of the contract so it can keep the funds from Mosaic.

313.     Instead of letting consumers exercise their right to rescind, Solar Titan often falsely tells consumers that they failed to properly exercise their right of rescission.

53

314.    For many consumers who have exercised their three-day right to cancel, Solar Titan demands that they pay 30% of the contract amount before it will release them from the Solar Titan Agreement.

315.    For consumers who cannot afford to pay 30% of the contract amount, Solar Titan stops the installation process, but Solar Titan still accepts and retains payments from Mosaic on the sale. This is made easier by the fact that Mosaic has reduced the Milestones Solar Titan must complete to fully fund the sale.

316.    Starting at the end of 2021, Solar Titan stopped paying its sales representatives as agreed and began changing the commission pay schedule without notice. As a result, many of Solar Titan's experienced sales staff left the company, and Solar Titan continues to have a revolving door for sales representatives who leave after learning that Solar Titan will not consistently pay them their earned commission.

317.    Considering the many consumers who have purchased systems but complain that the installation has never been completed, it seems that Solar Titan is also not using the funds it receives from sales to complete its installations and pay installation crews.

318.    Even when a consumer informs Mosaic that they have told Solar Titan to cancel the contract within the three-day cooling-off period, Mosaic often will only release consumers from the Mosaic Agreement when Solar Titan confirms that it has canceled the contract. Until Mosaic releases consumers from the Mosaic Agreement, Solar Titan retains the funds that Mosaic has transmitted to Solar Titan for a given sale.

319.    Eventually, Solar Titan may agree to release consumers who exercised their three-day right of cancellation from the contract, but this often happens several months after consumers

first attempt to exercise their right to cancel; Solar Titan likely delays this process so that it can procure funding from Mosaic for new sales before canceling the prior sales.

320.    When Solar Titan is notified of a consumer's intent to cancel, the company ceases all installation efforts; however, the company often does not notify Mosaic of the cancellation and attempts to keep the loan funds already disbursed by Mosaic.

321.    In other words, Solar Titan retains consumer loan funds even when it is not taking steps to complete the installation process.

322.    Upon information and belief, these ill-gotten funds are being diverted to support the lavish lifestyle of the individually named Defendants.

323.    Prior to their work at Solar Titan, Atnip and Kelley had very little income and resources. Kelley worked as a sales representative for another solar system company that was not paying well. Kelley had few other options because of his felony wire fraud conviction. Atnip, Kelley's long-time romantic partner and husband, also lacked income. Kelley and Atnip had so little money that they had to borrow money from friends and family to relocate from Las Vegas, where they resided while Kelley was first placed on probation, to Knoxville, Tennessee.

324.    Upon information and belief, Atnip and/or Kelley used the proceeds from Solar Titan's unlawful sales practices to purchase a 9,959 square foot, eight-bedroom, and nine-bathroom house located at 3411 Tooles Bend Road, Knoxville, TN, 37922, for approximately $8,650,000 in April 2022.

325.    Just seven months later, on November 15, 2022, Kelley and Atnip sold the Tooles Bend Road property to the Clarity Light 24 Trust for $9,995,000.

326.    Clarity Light 24 Trust was created just five days before the sale of the home from Kelley and Atnip to Clarity Light 24 Trust.

327. Based on the circumstances surrounding the November 15, 2022 sale of the Tooles Bend Road property, it is unclear whether this was an arm's length transaction.

328. Upon information and belief, the individual Solar Titan Defendants used the profits from Solar Titan's unlawful sales practices to purchase or lease a private jet that Atnip took to flaunt to his family, and to purchase, either in Solar Titan's name or in their own individual names, at least eight Tesla vehicles between 2020-2022. As set out above, Solar Titan routinely failed to pay its sales staff or complete its installations during the period when the individual Solar Titan Defendants were making these extravagant purchases.

329. Upon information and belief, the Solar Titan Defendants used the profits from Solar Titan's illegal sales to launch Titan Charters.

## VI. VIOLATIONS OF THE LAW

### COUNT 1
### THE CONSUMER FINANCIAL PROTECTION ACT
### 12 U.S.C. §§ 5531, 5552, and 5565
### (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

330. Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint.

331. State Attorneys General are empowered by the CFPA to bring civil enforcement lawsuits for violations of the statute committed by "covered persons." 12 U.S.C. §§ 5552 and 5565(b).

332. Mosaic is a "covered person" under 12 U.S.C. § 5481(6)(A) because it offers or provides consumer financial products or services to consumers to use primarily for personal, family, or household purposes. The service offered or provided constitutes a "financial product or service" because it is "extending credit and servicing loans, including acquiring, purchasing, selling, broking and other extensions of credit." 12 U.S.C. § 5481(15)(A)(i).

56

333. Solar Titan Defendants are "related persons" under the CFPA, because they either act as Mosaic's agents or independent contractors who knowingly or recklessly participate in Mosaic's unfair, deceptive, and abusive practices. 12 U.S.C. § 5481(25)(C). As "related persons," Solar Titan Defendants should be treated as "covered persons" under the CFPA. 12 U.S.C. § 5481(25)(B).

334. Solar Titan processes transactions relating to consumer financial products or services and is a "service provider" under 12 U.S.C. § 5481(26) because Solar Titan provides a material service to a covered person in connection with the offering or the provision of financial products or services.

335. Section 1036(a)(1)(B) of the CFPA prohibits covered persons from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

336. The CFPA defines an "unfair" act or practice as, *inter alia*, one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers," where that "substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c).

337. The CFPA defines an "abusive" act or practice as, *inter alia*, one that: (1) "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or (2) takes unreasonable advantage of -- (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interest of the consumer." 12 U.S.C. § 5531(d).

338. At all relevant times, Solar Titan acts as Mosaic's agent, and within the scope of Mosaic's agency relationship when Solar Titan offers or provides loans to consumers who need financing from Mosaic to purchase and install their solar systems.

339. At all relevant times, Solar Titan and Mosaic act individually and jointly in committing all unfair, deceptive, and abusive practices when offering and providing loans to Solar Titan customers who need financing from Mosaic to purchase and install their solar systems.

