[FILED UNDER SEAL]

FILED

FEB 06 2023

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| STATE OF TENNESSEE,<br>*ex rel.* JONATHAN SKRMETTI,<br>ATTORNEY GENERAL and REPORTER,<br><br>*and*<br><br>COMMONWEALTH OF KENTUCKY,<br>*ex rel.* DANIEL CAMERON,<br>ATTORNEY GENERAL,<br><br>      Plaintiffs,<br><br>vs.<br><br>IDEAL HORIZON BENEFITS, LLC d/b/a<br>SOLAR TITAN USA, *a Tennessee Limited<br>Liability Company,*<br><br>CRAIG KELLEY, RICHARD ATNIP,<br>and SARAH KIRKLAND, *individually<br>and as officers of Solar Titan USA,*<br><br>*and*<br><br>SOLAR MOSAIC, LLC d/b/a MOSAIC,<br>*a California Limited Liability Company,*<br><br>      Defendants,<br><br>*and*<br><br>SOLAR TITAN CHARTERS, LLC d/b/a<br>TITAN CHARTERS, *a Florida Limited<br>Liability Company,*<br><br>      Relief Defendant. | **JURY TRIAL DEMANDED**<br><br><br><br>CASE NO. _____ |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, OTHER EQUITABLE RELIEF, AND AN ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

---

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................ 3

   A.  The Solar Titan Defendants' Unfair and Deceptive Business Practices .............................. 3

      1.  Solar Titan Has Been Deceptive from the Start. ........................................................ 3

      2.  Using Misrepresentations to Induce Transactions ....................................................... 11

      3.  Solar Titan Acts as Mosaic's Agent ........................................................................ 16

      4.  Taking Loan Funds Before Legally Allowed ................................................................ 18

      5.  Shoddy Installations and Failure to Follow Industry Standards .................................... 21

      6.  Solar Titan Misrepresents Affiliations with Other Entities ......................................... 24

   B.  The Solar Titan Defendants Recklessly Spent *Consumer* Funds ................................... 26

   C.  The Solar Titan Defendants are Dissipating Assets and May Be Destroying Records. .... 28

III.  THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER AGAINST
      THE SOLAR TITAN DEFENDANTS. ............................................................. 30

   A.  This Court Has Authority to Grant the Requested Relief. ........................................... 30

      1.  Plaintiffs Have Demonstrated Likelihood of Success on the Merits on their TCPA and
          KCPA Counts. ................................................................................................. 33

      2.  Plaintiffs Have Demonstrated Likelihood of Success on the Merits on their Tennessee
          Home Solicitation Sales Act and Kentucky Home Solicitation Sales Act Counts. ............... 36

      3.  Plaintiffs Have Demonstrated Likelihood of Success on the Merits on their CFPA
          Count. ............................................................................................................ 37

      4.  Plaintiffs Have Demonstrated Likelihood of Success on the Merits on their CRFA
          Count. ............................................................................................................ 42

      5.  Plaintiffs Have Demonstrated Likelihood of Proving that the Individual Defendants are
          Liable. ............................................................................................................ 42

IV.   THE PROPOSED *EX PARTE* TRO IS IN THE PUBLIC'S INTEREST AND IS
      NECESSARY TO STOP ONGOING HARM AND PRESERVE THE COURT'S ABILITY TO
      PROVIDE EFFECTIVE FINAL RELIEF. ......................................................... 43

   A.  Relief is Necessary to Stop Defendants' Unlawful Activity. ......................................... 43

   B.  An Asset Freeze and Appointment of a Temporary Receiver are Necessary to Prevent
       Further Dilution and Misappropriation of Assets. ..................................................... 45

      1.  There is an imminent danger that Defendants' assets will be lost, concealed, injured,
          diminished in value, or squandered. ...................................................................... 45

      2.  The Solar Titan Defendants have engaged in fraudulent conduct. ................................. 47

3.    Legal remedies available to the States are inadequate. .................................. 47

4.    Appointing a receiver will do more good than harm. ................................... 48

5.    The Solar Titans' Defendants' liabilities appear to outweigh their assets. .................... 48

C.   Immediate Access and Limited Expedited Discovery Are Necessary to Locate and Preserve Relevant Records. ..................................................................................... 50

D.   *Ex Parte* Relief is Necessary to Protect Assets and Evidence. ......................................... 50

V.     CONCLUSION ........................................................................................................... 52

## TABLE OF AUTHORITIES

**Cases**

*Consumer Fin. Prot. Bureau v. Gordon,*
    819 F.3d 1179 ...................................................................................................................... 40

*Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC,*
    846 F.3d 1049 (9th Cir. 2017) .............................................................................................. 37

*Craig & Bishop, Inc. v. Piles,*
    247 S.W.3d 897 (Ky. 2008) .................................................................................................. 33

*Dare To Be Great, Inc. v. Com. Ex rel Hancock,*
    511 S.W.2d 224 (Ky. 1974) .................................................................................................. 33

*F.T.C. v. ACRO Servs. LLC,*
    No. 3:22-CV-00895, 2022 WL 17177641 (M.D. Tenn. Nov. 21, 2022) ....................... 31, 51

*F.T.C. v. Am. Fin. Benefits Ctr.,*
    324 F. Supp. 3d 1067 (N.D. Cal. 2018) ............................................................................... 42

*F.T.C. v. Consumer Defense, LLC,*
    926 F.3d 1208 (9th Cir. 2019) ......................................................................................... 31, 32

*F.T.C. v. E.M.A. Nationwide, Inc.,*
    767 F.3d 611 (6th Cir. 2014) ................................................................................................ 33

*F.T.C. v. Neovi, Inc.,*
    604 F.3d 1150 (9th Cir. 2010) .............................................................................................. 35

*First Tech. Safety Sys., Inc. v. Depinet,*
    11 F.3d 641 (6th Cir. 1993) .................................................................................................. 50

*Ford Motor Co. v. Mayes,*
    575 S.W.2d 480 (Ky. Ct. App. 1978) ................................................................................... 34

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) .............................................................................................................. 31

*Liberte Cap. Grp., LLC v. Capwill,*
    462 F.3d 543 (6th Cir. 2006) ................................................................................................ 45

ii

*Macon Lumber Co. v. Bishop & Collins,*
  229 F.2d 305 (6th Cir. 1956) ................................................................................................ 45

*Mayall v. Randall Firm, PLLC,*
  No. 1:13-CV-00166-TC, 2017 WL 3432033 (D. Utah Aug. 9, 2017) .................................. 37

*Moncier v. Jones,*
  803 F. Supp. 2d 815 (E.D. Tenn. 2011) ................................................................................ 30

*Moody v. Hutchinson,*
  247 S.W.3d 187 (Tenn. Ct. App. 2007) ................................................................................ 30

*Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.,*
  630 F. App'x 410 (6th Cir. 2015) .......................................................................................... 45

*State v. Heath,*
  806 S.W.2d 535 (Tenn. Ct. App. 1990) ................................................................................ 30

*Stevens v. Motorists Mut. Ins. Co,*
  759 S.W.2d 535, 537 (Tenn. Ct. App. 1990) ........................................................................ 33

*Telecom Directories, Inc. v. Com ex rel. Cowan,*
  833 S.W.2d 848 (Ky. Ct. App. 1991) .................................................................................... 34

*Tucker v. Sierra Builders,*
  180 S.W.3d 109 (Tenn. Ct. App. 2005) .................................................................. 33, 35, 39

*United States v. Novak,*
  476 F.3d 1041 (9th Cir.2007) ................................................................................................ 40

**Statutes**

12 U.S.C. § 5301, *et seq.* ............................................................................................................... 2

12 U.S.C. § 5481 ......................................................................................................... 38, 39, 40

12 U.S.C. § 5531 ............................................................................................... 34, 37, 40, 41

12 U.S.C. § 5536 ................................................................................................................. 37, 39

12 U.S.C. § 5552 ................................................................................................................. 31, 37

12 U.S.C. § 5565 ................................................................................................................. 31, 49

15 U.S.C. § 1601, *et. seq.* .............................................................................................................. 2

15 U.S.C. § 45 ............................................................................................................................ 40

15 U.S.C. § 45b .................................................................................................................... 2, 42

26 U.S.C. § 25D ........................................................................................................................ 14

KY. REV. STAT. § 367.110, *et. seq.* .............................................................................................. 2

KY. REV. STAT. § 367.170 ..................................................................................................... 33, 34

KY. REV. STAT. § 367.190 .................................................................................................... 30, 31, 32

KY. REV. STAT. § 367.240 .............................................................................................................. 5

KY. REV. STAT. § 367.410, *et. seq.* ......................................................................................... 2, 37

KY. REV. STAT. § 367.420 ............................................................................................... 10, 18, 36

KY. REV. STAT. § 367.430 ........................................................................................................... 36

KY. REV. STAT. § 367.450 ........................................................................................................... 36

KY. REV. STAT. § 367.990 ........................................................................................................... 49

TENN. CODE ANN. § 47-18-101, *et seq.* ........................................................................................ 2

TENN. CODE ANN. § 47-18-104 ................................................................................................... 33

TENN. CODE ANN. § 47-18-106 ..................................................................................................... 4

TENN. CODE ANN. § 47-18-108 ....................................................................................... 30, 31, 32

TENN. CODE ANN. § 47-18-109 ................................................................................................... 49

TENN. CODE ANN. § 47-18-115 ................................................................................................... 34

TENN. CODE ANN. § 47-10-701, *et seq.* ...................................................................................... 37

TENN. CODE ANN. § 47-18-703 ................................................................................................... 18

TENN. CODE ANN. § 47-18-704 ................................................................................................... 36

TENN. CODE ANN. § 47-18-705 ............................................................................................. 10, 37

**Other Authorities**

12 C.F.R. § 1026, *et. seq.* ............................................................................................................ 2

12 C.F.R. § 1026 ........................................................................................................................ 10, 18

16 C.F.R. 429.1 ............................................................................................................................. 10

Federal Rule of Civil Procedure 65 ........................................................................................ 32, 50

Federal Rule of Civil Procedure 66 .............................................................................................. 45

Jonathan Sheldon & Carolyn L. Carter, *Unfair and Deceptive Acts and Practices* § 4.3.2.2 .................................... 35

iv

**Media**

Grace King, *10Investigtes: Knoxville-based solar company 'downsizing due to major issues' with parts from supplier*, 10NEWS, Knoxville, TN NBC Affilate (Dec. 15, 2022)
https://www.wbir.com/article/news/investigations/10investigates-knoxville-based-solar-company-downsizing-due-to-major-issues-with-parts-from-supplier-update-december-15/51-0f204ee8-0771-4366-b34b-7d947f1290a4 ...... 10, 49

Grace King, *10Investigates: Solar Titan brought 'to its knees' as it 'significantly' reduces staff*, 10 News, Knoxville, TN NBC Affiliate (Jan. 6, 2023)
https://www.wbir.com/article/news/investigations/10investigates-solar-titan-brought-to-its-knees-as-it-significantly-reduces-staff-january-6-2023/51-51fca812-5543-43fe-9c40-bc058bf1c0bf .........................*passim*

Don Dare, *'$91,000 and it's still not running' Greeneville woman waited months for solar panels repairs,* WATE, Knoxville, TN ABC Affiliate (Jan. 11, 2023)
https://www.wate.com/investigations/greeneville-woman-waited-months-for-solar-panels-repairs/ ................... 5, 28

## I. INTRODUCTION

Since at least 2019, Defendants Ideal Horizon Benefits, LLC d/b/a Solar Titan USA ("Solar Titan"), Craig Kelley ("Kelley"), Richard Atnip ("Atnip"), and Sarah Kirkland ("Kirkland") (collectively the "Solar Titan Defendants") have operated a residential solar panel system installation business that relies on misrepresentations and deception to induce consumer transactions. The Solar Titan Defendants trick consumers into spending tens of thousands of dollars by leading them to believe the solar system will completely or almost completely eliminate their electric utility bill; instead, these consumers are often left with little or nothing to show for their purchase besides an additional monthly expense in the form of a payment for a pricey loan from a lender like Defendant Solar Mosaic, LLC d/b/a Mosaic ("Mosaic").

While the Solar Titan Defendants are always willing to take a consumer's money, they are rarely willing to provide the consumer with the benefit of their bargain. Consumers regularly report that their solar systems do not work as promised and, in some cases, the systems do not work at all. Other consumers report going months without a completed installation, all while being required to make monthly loan payments to Mosaic. At the same time, Solar Titan employees report continuous changes to their commission-based compensation structure and not being paid for months on end. Meanwhile, the Solar Titan Defendants lead a lavish lifestyle that includes luxury cars, at least one private jet, expensive yachts, and multi-million-dollar homes. Concerningly, the Solar Titan Defendants have recently sold many of the assets purchased with their ill-gotten gains.

Because the Solar Titan Defendants operate a business that engages in pervasive violations of multiple federal and state consumer protection laws, and because the Solar Titan Defendants have dissipated and appear to be continuing to dissipate assets accumulated from their unlawful business practices, the Attorneys General of Tennessee and Kentucky (collectively, "Plaintiffs")

1

respectfully request this Court to temporarily restrain the Solar Titan Defendants from engaging in this unlawful conduct and to appoint a receiver to oversee the assets of the company pending resolution of this civil law enforcement action.

In cases involving blatantly illegal, unfair, and deceptive conduct such as this one, State Attorneys General tasked with enforcing consumer protection laws have requested *ex parte* temporary restraining orders ("TROs"), which include asset freezes, appointments of receivers over corporate entities, and immediate access to the defendants' business premises. United States District Courts have regularly entered such orders to prevent the perpetrators from harming more consumers, destroying evidence, and concealing fraudulently obtained assets before a preliminary injunction is entered. The same extraordinary relief is warranted here. In support, Plaintiffs present evidence leaving little doubt that the Solar Titan Defendants are engaged in violations of federal and state consumer protection laws, including the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5301, *et seq.*, the Truth in Lending Act ("TILA") 15 U.S.C. § 1601, *et. seq.*, TILA's implementing regulation ("Regulation Z"), 12 C.F.R. § 1026, *et. seq.*, the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b, the Tennessee Consumer Protection Act of 1977 ("TCPA"), TENN. CODE ANN. § 47-18-101, *et seq.*, the Kentucky Consumer Protection Act ("KCPA"), KY REV. STAT. § 367.110, *et. seq.*, the Tennessee Home Solicitation Sales Act, TENN. CODE ANN. § 47-18-701, *et. seq.*, and the Kentucky Home Solicitation Sales Act, KY REV. STAT. § 367.410, *et. seq.*

The Plaintiffs' evidence also demonstrates that a non-noticed *ex parte* TRO proceeding is necessary to prevent Defendants from hiding or diluting assets and destroying evidence, thereby preserving the Court's ability to provide effective final relief. Based on this evidence, the Plaintiffs respectfully request that this Court issue the proposed *ex parte* TRO, including an asset freeze,

appointment of a receiver, immediate access to the business, and an order to show cause why a preliminary injunction should not be issued.

