# Exhibit D

Sworn Statement of Jason Horton with Exhibits

# In The Matter Of:

*In Re: Investigation of Ideal Horizon Benefits,*
*d/b/a Solar Titan USA, Inc.*

---

*Sworn Statement of Jason Horton*
*August 3, 2022*

---

*Christina A. Meza, LCR, RPR, CCR*

Original File 2022-08-03 Jason Horton.txt
**Min-U-Script® with Word Index**

1

IN RE:                              )
                                    )
INVESTIGATION OF IDEAL HORIZON      )
BENEFITS, d/b/a SOLAR TITAN         )
USA, INC.                           )

------------------------------------------------------

SWORN STATEMENT OF

JASON HORTON

Wednesday, August 3, 2022

------------------------------------------------------

CHRISTINA A. MEZA, LCR, RPR, CCR
LICENSED COURT REPORTER
P.O. BOX 432
NOLENSVILLE, TN  37135
615-202-7303
christina.a.meza@gmail.com

2

APPEARANCES:

For the State of Tennessee Attorney General's Office:

       Mr. Samuel D, Keen
       Ms. Alicia Daniels-Hill
       Consumer Protection Division
       Office of the Tennessee Attorney General
       P.O. Box 20207
       Nashville, TN  37202
       615-837-5155
       samuel.keen@ag.tn.gov
       alicia.daniels-hill@ag.tn.gov

Reported By:
Christina A. Meza, LCR, RPR, CCR

3

1          The sworn statement of Jason Horton

2    was taken by counsel for the Office of the Tennessee

3    Attorney General, UBS Building, 19th Floor, 315

4    Deaderick Street, Nashville, Tennessee, on Wednesday,

5    August 3, 2022, beginning at 10:03 A.M., for all

6    purposes allowed under the Tennessee Rules of Civil

7    Procedure.

8          It is agreed that Christina A. Meza,

9    Licensed Court Reporter, Registered Professional

10   Reporter, Certified Court Reporter, and Notary Public

11   for the State of Tennessee at Large, may swear the

12   witness, take the sworn statement, and afterwards

13   reduce same to typewritten form.  The reading and

14   signing of the completed sworn statement by the witness

15   was not discussed.

16          All formalities as to caption,

17   certificate, transmission, filing, etc., are waived.

18   All objections except as to the form of the questions

19   are reserved to on or before the hearing.

20   ---------------------------------------------------

21                      INDEX

                                                PAGE

22   JASON HORTON:

23       Examination by Mr. Keen ....................  6

24

25

Christina A. Meza, LCR, RPR, CCR 615.202.7303

4

1                             EXHIBITS

2    NUMBER                 DESCRIPTION                  PAGE

3    1        A copy of text messages between Craig       21
              Kelley and Shawna Helton
4
     2        A document titled "Anyway Money Pitch"      31
5
     3        A document titled "Non-Disclosure,          43
6             Non-Competition, and Non-Solicitation
              Agreement"
7
     4        A document titled "What Starting Size       46
8             Solar System to Recommend:  This is a
              guideline"
9
     5        A document titled "Solar System Sizing      48
10            Guideline QCell400"

11   6        A document titled "Current Lifetime Plan,   59
              Includes Moderate Annual Increase, to
12            Electric Company"

13   7        Two blank "Installation Agreement" forms    77

14   8        Mr. Horton's resignation information from   197
              Solar Titan USA
15

16

17

18

19

20

21

22

23

24

25

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1          MR. KEEN:  We're on the record.  What

2     that means -- whenever I say we're on the record it

3     means that she's recording what we're saying and she's

4     going to transcribe it for us later on just so that we

5     have a record of it so we can refer back to if we need

6     to.

7          So, as you know, my name is Sam Keen.

8     I'm an assistant attorney general with the Tennessee

9     Attorney General's Office in our Consumer Protection

10    Division.

11          This is Alicia Daniels-Hill.  She is a

12    legal assistant with our office, and we won't go into

13    the complicated and frustrating details.  She is a

14    licensed attorney in the state of Ohio.  She is -- she

15    moved to Tennessee about a year ago, and so she's

16    practicing pending admission.  She has to go through a

17    whole process where they waive her in to practice.

18          And we are here today to conduct

19    what's called a sworn statement.  I believe we've

20    talked about that a little bit on the phone.

21          THE WITNESS:  We have.

22          MR. KEEN:  We're going to swear you in

23    so that all the testimony you give today is under oath.

24    ///

25    ///

Case 3:23-cv-00046-DCLC-JEM   Document 10-3   Filed 02/06/23   Page 8 of 90   PageID #: 504

1                    JASON HORTON,

2    called as a witness, having been duly sworn, was

3    examined and testified as follows:

4                    EXAMINATION

5    BY MR. KEEN:

6    Q.          Would you mind stating your full name

7    for the record.

8    A.          Jason D. Horton from Knoxville,

9    Tennessee.

10   Q.          How do you spell that?

11   A.          Jason, J-A-S-O-N.   Horton is

12   H-O-R-T-O-N.

13   Q.          Is it okay if I call you Jason?

14   A.          Yes.

15   Q.          And you understand that you're under

16   oath?

17   A.          Yes, I do.

18   Q.          You understand what that means?

19   A.          Uh-huh.

20   Q.          And you see Ms. Meza is here today.

21   She's our court reporter, and she's going to capture

22   all of our responses -- all of your responses to my

23   questions.   So in order to help her out, I just ask

24   that we not give nonverbal responses.   So even if

25   your response is just a simple yes or a no, actually

Case 3:23-cv-00046-DCLC-JEM   Document 10-3   Filed 02/06/23   Page 9 of 90   PageID #:
505

1  say the word yes or no instead of shaking your head

2  yes or no.

3         Let's also speak loudly and clearly today

4  so that Ms. Meza can accurately record what we're

5  saying.  And let's try to avoid talking over each

6  other.  So I will try my best to wait until you're done

7  talking before I ask the next question or ask a

8  follow-up question.  And, likewise, if you will try

9  your best to wait to give your answer until I'm done

10 asking the question, that would be very helpful.

11        Is there any reason you would have

12 difficulty speaking loudly and clearly today?

13 A.         No.  I thought I was being loud and

14 clear.

15 Q.         You are.  For sure.  I just want to make

16 sure.

17 A.         Okay.

18 Q.         This is all sort of the routine

19 questions that we ask before we start getting into

20 the details of why you're here today.  We will

21 probably need to take some breaks today.  Obviously

22 we're going to need to take a break so you can renew

23 your parking.  So if you need to take a break, if

24 you need to stop, just let me know.

25 A.         Okay.

Case 3:23-cv-00046-DCLC-JEM   Document 10-3   Filed 02/06/23   Page 10 of 90   PageID #: 506

1    Q.          We'll probably take a break for lunch

2    around noon which is when your parking expires.

3    A.          Let's get going.

4    Q.          All right.  Good deal.  If there's

5    anything that I ask that you don't understand, let

6    me know and I will try my best to clarify it.  I

7    understand you brought some documents.

8    A.          I did.  I brought in some case files of

9    customers that you requested.  There are personal

10   information on there, meaning their social security

11   numbers and stuff like that, so it needs to be taken

12   with great care.  They are a lot of my past

13   customers, some local, some in Kentucky, Alabama,

14   and Virginia.  You will see an assortment in there

15   from the four different states I have worked in.

16              I also have some more stuff over here I

17   will share with you too as we go along.  Just people of

18   interest it would pay to make a phone call to to gather

19   some other information you might need.

20   Q.          If there's anything that you have that's

21   responsive to a question that I have or that would

22   help me better understand the answer that you're

23   giving, then we can stop and maybe you can pull that

24   document out and we can talk about it.

25   A.          Now, everything that I've sent you by

Case 3:23-cv-00046-DCLC-JEM   Document 10-3   Filed 02/06/23   Page 11 of 90   PageID #: 507

1  email -- is it on record now?

2  Q.        No.

3  A.        So I'll need to reprint all that out?

4  Q.        No, not necessarily.  If there's

5  something that you had sent me previously that is

6  responsive to what I'm asking, then we should talk

7  about that.  And if it's something that you don't

8  have, then we can try to get a copy of that so that

9  we can make it part of the record.

10  A.        Okay.  There were some things that you

11  asked for that I do not have.  That is the text

12  messages between myself, Craig Kelley, and Sarah

13  Kirkland.  There are so many texts that we're

14  talking about going back to 2019.

15  Q.        And all that stuff is on your phone,

16  though -- right? -- still?

17  A.        It is.

18  Q.        You just weren't able to print it out?

19  A.        You're talking about several hundred

20  copies.

21  Q.        Several hundred.  All right.  I gotcha.

22  This is just a question that we ask everybody.  Is

23  there any reason today why you wouldn't be able to

24  testify truthfully or to the best of your

25  recollection and knowledge?

1  A.          No, there's not.

2  Q.          You're not on any medication or anything

3  that would affect your ability to testify today?

4  A.          No.

5  Q.          All right.  Good.  Are you familiar with

6  testifying?  Have you ever given testimony?

7  A.          No.  First time.

8  Q.          Okay.  Well, we'll try to be as -- you

9  know, this is obviously sort of a formal setting

10 where I ask questions and you give responses, but I

11 also want this to be conversational.  So if you have

12 something to say that maybe my question isn't as

13 pointed as it should be or I'm just not

14 understanding what to ask, feel free to just chime

15 in and say, "Hey, Sam, this is something I think you

16 should know about as well."

17           This is another question we ask everybody.

18 It's not meant to embarrass you or anything like that,

19 but it's something we need to know.  Have you ever been

20 arrested?

21 A.          No.

22 Q.          Never charged with a crime or anything?

23 A.          . No.

24 Q.          Have you ever been involved in a lawsuit

25 of any kind?

1   A.       No.

2   Q.       Where were you born?

3   A.       Sneedville, Tennessee.

4   Q.       What's your date of birth?

5   A.       3/14/77.

6   Q.       Where do you live currently?

7   A.       Knoxville, Tennessee, which is actually

8   Corryton, Tennessee.  6509 Mission Springs,

9   Corryton, Tennessee, 37721.

10   Q.       That's in Knox County?

11   A.       That is correct, Knox County.

12   Q.       Tell me a little bit about your

13   background.  Did you go -- have you lived in

14   Tennessee your whole life?

15   A.       I have.  The majority of my life has

16   been traveling through sales for different

17   companies.  I have ran and/or led different

18   companies from all types of sales.  What was the

19   question again?

20   Q.       Just tell me a little bit about your

21   background.

22   A.       My background has basically been in

23   sales all my life working for hardware companies or

24   doing vacation sales or real estate.

25   Q.       So would you say since the age of 18,

1  you've been in sales?

2  A.        Since the age of 23, I've been in sales.

3  Q.        Did you go to high school in Tennessee?

4  A.        I did.

5  Q.        Was that in Knox County as well?

6  A.        No.  That was in Sneedville, Tennessee.

7  Q.        Have you done any college classes?

8  A.        Yes, I have.

9  Q.        Okay.  Can you tell me a little bit

10  about that.