340. At all relevant times, Mosaic knows—or should know—that Solar Titan engages in or plans to engage in unfair, deceptive, and abusive practices when offering and providing loans to Solar Titan customers who need financing from Mosaic to pay Solar Titan for its solar systems. Despite the fact that Mosaic knows or should know that Solar Titan engages in such unlawful conduct, Mosaic nevertheless facilitates the commission of those unlawful acts. Mosaic intends to, and encourages, facilitates, or assists in the commission of unlawful acts, and thereby aids and abets Solar Titan in the unlawful conduct.

341. Defendants have engaged in a conspiracy and common course of conduct, the purpose of which is and was to engage in the unfair, deceptive, and abusive practices alleged in this Complaint. The conspiracy and common course of conduct continue to the present.

342. Defendants have agreed to provide financial products as part of their conspiracy to use unlawful sales practices to sell solar systems and installation services or to aid and abet such sales because convenient access to financial products with certain loan structures, including discounts, delayed payment increases that assume receipt of tax credits, and other promotions, help not only facilitate the sale of these solar systems and installation services but also result in favorable repayment terms and profits for Defendants.

58

343.    At all times relevant to this Complaint, Mosaic has had sufficient information from Solar Titan, consumer reports, and media outlets to know or that should have put Mosaic on notice that Solar Titan was selling solar systems and installation services to consumers that lacked the qualities that Solar Titan represented they had, including but not limited to Solar Titan claiming that consumers would experience larger energy savings than they would actually realize, consumers' eligibility for certain credits and promotions that would reduce the amount financed, and that the consumers' financing payments would begin after the solar systems were installed and functioning.

344.    Mosaic knew or should have known that Solar Titan's solar systems and installation services did not have the qualities, benefits, and characteristics that they were presented to have. Defendants used financial products and services to sell Solar Titan's products and services that lack the promised qualities, benefits, and characteristics.

345.    Defendants offer and provide financial services and products that lack the qualities, benefits, and characteristics that Defendants promise, including the timing of when consumer payments are due to Mosaic in relation to when consumers will have a functioning solar system.

346.    Defendant Mosaic's agreements include the statutorily-required notice allowing consumers to cancel their financial services and products by providing a notice within three days of consumers signing their agreement for their financial services and products. However, Defendants failed to honor consumers' cancellations when they provided the requisite notice despite the fact that consumers met the requirements under the terms of their contract to cancel their agreements.

347.    Defendants have failed to disclose that Solar Titan would be unlikely to fulfill the promised timeline for completing the solar system installation. Defendants have also concealed

59

and failed to disclose that, when claiming no payments would be due until the system is "installed," installation meant only that the "panels were on the roof," not that the system was actually operational. Thus, consumers' loan payments are often due to Mosaic before consumers' solar system is operational. Defendants fail to disclose that Mosaic will transfer the full purchase price to Solar Titan before Solar Titan has fully completed its installation services.

348.    Defendants have failed to disclose that consumers would not save 50%-90% on their energy bills when they purchase a Solar Titan system, and that consumers would still be responsible for 100% of their loan finance charges even when the system did not perform as Defendants advertised.

349.    Defendants have failed to disclose the total amount consumers would have to repay Mosaic at the time that consumers agree to finance the purchase of the solar system and installation services.

350.    Defendants' misrepresentations and material omissions described in paragraphs throughout this complaint above are deceptive acts or practices that violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

351.    Defendants' acts and practices are also unfair and abusive in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

352.    For example, Defendants' failure to meaningfully inform consumers that Mosaic often fully pays Solar Titan before the system is operating and performing as promised, and that Mosaic regularly requires consumers to pay Mosaic even before their system is performing as promised, constitutes an unfair practice in violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B). Consumers are reliant on Defendants to understand the benefits and consequences of agreeing to have Mosaic fund their purchase of the solar systems. This

includes the information about Mosaic partially funding the contracts or paying Solar Titan in full before consumers have an operational solar system that is performing as promised and that Mosaic will require consumers to pay Mosaic well before systems are operating and performing as promised.

353. Defendants' acts and practices relating to funding the sale and collection of loan payments cause or are likely to cause substantial consumer injury. Rather than saving significant amounts on their electric bills, consumers who are required to make payments before their system is fully operational and performing as promised have increased electrical expenses. The substantial consumer injury that Defendants' acts and practices cause or are likely to cause is not substantially outweighed by the countervailing benefits to consumers or competition. Consumers do not benefit from being misinformed about the likely increase in their monthly expenses, and they often risk falling behind on other monthly expenses because they are paying more for electrical expenses than they were prior to purchasing their solar system. Defendants have no legitimate competitive interest in misinforming consumers about the likely increase in their monthly expenditures when the system is not operational and performing as promised.

354. Defendants' failure to meaningfully disclose to consumers that Mosaic pays Solar Titan in part or in full for the sale of the system and that Mosaic requires consumers to pay Mosaic, often for several months, before the system is operational and performing as promised, also constitutes an abusive practice in violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B). The information Defendants withhold about consumers having a high likelihood of having to pay Mosaic before the system is operational and performing as promised (thus increasing their monthly electrical expenses) is material to consumers who believe that they will save money by purchasing a Solar Titan system. The Solar Titan Defendants' emphasis on the

supposed savings that consumers will experience when switching to solar energy also materially interferes with consumers' ability to understand the terms of the Mosaic Agreement.

355. Defendants' failure to meaningfully inform consumers about the qualifications for the Federal Tax Credit or give them an opportunity to consult with a tax practitioner about their eligibility for the Tax Credit before the sale of the system or consummation of the loan also constitutes an unfair practice in violation of Sections 1031 and 1035 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B). Solar Titan Defendants, through their marketing and sales pitch, and Mosaic, through its loan structure, have misled consumers who are not knowledgeable about the basic requirements for a Federal Tax Credit (including requirements that the consumer has a tax liability to which the credit can be applied) to expect that they can use that credit to make the lump sum payment to Mosaic.