## II. STATEMENT OF FACTS

### A. The Solar Titan Defendants' Unfair and Deceptive Business Practices

#### 1. Solar Titan Has Been Deceptive from the Start.

Since its inception, Solar Titan, at the direction of Defendants Kelley, Kirkland, and Atnip, has engaged in unfair and deceptive business practices to sell its residential solar systems. The Solar Titan Defendants mislead consumers about almost every material detail of their purchase and engage in unfair and deceptive business practices at every step of the transaction. From telling lies to induce the transaction, to having customers sign contracts with legally prohibited terms, to taking consumers' money and then refusing to provide the contracted-for services in a timely and professional manner, every aspect of Solar Titan's business is harmful to consumers.

The company's unlawful business model is not surprising, as Solar Titan was founded on falsehoods and deception by people with a well-documented history of such conduct. From the outset, the Solar Titan Defendants have used lies, misrepresentations, and material omissions to establish and grow their business. The Solar Titan Defendants have even lied about the people actually in charge of day-to-day operations in an effort to avoid regulatory scrutiny. Simply put, Solar Titan is an unscrupulous company run by dishonest people. The Plaintiffs are bringing this case to put a stop to the Solar Titan Defendants' unlawful behavior.

### a. Kelley is Running the Company.

On paper, Solar Titan appears to be managed by Kirkland and Atnip.[1] However, Craig Kelley regularly represents himself to consumers as the owner and CEO of the Company, despite not being listed on any corporate paperwork. This is not an oversight or mere failure to update documentation. In 2012, Kelley pled guilty to wire fraud in a Nevada federal court. He was given a five-year suspended prison sentence, placed on probation, and ordered to pay $195,000 in restitution.[2]  Such a conviction poses serious hurdles to starting a new business that relies on consumer lending. This explains why the Solar Titan Defendants have masked Kelley's true role with the company. Kelley is clearly the person primarily responsible for the day-to-day operations of Solar Titan. As Solar Titan's former Vice President of Sales and Training, Shawna Helton, explained in her Sworn Statement[3] to the State of Tennessee:

> Q: Okay, now we have mentioned a couple of names so far, but I want to clarify who these people are. So, let me ask you, who is Craig Kelley --
> A: Craig Kelley --
> Q: -- in relation to this investigation?
> A: He is the CEO.
> Q: The CEO of?
> A: Solar Titan USA.
> ...
> Q: And, then, who is Michael Atnip?
> A: Michael Atnip; I believe his legal first name is Richard as well, because I think that's Craig's as well. But he is Michael – he is Craig's husband, and he is part owner as well. Everything was in Michael's name because Craig could not have anything in his name because of Craig's felon – felony offense.
> Q: Tell me about this felony offense. What are you referring to?
> A: Craig told me a long time ago that he – while he lived in Vegas – he and Michael lived in Vegas – I guess they got into investing in homes or whatever. In any case, yeah, the Federal Government went after him for wire fraud…. So he couldn't – he couldn't be around money. He couldn't

---

[1] TRO Mot. Ex. A, TN Limited Liability Company Annual Form filed with the Secretary of State on April 1, 2021.
[2] TRO Mot. Ex. B, Criminal Docket for *United States v. Kelley*, 2:12-cr-00266-GMN-PAL-1.
[3] A Sworn Statement is a form of testimony given under oath pursuant to the Tennessee Attorney General's statutory investigatory authority to conduct examinations of witnesses. TENN. CODE ANN. § 47-18-106(a)(2).

4

deal with banks and money. That was a part of his probation, or at least that's what he told me.

Q: And so what – but it sounds like Craig Kelley was a CEO of a company that dealt with money?

A: Absolutely.

Q: And your understanding is that that probably wasn't legal?

A: I didn't know the aspect of his probation, so I didn't know if he was no longer on probation. I didn't know the extent of what he wasn't supposed to do and what he, you know, was allowed to do. But what seemed odd to me is **whenever he would be on the phone with these banks, these lenders, he would always say his name was Richard Atnip instead of Craig Kelley**.[4]

Three other former Solar Titan employees likewise testified in their Sworn Statements that Kelley was the CEO of Solar Titan. Jason Horton, a former Solar Titan sales consultant and representative, testified that he was hired by Kelley after Kelley told Horton he was the CEO.[5] Sarah Dorismar, Solar Titan's former Finance and Administration Manager, stated Kelley was one of the owners and had access to all of Solar Titan's accounts.[6] Michael Hill, a former regional sales manager for Solar Titan,[7] again testified that "Craig Kelley is the active owner."[8]

Beyond lying to employees, business partners, and consumers about his identity, Kelley has even attempted to hide his true role in the company from Plaintiff Kentucky in the course of Kentucky's investigation into Solar Titan. As part of its investigation, on June 6, 2022, Kentucky sent Solar Titan a Civil Investigative Demand ("CID") pursuant to its investigative authority under the KCPA.[9] As part of the CID, Solar Titan was asked to provide written responses under oath to

---

[4] TRO Mot. Ex. C, Sworn Statement of Shawna Helton, Oct. 10, 2022 (hereinafter "Helton Tr.") at 21:9-16 & 25, 22:1-25, 26:1-4 (emphasis added).
[5] TRO Mot. Ex. D, Sworn Statement of Jason Horton, Aug. 3, 2022 (hereinafter "Horton Tr.") at 19:1-19.
[6] TRO Mot. Ex. E, Sworn Statement of Sarah Dorismar, Aug. 27, 2022 (hereinafter "Dorismar Tr.") at 12:16-22.
[7] TRO Mot. Ex. F, Sworn Statement of Michael Hill, Sept. 1, 2022 (hereinafter "Hill Tr.") at 16:23-24 (stating, "I was basically a regional sales manager. But it was something like territory training development something manager. It was just the way to underpay me, basically.")
[8] Hill Tr. at 23:23-25, 24:1-5.
[9] KY. REV. STAT ANN. § 367.240(1).

certain questions.[10] In requests 4-5, Kentucky asked Solar Titan to identify the company's current and former directors and owners. [11] Solar Titan only listed Atnip and Kirkland as its directors and owners.[12] Kentucky also asked Solar Titan to identify all of its current and former employees.[13] In response, Solar Titan identified Craig Kelley as merely a sales manager.[14]

Plaintiffs' investigation has revealed that Craig Kelley is not merely a sales manager. Craig Kelley oversees and makes decisions concerning nearly every aspect of Solar Titan's operations, including overseeing its financing arrangements with lending partners, determining whether or when Solar Titan will cancel contracts after consumers exercise their three-day right of rescission, training sales representatives, and making personnel decisions, including whom to hire and how to structure employee pay.[15] The Solar Titan Defendants' willingness to mislead State law enforcement entities about Kelley's role in the company is indicative of their propensity for dishonesty generally and should be a factor considered by this Court when deciding whether the requested relief is necessary to preserve evidence and limit the Solar Titan Defendants' ability to dissipate recoverable assets.

---

[10] TRO Mot. Ex. G, Declaration of Paul Fata with KY CID Issued June 6, 2022 (hereinafter "CID Request(s)"), at Requests 4 and 5.
[11] CID Requests 4-5.
[12] TRO Mot. Ex. H, Solar Titan Responses to CID (hereinafter "Solar Titan First CID Responses"), Requests 4-5.
[13] CID Request 7.
[14] TRO Mot. Ex. I, Solar Titan's Sept. 4, 2022 CID Response (hereinafter "Sept. 4, 2022 CID Responses"), Request 7 (listing Craig Kelley and describing him as someone who "[h]andles sales management, manages territory managers, and facilitates sales-process development.")
[15] Dorismar Tr. at 25-31; Helton Tr. at 15:17-25; 18:3-9, 19:24-25; 20:1-25, 21:1-16; Horton Tr. at 18:13-19, 28:19-22; Sept. 4, 2022 CID Response to Request 7.

6

### b. Atnip, as Manager, Delegates Operational Authority to Kelley.

On its 2019 and 2020 Annual Report to the Tennessee Secretary of State, Richard Atnip was listed as Solar Titan's registered agent, and was listed as one of Solar Titan's two managing members (along with Kirkland).[16] But Atnip currently does not play a substantial management role in the company, and even when Atnip actually was actively involved in Solar Titan's operations, his involvement with the company was limited. As Ms. Helton explained in her Sworn Statement to Tennessee:

> Q: Was Michael Atnip involved in the day-to-day operations of Solar Titan?
> A: In the very beginning he was involved in the payroll process. So he is the one that handled payroll in the very beginning, probably for the first six – probably actually the first eight, nine months, maybe a year. And I will say as long as he was doing it, everything seemed to be on the up-and-up. It was legit. If pay was wrong, he would correct it immediately. The few sales reps that I had at that point in time never – hardly ever had an issue with payment. Again, if it was incorrect, he would correct it.
> Q: Do you know why he stopped being involved in the day-to-day operations?
> A: I know what I was told.
> Q: Okay. What were you told?
> A: Craig and Sarah basically said that, yeah, Michael was too spastic to be involved in everything, so they just convinced him to retire because he didn't understand how things needed to be done. They took over everything.[17]

When Mr. Horton was asked what role Atnip had in Solar Titan during his Sworn Statement, he responded:

> A: I've never actually seen him in the company. So I couldn't – I mean, very little…. From what I have actually seen and witnessed, **everything is ran [sic] by Craig Kelley and Sarah Kirkland,** from what I have witnessed with my own eyes.
> Q: So even though he's listed as the chief financial officer, he's not really involved in the day-to-day runnings?
> A: No, no.
> Q: Do you know what he does with the company?
> A: No. I can't begin to tell you that. I know he's retired Air Force.

---

[16] TRO Ex. J, Tennessee Secretary of State Annual Report Forms for Ideal Horizon Benefits.
[17] Helton Tr. at 24:10-25, 25:1-5.

> ...
> Q:   Is there a reason why his name would be put on stuff like, say, the articles of incorporation and Craig Kelley's name would not be put on that?
> A:   I'm assuming that has to do with Craig Kelley's background, his past, of the -- of what I've learned of his criminal background, because he is -- I've been told that he is a felon. That's what I'm assuming why his information is nowhere on nothing.[18]

In short, Atnip has misrepresented himself to the Tennessee Secretary of State as one of Solar Titan's two managing members. His misrepresentation was a cover for his husband, Defendant Kelley, whose status as a felon convicted of a financial crime prevents him from managing companies like Solar Titan that rely exclusively on consumer lending for income.

Atnip's delegation of operational management to Kelley has substantially benefited Atnip financially. He has used funds from Kelley and Kirkland's misdeeds to purchase or lease yachts, multimillion-dollar homes, luxury vehicles, and at least one private jet. For example, Mr. Horton described one instance wherein he was asked to accompany Atnip to the purchase of a $1.8 million yacht, a large portion of which was paid for in cash.[19] In fact, Atnip asked Mr. Horton to carry the bag of cash for him on the way to purchase the yacht. As Mr. Horton explained:

> Q:   [Y]ou said [Atnip] paid cash [to purchase the $1.8 million yacht] meaning did he write a check or do a wire transfer?
> A:   We had -- he had money in the bag I carried, which I did not know, and it was a wire transfer.
> Q:   Cash?
> A:   Yes.
> Q:   How much cash?
> A:   I don't know. I left . . . . I said a few choice words, and I turned and walked off because I did not want no part of it.
> ...
> Q:   You were upset that [Atnip] made you hold this bag of money that you didn't know was a bag of money?
> A:   That's correct.[20]

---

[18] Horton Tr. at 108:4-25; 109:1-8 (emphasis added).
[19] Horton Tr. at 165:21-23.
[20] Horton Tr. at 180:24 – 181:19.

When asked why Atnip had Mr. Horton unwittingly carry the bag of cash to the yacht purchase, Atnip said it was because Mr. Horton carries a firearm.[21] As Atnip enjoys the company's ill-gotten gains, his employees and customers continue to suffer.[22]

Having now raided the company's ill-gotten funds to supplement his lifestyle, Atnip is now attempting to shift blame for Solar Titan's' failure, to Generac Power Systems, Inc. ("Generac"), a manufacturer of some of the products Solar Titan sells to customers.[23] This Court should not fall for the Solar Titan Defendants' thinly veiled efforts to avoid responsibility. Generac is not the company that committed all the unfair and deceptive acts and practices outlined throughout the Plaintiffs' pleadings.

        **c.**        **Kirkland Directs Solar Titan Employees to Engage in Unfair and Deceptive Acts.**

As an owner and managing member of Solar Titan, Kirkland has directed and controlled several key aspects of the company's business. For example, Kirkland controlled and participated in hiring and terminating members of Solar Titan's administrative staff and operations team; responding to consumer complaints; working with Solar Titan's lending partners like Mosaic to procure funds for each sale; and coordinating with the local power companies ("LPCs") to procure permits to begin the solar system installation process and get approval to make the solar systems operational. During her Sworn Statement, Ms. Dorismar testified that Kirkland interviewed her when she first applied for the position to work for the operations team.[24] Ms. Dorismar also delineated how Kirkland and Kelley initially handled working with the lending partners, which she referred to as finance companies. Ms. Dorismar said that before she was hired, Kirkland and

---

[21] Horton Tr. at 195:10-18
[22] *See, e.g.*, Hill Tr. at 27:1-8.
[23] Grace King, *10Investigates: Solar Titan brought 'to its knees' as it 'significantly' reduces staff*, 10NEWS (Jan. 6, 2023), https://www.wbir.com/article/news/investigations/10investigates-solar-titan-brought-to-its-knees-as-it-significantly-reduces-staff-january-6-2023/51-51fca812-5543-43fe-9c40-bc058bf1c0bf.
[24] Dorismar Tr. at 11:16-20; *see also* Solar Titan's First CID Responses, Request 4.