11  A.        I have done John A. Gupton out here in

12  Nashville, funeral directing and embalming.  I also

13  graduated from Tennessee Tech in Morristown in

14  machine tool technology, and then I have a bunch of

15  little, like, non-credited things, stuff like that.

16  Q.        What did you graduate in?

17  A.        Machinist, a pre-engineer degree.

18  Q.        What year was that?

19  A.        That was in probably I think '98.

20  Q.        And you say you have some other classes

21  that you've taken, not necessarily college classes?

22  A.        Yes.  Just different ones in sales and

23  different courses and stuff like that.

24  Q.        Have those resulted in any special

25  certifications?

| | |
|---|---|
| 1 | A.          Yes, but it's hard for me to recall |
| 2 | those. |
| 3 | Q.          I understand. |
| 4 | A.          They have been many years ago. |
| 5 | Q.          I understand completely.  But |
| 6 | certifications relating to selling? |
| 7 | A.          Yes. |
| 8 | Q.          Okay.  You say you started selling when |
| 9 | you were 23 years old.  What was the first company |
| 10 | that you worked for? |
| 11 | A.          House Hasson Hardware Company.  That's |
| 12 | in Knoxville, Tennessee.  They sell hardware to, |
| 13 | like, your mom and pop -- your mom and pop hardware |
| 14 | stores. |
| 15 | Q.          So it's more like wholesale, not retail? |
| 16 | A.          Correct. |
| 17 | Q.          How long did you work there for? |
| 18 | A.          Six-plus years. |
| 19 | Q.          And then did you go to a new job after |
| 20 | that selling? |
| 21 | A.          I did. |
| 22 | Q.          Okay. |
| 23 | A.          I'm having a hard time remembering them |
| 24 | now. |
| 25 | Q.          That's all right. |

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    A.          So I have what's called a TBI, traumatic

2    brain injury.  I had a fall back in 2018.  So some

3    stuff I cannot recall as quickly as normal.

4    Q.          I understand.

5    A.          But that's the reason some of that I

6    cannot recall.  But I remember I left House Hasson

7    Hardware Company and I went to another company.  I

8    cannot think of the other company I went to.

9            But I've been in some sort of sales.  After

10   the accident in 2018, I went into working for what's

11   called Exploria Resorts.  That is a vacation

12   time-share.  Then I left there and started with

13   Solartime USA.

14   Q.          Gotcha.  So in 2018 you experienced the

15   injury.  Do you mind sharing a little bit about how

16   the injury happened?

17   A.          I was working for Coca-Cola in sales,

18   and I walked out on a dock and slipped on black ice.

19   I fell about 10 feet and hit my head.  That

20   injured -- I have a TBI and I have a shoulder over

21   here that's -- it's been repaired, but it's still

22   fragile.

23   Q.          Do you remember when that happened?

24   A.          That happened in January of 2017.

25   Q.          You said you had that shoulder surgery?

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1  A.          No.  They done repair to it through

2  physical therapy.  I had to do that and some other

3  things, had to do speech therapy, stuff like that.

4  Q.          And that was -- I assume that was all

5  covered under worker's compensation?

6  A.          Yes, it was.

7  Q.          And you had to take some time off of

8  work because of that?

9  A.          Yes.  I probably took close to a year or

10  year and a half off.

11  Q.          And while you were off, the company --

12  did they do the two-thirds your average weekly wage

13  where they pay you --

14  A.          Uh-huh.  (Witness moves head up and

15  down.)

16  Q.          Then -- so once you recovered from your

17  injury and you were ready to go back to work, you

18  decided not to go back to work at Coca-Cola?

19  A.          I did.

20  Q.          Was there any reason why you decided not

21  to go back to work with Coca-Cola?

22  A.          Money.

23  Q.          That's usually a good reason to go find

24  another job.  So you go and work for the time-share

25  company?

1    A.          Yes, I did.

2    Q.          What was the name of that company again?

3    A.          Exploria Resorts.

4    Q.          Did they sell time-shares in any

5    particular location or for any particular brand?

6    A.          They sold in their locations only.  They

7    had about 12 locations at the time they sold in.

8    Q.          Then that was the job you did just

9    before joining Solar Titan?

10   A.          That's where I actually met Craig Kelley

11   at.

12   Q.          So Craig was working for Exploria

13   Resorts as well?

14   A.          Yes.  Craig was what's called a TO.  A

15   TO is called a take-over manager.  He was the one --

16   we set the sale up and he comes in and closes the

17   deal.  So that's where my relationship started with

18   Mr. Craig Kelley.

19   Q.          Was he like a supervisor?

20   A.          No, he was not.  He was called a

21   take-over manager.  He was the closer is what he

22   was -- in sales, he would be the closer.  He would

23   come in and take over from where I left and offer

24   the deals that I could not offer.

25   Q.          I understand.  So in 2018 you've

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    recovered. You're back at work. You're working for

2    Exploria Resorts. You meet Craig Kelley. Tell me

3    how you end up going from Exploria --

4              MS. DANIELS-HILL: Before we do that,

5    I just have a follow-up question. Does anything

6    related to your TBI affect your ability to accurately

7    recall information you're giving us or just that

8    sometimes you might not remember right off the top of

9    your head?

10             THE WITNESS: I sometimes might not

11    remember. It might take me a second for it to come up,

12    but really anything prior to that I'm kind of just -- I

13    can't remember. I can remember, but it's just like as

14    we age you -- it's hard to recall some things but

15    something can bring it up. But anything moving

16    forward, I'm pretty -- I can tell you this way. The

17    day that I found out I had the TBI, I called my wife --

18    current wife by my ex-wife's name. So that's when we

19    knew that something was wrong.

20             But, no, everything is -- I've been

21    cleared. The doctor told me I would probably recover

22    about 80 percent. I've actually excelled to about

23    90 -- 90 percent. Just sometimes it's hard to recall

24    stuff sometimes. I'll get like a stop on it.

25    ///

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1   BY MR. KEEN:

2   Q.          If there's anything as we're going along

3   that you remember that might be responsive to what

4   we're talking about, just feel free to say, Oh, hey,

5   Sam, I just remembered this.

6           Okay.  So let's talk about you going from

7   Exploria to Solar Titan.  Just tell me a little bit

8   about how that happened.

9   A.          I was still with Exploria Resorts, and

10  Exploria Resorts came in and shut down the sale

11  site.  I left there and went on unemployment for

12  about two months, and then -- Craig and I stayed in

13  communications the whole time.  He said, "We have

14  something that's going on that we're fixing to

15  build.  Do you want to be a part of it?"  I said,

16  "Yes."  And he offered -- him and Sarah Kirkland

17  offered me a sales position, and I was the first

18  employee.  I started that, and then that's how the

19  relationship started with them.

20           Later on I met his partner, which is

21  Michael Atnip, and we developed a -- just a -- we

22  became like a family, you know, of great friends.  And,

23  you know, that's how that all came together.

24  Q.          So you found out about the Solar Titan

25  position through Craig Kelley?

1   A.          Yes, the CEO.

2   Q.          Craig Kelley is the CEO of Solar Titan?

3   A.          Yes.

4   Q.          So did you have to apply?

5   A.          No, never did.

6   Q.          You didn't have to do an interview or

7   anything?

8   A.          No.

9   Q.          You said that Craig told you that he was

10  building something and that he asked if you wanted

11  to be a part of it.  Did he explain to you about the

12  company like before you signed on to join?

13  A.          He said that we will be selling solar,

14  and that's all I needed to know at the time.

15  Q.          And did you know when they hired you --

16  what position did they say that they were hiring you

17  to do?

18  A.          I was hired as sales to -- as a sales

19  consultant to go out and just to sell.

20  Q.          Sales consultant.  What did they tell

21  you about the type of work that you would be doing?

22  Was it just doing sales or would there be any

23  management responsibilities or anything along those

24  lines?

25  A.          He offered me the director of sales.  I

1    told him I wanted no part of that.  I didn't want to

2    manage kids.

3              Here's you another -- here's you a

4    screenshot of how the executive order down, coming

5    from.  You also have an email of mine sent to you

6    dated -- it was dated 7/23 of the department heads, how

7    they all are set, and that's something that you can put

8    with your other file that puts him at the CEO level.

9    Q.         Let's just -- for the record, let's sort

10   of explain what this is.  What you're showing me

11   appears to be a printout of a text message

12   conversation that you had with Craig Kelley?

13   A.         That is a printout conversation that

14   Craig Kelley had with Shawna Helton and the text

15   message shows who is the CEO, the CFO, and the COO

16   of the company.

17   Q.         Okay.  How did you get a copy of a text

18   message between Craig Kelley and Shawna Helton?

19   A.         Shawna sent that by text message.

20   Q.         To you?

21   A.         Correct.

22   Q.         Why did she send it to you?

23   A.         Because I asked her if she had anything

24   that could put -- of the department heads.

25   Q.         That just sort of showed the

1    organizational structure?

2    A.         Yes, how it actually is set up.

3    Q.         I understand.  And in this text message

4    it says that the CEO is Craig Kelley?

5    A.         Correct.

6    Q.         And the CFO, meaning chief financial

7    officer, is Michael Atnip and the chief operational

8    officer is Sarah Kirkland?

9    A.         That is correct.

10                    MR. KEEN:  We can mark it as an

11   exhibit.

12                    MS. DANIELS-HILL:  Are these your only

13   copies of these?  Are these the originals?

14                    THE WITNESS:  These are yours.  I do

15   not need copies.

16                    MR. KEEN:  So, for the record, we're

17   going to make this document -- we're going to mark it

18   as Exhibit 1.

19                         (Marked Exhibit 1.)

20                    MR. KEEN:  Are there any other

21   questions that we need to ask about this right now?

22                    MS. DANIELS-HILL:  When did she send

23   you this screenshot?

24                    THE WITNESS:  That was sent this week.

25   That was sent yesterday at 1:20 P.M.

1       MS. DANIELS-HILL:  What day?

2       THE WITNESS:  August the 2nd.

3       MS. DANIELS-HILL:  Did she clarify

4  whether or not this was a text that she was having

5  directly with Craig Kelley then?

6       THE WITNESS:  It is.  It's directly

7  with him.

8       MS. DANIELS-HILL:  Was this from her

9  personal cell phone?

10      THE WITNESS:  It is.

11 BY MR. KEEN:

12 Q.       And in this she says -- she asks, "Is

13 payroll a week behind?"  But this was sent --

14 A.       February the 26th of 2020.

15 Q.       Over two years?

16 A.       Yes.

17 Q.       What is this below that?  She says, "I'm

18 going to send you my resignation letter to proof."

19 A.       She sent that to her previous employer.

20 She actually sold solar too.  How this all comes

21 involved in together, Craig, Shawna, and I sold

22 time-share at the same company.  That's how we all

23 three knew each other.  Prior to that, Shawna and

24 Craig sold time-share in Florida together.  That's

25 the connection.