356. Consumers are reliant on Defendants to understand the benefits and consequences of Solar Titan's pitch about the Tax Credit being an additional "discount" and savings for those who purchase Solar Titan solar systems. Consumers also rely on Defendants to understand the benefits and consequences of agreeing to choose Mosaic's financing option that requires a lump sum payment near the beginning of the loan that is approximately the same amount as the Federal Tax Credit would be if they qualified.

357. Defendants' acts and practices relating to the advertising and marketing of the Federal Tax Credit in relation to the sale and offering of the solar systems and loans cause or are likely to cause substantial consumer injury for consumers who are ineligible for the Federal Tax Credit. Most consumers who are ineligible for the Federal Tax Credit will either be unable to make the lump sum payment to Mosaic during the short time frame Mosaic requires or will struggle to make that payment. When those consumers do not make the lump sum payment, it creates

additional costs for the consumer under the terms of the loan because the total interest a consumer will pay for their loan and their monthly payment increases. The substantial consumer injury that Defendants' acts and practices cause or are likely to cause is not substantially outweighed by countervailing benefits to consumers or competition.

358. Consumers who are ineligible for the tax credit do not benefit from being unaware that they are ineligible for the credit. Instead, they find themselves having to pay more than they would if they did qualify for the credit under the terms of the loan, or they have to find some way to pay Mosaic the lump sum. Defendants could allow consumers to meet with a tax professional prior to signing them up for a lump sum payment loan structure or could disclose material conditions about qualifications for the Federal Tax Credit. Instead, they rush the sales and lending transactions and withhold material information about the sale. Defendants have no legitimate competitive interest in misleading consumers about their eligibility for the Federal Tax Credit or withholding material information about the qualifications for it. They also have no legitimate competitive interest in withholding material information from consumers that would allow consumers to better choose which financing options to apply for with Mosaic.

359. Defendants' failure to meaningfully disclose qualifications for the Federal Tax Credit also constitutes an abusive practice in violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B). The information being withheld about the criteria for Federal Tax Credit eligibility is material for consumers deciding whether they can afford the total costs of the solar system. Solar Titan Defendants' marketing and advertising of the Federal Tax Credit to ineligible consumers as a discount or additional savings for consumers who purchase a Solar Titan system materially interferes with consumers' ability to understand the total cost of their system. Mosaic's marketing, advertising, and offering of the loan structure requiring a lump sum payment

that is approximately the same amount as the Federal Tax Credit to consumers who are ineligible for the credit, materially interferes with consumers' ability to choose the appropriate financing option and to determine the total costs of financing the project.

360.    The CFPA unfairness and deceptive standard is the same as the unfairness and deceptive standard used by the FTC.[7] Tennessee likewise has adopted the FTC's unfairness and deceptive standard when analyzing the legality of business acts and practices. Therefore, in addition to the conduct described above, any of Defendants' conduct that constitutes unfair and deceptive business practices under Tennessee consumer protection laws also constitutes unfair, deceptive, and abusive practices under the CFPA.[8]

## COUNT 2
## THE TRUTH IN LENDING ACT & REGULATION Z
## 15 U.S.C. §§ 1631, 1635, and 1638; 12 C.F.R. §§ 1026.17 and 1026.23
## (AGAINST MOSAIC)

361.    The Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint.

362.    Section 1036(a)(1)(A) of the CFPA prohibits covered persons from offering or providing consumer financial products or services that are not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

363.    TILA and Regulation Z are each a "Federal consumer financial law." 12 U.S.C. § 5481(14) (defining "Federal consumer financial law" to include "enumerated consumer laws" and

---

[7] *See* Consumer Financial Protection Bureau, Compliance Bulletin 2022-05: Unfair and Deceptive Acts or Practices That Impede Consumer Reviews, https://files.consumerfinance.gov/f/documents/cfpb_bulletin_2022-05_unfair-deceptive-acts-practices-impede-consumer-reviews.pdf.
[8] TENN. CODE ANN. § 47-18-115; *Tucker v. Sierra Builders*, 180 S.W.3d 109 (Tenn. Ct. App. 2005).

"any rule or order prescribed by the Bureau under this title"); 12 U.S.C. § 5481(12)(O) (defining "enumerated consumer law" to include TILA).

364. At all times relevant to this Complaint, Mosaic has regularly extended consumer credit or offered consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments that is initially payable to Mosaic on the face of the contract, making Mosaic a "creditor" within the meaning of TILA, 15 U.S.C. § 1602(g) and Regulation Z, 12 C.F.R § 1026.2(a)(17).

365. TILA requires creditors to provide meaningful disclosure of credit terms so that consumers can more readily compare the various credit terms available to them, avoid the uninformed use of credit, and protect consumers against inaccurate and unfair lending practices. 15 U.S.C. § 1601(a).

366. Under TILA, when a creditor provides written disclosures and an itemization of the amount financed to consumers, it must provide the disclosures to consumers prior to the extension of credit. 15 U.S.C. § 1638(b)(1).

367. The TILA disclosure that the creditors are required to provide prior to the extension of credit must be conspicuously segregated from all other terms, data, or information provided in connection with a transaction, including any computations or itemization.

368. Mosaic extends credit to consumers prior to providing the disclosure through its service provider and/or agent, Solar Titan.

369. Per the Merchant Agreement, Mosaic has directed Solar Titan to submit credit applications on its behalf. Solar Titan's participation in the credit extension application process is an integral and necessary part of Mosaic's lending business.

370.    Mosaic has trained and directs Solar Titan to obtain consumers' signatures for the Mosaic Agreement. At all times relevant to the loan agreement transaction, Solar Titan maintains control of the device consumers use to sign the Mosaic Agreement.

371.    Solar Titan representatives have most consumers sign the Mosaic agreement before the consumer is able to see the TILA disclosure.

372.    Those who cannot see their TILA disclosure before consummation have no opportunity to decline the extension of credit from Mosaic if they cannot afford to repay Mosaic or do not want to be obligated to repay Mosaic for the full loan balance.

373.    Because of the numerous consumer complaints about this issue, Mosaic knows or should know that Solar Titan employees lack the proper training regarding the legally required credit application and loan agreement disclosures that must be made before entering into such agreements with consumers.