9

Kelley oversaw the company's relationship and operations with lenders.[25] She said that Kelley handled the process prior to installation. Ms. Dorismar explained that for the finance companies, "there's a pre – pre-installation process with the financing companies and there's a post installation process for the finance companies…. [W]hen [Ms. Dorismar] came along, they taught [her] both of those processes, and that took it off their plate."[26]

Kirkland also supervised and participated in the company's practice of not canceling consumers' installation agreements even after they exercised their three-day right to cancel[27] those agreements.[28] When Ms. Dorismar reported to Kirkland that there was a backlog of consumers who had exercised their right of rescission, Kirkland instructed Ms. Dorismar that (rather than processing all the cancellations) she should only cancel four contracts per week. Ms. Dorismar said:

> A:     And then fast-forward to us now having 90 cancellations in the queue for Shawna [Helton] to call and/or Craig [Kelley] to approve. They are past their three days. There's still an active loan because we haven't been given authority [by Kelley] to cancel them out, and it's just like I'm doing what I'm told…. So we're 90 deep, and she's telling me to cancel out three a week…. So I went to Sarah [Kirkland] again…. She said, 'But we just need to do four a week until we get this done.' I told her -- I said 90 -- I divided it up, and I think it was like 10 months. I said, 'Just with the 90 we have -- if I only did four a week, it is going to take us 10 months to clear up this list….'[29]

In short, Kirkland, who managed the day-to-day operations along with Kelley, is an active participant in Solar Titan's unlawful conduct and is liable for this conduct both as an officer of the company and in her individual capacity.

---

[25] Dorismar Tr. at 13:2-25; *see also* Solar Titan's First CID Responses, Request 4.

[26] Dorismar Tr. at 13:17-25.

[27] As discussed in more detail below, home solicitation sellers are required to provide a three-day right of rescission for all in-home purchases and purchases financed by installment credit. 16 C.F.R. 429.1; 12 C.F.R. 1026.23(b); TENN. CODE ANN. § 47-18-705; KY. REV. STAT. § 367.420(1).

[28] *Id.* at 29-33; *see also* Solar Titan's First CID Responses, Request 4.

[29] Dorismar Tr. at 31:11-23, 32:9-24.

### 2. Using Misrepresentations to Induce Transactions

The Solar Titan Defendants drastically exaggerate the savings consumers will experience when they switch to solar energy, omit important information about or misrepresent how the solar systems will be funded, and assure consumers that they will not have to make payments on their loans until the systems are operational. The Solar Titan Defendants also tell consumers their solar systems will be installed well before their loan payments are due.[30] They make this representation despite the company's history of failing inspection after inspection because of its shoddy workmanship, causing significant delays in making the system fully operational (*i.e.*, "commissioned").[31] The Solar Titan Defendants know or reasonably should know that they will not complete their installations and have the systems commissioned in the timeframe promised to consumers, and Solar Titan knows that consumers will not save nearly as much on their electric bill as the company promises.[32]

### a. Solar Titan Has Always Lied About System Performance and Energy Savings.

Solar Titan's marketing materials and advertisements claim consumers will save 50%-90% on their electric bill with a Solar Titan solar system.[33] Solar Titan claims consumers will not spend more on their solar system than they would pay "anyway" towards their electric bill.[34] Solar Titan refers to this as the "anyway money pitch."[35] Indeed, one of the most common complaints Plaintiffs

---

[30] *See, e.g., id.* at 40-45 and 89:5-25 (Ms. Helton states that although Solar Titan was telling consumers that they would not have to start paying on their loans until 60 days after installation, consumers did not know that "installed" does not mean operational.)

[31] *See, e.g., id.* at 40-45; Hill Tr. at 27:21-25, 28:1-15; TRO Mot. Ex. K, Declaration of Michael Morelli, the Director of Electrical, Residential Building, and Marina Inspections for the Tennessee State Fire Marshal's Office ("SFMO") (hereinafter collectively referred to as "Morelli Declaration") ¶¶ 8-20 (describing Solar Titan's unusually high failure rate for inspections and failure to pull proper permits prior to installations).

[32] *See, e.g.,* Helton Tr. at 40-45; Horton Tr. at 44-47 and Exs. 4 & 5.

[33] TRO Mot. Ex. L, Solar Titan USA Advertisement, "Become A Power Producer and Save 50-90% Off Your Monthly Electric Bill" (hereinafter "Solar Titan's Save 50-90% Off Electric Bill Advertisement").

[34] Horton Tr. 30:11-25, 31:1-25, and Ex.2.

[35] *Id.*

receive about Solar Titan centers around the company's misrepresentations about utility bill savings.[36]

The Solar Titan sales representatives rely on two primary misrepresentations to deceive consumers into believing that they will save consumers 50%-90% on their electric bill. First, they tell consumers that due to inflation, consumers will continue to pay more for their electric bills each month – falsely claiming that in the past eight years, the national average increase for power bills has been 8.2% each year.[37] After lying about the average annual increase in electric utilities, Solar Titan sales representatives are trained to conduct the "anyway money" sales pitch using a "modest" estimate that the consumer's energy bill will increase by 5% each year.[38] However, a study by the U.S. Energy Information Administration shows that between 2009 and 2019, there was less than an annual 2% increase in the price per kilowatt-hour on average for residential consumers in the United States.[39]

The second way that Solar Titan sales representatives claim that consumers will save money is by stating that the sales representative will choose a solar system size that will produce enough energy to cover the consumer's average monthly consumption. However, the Solar Titan Defendants gave their sales representatives charts that overstated how much energy each system size would produce. In his Sworn Statement, Mr. Horton described how Solar Titan repeatedly distributed inaccurate system sizing charts to sales representatives to use when telling consumers how much energy a solar system would generate. Mr. Horton explained:

> A:      …[T]hese were the numbers that I was selling off of to customers because I was given -- I was told this is the correct information from the company. And I later found out that we was [sic] selling a system that was not

---

[36] *See, e.g.*, TRO Mot. Ex. M, Declaration of Bill Warren, Team Lead of Development and Renewables for Knoxville Utility Board ("KUB") (hereinafter referred to as "Warren Declaration") ¶ 12.
[37] *See* Horton Tr. at Ex. 2.
[38] *Id.*
[39] Today in Energy, U.S. ENERGY INFO. ADMIN., https://www.eia.gov/todayinenergy/detail.php?id=46276 (last visited Jan. 3, 2022).

producing anywhere close to what we was [sic] promised. This was given by Craig Kelley and Sarah Kirkland.

Q: So this is a document that you just handed to me. It says, "What Starting Size Solar System to Recommend: This is a Guideline." You testified earlier that whenever you are asking a customer what it is they wanted, you would build them a system that could meet their needs.

A: That is correct.

Q: And you're saying that you used this guideline in order to come up with the system that you thought met their needs?

A: Yes ....

Q: But what you're telling me is that the numbers here on this document are incorrect?

A: Yes.

...

Q: And so you did use this document?

A: I used it for years, yes.[40]

Former sales manager Mr. Hill also testified that he once asked another Solar Titan manager, Dale Roden, about whether the systems being sold by Solar Titan would ever perform as promised.[41] Dale Roden responded by saying, "I can't tell you that. I was told not to say anything about that."[42] A month after that conversation, Solar Titan sent out the aforementioned updated sizing guideline.[43] Soon after, Mr. Hill resigned due to "ethical concerns."[44] In fact, every former Solar Titan employee Plaintiffs have spoken with has indicated that they resigned, in whole or in part, because of the serious ethical concerns they had about the company.

Ms. Helton, who also resigned due to ethical concerns,[45] said this in regard to the "updated" sizing chart:

A: Then when they found out that Pink Energy, which at the time was PowerHome, this was way back whenever the news channels first started doing their undercover stuff down in Georgia, they got scared and reissued a new sizing chart. And I said, well, if that doesn't scream: We are guilty, I

---

[40] Horton Tr. at 44:19-25, 45-47, Exs. 4 and 5.
[41] Hill Tr. at 34:20-25, 35:1-3 (explaining that he asked Dale Roden about whether the size systems are "'producing what they need to produce for [Solar Titan's] customers.'")
[42] Id. at 35:3-5.
[43] Id. at 35:13-14.
[44] Id. at 38:5-17.
[45] Helton Tr. at 71:12-72:19.

13

don't know what does, guys. Why now, all of a sudden, are you changing the sizing charts?[46]

### b.  Solar Titan Misrepresents Eligibility for Tax Credits.

The Solar Titan Defendants also deceive consumers into thinking they will be eligible for tax credits for which they do not qualify.[47] Consumers are told this tax credit (hereinafter the "Federal Tax Credit" or "Tax Credit") will reduce the overall cost of the system and its installation by 26%-30%.[48] However, the Federal Tax Credit for qualifying solar systems is nonrefundable, meaning the Federal Tax Credit can only be applied to an existing federal income tax liability.[49] Some Solar Titan customers are retirees or others that have no tax liability and are thus ineligible for the promised Tax Credit.[50] Even if a consumer is eligible to claim the Federal Tax Credit, the nonrefundable credit can only be claimed once; therefore, if a consumer's tax liability the year the system was purchased is less than the Tax Credit they are entitled to, the consumer will not receive the full Tax Credit amount represented by Solar Titan employees. Despite the Tax Credit being an integral part of Solar Titan's sales pitch, Solar Titan does not train its employees to understand the distinction between a refundable tax credit and a nonrefundable tax credit. Therefore, Solar Titan sales representatives are providing inaccurate information to consumers, which misleads consumers to think they qualify for the Federal Tax Credit when in fact they do not.[51]

Charles Schwable is one such consumer who complained to the Tennessee Division of Consumer Affairs ("DCA") about how Solar Titan misled him to believe he was eligible for a tax

---

[46] Id. at 46:9-16.
[47] Consumers who purchase a residential solar system may be eligible to receive a nonrefundable tax credit equal to 26%-30% of the cost of the purchased solar system. The Federal Tax Credit is derived from the Energy Savings Act of 2005 and is codified in the IRS tax code at 26 U.S.C. § 25D(g).
[48] Horton Tr. at 33:12-25, 34:1-6, 61:6-12, 63:5-12.
[49] Horton Tr. at 63:5-12.
[50] See id. at 61-63.
[51] Id.

14

refund when he was not.[52] As he described in his consumer complaint, "I am a disabled Veteran on a fixed income having a financial nightmare based on a lie, misrepresentation, and false narrative . . . . [T]he tax incentive is a lie, it is a tax credit not if you get a refund."[53] Consumer Michael Moore also submitted a consumer complaint to DCA that alleges Solar Titan lied to him about his eligibility for the tax credit.[54] As Mr. Moore explains in his complaint: "I met with a sales representative at my home regarding purchasing solar power equipment for my home. He explained to me that the cost would be approximately $30,000 however I was guaranteed to receive a $10,000 tax credit which would drive the cost down to around $20,000."[55] Mr. Moore, who is elderly and on a fixed income, later learned he was not eligible for the promised Tax Credit.[56] Mr. Moore believes that Solar Titan took advantage of him because he is elderly.[57]

The structure of the financing promoted by the Defendants, itself, misrepresents that all consumers are eligible for the federal tax credit because every consumer loan provided by Mosaic to a Solar Titan customer suggests that the cost of the loan will be offset by the Federal Tax Credit.[58] The terms of the loan assume each consumer will pay Mosaic a balloon payment in approximately the same amount as the Tax Credit prior to re-amortization that occurs 18 months after the first payment is due.[59] The terms are intended to give the impression that the consumer is indeed eligible for the Tax Credit and that the cost of the system and the associated loan will be lowered as a result.

---

[52] Consumers who submit consumer complaints to the DCA must attest to the accuracy and truthfulness of the content contained in the complaint.
[53] TRO Mot. Ex. N, Declaration of Claire Marsalis, Director of the DCA (hereinafter "Marsalis Declaration") at Ex. A, pp. 373-375.
[54] *Id.* at Marsalis Declaration at Ex. A, pp. 341-343.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] TRO Mot. Ex. O, Mosaic Loan Agreement, ¶ 2.
[59] *See, e.g., id.*

### 3.    Solar Titan Acts as Mosaic's Agent

Solar Titan acts as Mosaic's Agent for the purposes of promoting Mosaic's lending agreement; therefore, Solar Titan is covered by and must comply with federal financial consumer protection laws. Mosaic depends on Solar Titan sales representatives to facilitate its lending practices by helping consumers fill out their applications using Mosaic's online portal.[60] Mosaic dictates what information the Solar Titan representative collects from consumers to fill out the finance application.[61] Solar Titan also uses Mosaic's software to communicate to consumers that they have been approved for financing.[62] Mosaic also has contractual rights to control how Solar Titan's staff are trained to explain to consumers Mosaic's loan approval process and the terms and conditions of Mosaic's loan program.[63] Mosaic even requires all Solar Titan sales representatives to "obtain a passing score on any Mosaic Program training test or quiz in order to gain access to the Portal and participate in the Mosaic Program."[64] Mosaic requires Solar Titan to submit for Mosaic's approval all communications to consumers about Mosaic's loan program.[65] The terms of the Mosaic Participant Agreement give Mosaic the ability to control how Solar Titan facilitates the loan application process and solicits consumers to use Mosaic's loan products and services.

---

[60] Helton Sworn Statement Tr. at 100:19-25, 101:1-13, 103:24-25, 104:1-16.
[61] *Id.* at 101:1-13, 102:16-23; 103:12-16, 24-25; 104:1-16; *See also* Ex. P, Mosaic Program Participant Agreement (hereinafter "Mosaic Participant Agreement" or "the Participant Agreement") (Mosaic Participant Agreement Paragraph 1.3 states that Mosaic "has the sole discretion to (a) determine the terms and conditions of any Financing Application, Financing Agreement, Financing Product, and (b) establish policies and procedures related to the promotion, application and/or funding of Financing Products, as applicable." Paragraph 2.1 of the Mosaic Participant Agreement outlines the process for Program Participants, like Solar Titan, to create a "custom application… to enable Customers to apply for financing products from one or more [of Mosaic's] financing providers." The Participant Agreement requires Solar Titan to have Mosaic approve those custom applications.)
[62] Helton Tr. at 101:17-25; 103:24-25; 104:1-16.
[63] Mosaic Participant Agreement, ¶ 4.1.
[64] Mosaic Participant Agreement, ¶ 4.1.
[65] Mosaic Participant Agreement (stating in paragraph 3.1. that "Any marketing, promotional and advertising materials and communications referencing the Mosaic Program, Financing Products, Program Administrator, or a Financing Provider… must be approved in writing by Program Administrator in advance of use by Participant.)