1       And where I come into play with them too is

2   the one in Gatlinburg, Tennessee.  That's where I

3   actually met them.  Like I say, I reached out to Shawna

4   to see if she had anything that she wanted to provide,

5   and that was what she actually sent.  A lot of the

6   things that, like I told you on the telephone, is a lot

7   of people comes and talks to me.  And the reasons I'm

8   doing that is because I was the first one at the

9   company.  I knew everything -- I knew what was -- I

10  found out what was going on.  People was telling me,

11  "Jason, this is going on.  This is going on."  I said,

12  "There's no way this is going on."

13      And people were just telling me stuff, just

14  like Shawna.  Shawna came to me a couple months back.

15  She said, "Jason, I'm not being paid."  I said, "I'm

16  not either."  And she said, "What are you going to do?"

17  I said, "Well, I'm fixing to resign.  I feel like a --

18  I feel like a carrot is being hung in front of me."

19      You know, when your employer goes and buys

20  a $8.2 million home and invites you out for a barbecue

21  next week and they can't pay you, that's kind of an

22  insult to you.  So just with that being said -- I

23  apologize.  I know we kind of got off record there.

24  Q.        No.  That's fine.  That's perfectly

25  fine.

1    A.          Please feel free to move forward.

2    Q.          So Craig also asked Shawna to join Solar

3    Titan?

4    A.          Correct.

5    Q.          And so Shawna would have to resign from

6    Exploria?

7    A.          She resigned from another company that

8    she was selling solar for, and I do not know what

9    that company's name was.  But she left there and

10   went -- she became what's called the -- I think she

11   was the director of sales at Solar Titan, and then

12   later she became the vice president of sales at

13   Solar Titan.  See, I never did answer to Shawna.  I

14   answered directly to Craig Kelley.

15   Q.          Craig's always been your boss?

16   A.          Craig Kelley has been my direct contact.

17   All my other staff -- I never did answer to no one.

18   I pretty much had the freedom to go wherever I

19   wanted to go.

20   Q.          And Sarah Kirkland, am I understanding

21   correctly, also worked for the same solar company as

22   Shawna?

23   A.          No.  Yes.  No.  Sarah worked for the

24   same company that Craig worked for prior.  Craig

25   and -- Craig and Sarah worked for another company.

1    It was called Solar sales.  Solar, S-O-L-A-R.

2    Sales, S-A-L-E-S.  And it was out of Georgia.  That

3    is where those two met.

4    Q.          Well, it sounds like they didn't work

5    there very long.

6    A.          No.  It was a very short-lived.  The

7    reason that I was explained why they -- why they

8    left was because they was not being paid.  So I do

9    remember being told that's why they left and

10   developed Solar Titan USA.

11   Q.          Did they take what they learned at Solar

12   Sales and apply it to their development of Solar

13   Titan?

14   A.          I'm assuming whatever they learned was

15   very short, because it was a very short time that

16   they was there.  So, to answer your question, no, I

17   do not know the answer to that one.

18   Q.          What made you want to leave Exploria and

19   then go to work for Solar Titan?

20   A.          Money.

21   Q.          And then Craig sort of -- he told you

22   how much money that you could expect to make while

23   working there?

24   A.          He just told me -- he just told me -- he

25   said, "You can make what you want to make."  And

1    that's pretty much -- that's what I did.

2    Q.          When you say you can make what you want

3    to make, that's because you were paid primarily on

4    commission?

5    A.          Yes.  I was paid a straight commission.

6    Q.          Straight commission.  So there was no

7    base rate or anything?

8    A.          No.

9    Q.          Can you explain your commission pay

10   scale.

11   A.          My commission pay scale started out as

12   5 percent on the total sales sold.  So if we did a

13   sale -- let me grab a calculator.  I'm sorry.  I can

14   actually break it down for you.  If the job was

15   $50,000, I would get 5 cents on the dollar which

16   would pay me $2,500.  And then I would be paid half

17   of that two weeks after the sale and then I'd get

18   the other remaining half four weeks after the

19   installation has took place or when glass is put on

20   the roof.

21          That is the initial start-up how pay

22   started, and from there until now pay has changed about

23   three different times without even any acknowledgment.

24   They just go ahead and change it without even

25   acknowledging how they're going to change it.

1   Q.          Did you sign a contract when you first

2   started at Solar Titan?

3   A.          No, I did not.  Everything was on a

4   handshake and verbal.

5   Q.          And I want to just -- because you used

6   some industry terms, like "glass on the roof."  Can

7   you explain what glass on the roof is?

8   A.          That's when solar is actually put on the

9   roof.  That is when the installer crew has come out

10  and installed the solar, which is the glass, and

11  that is considered to be a complete job.

12  Q.          Okay.  Is it considered to be a complete

13  job even if it hasn't passed inspection?

14  A.          In their eyes, yes.

15  Q.          In the eyes of Craig, Sarah, and

16  Richard?

17  A.          Correct.

18  Q.          Even if hasn't passed inspection, you

19  are still as the salesperson expecting to be paid a

20  commission on that sale?

21  A.          Yes.  Because when glass is on the roof,

22  the company is paid their full amounts.  There's no

23  reason to hold -- withhold funding from a sales rep

24  if the company has already paid a hundred percent.

25  Now, backing up prior to this, I was not aware of

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1  this until October of last year that when we

2  actually installed I thought it was a complete job.

3  I thought inspections was already done, everything

4  was connected.  I was kept in the dark.

5          As they trained reps, they do not tell the

6  reps the technical side of the installation.  They keep

7  us in the dark kind of, but when I think of an

8  installation is a complete installation.  That's all

9  permanent inspections complete and the system is turned

10 on and running.  That's what I think when I think of a

11 complete, but, no, they was only getting halfway there,

12 getting paid, moving on to another thing.

13 Q.        And we'll -- we'll definitely talk about

14 all that, but I wanted to mention something that you

15 brought up about your training.  You mentioned

16 specifically that whenever you are trained, they

17 didn't really explain to you the technical aspect of

18 the installation.  I just want to ask generally,

19 tell me a little bit about the training that you had

20 before you even started working with Solar Titan.

21 Who trained you?

22 A.        Craig Kelley.

23 Q.        And did Craig Kelley give you any

24 training material?

25 A.        I have very little.  Everything that I

1   have is actually recorded.  Like I said, guys, I

2   have a TBI.  It's better for me to listen to

3   recordings.  I have recordings of him.  I rode with

4   him for about 30 to 60 days -- rode with him

5   personally and listened to his sales pitch.

6   Q.          So you have more on-the-job-type

7   training?

8   A.          I did.

9   Q.          You said you were in training for almost

10  60 days?

11  A.          We'll say 60 days, correct.

12  Q.          But during that time you probably led

13  some of the sales?

14  A.          No, I did not.

15  Q.          You just --

16  A.          I was not for sure if I was going to

17  even come on board.

18  Q.          What convinced you I guess during the

19  training to say, hey, this is something that I want

20  to do?

21  A.          I enjoyed the freedom.  That was the

22  best thing about it was the freedom.  No one ever

23  called.  No one -- it was just the freedom of the

24  job.  You had three appointments -- three to four

25  appointments per day, you're done, you go home.

1   That's why I didn't take the management role.  They
2   actually offered me the director or the VP of sales,
3   but I did not want to deal with people.
4   Q.          What types of things were you taught in
5   your training.  I know that that's a very broad
6   question, but I want you to try your best to answer
7   it and then I'll ask you more specific questions
8   based on your answers.
9   A.          What was I taught?
10  Q.          How were you taught to sell the product?
11  A.          How I was taught to sell the product?
12  Well, how I was taught to sell the product is the
13  money.  We have what's called the "anyway money,"
14  and the anyway money is the money you're going to be
15  spending anyway for your electricity.  And here is
16  kind of a pitch that they actually use in-house and
17  it kind of will explain how everything goes with
18  that.
19  Q.          So let me, just for the record, the
20  document you just handed me is titled "Anyway Money
21  Pitch," and this is part of -- it looks like part of
22  something that's a larger book that's called "Solar
23  Titan USA Professional Development"; is that right?
24  A.          That's correct.
25  Q.          Can you tell me about what -- what is

1   Solar Titan USA Professional Development?  Do you

2   know?

3   A.          That is their sales side where they do

4   sales training.

5   Q.          It's like the training booklet?

6   A.          Yes, it is.

7   Q.          Is that something that they gave to you?

8   A.          No, I did not have that.

9   Q.          How did you get this -- I guess this is

10  just one small part of that book?

11  A.          That was actually shared with something

12  that I had in my files.  When I went into the office

13  which was for -- it wasn't that much, but when I did

14  go in the office, people would always ask me, "How

15  do you sell so much versus everybody else?"  And I

16  always say, "It's the anyway money."  And that's the

17  sales pitch that all the other reps use is how you

18  actually -- how you set the sale up to sell.

19              MS. DANIELS-HILL:  Just for the

20  record, we'd like to mark this as Exhibit 2.

21                          (Marked Exhibit 2.)

22              THE WITNESS:  It's set up just as

23  simple conversation as we are having here today.  Now,

24  that's my sales pitch.  Now, as they started hiring

25  employees, they started -- they have a whole another

1    sales pitch.  I don't know how that is set up.

2    BY MR. KEEN:

3    Q.          Can you tell me about what the anyway --

4    you know --

5                    MS. DANIELS-HILL:  Before we get into

6    the details of this, I want to ask a few follow-up

7    questions about this.  You said you got this from the

8    office.  How long ago did you get this anyway pitch?

9                    THE WITNESS:  I probably had it for at

10   least two years.

11                   MS. DANIELS-HILL:  Who in the office

12   actually gave it to you?

13                   THE WITNESS:  Shawna Helton.

14                   MS. DANIELS-HILL:  Why was she giving

15   that to you?

16                   THE WITNESS:  She asked me if I wanted

17   it, and I threw it in my box.

18                   MS. DANIELS-HILL:  Was it supposed to

19   assist you on your sales?

20                   THE WITNESS:  No.

21                   MS. DANIELS-HILL:  Do you know why she

22   would have thought you might want a copy of that?

23                   THE WITNESS:  She handed me a copy of

24   that if a sales rep would ever ride with me.  They did

25   occasionally.  I had a separate presentation versus

1   what they had.  And when they went with me, they would

2   look like a deer in the headlights compared to what

3   they have -- what they've done.

4               You know, I keep things very simple.

5   This here is complicated.  Simple -- simple works the

6   best.  It's to the point.  Everything is laid out, and

7   it's -- versus this here.  This here is five pages of

8   stuff that you don't need to go into.

9   BY MR. KEEN:

10  Q.          Tell me -- so how would you do your

11  sales pitch?

12  A.          My sales pitch is, "When did you realize

13  it was the smart thing to do that you could produce

14  your own power instead of being a lifetime

15  electrical customer?"  And that's pretty much how my

16  pitch started.

17              And I would ask you for your electric bill.

18  Then I would find out how much you spent per year for

19  your electric.  I looked at your kilowatt usage, and

20  then I would build a package to suit your needs.  I

21  would ask the customer, "Are you looking to -- what are

22  you looking to offset?  Are you looking to offset

23  50 percent?  Are you looking to offset 90 percent?"