374.    Under TILA, lenders are required to clearly and conspicuously disclose to the consumer their rights to rescind the transaction. 15 U.S.C. § 1635(a).

375.    Regulation Z also proscribes lenders from disbursing a consumer's loan funds to retailers prior to the expiration of the rescission period unless the consumer has waived their right to rescind. 12 C.F.R § 1026.23(c).

376.    Mosaic, without receiving waivers from consumers, is disbursing loan funds to Solar Titan prior to the expiration of the consumer's rescission period.

377.    Under TILA, the lender cannot hold those consumers who exercise their right to rescind within three days of consummation of the transaction liable for any finance charge or any other charges. 15 U.S.C. § 1635(b) and (f). Consumers exercising their right to rescind will void any security interest the lender has taken pursuant to the credit transaction. 15 U.S.C. § 1635(b).

378. TILA also requires that the lender take all necessary and appropriate actions to reflect the termination of any security interest the lender has taken pursuant to the credit transaction within 20 days after the lender's receipt of the consumer's notice of rescission. *Id.*

379. Through its own representatives and Solar Titan's representatives, Mosaic has failed to cancel loans for consumers who exercised their right to rescind the credit transaction within three days of executing the Mosaic Agreement.

380. Through its own representatives and Solar Titan's representatives, Mosaic also failed to take all necessary and appropriate steps to reflect the termination of any security interest that it took in relation to the credit transactions within twenty days after receipt of the consumer's notice of rescission. Because Mosaic was not honoring consumers' right to rescind the credit transaction within three days of consummation, Mosaic failed to take any steps to remove its UCC Article lien.

381. Upon information and belief, for those consumers who exercised their three-day rescission right and for whom Mosaic failed to take steps to remove the UCC Article Lien in the required time period, the UCC Article Lien encumbered the consumers' real property.

## COUNT 3
## THE CONSUMER REVIEW FAIRNESS ACT
## 15 U.S.C § 45b
## (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

382. Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint.

383. The Solar Titan Defendants had full control over drafting the terms and conditions on the Solar Titan Agreement.

384. The Solar Titan Agreement that Solar Titan Defendants offered and provided consumers was only one page.

67

385. The front of the Solar Titan Agreement contained blank spaces for the sales representative to insert information about the solar system size that the consumer was purchasing and the type of mount that Solar Titan would complete during the installation.

386. The terms and conditions were on the back of the page of the Solar Titan Agreement, and those terms and conditions were pre-typed.

387. Consumers were not permitted to negotiate the terms and conditions on the back of the Solar Titan Agreement. As a matter of practice, Solar Titan sales representatives did not even mention or review the terms and conditions on the back of the Solar Titan Agreement. Some consumers have been completely unaware of the terms and conditions provisions on the back of the Solar Titan Agreement.

388. The Solar Titan Agreement constitutes a "form contract" under the Consumer Fairness Review Act because it constitutes a contract with standardized terms that Solar Titan used in the course of selling its solar system and installation services, and the consumer lacked the meaningful opportunity to negotiate the standardized terms. 15 U.S.C. § 45b(a)(3).

389. Although there are multiple iterations of the terms and conditions on the back of the Solar Titan Agreement, most of the Solar Titan Agreements contain a version of the following provision:

> Buyer agrees not to use any form of social media to express their opinions that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits LLC/Solar Titan USA LLC, breaching acceptance of this clause by buyer can and will deem monetary compensation of benefits to Ideal Horizon Benefits LLC/Solar Titan USA LLC through mediation actions.

390. CRFA renders void, and Section 2(c) of the CRFA prohibits the offering of, provisions in form contracts that: prohibit or restrict individual consumers' ability to communicate reviews, performance assessments, and similar analyses about a seller's goods, services, or

68

conduct; or that impose a penalty or fee against individual consumers who engage in such communications. 15 U.S.C. §§ 45b(a)(2), 45b(b)(1), and 45b(c).

391.    The language in the Solar Titan Agreement terms and conditions with respect to consumers agreeing not to express opinions on social media that could be portrayed as negative in the eye of the public and the language imposing fees on consumers who express these opinions violates 15 U.S.C. §§ 45b(a)(2), 45b(b)(1), and 45b(c).

392.    Solar Titan Defendants have told consumers planning to post negative reviews that they cannot post those reviews because they have agreed not to post negative reviews about Solar Titan.

393.    The Tennessee Office of Attorney General and Kentucky Office of Attorney General have the authority to bring this action for violations of the CRFA pursuant to 15 U.S.C. § 45b(e)(1).

394.    Mosaic is liable for the Solar Titan Defendants' violations of the CRFA under the FTC Holder Rule. 16 C.F.R. pt. 433.

395.    Each Mosaic Agreement contains the legally required Holder Rule notice that reads:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY BY THE DEBTOR HEREUNDER SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

396.    Because Mosaic is subject to all claims that consumers could assert against Solar Titan, Mosaic is liable for the Solar Titan Defendants' CRFA violations.

69

## COUNT 4
## THE TENNESSEE CONSUMER PROTECTION ACT
### Tenn. Code Ann. § 47-18-104(a) and (b)
### (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

397.    Tennessee re-alleges and incorporates by reference all prior paragraphs of this Complaint.

398.    The Solar Titan Defendants have repeatedly violated the TCPA by engaging in the deceptive and fraudulent practices described in this Complaint.

399.    By making express material misrepresentations about the capabilities of the solar systems sold by Solar Titan, the Solar Titan Defendants have engaged in deceptive trade practices that are prohibited by the TCPA. In particular, the Solar Titan Defendants have violated Tenn. Code Ann. § 47-18-104(a) and (b)(6), (b)(7), (b)(12), and (b)(27).

400.    The Solar Titan Defendants knew the representations they were making were not true, but made these representations anyway to sell more solar systems to unsuspecting consumers.

401.    The Solar Titan Defendants' misrepresentations about consumers' eligibility for tax credits or "buybacks" are also violations of the TCPA. Tenn. Code Ann. § 47-18-104(b)(11)-(12).