16

Mosaic also dictates all the steps Solar Titan must take in order to receive a consumer's loan funds. Before Mosaic disburses a consumer's loan funds to Solar Titan, Solar Titan must demonstrate that certain "Milestones" have been completed.[66] The Milestones, and the method by which Solar Titan must demonstrate they are completed, are controlled by Mosaic.[67] As Ms. Dorismar explained, when she first started working for Solar Titan, Mosaic disbursed portions of a consumer's loan at three different intervals and only after Solar Titan reached the requisite Milestone for each disbursement.[68] These three Milestones were: (1) submitting the bill of lading for approval (*i.e.*, submitting the install agreement and completing the loan approval process); (2) putting "glass on the roof" (*i.e.*, attaching the solar panels to the consumer's roof); and (3) demonstrating permission to operate ("PTO") (*i.e.*, demonstrating to Mosaic that the solar system has passed all required inspections and is ready to be commissioned by the consumer's LPC).[69]

At some point, Mosaic essentially eliminated the PTO Milestone and agreed to fully disburse the consumer's loan funds once "glass was on the roof," regardless of whether the solar system was actually working or not.[70] As Ms. Dorismar explained:

> Q:   Do you know the reason why [the Milestone requirements] may have been changed?
> A:   Just because of [Solar Titan] bringing in more money [Mosaic], and they're making more money because we're making more money and that's just one of the perks, I guess.[71]

Dorismar also said that, at Solar Titan's request, Mosaic later changed the requirements for Solar Titan to complete the second Milestone: Solar Titan no longer had to demonstrate a consumer's solar system was actually installed; instead, Solar Titan merely had to "click[] a button that says

---

[66] Dorismar Tr. at 15-17.
[67] *Id.*
[68] *Id.* at 19:4-22.
[69] *Id.* at 19:22-25, 20-21.
[70] *Id.* at 19:4-16, 21:22-25, 22:1-7.
[71] *Id.* at 23:3-8.

17

[the installation is complete]".[72] Even after Solar Titan had difficulty demonstrating that customers had operational systems, Mosaic still reduced the Milestone requirements. Simply put, Mosaic did not care whether Solar Titan could demonstrate that the consumer had an operational solar system installed because eliminating that "Milestone" from the loan disbursement schedule made Solar Titan more money, which in turn increased Mosaic's profit.

### 4.    Taking Loan Funds Before Legally Allowed

Of all the unfair and deceptive business practices committed by the Solar Titan Defendants, Solar Titan's practice of refusing to cancel installation agreements for customers who exercised their right to cancel the agreement within three days of signing is perhaps the most egregious. Instead of waiting for the expiration of the three-day "cooling-off" period required by both Tennessee and Kentucky state law,[73] Solar Titan's business practice has been to seek loan disbursements from Mosaic immediately after the consumer signs the installation agreement.[74] If a consumer cancelled within the cooling-off period, rather than notify the consumer's lender that the agreement was cancelled (as they were required to do), the Solar Titan Defendants held onto funds received from the lender – for longer than nine months in some cases.[75] As a result, these customers remained liable for the loan balances and would receive monthly billing as if they had never cancelled.

Importantly, it is illegal for lenders like Mosaic to disburse loan funds before the "cooling off" period has expired.[76] Equally important, Solar Titan is contractually forbidden from seeking

---

[72] *Id.* at 92:17-24, 99:7-24.
[73] TENN. CODE ANN. § 47-18-703; KY REV. STAT. § 367.420.
[74] Although Solar Titan was the company that was submitting the installation agreements to Mosaic prior to the expiration of the cooling-off period, Mosaic knew or should have known that Solar Titan was seeking loan disbursements prematurely because the signed installation agreement submitted through Mosaic's financing portal included the date the agreement was executed. *See id.* at 18-19, 25:13-25, 26:1-11.
[75] Dorismar Tr. at 33:19-25.
[76] 12 C.F.R. § 1026.23(c).

18

loan disbursements during the "cooling off" period.[77] Mosaic's Participant Agreement Loan Program Addendum states that it cannot disburse, and Solar Titan cannot seek, loan disbursements before the consumer's statutory right to cancel has expired unless the consumer explicitly agrees to waive their right. Even then, a cancellation waiver can only be obtained if it is provided by the consumer "due to emergency circumstances."[78]

When questioned about submitting installation and loan agreements (*i.e.*, the first Milestone) prior to the expiration of the consumer's three-day "cooling-off" period, Ms. Dorismar explained:

> A:      So [Solar Titan has] a three-day grace period. You sign the contract and then you have three days to cancel that we would let you out of the contract. And that's the same thing with the finance company. They gave you the three-day grace period before -- and then there wouldn't be any penalty or anything to be let out of the contract. But because they wanted us to put the information into the system **the day after the contract was signed**, we met the bill of lading approved [Milestone] most of the time before that three days was over. So we received money on that account. But, say we received the money on day two, day three you call in and want to cancel, we're legally obligated for you -- to let you out of the contract, but because we had already reached that first Milestone and they paid us money, their cancellation process takes longer. So sometimes they will actually get billed for their first payment before their contract is finished.[79]

Ms. Dorismar went on to explain that she tried to talk Kelley and Kirkland out of continuing the practice of seeking loan funds from Mosaic before the consumer's three-day right to cancel expired.[80] Kelley and Kirkland refused because it would create a "cash flow issue."[81] Ms. Dorismar explained that stopping this business practice would actually fix a lot of the company's cash flow problems in the long run, but still, Kelley and Kirkland refused.[82]

---

[77] TRO Mot. Ex. Q, Mosaic Participant Agreement Loan Program Addendum, at ¶ 2.1.3
[78] *Id.*
[79] *Id.* at 25:20-25, 26:1-14 (emphasis added).
[80] *Id.* at 26:21-25.
[81] *Id.* at 27:3-4.
[82] *Id.*

In fact, instead of stopping the practice, Kelley intentionally delayed sale cancellations. At Kelley's and Kirkland's direction, Solar Titan's process to cancel contracts for consumers who exercised their three-day right of recission was to have the sales manager, Ms. Helton, call the consumers within the three days to try to save the sale.[83] At one point, Ms. Helton became behind and could not call consumers who exercised the right to cancel their contract before their three-day window expired.[84] Ms. Dorismar explained:

> A:     Well, the sales manager was extremely busy all the time, out in the field doing trainings, this, that, and whatever, and just didn't have the time -- because of all the requirements that Craig [Kelley] had on her wasn't able to get to these customers as quickly as we needed and as quickly as they were wanting to happen . . . . Then it's like 45 calls deep and then they're way past their three days but we haven't received [permission from Kelley] to cancel it, so they still have an active loan through Mosaic. And I would bring this to their attention over and over again that they're legally within their three days, but we haven't canceled them because we haven't got the form from sales back.[85]

When Ms. Helton was not able to call a consumer back during the "cooling off" window to attempt to save the sale, Ms. Dorismar started cancelling contracts for those consumers who had exercised their right to cancel.[86] By processing the cancellations as required by law, Ms. Dorismar caused Mosaic to withdraw at least a million dollars from Solar Titan's account.[87] Kelley was furious, and began requiring that all cancellations be approved directly by him before being processed.[88] Ms. Dorismar said that "most of the time [the customer cancellations] sat on [Kelley's] desk for weeks, and we never even received a final approval."[89]

---

[83] *Id.* at 28:19-25, 29:1-9.
[84] *Id.* at 29:10-25.
[85] *Id.* at 29:10-25, 30:1.
[86] *Id.* at 29:10-25, 30:1-6.
[87] *Id.* at 30:2-8.
[88] *Id.* at 30:7-12.
[89] *Id.* at 30:12-14.

Ms. Dorismar attempted to address the issue with Kirkland, whom she described as more "reasonable."[90] However, Kirkland initially only agreed to allow Ms. Dorismar to process three to four cancellations per week.[91] Ms. Dorismar again objected because four per week would not clear the significant backlog of customer cancellations.[92] Ms. Dorismar further explained:

> A: I told her -- I said with 90 -- I divided it up, and I think it was like 10 months. I said, "Just with the 90 that we have -- if I only did four a week, it is going to take us 10 months to clear up this list, and that's a lot of cancellation fees and that's a lot of interest fees." I said, "That's just the list of what I have now, not including all of the customers from today forward that are going to be canceling. So I don't know when we're ever going to get this cleared up because of this so-called cash flow issue." And I was like **I don't understand why the company is looking at money that's come in from potential -- from canceled customers as cash to use. It's not cash to use. None of it is.**[93]

Rather than allowing Kirkland to process cancellations for all customers who exercised their right of recission, Ms. Dorismar could only persuade Kirkland to permit her to cancel eight per week.[94] Thus, while the Solar Titan Defendants were continuing to seek loan disbursements before the consumers' right to cancel expired, cancellations were not being processed or honored, causing numerous consumers to become indebted for large sums of money for a product they did not want and could not afford.

### 5. Shoddy Installations and Failure to Follow Industry Standards

Every LPC and inspection authority interviewed by Plaintiffs have expressed serious concerns over Solar Titan's workmanship and the ability of the company's installers to complete installations in a competent manner. For example, Tim Suddoth, Middle Tennessee Electric's ("MTE") Distributed Energy Resources and Energy Services Supervisor, states in his Declaration

---

[90] *Id.* at 30:15-16.
[91] *Id.* at 31:22-25, 32:9-18.
[92] *Id.* at 32:9-18.
[93] *Id.* at 32:21-25, 33:1-9 (emphasis added).
[94] *Id.* at 33:17.

that MTE has run into numerous issues when attempting to commission solar system installations performed by Solar Titan.[95] Mr. Suddoth says these installation issues have the potential to injure either the homeowner, the installer, or an MTE line worker.[96] He further notes that Solar Titan installations have caused damage to consumers' homes including leaks and damaged shingles.[97]

Michael Morelli, who works as the Director of Electrical Inspections for the Tennessee State Fire Marshal's Office ("SFMO"), states that Solar Titan fails an "unusually high" number of inspections.[98] He indicates that the company is not performing installations in accordance with industry standards.[99] Mr. Morelli estimates that 60-70% of Solar Titan customers run into issues with their installations.[100] He identifies Solar Titan's common issues as: not getting proper permits, not keeping consumers informed, and not performing installations in accordance with the governing electrical code.[101]

Bill Warren, who is the Distributed Energy Resources Team Lead at the Knoxville Utility Board, states that Solar Titan has installed several systems in KUB's jurisdiction without submitting the proper paperwork (these installations are referred to as "non-commissioned generation sites").[102] Non-commissioned generation sites have the potential to cause a dangerous condition called "reverse flow"[103] onto the grid unbeknownst to KUB line workers.[104] Ms. Helton also testified that Solar Titan would install systems without even pulling the proper permits.[105]

---

[95] TRO Mot. Ex. R, Declaration of Tim Suddoth at ¶¶ 14-15.
[96] *Id.* at ¶ 16.
[97] *Id.*
[98] Morelli Declaration at ¶ 15.
[99] *Id.* at ¶ 18.
[100] *Id.* at ¶ 19.
[101] *Id.* at ¶ 20.
[102] Warren Declaration at ¶ 19.
[103] Reverse flow occurs when the power generated by a solar system exceeds the home's immediate demand. Reverse flow can cause power to flow onto a grid without the grid operator's knowledge; this can be dangerous if an LPC has shut down part of the grid for service.
[104] *Id.* at ¶ 12.
[105] Helton Tr. at 159:2-5.

22

Stephen Miller, an electrical engineer and the Manager of Operational Services for Warren Rural Electric Cooperative Corporation ("WRECC"), is encountering the same issues described above in Kentucky. In his declaration, Mr. Miller states that Solar Titan is interconnecting solar systems to the electric grid "before going through the proper procedures to pass inspection and commissioning."[106] Mr. Miller explains that "there is an increased risk of injury and/or death to property occupants, electric utility line workers, and other personnel who service the electric grid."[107] Mr. Miller also states that Solar Titan is deceiving consumers into thinking they are eligible for a one-for-one buyback credit in some Kentucky jurisdictions.[108] As Mr. Miller explains, this is simply not true.[109] Mr. Miller was forced to reach out to Kirkland directly to demand Solar Titan stop this false advertising.[110]

The accounts of Mr. Suddoth (MTE), Mr. Warren (KUB), Mr. Morelli (SFMO), and Mr. Miller (WRECC) are corroborated by the complaints from harmed consumers, many of whom complain that Solar Titan did not install the systems they paid for in a satisfactory manner. Tony Binkley, the president and CEO of the Better Business Bureau of Greater East TN, Inc. ("BBB"), reports that the BBB received so many complaints about Solar Titan over the span of a year, the organization was forced to drop Solar Titan's BBB score from a "B" to a "F" rating.[111] Kelley and Kirkland then met with Mr. Binkley and informed him that Solar Titan wanted to withdraw its affiliation with the BBB.[112] Claire Marsalis, the Director for the Tennessee Division of Consumer Affairs ("DCA"), states that DCA has received 125 complaints about Solar Titan since 2020.[113]

---

[106] TRO Mot. Ex. S, Declaration of Stephen Miller, at ¶ 7.
[107] *Id.*
[108] *Id.*, at ¶ 9.
[109] *Id.*, at Attachment 1.
[110] *Id.*, at Attachment 1 & 2.
[111] TRO Mot. Ex. S, Declaration of Tony Binkley at ¶10.
[112] *Id.* at ¶ 12.
[113] *See* Marsalis Declaration at ¶ 5 and attached consumer complaints.