24  And they would share what they was wanting to do.

25              I would build a package then.  Then I would

1    actually set the pricing up and go through, you know,

2    the benefits of solar to them.  You know, some of the

3    benefits of solar is it actually increases your home

4    value by 10 to 15 percent.  The Department of Energy --

5    you have the investment tax credit which is 26 percent

6    if you qualify.

7                    Also, there's no sales tax in the state of

8    Tennessee, and I would go through the financing that we

9    offer, and then I would offer the two packages to the

10   customer.  Now, that is my sales pitch.  What they

11   trained now is totally different.  I was taught that

12   sales pitch from the owner.

13   Q.           When you say what they train now is

14   totally different, can you explain what it is that

15   they train now?

16   A.           I do not know that, Sam.  That was

17   something that I never did get involved with.

18   Q.           Okay.

19                    MS. DANIELS-HILL:  Who does the

20   training now?

21                    THE WITNESS:  John Carroll.

22                    MS. DANIELS-HILL:  Was there anyone

23   prior to him that did the training?

24                    THE WITNESS:  Shawna Helton.

25                    MS. DANIELS-HILL:  Do you know what

```
 1    time period Shawna Helton would have done the training?
 2                        THE WITNESS:   Shawna started in
 3    February or -- January or February of 2020.  She
 4    probably done the training up to the middle to the last
 5    of October of 2020, and then John Carroll stepped in.
 6                        MS. DANIELS-HILL:  And he's been the
 7    one training reps since then?
 8                        THE WITNESS:  Yes.
 9    BY MR. KEEN:
10    Q.          How did you get leads?
11    A.          The leads comes in from my appointment
12    center.  I had two dedicated appointment centers for
13    myself.  All the leads -- I was told they came from
14    either Facebook or Google and the customers went in
15    and punched their names in with their information
16    and then from there the call center would actually
17    reach out to the customers and call them and
18    actually set the appointments up.  And then I would
19    go out and actually see the customers.
20    Q.          So you didn't have to generate your own
21    leads?
22    A.          That's correct.
23    Q.          Did you ever try to generate your own
24    leads?  Meaning did you ever ask a customer for
25    referrals or anything like that?
```

1    A.          Yes, I did.

2    Q.          Can you tell me a little bit about that.

3    A.          I would literally get the leads from the

4    customers.  They would share their names and

5    information.  I would actually forward them into Kay

6    Warren.  She is the head of the call center, and she

7    actually would call the customers and try to set up

8    appointments for me.

9    Q.          For the leads that you didn't generate

10   yourself -- for the leads that were given to you,

11   what did they tell you about the customers ahead of

12   time?

13   A.          They would give me their names and

14   information and what their average electric bill is.

15                     MS. DANIELS-HILL:  Do you know how

16   they knew what the average electric bill was?

17                     THE WITNESS:  They would ask the

18   customer.

19                     MS. DANIELS-HILL:  So it was just

20   information coming from the customer about what they

21   normally paid?

22                     THE WITNESS:  Yes, correct.

23   BY MR. KEEN:

24   Q.          Is that information that they would type

25   into the online form that they would fill out?

1   A.          They would either type it in or give it

2   verbally.

3   Q.          So if a customer filled out the form

4   online basically asking to be contacted by the

5   company, the company would call in and they would

6   ask follow-up questions about --

7   A.          That's correct.  They would ask -- the

8   first couple questions they asked are, "Are you the

9   actual homeowner?  Do you reside in a home -- a

10  stick built or a mobile home?  Do you have a credit

11  score of 650 or higher?  And what is your average

12  electric bill?"  That's kind of the four or five

13  questions they would ask when they actually called.

14  Q.          Sort of to determine eligibility?

15  A.          That is correct.

16  Q.          Why would they ask if they were in a

17  mobile home or a stick-built home?

18  A.          Because a lot of your single-wides

19  versus a double-wide you cannot do a solar roof

20  project.  We would turn down the single mobile homes

21  unless they owned land, meaning they owned a half

22  acre of land or more.

23  Q.          And then you could -- the reason why you

24  would ask if they owned the land is because you

25  could install the panels on the land itself and not

1    on the structure?

2    A.            Correct.  Which is called a ground

3    mount.

4    Q.            If someone did live on a mobile home or

5    in a mobile home, how would you know whether or not

6    you could actually install on the structure or not?

7    A.            The appointment center would literally

8    pull it up from Google Maps and by asking questions.

9    And there have been jobs that I have been sent out

10    which is actually a single-wide that we could not

11    even attempt to do an installation.

12            Some of the appointments that we was

13    probably sent out -- probably 1 out of 10 was duds,

14    which is what we called that we could not install

15    nothing.  But they would still want us to try to sell

16    them something, but when you could not even install,

17    there's no use of wasting their time or our time.

18    Q.            What do you mean they would still want

19    you to try to sell them something?

20    A.            They would want us to try to put a

21    system on the property.

22    Q.            Even if it couldn't be safely installed?

23    A.            Yes, yes.  They would go through

24    every -- every means trying to get something to be

25    installed.

1    Q.          Who is "they"?

2    A.          Craig or Shawna.

3    Q.          So if you told Craig or Shawna that you

4    went out to a potential customer's home and it was a

5    dud, they would say, "Well, we don't care.  We still

6    want you to sell"?

7    A.          Yes, if it's any way possible.

8    Q.          Have you ever sold or have you ever

9    known of a sale on a structure that it wouldn't be

10   safe to install on?

11   A.          No, I do not.

12              MR. KEEN:  How many customers would

13   you go to -- well, first, do you have any follow-up

14   questions on that?

15              MS. DANIELS-HILL:  Yeah, I did have a

16   few.  So when you said the call center would Google Map

17   it, how do you know what the call center normally asks

18   customers?

19              THE WITNESS:  Kay Warren.  She told me

20   the process that they normally ask is -- she said

21   that's probably the top four to five questions they

22   normally ask.

23              MS. DANIELS-HILL:  What was the reason

24   she was explaining to you what they normally ask

25   customers?

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1            THE WITNESS:  Her and I developed a

2    relationship.  This is how it came up.  I was -- from

3    time to time I would go to what's called a dud

4    appointment, and literally pull up and it would be a

5    single-wide, no credit.  The first -- when you first

6    pull up and a place looks pretty bad, you pretty much

7    know that you're not going to get nowhere.  You kind of

8    develop, just like you guys -- we all development our

9    traits that our gut tells us yes or no.  And it's just

10    one of those -- you know, one of those things that you

11    develop.

12            And, you know, I have been in some of

13    the "dumpest" places in Tennessee, Kentucky, and

14    Virginia.  And you can pretty much know that this is

15    not going to be a sale.  And I would call in to Kay,

16    and I would ask Kay -- I said, "Kay, why was this

17    appointment set for?"  And she would go into it and

18    tell me who actually set the appointment, and they

19    would actually go talk to the person.

20            MS. DANIELS-HILL:  And did Kay have a

21    boss that she reported to or was she her own boss?

22            THE WITNESS:  She reported to Craig

23    Kelley.

24    BY MR. KEEN:

25    Q.        So how many -- first, let me -- did you

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1  work Monday through Friday?  Did you work Saturdays

2  sometimes?

3  A.          My first year I worked seven days a

4  week.  I run three to four appointments per day.

5  Q.          So we're talking 20 appointments a week?

6  A.          Every bit, yes, or more.

7  Q.          How many sales would you expect to get

8  out of those 20 appointments?

9  A.          Seventeen.  Sixteen to 17.

10  Q.          Wow.  So you are killing it.

11  A.          I became a master.

12  Q.          Yeah, it sounds like it.

13  A.          Master of my talent.

14  Q.          Well, good.  So three to four a day,

15  seven days a week, but you said you stopped doing

16  seven days a week after some time?

17  A.          I did.

18  Q.          Did you -- would you do six days a week

19  then?

20  A.          I cut myself down to about six days a

21  week.  I would work Monday through Saturday, take

22  off Sundays, and then later I cut myself even

23  further back down to five days a week.  And then the

24  last 16 weeks, I might not work then.

25  Q.          You said you worked?

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1  A.          I worked zero for them.

2  Q.          How long ago was that whenever you

3  started -- when you basically stopped?

4  A.          Pretty much the last week in March.  We

5  started having issues.  We had a pay change in

6  December that they sent out documents for.  No one

7  was -- no one signed it.  Well -- but they went

8  ahead and done it anyway.

9             See, my pay was never supposed to change

10  ever, but my pay got changed.  This actually happened

11  in October.  That's when I realized there was something

12  going on.  That's when I started noticing that my pay

13  was changing dramatically.  What I was being paid on

14  the 5 percent was being changed, and they sent out

15  what's called a "Non-disclosure, Non-compete, and

16  Non-solicitation Agreement" to all the employees.  I

17  refused to sign it.  I've never signed it.

18  Q.          What did they say about you not signing

19  it?

20  A.          He told me to sign it or you will be

21  terminated, and I said, "Fire me."  But he never

22  did.

23  Q.          Can you tell me what -- what it is that

24  you just handed me?

25  A.          That is a non-disclosure agreement where

1    I am not allowed to talk to anyone about the sales

2    process at Solar Titan, not to talk about the

3    customers in no shape and form, and I think that's

4    kind of what lead up to it.

5    Q.        You said this was given to you in

6    October of 2021?

7    A.        Let me back up.  That was given to me in

8    October of, yes, 2021.

9    Q.        And who gave that to you again?

10   A.        Craig Kelley.

11              MS. DANIELS-HILL:  We'll have this

12   marked, for the record, as Exhibit 3.

13                          (Marked Exhibit 3.)

14   BY MR. KEEN:

15   Q.        So this document that we have marked

16   Exhibit 3 is titled "Non-disclosure,

17   Non-competition, and Non-solicitation Agreement."

18   And I know that you just explained what's in it, but

19   will you just kind of say again what your

20   understanding of it is.

21   A.        That is that we cannot -- as a Solar

22   employee with Solar Titan, we cannot work for no

23   other company for "X" amount of months or years,

24   that we are not allowed to talk about customers and

25   nothing negative about the company.

1  Q.          Do you know why that they gave this to

2  you?

3  A.          I do not know why.  All the employees

4  was given that.  That is pretty much when everything

5  started to start falling apart.

6  Q.          Tell me about -- what do you mean when

7  stuff started falling apart?

8  A.          Our installations got to the point that

9  they was not -- we had -- some of the information I

10 have here with me was what was given to the company

11 at the start, and we was told -- I was told at the

12 time this is what our systems will produce.  This

13 was my initial paperwork given to me about what each

14 system would produce for kilowatt-wise.  And these

15 numbers -- if you add them up, they are incorrect.

16 A 4 kilowatt will produce nowhere near 800 kilowatts

17 per month.  The max that the four will produce is

18 five, and that's on a good day.