402.    The Solar Titan installation agreement itself contains misrepresentations regarding the warranties being offered to consumers. Solar Titan entered into these contracts knowing it did not intend to honor these warranties. This is a violation of the TCPA. Tenn. Code Ann. § 47-18-104(b)(19).

403.    The Solar Titan Defendants misrepresented that the company would provide "turnkey" installations and complete installs in a timely and workman-like manner. The Solar Titan Defendants entered into contracts with consumers knowing that the installations would be unreasonably delayed and performed by unqualified individuals who lacked appropriate

70

supervision and training. This is a violation of the TCPA. TENN. CODE ANN. § 47-18-104(b)(7), (b)(9), (b)(10), (b)(27), and (b)(33).

404.    The Solar Titan Defendants misrepresented that the company and its employees maintained the legally required licensures, certifications, and bonds to complete home improvement contracting and electrical work. This is a violation of the TCPA. TENN. CODE ANN. § 62-6-136(b).

405.    The Solar Titan Defendants also made express material misrepresentations about the company's affiliation with other entities. As described above, Solar Titan knowingly used the TVA and SEIA logos on its website despite having no relationship with either organization. Solar Titan has never been a SEIA member, and Solar Titan continued to use the TVA logo even after being removed from TVA's Green Connect QCN program.

406.    TVA and SEIA had to send Solar Titan cease and desist letters in order to stop these misrepresentations.   Again, these misrepresentations constitute violations of the TCPA. TENN. CODE ANN. § 47-18-104(b)(5).

407.    Kelley, Kirkland, and Atnip are also liable in their individual capacity as a result of these and other actions they took constituting multiple separate violations of the TCPA, including, but not limited to authorizing, encouraging, and directing Solar Titan employees to use misleading and untrue representations to induce transactions. Kelley, Kirkland, and Atnip helped develop and train sales staff on how to use misleading statements in order to induce transactions. Kelley, Kirkland, and Atnip also trained and encouraged their staff to identify and sell to seniors and other vulnerable groups.

408.    Mosaic knew that the Solar Titan Defendants were lying to consumers about the capabilities of the solar systems being sold. Mosaic also knew the Solar Titan Defendants were

not performing installations as represented. Mosaic chose to work with the Solar Titan Defendants anyway and facilitate purchases of these misrepresented solar systems. Therefore, Mosaic has engaged in unfair and deceptive trade practices under the TCPA. In particular, Mosaic has violated TENN. CODE ANN. § 47-18-104(a) and (b)(27).

409.    Mosaic is also liable to Tennessee consumers for the Solar Titan Defendants' violations of the TCPA pursuant to the Holder Rule notice in its loan agreements. As described above, the Holder Rule subjects Mosaic, as the loan holder, to "all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof."

410.    Pursuant to TENN. CODE ANN. § 47-18-108(a)(1), "[w]henever the attorney general has reason to believe that any person has engaged in . . . any act or practice declared unlawful by this part . . . the attorney general may bring an action in the name of the state against such person to restrain by temporary restraining order . . . the use of such act or practice."

411.    Pursuant to TENN. CODE ANN. § 47-18-108(b)(3), Attorney General Skrmetti may also seek, and this Court may order, a civil penalty of up to $1,000 for each violation of the TCPA.

## COUNT 5
## THE KENTUCKY CONSUMER PROTECTION ACT
### KY. REV. STAT. § 367.110, *et seq.*[9]
### (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

412.    Kentucky re-alleges and incorporates by reference all prior paragraphs of this Complaint.

413.    Pursuant to KY. REV. STAT. (KRS) § 367.170, "[u]nfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

---

[9] As codified, KY. REV. STAT. §§ 367.110 to 367.360 are referred to as the "Consumer Protection Act;" however, as used herein "Kentucky Consumer Protection Act" and "KCPA" refer to all provisions under Kentucky Revised Statutes Title 29, Chapter 367, entitled "Consumer Protection" and codified at KY. REV. STAT. §§ 367.110 to 367.993.

414.     Pursuant to KY. REV. STAT. § 367.190, "[w]henever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by KRS 367.170 to be unlawful, and that proceedings would be in the public interest, he may immediately move in the name of the Commonwealth in a Circuit Court for a restraining order or temporary or permanent injunction to prohibit the use of such method, act or practice."

415.     Pursuant to KY. REV. STAT. § 367.200, "[t]he court may make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been paid out as a result of any practice declared to be unlawful by KRS 367.130 to KRS 367.300…".

416.     Pursuant to KY. REV. STAT. § 367.990(2), if the court finds a person is willfully violating or has willfully violated the KCPA, the Attorney General may recover a civil penalty on behalf of the Commonwealth of "not more than two thousand dollars ($2,000.00) per violation, or where the defendant's conduct is directed at a person aged sixty (60) or older, a civil penalty of not more than ten thousand dollars ($10,000) per violation, if the trier of fact determines that the defendant knew or should have known that the person aged sixty (60) or older is substantially more vulnerable than other members of the public."

417.     The Solar Titan Defendants have repeatedly violated the KCPA by engaging in the unfair, false, misleading, and deceptive practices described in this Complaint.

418.     By making express material misrepresentations about the capabilities of the solar systems sold by Solar Titan, the Solar Titan Defendants have engaged in unfair, false, misleading, and deceptive practices that are prohibited by the KCPA.

419.     The Solar Titan Defendants knew the representations they were making were not true, but made these representations anyway to sell more solar systems to unsuspecting consumers.

73

420.     The Solar Titan Defendants' misrepresentations about consumers' eligibility for tax credits or "buybacks" are also violations of the KCPA.

421.     The Solar Titan Installation Agreement itself contains misrepresentations regarding the warranties being offered to consumers. Solar Titan entered into these contracts knowing it did not intend to honor these warranties.

422.     The Solar Titan Defendants misrepresented that the company would provide "turnkey" installations and complete installs in a timely and workman-like manner. The Solar Titan Defendants entered into contracts with consumers knowing that the installs would be delayed and performed by unqualified individuals who lacked appropriate supervision and training.

423.     Delays in the installation process were caused by Solar Titan's failure to coordinate with the LPCs as promised.