23

Again, many of these consumer complaints involve concerns over Solar Titan's installation process.[114] The same is true of the 92 consumer complaints about Solar Titan submitted to Kentucky's Office of the Attorney General since 2020, also attached as an exhibit to the TRO Motion.[115]

In support of their Motion for Temporary Restraining Order, Plaintiffs have attached five declarations from just some of the many consumers Solar Titan misled. One such declaration from Jonathan Snow explains that Solar Titan failed several inspections during the installation process at his home.[116] As a result, Mr. Snow was forced to start repaying his Mosaic loan before his system was ever generating any power.[117] Another consumer, Bruce Whitehead, explains that he waited several months after he signed the installation agreement before Solar Titan installers came to his home to complete the installation.[118] After the panels were installed, Solar Titan refused to take the steps necessary to make the system operational and seek the required approval.[119] Consumer Ronnie Smith reports that Solar Titan's installation caused his roof to leak.[120] Despite claiming to warrant its installation services in the installation contract, Solar Titan refused to take responsibility for the leak, and Mr. Smith had to pay for his roof repairs out of pocket.[121]

### 6. Solar Titan Misrepresents Affiliations with Other Entities.

Solar Titan also misrepresents its affiliation with government and professional entities in an effort to appear more legitimate. As explained by Lisa Akins, the Tennessee Valley Authority's ("TVA") Commercial Energy Solutions Senior Program Manager, TVA kicked Solar Titan off of

---

[114] See, generally, Marsalis Declaration, at Attachment 1.
[115] See, generally, TRO Mot. Ex. U, Declaration of Lisa Cochran, at Attachment 1.
[116] TRO Mot. Ex. V, Declaration of Jonathan Snow at ¶ 12.
[117] Id. at 14.
[118] TRO Mot. Ex. W, Declaration of Bruce Whitehead at ¶ 13.
[119] Id. at ¶¶ 13-16.
[120] TRO Mot. Ex. X, Declaration of Ronnie Smith. at ¶ 10.
[121] Id. at ¶ 11.

24

its Green Connect Qualified Contractor Network ("QCN") program due to the high volume of complaints from LPCs and consumers about the company.[122] Initially, TCA suspended Solar for one month due to installations not being satisfactorily completed in a timely fashion; however, after failing to adequately address unresolved issues, Solar Titan was given a one-year suspension.[123]

Despite its one-year suspension from TVA's QCN program, Solar Titan continued to represent itself as a TVA-approved installer on its website.[124] On May 26, 2022, the TVA sent Solar Titan an email demanding that the company remove any references to the TVA from its website.[125] Solar Titan did not respond to that e-mail.[126] TVA later learned that Solar Titan had advertisements on YouTube that used the TVA logo and falsely claimed that Solar Titan was TVA approved.[127] On June 22, 2022, TVA sent Solar Titan a letter requesting that the company cease making the false representation that Solar Titan was a QCN participant.[128] The letter also demanded that Solar Titan stop the unauthorized use of TVA's name and logo.[129] While Solar Titan removed the misrepresentations from its website, Solar Titan continued to use the YouTube advertisements for weeks.[130]

Solar Titan also falsely claimed that it was a member of the Solar Energy Industries Association ("SEIA"), a private trade group created to promote the solar industry and encourage the use of ethical business practices by industry participants.[131] The SEIA requires members who

---

[122] TRO Mot. Ex. Y, Declaration of Lisa Akins. ¶¶ 10-18.
[123] *Id.* at ¶¶ 14-15.
[124] *Id.* at ¶ 19.
[125] *Id.*
[126] *Id.*
[127] *Id.* at ¶ 20.
[128] *Id.* at ¶ 21.
[129] *Id.*
[130] *Id.*
[131] SEIA Website, https://www.seia.org/initiatives/seia-solar-business-code (Last accessed Jan. 20, 2023).

join to agree to abide by a code of ethics to ensure consumers are being treated fairly and that installations are being performed in a safe, timely, and professional manner.[132] Solar Titan's use of the SEIA logo on its website gave consumers the impression that the company agreed to comply with this code of ethics and that it was holding itself accountable in accordance with industry standards. However, as confirmed in an email sent to Plaintiffs by Amir Yazdi, SEIA's Deputy General Counsel, Solar Titan was not and has never been a SEIA member.[133]

### B.    The Solar Titan Defendants Recklessly Spent Consumer Funds.

The Solar Titan Defendants used the unfair and deceptive business practices described above to fund their lavish lifestyle. Multiple whistleblowers, all of whom formerly held prominent roles within Solar Titan, have testified to Solar Titan's financial unraveling and its principals' reckless and extravagant spending.[134] Solar Titan's principals purchased and leased multi-million dollar mansions, luxury vehicles, yachts, and at least one private jet.[135] Prior to founding Solar Titan, Kelley, Kirkland, and Atnip did not have significant financial resources, suggesting that the funds used to make these expensive purchases were derived from Solar Titan's customers.[136]

Ms. Helton testified about how Solar Titan's inability to pay its employees or fulfill its obligations to its customers appeared related to Kelley, Kirkland, and Atnip's lavish lifestyle and extravagant spending habits:

> Q:    So in March 2022, you said they probably did $4.2 million in profit?
> A:    At least.
> Q:    But it sounds like they were having difficulty getting the installs done. It sounds like they had a lot of money. Why would they have difficulty getting the installs done?

---

[132] *Id.*

[133] TRO Mot. Ex. Z, Email conversations between Tennessee's Counsel and SEIA Deputy Counsel Amir Yazdi.

[134] *See, e.g.*, Horton Tr. at 163:24-169:19; 195:2-196:4 (describing, among other things, a time when Mr. Horton accompanied Atnip to purchase a $1.8 million yacht while carrying a bag full of cash).

[135] Helton Tr. at 56:21-22 ("[A] lot of shady of things were going on… . [T]he owners were definitely taking their cut….").

[136] Helton Tr. at 14:6-10, 133:18-25, 134:1-15; Horton Tr. 171:1-20.

A: Because they were spending it as quick as they were - - as we were making it for them.

Q: Who was?

A: I don't - - between Sarah [Kirkland], Craig [Kelley], and Mike [Atnip]. I feel that they were probably drawing profits weekly. Now, this, again, is my perception because, I agree with you, why on earth should a company this large and this successful will be having [sic] these kind of issues?

My sales reps were never paid on time. My sales reps were never paid what they were supposed to be paid. They kept cutting commissions....

So you're telling me that we are charging 30-, $40,000, and the average Commission is 3- to $400. That's not -- By the time tax and insurance is taken out, that's not enough for gas for the week. And you are going to want me, as a sales rep, to run 1,000 miles a week and you're not even going to pay me? And $400 is complete commission. They were only paying half up front.

So, yeah, a lot of shady, shady things were going on. But, no, I feel that the owners were definitely taking weekly their cut.

Q: So even if they weren't –

A: And –

Q: -- making payroll, they would make sure –

A: They were getting paid, absolutely. I mean, how else are you going to fund yachts and Teslas and homes, lake homes for your family members and this family member and that family member? And I'm not hating. I -- If everybody was getting paid and these homeowners were getting their installations done on time and correctly, I'd say, "You know what? Let them buy whatever they want to buy. They are doing everything the right way." But when people aren't getting paid and these homeowners are getting screwed and they are getting double billed for months and crap may be on the roof, but, yet nobody has come out to finish the job, but you can afford a Tesla every single month and you can afford to go out and buy these yachts. They are not even yachts. They are called super yachts. They had so many yachts that, yeah, they started another company from the money they were drawing off Solar Titan. And, you know, that's when I have a problem. You can afford to do all these things, but you can't afford to pay people and you can't afford to do these homeowners that have already bought from you, you've already got their money, there is a problem with that.[137]

Former sales manager, Mike Hill, gave similar testimony describing Kelley, Kirkland, and

Atnip's indifference to the financial hardship of Solar Titan's employees and customers:

Q: Was there one red flag in particular that actually tipped things to where you were like, no, I don't think this is an honest company?

---

[137] Helton Tr. at 55:14-25, 56:1-25, 57:1-21; *See also id.* at 134:16-25 ("[T]hey were going to bulldoze that million-dollar home to build another million-dollar home. But yet they can't pay their people. They can't get these installs done correctly.")

A:      All my employees were broke. And this guy was flying a personal jet from
        Knoxville to Huntsville, Alabama, to take his dad out to dinner....
        you know, they were sending out e-mails saying that they were going to
        send you a check for $2,800 this Friday. That's what your expected pay was.
        And then that Friday you got $200, $50, $500. You know?
        But this guy is buying a house in Destin. You know, this guy has bought
        half of a really nice area here in Knoxville in a high-end neighborhood. I
        mean, it's got to be $200,000 an acre where he's buying in Westland here in
        Knoxville. Acres and acres. and they're making me have to go to these
        offices, look these employees in their eye, and say, "Hey, man. It's going to
        be okay. Go out there and sell some more. Go sell some more, man. You're
        going to be paid eventually. Just keep on selling. I can't help that your kids
        don't have no food; your lights are turned off. Just go sell something." I'm
        not a liar. I don't believe in hurting people. I only want to help people.[138]

Unfortunately, Kelley, Kirkland, and Atnip have shown no such concern about the harm
inflicted on Solar Titan's employees and customers as they drain Solar Titan of its financial
resources.

### C.      The Solar Titan Defendants are Dissipating Assets and May Be Destroying Records.

Public records confirm that Solar Titan's principals have recently begun liquidating assets.
On November 15, 2022, Kelley and Atnip sold their home at 3411 Tooles Bend Road in Knoxville
for $9.75 million dollars.[139] They also sold another home in Knox County for $550,000 on October
27, 2022, and a home in Miramar Beach, Florida for $1.715 million on June 28, 2022.[140] In
response to a recent news inquiry, Atnip represented that he had reinvested "millions" into Solar
Titan.[141] However, despite the principals having liquidated millions of dollars' worth of assets,
Solar Titan's employees are still not being paid and customers experiencing installation and repair

---

[138] Hill Tr. at 46:19-25, 47:1-19.
[139] TRO Mot. Ex. AA, Deed from Nov. 15, 2022 sale of home at 3411 Tooles Bend Road, Knoxville, TN 37922.
[140] TRO Mot. Ex. BB, Deed from Oct. 27, 2022 sale of home at 11913 Grigsby Chapel Road, Knoxville, TN 37934;
TRO Mot. Ex. CC, Deed from June 28, 2022 sale of home at 3017 Club Drive, Miramar Beach, FL 32550.
[141] See Grace King, *10Investigates: Solar Titan brought 'to its knees' as it 'significantly' reduces staff*, 10NEWS (Jan.
6, 2023), https://www.wbir.com/article/news/investigations/10investigates-solar-titan-brought-to-its-knees-as-it-
significantly-reduces-staff-january-6-2023/51-51fca812-5543-43fe-9c40-bc058bf1c0bf:

issues are not being helped.[142] Atnip's claim that Solar Titan principals are selling property to reinvest into the company appears unlikely, given the Solar Titan principals' ongoing fraudulent behavior. Instead, the principals are likely liquidating their real estate holdings and expensive personal property items to park money out of view and away from creditors and those seeking to hold them accountable for their unlawful conduct.

During a recent phone conversation with a former Solar Titan accountant and human resource manager, counsel for Plaintiff State of Tennessee was told that the Solar Titan Defendants have been "wiping" work computers in an effort to hide evidence of unlawful conduct.[143] The same employee also advised that Solar Titan executives are preparing to file bankruptcy on behalf of the company.[144] This former employee also informed Tennessee that Kelley, Atnip, and Kirkland are reportedly planning to abandon Solar Titan and that Kirkland is attempting to start a completely new residential solar system installation company with a partner from Texas.[145] Solar Titan has recently vacated their headquarters in Knoxville, and it is unclear where their business records have been transferred.[146]

A conversation between Assistant Attorney General Samuel Keen ("AAG Keen") and Solar Titan's former CFO, John Brandon Stephens, also reveals that the company is on the precipice of financial collapse.[147] In fact, Solar Titan is planning to start a new company with a company out of San Antonio, Texas called Texas Solar. In doing so, Solar Titan plans to transfer

---

[142] *See, e.g.*, Don Dare, *'$91,000 and it's still not running' Greeneville woman waited months for solar panels repairs*, WATE Knoxville, TN ABC Affiliate, Jan. 11, 2023, https://www.wate.com/investigations/greeneville-woman-waited-months-for-solar-panels-repairs/.

[143] AAG Keen's Rule 65(b) Certification and Declaration, at ¶ 24.

[144] *Id.*

[145] *Id.*

[146] *See* Grace King, *10Investigates: Solar Titan brought 'to its knees' as it 'significantly' reduces staff*, 10NEWS (Jan. 6, 2023), https://www.wbir.com/article/news/investigations/10investigates-solar-titan-brought-to-its-knees-as-it-significantly-reduces-staff-january-6-2023/51-51fca812-5543-43fe-9c40-bc058bf1c0bf.

[147] AAG Keen's Rule 65(b) Declaration, at ¶ 25.

its remaining assets to Texas Solar and file bankruptcy, leaving Solar Titan's customers with no recourse.[148]

### III. THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER AGAINST THE SOLAR TITAN DEFENDANTS.

Where, as here, a person or entity violates federal and state consumer protection laws, Plaintiffs have the statutory authority under their respective consumer protection acts and common law authority to seek appropriate relief, including temporary and permanent equitable relief.[149] Here, Tennessee and Kentucky seek temporary and permanent equitable relief to protect consumers from future harm and to redress the injuries caused by Defendants' numerous consumer protection law violations. To preserve the possibility of effective final relief and to prevent the Solar Titan Defendants from committing further violations during the pendency of this action, the Court should grant the Plaintiffs' *ex parte* application for a TRO, including an asset freeze, appointment of a temporary receiver, and immediate access to Solar Titan's business premises.

#### A. This Court Has Authority to Grant the Requested Relief.

This Court has the authority to grant all the extraordinary relief requested and should do so based on the facts presented showing that the Solar Titan Defendants have engaged in pervasive fraud, deception, and unfair conduct.