19            And these were the numbers that I was

20 selling off of to customers because I was given -- I

21 was told this is the correct information from the

22 company.  And I later found out that we was selling a

23 system that was not producing anywhere close to what we

24 was promised.  This was given by Craig Kelley and Sarah

25 Kirkland.

1   Q.      So this is a document that you just

2   handed to me.  It says, "What Starting Size Solar

3   System to Recommend:  This is a Guideline."

4         You testified earlier that whenever you are

5   asking a customer what it is they wanted, you would

6   build them a system that could meet their needs.

7   A.      That is correct.

8   Q.      And you're saying that you used this

9   guideline in order to come up with the system that

10   you thought met their needs?

11   A.      Yes, based on what the customer told me

12   and shared with me with his electric bill.  When a

13   customer gives you an electric bill, it shows you a

14   broad, across the 12 months of what they currently

15   use.  And what they call that is they call it a

16   kilowatt hour, and that's what a customer uses per

17   month.  And we would take that number by those 12

18   months, divide it by 12 to find out the average

19   kilowatt usage.  Then we would look at the kilowatt

20   usage per average and base it off of those numbers

21   there.

22   Q.      But what you're telling me is that the

23   numbers here on this document are incorrect?

24   A.      Yes.

25   Q.      So let me ask you some questions about

1   this document then.  When did you first get this
2   document?
3   A.          That document was given to me in
4   November of 2019.
5   Q.          Who gave it to you?
6   A.          Craig Kelley and Sarah Kirkland.
7   Q.          And what did they tell you whenever they
8   gave you this document?
9   A.          That would be the document we would use
10  to -- for our customers to base on their system
11  size.
12  Q.          And so you did use this document?
13  A.          I used it for years, yes.
14               MR. KEEN:  I'm going to ask that this
15  be marked as Exhibit 4.
16                        (Marked Exhibit 4.)
17  BY MR. KEEN:
18  Q.          At the time that they gave you this
19  document, did you have any reason to believe that
20  what was contained within it wasn't accurate?
21  A.          No, I did not.
22  Q.          How did you go from understanding this
23  to be accurate to now understanding that it's not
24  accurate?
25  A.          This came out.  They sent me another

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1   document, and they updated it and the numbers are

2   still not correct.  Then later last year I found out

3   how to actually add up the correct -- how to

4   determine the correct system.

5            This was a document sent out by Sarah

6   Kirkland with updated information.  We were told by --

7   by Shawna, which Shawna was told by Craig and Sarah,

8   that we've been selling a system that's not even

9   correct.  The majority of the sales reps at the time

10  left because we as reps have been selling these systems

11  based on these numbers here that it actually would

12  produce and finding out later they are nowhere close.

13  Q.        So the document that you just handed me

14  is titled "Solar System Sizing Guideline QCell 400"?

15  A.        Correct.

16  Q.        This is an updated sizing guideline from

17  the one that we previously talked about, Exhibit 4?

18  A.        Yes.

19  Q.        When did you get this?

20  A.        I received that in October of -- October

21  of last year.

22  Q.        So at the same time that they gave you

23  the non-disclosure?

24  A.        Uh-huh.  (Witness moves head up and

25  down.)

Case 3:23-cv-00046-DCLC-JEM   Document 10-3   Filed 02/06/23   Page 50 of 90   PageID #: 546

1    Q.          Did they give it to you like at the

2    exact same time?

3    A.          No.  It was sent at a separate time.

4    Q.          Which one came first?

5    A.          (Indicating.)  That came first.  That

6    came second.

7    Q.          When you say "that" --

8    A.          That -- the non-disclosure came first,

9    and then that came second.  That probably came more

10   in November versus October.

11                    MR. KEEN:  Let me have this marked as

12   Exhibit 5.

13                         (Marked Exhibit 5.)

14                    MS. DANIELS-HILL:  I have a question

15   about Exhibit 4 which was the first panel guideline

16   that you received.  Do you know who created this?

17                    THE WITNESS:  Craig Kelley.

18                    MS. DANIELS-HILL:  How do you know

19   that?

20                    THE WITNESS:  He printed it off his

21   computer at home.

22                    MS. DANIELS-HILL:  Were you actually

23   there when he did that?

24                    THE WITNESS:  Yes, I was.  I was

25   dropping off checks.

49

1              MS. DANIELS-HILL:  For <u>Exhibit 5</u>, do

2    you know who created that document?

3              THE WITNESS:  I do not.  That was

4    sent -- by email it was sent by Sarah Kirkland.  And to

5    add to this, there's another document out there that I

6    do not have a copy of that they updated this again.

7    The systems that they was installing was not producing

8    nowhere near what they was saying.

9    BY MR. KEEN:

10   Q.         They updated it with numbers that are

11   lower than the ones in the second document?

12   A.         Yes.

13   Q.         So, for example, in the first document,

14   in <u>Exhibit 4</u>, it says that 4 kilowatts is -- a 4

15   kilowatt system is for a usage of 800 kilowatts and

16   under?

17   A.         Correct.

18   Q.         In the second one, now it says 4

19   kilowatts is now for only 600 kilowatts and under?

20   A.         That's correct.

21   Q.         Now, in the third document, now they're

22   saying --

23   A.         A 4 kilowatt will produce anywhere up to

24   500.

25   Q.         And you say whenever -- around the time

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1   they sent out the non-disclosure agreement and this

2   new sizing guideline is whenever a lot of

3   salespeople left?

4   A.        That's correct.

5   Q.        And your understanding of why they left

6   is because they didn't like the fact that they were

7   selling something that wasn't factually accurate?

8   A.        That's correct.

9   Q.        Did anyone tell you that specifically?

10   A.        I heard that from a couple reps.  One is

11   Todd Kelley.  He lives in Kentucky.  His information

12   has also been sent to you, and also have a list of

13   what's called customers of interest and these are

14   some of the customers that I have dealt with for in

15   the past that was -- was based on these numbers here

16   of the sizing system that the system is nowhere

17   producing what they're supposed to be producing.

18           And Todd's name is actually on here.  He is

19   actually on the email that I sent you too of former

20   reps that you should contact for information.

21   Q.        Do you know why they created these

22   guidelines?

23   A.        I have no idea why, but I see the

24   benefit of them after seeing it.  We was able to go

25   out and sell a system that was a lesser system than

1   the other company was selling but for a higher

2   dollar.  It's profit.  All it is is a profit margin

3   for them.  When you can sell a system that a 4K that

4   would say that would produce 800 kilowatts and

5   for -- had a $5 price mark, they're pretty much

6   taking about 70 percent profit in.

7   Q.         So you think that this gave them a

8   competitive advantage?

9   A.         This gave them an advantage.  If it was

10  done correctly, yes, but it was not done correctly.

11  You know, I've been in sales all my life, and I

12  believe in selling a product that actually works.

13  And when you have -- when you lose friends -- best

14  friends over this, and your best friend tells you

15  the system is not working correctly and it's not

16  producing nowhere near, that's kind of when you get

17  a red flag and you know that something is wrong.

18           And for the longest time I did not leave my

19  phone number out there.  Customers would call in and

20  complain, and it did not make sense to me.  And I

21  started leaving my number with them, and this is where

22  all this has boiled up from October.  That -- now I'm

23  seeing the full picture of things not being done

24  correctly, not being installed correctly or just

25  totally being left and not -- customers -- K.C. Johnson

1  in -- he's in Tennessee.  Literally he sat for pretty

2  much a year and a half and was paying for a system that

3  did not have nothing, and I did not know that until I

4  reached out to him.  He just like, "I don't have a

5  system but I'm paying for it."  I said, "Why are you

6  paying for it?  Why didn't you call me?"  "Well, I

7  didn't have your number."  "Well, you do now."

8           And he just -- I can go back to customers

9  that I've been in contact here recently just finding

10  out stuff now that I thought was completed, done,

11  installed, and produced their own power, and they're

12  not.  And the system that we were selling that we was

13  told by them that would produce is nowhere near that.

14  Q.          So when the company found out that what

15  they were telling people was not accurate --

16  A.          The company already knew this.  It's not

17  that they didn't find out.  They already knew this.

18  Q.          How do you know they knew it?

19  A.          Sarah went to training to -- it's called

20  PV training.  It's handled by NABCEP.  N-A-C -- I'm

21  not for sure how it is.  It is a company that

22  trained people in solar.  It tells them how to do --

23  how their systems produce, what size the system

24  produces, everything.

25           It's not like -- you're trained on this.

1    You literally take a test.  You pass it to the state.

2    I'm going to get you the information.  Bear with me.

3    So you'll exactly what I'm referring to.

4                    MS. DANIELS-HILL:  Do you mind

5    explaining just for the record what you're looking up

6    right now just so we have that clear?  When you're

7    typing and stuff in the computer, do you mind just

8    explaining what it is that you're searching right now?

9                    THE WITNESS:  I will in a minute.

10   Just bear with me.  I'm pulling up the correct email

11   address for what she was -- so she'll know what I'm

12   referring to.  There is a website that all PV -- that

13   all solar companies have a PV.  It's a licensed,

14   certified person that knows the federal guidelines of

15   the system, and literally she knows this training of

16   what's actually supposed to be done.

17                   MS. DANIELS-HILL:  You said it's a PV?

18                   THE WITNESS:  It's a PV associate.

19                   MS. DANIELS-HILL:  So Sarah Kirkland

20   is the PV for Solar Titan?

21                   THE WITNESS:  Yes.

22   BY MR. KEEN:

23   Q.          You said it's something that's required

24   of every company?

25   A.          Yes.  Every company has one in their

1    company that has this certification before you can

2    even install solar on any home as part of their

3    permitting stuff.

4    Q.          Do you know who -- I guess who was that

5    a requirement of?  Was that of the State?

6    A.          That is a requirement of the State.  I'm

7    assuming now.  I might be wrong about that now.  I

8    don't want to give you false information.  I might

9    be wrong about that.

10   Q.          No.  We'll follow-up on that because

11   I've not heard that.

12   A.          That is the website where they actually

13   go for their training to get the PV associate.

14   Q.          NABCEP, N-A-B-C-E-P, and what does that

15   stand for?  Does it say on there?

16   A.          I'll find something for you here shortly

17   for it.  You actually become a board certification

18   with it.  Let's see here.  But that is the

19   requirements that she actually -- she actually

20   tested on.  She requires -- it tells her and

21   explains to her everything of the system.

22   Q.          A PV installer specialist.  So Sarah

23   Kirkland is board certified as a PV installer

24   specialist, and PV stands for photovoltaic?

25   A.          Yes, however it's pronounced.

1  Q.          So Sarah knows how to do these

2  calculations?

3  A.          Yes, yes.

4  Q.          And she did these calculations or the

5  information that she put down was not based on

6  correct calculations?

7  A.          That's correct.

8  Q.          And you think that she did this

9  intentionally?

10  A.          I do not know that to be correct.  I

11  just know what they sent out to us later was false

12  information, and they have sent out a third one.  I

13  do not have a copy of that one.  They updated with

14  the numbers for even less.

15  Q.          Did that result in more people leaving?

16  A.          Yes, it did.

17  Q.          And, again, for the same reason, that

18  they felt like they were misleading?