424.     The Solar Titan Defendants misrepresented that the company and its employees maintained the legally required licensures, certifications, and bonds to complete home improvement contracting and electrical work.

425.     The Solar Titan Defendants also made express material misrepresentations about the company's affiliation with other entities. Solar Titan knowingly used the TVA and Solar Energy Industries Association (SEIA) logos on its website despite having no relationship with either organization. Solar Titan has never been a SEIA member, and Solar Titan continued to use the TVA logo even after being removed from TVA's Green Connect QCN program.

426.     TVA and SEIA had to send Solar Titan cease and desist letters in order to stop these misrepresentations.

427.     The Solar Titan Defendants knew or should have known that their unfair, false, misleading, and deceptive trade practices were directed at persons aged sixty (60) or older who

were substantially more vulnerable than other members of the public. Therefore, the Solar Titan Defendants are subject to a civil penalty of up to ten thousand dollars ($10,000) for each unfair, false, misleading, or deceptive trade practice directed at such persons. KY. REV. STAT. § 367.990(2).

428.    Kelley, Kirkland, and Atnip are also liable in their individual capacity as a result of these and other actions they took constituting multiple separate violations of the KCPA, including, but not limited to authorizing, encouraging, and directing Solar Titan employees to use misleading and untrue representations to induce transactions. Kelley, Kirkland, and Atnip helped develop and train sales staff on how to use misleading statements in order to induce transactions. Kelley, Kirkland, and Atnip also trained and encouraged their staff to identify and sell to seniors and other vulnerable groups.

429.    The conduct, practices, and actions described in this Complaint occurred as part of a joint or common enterprise between the Solar Titan Defendants.

430.    Mosaic knew that the Solar Titan Defendants were lying to consumers about the capabilities of the solar systems being sold. Mosaic also knew the Solar Titan Defendants were not performing installations as represented. Mosaic chose to work with the Solar Titan Defendants anyway and facilitate purchases of these misrepresented solar power systems. Therefore, Mosaic has engaged in unfair, false, misleading, and deceptive trade practices under the KCPA.

431.    Mosaic is also liable to Kentucky consumers for the Solar Titan Defendants' violations of the KCPA pursuant to the "Holder Rule" Notice in their loan agreements. This Holder Rule Notice subjects Mosaic, as the loan holder, to "all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof."

432.    All of the Solar Titan Defendants' and Mosaic's unfair, false, misleading, and deceptive trade practices described herein were committed willfully.

## COUNT 6
### THE TENNESSEE HOME SOLICITATION SALES ACT
#### TENN. CODE ANN. § 47-18-701
### (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

433.    Tennessee re-alleges and incorporates by reference all prior paragraphs of this Complaint.

434.    Solar Titan engages in home solicitation sales as defined by TENN. CODE ANN. § 47-18-702(4).

435.    The Tennessee Home Solicitation Sales Act requires written agreements induced pursuant to a home solicitation to contain specific disclosures. TENN. CODE ANN. § 47-18-704(a)-(b)(1) states, in relevant part, that home solicitation sales agreements must include a "readily legible statement" on the "**front side** of the receipt or contract, **or immediately above the buyer's signature**, under the conspicuous caption: "BUYER'S RIGHT TO CANCEL." (Emphasis added).

436.    Per TENN. CODE ANN. § 47-18-104(b)(2), the "BUYER'S RIGHT TO CANCEL" statement must read as follows:

> "If this agreement was solicited at your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before twelve o'clock midnight (12:00) of the third business day after you sign this agreement. The notice must be mailed to: [insert name and mailing address of seller]."

437.    Solar Titan installation agreements, which concern home solicitation sales, do not contain a legally compliant "buyer's right to cancel" notice. The notice in the Solar Titan contract is not on the front page or immediately above the buyer's signature. The notice is also not placed

under a conspicuous caption. Instead, the notice is jammed into the middle of the back page of the contract with no distinction from the rest of the convoluted and confusing contractual terms.

438.    If a home solicitation sales agreement does not contain a legally compliant "buyer's right to cancel" notice, the buyer may, at any time before the legally compliant notice is provided, "cancel the home solicitation sale by notifying the seller in any manner and by any means of the buyer's intention to cancel." *Id.* at 704(d).

439.    Because Solar Titan contracts do not contain a legally compliant "buyer's right to cancel" notice, any consumer who has done business with Solar Titan should be allowed to cancel the home solicitation sales agreement at any time.

440.    Further, even if Solar Titan's contracts contained the required language, Solar Titan violated the Tennessee Home Solicitation Sales act by failing to actually cancel the contracts that consumers properly requested be canceled.

441.    Failing to cancel these contracts and refund all monies paid pursuant to the contract within ten days after the cancellation is also a violation of the Tennessee Home Solicitation Sales Act. TENN. CODE ANN. § 47-18-105.

442.    Consumers should be refunded for monies paid to Solar Titan under these unlawful contracts.

443.    Mosaic also failed to cancel contracts for consumers who exercised their three-day right of rescission in violation of the Tennessee Home Solicitation Sales Act.

444.    With regards to Solar Titan failing to cancel contracts, because Mosaic knew or should have known of the defect in Solar Titan's installation agreement, and because Mosaic facilitated this unlawful transaction, the accompanying financing agreement should also be canceled.

77

445.    Also, as discussed above, Mosaic is liable to Tennessee consumers for the Solar Titan Defendants' violations of the Tennessee Home Solicitations Sales Act pursuant to the "Holder Rule" Notice in their loan agreements. Mosaic is jointly and severally liable for the Solar Titan Defendants' unlawful contracts.

446.    Kelley, Kirkland, and Atnip are also liable in their individual capacity because all Solar Titan's actions in violation of the Tennessee Home Solicitation Sales Act detailed herein were committed pursuant to their express authorization, direction, and control. Kelley, Kirkland, and Atnip knew or should have known about Solar Titan's failure to cancel contracts when consumers exercised their three-day right of cancellation. Furthermore, on information and belief, Kelley, Kirkland, and Atnip have misappropriated for their personal use funds paid by consumers pursuant to a home solicitation sales agreement between the consumers and Solar Titan. Kelley, Kirkland, and Atnip should be required to return the misappropriated funds to consumers who exercised their right to cancel their Solar Titan Agreement under the Tennessee Home Solicitation Sales Act.