The standards for evaluating an application for a TRO and a motion for a preliminary injunction are the same.[150] In private civil litigation, courts traditionally consider four factors in deciding whether to issue a temporary injunction, including: "(1) the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the balance between this harm and the injury that

---

[148] *Id.*
[149] *See* TENN. CODE ANN. § 47-18-108(a)(1); KY. REV. STAT. § 367.190(1); *State v. Heath*, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990) ("The state attorney general has all common law powers of office, except insofar as they are restricted by statute and the attorney general's duties are so numerous that the legislature does not attempt to identify each by statute.").
[150] *Moncier v. Jones*, 803 F. Supp. 2d 815, 826 (E.D. Tenn. 2011).

granting the injunction would inflict on the defendant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest."[151]

However, public civil enforcement actions are treated differently from private suits, and a court should grant a TRO in a statutory enforcement action where the government agency demonstrates a likelihood of success on the merits and that the balance of equities tip in the government's favor.[152] The United States Supreme Court has emphasized that when a court is called upon to enforce a statutory injunction, its reliance upon the traditional practices of equity must be "conditioned by the necessities of the public interest which Congress has sought to protect."[153] "The standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief." Thus, "when the injunction is sought as a corollary to statutory enforcement, and the applicable statute authorizes injunctive relief," there is no requirement that the state show irreparable injury and inadequacy of legal remedies.[154] [155]

The statutes that give rise to Plaintiffs' Federal Law Claims and State Law Claims authorize this Court to enjoin practices that violate laws enforced by State Attorneys General. The CFPA authorizes any State to bring actions under the CFPA and to secure the remedies provided by the CFPA.[156] The CFPA further authorizes this Court to "grant any appropriate equitable relief with respect to violation of Federal consumer financial law," including, without limitation, "limits on the activities or functions of the person."[157] Likewise, the TCPA authorizes the Tennessee

---

[151] *Moody v. Hutchinson*, 247 S.W.3d 187, 199-200 (Tenn. Ct. App. 2007).
[152] *See, e.g., F.T.C. v. Consumer Defense, LLC*, 926 F.3d 1208, 1212-14 (9th Cir. 2019).
[153] *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944).
[154] *Consumer Defense*, 926 F.3d at 1213-1214.
[155] *But see F.T.C. v. ACRO Servs. LLC*, No. 3:22-CV-00895, 2022 WL 17177641, at *2 (M.D. Tenn. Nov. 21, 2022) (granting most of FTC's *ex parte* requests for extraordinarily relief but declining to grant certain relief for which notice to the defendant was statutorily required). In the instant case, neither the TCPA nor KCPA require notice be provided to a defendant before Plaintiffs can seek *ex parte* equitable relief pursuant to Plaintiffs' statutory authority. *See* TENN. CODE ANN. § 47-18-108; KY REV. STAT. § 367.190.
[156] 12 U.S.C. § 5552.
[157] 12 U.S.C § 5565(a)(1) & (2).

31

Attorney General to seek both a temporary restraining order and a temporary injunction "whenever the [State] has reason to believe that any person has engaged in, is engaging in . . . any act or practice declared unlawful by this part and that proceedings would be in the public interest…".[158] The KCPA grants the same authority to Kentucky's Attorney General.[159] Because Plaintiffs are requesting injunctive relief pursuant to the aforementioned statutes, there is a presumption that the public interest has been considered by the legislature.[160]

Also, under Federal Rule of Civil Procedure 65, courts are authorized to issue a TRO without written or oral notice to the adverse party or its attorney only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party can be heard in opposition." Here, the Plaintiffs' pleadings, including the certificate of Plaintiffs' counsel, the civil enforcement complaint, and the exhibits attached to this motion, all support Plaintiffs' assertion that the requested relief should issue before the Solar Titan Defendants can be heard on the matter.

## B.    Plaintiffs Meet the Standard for Preliminary Injunctive Relief.

As described above, irreparable harm and injury need not be shown for a statutory injunction.[161] For that reason, the central inquiries are: (1) whether there is a likelihood of ultimate success on the merits, and (2) whether an injunction would be in the public interest.

---

[158] TENN. CODE ANN. § 47-18-108(a)(1).
[159] KY REV. STAT. § 367.190(1).
[160] *Consumer Defense*, 926 F.3d at 1214.
[161] Although such a showing is not required to obtain a statutory injunction here, Plaintiffs can show that consumers are at risk of irreparable injury and there are no adequate remedies at law because of the nature of the continued economic harm and threat to the health and safety of the public caused by the Solar Titan Defendants' illegal business practices.

1.  **Plaintiffs Have Demonstrated Likelihood of Success on the Merits on their TCPA and KCPA Counts.**

Plaintiffs are likely to succeed on the merits of this enforcement action because they have shown that the Solar Titan Defendants have repeatedly violated federal and state consumer protection laws. Plaintiffs have shown that Solar Titan misled consumers about the characteristics and benefits of their solar systems, failed to honor consumers' cancellations made within the three-day "cooling-off" period, and omitted material and legally required information about the systems and the terms of the associated financing.

a.  **The Solar Titan Defendants have engaged in deceptive acts.**

The TCPA declares that "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices...".[162] Similarly, the KCPA prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]"[163]

The Solar Titan Defendants have engaged in deceptive acts and practices in violation of the TCPA and KCPA.[164] An act or practice is considered deceptive when "(1) 'there is a representation, omission, or practice that,' (2) 'is likely to mislead consumers acting reasonably under the circumstances,' and (3) 'the representation, omission, or practice is material.'"[165] Representations that are "likely to affect a consumer's decision to buy a product or service" are material.[166]

---

[162] TENN. CODE ANN. § 47-18-104(a).
[163] KY REV. STAT. § 367.170(1).
[164]  The deceptive acts described herein are also "false" and "misleading" under the KCPA. *See Dare To Be Great, Inc. v. Com. ex rel. Hancock*, 511 S.W.2d 224, 227 (Ky. 1974); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 820 (Ky. 1988); *Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897, 905 (Ky. 2008); *Telecom Directories, Inc. v. Com. ex rel. Cowan*, 833 S.W.2d 848, 850 (Ky. Ct. App. 1991).
[165] *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630-631 (6th Cir. 2014); *see also Tucker v. Sierra Builders*, 180 S.W.3d 109, 117 (Tenn. Ct. App. 2005).
[166] *E.M.A.*, 767 F.3d at 631.

As described above, Solar Titan has made several misrepresentations and omitted material information about the characteristics of the solar systems and installations being sold by the company. The company also makes misrepresentations and omits material information related to the consumer loans used to fund these projects. These misrepresentations and omissions include, but are not limited to, claiming that consumers will save significant sums of money by purchasing a Solar Titan system, misrepresenting consumers' eligibility for the Federal Tax Credit, failing to explain the timing of when consumers' payments are due on their loans in relation to when they will have a solar system that is functioning as promised, failing to honor consumers' three-day right of rescission, and misrepresenting consumers' ability to cancel their loan agreements.[167]

As demonstrated by the hundreds of consumer complaints Plaintiffs have received, each of the above-mentioned deceptions are material and were intended to mislead consumers and induce transactions. These facts, supported by the attached Exhibits and Plaintiffs' other filings, demonstrate that Plaintiffs will likely succeed in proving that Solar Titan committed deceptive acts affecting trade or commerce.

b.      The Solar Titan Defendants have engaged in unfair practices.

The Solar Titan Defendants' conduct also constitutes unfair practices in violation of the TCPA and KCPA.[168] The TCPA has no definition of unfairness but is construed consistently with the FTC Act.[169] The FTC Act defines unfair acts and practices as those practices that "cause or

---

[167] *See, e.g.*, TRO Mot. Ex. L, Solar Titan USA Advertisement (stating customers would save 50-90% on their electric bills); Horton Tr. at 33:12-25, 34:1-6, 61:6-12, 63:5-12. (describing the purported Tax Credit used as a selling point by Solar Titan); Helton Tr. at 40: 40-45, 89:5-25 (stating that while Solar Titan told its consumers that they would not have to pay on their systems until 60 days after "installation," consumers were unaware that "installation" did not mean "functioning"); Dorismar Tr. at 13:17-25, 32:21-25, 33:17 (describing how upper management only allowed a small fraction of properly rescinded contracts to be cancelled).
[168] Under the KCPA, "unfair shall be construed to mean unconscionable." KY. REV. STAT. § 367.170(2); *see also Ford Motor Co. v. Mayes*, 575 S.W.2d 480, 485–86 (Ky. Ct. App. 1978) (unfair trade practice for seller to refuse to recognize buyer's rights under Uniform Commercial Code).
[169] Because the TCPA mandates that it must be interpreted consistently with the federal courts' interpretations of § 5(a)(1) of the Federal Trade Commission Act, Tennessee relies on FTC law in its legal analysis. *See* TENN. CODE ANN. § 47-18-115.

34

[are] likely to cause substantial injury to consumers which is not reasonably avoidable by consumers," and the substantial injury "is not outweighed by countervailing benefits to consumers or to competition."[170] Under FTC case precedent, monetary injuries are typically considered substantial.[171] Additionally, the injury is considered substantial if an act or practice does "small harm to a large number of people or if it raises a significant risk of concrete harm."[172] Examples of situations causing injuries that are not reasonably avoidable include: "(1) withholding important information from consumers, (2) overt coercion, or (3) exercising undue influence over a highly susceptible class of consumers."[173]

As demonstrated in the Statement of Facts, the Solar Titan Defendants have engaged in numerous unfair acts affecting trade and commerce. For instance, the Solar Titan Defendants and Mosaic have knowledge about the schedule of payments from Mosaic to Solar Titan, the requirements and availability to consumers of the Federal Tax Credit, and how much consumers can actually expect to save when purchasing a Solar Titan system. The Solar Titan Defendants unfairly mislead consumers by misrepresenting or omitting material information about these important subjects. For example, the Solar Titan Defendants not only withhold information about when Mosaic pays Solar Titan in full,[174] but they also use terms like "installation" without explaining that installation simply means that panels are on the roof, not that they are fully operational.[175]

---

[170] 12 U.S.C. § 5531(c)(1).
[171] See *Tucker v. Sierra Builders*, 180 S.W.3d 109, 117 (Tenn. Ct. App. 2005) (citing Jonathan Sheldon & Carolyn L. Carter, *Unfair and Deceptive Acts and Practices* (hereinafter "Unfair and Deceptive Acts and Practices") § 4.3.2.2, at 154.)
[172] See *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010), as amended (June 15, 2010), amended, No. 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010) (internal citations omitted).
[173] *Unfair and Deceptive Acts and Practices* § 4.3.2.3, at 155.
[174] See, e.g., Helton Tr. at 41:25, 42:1-10 (stating that Solar Titan would tell consumers that it would take only four to six weeks to complete "installation" but that it would take several months to get the systems operational).
[175] *Id.* at 40-45 and 89:5-25 (explaining that by "installation" Solar Titan did not mean "functioning").

Of all Solar Titan's unfair acts, refusing to process cancellations made pursuant to the consumer's three-day right of cancellation is, perhaps, the most egregious. Every former Solar Titan employee interviewed by Plaintiffs has confirmed that this is a practice Solar Titan engages in despite knowing it to be illegal and despite knowing the negative consequences it has on consumers. This fact alone, which is fully supported by the evidence provided by Plaintiffs in support of their motion, is sufficient to show that Plaintiffs are likely to succeed on their TCPA and KCPA claims. Importantly, these are the claims that provide Plaintiffs the statutory basis for the extraordinary relief they request here.

2.    **Plaintiffs Have Demonstrated Likelihood of Success on the Merits on their Tennessee Home Solicitation Sales Act and Kentucky Home Solicitation Sales Act Counts.**

Both Tennessee's and Kentucky's Home Solicitation Sales Acts require that a conspicuous "BUYER'S RIGHT TO CANCEL" notice be included on home solicitation sales agreements (like Solar Titan's installation agreements) to inform buyers that they have three days to cancel the agreement.[176] Under both Tennessee and Kentucky law, until a proper "buyer's right to cancel" notice is provided, a buyer may cancel the agreement at any time.[177] Kentucky law even states that a seller is not entitled to any compensation for services performed before the time for the buyer to exercise the right to cancel has elapsed.[178]

Solar Titan's installation agreements do not contain a "buyer's right to cancel" notice that complies with either TENN. CODE ANN. § 47-18-704(b) or KY REV. STAT. § 367.430(1)– (2). Instead, the sentence informing Solar Titan's customers of their right to cancel the agreement was jammed into the middle of the back page of the contract with no distinction from the rest of the

---

[176] *See* TENN. CODE ANN. § 47-18-704(b); KY REV. STAT. §§ 367.420(1), 367.430(1)-(2).
[177] TENN. CODE ANN. § 47-18-704(d); KY REV. STAT. § 367.430(3).
[178] KY REV. STAT. § 367.450(3).

convoluted and confusing contractual terms.[179] Since Solar Titan failed to comply with either the Tennessee or Kentucky Home Solicitation Sales Acts, all consumers who have purchased a solar power system from Solar Titan retain the right to rescind their purchase agreements and demand that Solar Titan refund any monies paid.[180]

In addition to not providing the notice required by law, Solar Titan has not allowed consumers to cancel their contracts when they have exercised their right to rescind their contract; this is another violation of the Tennessee and Kentucky Home Solicitation Sales Acts.[181] By not cancelling loans as required by law, the Solar Titan Defendants have caused significant economic harm to Tennessee and Kentucky consumers.

3.  **Plaintiffs Have Demonstrated Likelihood of Success on the Merits on their CFPA Count.**

Plaintiffs will succeed on their claim that the Solar Titan Defendants have violated the CFPA, 12 U.S.C. §§ 5531 and 5536(a).

a.  **The Solar Titan Defendants are "covered persons" under the CFPA.**

The CFPA prohibits a "covered person or service provider" from engaging in unfair, deceptive, and abusive acts and practices in connection with offering and providing "any financial product or service."[182] States have the authority to bring actions for violations against covered persons and service providers violating sections 1031 and 1036 of CFPA.[183] Plaintiffs have shown

---

[179] *See, e.g.,* Horton Tr. at Ex. 7.
[180] TENN. CODE ANN. § 47-18-705(a) requires the seller to cancel contracts, refund any payments consumers have made, and tender "any note or other evidence of indebtedness."
[181] TENN. CODE ANN. § 47-10-701, *et seq.*; KY. REV. STAT. § 367.410, *et seq.*
[182] 12 U.S.C. § 5536
[183] 12 U.S.C. § 5552; *see also Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC,* 846 F.3d 1049, 1053 (9th Cir. 2017) ("States are also authorized to 'bring a civil action' to enforce provisions of the Act. The only entities excluded from the enforcement authority of the state are national banks and federal savings associations."); *Mayall v. Randall Firm, PLLC,* No. 1:13-CV-00166-TC, 2017 WL 3432033, at *2 (D. Utah Aug. 9, 2017) (recognizing that states have independent authority to enforce the CFPA).

37

that each Defendant is a "covered person or service provider" under the CFPA and is not a national bank or savings association.[184] Plaintiffs have also demonstrated that each Defendant, as a "covered person or service provider," engaged in unfair, deceptive, and abusive acts and practices as defined by the CFPA.