19  A.          Customers, correct.

20  Q.          Were all your sales presentation -- were

21  they always in person?

22  A.          Yes, it was.

23  Q.          How long would the presentation last?

24  A.          Anywhere from 30 to 45 minutes.

25  Q.          Okay.  What time of the day did they

1  normally happen?

2  A.          9:00, 12:00, 3:00, and 6:00.

3  Q.          So you split -- you just divided them

4  out in three-hour increments throughout the day?

5  A.          Uh-huh.  (Witness moves head up and

6  down.)

7  Q.          And was that to give you time to travel?

8  A.          Yes.

9  Q.          Did you try to set up your appointments

10  so that they were more close together or did you

11  have any control over that?

12  A.          Kay did.  Kay actually set all my

13  appointments up where everything was pretty much

14  within a 30- to 45-minute drive for me.

15  Q.          So we talked about the information that

16  you knew about the customer before even getting to

17  their house.  Would you call them ahead of time and

18  say, "Hey, I'm Jason.  I'm coming to do your sales

19  presentation" or did they just have an appointment

20  made?

21  A.          No.  They would do a pre-call the night

22  before just to confirm the appointment.  I would

23  always show up anywhere from 20 to 30 minutes early

24  just to --

25  Q.          So I know you mentioned that you talked

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    about the customer's power bill, and I don't want

2    you to walk me through the whole 45-minute

3    presentation.  But kind of start -- how did you

4    start the presentation?  When did you start talking

5    about the power bill?  When did you start talking

6    about how much they could safe?  And just kind of go

7    through that.

8    A.          We'll go through the presentation.  It's

9    a very short presentation and -- so you will

10   actually -- will understand it.  I would always open

11   up, "When did you realize it was a smart thing that

12   you could produce your own power, hedge yourself and

13   your company from the rising cost of electricity

14   instead of being a lifetime customer?"  That was my

15   opening statement.

16          The customer would tell me.  Then I would

17   ask for the electric bill, and then I would figure up

18   what they were spending.  And then I would actually go

19   back into it.  Where you're wanting to get to the money

20   saving -- we was given a printout from the company of

21   what -- if the customer currently had an electric bill

22   let's say of $110 a month -- this was given to us as an

23   employee of what the customer would have spent in the

24   next 10 years of the loss, and I'm assuming that was

25   set on a 5 percent increase per year.  This was

1    information that we actually would use that towards the

2    customer to persuade them into a purchase.

3    Q.        So what you're showing me -- the

4    document you just handed me is titled "Current

5    Lifetime Plan," and basically what it is is it's a

6    table that shows based on the customer's monthly

7    bill what they can expect to pay for electricity

8    over 10 years and over 20 years?

9    A.        Correct.

10    Q.        And who gave you this document?

11    A.        That was given to me from Craig Kelley.

12    Q.        Did he send it to you via email or did

13    he hand it to you directly?

14    A.        Handed it to me directly.

15    Q.        Was this when you first started working

16    with the company?

17    A.        Yes.

18    Q.        Is it your understanding that Craig made

19    this document or somebody else made this document?

20    A.        I don't know who actually made the

21    document, but it was handed by him to me to use

22    that.

23    Q.        And this is what you used --

24    A.        Yes.

25    Q.        -- throughout your time?

1    A.          Uh-huh.

2                    MS. DANIELS-HILL:  We'll have this

3    marked as Exhibit 6.

4                         (Marked Exhibit 6.)

5                    THE WITNESS:  So going forward from

6    there, I would say, "Okay.  Guys, today I'm going to

7    keep this simple.  Right now you're purchasing all your

8    electricity with 100 percent loss of your money.  This

9    is the plan that you guys have put in place, and it's a

10   lifetime plan.  Solar takes us from being a lifetime

11   electrical customer to a power producer.  All the money

12   that we're going to talk about here today, guys, is

13   money that you guys are going to be spending anyway.

14   What I call this money is I call this your 'anyway

15   money.'"

16                    That's part of the presentation.  I

17   would always ask for questions, and that would be it.

18   Q.          When you say "anyway money," basically

19   it was saying, hey, you know, the savings that

20   you're going to get from this --

21   A.          Is greater.

22   Q.          -- is going to offset -- it's greater

23   than the cost of your electric bill over the next 10

24   to 20 years?

25   A.          Correct.  And it would if those numbers

Case 3:23-cv-00046-DCLC-JEM   Document 10-3   Filed 02/06/23   Page 62 of 90   PageID #: 558

1  was correct about what the system would produce.

2  That is where the fault is, is that the systems that

3  they're saying that produces "X" amount does not

4  produce anywhere close to what they're supposed to

5  be producing.

6  Q.          You said you would ask customers if they

7  had any questions?

8  A.          Yes.

9  Q.          What types of questions would they have?

10  A.          They would ask me does it work?  Do you

11  see this going forward in the future?  They would

12  ask me -- we would get into questions that would

13  really -- probably one out of ten would ask about

14  solar.  The rest would be about -- it's funny that

15  solar brings up God and politics, and that was kind

16  of the lead they would be going.  I would go back,

17  "Guys, today we're going to keep it simple.

18  Politics and religion we're not going to talk

19  about."  And then I would go right back into it, and

20  then I would start getting the calculation up about

21  how much money they spent per year for their

22  electric bill.

23          Then I would go right back into it, and I

24  would say, "Like I said, guys, all the money we're

25  going to talk about today, guys, is money that you guys

1   are going to be spending anyway."  And what I'm

2   actually looking at is my sales presentation here and

3   what I actually -- it's never changed.  It's been the

4   same since day one.  I'm not referencing.  I've not

5   used it in the last 16 to 17 weeks.

6   Q.          Did they ever ask about the tax credit?

7   A.          They did.  We always tell them -- now, I

8   don't know what other people did.  I will back up

9   and we'll talk a little bit about that.  When I was

10  first trained on the tax credit, I was told that

11  everybody got it.  And then later I found out that

12  it was not.

13  Q.          Who told you that everybody got the tax

14  credit?

15  A.          Craig Kelley.  I have voice recordings

16  of him doing presentations with it.  They are

17  actually on my phone.  That was how I was actually

18  trained.  I actually rode with Craig Kelley about 60

19  days prior to me even accepting the position.

20  Q.          So Craig would tell customers you're

21  going to get a 26 percent tax credit on this?

22  A.          That's correct.

23  Q.          And was he telling customers that --

24  that they would get basically a tax refund of

25  26 percent of the cost?

1  A.          Of the system.

2  Q.          The cost of the system or the cost

3  overall of the system plus the financing?

4  A.          The cost of the total system.  So if the

5  system was -- we'll keep it simple -- 10,000, they

6  would get $2,600 back.

7  Q.          But even if they ended up paying 15 with

8  the financing and everything --

9  A.          That's with financing with the 10,000.

10  They would get 26 of it.

11              MS. DANIELS-HILL:  When you say "of

12  the system," are you including installation in that

13  cost?

14              THE WITNESS:  Yes.  Yeah.  They offer

15  a what's called a turnkey.  That includes everything.

16  BY MR. KEEN:

17  Q.          When did you find out that that was not

18  correct?

19  A.          I found out last October.

20  Q.          And when I say that was not correct, I

21  mean that everybody gets the 26 percent tax credit?

22  A.          I found out in October -- everything

23  that you're asking came to light about October of

24  last year.  That's when I realized there was a lot

25  of things going on that I -- my wife told me -- she

Christina A. Meza, LCR, RPR, CCR 615.202.7303

```
 1    said, "You need to open your eyes up and look around
 2    you.  Something is not right here."  And I started
 3    doing my own research and started finding out that a
 4    lot of stuff was not correct -- was not done.
 5               It's like the -- it's like the whole year
 6    and a half, whatever, has been a big lie.  But that was
 7    how I was trained to sell the system, and the
 8    26 percent -- I later found out too how it actually did
 9    work.  It was against their tax liability.  I was not
10    told that.  I was told that everybody -- anyone that
11    paid taxes got it.  They can either get it in one lump
12    sum or take it in a five-year increment.
13    Q.        Did you ever hear from customers that
14    what was initially told to them about the tax credit
15    wasn't true and that they were upset about that?
16    A.        Yes, I have.
17    Q.        What was -- what was -- first let me ask
18    you what was your response to those customers?
19    A.        I was always telling them to get a CPA
20    to actually handle it.  It's pointblank how it's
21    written online.  It's 26 percent of your tax, but
22    yes.  There have been customers out there that I'm
23    assuming that has been royally screwed over over
24    that and -- as I found out in October.  This is not
25    right.
```

1  Q.          What would the -- would they ever

2  contact the company to complain about the tax

3  credit?

4  A.          Yes.  I'm assuming that they -- now, I

5  do not know that firsthand, but I have had customers

6  call me about it.  One customer in particular is

7  Deanne Smith.  She's actually on a list I'm going to

8  give you shortly.  It's called "Customers of

9  Interest" that has some names of customers that I

10 have spoke to in the past.

11         Some shady stuff has went on with them and

12 the company, and some things you need to -- it's worth

13 the phone call to the customer if you're wanting

14 information.  A lot of these customers I have spoke to

15 personally.  Many of these customers I have sent

16 tickets into the company, called about the customer,

17 and literally would -- cannot get no words or being

18 told the customer is lying and I just need to not deal

19 with it.

20         Sales -- they would tell me sales is your

21 department, not customer service, and I would continue

22 to try to push.  And you get to the point where

23 you're -- you're up against a wall and nothing was

24 being done about it.

25 Q.          You said that you would put a ticket in?

1    A.          Uh-huh.  (Witness moves head up and
2    down.)
3    Q.          What does that mean?
4    A.          A ticket -- it's like -- I had a direct
5    connection with Sarah and Craig, and anytime I
6    submitted a ticket -- what I meant by ticket is a
7    text message to them.  I literally had direct
8    connection to them if I ever had anything going on.
9    Out of all the employees, I was the only one to have
10   a direct connect to both of them.  So literally when
11   I say I have since 2019 several hundred pages of
12   conversations with them.
13             I have customers that have called me and
14   said the system is not working, and I would send in a
15   text message to them saying that we need to look at
16   this system and see what's going on with it, why is it
17   not working.  And a lot would get -- and Craig would
18   get back and say it's just the customer BS'ing, lying,
19   or they're wanting something for free.  And for the
20   longest time I actually thought that, but as I learnt
21   firsthand, it was not going on.  I was finding out from
22   customers and from friends that the systems that we was
23   selling did not work nowheres or was not completed or
24   have never been installed.
25   Q.          So we've talked about customer

1    complaints about the system not working like it

2    should.  We've talked about customer complaints

3    about the tax credit.  Let's talk about the

4    system -- the actual installation itself for a

5    minute, if you can.  So what were the customers told

6    would be the time line in terms of install at the

7    time of sale?

8    A.          Four to six weeks.

9    Q.          And, in your experience, was that

10   typical?