## COUNT 7
## THE KENTUCKY HOME SOLICITATION SALES ACT
### KY. REV. STAT. § 367.410
## (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

447.    Kentucky re-alleges and incorporates by reference all prior paragraphs of this Complaint.

448.    Solar Titan engages in Home Solicitation Sales as defined by KY. REV. STAT. § 367.410.

449.    "'Home solicitation sale' means a sale of goods or services, **including consumer loans**, in which the seller or a person acting for him engages in a personal solicitation of the sale

at a residence of the buyer and the buyer's agreement or offer to purchase is there given to the seller or a person acting for him." KY. REV. STAT. § 367.410 (emphasis added).

450.    "Except for home solicitation sales on loans in which a security interest is taken in the principal dwelling of the buyer . . . including all other consumer loans, in addition to any right otherwise to revoke an offer, the buyer has the right to cancel a home solicitation sale until midnight of the third business day after the day on which the buyer signs an agreement or offer to purchase which complies with this part." KY. REV. STAT. § 367.420(1).

451.    "For home solicitation sales on loans in which a security interest is taken in the principal dwelling of the buyer, the buyer shall have the right to rescind or cancel the transaction until midnight of the tenth business day following the later of the consummation of the loan transaction or the delivery of the material disclosures required under the Truth in Lending Act, 15 U.S.C. 1601 et seq." KY. REV. STAT. § 367.420(6).

452.    "Cancellation occurs when the buyer gives written notice of cancellation to the seller at the address stated in the agreement or offer to purchase." KY. REV. STAT. § 367.420(2).

453.    "Notice of cancellation, if given by mail, is given when it is deposited in a mailbox properly addressed and postage prepaid." KY. REV. STAT. § 367.420(3).

454.    "Notice of cancellation given by the buyer need not take a particular form and is sufficient if it indicates by any form of written expression the intention of the buyer not to be bound by the home solicitation sale." KY. REV. STAT. § 367.420(4).

455.    In a home solicitation sale, "the seller must present to the buyer and obtain his signature to a written agreement or offer to purchase which designates as the date of the transaction the date on which the buyer actually signs and contains a statement of the buyer's rights[.]" KY.

REV. STAT. § 367.430(1).[10] The statement of the buyer's rights must "[a]ppear under the conspicuous caption: "BUYER'S RIGHT TO CANCEL," and [r]ead as follows:

> "If this agreement was solicited to your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement. The notice must be mailed to: [address]."

KY. REV. STAT. § 367.430(2).

456. "Until the seller has complied with [KY. REV. STAT. § 367.430] the buyer may cancel the home solicitation by notifying the seller in any manner and by any means of his intention to cancel." KY. REV. STAT. § 367.430(3).

457. "Within ten (10) days after a home solicitation sale has been canceled or an offer to purchase revoked, the seller must tender to the buyer any payments made by the buyer and any note or other evidence of indebtedness." KY. REV. STAT. § 367.440(1).

458. Until the seller has complied with the obligations imposed by KY REV. STAT. § 367.440 the buyer may retain possession of goods delivered to him by the seller and has a lien on the goods in his possession or control for any recovery to which he is entitled." KY. REV. STAT. § 367.440(3).

459. "If the seller has performed any services pursuant to a home solicitation sale prior to its cancellation, the seller is entitled to no compensation." KY. REV. STAT. § 367.450(3).

460. "Any waiver by the buyer of rights provided in KRS 367.410 to 367.450 is null and void, and will not operate to relieve the seller of any obligation placed upon him by KRS 367.410 to 367.450 or this section." KY. REV. STAT. § 367.460.

---

[10] KY REV. STAT. § 367.430(1) contains an inapplicable exception for home solicitation sales that occur when "the buyer requests the seller to provide goods or services in an emergency."

461.	The Solar Titan Agreements consummating the home solicitation sales do not contain a legally compliant "buyer's right to cancel" notice. The notice is not placed under a conspicuous caption. Instead, the notice is jammed into the middle of the back page of the contract with no distinction from the rest of the convoluted and confusing contractual terms. *See* KY. REV. STAT. § 367.430(1)-(2).

462.	Because Solar Titan Agreements do not contain a legally compliant "buyer's right to cancel" notice, any consumers who have done business with Solar Titan should be allowed to cancel the Solar Titan Agreement at any time. *See* KY. REV. STAT. § 367.430(3).

463.	Consumers should also be refunded any monies paid to Solar Titan under these unlawful contracts. *See* KY. REV. STAT. § 367.440(1). Said monies are due within ten (10) days of cancellation or revocation by the consumer. *Id.*

464.	Solar Titan is not entitled to any compensation for services performed prior to any cancellation by consumers exercising their right to cancel under KY. REV. STAT. §§ 367.410 – 367.460, and any compensation paid should be refunded to the consumers. *See* KY. REV. STAT. § 367.450(3).

465.	Kelley, Kirkland, and Atnip are also liable in their individual capacity because all actions in violation of the Kentucky Home Solicitation Sales Act detailed herein were committed pursuant to their express authorization, direction, and control. Furthermore, on information and belief, Kelley, Kirkland, and Atnip have misappropriated for their personal use funds paid by consumers pursuant to a home solicitation sales agreement between the consumers and Solar Titan. Kelley, Kirkland, and Atnip should be required to return the misappropriated funds to consumers who exercised their right to cancel their Solar Titan Agreement under the Kentucky Home Solicitation Sales Act.

466.    During the course of the sales transaction, Solar Titan's sales representatives acted as Mosaic's agents. By procuring customers for Mosaic, Solar Titan's sales representatives conducted a home solicitation sale for a consumer loan. *See* KY. REV. STAT. § 367.410.

467.    On information and belief, the Mosaic Agreement did not contain the "buyer's right to cancel" notice required by KY. REV. STAT. § 367.430(1)-(2). Therefore, any consumers who have done business with Mosaic should be allowed to cancel the Mosaic Agreement at any time. *See* KY. REV. STAT. § 367.430(3).