This Court should find that Plaintiffs are likely to show that the Solar Titan Defendants are liable under the CFPA as "covered persons" because they engaged in offering and providing a consumer financial product or service. In the alternative, Solar Titan was a "service provider" for Mosaic. The CFPA defines "covered person" as "(A) any person that engages in offering or providing a consumer financial product or service; and (B) any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person."[185] When any person extends credit or services a loan to a consumer "primarily for personal, family or household purposes," they have offered or provided a "financial product or service."[186] The CFPA treats "related persons" (defined below) as covered persons for purposes of liability.[187] "Related persons" are those who act as agents for covered persons.[188] The term "related persons" also includes "independent contractors" who "materially participate in the conduct of the affairs of such covered person" and "knowingly or recklessly participate in the covered person's unlawful conduct." The loans consumers use to finance the purchase of Solar Titan solar systems are "financial products or services" under the CFPA, and Mosaic offered or provided those financial products or services.

Plaintiffs are likely to demonstrate that the Solar Titan Defendants have acted as "related persons" of Mosaic under the CFPA, and thus the Solar Titan Defendants are liable under the

---

[184] Plaintiffs have confirmed that none of the Defendants is a national bank or savings association by reviewing the list of national banks and savings associations available on the Office of the Comptroller of the Currency website at https://occ.gov/topics/charters-and-licensing/financial-institution-lists/index-financial-institution-lists.html.
[185] 12 U.S.C. § 5481(6).
[186] 12 U.S.C. § 5481(5) & (12).
[187] 12 U.S.C. § 5481(25)(B).
[188] 12 U.S.C. § 5481(25)(C)(i).

CFPA as "covered persons."[189] The Solar Titan Defendants have acted as "related persons" because, as described in the Statement of Facts, they have acted as Mosaic's agents.[190] Mosaic has the right to control Solar Titan's conduct toward consumers in the solicitation, application, approval, and consummation of loan agreements between consumers and Mosaic.[191]

Even if this Court were to find insufficient the evidence of the Solar Titan Defendants' agency relationship with Mosaic, Defendants are still liable as "related persons" if they are "independent contractors" or "services providers" of Mosaic.[192] Even if viewed as an "independent contractor," Solar Titan has knowingly or recklessly participated in Mosaic's unfair, deceptive, and abusive acts and practices. Solar Titan knows or should know that Mosaic's application process and loan terms are misleading, and that its financing practices are unfair and abusive in violation of CFPA. For example, Solar Titan understands how Mosaic transmits payments to Solar Titan and that consumers often lack the understanding that they could be responsible for paying for the solar systems even before they are operational.[193] However, Solar Titan continues to tell consumers that they will not have to begin paying on their loans until after their systems are "installed" (without explaining to consumers that "installed" does not mean functioning).[194]

Alternatively, Plaintiffs are likely to demonstrate that the Solar Titan Defendants are liable as "service providers" under the CFPA because Solar Titan provides a material service to Mosaic

---

[189] 12 U.S.C. § 5481(25)(B).
[190] When determining whether someone is an agent instead of an independent contractor, courts look at the following factors: "(1) the right to control the conduct of the work, (2) the right of termination, (3) the method of payment, (4) the freedom to select and hire helpers, (5) the furnishing of tools and equipment, (6) the self-scheduling of work hours, and (7) the freedom to render services to other entities." *See Tucker v. Sierra Builders*, 180 S.W.3d 109, 120 (Tenn. Ct. App. 2005) (internal citation omitted). Although courts often consider all seven factors, "[c]ontrol is a key element in the creation of a principal-agent relationship." *Id.*
[191] Mosaic Participant Agreement, ¶ 4.1.
[192] 12 U.S.C. §§ 5536, 5481(25)(B), (C)(ii) & (C)(iii), 5481(26).
[193] *See, e.g.*, Dorismar Tr. at 19: 4-25, 21:22-25, 22:1-7.
[194] *See, e.g.,* Declaration of Jonathan Snow, ¶¶ 9-13 (wherein Mr. Snow as a consumer of Solar Titan, explains how Solar Titan informed him that he had to make payments on the loan even though his panels were not yet operational after he had agreed to purchase the panel and to Mosaic's loan terms).

by soliciting customers and facilitating the consumer's loan application process.[195] "Service provider" under the CFPA means "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service."[196] The CFPA states that "process[ing] transactions relating to the consumer financial product or service" is an example of providing a "material service to a covered person."[197] By processing consumer applications and handling Mosaic's loan solicitation, Solar Titan is providing a "material service," and is thus a "service provider" under the CFPA.

> **b.     The Solar Titan Defendants have engaged in unfair and deceptive acts and practices in violation of the CFPA.**

As a "covered person" and/or "service provider," Solar Titan and Mosaic have each engaged in unfair and deceptive practices under the CFPA. For the CFPA, courts also follow FTC precedent when delineating the standards for deception and unfairness under the CFPA.[198] Thus, the same acts and practices set forth above as unfair and deceptive under Plaintiffs' state laws are also unfair and deceptive under the CFPA. For example, Solar Titan's and Mosaic's misrepresentations about (1) consumers' eligibility for the Federal Tax Credit and (2) when consumers' loan payments were due in relation to when the consumers would have a solar system that was functioning as promised, are unfair and deceptive practices in violation of the CFPA.

---

[195] *See, e.g.,* Helton Tr. at 100:19-25, 101:1-13, 103:24-25, 104:1-16.
[196] 12 U.S.C. § 5481(26)(A).
[197] *Id.*
[198] Courts should look to Federal Trade Commission ("FTC") case law when interpreting the deception and unfairness prongs of the CFPA because the language prohibiting deceptive acts and practices under the CPFA mirrors the language prohibiting unfair and deceptive acts and practices under the FTC Act. Compare, for example, the standard for unfairness under Section 5(n) of the FTC Act, 15 U.S.C. § 45(n) to the unfairness standard under Section 1031(c) of the CFPA, 12 U.S.C § 5531(c). *See also United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir.2007) ("[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter."); *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192–93, and ft 7 (9th Cir. 2016)(internal citations omitted)(outlining the test for deception under the FTC and in footnote 7, indicating that the court relies on the FTC cases interpreting the FTC Act to determine what constitutes a deceptive act or practice).

**c.** **The Solar Titan Defendants have engaged in abusive acts and practices.**

Solar Titan's loan solicitation and application process is an "abusive" act or practice under the CFPA, because it interferes with consumers' ability to understand their repayment terms and takes unreasonable advantage of its customers. The CFPA outlines the following standard for an act or practice to be considered abusive: (1) material interference with a consumer's ability to understand a term or condition of a financial product or service, (2) taking unreasonable advantage of (a) a consumer's lack of understanding of material risks, costs, and conditions of a financial product or service, (b) a consumer's inability to protect their own interest when selecting or using a financial product or service, or (c) a consumer's reasonable reliance on the covered person to act in the consumer's interest.[199]

The Solar Titan Defendants have committed several abusive acts and practices, including leading consumers to believe they will not be obligated to make loan payments until their solar system is operational and misrepresenting consumers' eligibility for the Federal Tax Credit.[200] These misrepresentations and failures to fully explain to consumers when their first payments would be due materially interfered with consumers' understanding of the risks and costs of agreeing to Mosaic's loan terms. In reliance on Solar Titan's representations, consumers often thought they would save money on their electrical expenses, not increase their monthly expenses by paying a loan on top of their full electric bill.[201] Omitting disclosure about qualifications for the Tax Credit, and the Solar Titan Defendants' sales practice of telling all consumers the amount of "their" Tax Credit, especially when coupled with Mosaic's loan payment structure, had a

---

[199] 12 U.S.C. § 5531(d).
[200] *See, e.g.*, Helton Tr. at 46:9-16, 112:4-25, 113:1-4, 115:8-12, 175:7-15; Hill Tr. 38:5-17; Dorismar Tr. 83:12-2, 84:1-5, 85:13-25; 86:1-12; Horton Tr. at 47:6-12, 51:18-25, 52:1-17; 55:1-19; 139:18-25, 140:1-2.
[201] *See, e.g.*, Horton Tr. 30:11-25, 31:1-25, and Ex. 2.

41

tendency to mislead all consumers into thinking they would qualify for the Tax Credit.[202] The Defendants caused consumers who were ineligible for the credit to misunderstand how much they would owe Mosaic over the life of the loan.[203] These acts and practices, in addition to Solar Titan's sales practices, constitute abusive practices in violation of the CFPA.

### 4. Plaintiffs Have Demonstrated Likelihood of Success on the Merits on their CRFA Count.

The Consumer Review Fairness Act of 2016 ("CFRA"), codified at 15 U.S.C. § 45b, prohibits provisions in form contracts that seek to limit or penalize customer reviews of a business's products or services. The Solar Titan Defendants violated the CRFA by including a term in their standard form contracts that purported to restrain customers from making negative statements about Solar Titan (regardless of their truth) on social media.[204] The Solar Titan Defendants have repeatedly attempted to dissuade consumers from posting negative, but accurate, consumer reviews.[205] This contract term, which provided that the buyer's breach would entitle Solar Titan to "monetary compensation benefits," was a clear violation of the Consumer Review Fairness Act of 2016, codified at 15 U.S.C. § 45b.

### 5. Plaintiffs Have Demonstrated Likelihood of Proving that the Individual Defendants are Liable.

In order to obtain injunctive relief against an individual for a corporation's violations of state and federal consumer protection laws, the Plaintiffs must show that the individual "participated directly in the acts and practices or had the authority to control them."[206] Atnip is the

---

[202] *See id.*, at 33:12-25, 34:1-6, 61:6-12, 63:5-12.
[203] *See id.*, at 61-63.
[204] Horton Tr. Ex. 7, "Installation Agreement" (states "Buyer agrees not to use any form of social media to express their opinion that could be portrayed as negative in the eyes of the public towards or about Ideal Horizon Benefits. Breaching acceptance of this clause by buyer can and will deem monetary compensation benefits to Ideal Horizon Benefits, LLC/Solar Titan USA.)
[205] *See, e.g., id.*; Snow Declaration, ¶¶ 20-22 (explaining that he was told that his contract prohibited him from leaving negative reviews online).
[206] *F.T.C. v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1080 (N.D. Cal. 2018) (internal citations omitted).

42

current owner of Solar Titan, and has the authority to control all aspects of Solar Titan's operations or winding down process.[207] Even if Atnip has since delegated control of the business, as the majority owner, he still has the authority to control the business operations.[208]

Kelley and Kirkland also have the authority to control the company's conduct and have directly participated in the unlawful conduct. Kelley oversees and decides how Solar Titan navigates its partnerships with Solar Titan lenders like Mosaic, determines whether or when Solar Titan honors or refuses to honor three-day cancellations, oversees training for sales staff, and even has met with the BBB about consumer complaints.[209] Kirkland also oversees loan cancellations and Solar Titan's relationships with consumer lenders, and has controlled and participated in the hiring and termination of Solar Titan's integral operations personnel.[210] Per Kirkland's own instructions, the BBB forwards all complaints from consumers to Kirkland so she can determine how to address them.[211] The complaints include grievances about the company's installation process, sales representative promises, a malfunctioning solar system, and being billed on loans before a system is operational.[212] Plaintiffs have shown that Kelley, Kirkland, and Atnip either had the authority to control or directly participated in Solar Titan's unlawful activity.

## IV. THE PROPOSED *EX PARTE* TRO IS IN THE PUBLIC'S INTEREST AND IS NECESSARY TO STOP ONGOING HARM AND PRESERVE THE COURT'S ABILITY TO PROVIDE EFFECTIVE FINAL RELIEF.

### A. Relief is Necessary to Stop Defendants' Unlawful Activity.

Defendants Kelley, Atnip, and Kirkland have operated Solar Titan in a manner designed to defraud customers and, as a result, have become significantly, albeit unjustly, enriched while

---

[207] Solar Titan First CID Response, Requests 4-5.
[208] *Id.*; TRO Mot. Ex. J Tennessee Secretary of State Annual Report Forms for Ideal Horizon Benefits.
[209] Dorismar Tr. at 11:16-20, 13:2-25; *see also* Solar Titan's First CID Responses, Request 4.
[210] Dorismar Tr. at 11:16-20
[211] Binkley Declaration at ¶ 11.
[212] *Id.* at Attachment 1.

43

wreaking financial havoc on the company's customers. As detailed above, many of Solar Titan's customers find themselves in dire financial straits because they were misled and deceived by Defendants.[213] Instead of realizing the savings they were promised, many of Solar Titan's customers are saddled with a loan payment for a substandard or non-functioning solar system on top of their normal utility bill.[214] For some of Solar Titan's customers with limited financial means, having their electric expenses essentially double has ruined them financially.[215] For example, 74-year-old R.H. and his wife (a home-bound stroke survivor) live on a fixed income.[216] They have been forced to contemplate selling their home because they can no longer afford their $359.00 monthly loan payment for a non-functioning solar system on top of their utility bill.[217]

Solar Titan's poor workmanship not only causes substantial installation delays but also creates safety hazards endangering homeowners and the public. As a result of improper installations by Solar Titan, there have also been numerous incidents of Solar Titan connecting a solar system to the utility grid before it has been properly inspected and approved by the utility company.[218] This creates a life-threatening hazard to utility line workers because if the utility company is not aware that the system has been connected to the grid, it will not know to shut the line down during maintenance operations.[219] A worker could be electrocuted.[220] Solar Titan's practices even endanger its own workers. Recently, an employee in Georgia was electrocuted when she drilled into a live transformer box.[221] Solar Titan will continue to pose a public safety hazard as long as it is allowed to continue to operate without court intervention.

---

[213] *See, e.g.*, Marsalis Declaration at Attachment 1, pp. 88-93, 156-158, 189-191.
[214] *Id.*
[215] *Id.*
[216] Cochran Declaration at Attachment 1, pgs. 58-59.
[217] *Id.*
[218] Suddoth Declaration, ¶¶ 14-15.
[219] Warren Declaration, ¶¶ 12-13.
[220] Suddoth Declaration, ¶ 16.
[221] Helton Tr. at 53:10-14.