11   A.          I never did know nothing really about it

12   unless the customer called me.  The installation

13   side -- that was more of a Sarah Kirkland and Ernie

14   Bussell.  Bussell I think is how you pronounce his

15   last name.  And they recently replaced him with a

16   guy named Dale.  I don't know what Dale's last name

17   is.  But as far as installation, I used to have

18   access to that from my computer, and they took all

19   that away from me when I started ruffling the

20   feathers.

21   Q.          What do you mean you had access to it on

22   your computer?

23   A.          I used to be able to see each

24   installation, the pictures, and when they actually

25   was going to install the system.

1    Q.        So you would be able to keep up with the

2    progress?

3    A.        Yes.  Because at the time I was aware

4    that the company was keeping money from me

5    personally.  That's when I was continuing to

6    research it.

7    Q.        Meaning you weren't being paid upon

8    successful installation?

9    A.        I was not being paid for the job.  There

10   are several jobs that I have been sold that I have

11   been told from management that the customers

12   canceled, and I actually went back and met the

13   customer and their system has been installed or

14   working correctly.

15   Q.        And whenever you started raising those

16   issues -- to Craig --

17   A.        Yes.

18   Q.        -- or Sarah?

19   A.        Craig.

20   Q.        Okay.  You said that your access was

21   revoked?

22   A.        Correct.  I was restricted.

23   Q.        So is this something -- is this a system

24   like company-wide?

25   A.        Uh-huh.  It's called Sales Force.

1  That's what the company used.  It's called a CRM.

2  We use -- they use Sales Force.  They also have

3  what's called Market Sharp.  Sales Force came later.

4  Before Sales Force it was called Market Sharp and

5  all the personal information from the customers

6  stored data.  All the data in -- all the information

7  from the customer.

8  Q.          Like a database for each customer?

9  A.          That's correct.  And they had all the

10  pictures of the installation, who did that, who

11  installed it.  I also have what the numbers they

12  predicted that the system was going to produce.  It

13  had a lot of detailed information in it.

14  Q.          What about permits?

15  A.          Yes.  Supposed to have permits and all

16  that stuff.

17  Q.          So I want to back up to when I asked you

18  about the four- to six-week time line.  Did you ever

19  find out that the installations were not happening

20  within the time line that customers thought that it

21  should happen in?

22  A.          Yes.

23  Q.          Can you tell me about some of your

24  experiences with that.

25  A.          Some of the customers here -- one is

1    called -- his name is Casey Johnson.  He lives in
2    Nashville, Tennessee.  The job was actually sold --
3    I actually sent you an email on that customer.  He
4    was sold in November, December of 2020.  As of a
5    couple weeks ago his system at his home is still not
6    installed correctly, still not working.
7            The customer has continued to pay his bill
8    because if you don't pay your bill, they file on your
9    credit.  He is one of the customers -- him and I have
10   talked off and on since last year since finding out
11   that things have not been done correctly.
12           There also was a woman -- well, I don't --
13   this is all from an email to -- from Shawna about the
14   woman being electrocuted in Georgia.  There are several
15   customers in Alabama that I have sold to that is not
16   had their system installed and paying for their system.
17           There's a customer here in Nashville that
18   I've got a lot of talk with back and forth.  I have
19   sent multiple messages in to Craig and Sarah about him,
20   and nothing has seemed to be done since I have sent
21   messages.  I've been told that he is just a pain in
22   their side and that they're not moving forward doing
23   nothing.  They are not moving forward to do nothing
24   quickly for him whatsoever.  It's like the more you
25   complain, the slower they get.

1  Q.          What's the name of that customer?

2  A.          This customer name is David Evenson,

3  E-V-E-N-S-O-N.  His phone number is 312-256-0998.  I

4  also have a copy here if you need it, so you will

5  have that.

6  Q.          This is a list of customers that are

7  having problems?

8  A.          And it's missing one name.  Let me add

9  one name.  Actually, I've got two here that I do not

10 have.  I apologize.

11             MS. DANIELS-HILL:  Just to clarify.

12 You said there was one customer who was sold the system

13 in November or December of 2020, and the system still

14 isn't working today.  When you say still not working

15 today, do you mean it's not producing any solar energy

16 or it's not producing as much as what he was sold?

17             THE WITNESS:  One of his systems is

18 connected finally.  It happened this year.  And the one

19 at his home as of a couple weeks back is still not

20 working.  What I mean by working, it's not turned on.

21 BY MR. KEEN:

22 Q.          This is Mr. Casey Johnson?

23 A.          That is correct.

24 Q.          If I recall correctly, he bought one

25 system for his house and one for his business?

| | |
|---|---|
| 1 | A.          That is correct.  Have you spoke with |
| 2 | him yet? |
| 3 | Q.          I have spoken with Mr. Johnson. |
| 4 | A.          Because I gave him your number, and I |
| 5 | also gave you his information. |
| 6 | Q.          Yes, I spoke with Mr. Johnson. |
| 7 | A.          Great guy.  Just sad that he got tied |
| 8 | up. |
| 9 |           MR. KEEN:  Okay.  I don't think we |
| 10 | need to make this an exhibit. |
| 11 |           MS. DANIELS-HILL:  No. |
| 12 | BY MR. KEEN: |
| 13 | Q.          But, just for the record, a list of |
| 14 | customers' names and their phone numbers was |
| 15 | provided. |
| 16 | A.          Do you want to go through each of the |
| 17 | customers so you'll know for the record what -- |
| 18 | Q.          You said David Evenson, Nashville |
| 19 | customer.  He's having installation troubles? |
| 20 | A.          That's correct. |
| 21 | Q.          Charles Ochsner, Louisville, Kentucky? |
| 22 | A.          He's trying to get removed off of -- he |
| 23 | actually sent his letter in within the three days of |
| 24 | the customer to cancel their -- the company is still |
| 25 | trying to pursue money after him afterwards.  This |

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    is some stuff you need to be looked into.  I know

2    you've heard of floating the books before.

3    Q.         I have.

4    A.              This will be what is called floating the

5    books.  When the credit company -- Sunlight Mosaic

6    or Dividend -- releases funds -- when Solar Titan

7    submits a ticket in to the finance company, the

8    finance company sends funds over -- correct? -- as a

9    wire transfer.  So the money is sitting in the

10   account.  The company has access to the money.

11              So if a customer within three days decides

12   to cancel the loan, the customer will send in a

13   certified letter to the company within three days, and

14   he's supposed to be canceled out of the system.  So

15   when the customer calls the company and says I canceled

16   and they have no record and the customer provides a

17   record, the company should then cancel out the loan.

18   But what's been done, they are not.  They're keeping

19   the funding in there and giving the customer a hard

20   time and telling the customer he can either pay a

21   30 percent fee of the system cost and he can either pay

22   cash or card and be released from the funds.  If not,

23   the company will continue to hold the funds, and it's

24   where it comes in kind of floating the cash.  Charles

25   is one of the customers that has been involved in that.

1    Q.          So Charles Ochsner -- am I saying that

2    right?

3    A.          I don't know how you pronounce his name.

4    Q.          But he canceled his loan --

5    A.          Within the three days.

6    Q.          And he sent it in writing?

7    A.          Correct.

8    Q.          And the company, Solar Titan, did not

9    inform the lender that Mr. Ochsner had canceled the

10   loan?

11   A.          That's correct.

12   Q.          And instead what they did is they kept

13   that initial deposit that was sent to -- from the

14   lender to Solar Titan?

15   A.          Uh-huh.

16   Q.          Now, you said that Solar Titan wants

17   Mr. Ochsner to pay a 30 percent fee.  Meaning

18   30 percent of his --

19   A.          Total system costs.

20   Q.          System costs.

21   A.          Before they will actually release him

22   from that.

23   Q.          Do you know why they want him to pay

24   30 percent?

25   A.          They want the money.  They are saying

1  that the customer did not send in the letter. Now,

2  backing up, I'm going to move around a little bit.

3  This is the stuff that I have learned when you start

4  looking around at things that are going on.

5              Over the last couple of years they have

6  actually changed some things, how the customer actually

7  sends in a cancellation. When a customer -- when a

8  customer sends in a cancellation, the customer has

9  three business days to do it, and it's not including

10 like a weekend or -- we all know what a business day

11 is. And sometimes they try to use the weekday as -- a

12 weekend as a business day, and that's not correct how

13 it's actually worded.

14             Some of the sales agreements on the back

15 has been changed. And we used to use what's called the

16 info@TheIdealHorizon.com. It's actually changed, and

17 that's where the cancellation is, because they can use

18 both sides in this. And they'll ask them, "Where did

19 you send it to?" And they'll say, "Well, that's not on

20 our information. You sent it to the wrong party."

21 Q.          So let's just -- who would they send

22 their cancellation to?

23 A.          They would send it by mail or

24 directly -- I mean U.S. -- United States certified

25 letter or by email.

1  Q.          And you said something about Ideal
2  Horizon?

3  A.          That's correct.

4  Q.          What is Ideal Horizon?

5  A.          That is their business.  Solar Titan is
6  done as d/b/a, doing business as Ideal Horizon.
7  Ideal Horizon is a business that they bought out so
8  they can actually -- I don't know why they initially
9  bought out the other business for, but that is the
10  main business called Ideal Horizon.

11  Q.          So the customer would send a letter to
12  Ideal Horizon is what you're saying?

13  A.          Yes.  To cancel out the -- and they
14  would play the tactic as this is Solar Titan, not
15  Ideal Horizon.

16  Q.          So they would say you sent it to the
17  wrong company?

18  A.          Correct.

19  Q.          Even though it's the exact same company?

20  A.          Same company.

21              MS. DANIELS-HILL:  I just want to
22  clarify.  So are customers using the information that
23  is on the installation agreement to determine where to
24  send the three-day cancellation?

25              THE WITNESS:  Yes.

1          MS. DANIELS-HILL:  And then they are

2    doing what they are supposed to under the agreement,

3    and Solar Titan/Ideal Horizon is telling them that's

4    the wrong place?

5          THE WITNESS:  That's correct.

6    BY MR. KEEN:

7    Q.        And they do that for the purpose of not

8    having to cancel out their loan?

9    A.        That's correct.

10   Q.        So what you just handed me are blank

11   copies of what's titled "Installation Agreement."

12   And it has in the left-hand corner -- left top

13   corner the Solar Titan USA logo and then in the

14   right top corner an Ideal Horizon Benefits, LLC

15   logo.  And you are saying these are two -- they look

16   very similar, but they have two different --

17   A.        Email addresses on the back.

18   Q.        And that's the big difference between

19   the two?

20   A.        Yes.  And trying to add to this --

21          MS. DANIELS-HILL:  Just one second.

22   Just one second.  I want to make sure we get these

23   marked.

24          THE WITNESS:  Let me add to this.  Let

25   me add to this, just before we go with the break.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    These are put in different folders so if the customer

2    does ever decide to cancel within the three days, if

3    they -- if that folder there -- may I please?

4                        MS. DANIELS-HILL:  Sure.

5                        THE WITNESS:  If one of these here has

6    customer care, they will say, "No.  The email that

7    we've got is info@TheIdealHorizon.  Where do you get

8    this email address at?"  So they play them together --

9    play them apart.