468.    Consumers should also be refunded for monies paid to Mosaic under these unlawful contracts. *See* KY. REV. STAT. § 367.440(1). Said monies are due within ten (10) days of cancellation or revocation by the consumer. *Id.*

469.    Mosaic is not entitled to any compensation for services performed prior to any cancellation by consumers exercising their right to cancel under KY. REV. STAT. §§ 367.410 – 367.460, and any compensation paid should be refunded to the consumers. *See* KY. REV. STAT. § 367.450(3).

470.    Mosaic is also liable to Kentucky consumers for the Solar Titan Defendants' violations of the Kentucky Home Solicitations Sales Act pursuant to the "Holder Rule" Notice in their loan agreements. Mosaic is jointly and severally liable for the Solar Titan Defendants' unlawful contracts.

### COUNT 8
### UNJUST ENRICHMENT AND
### DISGORGEMENT OF ASSETS OF RELIEF DEFENDANT
### (AGAINST TITAN CHARTERS)

471.    Relief Defendant Titan Charters is believed to have received ill-gotten funds or otherwise benefitted from funds that are the proceeds of the Solar Titan Defendants' unlawful acts and practices. Titan Charters has no legitimate claim to the ill-gotten funds in its possession and

82

will be unjustly enriched if it is not required to disgorge the funds or the value of the benefit it received as a result of the Solar Titan Defendants' unlawful acts and practices.

472.    For the reasons stated above, Titan Charters holds the proceeds of Defendants' unlawful acts and practices in a constructive trust for the benefit of injured consumers.

473.    Titan Charters should be required to disgorge the ill-gotten funds or the value of the benefit it received as a consequence of the Solar Titan Defendants' unlawful acts and practices.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, State of Tennessee, *ex rel.* Jonathan Skrmetti, and Commonwealth of Kentucky, *ex rel.* Daniel Cameron, pursuant to the authority granted to them under the Federal Law Claims, their respective State Law Claims, and their common law responsibility to promote public protection, request that the Court:

A.    Order this Complaint be filed without cost bond as provided by TENN. CODE ANN. §§ 47-18-108(b)(4) and 47-18-116;

B.    Order Defendants to appear and answer this Complaint;

C.    Enter judgment against each Defendant in favor of Plaintiffs for each violation alleged in this Complaint;

D.    Enter a permanent injunction to prevent Defendants' future violations of federal and state law;

E.    Award such equitable relief as the Court finds necessary to redress consumer injury resulting from Defendants' violations of the law including, but not limited to, disgorgement of ill-gotten gains;

F.    Make such orders or render such judgments as may be necessary to restore to any consumer or other person any ascertainable losses, including statutory and pre-judgment interest,

suffered by reason of the alleged violations of federal and state law;

G.     Order each Defendant to separately pay civil penalties to the State of Tennessee of not more than $1,000 per violation of the TCPA as provided by TENN. CODE ANN. § 47-18-108(b)(3) and Order each Defendant to separately pay civil penalties to the Commonwealth of Kentucky of not more than $2,000 per violation of the KCPA, or $10,000 per violation of the KCPA where Defendants' conduct was directed at a person aged sixty (60) or older and substantially more vulnerable than other members of the public, as provided by KY. REV. STAT. § 367.990(2).

H.     Enter judgment against Defendants and in favor of the State of Tennessee for the reasonable costs and expenses of the investigation and prosecution of Defendants' actions, including attorneys' fees, expert and other witness fees, and costs, as provided by FED R. CIV. P. 54(d); TENN. CODE ANN. § 47-18-108(a)(6) and (b)(4), and KY REV. STAT. § 48.005(4);

I.     Order that all costs in this case be taxed against Defendants and no costs be taxed against the State of Tennessee and Commonwealth of Kentucky as provided in TENN. CODE ANN. § 47-18-116 and KY. R. CIV. P. 54.04(1);

J.     Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to: temporary and preliminary injunctions, an order freezing assets, the appointment of a receiver, immediate access to Solar Titan's business premises and records, an accounting of assets, and expedited discovery;

K.     Require the Relief Defendant to disgorge itself of ill-gotten funds received from the Defendants' unlawful acts and practices; and

L.     Award any and all such further relief as the Court deems just and proper.

Respectfully submitted,

_JONATHAN SKRMETTI_, TN BPR No. 031551
Tennessee Attorney General and Reporter

_DAVID McDOWELL_, TN BPR No. 024588
Deputy Attorney General
(Admitted to Practice in Eastern District)
SAMUEL KEEN, TN BPR No. 033865
Assistant Attorney General
(*Pro Hac Vice* Admission Pending)
ALICIA DANIELS-HILL, TN BPR No. 04672
Assistant Attorney General
(*Pro Hac Vice* Admission Pending)
OFFICE OF THE TENNESSEE ATTORNEY GENERAL
Consumer Protection Division
P.O. Box 20207
Nashville, Tennessee 37202
p. (615) 837-5155 (Keen)
p. (615) 253-3819 (Daniels-Hill)
e. samuel.keen@ag.tn.gov
e. alicia.daniels-hill@ag.tn.gov

Attorneys for Plaintiff
STATE OF TENNESSEE

DANIEL CAMERON
Kentucky Attorney General
PHILIP HELERINGER, KY Bar No. 96748
Executive Director of Consumer Protection
(*Pro Hac Vice* Admission Pending)
PAUL FATA, KY Bar No. 99528
Assistant Attorney General
(*Pro Hac Vice* Admission Pending)
LYNDSEY ANTOS, KY Bar No. 99971
Assistant Attorney General
(*Pro Hac Vice* Admission Pending)
OFFICE OF THE KENTUCKY ATTORNEY GENERAL
Office of Consumer Protection
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
p. (502) 696-5578 (Fata)
p. (502) 696-5641 (Antos)
e. paul.fata@ky.gov
e. lyndsey.antos@ky.gov

Attorneys for Plaintiff
COMMONWEALTH OF KENTUCKY