44

**B.** **An Asset Freeze and Appointment of a Temporary Receiver are Necessary to Prevent Further Dilution and Misappropriation of Assets.**

Appointing a receiver is necessary to prevent the individual Defendants from continuing to dilute assets, misappropriate consumer funds, and defraud consumers. This Court has the power to appoint a receiver pendente lite over all of Solar Titan's property, pursuant to its equitable powers and Federal Rule of Civil Procedure 66.[222] A receiver *pendente lite* should be appointed when "it appears that the appointment is necessary either to prevent fraud or to save [] property from irreparable injury or threatened loss or destruction."[223] The Sixth Circuit Court of Appeals has held that district courts should consider the following factors in deciding whether to appoint a receiver: (1) "whether the property at issue is in 'imminent danger of ... being lost, concealed, injured, diminished in value, or squandered,'" (2) "whether the defendant engaged in fraudulent conduct," (3) "'the inadequacy of the available legal remedies,'" (4) "the likelihood that the appointment will do more good than harm," (5) "whether there is inadequate security for a debt and whether a debtor is insolvent."[224] Plaintiffs have demonstrated that each factor weighs in favor of this Court appointing a receiver.

**1.** **There is an imminent danger that Defendants' assets will be lost, concealed, injured, diminished in value, or squandered.**

Numerous whistleblowers have come forward to expose Defendants' fraudulent business practices, mismanagement, and misappropriation of assets. As Shawna Helton testified, Solar Titan had $47 million in net sales in 2021 but was unable to pay its employees or fulfill its

---

[222] *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006).
[223] *Macon Lumber Co. v. Bishop & Collins, 229 F.2d 305, 307* (6th Cir. 1956).
[224] *Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414–15 (6th Cir. 2015)

obligations to its customers.[225] However, Craig Kelley, Richard Atnip, and Sarah Kirkland still made extravagant purchases, including expensive homes, luxury vehicles, yachts, and a private jet.[226]

In light of the numerous issues facing Solar Titan, the Plaintiffs are concerned about the financial state of the company and the principals' liquidation of assets. Atnip has admitted that the company is in distress.[227] Kelley and Atnip recently sold their Knoxville, Tennessee mansion.[228] Before founding Solar Titan, Kelley and Atnip did not have any significant financial assets.[229] This multi-million-dollar mansion was purchased using proceeds from Solar Titan's fraudulent sales and from canceled contracts. This money rightfully belongs to Solar Titan's customers who canceled their contracts and who paid Solar Titan for something they have still not received - an operational solar system that performs as promised.

Moreover, the Solar Titan Defendants have used cash and other difficult-to-trace means to make significant purchases using Solar Titan's ill-gotten gains. For example, as described above, Atnip bought a $1.8 million dollar yacht, a significant portion of which was paid for in cash.[230] A qualified receiver will be necessary to track exactly where the money for these types of purchases came from. The appointment of a receiver *pendente lite* to oversee all of Solar Titan's financial activities will ensure that Defendants cannot hide, dissipate, or otherwise further misuse funds

[225] Helton Tr. at 158:21-22 (saying that "in the year 2021 we [Solar Titan] did $47 in net sales"); Helton Tr. at 171:2-5 (explaining that "I kept getting feedback that, our reps aren't making anything, Shawna. This was coming from my sales managers in the field."); Helton Tr. at 173:3-5 (stating that, "these reps, according to the people that I still know are working there, are still having problems getting paid.")
[226] *Id.* at 55:14-25, 56:1-25, 57:1-21; *see also id.* at 134:16-25 ("[T]hey were going to bulldoze that million-dollar home to build another million-dollar home. But yet they can't pay their people. They can't get these installs done correctly.")
[227] Grace King, 10Investigates: Solar Titan brought 'to its knees' as it 'significantly' reduces staff, 10NEWS (Jan. 6, 2023), https://www.wbir.com/article/news/investigations/10investigates-solar-titan-brought-to-its-knees-as-it-significantly-reduces-staff-january-6-2023/51-51fca812-5543-43fe-9c40-bc058bf1c0bf
[228] Deed from Nov. 15, 2022, sale of home at 3411 Tooles Bend Road.
[229] Helton Tr. at 14:6-10, 133:1-15; Horton Tr. at 171:1-20.
[230] Horton Tr. at 180:24 – 181:19.

received on behalf of Solar Titan's customers. Appointing a receiver will preserve the funds for those consumers who canceled their contracts and for eventual payment of restitution to the consumers harmed by Solar Titan's unlawful business practices.

### 2. The Solar Titan Defendants have engaged in fraudulent conduct.

The fact that Solar Titan has engaged in fraudulent conduct is well documented above, and a receiver is needed to preserve evidence and prevent further liquidation of assets.

### 3. Legal remedies available to the States are inadequate.

If a receiver is not appointed, the Solar Titan Defendants will continue to squander their assets, and/or dissipate or hide, whatever assets remain. Most, if not all of Solar Titan's physical and financial assets were derived from sales to Solar Titan customers. A receiver will ensure that the Solar Titan Defendants do not dissipate or misuse assets that could be used to provide restitution to Solar Titan's customers. The appointment of a receiver *pendente lite* is critical to prevent further dilution of assets.

Likewise, if a receiver is not appointed, Solar Titan could continue engaging in unlawful business practices that harm consumers and endanger the public welfare if they continue to operate. If Solar Titan continues to operate, a receiver will be necessary to oversee Defendants' business activities and prevent Solar Titan from causing additional harm to consumers or continuing its unsafe installation practices during the pendency of this litigation. If Solar Titan ceases its operations, a receiver will be necessary to liquidate the business. Atnip, Kelley, and Kirkland should not be trusted to properly disburse payments to the consumers they have been defrauding, the employees they have been promising wages but have been failing to pay since at least October 2021, and/or any other existing creditors.

### 4. Appointing a receiver will do more good than harm.

Appointing a receiver will do more good than harm. Solar Titan's employees have been leaving the company in droves as a result of not being paid for months.[231] Further, Solar Titan has not only been unable to fulfill its obligations to existing customers, but has continued to skip safety precautions during installations; endangering families, the company's installation crews, and utility workers.[232] Yet, Solar Titan continues to solicit new customers with the same misleading and fraudulent practices it has always employed despite knowing it does not have the personnel necessary to take care of its existing customers, let alone take on new ones.[233] Unless a receiver *pendente lite* is appointed, Kelley, Atnip, and Kirkland may continue defrauding consumers and squandering money that belongs to consumers, including those who properly canceled their contracts.

The appointment of a receiver will not inhibit Solar Titan's ability to carry on legitimate business operations, nor will it inhibit lawful liquidation of assets in the event Solar Titan winds down. Instead, a receiver will ensure that Solar Titan conducts its business in a lawful manner. If Solar Titan ceases operations, the receiver will also ensure the proper disbursement of funds that belong to consumers who rescinded the contracts and those who are entitled to reimbursements.

### 5. The Solar Titans' Defendants' liabilities appear to outweigh their assets.

As previously discussed, the Solar Titan Defendants' obligations to Solar Titan's customers remain outstanding. Atnip, the majority owner of Solar Titan, has indicated that the company is failing, stating that in seven months, a company that employed over 400 workers

---

[231] Grace King, 10Investigates: Solar Titan brought 'to its knees' as it 'significantly' reduces staff, 10NEWS (Jan. 6, 2023), https://www.wbir.com/article/news/investigations/10investigates-solar-titan-brought-to-its-knees-as-it-significantly-reduces-staff-january-6-2023/51-51fca812-5543-43fe-9c40-bc058bf1c0bf
[232] *See generally*, Morelli Declaration, Suddoth Declaration, Warren Declaration, and Binkley Declaration.
[233] *Id.*

reduced its employees to less than 100.[234] Solar Titan has failed to fully install many consumers' systems, and many of the systems are incapable of performing in the manner Solar Titan promised.[235] Consumers are entitled to restitution for Solar Titan's fraud, and many consumers are entitled to have loan proceeds returned to Mosaic as part of having their purchase and loan cancelled.[236] In addition to recovering restitution on behalf of affected consumers in their respective jurisdictions, the States are also entitled to seek statutory penalties pursuant to their various federal and state law claims.[237]

Solar Titan also likely owes several employees wages for their work. Despite Solar Titan hiking the cost of its systems and making substantial profits, Solar Titan has cut the installation crew's pay in half and has either substantially decreased the pay for the sales crew or not paid them at all.[238] Solar Titan likely owes several of their employees past due wages, commissions, and other compensation. These are just some of the liabilities known to Plaintiffs. Given the Solar Titan Defendants' current financial condition, a receiver *pendente lite* is needed to preserve as much of Defendants' assets as possible for the eventual payment of restitution and recovery.

---

[234] Grace King, *10Investigates: Solar Titan brought 'to its knees' as it 'significantly' reduces staff*, 10NEWS (Jan. 6, 2023), https://www.wbir.com/article/news/investigations/10investigates-solar-titan-brought-to-its-knees-as-it-significantly-reduces-staff-january-6-2023/51-51fca812-5543-43fe-9c40-bc058bf1c0bf
[235] *See generally*, Consumer Complaints attached to Marsalis Declaration.
[236] 12 U.S.C. § 5565
[237] TENN. CODE ANN. § 47-18-109; KY. REV. STAT. § 367.990
[238] *See, e.g.*, Horton Tr. at 83:24-25, 84:1-15, 145:15-23, 147: 23-25, 147:1-6.

49

## C. Immediate Access and Limited Expedited Discovery Are Necessary to Locate and Preserve Relevant Records.

Solar Titan has vacated the building that it used for its headquarters in Knoxville,[239] so the owners and the few remaining employees are likely conducting business remotely. Without a primary office space for their operations, Solar Titan business records may be dispersed across Tennessee and Kentucky, where the company employees reside. A receiver is necessary to gather and safely retain the records of a seemingly failing company. Additionally, keeping in line with their pattern of placing blame on everyone else, Solar Titan has recently attempted to shift blame onto a supplier partner, Generac,[240] and has every incentive to destroy records evidencing their role in defrauding consumers. Without a receiver being appointed and the court order expediting discovery, records that are necessary for this Court to ascertain the breadth of Solar Titan's unlawfulness are likely to be either purposefully or inadvertently destroyed.

## D. *Ex Parte* Relief is Necessary to Protect Assets and Evidence.

Given the substantial risk of asset dissipation and evidence destruction in this case, as well as the Solar Titan Defendants' ongoing violations of the law, Plaintiffs ask that the Court enter the proposed TRO *ex parte* without notice. Federal Rule of Civil Procedure 65(b) authorizes this Court to enter *ex parte* orders when there is a clear showing that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard on opposition." *Ex parte* orders are appropriate where "notice to the defendant would render fruitless further prosecution of the action."[241]

---

[239] Grace King, *10Invesigates: Knoxville-based solar company 'downsizing due to major issues' with parts from supplier*, 10NEWS (Dec. 15, 2022), https://www.wbir.com/article/news/investigations/10investigates-knoxville-based-solar-company-downsizing-due-to-major-issues-with-parts-from-supplier-update-december-15/51-0f204ee8-0771-4366-b34b-7d947f1290a4

[240] *Id.*

[241] *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993).

50

As described in AAG Keen's Rule 65(b) Declaration and the Statement of Facts, the Solar Titan Defendants have a history of dishonesty and have attempted to hide the truth from State law enforcement agencies tasked with investigating their conduct. Kelley was convicted of wire fraud and the Solar Titan Defendants have misrepresented his role in the Company. Atnip allows Kelley to impersonate him because it benefits him financially. Moreover, Plaintiffs can attest that company principals in similar cases have violated court orders, attempted to dispose of evidence, and attempted to dissipate or hide recoverable assets.[242]

The evidence shows the Solar Titan Defendants' business operations are permeated by unlawful practices and that they continue to deceive and harm consumers. The evidence also shows that the Solar Titan Defendants act with complete disregard for legal processes and are comfortable with blatantly lying to state investigators in an effort to conceal the true nature of their business. The Solar Titan Defendants also have no qualms about flagrantly disobeying laws and regulations in pursuit of increased profits; thus, Plaintiffs cannot be assured that the Solar Titan Defendants will timely produce documents and information in discovery, or that they will refrain from concealing or destroying evidence. This case fits squarely in the category of cases where *ex parte* relief is necessary to preserve effective final relief.

---

[242] *See F.T.C. v. ACRO Servs. LLC*, No. 3:22-CV-00895, 2022 WL 17177641, at *5 (M.D. Tenn. Nov. 21, 2022) (citing *First Tech. Safety Sys.*, 11 F.3d at 650-652).

## V. CONCLUSION

Because the Solar Titan Defendants are violating the law and preliminary relief is necessary to maintain the status quo, prevent additional harm to consumers, and preserve assets and evidence, the Court should enter the proposed *ex parte* temporary restraining order with asset freeze including the assets of Solar Titan and its principals, immediate access to documents and premises, and the appointment of a receiver, while requiring the Solar Titan Defendants to show cause why a preliminary injunction should not issue.

JONATHAN SKRMETTI, TN BPR No. 031551
Tennessee Attorney General and Reporter

DAVID McDOWELL, TN BPR No. 024588
Deputy Attorney General
(Admitted to Practice in Eastern District)
SAMUEL KEEN, TN BPR No. 033865
Assistant Attorney General
(*Pro Hac Vice* Admission Pending)
ALICIA DANIELS-HILL, TN BPR No. 04672
Assistant Attorney General
(*Pro Hac Vice* Admission Pending)
OFFICE OF THE TENNESSEE ATTORNEY GENERAL
Consumer Protection Division
P.O. Box 20207
Nashville, Tennessee 37202
p.  (615) 837-5155 (Keen)
p.  (615) 253-3819 (Daniels-Hill)
e.  samuel.keen@ag.tn.gov
e.  alicia.daniels-hill@ag.tn.gov

Attorneys for Plaintiff
STATE OF TENNESSEE

Respectfully submitted,

DANIEL CAMERON
Kentucky Attorney General
PHILIP HELERINGER, KY Bar No. 96748
Executive Director of Consumer Protection
(*Pro Hac Vice* Admission Pending)
PAUL FATA, KY Bar No. 99528
Assistant Attorney General
(*Pro Hac Vice* Admission Pending)
LYNDSEY ANTOS, KY Bar No. 99971
Assistant Attorney General
(*Pro Hac Vice* Admission Pending)
OFFICE OF THE KENTUCKY ATTORNEY GENERAL
Office of Consumer Protection
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
p.  (502) 696-5578 (Fata)
p.  (502) 696-5641 (Antos)
e.  paul.fata@ky.gov
e.  lyndsey.antos@ky.gov

Attorneys for Plaintiff
COMMONWEALTH OF KENTUCKY