10   BY MR. KEEN:

11   Q.          So if they have one, they'll say, no,

12   you sent it to this Ideal, but if they had the

13   Solar, they will say, no, you sent it to --

14   A.          Yes.

15                        (Marked Exhibit 7.)

16                        THE WITNESS:  That also changes, and

17   the phone number changes from the company too

18   occasionally.  I've noticed that too.

19                        MS. DANIELS-HILL:  What do you mean by

20   they put them in different folders?

21                        THE WITNESS:  Sales folders are built

22   by the sales team.  So when I -- when I call in for

23   folders, someone else would build the folder for me,

24   and then they would put different documents in them.

25   So occasionally you would get one that will say

1    something else and one will say something -- a

2    different, vice versa.  And occasionally they would

3    have different phone numbers on them of the company.

4                    MS. DANIELS-HILL:  Are these sales

5    folders something they build for you to keep or were

6    they for the customers?

7                    THE WITNESS:  The only sales folders

8    is what we take out to the customer when we go out to

9    actually see the customer to sell the product.  And

10   each one was -- they're all built the same, but those

11   two documents that I handed you plays different.  One

12   folder might have one in it, and one folder might have

13   the other one in it.  So when the customer would call

14   in they'll ask for -- "Are you sending that?  Oh, well,

15   that's not our email address.  Ours is

16   customercare@SolarTitanUSA."

17                   MS. DANIELS-HILL:  Do you know if

18   these different email addresses go to the same person?

19                   THE WITNESS:  The same person.

20                   MS. DANIELS-HILL:  Who are the ones

21   receiving the emails?

22                   THE WITNESS:  I actually don't know

23   the person in -- her name -- his or her name, but it

24   goes to the same company.  Ideal Horizon and Solar

25   Titan is one company.  It's d/b/a, doing business as.

1   BY MR. KEEN:

2   Q.          But you don't know the actual person who

3   is reading those emails?

4   A.          I do not.  Out of that company, I know

5   probably less than six people personally.

6   Q.          Now, if -- when the product is sold, so

7   like before even install happens and the customer

8   signs up with financing -- and they can sign up with

9   financing with primarily one of two companies; is

10  that correct?

11  A.          We have three.  Sunlight Financial.

12  Mosaic.  It's spelled M-O-S-A-I-C.  And you have a

13  company called Dividend.  It's a new company that

14  they brought on board, and the reason why I'm

15  thinking they were brought on board is because of

16  all the complaints about Mosaic.

17  Q.          The -- does Mosaic -- is Mosaic not

18  wanting to work with Solar Titan anymore because of

19  the complaints?

20  A.          I do not know that personally.  I can't

21  tell you that.  I don't know that myself.

22  Q.          So the system gets sold, and it's sold

23  as a turnkey.  So labor and the system itself --

24  it's all billed as one thing.  Am I understanding

25  that correctly?

1  A.          Correct, yes.

2  Q.          So the contract doesn't necessarily

3  distinguish between the cost of the system and the

4  cost of labor?

5  A.          It was supposed to include it all.

6  Q.          Okay.  So the system is sold.  They sign

7  a contract.  They sign up for financing with one of

8  these companies.  How long after the customer signs

9  up for financing does the finance company send the

10  money to Solar Titan?

11  A.          As soon as Solar Titan submits the

12  paperwork.  Literally a matter of hours.

13  Q.          So the same day?

14  A.          Same day.

15  Q.          And how much money is sent to Solar

16  Titan --

17  A.          I do not know that.

18  Q.          -- at the front end?

19  A.          I do not know that.

20  Q.          That's fine.

21  A.          I'm assuming it's a pretty good chunk.

22  Some of the paperwork I was going to show you I

23  don't have access of it now.  I've been locked out

24  of it.  But if it's a $30,000 system, they'll

25  probably get $10,000 upfront.

1  Q.          So a third?

2  A.          A third.  And then they get the

3  remaining part when the glass is on the roof.  As

4  soon as the glass is on the roof, they'll take a

5  picture, submit it in, and it's dropped like that.

6  Q.          Let's say Solar Mosaic knows to deposit

7  the rest of the loan to Solar Titan based on Solar

8  Titan's representation that the system is

9  operational?

10  A.          That's correct.  No, no, no, no.  If

11  glass is on the roof.  So I don't know if the

12  financing company thinks that the system is

13  operational or not.  That is something that I've

14  never got into.

15  Q.          So they don't -- so Solar Mosaic, for

16  example, wouldn't actually inquire into whether or

17  not the system is operational before they gave Solar

18  Titan the full amount of the loan?

19  A.          I do not know that question.

20  Q.          Now, if a customer like Charles, for

21  example -- Charles Ochsner -- he tried to cancel his

22  loan, but it was after apparently Solar Mosaic gave

23  a third of the loan to Solar Titan.  Right?  So

24  Solar Titan has this money.  They have a third of

25  the loan, and now they're telling Charles Ochsner

1    we'll only cancel you if you pay us 30 percent of

2    your loan install.

3            Why do you -- what -- why do you think

4    they're having Charles Ochsner pay 30 percent of the

5    price after he's canceled within -- you mentioned

6    something about floating the books.

7    A.          Floating the books.  Money.  I believe

8    that the company is on the end of the sinking ship

9    of the things that I've seen just from payroll.

10   When you stop paying your employees or start giving

11   them a ration of your pay, that's kind of a sign

12   that there's something going on.

13           When you start seeing cars being sold and

14   property being sold, that's kind of a red flag that,

15   you know, they don't have the money or they're moving

16   money around.  Charles is probably not the only

17   customer that's been done that way.  I'm assuming over

18   the years -- and at one time we had probably 80-plus

19   sales reps.  And I'm assuming this happened many other

20   times.  Charles is -- like I say, he's a great man.  He

21   lives in Louisville, Kentucky.  He canceled within his

22   time.  They're just trying to hold him out, and they

23   might eventually let him off the loan, but with that

24   money into the bank, which is cash flow -- there has

25   always been a cash flow problem with them.  They like

1    to spend money, I will say that, from what I've seen.

2    They like to spend money.  They don't care to spend it.

3              Then when the finance company finds out

4    that Charles has -- or Solar Titan has released them,

5    the money comes right directly back out of their

6    account.  What I've seen other accounts or Bank of

7    America -- they have multiple accounts there.

8              There's also an account -- this is from

9    another individual stating that one of the accounts had

10   a little bit over 26 to $28 million in it.  That is the

11   account where a lot of the checks are deposited at.  A

12   lot of the checks are probably off record.  It's

13   probably no -- I don't know what -- but no taxes, no

14   nothing off of them.  That is -- it's worth looking

15   into.  That's -- just like I said, it's where a lot of

16   checks are deposited.

17   Q.        Is it your understanding that Solar

18   Titan's spending -- once Solar Mosaic sends in that

19   one-third of the loan, that Solar Titan is spending

20   that money before they're technically allowed to or

21   they're spending it on something other than the

22   costs to procure the equipment and install the

23   equipment?

24   A.        I just know last year we done as a

25   company $200 million in sales.  Out of that

1    $200 million about $60 million of it was profit.

2    And they have bought stuff right and left.  They

3    bought a home, two boats in Florida.  One boat was

4    like a $2 million boat.  They own a yacht company --

5    not a yacht company but a charter company.  Jet

6    Skis.  They own a home in Knoxville, $8 million.

7    They buy property for their family.

8            It -- when you have that much money and you

9    can't pay your employees, there's a problem.  And I

10   don't know if it's versus they -- it's a problem they

11   don't want to pay their employees.  Literally in the

12   contract I handed you earlier under the non-disclose,

13   if an employee quits, they keep the funding.  They keep

14   all the moneys due to you.  So literally I'm walking

15   away without about $70,000 in my bank account.  My

16   attorney is going to take care of that, hopefully.

17   Q.          We'll talk about all of that once we --

18   I think it might be a good idea with taking a break

19   for lunch and then coming back at 1:00.  Can I ask

20   one quick question before we break.  We talked about

21   the tax credit promotion.  Were there any other

22   promotions that you discussed with customers in

23   order to try to close the sale?

24   A.          In-house they had what's called a --

25   they would give the customer -- I can't remember the

1    actual amount, but the company would write them a

2    check for $3,500 and they would tell the customer it

3    is part of the FEMA that they're giving back to the

4    customer or it's a part of the -- part of the

5    president's solar bill.  It all was a BS.  You had

6    to call a TO to get that, a take-over.  And they

7    would tell the customer that it's part of FEMA

8    funding that they have from back FEMA and stuff like

9    that.  And they would give the customer $2,500.  All

10   it was was a check when the customer was completely

11   installed, permits in place, producing their own

12   power, they would come back at the end and write

13   them a check for, like, $2,500, and the customer

14   would take it and cash it.

15   Q.         So basically a rebate?

16   A.         Yes, in a rebate.

17   Q.         This is something that you would talk to

18   customers about during the sales pitch?

19   A.         Some but normally that was a -- probably

20   twice.  I'm not a fan of using the word "FEMA."

21   Because FEMA is a great -- it's a great company.

22   It's a great thing put in place.  I don't think you

23   should abuse something.  I would call it TO, which

24   my TO was Craig Kelley.  I would call him and he

25   would make up this story where the money came from.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1          MS. DANIELS-HILL:  During the sales

2    pitch?

3          THE WITNESS:  At the end if I was

4    going to close the sale.  So if the customer was on the

5    edge and wanted an additional incentive, they would --

6    we would say, "Well, I might have this one other

7    thing."  And we would call a TO, and the TO would come

8    in and offer the additional $3,500 to push the customer

9    over.

10   BY MR. KEEN:

11   Q.          And that was a check that was sent to

12   them once glass was on the roof?

13   A.          Once the system was completely finished

14   what was supposed to be done -- that's permits and

15   the system is producing power.  Literally they

16   probably get that check anywhere from four to six

17   months, and there have been times out of the three

18   or four times I used it that the check would bounce.

19   Then I would get a call about the check bouncing or

20   they never did receive the check.

21   Q.          So if the company would write a rebate

22   check --

23   A.          Uh-huh.

24   Q.          -- they would say that this is money

25   that they got from FEMA?

1   A.              FEMA or some kind of government program.

2   Q.              And your understanding is it was not

3   true?

4   A.              That was BS.

5   Q.              But then even though they say this is

6   money that they got from a government program, they

7   would still write the check, send it to the

8   customer, and the check would bounce?

9   A.              That has happened one time that I'm

10  aware of.

11  Q.              And then in other instances the

12  customer, who would otherwise be eligible for the

13  rebate, would not get the rebate?

14  A.              That's correct.  And I'm going to look

15  up and give you the name of the person that actually

16  the check bounced on.

17  Q.              Okay.

18  A.              It might take several months of going

19  back.

20  Q.              If you want to try to find that

21  information out while we're on break, that's

22  perfectly fine as well.

23  A.              Are you saying you don't want to wait?

24  Q.              Well, I'm happy to wait.  I just don't

25  want to make you look through it if you're ready to