1  Q.        And he's Craig Kelley's partner?

2  They're married; is that right?

3  A.        That's what I've been told, yes.

4  Q.        What role does Mr. Atnip play in the

5  company?

6  A.        I've never actually seen him in the

7  company.  So I couldn't -- I mean, very little.  As

8  far as when you're out -- we have what's called

9  picnics occasionally.  Nothing from the company.

10  From what I have actually seen and witnessed,

11  everything is ran by Craig Kelley and Sarah

12  Kirkland, from what I have witnessed with my own

13  eyes.

14  Q.        So even though he's listed as the chief

15  financial officer, he's not really involved in the

16  day-to-day runnings?

17  A.        No, no.

18  Q.        Do you know what he does with the

19  company?

20  A.        No.  I can't begin to tell you that.  I

21  know he's retired Air Force.

22  Q.        He is or that's just what he says?

23  A.        That's what he says.

24  Q.        Is there a reason why his name would be

25  put on stuff like, say, the articles of

1 incorporation and Craig Kelley's name would not be

2 put on that?

3 A.          I'm assuming that has to do with Craig

4 Kelley's background, his past, of the -- of what

5 I've learned of his criminal background, because he

6 is -- I've been told that he is a felon.  That's

7 what I'm assuming why his information is nowhere on

8 nothing.

9                    MS. DANIELS-HILL:  Who told you that?

10                    THE WITNESS:  Huh?

11                    MS. DANIELS-HILL:  Who told you that

12 he was a felon?

13                    THE WITNESS:  I actually had -- Shawna

14 Helton told me that, and then I actually asked another

15 gentleman and then got confirmation that it was for

16 sure.

17 BY MR. KEEN:

18 Q.          Do you know if Craig has ever been

19 married to anyone else?

20 A.          I don't know him that well.

21                    MR. KEEN:  Anything else about

22 Mr. Atnip that I need to ask right now?

23                    MS. DANIELS-HILL:  I just wanted to

24 get some clarification.  So when you're saying Sarah

25 Kirkland and Craig Kelley, to your knowledge, were the

1   ones running everything, I can tell that you always

2   direct report back to Sarah Kirkland and Craig Kelley.

3   What other things would you say they're normally the

4   ones in charge of?  I know you mentioned another

5   employee who also had to report to Craig.

6              THE WITNESS:  Pretty much the sales

7   and marketing is ran by Craig Kelley.  The operations

8   is ran by Sarah Kirkland.  That's the installation.

9   But I have seen Craig oversee her, and from what I've

10   seen things is he got involved in operations back last

11   year and changed stuff.  At one time our systems used

12   to work correctly, and since his hand has touched it,

13   it is a half A-S-S, trying to be polite with that word.

14              But the operations side has changed

15   dramatically, and things has not ran as smooth as it

16   used to be ran.  We used to at one time could sell a

17   system and in four to six weeks have it up and running

18   and operational with no problem.  Eight weeks at the

19   max.  And then involvement happened and COVID was used

20   as an excuse for many times for our pay and also used

21   for installations, permits.

22              That is something that customers has

23   told me feedback is -- is why are you guys -- you know,

24   how come the electric company is calling me to move

25   forward and you guys can't even get your things

1    installed or done right?

2              A great customer to call on that is

3    David Evenson.  I don't know if you have spoke with him

4    or not, but he's here in Nashville.  He is one that has

5    had many, many problems.  And from what I have followed

6    with David, he has done everything that he could and

7    Solar Titan has failed to get things in place.  There

8    are many other customers too on this list that would

9    have the same complaint or the concern of what's

10   happened from the installation side.

11             As far as of the sales side, I want to

12   think that all the sales reps does the correct job.  I

13   don't know that.  All the gentlemen that I have trained

14   have either been fired or resigned, and -- but I want

15   to think 90 percent of it is on the installation side

16   when we turn things over, because it's pretty much --

17   it's went downhill from there.

18             Customers that I know of personally is

19   not happy at all.  Stuff is not being done correctly or

20   being done to code or they're installed without permits

21   and having crew members running electrical where you

22   should have electricians.  They're turning systems on

23   or connecting to the actual box where a certified

24   electrician should be used there.

25             From hearsay, a woman got electrocuted

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1  in Georgia. I don't know all the details. I was

2  informed on that from a letter that I was sent from

3  Shawna Helton's resignation, and I've been informed by

4  other people that have about been shocked or killed or

5  from misplacement or just bad operation side of things.

6                  We've also had a couple customers --

7  one of my customers in the past -- I think his home

8  caught on fire because of the wiring that one of our

9  installers, not an electrician, wired it. Let's see.

10  That's happened. I know that's happened a couple of

11  times. There's a doctor in Knoxville that the system

12  was not even -- it was a large sale. It was about a

13  hundred thousand dollar sale, and they had to -- pretty

14  much had to force the customer to sign an agreement to

15  get him to hush, and they gave him a bunch of stuff.

16  BY MR. KEEN:

17  Q.        What happened with that?

18  A.        The system did not work correctly. It

19  never was installed correctly. And they spent many,

20  many times over their trying to get things working.

21  That customer's name is David Gerkin. His name is

22  on the list that I gave to you. He is number 22 on

23  that list.

24  Q.        Okay. I have a couple follow-up

25  questions just based on what you just asked -- or

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 5 of 162   PageID #: 701

1  not what you just asked -- what you stated.

2  A.        Okay.

3  Q.        You said some sales reps have been

4  fired.  Why would they be fired?

5  A.        They would quit because anytime that a

6  rep would give lip back or concern, they would let

7  them go.  They did not want a rep to ask questions.

8  And some has been fired because of drugs and just,

9  you know, petty -- I wouldn't call that petty stuff.

10  But, you know, that's pretty -- but the majority of

11  the reps that I knew was fired because they either

12  made a comment about something -- about something

13  that was not done correctly and -- or a customer

14  continued to call and then they let him go because

15  they didn't want to fool with them and they didn't

16  pay them.

17  Q.        And you may not know about this and I

18  don't want to spend a lot of time about it, but can

19  you tell me a little bit of the hiring process for

20  sales reps?

21  A.        I don't know nothing about it.  That

22  would be a Shawna Helton question.

23  Q.        But you don't know if they did, like,

24  background checks?

25  A.        I couldn't tell you nothing about it.

1  Q.          The woman in Georgia who was

2  electrocuted, are you saying that that was a Solar

3  Titan customer or Solar Titan employee?

4  A.          That was an employee.

5  Q.          Do you know her name?

6  A.          I do not.

7  Q.          And she was an installer?

8  A.          She was an installer in the Southern

9  Alabama area -- Southern Georgia area.  My

10  correction.  It was her and another gentleman that

11  actually got electrocuted.  Like I said, this is all

12  hearsay that it came from an email from Shawna

13  Helton.  You will need to follow up with her.  I

14  don't know if you guys have actually spoken with her

15  or not, but you -- that will be a lady that you will

16  need to -- she can actually fill in a lot of the

17  blanks of the stuff that I don't know, like this

18  here.  This was -- like I said, this was in an

19  email.  As far as verbally, that was what I was told

20  from her.  It was a woman with a baby and there was

21  another gentleman involved in it.  He actually went

22  to knock her off.  I think she drove directly into

23  an amper box, the actual electrical box.  That's

24  what I was told about it.

25  Q.          This was -- she was I assume not a

1    licensed electrician?

2    A.          No, she was not.  She was an employee

3    being trained.  They believe in training employees

4    on-the-job.

5    Q.          The home that caught on fire because of

6    wiring -- where was that?

7    A.          That was in Kentucky.

8    Q.          Do you remember the name of the customer

9    or where exactly in Kentucky?

10   A.          I do not, but I can look.  Continue with

11   your next question while I look here.

12   Q.          Do you know what happened with the home

13   fire?  Did Solar Titan cover it?

14   A.          I do not know all the ins and outs of

15   it.  The day of the fire, the customer reached out

16   to me and was very angry, and I can understand why.

17   I directed him to the company and actually speak to

18   Sarah Kirkland.  Then I got in trouble for that too.

19   Q.          What do you mean you got in trouble?

20   A.          That I should not be giving out Sarah's

21   name.

22   Q.          Even though this guy's I presume home

23   caught on fire?

24   A.          Craig Kelley -- when you actually meet

25   him, if you ever do, he is a narcissistic

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 8 of 162   PageID #: 704

1    personality.  He believed -- he believes -- that
2    kind of personality believes everybody is out to get
3    him and it's never his fault.  That's the
4    personality that he actually has.
5              So even though the customer's home caught
6    on fire and he lost everything that he had, he still
7    believes that it was not his fault or the company's
8    fault.
9    Q.        So your understanding is that the fire
10   was a total loss type of fire?
11   A.        That's what I'm understanding.
12   Q.        But nobody died or got hurt?
13   A.        I do not know that.  Just from the call
14   that I had, it was a very short call.  Literally the
15   system was installed, turned on that day, and that
16   night it caught fire before the electricians were
17   even on site to do the system.
18   Q.        Now, I know most customers pay with
19   financing, either through Solar Mosaic or this new
20   company Dividend -- what's the name of the third one
21   again?
22   A.        You have Mosaic.  You have Sunlight, and
23   you have Dividend.
24   Q.        What percentage of customers would you
25   say pay out of their own -- like, they don't use

1  financing; they pay out of their own pocket?

2  A.          Probably 1 percent.

3  Q.          Okay.  How did they pay -- that

4  1 percent of customers -- how did they pay Solar

5  Titan?

6  A.          They either would pay by check or by

7  cash.

8  Q.          Like -- cash like bills?

9  A.          Yes.

10  Q.          I assume they are written a receipt when

11  they are paid?

12  A.          They have a sales agreement, and that's

13  all they had.  Just like this right here

14  (indicating).

15  Q.          Okay.  I gotcha.  How was the money

16  collected for customers who paid by cash?

17  A.          By cash, it was all given to Craig

18  Kelley, and checks too was also given to Craig

19  Kelley.

20  Q.          Do you know -- were checks made out to

21  Ideal Horizon or were they made out to Solar Titan?

22  A.          It was made out to Solar Titan.

23  Q.          Okay.  Is it your understanding that all

24  that money was properly accounted for?

25  A.          It was my understanding when I actually

1  counted the money and passed it to there -- to the

2  individual, Craig would either confirm it's there

3  and they would move forward.  Literally when the --

4  when I say when the sales happened and when I turned

5  everything over, I had nothing else to do with it.

6           I mean, literally, checks, paperwork,

7  whatever -- it was all turned over.  Cash, card.

8  Customers would pay by credit card.  Literally, they

9  would get their credit card number.  They would run it

10  through a machine at the office, confirm, give me an

11  authorization number, and then we would be done there.

12  Q.        Did the company have a different account

13  for depositing funds from customers who paid by cash

14  or check or card?

15  A.        Yes.  They had what's called a separate

16  fund.  I do not have the account number no more.

17  There's a gentleman that will -- that does -- he

18  actually takes a picture of that, but all checks or

19  cash was dropped into an account separate from what

20  the company had.  I'm assuming.  I don't know that a

21  hundred percent.  Like I say, all the checks or cash

22  that I was given by customers -- all of that was

23  handed to Craig Kelley.  Like I say, I answered

24  directly to Craig Kelley.  He was the only one I

25  answered to.

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 11 of 162   PageID #: 707

1              MS. DANIELS-HILL:  How did you become

2    aware of the separate account for customers that

3    weren't financing?

4              THE WITNESS:  A sales rep.  He called

5    me -- he looked at me for any kind of advice.  His name

6    was Mike Hill.  Mike would call and ask questions.

7    Occasionally they would have me come in to -- when they

8    brought in new reps to let me talk a little bit.  I got

9    to the point I didn't want to go no more.  But Mike and

10   I took up.  He was a great guy, and he called me one

11   day.  He said, "Jason, he said it's real great -- it's

12   real good the company has their own jet.  You know,

13   only been in business two years."  And he said, "It

14   doesn't make sense why they have this and they can't

15   pay us."

16              Mike was in Alabama.  That month in

17   Alabama he should have made about $70,000 commission.

18   They only paid him about half, and they told him that

19   his remaining of his sales canceled.  And even though

20   he went back down and seen that they was installed.  He

21   decided to leave that day.  He left pretty much that

22   month.  A lot of his customers paid with cash, and he

23   was the one that informed me of the check -- of the

24   separate account, that it was like 26 to $28 million in

25   that account, and it was under a different name.  It

1  was not under Solar Titan USA.  It was under some --

2  the guy's name was -- I don't think he said Michael,

3  but I don't know who the actual guy -- I never heard

4  the guy's name.

5  Literally, when Solar Titan was

6  started, there was only three, which was Craig,

7  Michael, and Sarah.  I came on about board.  Kay Warren

8  came on board.  Shawna Helton came on board, and Lakea

9  came on board.  That was the original ones that came on

10 board.  As far as the employee, it was me, Kay, Shawna,

11 and Lakea.

12  MS. DANIELS-HILL:  When you say Mike

13 Hill told you about the separate account, how did Mike

14 explain that he came to know about the second account?

15  THE WITNESS:  In Alabama, Mike had a

16 sales team and they all reported to him.  And anytime

17 they had a cash transaction or a check, he had

18 authorization to go drop the check in that account.

19 Mike Hill also answered directly to Shawna Helton.

20 BY MR. KEEN:

21 Q.  You said the account name might have

22 been Michael.  Is it possible that it was Michael

23 Atnip?

24 A.  No, no.  It was a weird last name that

25 I've never heard of.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1          MS. DANIELS-HILL:  So if he had

2    authority to deposit checks, was he also then

3    depositing, like, any kind of money from the finance

4    company --

5          THE WITNESS:  No.

6          MS. DANIELS-HILL:  -- into a different

7    account?

8          THE WITNESS:  The finance company

9    comes directly into the Bank of America account, but

10   that was -- I was told that was a separate account for

11   the cash customers.  The lady who was actually over

12   that -- her name is Stacy Monk.  I think that's her

13   last name.  She is the general manager -- they called

14   her a corporate general manager.  She oversees all the

15   financial everything.

16   BY MR. KEEN:

17   Q.         Is Stacy still there?

18   A.         Yes, she is.

19          MS. DANIELS-HILL:  So she received the

20   checks from -- or the payment from the finance company?

21          THE WITNESS:  She received the wire

22   transfers into there, and her name -- another lady

23   that's involved in that -- there was actually two

24   ladies involved in that.  The second -- the first lady

25   is Jessica Real, and I don't know how the actual last

1   name is spelled.  Maybe it's R-H.  And then the other
2   lady that was involved in that was a lady named
3   Sarah -- Sarah D. I call her.  Dorsemer.  I can't
4   pronounce her last name.
5   BY MR. KEEN:
6   Q.          Dorsemer?
7   A.          Dorsemer.  If she were to ever come
8   forward and have a conversation -- she is worried
9   about her safety.
10  Q.          Have you talked with Sarah Dorsemer?
11  A.          I've talked to her.
12  Q.          And she told you that she's worried
13  about her safety?
14  A.          Yes.
15  Q.          Has she explained what that -- what does
16  she mean by she is worried about her safety?
17  A.          She does not want no one to know nothing
18  about her personally.  She is just worried that --
19  she just says that she's worried about my safety.  I
20  don't know why, but that's just something that she
21  said.
22              But she would be a great person to have a
23  conversation with and probably could fill in the
24  details of the financing -- of what she has told me,
25  and that goes right back to floating the books, the

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    floating the cash.  She would be the one that

2    actually -- from what she told me in a conversation at

3    the office was, each week -- let's say, for example,

4    that there was 10 customers that canceled.  She was

5    only told to release three a week.  So each week, if

6    they had 10, up to 52, she was only told to release

7    three to four a week because of cash flow.

8            Because as soon as the Mosaic companies --

9    the finance companies find out the customer has

10   canceled, they automatically withdraw the cash from the

11   contract.  That's what they call their cash spending.

12   Q.          So one reason why they wouldn't cancel a

13   customer out is because they had already spent the

14   money that came in?  Is that your understanding?

15   A.          That is how I understand things.

16   Q.          Okay.

17   A.          I do know last year that the owners got

18   together -- that is Craig, Michael, and Sarah, and

19   they had "X" amount of money in the account, and

20   they decided to give themselves a hefty raise.  And

21   the money that the company used to flow is no longer

22   there.  Since then Sarah has purchased her a million

23   dollar -- million and a half dollar home and

24   upgraded it.

25            So, like I said, there's a lot of money

1  flowing to the owners.  The money that used to flow to

2  the employees is pretty much trickled down or they're

3  not being paid at all.

4  Q.          And money that presumably should be used

5  for customer service is not --

6  A.          That is correct, yeah.  I have heard the

7  customer service department sucks.  I know that

8  personally firsthand.  I've called them myself.

9  They literally will just hang up on you.  That's if

10  you're an employee or not an employee.

11               MS. DANIELS-HILL:  Why were you

12  calling them?

13               THE WITNESS:  For customers.  I've

14  done that several times.  Literally, I was on the phone

15  with a customer.  Her name is -- looking at my list

16  here -- Betty Carmean.  She's in Georgia.  They came

17  and done an installation, and Code requires that any

18  kind of wire being run runs into conduit.  And they

19  literally laid the wire on the ground and connected it.

20  And she called me, and she said, "You're not going to

21  believe this.  They hung up on me."  I said, "Let's

22  call them."  And I called them and told them who I was,

23  and they literally hung up on me, not once but twice.

24               The third time the lady finally

25  listened to the words I said out of my mouth, and she

1  got something done, but nothing really got
2  accomplished.
3              It's like a rat race when you call
4  customer service.  They will literally lead you from
5  one to another area.  Then we've got to schedule you.
6  And then we'll call you back.  And then if you do get
7  the call back, it's great.  And if you don't -- like I
8  said, the customers who least complain gets more
9  callback versus the one who does complain.
10 BY MR. KEEN:
11 Q.         So if you call to explain, you would get
12 the runaround?
13 A.         Yes, you would get the runaround for a
14 while.
15 Q.         Speaking of laying a wire on the ground
16 without putting conduit on it, can you talk to me
17 about the permitting requirements that you have
18 to -- the permits that you have to pull in order to
19 even start doing an install on somebody's house?
20 A.         I know nothing about that.
21 Q.         Okay.  But you understand that there are
22 permits that have to be pulled?
23 A.         Yes, I understand that there is -- in
24 some cities and states you are required to pull an
25 electrical permit and a building permit.  I am fully

1    aware of that.

2              But what I have been told from customers or

3    from other employees they are not being pulled.  They

4    are supposed to be pulled before installation, and I've

5    been told that they're installing before permits are

6    ever pulled.

7    Q.         Those are customers that have told you

8    that they are --

9    A.         Yes.

10   Q.         -- being installed without permits?

11   A.         There's also a job that was actually

12   installed that the electric company was never

13   notified on until later.

14   Q.         Until they tried to run it?

15   A.         Well, until TVA called them and told

16   them that they cannot do back-feeding.

17   Q.         Back-feeding.  That's what it's called.

18   Back-feeding is whenever -- well, why don't you tell

19   me what back-feeding is.

20   A.         Back-feeding is when the grid produces

21   more power than you use at home, and they actually

22   back-feed back into the system.  TVA -- that's when

23   you know that TVA has not done their job or that the

24   electric company has not been notified.  When the

25   electric company is notified, they come out and

1  actually install what's called a special meter.

2  They take out the one that you currently use in your

3  home because everything you use in your home now is

4  a one-way meter.  So that means electricity only

5  flows one way, and it flows directly back and flows

6  directly into your home.

7                    The two-way meter is the meter that flows

8  bidirectional.  It can go in your home or outside your

9  home.  The reason why they do that for, is because when

10  the power shuts down, the inverter shuts down the

11  system so it cannot back-feed into the grid.  So if

12  proper steps were taken correctly, the local electric

13  company would come out and put what's called a

14  bidirectional meter.  If not, they have the one-way

15  meter.  So if the power is actually lost -- let's say

16  the grid goes down and someone is working on the line,

17  if that system is continuing to feed it, it literally

18  will electrocute the man that's working on the line.

19  Q.            So it's very dangerous?

20  A.            It is dangerous, life threatening.

21  Q.            But what you're saying is there would be

22  situations where back-feeding would occur without

23  notifying the electric company?

24  A.            Yes.  That is where -- I don't know if

25  it was personally Solar Titan that failed to do that

1   or if it's the electric company has failed to come

2   out and change the meter.  But in reality which is

3   life, when a system is complete, it is tagged for do

4   not operate.  So it either could be tagged or the

5   installers either turn the system on or the

6   customers turn the system on when it's on, but he

7   would literally have to cut a lock to turn it on.

8   Q.          And so if there's -- if TVA or the

9   electric company sees that back-feeding is

10  occurring, even though they haven't been notified,

11  what do they do?

12  A.          They contact the customer and they --

13  they go through steps and ask the customer what's

14  going on, why are you back-feeding, and so and so.

15  And the customer's reaction will be, well, I

16  recently installed a solar system, and the TVA would

17  probably have no record of it.  If there's no record

18  of it, that means there's been no permits put in

19  place or pulled or applied for.

20  Q.          Or an inspection?

21  A.          Yeah, an inspection never did happen.

22  Q.          Would the electric company tell them

23  that they need to shut off their solar system?

24  A.          They would tell them they're fixing to

25  shut off their power completely.

1    Q.        And they would -- they shut off their
2    power until the inspection happens?
3    A.        They would shut off the power until the
4    permit is pulled and approved and then the
5    inspection.
6    Q.        Is that something that could happen
7    relatively quickly?
8    A.        As far as the electric company cutting
9    you off, it could happen as them coming out.  I
10   mean, that could happen just like that.
11   Q.        What about permits?  How long would it
12   take to get a permit pulled?
13   A.        Two weeks.
14   Q.        Two weeks?
15   A.        Two to three weeks.
16   Q.        Is there any reason why it takes that
17   long?
18   A.        Yeah.  Humans.
19   Q.        You said you could get it done before
20   then?
21   A.        You could probably get it done before
22   then.  What causes the slow part of it is the actual
23   humans.
24   Q.        But my understanding is that in
25   Tennessee there's -- it's all done online?

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 22 of 162   PageID #:
718

1    A.          Some is and some is not.  Each electric

2    company has its own requirements.  None of them are

3    the same.  There are 94 electric companies, which is

4    co-ops in Tennessee, and none of them are the same.

5    They all have different requirements.

6                        MS. DANIELS-HILL:  I just want to

7    clarify.  You have the state agencies that inspect most

8    of Tennessee.  Does the electric company also do their

9    own inspection and issue their own permit?

10                       THE WITNESS:  Some does; some does

11   not.  That's why I'm saying out of the 94 or 95, they

12   all each have individual differences.  None of them is

13   the same.  Some states are.  Kentucky is.  Tennessee is

14   not.  Each individual electric company kind of does

15   things different than the other one.

16   BY MR. KEEN:

17   Q.          But no matter what, somebody from Codes

18   or the State fire marshal's office would have to

19   come out and say, yes, this installation is up to

20   code and we're going to pass it?

21   A.          That's correct.

22   Q.          So Solar Titan has done jobs -- you're

23   understanding is they've done jobs where -- they

24   started installations where they haven't even pulled

25   permits?

1  A.          That's correct.

2  Q.          Have they ever turned a system on that

3  has not passed inspection?

4  A.          I would not know that.

5  Q.          Okay.  Have you ever gotten a complaint

6  from a customer about their system not passing

7  inspection?

8  A.          Yes.

9  Q.          Can you tell me a little bit about that.

10  A.          Richard Coomer is one of them up in

11  Louisville, Kentucky.  The wiring was not done with

12  what they call a whip.  A whip is the conduit run

13  from the solar array down to the electrical box.  A

14  whip cannot touch nothing metal, and the whip

15  actually was touching the gutter going down.  That

16  is one of the customers.

17          Another complaint has came from Casey

18  Johnson.  He has failed multiple times inspections.

19          David Evenson.  I know we keep coming back

20  to him.  He has failed several, and what I have learned

21  or read it's all been part of Solar Titan, the

22  installation crew.

23          Peter Rodriguez.  He's in Georgia.  He's

24  also -- all these names are on this list, "Customers of

25  Interest."

1              Betty Carmean.  She's in Georgia.  She's

2     another one.

3              Billy Perkins.  He's in Kentucky.

4              Beth Morgan is another customer, her and

5     her husband.

6              Elvis Greene in Georgia.

7              Sandra Smallwood in Kentucky.

8              Deb O'Dell.  Let's talk a little bit about

9     Deb O'Dell.  Deb O'Dell was probably my second

10    customer.  That was Craig's -- that was a sale that

11    Craig did, and I was a part of it.  This lady here --

12    can we go off the record for a second?

13    Q.          Yes, let's go off the record.

14                    (Off the record.)

15              THE WITNESS:  Deb O'Dell was sold a

16    system that would produce -- at the time would have

17    been a 7 kilowatt system.  The size of the system is

18    actually in your file.  She has had numerous problems

19    of inspections, and the system is not producing what

20    it's supposed to be doing.

21              I was given the information -- the

22    instruction to go sell Deb O'Dell a battery.  The

23    battery -- the cost of the battery is roughly about

24    $8,000.  They wanted me to charge about 20,000 for the

25    battery.  It was supposed to be given to her free, but

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 25 of 162   PageID #: 721

1    for some reason Craig Kelley wanted me to charge her

2    for it. And she was very upset. She would be a woman

3    of interest that could -- would give you some feedback.

4             MS. DANIELS-HILL: Did Craig say why

5    he's telling you that you need to charge her if you had

6    previously promised or someone from the company

7    previously promised not to?

8             THE WITNESS: Ernie Bussell -- however

9    you pronounce his last name. He was at one time the

10   director of operations. When Ernie was there,

11   everything was run correctly and done correctly. All

12   the systems worked correctly. After Ernie was

13   terminated, because they did not want him to run things

14   that way, he promised a lot of customers batteries to

15   make up for the things that the system was not

16   producing. They knew at the time that the systems was

17   not producing what it was supposed to be.

18            Deb was promised a battery from him,

19   and before they actually got the battery to her, they

20   actually -- he was terminated. And then I was

21   instructed to go sell her a battery at "X" number cost

22   over retail, and it just was what I was told to do.

23            Another customer of interest you will

24   need to speak with is Bruce Whitehead. He's out of

25   Knoxville. He's actually a pilot. He's had -- I know

1    he's had numerous failed inspections because of what

2    they've actually done or not done.  I know he's had a

3    lot of complaints.  I've actually talked to him two or

4    three times.  I've sent text messages or tickets for

5    someone to go out and look at his system.  When you

6    send a ticket in or text message, I always get

7    feedback.  Like from Craig, there's always three sides

8    to the story, the truth and what the customer makes up

9    and what actually happened.  But he's a good customer.

10                   Lane Perkins is another one who's up

11   in Kentucky.  Great guy.  They -- the system should

12   have already been done in a long time, but I think it's

13   completed now.  They had problems after problems after

14   problems.

15   BY MR. KEEN:

16   Q.          With the passing of inspection?

17   A.          Yes, or even getting installed.  His

18   son's name is Billy Perkins.  Literally, his son

19   lives right beside of him.  I sold Billy his system.

20   The installation crew went in and drove a hole in

21   the outside of his wall where you could actually see

22   plumbing through his home, and they never did fix

23   it.  I think Mr. Perkins -- Billy ended up fixing it

24   himself.

25                   So there's some shady stuff going on with

1    the installations.  I don't know if actually the crew

2    or they've been told just to leave.

3    Q.          Am I correct that before you even call

4    the inspector out, the licensed electrician or the

5    licensed builder involved in the installation --

6    overseeing the installation has to sign off saying

7    that they believe the installation is complete and

8    ready for inspection?

9    A.          I do not know that.

10   Q.          And I don't know that either.  It was

11   just something I had a question about.

12   A.          I do know the permits are the pulled --

13   the permit -- the engineer drawings are done first.

14   And then they are submitted over to the electrical

15   permits.  It's submitted to the electric companies.

16   The electric company has to sign off for the permit,

17   and then the City or Codes -- I know kind of that

18   part.

19               Now, when they go out to install it, it's

20   literally two men or three men with a truck or van.

21   They are trained to install the system and run the

22   wiring, and I don't understand why they can run wiring

23   because literally it's an electrician, and they will

24   tie everything in, turn the system on, and they're

25   supposed to shut the system off.  Now, does every

1  system get turned off?  No.  I've learned that.

2  Q.          So the people that do the install --

3  obviously you're supposed to have an electrician

4  make the final connections and turn the system on?

5  A.          Uh-huh.

6  Q.          They are sort of skirting that by just

7  having them run the wiring and they're not supposed

8  to make the final connection, but they're -- but the

9  installers who are not licensed electricians are, in

10  fact, making the final connection?

11  A.          They do what's called a test, and what

12  that does is making sure the system is operational

13  and it actually turns on and produces power, and

14  then they are supposed to shut it off.  Now, saying

15  that all systems gets cut off -- I will not say

16  that.  We're all humans.  Just like the home in

17  Kentucky got burned down.  I do not know what

18  happened there.  Literally, when they do a test, it

19  is supposed to be shut off and padlock it.  Not all

20  systems that I've been up to -- that I've actually

21  went and turned on has been padlocked or had any

22  kind of signage or anything like that on it.

23  Q.          You're saying not all systems have been

24  padlocked?

25  A.          That's what I'm saying.

1   Q.          Have any of them been padlocked?

2   A.          A few, yes.

3   Q.          Would you say more have been unpadlocked

4   than padlocked?

5   A.          Unpadlocked.

6   Q.          About pulling permits.  Now, my

7   understanding is the only people that can pull

8   permits are licensed builders and licensed

9   electricians?

10  A.          That is correct.

11  Q.          Are you aware of any time where Solar

12  Titan has pulled a permit without the consent or

13  knowledge of the licensed electrician -- the license

14  number that they're using to pull the permit?

15  A.          I have been told by Ryan Crofton -- I

16  forwarded his information to you -- that they have.

17  Ryan was with Solar Titan for roughly about a year

18  and with recently conversation that he resigned

19  because they -- he about lost his license because of

20  what they was doing.  They was actually using his

21  license to pull permits, and he was not even fully

22  aware of it.

23              That one -- that is a good -- and Glen

24  Abit -- Abolt, however you pronounce his name -- he was

25  our original electrician we started with.  Then he

1    later left, and I don't know if they were doing the

2    same thing with Glen or not, but Glen is no longer with

3    the company either.

4                    MR. KEEN:   That's all the questions I

5    have related to permitting and inspection if you have

6    any follow-ups, Alicia?

7                    MS. DANIELS-HILL:   No.

8    BY MR. KEEN:

9    Q.          Let me ask you this.  So I know that you

10   know that there are customers who are complaining

11   about Solar Titan because they complained to you

12   directly.  Are there any other avenues that you're

13   aware of that customers are using to lodge

14   complaints against Solar Titan?

15   A.          Explain that question more thoroughly.

16   Q.          So, for example, is there -- do you see

17   customers complain on social media about Solar

18   Titan?

19   A.          Yes.

20   Q.          Can you tell me about that.

21   A.          I see the news on YouTube or WHS Channel

22   11, that is actually in Louisville.  A lot of those

23   customers complained about permitting and the system

24   not being installed correctly.  I've saw it in

25   Georgia, and I've also saw it in Alabama.  One of

1    the stories that actually was mentioned out of

2    Alabama was a customer that I actually sold.  And

3    the customer originally -- she stated why she backed

4    out for was because of the investigation going on in

5    Kentucky by the attorney general.

6    Q.          Have you seen any, like, social media

7    groups?

8    A.          Well, you can look on Facebook.  "Solar

9    Titan Screwed Us" or "Screwed Me" or whatever it's

10   called -- that's all there.  I've seen the negative

11   there, and what I've actually read has been correct

12   of what I've seen or witnessed.  Some of the

13   customers in there I actually know.

14            You also will find them too on Better

15   Business Bureau.  I think they have completely flunked

16   out of that, out of the BBB now.  If not, I don't know

17   why they are even still listed.

18            You know, when you go through and you read

19   all those complaints and you hear Craig Kelley or Sarah

20   Kirkland saying the customers are liars.  Liars are

21   buyers.  And, you know, you look to think that your

22   company you're working for is telling you the truth,

23   and then you go over here and start reading all these

24   negative complaints.  You kind of realize that your

25   company that you put faith into and for your -- that

1  you're employed with you find out they're boldfaced

2  lying to you.

3  Q.          You said something -- you said liars are

4  buyers?

5  A.          Liars are buyers.  That is something

6  that -- a statement that he's always used.

7  Q.          He?

8  A.          Craig Kelley.  A liar is a buyer.

9  Q.          What does that mean?

10 A.          It means when a customer purchased

11 something and they want to back out of it.  They

12 will use any kind of form or anything to get out of

13 a purchase.  Or liars are buyers.

14 Q.          Okay.  What do you know -- is Solar

15 Titan doing anything to help these customers who

16 have inoperable systems or have systems that don't

17 pass inspection?  Is there anything being done at

18 all?  A lot of them have loans; right?

19 A.          99 percent of those customers has loans.

20 99 percent of those customers is probably paying for

21 electric and solar.  And 99 percent of those

22 customers are probably struggling to even get by in

23 life.  I mean, not all customers that we dealt with

24 was you know -- had a middle income or salary like

25 that.  I wouldn't saw they all was, but a lot was

```
1   low income, and they just believed in a way of
2   getting out of paying their electric.  And solar --
3   solar works.  When it's installed correctly, it
4   works.  It's a great system.  I have one on my farm,
5   and it totally works when it's installed correctly.
6   But when it's installed incorrectly, it does not
7   work.
8   Q.        It sounds like they're cutting corners
9   just to try to save money --
10  A.        Saving money.
11  Q.        -- or sell as many as possible and move
12  on to the next?  Is that kind of --
13  A.        All systems are supposed to have what's
14  called an ATS, which is an automatic transfer
15  switch.  They kind of avoid doing that installation
16  because it's an actual cost for them.  They would
17  rather wire it directly to an actual breaker versus
18  them using the automatic transfer switch.  What the
19  automatic transfer switch does is when the power
20  goes out, the transfer switch switches everything
21  over to a battery and it shuts off the power from
22  going back out to the grid.  But what they do --
23  they do what's called a wire-in breaker.  They'll
24  usually -- they'll take the solar and wire in to --
25  of the circuits they want to run.  That is a cheap
```

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 34 of 162   PageID #: 730

1    alternative to an ATS which is also a -- a cheap way

2    of doing it, and if it -- if the breaker fails, it

3    literally will catch on fire or your box will be

4    burned or something like that.  Anything can happen.

5    It's electrical stuff you don't mess with.

6    Q.          If a customer has a system that's

7    inoperable or isn't producing like it should,

8    they're paying on a loan, still paying their

9    electric bill, does Solar Titan ever reimburse the

10   customer for their loan or their monthly loan

11   payment or anything?

12   A.          There are some things that says that

13   they actually have.  From the conversation that I

14   had with the lady in that department, she said

15   they're only sending out three checks a week of the

16   complaints.  She said that we wrote a bunch of

17   checks, but none of them has been sent out.  They

18   tell everybody to call them directly.  And the

19   reason why they want to call them directly is they

20   don't want it broadcast all over TV.  And I can

21   understand that if I was in the business side of it,

22   but, you know, they're trying to -- they're saying

23   they're trying to help the customers, and literally

24   they are not.

25               Going back to a customer here.  Her name is

1    Nancy.  She lives in Knoxville, Tennessee.  Her system

2    went down and it was weeks before they even got out

3    there to do that, and the customer wanted money for it

4    and -- because she had had to pay both of them.  And

5    they declined to pay her any because they said she had

6    money.  There was no use of paying her, that she

7    already had money.

8              And then you look back too at a different

9    customer, which is Deanne Smith.  She's in Loudon,

10   Tennessee.  It's a prime example.  They are two --

11   they're husband and wife that are on disability.  And

12   they are literally paying a solar payment and an

13   electric bill, and they're struggling and they will not

14   help them one bit.  And their system does not even work

15   correctly, and I instructed them many times to help

16   them, and they will not.

17   Q.        Do you know why not?

18   A.        I have no idea why not.  Probably

19   because I've had a bet that she has called to

20   complain so much, but literally the system does not

21   even work correctly.  There was a leak in her roof.

22   They did not want to repair it because they said it

23   was not us, but the system was installed, and, like,

24   two weeks later the roof was leaking.  I literally

25   went and picked up a guy and we took a tube of caulk

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 36 of 162   PageID #: 732

1    and fixed it ourself just to get it fixed.  But they

2    never did want to acknowledge the leak.

3    Q.          So you did that on your own just to help

4    the customer?

5    A.          Yes.

6                    MR. KEEN:  That was all the questions

7    I had about customer complaints.  Is there any

8    follow-up you want to ask about?

9                    MS. DANIELS-HILL:  No.

10   BY MR. KEEN:

11   Q.          I know that Solar Titan talks about they

12   hire a lot of veterans.  Is that -- have you heard

13   that?  Have you heard them say --

14   A.          I have heard that.

15   Q.          And you mentioned that Richard Atnip is

16   an Air Force veteran?

17   A.          Yes.

18   Q.          Do you know -- do they make an effort to

19   hire veterans, do you know?

20   A.          Well, if you're a company that says that

21   it supports the military, there are certain days of

22   the year that you would not work.  They do not

23   recognize any holiday at all.  You could either work

24   or not be paid for that day.  As far as the

25   veterans, I know -- I can't think of a veteran there

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 37 of 162   PageID #: 733

1  other than Michael, which, like I say, I only know

2  about a handful of people that I actually had a

3  relationship with.

4  We do offer what's called a veteran

5  discount.  All the reps are to give them a $500

6  discount.  $500 on $50,000 is not really a lot of

7  money.

8  MS. DANIELS-HILL:  What do they

9  explain to customers that they are offering a veteran's

10 discount?  What do they say about this is the reason

11 that we're offering the discount?

12 THE WITNESS:  What they've always said

13 is we've given a veteran discount if you're a retired

14 veteran, and that's just literally $500 off of the

15 inflated price already.  I mean, they're right now up

16 to about 6.50 cents a kilowatt.  Their cost is about

17 1.62.  So get back into math.  So if you're at 6.50 a

18 watt, 6 times that times 10 -- times 10,000.  That's

19 $65,000.  That's the total sale, and the cost is 1.62

20 times 10,000.  $16,000 for cost.  That includes the

21 labor too.  Literally on that job they're clearing

22 about that much money (indicating).  I mean, they're

23 literally racking in the money.

24 BY MR. KEEN:

25 Q.       When you say labor costs, do you mean

1  the installation costs or the installation and

2  sales?

3  A.           Installation and sales is all included

4  in that number.

5  Q.           How do you know about this number?

6  A.           It was shared through the buyer, but the

7  buyer told me what they actually buy it at and what

8  they literary got into the system.  So they

9  literally got less than a -- less than a quarter

10 into it.

11                MS. DANIELS-HILL:  Do you know how

12 Solar Titan determines how much to charge for the labor

13 and installation?

14                THE WITNESS:  They do their own

15 in-house installation, and what they give to the

16 crew -- it used to be 25 cents per kilowatt.  I don't

17 know what it is now.  So you would pay them 25 cents on

18 a 10,000 system -- $10,000 which is -- 10,000.  So .25

19 times 10,000.  They will make $2500 between the two

20 total.  Now, they would take the 25 and divide it by

21 two, and that's how they would come up with their

22 number.

23                They recently had a suspicious pay

24 change.  No one knows nothing about it.  Just like the

25 sales side had it.  We had a pay change that happened

1  that no one knew nothing about it, and their pay

2  literally got cut dramatically.  They went from

3  averaging anywhere from -- an installer would probably

4  make anywhere from 3 to 5,000 a week, and I reckon now

5  they're below $2,000 a week now.  So the installers are

6  leaving -- they're leaving to go to other companies.

7                    MS. DANIELS-HILL:  So if they were

8  getting you said like 2,500 on a 10,000 kilowatt

9  system, is that the exact amount that would then be

10 charged to the customer or were they going to be

11 charged even more than that?

12                   THE WITNESS:  No.  That would come out

13 of the total cost of the 65.

14                   MS. DANIELS-HILL:  But customers

15 weren't getting, like, a breakdown of this is the

16 amount that is for the system that we're charging --

17                   THE WITNESS:  No.

18                   MS. DANIELS-HILL:  -- this is the

19 amount for the labor?

20                   THE WITNESS:  No.

21 BY MR. KEEN:

22 Q.           So if Mr. Coomer got a 4 kilowatt, if I

23 also got a 4 kilowatt, would we always get the same

24 price or maybe he would get sold a little bit more

25 money?  He would try to get 10,000 more out of him?

1    A.          No.

2    Q.          Is there --

3    A.          It would all stay pretty close to the

4    five and the five and a quarter kilowatt.  The

5    across the board for them was about anywhere from

6    five and a quarter to 5.50 price per kilowatt.  If

7    you got down below a five, you would actually lose a

8    precent on your commission, but that was kind of the

9    breakdown.

10   Q.          The salespeople -- did they negotiate

11   with customers a lot about price and stuff?

12   A.          Some did; some did not.  I'm not saying

13   they all did.  Now they're actually at $6.50 a

14   kilowatt, which is the highest in the nation.  You

15   would assume that California would be the highest.

16   They are not.  Solar Titan, from what I've read and

17   seen, is the highest solar company in the nation.

18   Q.          What are energy consultants?

19   A.          They are sales reps.

20   Q.          So like --

21   A.          Uh-huh.  (Witness moves head up and

22   down.)

23   Q.          And did Shawna train sales reps?

24   A.          She did.

25   Q.          What did she -- did she just train them

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 41 of 162   PageID #: 737

1  on how to give the pitch and that sort of stuff?

2  A.          I do not know that.  That was something

3  that you will need to ask Shawna directly.  She

4  trained -- like I say, she came on board after me --

5  it was literally after me and she done the

6  wholesales training.  She done everything.  I would

7  not know nothing about what she actually trained,

8  other than the document that I handed you.

9  Q.          The Anyway Money document?

10  A.          The Anyway Money document.

11  Q.          What about the pitch book?

12  A.          I've never even seen that.

13  Q.          You don't have a copy of the pitch book?

14  A.          No.

15  Q.          I know you mentioned Dale --

16  A.          But if you reach out to the gentleman

17  named Todd, number 15 on your list, he might be able

18  to fill in some of the information.

19              I actually sent you other names by email.

20  They are no longer with Solar Titan that probably could

21  give you some details about the information that I do

22  not have.

23  Q.          The former sales reps?

24  A.          Yes.

25  Q.          Todd -- what is Todd's last name?

1    A.          I do not know what Todd's last name is.

2    Q.          But it's something that you sent me?

3    A.          It's number 15 on the list.

4    Q.          Can you tell me about Dale Roden?  I

5    know we talked a little bit about Dale Roden earlier

6    today.  What does he do?

7    A.          He is the -- I don't know what his

8    correct title for him is.  He runs the operation

9    department.  I guess he would be the director or the

10   general manager over operations or of the

11   installation.  My background of him was not good.  I

12   was told that he had a previous electric -- a solar

13   company in Chattanooga that went out of business

14   because of a shady business.  That's all I know and

15   what I learned.  And my dealings with him have not

16   been professional.

17   Q.          Do you know the name of the Chattanooga

18   business?

19   A.          I do not.

20   Q.          Whenever you say shady business

21   dealings, you mean shady business sort of in the way

22   that Solar Titan is doing shady business?

23   A.          Yes, money wise and just, you know --

24   like I said, these systems work.  There's a few

25   people making it hard on other customers.  If these

1   systems are installed correctly, they produce what
2   they say and they actually work.  There are some
3   people out there -- just like this world that we
4   live in.  You know, this world that we live in is a
5   horrible place, but there's a few good people that
6   makes it good.  It's the same way with some of these
7   people that I learned with and worked with in the
8   past.  They're the ones that makes this all, you
9   know, hard for us in this world.
10  Q.          Has Dale been with the company since the
11  beginning?
12  A.          No, he has not.
13  Q.          Solar Titan?
14  A.          No.
15  Q.          Whenever he came along -- did you see
16  things get worse after he came along?
17  A.          Yes.  Ernie Bussell -- I cannot
18  pronounce his name -- B-U-S-S-E-L-L -- had the role
19  that whenever thing I thought was installed
20  correctly -- after Ernie leaving, Dale took his
21  spot, and it has -- it went downhill.
22  Q.          You said that your dealings with Dale
23  were unprofessional?
24  A.          Yes.
25  Q.          Can you talk to me a little bit about

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 44 of 162   PageID #: 740

1  that.

2  A.          You can't get nothing done.  You get

3  told something and something else happens.

4  Q.          So he was just not responsive like

5  whenever you asked for something or is he just lazy?

6  A.          I would call him lazy.

7  Q.          Okay.  Lazy and incompetent or just

8  lazy?

9  A.          Lazy, incompetent, just not a person of

10  its word.  That's pretty much all I can say since

11  you're recording me.  Off the record.

12                    (Off the record.)

13                    THE WITNESS:  Back on the record now.

14  BY MR. KEEN:

15  Q.          When did Solar Titan become aware that

16  the Generac systems wouldn't work below 41 degrees?

17  A.          They should have known it day one when

18  they signed up.

19  Q.          But they didn't or they knew and they

20  didn't tell anybody?

21  A.          I would assume they knew but didn't tell

22  no one, because it's literally on their tech sheet.

23  Q.          What is the tech sheet?

24  A.          That tech sheet explains the functions

25  of the system, of the battery, the watts, the

1  kilowatts that it can take on, the temperature.

2  It's really a -- it's a great piece of data.  It's a

3  data sheet is what it is.  It explains everything --

4  the technical side of the system.

5              Now, I will say this, we as sales reps did

6  not know nothing about that until last year some time,

7  and I've learned it from a customer that called me

8  about it and she was extremely upset at me, which I was

9  not -- and she actually sent me the tech sheet on it --

10  of that battery.  I had to learn it the hard way.  Her

11  name was Susan Smallwood, I think.  She was in

12  Kentucky, but she literally sent me the tech sheet of

13  the battery.

14  Q.          What are you looking for?

15  A.          I'm looking for my sheet that I had

16  here.  Stuff literally gets up and walks away.  She

17  is number 10 on your call list.

18  Q.          Do you have a copy of the tech sheet?

19  A.          I do, not with me personally.

20  Q.          Okay.  Not right now.  I gotcha.

21              MS. DANIELS-HILL:  How did Susan get a

22  copy of the tech sheet?  Did she Google it?

23              THE WITNESS:  She called Generac

24  herself.  She was a smart one, and I do not mean that

25  by no means being negative toward women, by no means.

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 46 of 162   PageID #: 742

1    I'm not trying to be negative about it, but she

2    literally picked up the phone and called me.  She asked

3    me if I was aware of it.  I said no.  She said, "Have

4    you called your Generac dealer?"  I said, "No.  I

5    didn't know nothing about it."  She said, "Who informed

6    you of this?"  I said, "Well, the company."  I said,

7    "We have never been told that."  She said, "Well, I'm

8    sending it over to you."  And literally there it was.

9    I think it was 40 at the lowest.  Anything below 40 up

10   to 120.  Is that how it's wrote?  Yes.

11   BY MR. KEEN:

12   Q.          Where did Susan live?

13   A.          Susan -- actually her name is Sandra.

14   She lives in Kentucky.

15   Q.          So presumably it would get below

16   40 degrees in Kentucky?

17   A.          Yes.

18   Q.          For probably several months out of the

19   year?

20   A.          Pretty much the same time that we --

21   that you guys experience here in Nashville.

22   Q.          So --

23   A.          Generac is not a good product.  It's a

24   lithium-ion battery.  It's not a good product.

25   Q.          But they make it known -- I mean, you

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1  would assume if you're going to be purchasing as a

2  retailer, meaning Solar Titan -- purchasing a

3  product wholesale directly from the manufacturer --

4  did they get it directly from the manufacturer?

5  A.          I think they purchased it directly from

6  what they call CED.  It's out of South Carolina.

7  It's probably one of their wholesalers.  I'm

8  assuming if they're doing that much business, they

9  are purchasing some directly from Generac because

10  literally at one time Solar Titan was probably

11  selling anywhere from 20 to 30 jobs a week or more.

12  And that's when we had a sales crew up in the 60s.

13  I think when I left, they've got less now than 15

14  employees.  There was 31 that resigned a couple

15  weeks back for nonpayment, and then I think last

16  week there was a couple more.  And then, like I say,

17  I think now they're down to less than 15.

18  Q.          Do you know what CED stands for?

19  A.          I can look it up.

20  Q.          That's fine.  If we need to look it up,

21  we'll look it up.  But, like I was saying, CED would

22  inform Solar Titan, "Hey, you're purchasing this

23  product from us.  These are the specifications."

24  A.          That's correct.  Actually, the vendor

25  should actually provide all that information to

1   them.  It's not like it's hidden from the actual --

2   that stuff is not hidden.

3   Q.        But Solar Titan didn't let their sales

4   reps know about it?

5   A.        They didn't let no one know about it.

6   No one was aware about that, especially the sales

7   reps, the one who matters the most is out in the

8   field.

9   Q.        Has anybody called to complain to Solar

10  Titan about the fact that they were sold a system

11  that doesn't work for several months out of the

12  year?

13  A.        I am not aware of that.  I'm just aware

14  of that one customer calling me.  She literally let

15  me have it.

16            MS. DANIELS-HILL:  What doesn't work

17  after it gets under 40 degrees?  Is it that the

18  system's battery is not working?  Is it the --

19            THE WITNESS:  The battery does not

20  work at all.  That is the name and that's all I know

21  about it.  When it gets below a certain temperature,

22  the battery does not release any energy, or when it

23  gets a certain temperature, it does not.  It would not

24  release no system -- no energy back into your home.

25            MS. DANIELS-HILL:  So it's not that

1  it's not actually getting the extra energy --

2                    THE WITNESS:  It cannot store it.

3                    MS. DANIELS-HILL:  It's that it can't

4  store it?

5                    THE WITNESS:  It can't store it or

6  discharge it.

7  BY MR. KEEN:

8  Q.          Solar Titan primarily using Generac

9  systems?

10 A.          They originally switched from Generac.

11 They originally -- it started out it was first LG

12 Chem battery.  The LG Chem is probably one of the

13 best batteries they ever installed as far as

14 tech-wise on their data sheet.  Then they went to a

15 different battery which was the Generac, and the

16 Generac was thought to be a good battery like the

17 Generators.  It's not.

18              Now they're installing what's called a

19 SolarEdge battery.  It's a new battery from SolarEdge.

20 SolarEdge is some other stuff -- SolarEdge is like the

21 cream of the crop as far as of the -- of the inverters.

22 They have some of the best inverters made.

23              The battery technology has not been out

24 that long.  They bought a lot of that technology from

25 Enphase which is another company.  Enphase makes great

1   product.  They are huge in California, but it comes

2   down to -- if you have all this great products, it

3   comes down to your solar array.  If you do not have a

4   good quality solar array or a brand-name tier one

5   panel, your system is not going to make a hill of

6   beans.  If it's not -- all not connected together and

7   working together, it's not going to be worth having.

8   Q.        What kind of panels does Solar Titan

9   use?

10   A.        They use different ones.  Some of the

11   ones they use is called Hyundai.  They use what's

12   called a Jinko panel.  A lot of these companies --

13   we advertise American made.  A lot of the stuff is

14   not American made.

15   Q.        What do they advertise that's American

16   made that's not?

17   A.        I think they advertise American-made

18   product.  The one -- one of the panels that we

19   actually had and we switched to and was actually on

20   that data sheet which was the QCell -- they're

21   actually manufactured -- they are a German panel

22   made in Dalton, Georgia, but they cannot get them.

23   But they tell customers that they are American made,

24   and they are not.

25   Q.        So they tell customers that they're

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 51 of 162   PageID #: 747

1  using QCell?

2  A.        They tell customers they're using

3  American-made products, but a lot of the product is

4  not American made.  SolarEdge is a Israel company,

5  and a lot of the panels that they are buying is not

6  American made.  They're literally made in Korea or

7  shipped over.

8  Q.        So whenever they say American made, that

9  leads customers to believe they are buying the QCell

10  product because that's the only one that's American

11  made?

12  A.        No.  There's other companies in the

13  Americas that's actually made.  You've got four or

14  five companies made -- but when you advertise

15  American-made materials and when you go up to sell a

16  veteran, a veteran don't want nothing made in a

17  foreign country.  Most of our citizens, and I'm one

18  of them, I would rather buy America made versus

19  another country.  I always do that myself.  I would

20  rather pay a little extra to have American made

21  versus a China product.  I'm not getting into

22  politics or religion or anything like that.  It

23  seems like an American-made material is better

24  than --

25  Q.        Quality?

1  A.          -- quality-wise versus the foreign

2  country.

3  Q.          Yes, I agree.  But that's the thing is

4  they say, Hey, we use American made.  You can trust

5  our quality.

6  A.          You can trust our quality.

7  Q.          But the reality is that they're made for

8  manufactured products?

9  A.          Correct.  I would say seven -- six to

10 seven out of ten customers gets installed correctly.

11 Actually, let me back up.  Six to seven of the

12 customers there will be complaints, and about three

13 of them might be done correctly because the reps

14 that the -- I will never have my installation crew

15 paid on a commission.  They are paid on time.  The

16 quicker they get the job done the quicker they make

17 more money.  That is no way to run a crew that is

18 going to be installing something.  My opinion now.

19          Now, I can see putting a sales rep on a

20 commission.  He's earned the sale, but as far as

21 putting an installation crew on a commission paid by

22 performance installed, that is -- because that's how

23 they get paid, when glass is on the roof.  That is no

24 way to run that department, because you get a lot of

25 shoddy work that way.

1              MS. DANIELS-HILL:  I have a question

2     about the batteries.  So you said if Solar Titan

3     originally was selling cam batteries.  How long were

4     they selling those as opposed to Generac?

5                    THE WITNESS:  They probably was

6     selling it anywhere from -- let me back up and let me

7     go into a little more detail.  Pull exhibits -- let's

8     see what you got over there again.

9                    MS. DANIELS-HILL:  Just stop me when

10    I'm on the right one.

11                    THE WITNESS:  Keep going.  That --

12    right there.

13                    MS. DANIELS-HILL:  This is Exhibit 4.

14                    THE WITNESS:  Exhibit 4.  Prior to us

15    installing batteries -- Solar Titan never did actually

16    install a battery starting out.  We was told by Craig

17    Kelley and Sarah that all the energy that these panels

18    produced, at nighttime they could pull from the panels

19    so the customer would not actually need a battery.  All

20    this time we did not actually have batteries in stock

21    to sell to customers.  It's not because we couldn't get

22    them.  They could but they was trying to stay away from

23    the battery because what we was told that the energy

24    that was stored into the solar panel, the array, will

25    be pulled through the array into the home.  And that's

1    when the arrays -- what they do is they discharge.

2                       So when we first started out or when

3    they first started out.  I keep saying "we" because I

4    feel like I was a part of it from the beginning I was

5    there.  The array would store the energy, and then you

6    would pull from there, so you really didn't need a

7    battery backup.  I have been told that many times.

8    Because our systems were producing so much.

9                       Later going into the middle of 2020,

10   they brought a battery in, which was LG Chem.  The

11   reason why they brought the battery in was to make up

12   the difference between the net metering.  Knoxville,

13   Tennessee, or Tennessee in general cut out net metering

14   in 2019.  So the battery was put in place to store the

15   excess power with them.  So the excess power would go

16   in the battery.  At nighttime they would actually

17   discharge the battery into the system.

18                       So fast-forward from there, we started

19   with the LG.  Then we went to what's called the

20   Generac, and now they're actually using the SolarEdge

21   battery.  Which as far as if you look at the specs of

22   the SolarEdge, it's about the same.  The SolarEdge

23   battery is a little bit better.  It's made from a

24   better company.

25                       But I hope that kind of answered your

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 55 of 162   PageID #: 751

1    question what you are actually looking for, but I did

2    want to say that prior to the battery, we was told that

3    the panels actually stored excess power and you did not

4    need a battery.

5                      MS. DANIELS-HILL:  So you're saying

6    when you were given Exhibit 4 to explain how much

7    energy the systems would generate, that was the time a

8    battery wasn't being offered?

9                      THE WITNESS:  That's correct.

10                     MS. DANIELS-HILL:  And then when did

11   they start selling Generac batteries instead of LG

12   Chem?

13                     THE WITNESS:  I don't know the exact

14   date of that.  I'm sure it was in 2021.

15                     MS. DANIELS-HILL:  And then

16   SolarEdge -- was that something that just started this

17   year?

18                     THE WITNESS:  Yes.  SolarEdge -- I

19   don't know when they actually started selling the

20   SolarEdge battery, but they got rid of the Generac

21   because of the problems they were having with the

22   Generac.

23   BY MR. KEEN:

24   Q.          And I know we already talked about this,

25   but I want to talk about this a little bit more.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    You mentioned that the company or at least the
2    people that owned the company, being Sarah Kirkland
3    and Craig Kelley and Richard Atnip, owned some very
4    fancy things.
5    A.          That's correct.
6    Q.          Homes, boats, planes.  Can you -- I just
7    want to go through and you tell me what you
8    understand it is that they have and whether it's
9    something the company owns or whether it's something
10   an individual owns.  So you mentioned Sarah bought a
11   one and a half million dollar home recently?
12   A.          She bought like a million dollar home
13   down on the lake.  What I've been told is it was
14   totally refinished -- gutted and refinished.
15   Q.          Which lake is this?
16   A.          That would be Fort Loudoun in Knoxville,
17   Tennessee.
18   Q.          And you mentioned something about an
19   $8.2 million home.
20   A.          That's actually owned by Craig and
21   Michael.  That purchase probably happened about two
22   to three months ago.  I'm assuming -- I don't know
23   if it was through the company or through personal.
24   I am not aware who actually -- but when you pull the
25   tax statement, it shows up Michael Atnip.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1           MS. DANIELS-HILL:  To your knowledge,

2    did they have the ability to buy an 8 and a half

3    million dollar home before they started Solar Titan?

4           THE WITNESS:  Lord, no.  Honey, I gave

5    them money to buy the small home they was actually in.

6    BY MR. KEEN:

7    Q.          And you've been to this house yourself?

8    A.          I have.

9    Q.          For a barbecue?

10   A.          I didn't go to the barbecue.  My wife

11   sells real estate, but, yes, I have actually been to

12   the home.

13   Q.          Do they own any other homes?

14   A.          They own multiple properties in

15   Knoxville now.  All this has happened in the last

16   year, year and a half.  Money has like came from

17   nowheres.  You cannot explain where the money is

18   coming from.  Just the spending that's went on, the

19   cars, the Teslas, buying their family homes, cars,

20   planes, boats.

21          I was with them once when they bought a

22   boat.  A $1.8 million boat, paid cash for.  They had

23   another boat they bought.  It was a large cabin

24   cruiser.  We actually last year went down for a trip.

25   I won a trip last year for -- to stay in their home

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 58 of 162   PageID #: 754

1    which is in -- they don't own it anymore.  It's in

2    Destin, Florida.  Me and my family and friends stayed

3    down there.

4              We also took out one of their boats.  That

5    was something that I did not understand.  I had to pay

6    for the boat ride, but they reimbursed me back.  They

7    own a company called -- I think it's called Titan

8    Charters.  It is a boating company, and they go out and

9    do fishing with.  I had to pay $4,000 to take my

10   family.  On the back side, they refunded me $5,000 from

11   Solar Titan's money, which I thought I was getting a

12   good deal on it, but now I realize I've got to pay

13   taxes on the money.  So I lost money.

14   Q.        So you paid -- you wrote a check?

15   A.        I paid with my Amex, my Black card.

16   Q.        You paid with your American Express.

17   You paid to Titan Charters?

18   A.        Correct.

19   Q.        But then you got reimbursed through

20   Solar Titan?

21   A.        That's correct.

22   Q.        Did they explain why they were doing

23   that?

24   A.        For -- no, it never was explained.

25   Q.        Let's sort of go through -- let's start

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1  with homes real quick.  So we know that they've

2  got -- that Michael and Craig have this $8 million

3  home in Knoxville.  Sarah has a house on the lake in

4  Knoxville.  You said Craig and Michael own several

5  homes.  Is it in the East Tennessee area or

6  throughout the Southeast?

7  A.        They own several homes in Knoxville.

8  Property-wise they own -- probably at least four of

9  the properties has million dollar-plus homes on

10  them.  They have bought family and friends homes,

11  probably 500 -- 500 or higher.  They also bought

12  property in Alabama down on the lake.  What is that

13  property down there?  What is that lake in Alabama?

14  I can't remember the name of the lake.  But they

15  literally bought three lots with a beautiful million

16  dollar home on it, bulldozed it down, and built

17  another home.

18  Q.        And is this all for personal use or do

19  they rent these out?

20  A.        I do not know that information

21  personally.  I can't tell you nothing about that,

22  but I do know recently they sold the home in Destin,

23  Florida, and I think the plane was sold or it was

24  repo'ed.  I don't know how that actually took place.

25  Q.        So the home that Michael and Craig owned

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 60 of 162   PageID #: 756

1  in Destin -- they sold it?

2  A.          Correct.

3  Q.          Just because they weren't using it?

4  A.          We was told they sold it because they

5  didn't need it.

6              MS. DANIELS-HILL:  Can I ask, how did

7  they use that home in Destin, because you said you won

8  a trip to go use it?  So what was that house for?

9              THE WITNESS:  That home was probably

10  used for them to take vacations in.

11              MS. DANIELS-HILL:  But they allowed

12  staff if they won something to use it?

13              THE WITNESS:  They occasionally would

14  let their reps stay there that sold "X" number.  Let's

15  put it this way.  Of all the company employees there, I

16  outsold everyone there.  Probably in the last two or

17  three years, I mean, literally eight out of ten bought

18  every week from me.  But whatever I wanted, I would

19  probably get if I asked for it.

20              MS. DANIELS-HILL:  So it was like a

21  perk if you sold a certain amount?

22              THE WITNESS:  That was a perk.  Last

23  December I sold -- well, last December -- no.  Actually

24  back up.  December of 2020 I think I made close to

25  $80,000 commissions out of that, and I probably sold

1    close to one-half million dollars that month.  But yes.

2            MS. DANIELS-HILL:  But you're saying

3    you're the only one that got that perk, or were there

4    other sales rep that also got perks like that?

5            THE WITNESS:  They would get -- other

6    reps would get different things.  He just asked me, you

7    know, "What do you want to do?"  I said, "I want to go

8    to Destin."  He said, well, you need to hit this and

9    this.  And I just hit everything he said.

10           MS. DANIELS-HILL:  What other perks

11    were they offering other reps?

12          THE WITNESS:  They would probably give

13    them money or something like that.

14           MS. DANIELS-HILL:  Did they use any

15    other property that they had owned privately --

16          THE WITNESS:  No.

17          MS. DANIELS-HILL:  -- to give perks?

18          THE WITNESS:  I don't know that.  I

19    don't know that.

20    BY MR. KEEN:

21    Q.       Do you know -- it sounds like -- well,

22    do you know if any of this real estate was owned

23    either by Solar Titan, Titan Charters, Ideal

24    Horizons, or was it always, to your knowledge, owned

25    by an individual?

1  A.          Everything that I have seen on paper has

2  been Michael Atnip.  There might be something out

3  there owned by Solar Titan.  I do not know that.

4  Sam, I can only tell you what I've actually seen on

5  paper.

6  Q.          Did Sarah own any other real estate

7  besides this home in Fort Loudoun?

8  A.          I think Sarah owns, like, two homes now.

9  Q.          And I know that you said this, but did

10  it seem like this money just came out of nowhere,

11  that they were just spending money it sounds like

12  pretty recklessly on these things?  You don't have

13  any idea where they got it?

14  A.          No, I do not.  Literally, the company

15  done $200 million in sales last year.  That's --

16  roughly they probably cleared between 30 and

17  $40 million and probably could have done more than

18  that from what I've -- just based on the

19  calculations percent-wise.  I don't know if all the

20  money came from the company or not.  There was a lot

21  of money spent -- let's put it that way -- from

22  them.

23  Q.          Does the company have any debts that you

24  are aware of?

25  A.          I'm not aware of that.

1          MS. DANIELS-HILL:  You said that you

2     had to lend them money to buy a smaller house.  How

3     much did you have to lend them?

4          THE WITNESS:  That was something

5     that -- I'm going to keep that off the record.  Can we

6     go off the record for a second?

7          MR. KEEN:  Yes, go off the record.

8          (Recess taken from 3:10 P.M.

9          to 3:22 P.M.)

10    BY MR. KEEN:

11    Q.          So when you first met Craig Kelley and

12    Michael Atnip -- or not when you first met them, but

13    whenever you first joined them at Solar Titan, they

14    were struggling financially?

15    A.          Yes.  To back up a little bit, let me

16    interrupt you so you will understand that part.

17    When I met them -- when I met Craig originally, he

18    was working at Club Exploria.  That's in Gatlinburg.

19    They was literally struggling then.  We probably

20    worked together about six months.

21          He purchased a home in Knoxville, and the

22    lady that actually gave him the money for the home

23    purchase -- part of it -- was a lady known by Terry

24    Sipes or Snipes.  I forgot how her name is actually

25    pronounced.  She was employed at Holiday Inn Resorts.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    Later they moved forward and she was hired by the
2    company.  And then later she quit because of the way
3    that she was being treated by Craig.
4    Q.          So Terry was hired by Solar Titan?
5    A.          Yes.
6    Q.          Hired away from Holiday Inn presumably
7    doing time-shares?
8    A.          Yes.  They was very good friends.
9    She -- when she resigned, she wrote a letter to
10   him -- a very personal letter to him explaining
11   about the multiple times that she has loaned him
12   money to purchase homes in Knoxville or give him
13   money where he could actually leave Vegas, him and
14   his family, to get to Tennessee.  Her phone number
15   is -- if you want to contact her, her number is
16   865-660-5767.
17   Q.          And you said that she wrote a letter.
18   Is this a letter that you've seen?
19   A.          I've not officially seen the letter.
20   The letter that was wrote was sent to a lady by the
21   name of Kay Warren.  Craig actually personally
22   showed the letter to Kay and had Kay to read the
23   letter.  And Kay told Craig that, "I would never
24   show that letter to no one if I was you."  It
25   literally states each time that she has financially

1    helped him and Michael out, and it was multiple
2    times.   The home they lived in Knoxville prior to
3    Solar Titan -- it was a very small home.   She
4    actually gave them the money to even purchase the
5    home.
6                        MS. DANIELS-HILL:   When you say
7    "small," do you know like -- what do you mean by how
8    small?
9                        THE WITNESS:   To me an 1,800 -- well,
10   1,500 square foot is small.   But everybody has their
11   difference how, you know -- coming from -- prior to him
12   living in Knoxville, they lived in a hotel room I want
13   to think for roughly three to six weeks.
14   BY MR. KEEN:
15   Q.          In Gatlinburg?
16   A.          Yes.
17   Q.          But either way, it wasn't an
18   $8.2 million house?
19   A.          That's correct.   That leads me back to
20   the money coming out of nowhere.
21   Q.          And so during this time when they're
22   asking customers who have canceled within the
23   three-day period to pay their 30 percent share or
24   else they're not going to let them out of their
25   loan, they're buying $8 million houses?

1    A.          That is correct.

2    Q.          Presumably with money that they got from

3    the sales -- you know, at least in part; right?

4    A.          Correct.

5    Q.          Of these sales that have been canceled?

6    A.          They are buying homes with money they

7    don't have.

8                MS. DANIELS-HILL:  To your knowledge,

9    they don't have any different types of employment?

10   They're not getting paid from doing any types of other

11   business that you're aware of?

12               THE WITNESS:  Nothing that I'm aware

13   of.

14   BY MR. KEEN:

15   Q.          Besides this Titan Charter thing.  Let's

16   go back real quick, though, before we get into that.

17   So they're buying homes.  You said they are buying a

18   bunch of Tesla Model 3s.  Is that because -- does

19   that have something to do with the solar industry?

20   A.          I do not that -- specifically why they

21   buy that model.  A lot of the company employees

22   drives a Tesla.  The company gives a lot of their

23   directors -- they call it directors that runs the

24   department -- a Tesla car to drive.

25   Q.          Like a company car?

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    A.          Uh-huh.

2    Q.          And so these Teslas -- do you know if

3    they're owned by individuals or owned by the

4    company?

5    A.          I am aware that they're actually owned

6    by the company.

7                MS. DANIELS-HILL:  How many employees

8    are considered directors that are getting these Teslas?

9                THE WITNESS:  I'm going to say there's

10   at least five or six or maybe more.  We have -- we -- I

11   keep saying we.  They have employees there that's

12   making an extraordinary amount of money and doing

13   literally nothing, and they are friends of the owners.

14   And they literally I would say, you know, would do less

15   than nothing.  They might just talk to people on the

16   phone or do something.

17                They all have a job and just -- it's

18   just the pay -- it's a little higher than I think -- we

19   have employees there that does little sales --

20   different types of sales, and they're clearing 3- or

21   400,000 a year, and I don't see how they pay for their

22   position.

23                My position -- the money I made, I

24   actually paid for it going forward off the sales that I

25   made.  But literally you've got people in there that's

1    doing nothing and making, you know, six figures.

2                    MS. DANIELS-HILL:  Have they gotten

3    rid of these Teslas in recent months?

4                    THE WITNESS:  They have got rid of --

5    selling a few cars here within the last 30 to 60 days.

6    I'm thinking that they have got into a money crunch or

7    they're just hoarding money for what's to come.

8                    I was told by the front desk lady that

9    they have already been served a little bit over 70

10   lawsuits so far to date from different people and from,

11   like, groups together.  I don't know that to be a fact.

12   Like I said, the lady told me.  She also said that they

13   have already retained an attorney too.  He's in

14   Nashville here.

15                   MS. DANIELS-HILL:  Who's this lady

16   that's telling you this?

17                   THE WITNESS:  I plead the Fifth on her

18   name, because she's still employed with the company.

19   BY MR. KEEN:

20   Q.          So they're selling cars --

21   A.          But a lady of interest would be Lakea

22   Helton.  She's still employed with the company.

23   Q.          Do you know is she employed as of today?

24   A.          Yes.

25   Q.          A lot of people have left -- right? --

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 69 of 162   PageID #: 765

1  in the last several weeks?

2  A.          Yes.  In the several months -- we was --

3  they was probably close to I'm going to say 200-plus

4  employees, and now they're probably down to less

5  than -- I don't know -- I mean, at one time they had

6  up to about 400 employees.  And since the majority

7  of the sales reps just left, and the -- I'm going to

8  say they're less than a hundred.  I might be wrong

9  about that now.  I do not know that to be a fact.

10  Just from when I go in the office and visit, there's

11  people not at cubicles.  There used to be -- all the

12  cubicles used to be filled.  To me, it's like a

13  skeleton crew there now.

14          I was told that all the hiring has stopped.

15  They will not be hiring no one going forward until they

16  get things worked out.  They have cut back on their

17  marketing, but they are using a company called Sun of

18  America to run some of their ads on.

19  Q.          Sun of America?  I presume S-U-N?

20  A.          Yes.  And I actually entered my

21  information, and it was a Solar Titan person that

22  called me.  So I don't know where the name Sun of

23  America came from, but whoever came up with that

24  name -- they ought to be fired, because that's the

25  worst name for a solar company I could ever think

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 70 of 162   PageID #: 766

1    of.

2    Q.          You said that they're selling cars in

3    anticipation of what's to come.

4    A.          I don't know why that's actually

5    happened, Sam.  I just know in my past when I got

6    low on money or someone got low on money, we would

7    start getting rid of the extra things that we didn't

8    need.  That's what I thought in my head.  They're

9    getting low on money or spent more and they're

10   getting -- they had to get rid of a few things.

11             MS. DANIELS-HILL:  Would you say that

12   they started getting rid of things after all these

13   lawsuits and complaints started?

14             THE WITNESS:  Yes.  This all happened

15   in less than 60 to 90 days is when this all started

16   flowing.

17             MS. DANIELS-HILL:  Are there any other

18   company assets than the Tesla cars?

19             THE WITNESS:  I don't know if the

20   boats are actually in the company's name or not.  They

21   used to own two boats, four Jet Skis.

22             MS. DANIELS-HILL:  Have the boats ever

23   been used in some way for employees?

24             THE WITNESS:  I've actually been on a

25   boat ride with them.

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 71 of 162   PageID #: 767

1           MS. DANIELS-HILL:  What were you on

2    the boat ride with them for?

3           THE WITNESS:  The purchase of the one

4    that they bought, the big one.  I was on the purchase

5    for that one.

6    BY MR. KEEN:

7    Q.        The $1.8 million one they bought for

8    cash?

9    A.        That's right, uh-huh.

10   Q.        Do you know what kind of boat it was?

11   A.        Uh-huh.

12   Q.        What kind?

13   A.        It was a 455 Everglade.

14   Q.        Is this, like, a yacht that you can stay

15   overnight on?

16   A.        You could.  It's a 50-plus-footer

17   fishing vessel.

18   Q.        And these boats -- are they all housed

19   in the Gulf area?

20   A.        Uh-huh.  (Witness moves head up and

21   down.)

22   Q.        All right.  They have them like in a

23   marina or something?

24   A.        They do.  They have it in the marina

25   in -- the last time I was there, they have it in a

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 72 of 162   PageID #: 768

1    marina in Destin.  That is the biggest one there.

2    Q.       And it sounds like they use these for

3    their own personal endeavors?  They go out on their

4    own with them?

5    A.       I've been down there twice with them on

6    that.  Once when they picked it up.  We vacation

7    down there.  We've vacationed in Destin for many,

8    many years.  My mother bought a home down there last

9    year.  Versus staying in -- my mother stayed last

10    year with us in December.  And then actually in

11    January of this year she bought a retirement home

12    down there.  So we're still going to be going down

13    there.

14         But when I was with them, he actually had

15    his mother and father with him that week.  Well, we --

16    we was down there for four days is when they actually

17    bought that boat.  As far as personal use, I don't know

18    that.

19    Q.       So is it being used by Titan Charters

20    to, like, take folks out fishing and stuff?

21    A.       I don't know that.  I'm not there to

22    witness it.

23    Q.       I was just wondering if you knew that or

24    not, if he had mentioned it.  But you said he paid

25    cash meaning did he write a check or do a wire

1  transfer?

2  A.          We had -- he had money in the bag I

3  carried, which I did not know, and it was a wire

4  transfer.

5  Q.          Cash?

6  A.          Yes.

7  Q.          How much cash?

8  A.          I don't know.  I left.

9  Q.          Wow.

10  A.          I handed it to him and he opened up.  I

11  said a few choice words, and I turned and walked off

12  because I did not want no part of it.

13  Q.          You said you told him choice words.  You

14  told Craig choice words?

15  A.          I told Michael.

16  Q.          You were upset that Michael made you

17  hold this bag of money that you didn't know was a

18  bag of money?

19  A.          That's correct.

20  Q.          And I imagine too -- I don't want to put

21  words in your mouth.  So -- but you're probably not

22  happy about the fact that they are spending this

23  amount of money whenever their employees aren't

24  being timely paid and whenever their customers are

25  having all these issues?

1    A.          This all happened the same month that

2    everything started happening.  October was when they

3    bought the boat, last year, and that's when pretty

4    much everything started going downhill.

5              That's when at the last -- I did not find

6    out about the pay grade until December.  We sat down

7    and we had like a Christmas breakfast, and that's when

8    I was instructed -- because my first initial thing we

9    eat breakfast, we talked, and I went into something and

10   I started talking about how pay has recently changed.

11   And then they went into detail and explained to me that

12   they have recently changed pay.

13             And I asked them how they changed pay, and

14   they said, "Well, it will benefit you more.  You'll get

15   more money back."  And I said, "Okay."  Then as I

16   started learning about how the pay worked, if you sold

17   a system upfront $50,000, they would take what's called

18   an administration fee out of them, which is 18 percent.

19   So 18 percent of the 50,000 deducted, you would get

20   paid 4 -- 5 percent on that remaining cost.

21             And, for me, that was a pay cut.  I was

22   losing about 200 -- 2- to $300 per job, but at the time

23   I did not know that.  I did not figure that out until

24   March what was actually happening.  That was actually

25   kept secret, and by then we was already into it.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1    Q.        Did they change the time frame in which

2    you got paid?  Because it used to be you got half of

3    your commission at the time of sale and then half

4    when glass was on the roof.

5    A.        No.  That actually changed later.  So

6    the first of October was when they bought the boat,

7    and then later in the month of October is when I

8    found out about all the changes and started having

9    complaints going into December from all the

10   customers of what's going on with the systems.

11            And then as far as the pay change, I did

12   not see -- I was told about it in December.  It was

13   told to me that was an increase, which actually was a

14   decrease, and I did not actually see the first payment

15   happen until about February.  February, March is when I

16   actually started adding up the math, because the math

17   was not coming up correctly on what I was supposed to

18   be making.

19            And then I started complaining about it,

20   and I was told, "That's the way it is.  You signed for

21   it."  I said, "I never signed for nothing.  You changed

22   it automatically."  Then coming this April they changed

23   it again without anyone even knowing about to what it

24   is today.

25   Q.        What is it?

1  A.          If you sold a job today, they would give

2  you 25 percent of the money.  So if it was $100,

3  they would give you $25 and they would not pay you

4  the other 75 till six to nine months down the road.

5  The reason why they do that is in their agreement

6  with you is if you leave, they keep your money.

7  They don't have to pay you.

8  Q.          They say that this is what you signed in

9  the non-disclosure agreement?

10  A.          Yes, which I have never signed.

11  Q.          But you never signed it?

12  A.          That's correct.

13          MS. DANIELS-HILL:  Did that also

14  correspond with how long it's taking for these systems

15  to be operational, the six to nine months?

16          THE WITNESS:  That is what they're

17  saying.  Literally, I have another friend that has a

18  solar company, and he is literally getting

19  installations from the sale to the end in four weeks to

20  five weeks.  It's not that the electric companies are

21  against the companies.  It's just the company is not

22  doing the work or they're trying to avoid costs because

23  to get a permit in some of these counties are anywhere

24  up to $1,500 or more.

25          And this gentleman is actually getting

1    the permits before he even installs.  So he is actually

2    doing it the correct way.  And then there's this other

3    company over here that does it the shady way, and

4    that's why that we're here today.

5                    MS. DANIELS-HILL:  I want to ask him

6    about the assets.  So the Jet Skis -- were they also

7    acquired in October of 2021?

8                    THE WITNESS:  They probably was --

9    they was there before I was.  There was another boat

10   there too before I was.  There was a 50- to 60-foot

11   Formula cabin cruiser, which is a big old -- big

12   sleeping boat you can sleep in overnight.  It's got

13   three staterooms and two baths in it.

14                   MS. DANIELS-HILL:  If they didn't have

15   any money, how were they getting those?

16                   THE WITNESS:  I don't know.  You tell

17   me.

18                   MS. DANIELS-HILL:  Were there any

19   other, like, company outings?  You said there was a

20   Christmas breakfast, for example.  Were there any other

21   outings or anything like that?

22                   THE WITNESS:  We would -- we would do,

23   like, breakfast.  We would occasionally go out to

24   dinner.  They would treat me to dinner going out.  No.

25   I mean, that's all I could think of.  They would have

1  like -- they had, like, little get-togethers for the

2  whole company.  I would never really go to those,

3  because I was never really -- took place -- part in the

4  company as far as the other employees.  As I said, I

5  only answered to -- if I even answered -- was to Craig

6  Kelley.  Literally --

7             MS. DANIELS-HILL:  But they did have

8  employee parties then?

9             THE WITNESS:  I'm assuming they had

10  one or two.  I remember seeing some kind of emails

11  about them.  I never did attend those parties.

12             MS. DANIELS-HILL:  Do you know where

13  those would normally be located?

14             THE WITNESS:  They would either be at

15  the company or they would do a restaurant party.

16  BY MR. KEEN:

17  Q.         Let's talk about this plane for a

18  second.  They just had one plane?

19  A.         Yes.

20  Q.         And this plane -- do you know who owned

21  it, who it was titled to?

22  A.         It was probably titled to Michael Atnip.

23  It was an SR22 that was a Cirrus, C-I-R-R-U-S.

24  They're out of Knoxville, Tennessee.  He was taking

25  flying lessons through Cirrus with that.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1           I think there was another one purchased

2    later.  We actually flew down on a private jet when we

3    went down which was a Cirrus jet.  I think that was

4    purchased through a company.  I don't think they

5    actually owned it directly.  It was a lease.

6                    MS. DANIELS-HILL:  When was the SR2020

7    purchased?

8                    THE WITNESS:  It was purchased

9    possibly this year.

10   BY MR. KEEN:

11   Q.          So Michael owned this plane.  He was

12   taking flying lessons?

13   A.          I don't know if Michael owns the plane

14   or Solar Titan owns the plane, but I do know that

15   Michael flew down to Alabama let's say four to six

16   weeks ago and was showing off to his family and

17   taking them all out to dinner and flew back.  I'm

18   fully aware of that.

19   Q.          Four to six weeks ago Michael takes this

20   plane -- it's a small jet?  It's not a prop?

21   A.          Correct.

22   Q.          So four to six weeks, he shows off to

23   his family, comes back -- flies back.  What is he on

24   a student license or do you know?

25   A.          I think he had a copilot with him.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1   Q.        Okay.  But you've said since then, is

2   it -- this is the plane that has been either sold or

3   repossessed?

4   A.        Yes.

5   Q.        So, to your knowledge, there was a loan

6   on the plane that may not have been paid?  Either

7   that or the plane was sold?

8   A.        That's correct.  Everything they had in

9   Florida -- homes-wise, they had the home in Florida.

10   They also had another lot they was building on.

11   That has been sold, and the home in Florida has been

12   sold.  Plus one or two of the boats has been sold.

13   Q.        What time frame are we talking?

14   A.        We'll say less than four to six weeks.

15   Q.        From today?

16   A.        Yes.  All this stuff started happening

17   when all the negative ads came on TV.  Pretty much

18   when everybody started their investigation.

19   Q.        This other plane now that is being

20   leased, is that something that they use for their

21   own personal stuff or do they -- is that something

22   that's related to their charter business?

23   A.        That is their personal.  That's

24   purchased on their jet card.

25   Q.        What is a jet card?

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

```
 1    A.          Where you pay -- let's say, for example,
 2    you pay $50,000 down and you get, like, 20 hours of
 3    flying time with it.
 4    Q.          So like a club?
 5    A.          Yes.
 6    Q.          Is it your understanding that the
 7    charter company is most -- or not mostly.  Is it all
 8    just boats and fishing charters or is there anything
 9    to do with planes?
10    A.          I think it's boats -- fishing and boats.
11                MS. DANIELS-HILL:  Do you know if they
12    sold any of these things to anyone that they know?
13                THE WITNESS:  I do not know that.
14    BY MR. KEEN:
15    Q.          Have you talked to Craig about -- you
16    said that you're owed roughly $70,000?
17    A.          Yes.
18    Q.          Have you talked to Craig about getting
19    paid for this?
20    A.          I have.
21    Q.          What has he said?
22    A.          He denies it.
23    Q.          He denies that you're owed the money?
24    A.          Yes.
25    Q.          Why does he say -- what's his basis for
```

1  saying he doesn't owe you the money?

2  A.          Of the pay change that they had made.

3  Q.          Oh.  So like the fact that you left

4  before your six to nine months?

5  A.          Well, if you go back and look at the

6  things that they've changed without anyone knowing

7  about it, that's where it's actually added up.  I

8  mean, to date just for last week or the week before

9  last, there's already $20,000 due to me right now

10  that I probably will never see a dime of it.

11  Q.          Why do you think you won't see a dime of

12  it?

13  A.          Because of his agreement states, even

14  though I never did sign it -- I literally will have

15  to get legal involved in it to even get my money

16  from him just on jobs that I've already sold that's

17  due.

18              Richard Coomer is one.  I am due $1,430.

19  Shelly Klem is due -- I am due $860.  Kevin Grim --

20  this is a customer that was sold back in January that's

21  still not connected, and he's in Kentucky.  I'm due

22  $2,000 on that job.

23  Q.          When is the last time you talked to

24  Craig about money?

25  A.          We had that conversation last week.

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 83 of 162   PageID #: 779

1  Q.        Can you tell me about that conversation.

2  A.        It was short and quick.  It turned into

3  an argument.

4  Q.        How did it start?

5  A.        It started by a text message.  He asked

6  me if I would continue to work for him.  I told him

7  what I would require if I decided to work, which I

8  was trying to get all my money paid, that I was not

9  going to go forward with him.  But he said -- he

10  said, "If you will come back," he said, "I will pay

11  you in full."  I said, "Okay."

12        The week before that -- this backs up two

13  or three weeks.  I worked a little bit that week.

14  Luckily for me, all the appointments that I went to

15  canceled.  When I got to the home, I made some kind of

16  excuse up just to get them to cancel.  It came that

17  Friday I was not paid, and I literally called in and

18  told him that I resigned immediately.  And he asked me

19  why.  And I said, "Because you've not paid me."  And

20  that was the end of story.

21        And then Friday of last week HR sent me all

22  of paperwork for the resignation, and the things that

23  should have been put on the resignation was not put

24  down accurate -- correctly.  He also sent me a

25  no-trespassing order saying I'm no longer allowed on

1    the property, that I would be picked up if I am.

2              Which you can actually use this if you want

3    to see this.  Let me go through everything.  There is

4    the unemployment compensation.  There is the separation

5    notice stating that I quit -- nothing about payment

6    that was due -- and an exit interview that I did not

7    complete.  I don't know if you want this or not, but

8    you are welcome to review it.

9              MS. DANIELS-HILL:  While he's

10   reviewing that, I just have a few other questions.

11              THE WITNESS:  You've always got

12   questions, but continue.

13              MS. DANIELS-HILL:  I do.  Have either

14   Craig, Michael, or Sarah K. relocated and gone to

15   another state?

16              THE WITNESS:  When I -- what I know

17   about Craig, he originally was in Tennessee.  He went

18   to Florida.  Something happened in Florida.  He moved

19   from Florida to Las Vegas, and then whatever happened

20   in Vegas brought him back to Tennessee.

21              MS. DANIELS-HILL:  I mean, since

22   coming to Tennessee --

23              THE WITNESS:  No.

24              MS. DANIELS-HILL:  -- have any of them

25   relocated?

1            THE WITNESS:  They all have lived in

2    Knoxville, unless they have changed their address to

3    Florida.  I -- that's -- I know if you look up his

4    name, you can see multiple addresses in Florida.  I

5    have never seen or been to none of them.

6            MS. DANIELS-HILL:  But to your

7    knowledge, they're still here in Knoxville?

8            THE WITNESS:  Yes.

9            MS. DANIELS-HILL:  To your knowledge,

10   have they been open in telling everyone about the

11   assets they're getting rid of and why?

12           THE WITNESS:  No.  No, they have not.

13           MS. DANIELS-HILL:  So who have they

14   told and who have they kept that information from?

15           THE WITNESS:  I would not officially

16   know that.  Craig and I became friends -- I would

17   probably say we became pretty close friends, and then

18   from what I witnessed, the shadiness, the lying, I kind

19   of locked myself away from him.  I'm not a fan of

20   the -- you know, if you're telling me something and

21   you're doing something else, I'm just not a fan of

22   that.

23           And I'm probably assuming we became

24   friends because of sales and stuff like that.  As far

25   as hanging out with him, we have been out -- me and my

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 86 of 162   PageID #: 782

1    wife and daughter have been out with him and Michael

2    and their son probably in the last six, seven years

3    probably not one time together.  My wife does not care

4    to be around them, none of them.  But I have been out

5    to breakfast and lunch with them and dinner before just

6    because they've called or I've called them.

7                    You know, prior to everything started,

8    we did go out.  I wouldn't say for much, but we would

9    go out for wings or do the guy thing.  And as our

10   relationship developed -- no love, not like that.  But

11   as a friendship developed, we would go out and go out

12   to eat.  One of our things was food.  Food brings

13   everybody together.  But I have been to his home; he's

14   been to my home.

15                    MS. DANIELS-HILL:  Are you aware if

16   any of these assets are being sold for much less than

17   they're worth?

18                    THE WITNESS:  I have no idea.  I don't

19   even know what they're actually being sold for as far

20   as a value-wise and the number.  I don't know that.

21                    There is some stuff I just -- I don't

22   ask.  I know it's none of my concern.  I just know when

23   they buy an $8.6 million home and they ask you the next

24   week to come to a barbecue and they ain't paid you in

25   about three or four weeks, it kind of pisses you off.

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

```
 1   BY MR. KEEN:
 2   Q.          My last question is just -- I remember
 3   you mentioned this, and I just want to make sure
 4   that I'm not missing it.  Whenever you went with
 5   Michael to buy that boat and you had that bag full
 6   of cash he didn't tell you about, and then you said
 7   you-all exchanged words, do you remember the details
 8   of that conversation?
 9   A.          I do.
10   Q.          Can you kind of tell me what -- how it
11   went?  What did you say to him first?
12   A.          "What the F-U-C-K?"
13   Q.          And then what did he say?
14   A.          He laughed.  He said, "You're the only
15   one here with a firearm."
16   Q.          With a what?
17   A.          With a firearm.  He said, "I felt safer
18   with you carrying it than anyone."
19   Q.          And then so you just left it with them?
20   A.          I handed it to him and went outside.
21   Anything that they did financially, I wanted no part
22   of it.  When they was on the phone talking, I
23   would -- if we was out on a sales call, I would tell
24   Craig to -- I would literally would tell him, "Hush.
25   Don't talk about this.  I don't want to know your
```

1  financials, and I don't want no part of that."

2           And I literally saw them coming from

3  driving a Volkswagen to now they're driving hundred

4  thousand dollar cars like it's nothing.

5  Q.        I'm going to call this your resignation

6  packet or something that the company sent you.  I do

7  want to have it made an exhibit.

8           MS. DANIELS-HILL:  Is that your only

9  copy of that packet?

10          THE WITNESS:  I can print it off.  I

11 still have access to my emails.  I just cannot -- but

12 that's fine.  Could we make a copy of that just in case

13 because I am going to -- my attorney is going to write

14 a letter to the employment office --

15 BY MR. KEEN:

16 Q.        Yes, absolutely.

17 A.          -- to clarify some things on there.

18 Q.        Have you applied for unemployment?

19 A.          No.

20 Q.        Yes.  If it's okay -- just to lay a

21 foundation for this real quickly.  This is -- tell

22 me again what this is.

23 A.        That is the termination -- employment of

24 termination -- or termination of employment.  That

25 was sent from HR to me stating that I quit with

1    Solar Titan.  That does not specify why I quit for,

2    no reason.  She literally put her own words into it.

3    I'm assuming that she was informed by Craig Kelley.

4    Q.          Who is "she"?

5    A.          What's her name?  I can't see that far.

6    Rebecca Green.

7    Q.          When was that sent to you?

8    A.          That was dated July the 29th.

9    Q.          And you haven't made any alterations or

10   anything to this?

11   A.          No.

12                   MR. KEEN:  Let's have that added in as

13   an exhibit.

14                        (Marked Exhibit 8.)

15                   MR. KEEN:  I think I'm good on

16   questions personally.

17                   MS. DANIELS-HILL:  Me too.

18   BY MR. KEEN:

19   Q.          Well, let me ask you this real quick.

20   Did you do a resignation email or anything?

21   A.          No.

22   Q.          And just do you recall exactly when your

23   last day was working?

24   A.          It was official the 21st, which was a

25   Thursday.

1                    MS. DANIELS-HILL:   I have no other

2    questions.

3                              (Proceedings concluded at

4                    3:58 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

1         REPORTER'S CERTIFICATE

2              I, Christina A. Meza, Licensed Court

3    Reporter, Registered Professional Reporter, Certified

4    Court Reporter, and Notary Public for the State of

5    Tennessee, hereby certify that I reported the foregoing

6    proceedings at the time and place set forth in the

7    caption thereof; that the proceedings were

8    stenographically reported by me; and that the foregoing

9    proceedings constitute a true and correct transcript of

10   said proceedings to the best of my ability.

11              I FURTHER CERTIFY that I am not related to

12   any of the parties named herein, nor their counsel, and

13   have no interest, financial or otherwise, in the

14   outcome or events of this action.

15              IN WITNESS WHEREOF, I have hereunto affixed

16   my official signature and seal of office this 10th day

17   of August, 2022.

18

19

20

21

22   CHRISTINA A. MEZA, LCR, RPR, CCR
     AND NOTARY PUBLIC FOR THE STATE
23   OF TENNESSEE

24   LCR No. 166 Expires 6/30/2024

25   Notary Commission Expires 05/22/23

**Christina A. Meza, LCR, RPR, CCR 615.202.7303**

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

**$**

**$1,430 (1)**
190:18
**$1,500 (1)**
184:24
**$1.8 (2)**
165:22;179:7
**$10,000 (1)**
80:25;146:18
**$100 (2)**
91:22;184:2
**$110 (2)**
57:22;98:3
**$13,000 (1)**
99:5
**$16,000 (1)**
145:20
**$171 (1)**
98:4
**$2 (1)**
84:4
**$2,000 (2)**
147:5;190:22
**$2,500 (3)**
26:16;85:9,13
**$2,600 (1)**
62:6
**$20,000 (1)**
190:9
**$200 (6)**
83:25;84:1;98:22,
23,25;170:15
**$25 (1)**
184:3
**$2500 (1)**
146:19
**$28 (2)**
83:10;119:24
**$3,500 (5)**
85:2;86:8;88:15,
21,22
**$30,000 (2)**
80:24;99:2
**$300 (1)**
182:22
**$4,000 (1)**
166:9
**$40 (2)**
93:14;170:17
**$5 (1)**
51:5
**$5,000 (1)**
166:10
**$50,000 (4)**
26:15;145:6;
182:17;189:2
**$500 (3)**
145:5,6,14
**$6.50 (1)**
148:13
**$60 (2)**

84:1;93:15
**$65,000 (1)**
145:19
**$70,000 (3)**
84:15;119:17;
189:16
**$79,000 (1)**
99:8
**$8 (3)**
84:6;167:2;173:25
**$8,000 (1)**
132:24
**$8.2 (3)**
23:20;164:19;
173:18
**$8.6 (1)**
194:23
**$80,000 (1)**
168:25
**$860 (1)**
190:19
**$90 (1)**
91:22

**/**

**/// (3)**
5:24,25;17:25

**A**

**ability (3)**
10:3;17:6;165:2
**Abit (1)**
137:24
**able (6)**
9:18,23;50:24;
66:23;67:1;149:17
**Abolt (1)**
137:24
**absolutely (1)**
196:16
**abuse (1)**
85:23
**accept (1)**
102:21
**accepting (1)**
61:19
**access (4)**
66:18,21;67:20;
72:10;80:23;196:11
**accident (1)**
14:10
**accomplished (1)**
125:2
**account (21)**
72:10;83:6,8,11;
84:15;102:21;103:2;
118:12,16,19;119:2,
24,25;120:13,14,18,
21;121:7,9,10;123:19
**accounted (1)**
117:24

**accounts (3)**
83:6,7,9
**accurate (7)**
46:20,23,24;50:7;
52:15;91:1;191:24
**accurately (2)**
7:4;17:6
**acknowledge (2)**
106:11;144:2
**acknowledging (2)**
26:25;100:23
**acknowledgment (1)**
26:23
**acquired (1)**
185:7
**acre (1)**
37:22
**across (3)**
45:14;104:10;
148:5
**actual (13)**
37:9;66:4;79:2;
85:1;99:7;111:23;
114:23;120:3;
121:25;129:22;
141:16,17;156:1
**actually (208)**
6:25;11:7;16:10;
17:22;21:2;22:20;
23:3,5;26:14;27:8;
28:2;29:1;30:2,16;
31:11,18;32:12;34:1,
3;35:16,18,19;36:5,7;
37:13;38:6,10;40:18,
19;42:10;47:3,11;
48:22;50:18,19;
51:12;53:16;54:12,
17,19,19;56:12;
57:10,18;58:1,20;
61:2,3,17,17,18;63:8,
20;64:7;65:20;66:24;
67:12;69:2,3;70:9;
71:23;73:21;74:6,6,
13,16;75:8;78:9,22;
81:16;87:15;88:9,23;
89:15;90:21,22,23;
91:24;92:1,1,4,21,21;
93:19;95:6,18,22,25;
96:9;97:23;98:7;
99:13;100:13,15,17,
22,23;101:8,8;
102:19,23;104:2;
105:7,8,17;107:8,10,
13,16;108:6,10;
109:13,14;114:11,14,
16,21;115:17,24;
116:4;117:25;
118:18;121:11,23;
123:2;126:11,21;
127:1,15;131:15;
132:18;133:19,20,25;
134:2,3,9,21;135:1;
136:13,20;137:20;

138:22;139:1,2,11,
13;142:13;145:2;
146:7;148:7,13;
149:7,19;151:2;
153:9;154:13;
155:24,25;157:1;
158:19,19,21;159:13;
160:11;161:15,19,20;
162:16,20;163:1,3,
19;164:20,24;165:5,
11,24;167:24;
168:23;170:4;
171:22,24;172:13,21;
173:4;175:5,24;
177:20;178:4,20,24;
180:10,14,16;182:24,
24;183:5,13,14,16;
184:25;185:1;187:2,
5;190:7;192:2;
194:19
**add (7)**
44:15;47:3;49:5;
70:8;76:20,24,25
**added (4)**
98:5,7;190:7;
197:12
**adding (1)**
183:16
**additional (3)**
86:5,8;89:4
**address (4)**
53:11;77:8;78:15;
193:2
**addresses (3)**
76:17;78:18;193:4
**administration (1)**
182:18
**admission (1)**
5:16
**ads (2)**
177:18;188:17
**advantage (2)**
51:8,9
**advertise (4)**
158:13,15,17;
159:14
**advice (1)**
119:5
**affect (2)**
10:3;17:6
**afterwards (1)**
71:25
**AG (1)**
103:24
**again (10)**
11:19;16:2;43:9,
19;49:6;55:17;
116:21;161:8;
183:23;196:22
**against (4)**
63:9;64:23;138:14;
184:21
**age (3)**

11:25;12:2;17:14
**agencies (1)**
130:7
**ago (8)**
5:15;13:4;32:8;
42:2;69:5;164:22;
187:16,19
**agree (1)**
160:3
**agreeing (1)**
106:25
**Agreement (18)**
42:16,25;43:17;
50:1;75:23;76:2,11;
92:19;102:3,10,12;
103:6,9;112:14;
117:12;184:5,9;
190:13
**agreements (1)**
74:14
**ahead (4)**
26:24;36:11;42:8;
56:17
**ain't (1)**
194:24
**Air (2)**
108:21;144:16
**Alabama (11)**
8:13;69:15;114:9;
119:16,17;120:15;
138:25;139:2;
167:12,13;187:15
**Alicia (2)**
5:11;138:6
**allowed (8)**
43:1,24;83:20;
96:2;104:12,15;
168:11;191:25
**almost (1)**
29:9
**along (5)**
8:17;18:2;19:23;
151:15,16
**alterations (1)**
197:9
**alternative (1)**
142:1
**always (21)**
24:15;31:14,16;
55:21;56:23;57:10;
59:17;61:7;63:19;
82:25;89:1;106:10;
110:1;134:6,7;140:6;
145:12;147:23;
159:19;169:24;
192:11
**America (6)**
83:7;121:9;159:18;
177:18,19,23
**American (11)**
158:13,14,15,23;
159:4,6,8,10,20;
160:4;166:16

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

American-made (4)
158:17;159:3,15,
23
Americas (1)
159:13
Amex (1)
166:15
amount (16)
43:23;60:3;81:18;
85:1;93:20;101:2,4;
102:7,18;123:19;
147:9,16,19;168:21;
175:12;181:23
amounts (1)
27:22
amper (1)
114:23
and/or (1)
11:17
angry (1)
115:16
answered (9)
24:14;89:5,6;
118:23,25;120:19;
162:25;186:5,5
anticipation (1)
178:3
anymore (2)
79:18;166:1
apart (3)
44:5,7;77:9
apologize (2)
23:23;70:10
apparently (1)
81:22
appears (1)
20:11
Apple (1)
106:22
applied (2)
128:19;196:18
apply (2)
19:4;25:12
appointment (12)
35:11,12;38:7;
40:4,17,18;56:19,22;
89:20,22,24;90:1
appointments (11)
29:24,25;35:18;
36:8;38:12;41:4,5,8;
56:9,13;191:14
approved (1)
129:4
April (1)
183:22
area (5)
114:9,9;125:5;
167:5;179:19
argument (1)
191:3
around (7)
8:2;49:25;63:1;
74:2,4;82:16;194:4

array (6)
131:13;158:3,4;
161:24,25;162:5
arrays (1)
162:1
arrested (1)
10:20
articles (1)
108:25
aspect (1)
28:17
A-S-S (1)
110:13
assets (4)
178:18;185:6;
193:11;194:16
assist (1)
32:19
assistant (2)
5:8,12
associate (2)
53:18;54:13
assortment (1)
8:14
assume (6)
15:4;114:25;
117:10;148:15;
152:21;155:1
assuming (16)
25:14;54:7;57:24;
63:23;64:4;80:21;
82:17,19;109:3,7;
118:20;155:8;
164:22;186:9;
193:23;197:3
Atnip (15)
18:21;21:7;107:22,
24,25,25;108:4;
109:22;120:23;
144:15;164:3,25;
170:2;171:12;186:22
ATS (2)
141:14;142:1
attempt (1)
38:11
attend (1)
186:11
attorney (7)
5:8,9,14;84:16;
139:5;176:13;196:13
August (1)
22:2
authority (1)
121:2
authorization (2)
118:11;120:18
automatic (3)
141:14,18,19
automatically (2)
123:10;183:22
avenues (1)
138:12
average (9)

15:12;36:14,16;
37:11;45:18,20;
96:22;105:7;107:14
averaging (1)
147:3
avoid (3)
7:5;141:15;184:22
aware (21)
27:25;67:3;87:10;
119:2;126:1;137:11,
22;138:13;152:15;
154:3;156:6,13,13;
164:24;170:24,25;
174:11,12;175:5;
187:18;194:15
away (6)
66:19;84:15;
153:16;161:22;
172:6;193:19

**B**

baby (1)
114:20
back (76)
5:5;9:14;14:2;
15:17,18,21;17:1;
23:14;41:23;43:7;
52:8;57:19;60:16,19,
23;61:8;62:6;65:18;
67:12;68:17;69:18;
70:19;74:14;76:17;
83:5;84:19;85:3,8,
12;87:19;90:23;
91:25;92:1;95:21;
97:15,23;99:13;
104:21;106:16;
107:2,3;110:2,10;
113:6;119:20;
122:25;125:6,7;
126:22;127:5;
131:19;140:11;
141:22;142:25;
143:8;145:17;
152:13;155:15;
156:24;160:11;
161:6;166:6,10;
168:24;171:15;
173:19;174:16;
177:16;182:15;
187:17,23,23;190:5,
20;191:10;192:20
backed (1)
139:3
back-feed (2)
126:22;127:11
back-feeding (8)
126:16,17,18,19,
20;127:22;128:9,14
background (7)
11:13,21,22;109:4,
5;113:24;150:11
backing (2)

27:25;74:2
backs (1)
191:12
backup (1)
162:7
bad (3)
40:6;105:20;112:5
bag (4)
181:2,17,18;195:5
bank (4)
82:24;83:6;84:15;
121:9
barbecue (4)
23:20;165:9,10;
194:24
base (3)
26:7;45:20;46:10
based (23)
30:8;45:11;47:11;
50:15;55:5;58:6;
81:7;90:20;91:1;
94:7,8;95:2,4;96:6,
21;98:5,8,10,18;99:3;
104:22;112:25;
170:18
basic (1)
105:8
basically (8)
11:22;37:4;42:3;
58:5;59:18;61:24;
85:15;92:15
basis (1)
189:25
baths (1)
185:13
batteries (8)
96:16;133:14;
157:13;161:2,3,15,
20;163:11
battery (51)
90:21;94:21,21,24;
95:16;96:4,6,10,11,
14,17,21,23;97:3,6;
132:22,23,23,25;
133:18,19,21;141:21;
152:25;153:10,13;
154:24;156:18,19,22;
157:12,15,16,19,19,
23;161:16,19,23;
162:7,10,11,14,16,17,
21,23;163:2,4,8,20
BBB (1)
139:16
beans (1)
158:6
Bear (2)
53:2,10
beautiful (1)
167:15
became (7)
18:22;24:10,12;
41:11;193:16,17,23
become (3)

54:17;119:1;
152:15
begin (1)
108:20
beginning (2)
151:11;162:4
behalf (1)
90:3
behind (2)
22:13;104:13
believes (3)
116:1,2,7
below (7)
22:17;147:5;148:7;
152:16;154:9,15;
156:21
benefit (2)
50:24;182:14
benefits (3)
34:2,3;76:14
beside (1)
134:19
besides (2)
170:7;174:15
best (13)
7:6,9;8:6;9:24;
29:22;30:6;33:6;
51:13,14;94:22;
105:25;157:13,22
bet (1)
143:19
Beth (1)
132:4
better (6)
8:22;29:2;139:14;
159:23;162:23,24
Betty (2)
124:16;132:1
bidirectional (2)
127:8,14
big (5)
63:6;76:18;179:4;
185:11,11
biggest (1)
180:1
bill (35)
33:17;36:14,16;
37:12;45:12,13;57:1,
5,17,21;58:7;59:23;
60:22;69:7,8;85:5;
88:2;90:17;91:16,21,
22;92:25;93:14;94:6;
95:5,23;98:2,4;99:3;
101:3;104:3;107:13,
15;142:9;143:13
billed (1)
79:24
bills (1)
117:8
Billy (4)
132:3;134:18,19,
23
birth (2)

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

11:4;102:23
**bit (26)**
5:20;11:12,20;
12:9;14:15;18:7;
28:19;36:2;41:6;
61:9;74:2;83:10;
99:10;113:19;119:8;
131:9;132:8;143:14;
147:24;150:5;
151:25;162:23;
163:25;171:15;
176:9;191:13
**black (2)**
14:18;166:15
**blank (1)**
76:10
**blanks (1)**
114:17
**blowed (1)**
105:20
**board (13)**
29:17;54:17,23;
79:14,15;104:10;
120:7,8,8,9,10;148:5;
149:4
**boat (15)**
84:3,4;165:22,22,
23;166:6;178:25;
179:2,10;180:17;
182:3;183:6;185:9,
12;195:5
**boating (1)**
166:8
**boats (12)**
84:3;164:6;165:20;
166:4;178:20,21,22;
179:18;188:12;
189:8,10,10
**boiled (1)**
51:22
**boiling (1)**
107:6
**boldfaced (1)**
140:1
**book (4)**
30:22;31:10;
149:11,13
**booklet (1)**
31:5
**books (5)**
72:2,5;82:6,7;
122:25
**born (1)**
11:2
**boss (3)**
24:15;40:21,21
**both (3)**
65:10;74:18;143:4
**bottom (1)**
92:13
**bought (21)**
70:24;75:7,9;84:2,
3;157:24;164:10,12;

165:21,23;167:10,11,
15;168:17;179:4,7;
180:8,11,17;182:3;
183:6
**bounce (2)**
86:18;87:8
**bounced (3)**
87:16;88:9;89:16
**bouncing (1)**
86:19
**box (6)**
32:17;111:23;
114:23,23;131:13;
142:3
**brain (1)**
14:2
**brand (1)**
16:5
**brand-name (1)**
158:4
**break (14)**
7:22,23;8:1;26:14;
76:25;84:18,20;
87:21;88:1;90:6,7,
10;98:16,17
**breakdown (4)**
102:12;103:9;
147:15;148:9
**breaker (3)**
141:17,23;142:2
**breakfast (5)**
182:7,9;185:20,23;
194:5
**breaks (1)**
7:21
**bring (2)**
17:15;97:23
**brings (3)**
60:15;98:20;
194:12
**broad (3)**
30:5;45:14
**broadcast (1)**
142:20
**brought (10)**
8:7,8;28:15;79:14,
15;89:1;119:8;
162:10,11;192:20
**Bruce (1)**
133:24
**BS (2)**
85:5;87:4
**BS'ing (1)**
65:18
**build (6)**
18:15;33:20,25;
45:6;77:23;78:5
**builder (1)**
135:5
**builders (1)**
137:8
**building (3)**
19:10;125:25;

188:10
**built (5)**
37:10;77:21;78:10;
94:10;167:16
**bulldozed (1)**
167:16
**bunch (4)**
12:14;112:15;
142:16;174:18
**Bureau (1)**
139:15
**burned (2)**
136:17;142:4
**business (23)**
70:25;74:9,10,12;
75:5,6,7,9,10;78:25;
104:13;119:13;
139:15;142:21;
150:13,14,18,20,21,
22;155:8;174:11;
188:22
**Bussell (4)**
66:14,14;133:8;
151:17
**B-U-S-S-E-L-L (1)**
151:18
**buy (11)**
84:7;91:5;106:25;
146:7;159:18;165:2,
5;171:2;174:21;
194:23;195:5
**buyback (1)**
96:1
**buy-back (1)**
93:23
**buyer (3)**
140:8;146:6,7
**buyers (4)**
139:21;140:4,5,13
**buying (7)**
159:5,9;165:19;
173:25;174:6,17,17
**buys (1)**
23:19

---

## C

**cabin (2)**
165:23;185:11
**calculated (1)**
97:18
**calculating (1)**
94:6
**calculation (1)**
60:20
**calculations (4)**
55:2,4,6;170:19
**calculator (1)**
26:13
**California (2)**
148:15;158:1
**call (58)**
6:13;8:18;35:16,

17;36:6,7;37:5;
39:16,17;40:15;
45:15,15;51:19;52:6;
56:17;59:14,14;64:6,
13;77:22;78:13;85:6,
23,24;86:7,19;89:24;
90:2;92:6;95:23,24;
100:16;101:11,24;
102:6;111:2;113:9,
14;116:13,14;119:6;
122:3;123:11;
124:22;125:3,6,7,11;
131:12;135:3;
142:18,19;152:6;
153:17;155:6;
174:23;195:23;196:5
**callback (1)**
125:9
**called (77)**
5:19;6:2;14:1,11;
16:14,15,20;17:17;
24:10;25:1;29:23;
30:13,22;37:13;38:2,
14;40:3;42:15;50:13;
52:19;62:15;64:8,16;
65:13;66:12;67:25;
68:1,3,4;69:1;72:4;
74:15;75:10;79:13;
84:24;89:15;93:25,
25;98:23;100:16;
103:1;106:15;108:8;
118:15;119:4,10;
121:13;124:8,20,22;
126:15,17;127:1,13;
136:11;139:10;
141:14,23;143:19;
145:4;153:7,23;
154:2,4;156:9;
157:18;158:11,12;
162:19;166:7,7;
177:17,22;182:17;
191:17;194:6,6
**calling (3)**
110:24;124:12;
156:14
**calls (6)**
72:15;90:2;100:17;
101:11,17,21
**cam (1)**
161:3
**came (35)**
18:10,23;23:14;
35:13;40:2;46:25;
48:4,5,6,8,9,9;62:23;
68:3;85:25;114:12;
120:7,8,8,9,9,14;
123:14;124:16;
131:17;149:4;
151:15,16;165:16;
170:10,20;177:23,23;
188:17;191:16
**can (83)**
5:5;7:4,22;8:23,23,

17;36:6,7;37:5;
24:9,8,9;12:9;17:13,
15,16;20:7;21:10;
25:25;26:2,9,13;
27:6;30:25;32:3;
34:14;36:2;40:14;
42:23;51:3;52:8;
54:1;58:7;63:11;
66:5;68:23;72:20,21;
74:17;75:8;79:8;
84:19;90:16,22;
91:22;92:4,5,21;
95:6;97:3,22;105:20;
110:1;113:18;
114:16;115:10,16;
125:16;127:8;131:9;
132:12;135:22;
137:7;138:20;139:8;
142:4,20;150:4;
151:25;152:10;
153:1;155:19;160:4,
6,19;164:6;168:6;
170:4;171:5;179:14;
185:12;191:1;192:2;
193:4;195:10;196:10
**cancel (10)**
71:24;72:12,17;
75:13;76:8;77:2;
81:21;82:1;123:12;
191:16
**canceled (14)**
67:12;72:14,15;
73:4,9;82:5,21;
107:10;119:19;
123:4,10;173:22;
174:5;191:15
**cancellation (5)**
74:7,8,17,22;75:24
**capacity (1)**
104:7
**capture (1)**
6:21
**car (2)**
174:24,25
**carbon (1)**
106:17
**card (9)**
72:22;104:14;
118:7,8,9,14;166:15;
188:24,25
**care (6)**
8:12;39:5;77:6;
83:2;84:16;194:3
**Carmean (2)**
124:16;132:1
**Carolina (1)**
155:6
**carried (1)**
181:3
**Carroll (2)**
34:21;35:5
**carrot (1)**
23:18
**carrying (1)**

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 95 of 162   PageID #:
791

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

195:18
cars (8)
    82:13;165:19,19;
    176:5,20;178:2,18;
    196:4
case (3)
    8:8;93:18;196:12
Casey (3)
    69:1;70:22;131:17
cash (26)
    72:22,24;82:24,25;
    85:14;117:7,8,16,17;
    118:7,13,19,21;
    119:22;120:17;
    121:11;123:1,7,10,
    11;165:22;179:8;
    180:25;181:5,7;
    195:6
catch (1)
    142:3
cats (1)
    89:8
caught (5)
    112:8;115:5,23;
    116:5,16
caulk (1)
    143:25
causes (1)
    129:22
CED (3)
    155:6,18,21
cell (1)
    22:9
center (8)
    35:12,16;36:6;
    38:7;39:16,17;89:20,
    25
centers (5)
    35:12;89:22,24;
    90:2,2
cents (5)
    26:15;94:2;145:16;
    146:16,17
CEO (6)
    19:1,2;20:8,15;
    21:4;107:21
certain (4)
    144:21;156:21,23;
    168:21
certification (2)
    54:1,17
certifications (2)
    12:25;13:6
certified (5)
    53:14;54:23;72:13;
    74:24;111:23
CFO (3)
    20:15;21:6;107:23
chance (1)
    104:2
change (10)
    26:24,25;42:5,9;
    128:2;146:24,25;

183:1,11;190:2
changed (19)
    26:22;42:10,14;
    61:3;74:6,15,16;
    94:4;97:12;110:11,
    14;182:10,12,13;
    183:5,21,22;190:6;
    193:2
changes (3)
    77:16,17;183:8
changing (1)
    42:13
Channel (1)
    138:21
charge (5)
    110:4;132:24;
    133:1,5;146:12
charged (3)
    10:22;147:10,11
charging (1)
    147:16
Charles (10)
    71:21;72:24;73:1;
    81:20,21,25;82:4,16,
    20;83:4
charter (4)
    84:5;174:15;
    188:22;189:7
Charters (5)
    166:8,17;169:23;
    180:19;189:8
Chattanooga (2)
    150:13,17
cheap (2)
    141:25;142:1
check (21)
    85:2,10,13;86:11,
    16,18,19,20,22;87:7,
    8,16;88:9;89:16;
    117:6;118:14;
    119:23;120:17,18;
    166:14;180:25
checks (14)
    48:25;83:11,12,16;
    113:24;117:18,20;
    118:6,18,21;121:2,
    20;142:15,17
Chem (4)
    157:12,12;162:10;
    163:12
chief (3)
    21:6,7;108:14
chime (1)
    10:14
China (1)
    159:21
choice (3)
    181:11,13,14
choose (1)
    92:10
chose (1)
    92:10
Christmas (2)

182:7;185:20
chunk (1)
    80:21
circuits (1)
    141:25
Cirrus (3)
    186:23,25;187:3
C-I-R-R-U-S (1)
    186:23
cities (1)
    125:24
citizens (1)
    159:17
City (1)
    135:17
clarification (1)
    109:24
clarify (7)
    8:6;22:3;70:11;
    75:22;103:12;130:7;
    196:17
clarifying (1)
    104:20
classes (3)
    12:7,20,21
clear (5)
    7:14;53:6;91:12
cleared (2)
    17:21;170:16
clearing (2)
    145:21;175:20
clearly (2)
    7:3,12
close (12)
    15:9;44:23;47:12;
    56:10;60:4;84:23;
    86:4;148:3;168:24;
    169:1;177:3;193:17
closer (2)
    16:21,22
closes (1)
    16:16
Club (2)
    171:18;189:4
Coca-Cola (3)
    14:17;15:18,21
code (3)
    111:20;124:17;
    130:20
Codes (2)
    130:17;135:17
collected (1)
    117:16
collecting (1)
    88:15
college (2)
    12:7,21
coming (13)
    20:4;36:20;56:18;
    84:19;129:9;131:19;
    165:18;173:11,20;
    183:17,22;192:22;
    196:2

comment (1)
    113:12
commission (12)
    26:4,5,6,9,11;
    27:20;119:17;148:8;
    160:15,20,21;183:3
commissions (1)
    168:25
commitment (1)
    92:6
communications (1)
    18:13
companies (17)
    11:17,18,23;53:13;
    79:9;80:8;106:21;
    123:8,9;130:3;
    135:15;147:6;
    158:12;159:12,14;
    184:20,21
company (144)
    13:9,11;14:7,7,8;
    15:11,25;16:2;19:12;
    20:16;22:22,23:9;
    24:7,21,24,25;27:22,
    24;37:5,5;43:23,25;
    44:10,22;51:1;52:14,
    16,21;53:24,25;54:1;
    57:13,20;58:16;64:2,
    12,16;67:4;68:1;
    71:24;72:5,7,8,10,13,
    15,17,23;73:8;75:17,
    19,20;77:17;78:3,24,
    25;79:4,13,13;80:9;
    81:12;82:8;83:3,25;
    84:4,5,5;85:1,21;
    86:21;96:9;102:8;
    104:4,11;108:5,7,9,
    19;110:24;115:17;
    116:20;118:12,20;
    119:12;121:4,8,20;
    123:21;126:12,24,25;
    127:13,23;128:1,9,
    22;129:8;130:2,8,14;
    133:6;135:16;138:3;
    139:22,25;144:20;
    148:17;150:13;
    151:10;154:6;
    157:25;159:4;
    162:24;164:1,2,9,23;
    166:7,8;168:15;
    170:14,20,23;172:2;
    174:21,22,25;175:4,
    6;176:18,22;177:17,
    25;178:18;184:18,
    21;185:3,19;186:2,4,
    15;187:4;189:7;
    196:6
company's (3)
    24:9;116:7;178:20
company-wide (1)
    67:24
compared (1)
    33:2

compensation (2)
    15:5;192:4
competitive (1)
    51:8
complain (8)
    51:20;64:2;69:25;
    125:8,9;138:17;
    143:20;156:9
complained (2)
    138:11,23
complaining (2)
    138:10;183:19
complaint (3)
    111:9;131:5,17
complaints (13)
    66:1,2;79:16,19;
    134:3;138:14;
    139:19,24;142:16;
    144:7;160:12;
    178:13;183:9
complete (9)
    27:11,12;28:2,8,9,
    11;128:3;135:7;
    192:7
completed (4)
    52:10;65:23;
    101:23;134:13
completely (5)
    13:5;85:10;86:13;
    128:25;139:15
complicated (2)
    5:13;33:5
computer (4)
    48:21;53:7;66:18,
    22
concern (3)
    111:9;113:6;
    194:22
concluded (1)
    198:3
condition (1)
    105:18
conduct (1)
    5:18
conduit (3)
    124:18;125:16;
    131:12
confirm (3)
    56:22;118:2,10
confirmation (1)
    109:15
connect (1)
    65:10
connected (5)
    28:4;70:18;124:19;
    158:6;190:21
connecting (1)
    111:23
connection (5)
    22:25;65:5,8;
    136:8,10
connections (1)
    136:4

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

consent (1)
    137:12
considered (3)
    27:11,12;175:8
consultant (2)
    19:19,20
consultants (1)
    148:18
Consumer (1)
    5:9
consumers (1)
    95:12
contact (6)
    24:16;50:20;52:9;
    64:2;128:12;172:15
contacted (1)
    37:4
contained (1)
    46:20
continue (5)
    64:21;72:23;
    115:10;191:6;192:12
continued (2)
    69:7;113:14
continues (1)
    99:8
continuing (2)
    67:5;127:17
contract (7)
    27:1;80:2,7;84:12;
    90:23;91:24;123:11
control (1)
    56:11
conversation (11)
    20:12,13;31:23;
    122:8,23;123:2;
    137:18;142:13;
    190:25;191:1;195:8
conversational (1)
    10:11
conversations (1)
    65:12
convinced (2)
    29:18;101:1
COO (2)
    20:15;107:22
Coomer (10)
    103:17,22;106:2;
    107:9,10,11,16;
    131:10;147:22;
    190:18
co-ops (1)
    130:4
copies (4)
    9:20;21:13,15;
    76:11
copilot (1)
    187:25
copy (15)
    9:8;20:17;32:22,
    23;49:6;55:13;70:4;
    102:24;106:15,17;
    149:13;153:18,22;
    196:9,12
corner (3)
    76:12,13,14
corners (1)
    141:8
corporate (1)
    121:14
correction (1)
    114:10
correctly (32)
    24:21;51:10,10,15,
    24,24;67:14;69:6,11;
    70:24;79:25;104:5;
    110:12;111:19;
    112:18,19;113:13;
    127:12;133:11,11,12;
    138:24;141:3,5;
    143:15,21;151:1,20;
    160:10,13;183:17;
    191:24
correspond (1)
    184:14
Corryton (2)
    11:8,9
cost (24)
    57:13;59:23;61:25;
    62:2,2,4,13;72:21;
    80:3,4;91:7;98:20;
    99:4,7;100:3;101:3;
    132:23;133:21;
    141:16;145:16,19,20;
    147:13;182:20
costs (6)
    73:19,20;83:22;
    145:25;146:1;184:22
counted (1)
    118:1
counties (1)
    184:23
country (3)
    159:17,19;160:2
County (3)
    11:10,11;12:5
couple (12)
    23:14;37:8;50:10;
    69:5;70:19;74:5;
    90:16;112:6,10,24;
    155:14,16
course (1)
    88:4
courses (1)
    12:23
court (1)
    6:21
cover (1)
    115:13
covered (1)
    15:5
COVID (1)
    110:19
CPA (1)
    63:19
Craig (95)
    9:12;16:10,12,14,
    18;17:2;18:12,25;
    19:2,9;20:12,14,18;
    21:4;22:5,21,24;24:2,
    14,16,24,24,25;
    25:21;27:15;28:22,
    23;39:2,3;40:22;
    43:10;44:24;46:6;
    47:7;48:17;58:11,18;
    61:15,18,20;65:5,17;
    67:16,19;69:19;
    85:24;89:1,3,6;
    107:21;108:1,11;
    109:1,3,18,25;110:2,
    5,7,9;115:24;117:17,
    18;118:2,23,24;
    120:6;123:18;
    132:11;133:1,4;
    134:7;139:19;140:8;
    161:16;164:3,20;
    167:2,4,25;171:11,
    17;172:3,21,23;
    181:14;186:5;
    189:15,18;190:24;
    192:14,17;193:16;
    195:24;197:3
Craig's (2)
    24:15;132:10
cream (1)
    157:21
created (3)
    48:16;49:2;50:21
credit (19)
    34:5;37:10;40:5;
    61:6,10,14,21;62:21;
    63:14;64:3;66:3;
    69:9;72:5;84:21;
    95:23;98:20;99:5;
    118:8,9
crew (11)
    27:9;111:21;
    131:22;134:20;
    135:1;146:16;
    155:12;160:14,17,21;
    177:13
crime (1)
    10:22
criminal (1)
    109:5
CRM (1)
    68:1
Crofton (1)
    137:15
crop (1)
    157:21
cruiser (2)
    165:24;185:11
crunch (1)
    176:6
cubicles (2)
    177:11,12
current (5)
    17:18;58:4;91:21;
    93:14;95:5
currently (5)
    11:6;45:14;57:21;
    98:3;127:2
customer (144)
    33:15,21;34:10;
    35:24;36:18,20;37:3;
    45:5,11,13,16;56:16;
    57:14,16,21,23;58:2;
    59:11;64:6,13,16,18,
    21;65:18,25;66:2,12;
    67:13;68:7,8;69:3,7,
    17;70:1,2,12;71:19,
    24;72:11,12,15,16,
    19,20;74:1,6,7,8,8;
    75:11;77:1,6;78:8,9,
    13;79:7;80:8;81:20;
    82:17;84:25;85:2,4,7,
    9,10,13;86:4,8;87:8,
    12;88:8,14,20;90:21;
    91:14,21;92:7,9,23;
    93:4,8;94:11,13;
    95:3;96:20,22;97:17,
    22;98:6,21;99:2,13;
    100:6,11,13,20,23;
    101:1,7,8;102:6,20;
    103:2,22;106:10,13,
    14;107:2,3;111:2;
    112:14;113:13;
    114:3;115:8,15;
    123:9,13;124:5,7,15;
    125:4;128:12,13;
    131:6;132:4,10;
    133:23;134:8,9;
    139:2,3;140:10;
    142:6,10,25;143:3,9;
    144:4,7;147:10;
    153:7;156:14;
    161:19;190:20
customercare@SolarTitanUSA (1)
    78:16
customers (108)
    8:9,13;35:14,17,
    19;36:4,7,11;39:12,
    18,25;43:3,24;44:20;
    46:10;50:13,14;
    51:19,25;52:8;55:19;
    60:6;61:20,23;63:13,
    18,22;64:5,8,9,14,15;
    65:13,22;66:5;67:11;
    68:5,20,25;69:9,15;
    70:6;71:17;72:25;
    75:22;78:6;84:22;
    85:18;88:7,12,22;
    91:5,8;95:1;100:8;
    101:18;104:22,23;
    110:22;111:8,18;
    112:6,7;116:18,24;
    117:4,16;118:8,13,
    22;119:2,22;121:11;
    123:4;124:13;125:8;
    126:2,7;128:6;
    131:16,24;133:14;

customer' (1)
    71:14
customer's (8)
    39:4;57:1;58:6;
    90:3;98:2;112:21;
    116:5;128:15
cut (11)
    41:20,22;91:18;
    96:1,1;128:7;136:15;
    147:2;162:13;
    177:16;182:21
cutting (2)
    129:8;141:8

D

d/b/a (2)
    75:6;78:25
Dale (7)
    66:16;149:15;
    150:4,5;151:10,20,22
Dale's (1)
    66:16
Dalton (1)
    158:22
dangerous (2)
    127:19,20
Daniels-Hill (144)
    5:11;17:4;21:12,
    22;22:1,3,8;31:19;
    32:5,11,14,18,21;
    34:19,22,25;35:6;
    36:15,19;39:15,23;
    40:20;43:11;48:14,
    18,22;49:1;53:4,17,
    19;59:2;62:11;70:11;
    71:11;75:21;76:1,21;
    77:4,19;78:4,17,20;
    86:1;88:24;90:5;
    93:10,22;94:5,12,17,
    25;95:10;96:5,13;
    97:1,7,20,25;98:8,12;
    99:16,20,23;100:1,5,
    8,25;101:10;102:1,5,
    11,16,25;103:4,8,11,
    15;104:19;105:1;
    109:9,11,23;119:1;
    120:12;121:1,6,19;
    124:11;130:6;133:4;
    138:7;144:9;145:8;
    146:11;147:7,14,18;
    153:21;156:16,25;
    157:3;161:1,9,13;
    163:5,10,15;165:1;
    138:10,13,17,23;
    139:13,20;140:15,19,
    20,22,23;142:23;
    145:9;147:14;
    148:11;150:25;
    158:23,25;159:2,9;
    160:10,12;161:21;
    173:22;181:24;
    183:10

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

168:6,11,20;169:2,
10,14,17;171:1;
173:6;174:8;175:7;
176:2,15;178:11,17,
22;179:1;184:13;
185:5,14,18;186:7,
12;187:6;189:11;
192:9,13,21,24;
193:6,9,13;194:15;
196:8;197:17;198:1

**dark (2)**
28:4,7

**data (6)**
68:6,6;153:2,3;
157:14;158:20

**database (1)**
68:8

**date (5)**
11:4;102:23;
163:14;176:10;190:8

**dated (3)**
20:6,6;197:8

**daughter (1)**
194:1

**David (6)**
70:2;71:18;111:3,
6;112:21;131:19

**day (26)**
17:17;22:1;29:25;
41:4,14;44:18;55:25;
56:4;61:4;74:10,12;
80:13,14;96:22,23,
25;105:15,25;
107:16;115:15;
116:15;119:11,21;
144:24;152:17;
197:23

**days (21)**
29:4,10,11;41:3,15,
16,18,20,23;61:19;
71:23;72:11,13;73:5;
74:9;77:2;105:17;
144:21;176:5;
178:15;180:16

**day-to-day (1)**
108:16

**deal (7)**
8:4;16:17;30:3;
64:18;89:7,9;166:12

**dealer (1)**
154:4

**dealings (3)**
150:15,21;151:22

**deals (1)**
16:24

**dealt (4)**
50:14;101:18;
107:4;140:23

**Deanne (2)**
64:7;143:9

**Deb (6)**
132:8,9,9,15,22;
133:18

**debts (1)**
170:23

**December (11)**
42:6;69:4;70:13;
96:1;168:23,23,24;
180:10;182:6;183:9,
12

**decide (1)**
77:2

**decided (5)**
15:18,20;119:21;
123:20;191:7

**decides (1)**
72:11

**declined (1)**
143:5

**decrease (1)**
183:14

**dedicated (1)**
35:12

**deducted (1)**
182:19

**deer (1)**
33:2

**definitely (1)**
28:13

**degree (1)**
12:17

**degrees (3)**
152:16;154:16;
156:17

**demonstrate (1)**
95:6

**denies (2)**
189:22,23

**department (9)**
20:6,24;34:4;
64:21;124:7;142:14;
150:9;160:24;174:24

**deposit (3)**
73:13;81:6;121:2

**deposited (2)**
83:11,16

**depositing (2)**
118:13;121:3

**desk (1)**
176:8

**Destin (7)**
166:2;167:22;
168:1,7;169:8;180:1,
7

**detail (3)**
98:2;161:7;182:11

**detailed (1)**
68:13

**details (7)**
5:13;7:20;32:6;
112:1;122:24;
149:21;195:7

**determine (7)**
37:14;47:4;75:23;
94:9,18;97:9,16

**determines (1)**

**died (1)**
116:12

**difference (3)**
76:18;162:12;
173:11

**differences (1)**
130:12

**different (31)**
8:15;11:16,17;
12:22,23;26:23;
34:11,14;76:16;77:1,
20,24;78:2,3,11,18;
93:5,5;102:15;
118:12;119:25;
121:6;130:5,15;
143:8;157:15;
158:10;169:6;174:9;
175:20;176:10

**difficulty (1)**
7:12

**dime (2)**
190:10,11

**dinner (4)**
185:24,24;187:17;
194:5

**direct (5)**
24:16;65:4,7,10;
110:2

**directed (1)**
115:17

**directing (1)**
12:12

**directly (24)**
22:5,6;24:14;
58:13,14;74:24;83:5;
89:5;114:22;118:24;
120:19;121:9;127:5,
6;138:12;141:17;
142:18,19;149:3;
155:3,4,5,9;187:5

**director (5)**
19:25;24:11;30:2;
133:10;150:9

**directors (3)**
174:23,23;175:8

**disability (1)**
143:11

**discharge (1)**
157:6;162:1,17

**discount (7)**
88:18;98:19;145:5,
6,10,11,13

**discussed (1)**
84:22

**distinguish (1)**
80:3

**divide (2)**
45:18;146:20

**divided (2)**
56:3;105:12

**Dividend (4)**
72:6;79:13;116:20,
23

**Division (1)**
5:10

**dock (1)**
14:18

**doctor (2)**
17:21;112:11

**document (29)**
8:24;21:17;30:20;
43:15;45:1,23;46:1,2,
3,8,9,12,19;47:1,5,
13;49:2,5,11,13,21;
58:4,10,19,19,21;
149:8,9,10

**documents (4)**
8:7;42:6;77:24;
78:11

**dollar (10)**
26:15;51:2;112:13;
123:23,23;164:11,12;
165:3;167:16;196:4

**dollar-plus (1)**
167:9

**dollars (1)**
169:1

**done (56)**
7:6,9;12:7,11;15:1;
28:3;29:25;33:3;
35:1,4;42:8;51:10,10,
23;52:10;53:16;63:4;
64:24;69:11,20;
72:18;75:6;82:17;
83:24;86:14;101:23,
23;111:1,6,19,20;
113:13;118:11;
124:14,17;125:1;
126:23;129:19,21,25;
130:22,23;131:11;
133:11;134:2,2,12;
135:13;140:17;
149:5,6;152:2;
160:13,16;170:15,17

**Dorsemer (4)**
122:3,6,7,10

**double-wide (1)**
37:19

**down (51)**
15:15;18:10;20:4;
26:14;37:20;41:20,
23;47:25;55:5;56:6;
65:2;91:18;98:17,17,
21;99:7;119:20;
124:2;127:10,10,16;
131:13,15;136:17;
143:2;148:7,22;

**155:17;158:2,3;
164:13;165:24;
166:3;167:12,13,16;
177:4;179:21;1___
7,8,12,12,16;18__,
184:4;187:2,3,15;
189:2;191:24

**downhill (1)**
111:17;151:21;
182:4

**downloaded (1)**
102:24

**dramatically (3)**
42:13;110:15;
147:2

**drawings (1)**
135:13

**drive (2)**
56:14;174:24

**drives (1)**
174:22

**driving (2)**
196:3,3

**drop (1)**
120:18

**dropped (2)**
81:5;118:19

**dropping (1)**
48:25

**drove (2)**
114:22;134:20

**drugs (1)**
113:8

**dud (2)**
39:5;40:3

**duds (1)**
38:13

**due (9)**
84:14;92:13;190:9,
17,18,19,21;192:6

**duly (1)**
6:2

**dumpest (1)**
40:13

**during (5)**
29:12,18;85:18;
86:1;173:21

**E**

**earlier (3)**
45:4;84:12;150:5

**early (1)**
56:23

**earned (1)**
160:20

**East (1)**
167:5

**eat (2)**
182:9;194:12

**edge (1)**
86:5

**effort (1)**

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

144:18
**Eight (2)**
110:18;168:17
**either (23)**
23:16;35:14;37:1;
63:11;72:20,21;
88:20;111:14;
113:11;116:19;
117:6;118:2;128:4,5;
135:10;138:3;
144:23;169:23;
173:17;186:14;
188:2,6;192:13
**electric (47)**
33:17,19;36:14,16;
37:12;45:12,13;
57:17,21;59:23;
60:22;90:17;92:25;
93:14;95:5;96:9;
98:2,4,14;99:3,8;
101:3;104:3;107:13,
15;110:24;126:12,24,
25;127:12,23;128:1,
9,22;129:8;130:1,3,8,
14;135:15,16;
140:21;141:2;142:9;
143:13;150:12;
184:20
**electrical (8)**
33:15;59:11;
111:21;114:23;
125:25;131:13;
135:14;142:5
**electrician (8)**
111:24;112:9;
115:1;135:4,23;
136:3;137:13,25
**electricians (4)**
111:22;116:16;
136:9;137:9
**electricity (7)**
30:15;57:13;58:7;
59:8;91:7;99:9;127:4
**electrocute (1)**
127:18
**electrocuted (4)**
69:14;111:25;
114:2,11
**eligibility (1)**
37:14
**eligible (1)**
87:12
**else (11)**
31:15;58:19;77:23;
78:1;104:9;109:19,
21;118:5;152:3;
173:24;193:21
**Elvis (1)**
132:6
**email (19)**
9:1;20:5;49:4;
50:19;53:10;58:12;
69:3,13;74:25;76:17;

77:6,8;78:15,18;
102:20;114:12,19;
149:19;197:20
**emails (4)**
78:21;79:3;186:10;
196:11
**embalming (1)**
12:12
**embarrass (1)**
10:18
**employed (5)**
140:1;171:25;
176:18,22,23
**employee (12)**
18:18;43:22;57:23;
84:13;110:5;114:3,4;
115:2;120:10;
124:10,10;186:8
**employees (21)**
31:25;42:16;44:3;
65:9;82:10;84:9,11;
115:3;124:2;126:3;
155:14;168:15;
174:21;175:7,11,19;
177:4,6;178:23;
181:23;186:4
**employer (2)**
22:19;23:19
**employment (4)**
174:9;196:14,23,
24
**end (9)**
17:3;80:18;82:8;
85:12;86:3;100:9;
102:7;184:19;191:20
**endeavors (1)**
180:3
**ended (2)**
62:7;134:23
**Energy (13)**
34:4;70:15;95:20;
97:2;107:14;148:18;
156:22,24;157:1;
161:17,23;162:5;
163:7
**engineer (1)**
135:13
**enjoyed (1)**
29:21
**enough (1)**
91:10
**Enphase (2)**
157:25,25
**entered (1)**
177:20
**enters (1)**
102:22
**equal (1)**
105:9
**equipment (2)**
83:22,23
**Ernie (6)**
66:13;133:8,10,12;

151:17,20
**especially (1)**
156:6
**essentially (1)**
88:18
**estate (4)**
11:24;165:11;
169:22;170:6
**estimated (2)**
92:16;104:21
**ethic (1)**
89:10
**even (48)**
6:24;26:23,24;
27:13,18;28:20;
29:17;38:11,16,22;
41:22;47:8;54:2;
55:14;56:16;61:19;
62:7;75:19;79:7;
87:5;104:12;108:14;
110:25;112:12;
115:22;116:5,17;
119:19;125:19;
128:10;130:24;
134:17;135:3;
137:21;139:17;
140:22;143:2,14,21;
147:11;149:12;
173:4;183:23;185:1;
186:5;190:13,15;
194:19
**Evenson (4)**
70:2;71:18;111:3;
131:19
**E-V-E-N-S-O-N (1)**
70:3
**eventually (1)**
82:23
**Everglade (1)**
179:13
**everybody (12)**
9:22;10:17;31:15;
61:11,13;62:21;
63:10;116:2;142:18;
173:10;188:18;
194:13
**everyone (2)**
168:16;193:10
**exact (4)**
48:2;75:19;147:9;
163:13
**exactly (3)**
53:3;115:9;197:22
**EXAMINATION (1)**
6:4
**examined (1)**
6:3
**example (9)**
49:13;81:16,21;
103:17;123:3;
138:16;143:10;
185:20;189:1
**excelled (1)**

17:22
**excess (8)**
94:23,23;95:21;
96:3,10;162:15,15;
163:3
**exchanged (1)**
195:7
**excuse (2)**
110:20;191:16
**executive (1)**
20:4
**exhibit (31)**
21:11,18,19;31:20,
21;43:12,13,16;
46:15,16;47:17;
48:12,13,15;49:1,14;
59:3,4;71:10;77:15;
97:15,20,23;103:19;
104:24;161:13,14;
163:6;196:7;197:13,
14
**Exhibits (2)**
97:9;161:7
**exit (1)**
192:6
**expect (3)**
25:22;41:7;58:7
**expecting (1)**
27:19
**experience (2)**
66:9;154:21
**experienced (1)**
14:14
**experiences (1)**
68:24
**expires (1)**
8:2
**explain (18)**
19:11;20:10;26:9;
27:7;28:17;30:17;
34:14;95:11,17;98:1;
100:12;120:14;
125:11;138:15;
145:9;163:6;165:17;
166:22
**explained (6)**
25:7;43:18;100:5;
122:15;166:24;
182:11
**explaining (5)**
39:24;53:5,8;
104:22;172:10
**explains (3)**
54:21;152:24;
153:3
**Exploria (11)**
14:11;16:3,12;
17:2,3;18:7,9,10;
24:6;25:18;171:18
**Express (1)**
166:16
**extra (4)**
98:13;157:1;

159:20;178:7
**extraordinary (1)**
175:12
**extremely (1)**
153:8
**ex-wife's (1)**
17:18
**eyes (4)**
27:14,15;63:1;
108:13

---

## F

**Facebook (2)**
35:14;139:8
**fact (7)**
50:6;136:10;
156:10;176:11;
177:9;181:22;190:3
**facts (1)**
91:1
**factually (1)**
50:7
**failed (6)**
111:7;127:25;
128:1;131:18,20;
134:1
**fails (1)**
142:2
**faith (1)**
139:25
**fall (1)**
14:2
**falling (2)**
44:5,7
**false (2)**
54:8;55:11
**familiar (1)**
10:5
**family (9)**
18:22;84:7;165:19;
166:2,10;167:10;
172:14;187:16,23
**fan (3)**
85:20;193:19,21
**fancy (1)**
164:4
**far (19)**
66:17;104:14;
108:8;111:11;
114:19;120:10;
129:8;144:24;
157:13,21;160:20;
162:21;176:10;
180:17;183:11;
186:4;193:24;
194:19;197:5
**farm (1)**
141:4
**fast-forward (1)**
162:18
**father (1)**
180:15

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

fault (4)
60:2;116:3,7,8
feathers (1)
66:20
February (5)
22:14;35:3,3;
183:15,15
federal (2)
53:14;98:20
fee (4)
72:21;73:17;
100:14;182:18
feed (1)
127:17
feedback (3)
110:23;133:3;
134:7
feel (6)
10:14;18:4;23:17,
18;24:1;162:4
feeling (1)
100:9
feet (1)
14:19
fell (1)
14:19
felon (2)
109:6,12
felt (2)
55:18;195:17
FEMA (8)
85:3,7,8,20,21;
86:25;87:1;88:12
few (10)
32:6;39:16;91:9;
137:2;150:24;151:5;
176:5;178:10;
181:11;192:10
field (1)
156:8
Fifth (1)
176:17
figure (3)
57:17;95:11;
182:23
figures (1)
176:1
file (3)
20:8;69:8;132:18
files (2)
8:8;31:12
fill (4)
36:25;114:16;
122:23;149:18
filled (2)
37:3;177:12
filling (1)
100:21
final (3)
136:4,8,10
finally (2)
70:18;124:24
finance (13)

72:7,8;80:9;83:3;
99:17,18,20;101:5;
102:8;121:3,8,20;
123:9
financial (4)
21:6;79:11;108:15;
121:15
financially (3)
171:14;172:25;
195:21
financials (1)
196:1
financing (17)
34:8;62:3,8,9;79:8,
9;80:7,9;81:12;
101:5;102:18,25;
103:9;116:19;117:1;
119:3;122:24
find (14)
15:23;33:18;45:18;
52:17;54:16;62:17;
68:19;87:20;89:14;
95:5;123:9;139:14;
140:1;182:5
finding (6)
47:12;52:9;63:3;
65:21;69:10;104:8
finds (1)
83:3
fine (8)
23:24,25;80:20;
87:22;92:12,19;
155:20;196:12
finished (1)
86:13
Fire (12)
42:21;112:8;115:5,
13,15,23;116:6,9,10,
16;130:18;142:3
firearm (2)
195:15,17
fired (6)
111:14;113:4,4,8,
11;177:24
First (32)
10:7;13:9;18:17;
23:8;27:1;37:8;
39:13;40:5,5,25;
41:3;46:1;48:4,5,8,
15;49:13;58:15;
61:10;63:17;121:24;
135:13;157:11;
162:2,3;171:11,12,
13;182:8;183:6,14;
195:11
firsthand (3)
64:5;65:21;124:8
fishing (5)
166:9;179:17;
180:20;189:8,10
five (12)
33:7;37:12;39:21;
41:23;44:18;148:4,4,

6,7;159:14;175:10;
184:20
five-year (1)
63:12
fix (1)
134:22
fixed (2)
144:1,1
fixing (5)
18:14;23:17;95:6;
128:24;134:23
flag (2)
51:17;82:14
flew (3)
187:2,15,17
flies (1)
187:23
floating (7)
72:2,4,24;82:6,7;
122:25;123:1
Florida (12)
22:24;84:3;166:2;
167:23;188:9,9,11,
192:18,18,19;193:3,4
flow (5)
82:24,25;123:7,21;
124:1
flowing (2)
124:1;178:16
flows (4)
127:5,5,5,7
flunked (1)
139:15
flying (3)
186:25;187:12;
189:3
folder (4)
77:3,23;78:12,12
folders (6)
77:1,20,21,23;78:5,
7
folks (1)
180:20
follow (1)
114:13
followed (1)
111:5
follows (1)
6:3
follow-up (8)
7:8;17:5;32:6;
37:6;39:13;54:10;
112:24;144:8
follow-ups (1)
138:6
food (2)
194:12,12
fool (1)
113:15
foot (1)
173:10
Force (7)
67:25;68:2,3,4;

108:21;112:14;
144:16
foreign (2)
159:17;160:1
forgot (1)
171:24
form (7)
36:25;37:3;43:3;
92:7;94:16;97:13;
140:12
formal (1)
10:9
former (2)
50:19;149:23
Formula (1)
185:11
Fort (2)
164:16;170:7
forth (1)
69:18
forward (16)
17:16;24:1;36:5;
59:5;60:11;69:22,23;
107:9,12;110:25;
118:3;122:8;172:1;
175:24;177:15;191:9
forwarded (1)
137:16
found (12)
17:17;18:24;23:10;
44:22;47:2;52:14;
61:11;62:19,22;63:8,
24;183:8
foundation (1)
196:21
four (25)
8:15;26:18;29:24;
37:12;39:21;41:4,14;
44:17;66:8;86:16,18;
93:12;94:2;110:17;
123:7;159:13;167:8;
178:21;180:16;
184:19;187:15,19,22;
188:14;194:25
four- (1)
68:18
fragile (1)
14:22
frame (2)
183:1;188:13
free (5)
10:14;18:4;24:1;
65:19;132:25
freedom (4)
24:18;29:21,22,23
Friday (3)
41:1;191:17,21
friend (2)
51:14;184:17
friends (11)
18:22;51:13,14;
65:22;166:2;167:10;
172:8;175:13;

193:16,17,24
friendship (1)
194:11
front (3)
23:18;80:18;176:...
frustrating (1)
5:13
F-U-C-K (1)
195:12
full (8)
6:6;27:22;51:23;
81:18;92:2;104:6;
191:11;195:5
fully (3)
125:25;137:21;
187:18
functions (1)
152:24
fund (1)
118:16
funding (4)
27:23;72:19;84:13;
85:8
funds (5)
72:6,8,22,23;
118:13
funeral (1)
12:12
funny (1)
60:14
further (1)
41:23
future (1)
60:11

**G**

gather (1)
8:18
Gatlinburg (3)
23:2;171:18;
173:15
gave (20)
31:7;32:12;43:9;
44:1;46:5,8,18;
47:22;51:7,9;58:10;
71:4,5;81:17,22;
112:15,22;165:4;
171:22;173:4
geared (1)
106:13
Generac (14)
152:16;153:23;
154:4,23;155:9;
157:8,10,15,16;
161:4;162:20;
163:11,20,22
general (7)
5:8;96:22;121:13,
14;139:5;150:1...
162:13
generally (1)
28:18

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

**General's (1)**
5:9
**generate (4)**
35:20,23;36:9;
163:7
**generated (1)**
95:24
**generation (1)**
89:9
**Generators (1)**
157:17
**gentleman (6)**
109:15;114:10,21;
118:17;149:16;
184:25
**gentlemen (1)**
111:13
**Georgia (11)**
25:2;69:14;112:1;
114:1,9;124:16;
131:23;132:1,6;
138:25;158:22
**Gerkin (1)**
112:21
**German (1)**
158:21
**gets (11)**
62:21;79:22;99:5;
102:23;125:8;
136:15;153:16;
156:17,21,23;160:10
**get-togethers (1)**
186:1
**given (20)**
10:6;36:10;43:5,7;
44:4,10,13,20,24;
46:3;57:20,22;58:11;
117:17,18;118:22;
132:21,25;145:13;
163:6
**gives (3)**
45:13;95:22;
174:22
**giving (8)**
8:23;17:7;32:14;
72:19;82:10;85:3;
94:25;115:20
**glass (11)**
26:19;27:6,7,10,
21;81:3,4,11;86:12;
160:23;183:4
**Glen (3)**
137:23;138:2,2
**God (1)**
60:15
**goes (13)**
23:19;30:17;78:24;
94:23;95:21;99:9;
100:15,18;102:21;
107:24;122:25;
127:16;141:20
**Good (23)**
8:4;10:5;15:23;

41:14;44:18;80:21;
84:18;105:17;
107:16,17;119:12;
134:9;137:23;
150:11;151:5,6;
154:23,24;157:16;
158:4;166:12;172:8;
197:15
**Google (4)**
35:14;38:8;39:16;
153:22
**gotcha (4)**
9:21;14:14;117:15;
153:20
**government (2)**
87:1,6
**grab (1)**
26:13
**grade (1)**
182:6
**graduate (1)**
12:16
**graduated (1)**
12:13
**great (17)**
8:12;18:22;71:7;
82:20;85:21,21,22;
111:2;119:10,11;
122:22;125:7;
134:11;141:4;153:2;
157:25;158:2
**greater (2)**
59:21,22
**Green (1)**
197:6
**Greene (1)**
132:6
**grid (7)**
95:21;96:12,15;
126:20;127:11,16;
141:22
**Grim (1)**
190:19
**ground (3)**
38:2;124:19;
125:15
**groups (2)**
139:7;176:11
**guess (5)**
29:18;31:9;54:4;
100:25;150:9
**Guideline (6)**
45:3,9;47:14,16;
48:15;50:2
**guidelines (2)**
50:22;53:14
**Gulf (1)**
179:19
**Gupton (1)**
12:11
**gut (1)**
40:9
**gutted (1)**

164:14
**gutter (1)**
131:15
**guy (7)**
66:16;71:7;119:10;
120:3;134:11;
143:25;194:9
**guys (16)**
29:1;40:8;59:6,9,
12,13;60:17,24,25,
25;97:8,8;110:23,25;
114:14;154:21
**guy's (3)**
115:22;120:2,4

## H

**half (14)**
15:10;26:16,18;
37:21;52:2;63:6;
110:13;119:18;
123:23;164:11;
165:2,16;183:2,3
**halfway (1)**
28:11
**hand (3)**
58:13;107:16;
110:12
**handed (15)**
30:20;32:23;42:24;
45:2;47:13;58:4,14,
21;76:10;78:11;
84:12;118:23;149:8;
181:10;195:20
**handful (1)**
145:2
**handle (1)**
63:20
**handled (3)**
52:20;102:14;
104:11
**handles (1)**
90:1
**handshake (1)**
27:4
**hang (1)**
124:9
**hanging (1)**
193:25
**hangs (1)**
101:23
**happen (8)**
56:1;68:21;128:21;
129:6,9,10;142:4;
183:15
**happened (25)**
14:16,23,24;18:8;
42:10;70:18;82:19;
87:9;110:19;111:10;
112:10,10,17;115:12;
118:4;134:9;136:18;
146:25;164:21;
165:15;178:5,14;

182:1;192:18,19
**happening (4)**
68:19;182:2,24;
188:16
**happens (5)**
79:7;97:2;99:11;
129:2;152:3
**happy (3)**
87:24;111:19;
181:22
**hard (8)**
13:1,23;17:14,23;
72:19;150:25;151:9;
153:10
**hardly (1)**
91:9
**hardware (5)**
11:23;13:11,12,13;
14:7
**Hasson (2)**
13:11;14:6
**head (11)**
7:1;14:19;15:14;
17:9;36:6;47:24;
56:5;65:1;148:21;
178:8;179:20
**headlights (1)**
33:2
**heads (2)**
20:6,24
**hear (3)**
63:13;104:17;
139:19
**heard (10)**
50:10;54:11;72:2;
89:8;120:3,25;124:6;
144:12,13,14
**hearsay (2)**
111:25;114:12
**hedge (1)**
57:12
**hefty (1)**
123:20
**help (7)**
6:23;8:22;140:15;
142:23;143:14,15;
144:3
**helped (1)**
173:1
**helpful (1)**
7:10
**Helton (8)**
20:14,18;32:13;
34:24;35:1;109:14;
113:22;114:13;
120:8,19;176:22
**Helton's (1)**
112:3
**herding (1)**
89:8
**here's (2)**
20:3,3
**herself (1)**

153:24
**Hey (7)**
10:15;18:4;29:19;
56:18;59:19;155:22;
160:4
**hidden (2)**
156:1,2
**high (1)**
12:3
**higher (4)**
37:11;51:1;167:11;
175:18
**highest (3)**
148:14,15,17
**highlighted (1)**
97:16
**Hill (4)**
119:6;120:13,19;
158:5
**himself (1)**
134:24
**hire (2)**
144:12,19
**hired (5)**
19:15,18;172:1,4,6
**hiring (5)**
19:16;31:24;
113:19;177:14,15
**hit (3)**
14:19;169:8,9
**hoarding (1)**
176:7
**hold (4)**
27:23;72:23;82:22;
181:17
**hole (1)**
134:20
**holiday (3)**
144:23;171:25;
172:6
**home (64)**
23:20;29:25;34:3;
37:9,10,17,17;38:4,5;
39:4;48:21;54:2;
69:5;70:19;84:3,6;
91:11;101:9,17,20;
112:7;115:5,12,22;
116:5;123:23;
126:21;127:3,3,6,8,9;
134:22;136:16;
156:24;161:25;
164:11,12,19;165:3,
5,12,25;167:3,16,17,
22,25;168:7,9;170:7;
171:21,22;173:2,3,5;
180:8,11;188:9,11;
191:15;194:13,14,23
**homeowner (1)**
37:9
**homes (13)**
37:20;164:6;
165:13,19;167:1,5,7,
9,10;170:8;172:12;

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

174:6,17
**homes-wise (1)**
188:9
**Honey (1)**
165:4
**hope (1)**
162:25
**hopefully (1)**
84:16
**Horizon (11)**
75:2,4,6,7,10,12,
15;76:3,14;78:24;
117:21
**Horizons (1)**
169:24
**horrible (1)**
151:5
**HORTON (3)**
6:1,8,11
**H-O-R-T-O-N (1)**
6:12
**hotel (1)**
173:12
**hour (2)**
45:16;96:17
**hours (4)**
80:12;90:8;96:18;
189:2
**House (10)**
13:11;14:6;56:17;
70:25;125:19;165:7;
167:3;168:8;171:2;
173:18
**housed (1)**
179:18
**houses (1)**
173:25
**HR (2)**
191:21;196:25
**huge (1)**
158:1
**Huh (1)**
109:10
**Humans (3)**
129:18,23;136:16
**hundred (10)**
9:19,21;27:24;
65:11;90:25;91:10;
112:13;118:21;
177:8;196:3
**hung (3)**
23:18;124:21,23
**hurt (1)**
116:12
**husband (2)**
132:5;143:11
**hush (2)**
112:15;195:24
**Hyundai (1)**
158:11

**I**

**ice (1)**
14:18
**idea (5)**
50:23;84:18;
143:18;170:13;
194:18
**Ideal (13)**
75:1,4,6,7,10,12,
15;76:14;77:12;
78:24;105:18;
117:21;169:23
**ijuicz (1)**
106:22
**imagine (1)**
181:20
**immediately (1)**
191:18
**incentive (1)**
86:5
**include (1)**
80:5
**included (1)**
146:3
**includes (2)**
62:15;145:20
**including (3)**
62:12;74:9;99:4
**income (2)**
140:24;141:1
**incompetent (2)**
152:7,9
**incorporation (1)**
109:1
**incorrect (4)**
44:15;45:23;105:2,
5
**incorrectly (1)**
141:6
**increase (2)**
57:25;183:13
**increases (1)**
34:3
**increment (1)**
63:12
**increments (1)**
56:4
**Indicating (4)**
48:5;99:15;117:14;
145:22
**individual (7)**
83:9;89:2;118:2;
130:12,14;164:10;
169:25
**individuals (1)**
175:3
**industry (2)**
27:6;174:19
**inflated (1)**
145:15
**inflation (5)**
98:9,11;99:4;
100:3;101:3
**info@TheIdealHorizon (1)**

77:7
**info@TheIdealHorizoncom (1)**
74:16
**inform (2)**
73:9;155:22
**information (41)**
8:10,19;17:7;
35:15;36:5,14,20,24;
44:9,21;47:6;50:11,
20;53:2;54:8;55:5,
12;56:15;58:1;64:14;
68:5,6,13;71:5;
74:20;75:22;87:21;
100:18;103:23;
105:2,5;106:19;
109:7;132:21;
137:16;149:18,21;
155:25;167:20;
177:21;193:14
**informed (5)**
112:2,3;119:23;
154:5;197:3
**in-house (3)**
30:16;84:24;
146:15
**initial (4)**
26:21;44:13;73:13;
182:8
**initially (2)**
63:14;75:8
**initials (1)**
100:15
**injured (1)**
14:20
**injury (4)**
14:2,15,16;15:17
**Inn (2)**
171:25;172:6
**inoperable (2)**
140:16;142:7
**inquire (1)**
81:16
**ins (1)**
115:14
**inspect (1)**
130:7
**inspection (13)**
27:13,18;128:20,
21;129:2,5;130:9;
131:3,7;134:16;
135:8;138:5;140:17
**inspections (5)**
28:3,9;131:18;
132:19;134:1
**inspector (1)**
135:4
**install (19)**
37:25;38:6,14,16;
39:10;54:2;66:6,25;
79:7;82:2;83:22;
103:5,8;125:19;
127:1;135:19,21;
136:2;161:16

**installation (37)**
26:19;28:6,8,8,18;
38:11;62:12;66:4,12,
17,24;67:8;68:10;
71:19;75:23;76:11;
102:3;110:8;111:10,
15;124:17;126:4;
130:19;131:22;
134:20;135:5,6,7;
141:15;146:1,1,3,13,
15;150:11;160:14,21
**installations (6)**
44:8;68:19;110:21;
130:24;135:1;184:19
**installed (33)**
27:10;28:2;38:22,
25;51:24;52:11;
65:24;67:13;68:11;
69:6,16;85:11;104:1;
105:10;111:1,20;
112:19;116:15;
119:20;126:10,12;
128:16;134:17;
138:24;141:3,5,6;
143:23;151:1,19;
157:13;160:10,22
**installer (6)**
27:9;54:22,23;
114:7,8;147:3
**installers (4)**
112:9;128:5;136:9;
147:5
**installing (5)**
49:7;126:5;157:18;
160:18;161:15
**installs (1)**
185:1
**instances (1)**
87:11
**instead (6)**
7:1;33:14;57:14;
73:12;96:14;163:11
**instructed (3)**
133:21;143:15;
182:8
**instruction (1)**
132:22
**insult (1)**
23:22
**intentionally (1)**
55:9
**interest (8)**
8:18;50:13;64:9;
100:14;131:25;
133:3,23;176:21
**interrupt (1)**
171:16
**interview (2)**
19:6;192:6
**into (54)**
5:12;7:19;14:10;
23:1;31:12;32:5;
33:8;36:5,25;40:17;

57:19;58:2;60:12,19,
23;64:16;72:1;81:14,
16;82:24;83:15;
94:23;95:16,21;
102:20;114:22;
118:19;121:6,9,22;
124:18;126:22;
127:6,11;139:25;
145:17;146:8,10,
156:24;159:21;
161:7,24,25;162:9,
17;174:16;176:6;
182:9,11,25;183:9;
191:2;197:2
**inverter (1)**
127:10
**inverters (2)**
157:21,22
**investigation (2)**
139:4;188:18
**investment (2)**
34:5;99:12
**invites (1)**
23:20
**involved (12)**
10:24;22:21;34:17;
72:25;108:15;
110:10;114:21;
121:23,24;122:2;
135:5;190:15
**involvement (1)**
110:19
**Israel (1)**
159:4
**issue (1)**
130:9
**issues (3)**
42:5;67:16;181:25

**J**

**January (4)**
14:24;35:3;180:11;
190:20
**JASON (8)**
6:1,8,11,13;23:11,
15;56:18;119:11
**J-A-S-O-N (1)**
6:11
**Jessica (1)**
121:25
**Jet (9)**
84:5;119:12;
178:21;185:6;187:2,
3,20;188:24,25
**Jinko (1)**
158:12
**job (20)**
13:19;15:24;16:8;
26:14;27:11,13;
29:24;67:9;69:2,
104:4;111:12;
126:11,23;145:21;

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 102 of 162   PageID #: 798

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

160:16;175:17;
182:22;184:1;190:22
**jobs (6)**
38:9;67:10;130:22,
23;155:11;190:16
**John (3)**
12:11;34:21;35:5
**Johnson (6)**
51:25;69:1;70:22;
71:3,6;131:18
**join (2)**
19:12;24:2
**joined (1)**
171:13
**joining (1)**
16:9
**July (1)**
197:8

**K**

**Kay (16)**
36:5;39:19;40:15,
16,16,20;56:12,12;
89:14,17;120:7,10;
172:21,22,22,23
**KC (1)**
51:25
**KEEN (71)**
5:1,7,22;6:5;18:1;
21:10,16,20;22:11;
32:2;33:9;35:9;
36:23;39:12;40:24;
43:14;46:14,17;
48:11;49:9;53:22;
62:16;70:21;71:9,12;
76:6;77:10;79:1;
86:10;89:12;90:4,7,
13;93:17;103:16;
105:22;109:17,21;
112:16;120:20;
121:16;122:5;
125:10;130:16;
134:15;138:4,8;
144:6,10;145:24;
147:21;152:14;
154:11;157:7;
163:23;165:6;
169:20;171:7,10;
173:14;174:14;
176:19;179:6;
186:16;187:10;
189:14;195:1;
196:15;197:12,15,18
**keep (17)**
28:6;33:4;59:7;
60:17;62:5;67:1;
78:5;84:13,13;98:13;
103:13;131:19;
161:11;162:3;171:5;
175:11;184:6
**keeping (2)**
67:4;72:18

**Kelley (46)**
9:12;16:10,18;
17:2;18:25;19:2;
20:12,14,18;21:4;
22:5;24:14,16;28:22,
23;40:23;43:10;
44:24;46:6;48:17;
50:11;58:11;61:15,
18;85:24;89:1,3,6;
107:21;108:11;
109:25;110:2,7;
115:24;117:18,19;
118:23,24;133:1;
139:19;140:8;
161:17;164:3;
171:11;186:6;197:3
**Kelley's (3)**
108:1;109:1,4
**Kentucky (25)**
8:13;40:13;50:11;
71:21;82:21;93:16,
23,24;94:3,3;95:20,
22;115:7,9;130:13;
131:11;132:3,7;
134:11;136:17;
139:5;153:12;
154:14,16;190:21
**Kentucky's (1)**
103:24
**kept (4)**
28:4;73:12;182:25;
193:14
**Kevin (1)**
190:19
**kids (1)**
20:2
**killed (1)**
112:4
**killing (1)**
41:10
**kilowatt (27)**
33:19;44:16;45:16,
19,19;49:15,23;
90:20;92:10,24;93:2;
94:1,2;95:24;96:17,
18;105:9,24;132:17;
145:16;146:16;
147:8,22,23;148:4,6,
14
**kilowatts (18)**
44:16;49:14,15,19,
19;51:4;92:11;93:11,
12;96:8,19,23;105:9,
25;106:3;107:8,17;
153:1
**kilowatt-wise (1)**
44:14
**kind (40)**
10:25;17:12;23:21,
23;28:7;30:16,17;
37:12;40:7;43:4,19;
51:16;57:3,6;60:15;
72:24;82:11,14;87:1;

116:2;119:5;121:3;
124:18;130:14;
135:17;136:22;
139:24;140:12;
141:12,15;148:8;
158:8;162:25;
179:10,12;186:10;
191:15;193:18;
194:25;195:10
**Kirkland (19)**
9:13;18:16;21:8;
24:20;44:25;46:6;
47:6;49:4;53:19;
54:23;66:13;107:22;
108:12;109:25;
110:2,8;115:18;
139:20;164:2
**Klem (1)**
190:19
**knew (15)**
17:19;22:23;23:9,
9;36:16;52:16,17,18;
56:16;113:11;
133:16;147:1;
152:19,21;180:23
**knock (1)**
114:22
**knowing (2)**
183:23;190:6
**knowledge (9)**
9:25;109:25;
137:13;165:1;
169:24;174:8;188:5;
193:7,9
**known (4)**
39:9;152:17;
154:25;171:23
**knows (6)**
53:14,15;55:1;
81:6;100:14;146:24
**Knox (3)**
11:10,11;12:5
**Knoxville (20)**
6:8;11:7;13:12;
84:6;112:11;133:25;
143:1;162:12;
164:16;165:15;
167:3,4,7;171:21;
172:12;173:2,12;
186:24;193:2,7
**Korea (1)**
159:6

**L**

**labor (6)**
79:23;80:4;145:21,
25;146:12;147:19
**laboratory (2)**
105:18;106:1
**ladies (1)**
121:24
**lady (17)**

89:15;114:15;
121:11,22,24;122:2,
2;124:24;132:11;
142:14;171:22,23;
172:20;176:8,12,15,
21
**lady's (2)**
89:14,16
**laid (2)**
33:6;124:19
**lake (6)**
164:13,15;167:3,
12,13,14
**Lakea (3)**
120:8,11;176:21
**land (4)**
37:21,22,24,25
**Lane (1)**
134:10
**language (1)**
106:21
**large (5)**
91:10,10;93:8;
112:12;165:23
**larger (3)**
30:22;91:5;93:7
**largest (1)**
93:7
**Las (1)**
192:19
**last (50)**
28:1;35:4;41:24;
42:4;47:2,21;55:23;
61:5;62:19,24;66:15,
16;69:10;74:5;83:24;
97:12;105:21;
110:10;120:24;
121:13,25;122:4;
123:17;133:9;
149:25;150:1;153:6;
155:15;165:15,24,25;
168:16,22,23;170:15;
176:5;177:1;179:25;
180:8,9;182:3,5;
191:21;194:2;195:2;
197:23
**later (21)**
5:4;18:20;24:12;
41:22;44:22;47:2,12;
55:11;61:11;63:8;
68:3;101:22;126:13;
138:1;143:24;162:9;
172:1,2;183:5,7;
187:2
**laughed (1)**
195:14
**law (1)**
94:3
**lawsuit (1)**
10:24
**lawsuits (2)**
176:10;178:13

**lay (2)**
97:22;196:20
**laying (1)**
125:15
**lazy (5)**
152:5,6,7,8,9
**lead (4)**
43:4;60:16;95:7;
125:4
**leads (10)**
35:10,11,13,21,24;
36:3,9,10;159:9;
173:19
**leak (2)**
143:21;144:2
**leaking (1)**
143:24
**learn (2)**
105:21;153:10
**learned (9)**
25:11,14;74:3;
109:5;131:20;136:1;
150:15;151:7;153:7
**learning (1)**
182:16
**learnt (1)**
65:20
**lease (1)**
187:5
**leased (1)**
188:20
**least (6)**
32:10;125:8;164:1;
167:8;174:3;175:10
**leave (7)**
25:18;51:18;
104:12;119:21;
135:2;172:13;184:6
**leaves (3)**
102:2,17;103:5
**leaving (6)**
51:21;55:15;
104:15;147:6,6;
151:20
**led (2)**
11:17;29:12
**left (24)**
14:6,12;16:23;
18:11;24:9;25:8,9;
47:10;50:3,5;51:25;
76:12;84:2;90:15;
102:10;106:14;
119:21;138:1;
155:13;176:25;
177:7;181:8;190:3;
195:19
**left-hand (1)**
76:12
**legal (2)**
5:12;190:15
**lend (2)**
171:2,3
**lender (2)**

Case 3:23-cv-00046-DCLC-JEM    Document 10-5    Filed 02/06/23    Page 103 of 162    PageID #: 799

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

73:9,14

**less (17)**
55:14;79:5;99:12;
101:4;105:3;107:13,
14;146:9,9;155:13,
17;175:14;177:4,8,
178:15;188:14;
194:16

lesser (1)
50:25

**lessons (2)**
186:25;187:12

**letter (17)**
22:18;71:23;72:13;
74:1,25;75:11;112:2;
172:9,10,17,18,19,20,
22,23,24;196:14

**level (1)**
20:8

**LG (5)**
157:11,12;162:10,
19;163:11

**LG&E (1)**
95:22

**liability (1)**
63:9

**liar (1)**
140:8

**Liars (5)**
139:20,20;140:3,5,
13

**license (4)**
137:13,19,21;
187:24

**licensed (9)**
5:14;53:13;115:1;
135:4,5;136:9;137:8,
8,13

**lie (1)**
63:6

**life (7)**
11:14,15,23;51:11;
127:20;128:3;140:23

**lifetime (5)**
33:14;57:14;58:5;
59:10,10

**light (1)**
62:23

**likewise (1)**
7:8

**line (9)**
66:6;68:18,20;
100:22,22;101:12,12;
127:16,18

**lines (1)**
19:24

**lip (1)**
113:6

**list (12)**
50:12;64:7;70:6;
71:13;111:8;112:22,
23;124:15;131:24;
149:17;150:3;153:17

**listed (2)**
108:14;139:17

**listen (1)**
29:2

**listened (2)**
29:5;124:25

**literally (70)**
36:3;38:7;40:4;
52:1;53:1,15;64:17;
65:7,10;80:12;84:11,
14;86:15;88:8;99:11,
14;102:21;105:12;
106:20;116:14;
118:3,6,8;120:5;
124:9,14,19,23;
125:4;127:17;128:7;
134:18;135:20,23;
136:18;142:3,23;
143:12,20,24;145:14,
21,23;146:9;147:2;
149:5;152:22;
153:12,16;154:2,8;
155:10;156:14;
159:6;167:15;
168:17;170:14;
171:19;172:25;
175:13,14,25;184:17,
18;186:6;190:14;
191:17;195:24;
196:2;197:2

**literary (1)**
146:8

**lithium-ion (1)**
154:24

**little (32)**
5:20;11:12,20;
12:9,15;14:15;18:7;
28:19,25;36:2;61:9;
74:2;83:10;99:10;
108:7;113:19;119:8;
131:9;132:8;147:24;
150:5;151:25;
159:20;161:7;
162:23;163:25;
171:15;175:18,19;
176:9;186:1;191:13

**live (5)**
11:6;38:4;151:4,4;
154:12

**lived (4)**
11:13;173:2,12;
193:1

**lives (6)**
50:11;69:1;82:21;
134:19;143:1;154:14

**living (1)**
173:12

**LLC (1)**
76:14

**loan (18)**
72:12,17;73:4,10;
76:8;81:7,18,22,23,
25;82:2,23;83:19;

142:8,10,10;173:25;
188:5

**loaned (1)**
172:11

**loans (2)**
140:18,19

**local (2)**
8:13;127:12

located (1)
186:13

**location (1)**
16:5

**locations (2)**
16:6,7

**lock (1)**
128:7

**locked (2)**
80:23;193:19

**lodge (1)**
138:13

**log (1)**
102:20

**logo (2)**
76:13,15

**long (13)**
13:17;25:5;32:8;
42:2;55:23;80:8;
99:24;129:11,17;
134:12;157:24;
161:3;184:14

**longer (4)**
123:21;138:2;
149:20;191:25

**longest (2)**
51:18;65:20

**look (24)**
33:2;45:19;63:1;
65:15;76:15;87:14,
25;92:3;94:9;98:25;
99:1,9;115:10,11;
134:5;139:8,21;
143:8;155:19,20,21;
162:21;190:5;193:3

**looked (3)**
33:19;72:1;119:5

**looking (15)**
33:21,22,22,23;
53:5;61:2;74:4;
83:14;88:7;92:20;
95:5;124:15;153:14,
15;163:1

**looks (2)**
30:21;40:6

**Lord (1)**
165:4

**lose (2)**
51:13;148:7

**losing (1)**
182:22

**loss (3)**
57:24;59:8;116:10

**lost (4)**
116:6;127:15;

137:19;166:13

**lot (39)**
8:12;23:5,6;37:18;
50:2;62:24;63:4;
64:14;65:17;68:13;
69:18;83:11,12,15;
106:12;107:14;
113:18;114:16;
119:22;123:25;
133:14;134:3;
138:22;140:18,25;
144:12;145:6;
148:11;157:24;
158:12,13;159:3,5;
160:24;170:20;
174:21,22;176:25;
188:10

**lots (1)**
167:15

**loud (1)**
7:13

**loudly (2)**
7:3,12

**Loudon (1)**
143:9

**Loudoun (2)**
164:16;170:7

**Louisville (5)**
71:21;82:21;93:15;
131:11;138:22

**love (1)**
194:10

**low (4)**
141:1;178:6,6,9

**lower (1)**
49:11

**lower-grade (1)**
105:11

**lowest (1)**
154:9

**Luckily (1)**
191:14

**lump (1)**
63:11

**lunch (3)**
8:1;84:19;194:5

**lying (4)**
64:18;65:18;140:2;
193:18

---

**M**

**machine (2)**
12:14;118:10

**Machinist (1)**
12:17

**mail (1)**
74:23

**main (1)**
75:10

**majority (7)**
11:15;47:9;88:22;
91:4;105:10;113:10;

177:6

**makes (5)**
91:14;134:8;151:6
8;157:25

**making (6)**
136:10,12;150:25;
175:12;176:1;183:18

**man (2)**
82:20;127:18

**manage (1)**
20:2

**management (4)**
19:23;30:1;67:11;
89:6

**manager (5)**
16:15,21;121:13,
14;150:10

**manufactured (2)**
158:21;160:8

**manufacturer (2)**
155:3,4

**many (21)**
9:13;13:4;39:12;
40:25;41:7;64:15;
82:19;91:8;96:19;
110:20;111:5,5,8;
112:19,20;141:11;
143:15;162:7;175:7;
180:7,8

**Map (1)**
39:16

**Maps (1)**
38:8

**March (3)**
42:4;182:24;
183:15

**margin (1)**
51:2

**marina (3)**
179:23,24;180:1

**mark (2)**
21:10,17;31:20;
51:5

**Marked (14)**
21:19;31:21;43:12,
13,15;46:15,16;
48:11,13;59:3,4;
76:23;77:15;197:14

**Market (2)**
68:3,4

**marketing (2)**
110:7;177:17

**married (2)**
108:2;109:19

**marshal's (1)**
130:18

**master (2)**
41:11,13

**material (2)**
28:24;159:23

**materials (1)**
159:15

**math (3)**

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 104 of 162   PageID
#: 800

In Re:  Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

145:17;183:16,16
**matter (2)**
80:12;130:17
**matters (1)**
156:7
**max (2)**
44:17;110:19
**may (3)**
77:3;113:17;188:6
**maybe (5)**
8:23;10:12;122:1;
147:24;175:10
**mean (32)**
38:18;44:6;62:21;
65:3;66:21;70:15,20;
74:24;77:19;100:22;
106:19,23;107:1;
108:7;115:19;118:6;
122:16;129:10;
140:9,23;145:15,22,
25;150:21;153:24;
154:25;168:17;
173:7;177:5;185:25;
190:8;192:21
**meaning (8)**
8:10;21:6;35:24;
37:21;67:7;73:17;
155:2;180:25
**means (9)**
5:2,3;6:18;38:24;
127:4;128:18;
140:10;153:25,25
**meant (2)**
10:18;65:6
**media (2)**
138:17;139:6
**medication (1)**
10:2
**meet (3)**
17:2;45:6;115:24
**members (1)**
111:21
**men (2)**
135:20,20
**mention (1)**
28:14
**mentioned (13)**
28:15;56:25;82:5;
107:21;110:4;139:1;
144:15;149:15;
164:1,10,18;180:24;
195:3
**mentioning (1)**
88:25
**meriting (1)**
93:25
**mess (1)**
142:5
**message (9)**
20:11,15,18,19;
21:3;65:7,15;134:6;
191:5
**messages (4)**

9:12;69:19,21;
134:4
**met (10)**
16:10;18:20;23:3;
25:3;45:10;67:12;
171:11,12,17,17
**metal (1)**
131:14
**meter (7)**
127:1,4,7,7,14,15;
128:2
**metering (5)**
94:19;95:13,15;
162:12,13
**Meza (2)**
6:20;7:4
**Michael (28)**
18:21;21:7;107:24,
25;120:2,7,22,22;
123:18;145:1;
164:21,25;167:2,4,
25;170:2;171:12;
173:1;181:15,16;
186:22;187:11,13,15,
19;192:14;194:1;
195:5
**middle (3)**
35:4;140:24;162:9
**might (23)**
8:19;17:8,10,11;
18:3;32:22;41:24;
54:7,8;78:12,12;
82:23;84:18;86:6;
87:18;98:13;107:17;
120:21;149:17;
160:13;170:2;
175:15;177:8
**Mike (8)**
119:6,6,9,16;
120:12,13,15,19
**military (1)**
144:21
**million (25)**
23:20;83:10,25;
84:1,1,4,6;119:24;
123:22,23;164:11,12,
19;165:3,22;167:2,9,
15;169:1;170:15,17;
173:18,25;179:7;
194:23
**mind (4)**
6:6;14:15;53:4,7
**mine (1)**
20:5
**minute (2)**
53:9;66:5
**minutes (3)**
55:24;56:23;
101:22
**misleading (1)**
55:18
**misplacement (1)**
112:5

**missing (2)**
70:8;195:4
**Mission (1)**
11:8
**mobile (5)**
37:10,17,20;38:4,5
**Model (2)**
174:18,21
**mom (2)**
13:13,13
**Monday (2)**
41:1,21
**Money (106)**
15:22;25:20,22;
30:13,13,14,14,20;
31:16;57:19;59:8,11,
13,14,18;60:21,24,
25;67:4;71:25;72:9,
10;73:25;80:10,15;
81:24;82:7,15,16,24;
83:1,2,5,20;84:8;
85:25;86:24;87:6;
88:23;93:20;98:24,
24;99:13,14;117:15,
24;118:1;121:3;
123:14,19,21,25;
124:1,4;141:9,10;
143:3,6,7;145:7,22,
23;147:25;149:9,10;
150:23;160:17;
165:5,16,17;166:11,
13,13;169:13;170:10,
11,20,21;171:2,22;
172:12,13;173:4,20;
174:2,6;175:12,23;
176:6,7;178:6,6,9;
181:2,17,18,23;
182:15;184:2,6;
185:15;189:23;
190:1,15,24;191:8
**money' (1)**
59:15
**moneys (1)**
84:14
**Monk (1)**
121:12
**month (20)**
44:17;45:17;57:22;
91:22;93:12,14,15;
98:3,4,22,23;99:1;
105:17;106:3;
107:17;119:16,22;
169:1;182:1;183:7
**monthly (3)**
58:6;91:16;142:10
**months (16)**
18:12;23:14;43:23;
45:14,18;86:17;
87:18;154:18;
156:11;164:22;
171:20;176:3;177:2;
184:4,15;190:4
**more (35)**

8:16;13:15;29:6;
30:7;37:22;41:6;
48:9;55:15;56:10;
66:13;69:24;95:9;
97:23;99:24;100:2;
118:16;119:9;125:8;
126:21;137:3;
138:15;147:11,24,25;
155:11,16;160:17;
161:7;163:25;
170:17;175:10;
178:9;182:14,15;
184:24
**Morgan (1)**
132:4
**Morristown (1)**
12:13
**Mosaic (19)**
72:5;79:12,16,17,
17;81:6,15,22;83:18;
100:16,17;101:11,17,
21;102:6;103:1;
116:19,22;123:8
**M-O-S-A-I-C (1)**
79:12
**most (5)**
116:18;130:7;
156:7;159:17;189:7
**mostly (1)**
189:7
**mother (5)**
180:8,9,15
**mount (1)**
38:3
**mouth (2)**
124:25;181:21
**move (7)**
24:1;74:2;107:9,
11;110:24;118:3;
141:11
**moved (3)**
5:15;172:1;192:18
**moves (5)**
15:14;47:24;56:5;
65:1;148:21;179:20
**moving (6)**
17:15;28:12;69:22,
23;82:15;99:14
**much (48)**
24:18;25:22;26:1;
31:13,15;33:15,18;
40:6,14;42:4;44:4;
51:5;52:2;56:13;
57:6;60:21;70:16;
80:15;84:8;92:11;
93:10;94:6;96:14;
97:9;98:13,14;
101:12;105:2,15;
110:6;111:16;
112:14;119:21;
124:2;143:20;
145:22;146:12;
152:10;154:20;

155:8;162:8;163:6;
171:3;181:7;182:4;
188:17;194:8,16
**multiple (7)**
69:19;83:7;131:18;
165:14;172:11;
173:1;193:4
**multiply (2)**
105:14,16
**myself (8)**
9:12;35:13;41:20,
22;79:21;124:8;
159:19;193:19

**N**

**NABCEP (2)**
52:20;54:14
**N-A-B-C-E-P (1)**
54:14
**N-A-C (1)**
52:20
**name (61)**
5:7;6:6;16:2;
17:18;24:9;50:18;
66:15,16;69:1;70:1,2,
8,9;73:3;78:23,23;
87:15;89:14;106:9,
11;108:24;109:1;
112:21,21;114:5;
115:8,21;116:20;
119:5,25;120:2,4,21,
24;121:12,13,22;
122:1,4;124:15;
133:9;134:18;
137:24;142:25;
149:25;150:1,17;
151:18;153:11;
154:13;156:20;
167:14;171:24;
172:21;176:18;
177:22,24,25;178:20;
193:4;197:5
**named (3)**
66:16;122:2;
149:17
**names (7)**
35:15;36:4,13;
64:9;71:14;131:24;
149:19
**Nancy (1)**
143:1
**narcissistic (1)**
115:25
**Nashville (7)**
12:12;69:2,17;
71:18;111:4;154:21;
176:14
**nation (2)**
148:14,17
**near (4)**
44:16;49:8;51:16;
52:13

Case 3:23-cv-00046-DCLC-JEM    Document 10-5    Filed 02/06/23    Page 105 of 162    PageID
#: 801

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

**necessarily (4)**
9:4;12:21;80:2;
103:19
**necessary (1)**
103:20
**need (34)**
5:5;7:21,22,23,24;
8:19;9:3;10:19;
21:15,21;33:8;63:1;
64:12,18;65:15;70:4;
71:10;72:1;92:22;
103:18;109:22;
114:13,16;128:23;
133:5,24;149:3;
155:20;161:19;
162:6;163:4;168:5;
169:8;178:8
**needed (1)**
19:14
**needs (5)**
8:11;33:20;45:6,
10;101:19
**negative (6)**
43:25;139:10,24;
153:25;154:1;188:17
**negotiate (1)**
148:10
**net (6)**
93:25;94:18;95:13,
15;162:12,13
**new (7)**
13:19;50:2;79:13;
107:9;116:19;119:8;
157:19
**news (1)**
138:21
**next (9)**
7:7;23:21;57:24;
59:23;97:17;98:3;
115:11;141:12;
194:23
**night (3)**
56:21;97:2;116:16
**nighttime (5)**
96:4,11,20;161:18;
162:16
**nine (4)**
97:4;184:4,15;
190:4
**nobody (1)**
116:12
**Non-compete (1)**
42:15
**Non-competition (1)**
43:17
**non-credited (1)**
12:15
**non-disclose (1)**
84:12
**Non-disclosure (7)**
42:15,25;43:16;
47:23;48:8;50:1;
184:9

**None (7)**
130:2,4,12;142:17;
193:5;194:4,22
**nonpayment (1)**
155:15
**Non-solicitation (2)**
42:16;43:17
**nonverbal (1)**
6:24
**noon (1)**
8:2
**normal (1)**
14:3
**normally (12)**
36:21;39:17,20,22,
24;56:1;85:19;98:6;
101:21,24;110:3;
186:13
**notice (1)**
192:5
**noticed (1)**
77:18
**noticing (1)**
42:12
**notified (4)**
126:13,24,25;
128:10
**notifying (1)**
127:23
**no-trespassing (1)**
191:25
**November (4)**
46:4;48:10;69:4;
70:13
**nowhere (10)**
40:7;44:16;47:12;
49:8;50:16;51:16;
52:13;109:7;170:10;
173:20
**nowheres (2)**
65:23;165:17
**number (26)**
45:17;51:19,21;
52:7;70:3;71:4;
77:17;99:19;104:14,
15;112:22;118:9,11,
16;133:21;137:14;
146:4,5,22;149:17;
150:3;153:17;
168:14;172:14,15;
194:20
**numbers (18)**
8:11;44:15,19;
45:20,23;47:1,11;
49:10;50:15;55:14;
59:25;68:11;71:14;
78:3;98:5;99:3;
104:13;105:20
**numerous (2)**
132:18;134:1

**O**

**oath (2)**
5:23;6:16
**Obviously (3)**
7:21;10:9;136:3
**occasionally (8)**
32:25;77:18,25;
78:2;108:9;119:7;
168:13;185:23
**occur (1)**
127:22
**occurring (1)**
128:10
**Ochsner (7)**
71:21;73:1,9,17;
81:21,25;82:4
**October (18)**
28:1;35:5;42:11;
43:6,8;47:20,20;
48:10;51:22;62:19,
22,23;63:24;97:12;
182:2;183:6,7;185:7
**O'Dell (5)**
132:8,9,9,15,22
**off (54)**
15:7,10,11;17:8;
23:23;41:22;44:20;
45:20;48:20,25;
69:10;71:22;82:23;
83:12,14;88:18,21;
90:15;94:7,8;95:2,4;
98:8,10;107:8;
114:22;128:23,25;
129:1,3,9;132:12,13,
14;135:6,16,25;
136:1,14,15,19;
141:21;145:14;
152:11,12;171:5,6,7;
175:24;181:11;
187:16,22;194:25;
196:10
**offense (1)**
89:10
**offer (9)**
16:23,24;34:9,9;
62:14;86:8;91:3;
96:17;145:4
**offered (5)**
18:16,17;19:25;
30:2;163:8
**offering (3)**
145:9,11;169:11
**Office (12)**
5:9,12;31:12,14;
32:8,11;104:14;
118:10;123:3;
130:18;177:10;
196:14
**officer (3)**
21:7,8;108:15
**official (2)**
89:25;197:24
**officially (2)**
172:19;193:15

**offset (5)**
33:22,22,23;59:22;
93:9
**offsets (1)**
92:4
**Ohio (1)**
5:14
**old (2)**
13:9;185:11
**once (8)**
15:16;83:18;84:17;
86:12,13;124:23;
165:21;180:6
**one (135)**
16:15;23:2,8;
24:17;25:17;29:22,
23;31:10;35:7;40:10,
10;42:6,7;47:17;
48:4;49:18;50:10;
53:25;55:12,13;
60:13;61:4;63:11;
64:6;65:9;68:25;
69:9;70:8,9,12,17,18,
24,25;72:25;76:21,
22;77:5,11,25;78:1,
10,11,12,13,25;
79:9,24;80:7;82:18;
83:9;84:3,20;86:6;
87:9;88:8;89:21;
92:9;94:3,3,4,7;95:8;
96:17;97:14,16,23;
99:10;104:19;
107:10,10;110:11,16;
111:4;112:7,8;
116:20;118:24;
119:10,23;122:17;
123:1,12;125:5,9;
127:2,5;130:15;
131:10,16;132:2;
133:9;134:10;
137:23;138:25;
141:4;143:14;
146:24;147:1;
152:17,22;153:24;
155:7,10;156:5,6,7,
14;157:12;158:4,18,
18;159:10,17;
161:10;164:11;
166:4;169:3;172:24;
177:5,15;179:3,4,5,7;
180:1;186:10,18;
187:1;188:12,16;
190:18;194:3,12;
195:15
**one-half (1)**
169:1
**ones (9)**
12:22;49:11;78:20;
110:1,4;120:9;151:8;
158:10,11
**one-third (1)**
83:19
**one-three (2)**

**94:1,1
one-way (2)**
127:4,14
**online (4)**
36:25;37:4;63:21,
129:25
**only (32)**
16:6;21:12;28:11;
49:19;65:9;78:7;
82:1,16;89:4,6,7;
91:5;97:3,14;103:5;
106:14;118:24;
119:13,18;120:6;
123:5,6;127:4;137:7;
142:15;145:1;
159:10;169:3;170:4;
186:5;195:14;196:8
**on-the-job (1)**
115:4
**on-the-job-type (1)**
29:6
**open (3)**
57:10;63:1;193:10
**opened (1)**
181:10
**opening (1)**
57:15
**operate (1)**
128:4
**operating (1)**
104:6
**operation (2)**
112:5;150:8
**operational (7)**
21:7;81:9,13,19;
110:18;136:12;
184:15
**operations (5)**
110:7,10,14;
133:10;150:10
**opinion (1)**
160:18
**opportunity (1)**
88:14
**opposed (1)**
161:4
**option (2)**
88:20;92:10
**order (6)**
6:23;20:4;45:9;
84:23;125:18;191:25
**organizational (1)**
21:1
**original (2)**
120:9;137:25
**originally (7)**
104:23;139:3;
157:10,11;161:3;
171:17;192:17
**originals (1)**
21:13
**otherwise (1)**
87:12

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 106 of 162   PageID
#: 802

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

**ought (1)**
177:24
**Ours (1)**
78:15
**ourself (1)**
144:1
**out (171)**
6:23;8:24;9:3,18;
12:11;14:18;17:17;
18:24;19:19;23:3,10,
20;25:2;26:11;27:9;
33:6,18;35:17,19;
36:25;37:3;38:9,13,
13;39:4;41:8;42:6,
14;44:22;45:18;
46:25;47:2,5,12;
49:5;50:1,25;51:19;
52:4,10,14,17;55:11,
12;56:4;60:13;61:11;
62:17,19,22;63:3,8,
22,24;65:9,21;68:19;
69:10;72:14,17;75:7,
9,13;76:8;78:8,8;
79:4;80:23;82:22;
83:3,5,25;86:17;
87:21;91:7,9;95:11;
96:1,1;97:13,22,23;
100:21;101:16,24;
103:23;105:7,13,20;
108:8;115:15,20;
116:2,25;117:1,20,
21,22;123:9,13;
124:25;126:25;
127:2,13;128:2;
129:9;130:11,19;
133:24;134:5;135:4,
19;139:1,4,16,16;
140:1,11,12;141:2,
20,22;142:15,17;
143:2;147:12,25;
149:16;150:13;
151:3;154:18;155:6;
156:7,11;157:11,23;
160:10;161:16;
162:2,3,13;166:4,8;
167:19;168:17,25;
170:2,10;173:1,20,
24;177:16;180:3,20;
182:6,18,23;183:8;
185:23,24;186:24;
187:17;193:25,25;
194:1,4,8,9,11,11;
195:23
**outings (2)**
185:19,21
**outs (1)**
115:14
**outside (4)**
101:20;127:8;
134:21;195:20
**outsold (1)**
168:16
**over (37)**
7:5;8:16;14:20;
16:23;22:15;51:14;
56:11;58:8,8;59:23;
63:23,23;72:8;74:5;
82:17;83:10;86:9;
89:21,23;99:15;
104:9;111:16;
112:20;118:5,7;
121:11;133:22;
135:14;139:23;
141:21;142:20;
150:10;154:8;159:7;
161:8;176:9;185:3
**overall (1)**
62:3
**overnight (2)**
179:15;185:12
**oversee (1)**
110:9
**overseeing (1)**
135:6
**oversees (1)**
121:14
**owe (1)**
190:1
**owed (2)**
189:16,23
**own (35)**
33:14;35:20,23;
40:21;52:11;57:12;
63:3;84:4,6;85:11;
88:25;101:9,9;
108:12;116:25;
117:1;119:12;130:2,
9,9;144:3;146:14;
165:13,14;166:1,7;
167:4,7,8;170:6;
178:21;180:3,4;
188:21;197:2
**owned (17)**
37:21,21,24;164:2,
3,20;167:25;169:15,
22,24;170:3;175:3,3,
5;186:20;187:5,11
**owner (1)**
34:12
**owners (3)**
123:17;124:1;
175:13
**owns (5)**
164:9,10;170:8;
187:13,14

**P**

**package (2)**
33:20,25
**packages (1)**
34:9
**packet (2)**
196:6,9
**padlock (1)**
136:19

**padlocked (4)**
136:21,24;137:1,4
**page (1)**
95:9
**pages (2)**
33:7;65:11
**paid (44)**
23:15;25:8;26:3,5,
16;27:19,22,24;
28:12;36:21;42:13;
63:11;67:7,9;88:21;
90:8;117:11,16;
118:13;119:18,22;
124:3;144:24;
160:15,15,21,23;
165:22;166:14,15,16,
17;174:10;175:24;
180:24;181:24;
182:20;183:2;188:6;
189:19;191:8,17,19;
194:24
**pain (1)**
69:21
**panel (7)**
48:15;88:13;
105:11;158:5,12,21;
161:24
**panels (8)**
37:25;105:10;
158:8,18;159:5;
161:17,18;163:3
**paper (3)**
105:19;170:1,5
**paperwork (12)**
44:13;80:12,22;
100:13,21,21;104:9;
106:12,20,20;118:6;
191:22
**paragraph (1)**
92:21
**park (1)**
88:4
**parking (2)**
7:23;8:2
**part (29)**
9:9;18:15;19:11;
20:1;30:21,21;31:10;
54:2;59:16;81:3;
85:3,4,4,7;97:13;
98:18;100:21;
129:22;131:21;
132:11;135:18;
162:4;171:16,23;
174:3;181:12;186:3;
195:21;196:1
**particular (3)**
16:5,5;64:6
**parties (2)**
186:8,11
**partner (2)**
18:20;108:1
**party (2)**
74:20;186:15

**pass (3)**
53:1;130:20;
140:17
**passed (4)**
27:13,18;118:1;
131:3
**passing (2)**
131:6;134:16
**past (10)**
8:12;50:15;64:10;
91:8;101:19;107:5;
109:4;112:7;151:8;
178:5
**pay (63)**
8:18;15:13;23:21;
26:9,11,16,21,22;
42:5,9,10,12;58:7;
69:7,8;72:20,21;
73:17,23;82:1,4,11;
84:9,11;88:5;98:13;
101:4;110:20;
113:16;116:18,25;
117:1,3,4,6;118:8;
119:15;143:4,5;
146:17,23,25;147:1;
159:20;166:5,9,12;
173:23;175:18,21;
182:6,10,12,13,16,
21;183:11;184:3,7;
189:1,2;190:2;
191:10
**paying (22)**
52:2,5,6;62:7;
69:16;82:10;88:13;
98:6,14,22;99:24;
100:2;101:5,13;
102:7,18;140:20;
141:2;142:8,8;143:6,
12
**payment (5)**
121:20;142:11;
143:12;183:14;192:5
**payments (1)**
102:13
**payroll (2)**
22:13;82:9
**pays (1)**
100:14
**pending (1)**
5:16
**people (27)**
8:17;23:7,10,13;
30:3;31:14;52:15,22;
55:15;61:8;79:5;
97:9;98:13;112:4;
136:2;137:7;145:2;
150:25;151:3,5,7;
164:2;175:15,25;
176:10,25;177:11
**per (17)**
29:25;33:18;41:4;
44:17;45:16,20;
57:25;60:21;93:12;

94:2;96:23,25;
105:15,16;146:16;
148:6;182:22
**percent (53)**
17:22,23;26:12;
27:24;33:23,23;34:4,
5;42:14;51:6;57:25;
59:8;61:21,25;62:21;
63:8,21;72:21;73:17,
18,24;82:1,4;90:17,
18,22;91:4,6,13,15,
19,21;92:8,9,25;93:3;
95:1;98:19;104:3;
106:6;111:15;117:2,
4;118:21;140:19,20,
21;173:23;182:18,19,
20;184:2
**percentage (1)**
116:24
**percent-wise (1)**
170:19
**perfect (1)**
105:18
**perfectly (2)**
23:24;87:22
**performance (1)**
160:22
**period (2)**
35:1;173:23
**perk (3)**
168:21,22;169:3
**Perkins (4)**
132:3;134:10,18,
23
**perks (5)**
169:4,10,17
**permanent (1)**
28:9
**permit (10)**
125:25,25;129:4,
12;130:9;135:13,16;
137:12,14;184:23
**permits (19)**
68:14,15;85:11;
86:14;110:21;
111:20;125:18,22;
126:5,10;128:18;
129:11;130:25;
135:12,15;137:6,8,
21;185:1
**permitting (4)**
54:3;125:17;138:5,
23
**person (14)**
40:19;53:14;55:21;
78:18,19,23;79:2;
87:15;89:4,7;107:14;
122:22;152:9;177:21
**personal (10)**
8:9;22:9;68:5;
164:23;167:18;
172:10;180:3,17;
188:21,23

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

**personality (3)**
116:1,2,4
**personally (13)**
29:5;64:15;67:5;
79:5,20;111:18;
122:18;124:8;
127:25;153:19;
167:21;172:21;
197:16
**persuade (1)**
58:2
**Peter (1)**
131:23
**petty (2)**
113:9,9
**phone (19)**
5:20;8:18;9:15;
22:9;51:19;61:17;
64:13;70:3;71:14;
77:17;78:3;100:17;
104:13,15;124:14;
154:2;172:14;
175:16;195:22
**photovoltaic (1)**
54:24
**physical (1)**
15:2
**picked (4)**
143:25;154:2;
180:6;192:1
**picnics (1)**
108:9
**picture (3)**
51:23;81:5;118:18
**pictures (2)**
66:24;68:10
**piece (2)**
105:19;153:2
**pilot (1)**
133:25
**pink (1)**
106:15
**pisses (1)**
194:25
**pitch (17)**
29:5;30:16,21;
31:17,24;32:1,8;
33:11,12,16;34:10,
12;85:18;86:2;149:1,
11,13
**pitches (1)**
99:11
**place (13)**
26:19;40:6;59:9;
76:4;85:11,22;96:4;
111:7;128:19;151:5;
162:14;167:24;186:3
**placement (1)**
92:17
**places (1)**
40:13
**Plan (3)**
58:5;59:9,10

**plane (12)**
167:23;186:17,18,
20;187:11,13,14,20;
188:2,6,7,19
**planes (3)**
164:6;165:20;
189:9
**plant (1)**
101:9
**play (6)**
23:1;75:14;77:8,9;
95:16;108:4
**plays (1)**
78:11
**plead (1)**
176:17
**Please (2)**
24:1;77:3
**plumbing (1)**
134:22
**plus (2)**
62:3;188:12
**PM (5)**
21:25;90:12;171:8,
9;198:4
**pocket (1)**
117:1
**point (4)**
33:6;44:8;64:22;
119:9
**pointblank (1)**
63:20
**pointed (1)**
10:13
**polite (1)**
110:13
**politics (3)**
60:15,18;159:22
**pop (2)**
13:13,13
**position (6)**
18:17,25;19:16;
61:19;175:22,23
**possible (5)**
39:7;102:16;
105:25;120:22;
141:11
**possibly (1)**
187:9
**potential (1)**
39:4
**potentially (1)**
100:2
**power (26)**
33:14;52:11;57:1,
5,12;59:11;85:12;
86:15;91:11;94:23;
96:3,10;101:9,9;
126:21;127:10,15;
128:25;129:2,3;
136:13;141:19,21;
162:15,15;163:3
**practice (1)**

5:17
**practicing (1)**
5:16
**pre-call (1)**
56:21
**precent (1)**
148:8
**predicted (1)**
68:12
**pre-engineer (1)**
12:17
**present (1)**
101:13
**presentation (10)**
32:25;55:20,23;
56:19;57:3,4,8,9;
59:16;61:2
**presentations (1)**
61:16
**president (1)**
24:12
**president's (1)**
85:5
**presumably (4)**
124:4;154:15;
172:6;174:2
**presume (2)**
115:22;177:19
**pretty (26)**
17:16;24:18;26:1;
33:15;40:6,6,14;
42:4;44:4;51:5;52:1;
56:13;80:21;110:6;
111:16;112:13;
113:10;119:21;
124:2;148:3;152:10;
154:20;170:12;
182:3;188:17;193:17
**previous (2)**
22:19;150:12
**previously (4)**
9:5;47:17;133:6,7
**price (7)**
51:5;82:5;88:19;
145:15;147:24;
148:6,11
**prices (1)**
93:5
**pricing (1)**
34:1
**primarily (3)**
26:3;79:9;157:8
**prime (1)**
143:10
**print (4)**
9:18;92:12,19;
196:10
**printed (1)**
48:20
**printout (1)**
20:11,13;57:20
**prior (14)**
17:12;22:23;24:24;

27:25;34:23;61:19;
97:11,12;103:3;
161:14;163:2;173:2,
11;194:7
**private (1)**
187:2
**privately (1)**
169:15
**probably (63)**
7:21;8:1;12:19;
15:9;17:21;29:12;
32:9;35:4;38:13,13;
39:21;48:9;60:13;
79:5;80:25;82:16,18;
83:12,13;85:19;
86:16;91:7,10;93:13;
96:22;101:16;
102:22;117:2;
122:23;128:17;
129:21;132:9;
140:20,22;143:18;
147:3;149:20;
154:18;155:7,10;
157:12;161:5;
164:21;167:8,11;
168:9,16,19,25;
169:12;170:16,17;
171:19;177:3,4;
181:21;185:8;
186:22;190:10;
193:17,23;194:2,3
**problem (4)**
82:25;84:9,10;
110:18
**problems (7)**
70:7;111:5;132:18;
134:13,13,14;163:21
**Proceedings (1)**
198:3
**process (4)**
5:17;39:20;43:2;
113:19
**procure (1)**
83:22
**produce (24)**
33:13;44:12,14,16,
17;47:12;49:23;51:4;
52:13,23;57:12;60:1,
4;68:12;94:23;95:21;
96:10;105:24;107:7,
12,18,19;132:16;
151:1
**produced (3)**
52:11;96:3;161:18
**producer (1)**
59:11
**produces (6)**
52:24;60:3;96:25;
105:15;126:20;
136:13
**producing (15)**
44:23;49:7;50:17,
17;51:16;60:5;70:15,

16;85:11;86:15;
132:19;133:16,17;
142:7;162:8
**product (15)**
30:10,11,12;51:—,
78:9;79:6;154:23,24;
155:3,23;158:1,18;
159:3,10,21
**products (3)**
158:2;159:3;160:8
**Professional (3)**
30:23;31:1;150:16
**profit (4)**
51:2,2,6;84:1
**program (2)**
87:1,6
**progress (1)**
67:2
**project (1)**
37:20
**promised (5)**
44:24;133:6,7,14,
18
**promotion (2)**
84:21;88:9
**promotions (2)**
84:22;90:15
**pronounce (6)**
66:14;73:3;122:4;
133:9;137:24;151:18
**pronounced (2)**
54:25;171:25
**proof (1)**
22:18
**prop (1)**
187:20
**proper (1)**
127:12
**properly (1)**
117:24
**properties (2)**
165:14;167:9
**property (4)**
38:21;82:14;84:7;
167:12,13;169:15;
192:1
**Property-wise (1)**
167:8
**proportion (1)**
105:21
**Protection (1)**
5:9
**provide (2)**
23:4;155:25
**provided (1)**
71:15
**provides (1)**
72:16
**pull (14)**
8:23;38:8;40:4,6
96:14;125:18,2<
137:7,14,21;161:7,
18;162:6;164:24

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

pulled (11)
125:22;126:3,4,6;
128:19;129:4,12;
130:24;135:12;
137:12;161:25
pulling (4)
53:10;96:11,12;
137:6
punched (1)
35:15
purchase (10)
58:2;88:19;91:10;
140:13;164:21;
171:23;172:12;
173:4;179:3,4
purchased (10)
96:8;123:22;
140:10;155:5;
171:21;187:1,4,7,8;
188:24
purchases (1)
90:21
purchasing (6)
59:7;91:15;155:1,
2,9,22
purpose (1)
76:7
pursue (1)
71:25
push (2)
64:22;86:8
put (24)
20:7,24;26:19;
27:8;38:20;55:5;
59:9;64:25;77:1,20,
24;85:22;108:25;
109:2;127:13;
128:18;139:25;
162:14;168:15;
170:21;181:20;
191:23,23;197:2
puts (1)
20:8
putting (3)
125:16;160:19,21
PV (10)
52:20;53:12,13,17,
18,20;54:13,22,23,24

## Q

QCell (4)
47:14;158:20;
159:1,9
qualify (1)
34:6
quality (4)
158:4;159:25;
160:5,6
quality-wise (1)
160:1
quarter (3)
146:9;148:4,6

quick (9)
84:20;90:7,9,14;
107:20;167:1;
174:16;191:2;197:19
quicker (2)
160:16,16
quickly (4)
14:3;69:24;129:7;
196:21
quit (5)
113:5;172:2;192:5;
196:25;197:1
quits (1)
84:13

## R

race (1)
125:3
racking (1)
145:23
raise (1)
123:20
raising (1)
67:15
ran (6)
11:17;108:11;
110:7,8,15,16
rat (1)
125:3
rate (1)
26:7
rather (3)
141:17;159:18,20
ration (1)
82:11
reach (3)
35:17;103:23;
149:16
reached (3)
23:3;52:4;115:15
reaction (1)
128:15
read (7)
90:22;92:1;131:21;
139:11,18;148:16;
172:22
reading (2)
79:3;139:23
ready (3)
15:17;87:25;135:8
real (3)
11:24;90:14;
107:20;119:11,12;
121:25;165:11;
167:1;169:22;170:6;
174:16;196:21;
197:19
reality (2)
128:2;160:7
realize (4)
33:12;57:11;
139:24;166:12

realized (2)
42:11;62:24
really (12)
17:12;28:17;60:13;
66:11;106:23;
108:15;125:1;145:6;
153:2;162:6;186:2,3
reason (23)
7:11;9:23;14:5;
15:20,23;25:7;27:23;
37:23;39:23;46:19;
55:17;79:14;88:11;
108:24;123:12;
127:9;129:16;133:1;
142:19;145:10;
162:11;184:5;197:2
reasons (1)
23:7
rebate (6)
85:15,16;86:21;
87:13,13;88:18
Rebecca (1)
197:6
recall (8)
13:1;14:3,6;17:7,
14,23;70:24;197:22
receipt (1)
117:10
receive (3)
86:20;92:11;98:19
received (4)
47:20;48:16;
121:19,21
receiving (1)
78:21
recent (1)
176:3
recently (9)
52:9;66:15;128:16;
137:18;146:23;
164:11;167:22;
182:10,12
Recess (2)
90:11;171:8
recklessly (1)
170:12
reckon (1)
147:4
recognize (1)
144:23
recollection (1)
9:25
Recommend (1)
45:3
record (31)
5:1,2,5;6:7;7:4;9:1,
9;20:9;21:16;23:23;
30:19;31:20;43:12;
53:5;71:13,17;72:16,
17;83:12;105:23;
128:17,17;132:12,13,
14;152:11,12,13;
171:5,6,7

recorded (1)
29:1
recording (2)
5:3;152:11
recordings (3)
29:3,3;61:15
recover (1)
17:21
recovered (2)
15:16;17:1
red (2)
51:17;82:14
refer (1)
5:5
referencing (1)
61:4
referrals (1)
35:25
referring (3)
53:3,12;88:8
refinished (2)
164:14,14
refund (1)
61:24
refunded (1)
166:10
refused (1)
42:17
reimburse (1)
142:9
reimbursed (2)
166:6,19
related (3)
17:6;138:5;188:22
relating (1)
13:6
relationship (5)
16:17;18:19;40:2;
145:3;194:10
relatively (1)
129:7
release (5)
73:21;123:5,6;
156:22,24
released (2)
72:22;83:4
releases (1)
72:6
religion (2)
60:18;159:22
relocated (2)
192:14,25
remaining (4)
26:18;81:3;119:19;
182:20
remember (14)
14:6,23;17:8,11,13,
13;18:3;25:9;84:25;
115:8;167:14;
186:10;195:2,7
remembered (1)
18:5
remembering (1)

13:23
removed (1)
71:22
renew (1)
7:22
rent (1)
167:19
rep (14)
27:23;32:24;
101:13,22,23;102:2,
2,17;103:5;113:6,7;
119:4;160:19;169:4
repair (2)
15:1;143:22
repaired (1)
14:21
repeat (1)
95:8
replaced (1)
66:15
repo'ed (1)
167:24
report (2)
110:2,5
reported (3)
40:21,22;120:16
reporter (1)
6:21
repossessed (1)
188:3
representation (3)
81:8;91:13,23
reprint (1)
9:3
reps (30)
28:5,6;31:17;35:7;
47:9,10;50:10,20;
82:19;88:25;89:5;
97:8;104:10;111:12;
113:3,11,20;119:8;
145:5;148:19,23;
149:23;153:5;156:4,
7;160:13;168:14;
169:6,11;177:7
requested (1)
8:9
require (1)
191:7
required (2)
53:23;125:24
requirement (2)
54:5,6
requirements (4)
54:19;125:17;
130:2,5
requires (2)
54:20;124:17
research (2)
63:3;67:6
reside (1)
37:9
resign (2)
23:17;24:5

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 109 of 162   PageID #: 805

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

**resignation (6)**
22:18;112:3;
191:22,23;196:5;
197:20
**resigned (6)**
24:7;111:14;
137:18;155:14;
172:9;191:18
**Resorts (7)**
14:11;16:3,13;
17:2;18:9,10;171:25
**response (2)**
6:25;63:18
**responses (4)**
6:22,22,24;10:10
**responsibilities (1)**
19:23
**responsive (4)**
8:21;9:6;18:3;
152:4
**rest (2)**
60:14;81:7
**restaurant (1)**
186:15
**restricted (1)**
67:22
**result (1)**
55:15
**resulted (1)**
12:24
**retail (2)**
13:15;133:22
**retailer (1)**
155:2
**retained (1)**
176:13
**retired (2)**
108:21;145:13
**retirement (1)**
180:11
**return (1)**
99:12
**review (1)**
192:8
**reviewing (1)**
192:10
**revoked (1)**
67:21
**R-H (1)**
122:1
**Richard (9)**
27:16;103:22;
107:22,24,25;131:10;
144:15;164:3;190:18
**rid (7)**
163:20;176:3,4;
178:7,10,12;193:11
**ride (4)**
32:24;166:6;
178:25;179:2
**right (44)**
8:4;9:16,21;10:5;
13:25;17:8;21:21;

30:23;53:6,8;59:7;
60:19,23;63:2,25;
73:2;76:14;81:23;
83:5;84:2;90:8,9;
94:9;98:3;99:15,17;
103:6;106:15;108:2;
109:22;111:1;
117:13;122:25;
134:19;140:18;
145:15;153:20;
161:10,12;174:3;
176:25;179:9,22;
190:9
**rising (1)**
57:13
**road (1)**
184:4
**rode (3)**
29:3,4;61:18
**Roden (2)**
150:4,5
**Rodriguez (1)**
131:23
**ROI (1)**
99:11
**role (3)**
30:1;108:4;151:18
**rolled (1)**
99:6
**roof (14)**
26:20;27:6,7,9,21;
37:19;81:3,4,11;
86:12;143:21,24;
160:23;183:4
**room (1)**
173:12
**roughly (7)**
93:14;106:6;
132:23;137:17;
170:16;173:13;
189:16
**routine (1)**
7:18
**royally (1)**
63:23
**ruffling (1)**
66:19
**run (15)**
41:4;99:24;118:9;
124:18;126:14;
131:12;133:11,13;
135:21,22;136:7;
146:25;160:17,24;
177:18
**runaround (2)**
125:12,13
**running (5)**
28:10;88:10;110:1,
17;111:21
**runnings (1)**
108:16
**runs (3)**
124:18;150:8;

174:23
**Ryan (2)**
137:15,17

**S**

**sad (1)**
71:7
**safe (2)**
39:10;57:6
**safely (1)**
38:22
**safer (1)**
195:17
**safety (4)**
122:9,13,16,19
**salary (1)**
140:24
**sale (18)**
16:16;18:10;26:13,
17;27:20;31:18;39:9;
40:15;66:7;84:23;
86:4;112:12,13;
132:10;145:19;
160:20;183:3;184:19
**sales (101)**
11:16,18,23,24;
12:1,2,22;14:9,17;
16:22;18:17;19:18,
18,20,22,25;24:11,
12;25:1,2,12;26:12;
27:23;29:5,13;30:2;
31:3,4,17,24;32:1,19,
24;33:11,12;34:7,10,
12;41:7;43:1;47:9;
51:11;55:20;56:18;
61:2;64:20,20;67:25;
68:2,3,4;74:14;77:21,
22;78:4,7;82:19;
83:25;85:18;86:1;
88:25;89:5;97:8;
99:11;101:13;102:1,
2,9,11,17;110:6;
111:11,12;113:3,20;
117:12;118:4;119:4,
19;120:16;146:2,3,
25;148:19,23;
149:23;153:5;
155:12;156:3,6;
160:19;169:4;
170:15;174:3,5;
175:19,20,24;177:7;
193:24;195:23
**S-A-L-E-S (1)**
25:2
**salespeople (2)**
50:3;148:10
**salesperson (1)**
27:19
**Sam (6)**
5:7;10:15;18:5;
34:16;170:4;178:5
**same (32)**

22:22;24:21,24;
47:22;48:2;55:17;
61:4;75:19,20;78:10,
18,19,24;80:13,14;
89:10;94:15;95:1,9;
99:14;101:2;106:18;
111:9;130:3,4,13;
138:2;147:23;151:6;
154:20;162:22;182:1
**Sandra (2)**
132:7;154:13
**Sarah (40)**
9:12;18:16;21:8;
24:20,23,25;27:15;
44:24;46:6;47:5,7;
49:4;52:19;53:19;
54:22;55:1;65:5;
66:13;67:18;69:19;
107:21;108:11;
109:24;110:2,8;
115:18;120:7;122:3,
3,10;123:18,22;
139:19;161:17;
164:2,10;167:3;
170:6,8;192:14
**Sarah's (1)**
115:20
**sat (2)**
52:1;182:6
**Saturday (1)**
41:21
**Saturdays (1)**
41:1
**save (15)**
90:17,22;91:6,15,
20,22;92:25;93:3,11,
13,19;97:10;98:15;
100:10;141:9
**saved (1)**
93:13
**saving (4)**
57:20;93:7;94:6;
141:10
**savings (8)**
59:19;92:12,16;
95:12;96:7;104:3,22;
105:2
**saw (4)**
138:24,25;140:25;
196:2
**saying (36)**
5:3;7:5;45:8;49:8,
22;59:19;60:3;65:15;
73:1,25;75:12;76:15;
87:23;91:13;92:15;
105:23;106:24;
109:24;114:2;
127:21;130:11;
135:6;136:14,23,25;
139:20;142:22;
148:12;155:21;
162:3;163:5;169:2;
175:11;184:17;

190:1;191:25
**scale (2)**
26:10,11
**schedule (1)**
125:5
**school (1)**
12:3
**score (1)**
37:11
**screenshot (2)**
20:4;21:23
**screwed (3)**
63:23;139:9,9
**searching (1)**
53:8
**second (14)**
17:11;48:6,9;
49:11,18;76:21,22;
97:15;120:14;
121:24;132:9,12;
171:6;186:18
**secret (1)**
182:25
**security (2)**
8:10;102:23
**seeing (5)**
50:24;51:23;82:13;
106:13;186:10
**seem (1)**
170:10
**seemed (1)**
69:20
**seems (1)**
159:23
**sees (3)**
100:22,23;128:9
**sell (21)**
13:12;16:4;19:19;
30:10,11,12;31:15,
18;38:15,19;39:6;
50:25;51:3;63:7;
78:9;110:16;132:22;
133:21;141:11;
159:15;161:21
**selling (23)**
13:6,8,20;19:13;
24:8;44:20,22;47:8,
10;50:7;51:1,12;
52:12;65:23;155:11;
161:3,4,6;163:11,19;
176:5,20;178:2
**sells (1)**
165:11
**send (15)**
20:22;21:22;22:18;
58:12;65:14;72:12;
74:1,19,21,23;75:11,
24;80:9;87:7;134:6
**sending (3)**
78:14;142:15;
154:8
**sends (3)**
72:8;74:7,8;83:18

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

sense (2)
  51:20;119:14
sent (50)
  8:25;9:5;20:5,19;
  21:24;25:22;13,19;
  23:5;38:9,13;42:6,
  14;46:25;47:5;48:3;
  49:4,4;50:1,12,19;
  55:11,12;64:15;69:3,
  19,20;71:23;73:6,13;
  74:20;75:16;77:12,
  13;80:15;86:11;
  97:13;112:2;134:4;
  142:17;149:19;
  150:2;153:9,12;
  172:20;191:21,24;
  196:6,25;197:7
separate (9)
  32:25;48:3;103:14;
  118:15,19;119:2,24;
  120:13;121:10
separation (1)
  192:4
served (1)
  176:9
service (4)
  64:21;124:5,7;
  125:4
set (15)
  16:16;20:7;21:2;
  31:18,22;32:1;34:1;
  35:18;36:7;40:17,18;
  56:9,12;57:25;103:2
setting (2)
  10:9;106:1
seven (7)
  41:3,15,16;160:9,
  10,11;194:2
Seventeen (1)
  41:9
several (14)
  9:19,21;65:11;
  67:10;69:14;87:18;
  124:14;131:20;
  154:18;156:11;
  167:4,7;177:1,2
shadiness (1)
  193:18
shady (7)
  64:11;134:25;
  150:14,20,21,22;
  185:3
shaking (1)
  7:1
shape (1)
  43:3
share (5)
  8:17;33:24;36:4;
  103:23;173:23
shared (3)
  31:11;45:12;146:6
sharing (1)
  14:15

Sharp (2)
  68:3,4
Shawna (30)
  20:14,18,19;22:21,
  23;23:3,14,14;24:2,5,
  13,22;32:13;34:24;
  35:1,2;39:2,3;47:7,7;
  69:13;109:13;112:3;
  113:22;114:12;
  120:8,10,19;148:23;
  149:3
sheet (11)
  152:22,23,24;
  153:3,9,12,15,18,22;
  157:14;158:20
Shelly (1)
  190:19
ship (1)
  82:8
shipped (1)
  159:7
shocked (1)
  112:4
shoddy (1)
  160:25
short (5)
  25:15,15;57:9;
  116:14;191:2
short-lived (1)
  25:6
shortly (2)
  54:16;64:8
shoulder (2)
  14:20,25
show (7)
  56:23;80:22;92:7,
  7,8;93:4;172:24
showed (3)
  20:25;93:6;172:22
showing (3)
  20:10;58:3;187:16
shown (1)
  106:12
shows (5)
  20:15;45:13;58:6;
  164:25;187:22
shut (8)
  18:10;128:23,25;
  129:1,3;135:25;
  136:14,19
shuts (3)
  127:10,10;141:21
side (15)
  28:6;31:3;66:13;
  69:22;97:15;100:12;
  110:14;111:10,11,15;
  112:5;142:21;
  146:25;153:4;166:10
sides (2)
  74:18;134:7
sign (5)
  27:1;42:17,20;
  79:8;80:6,7;82:11;

91:24;100:9;106:8,
  11;112:14;135:6,16;
  190:14
signage (1)
  136:22
signature (2)
  102:3;106:23
signed (10)
  19:12;42:7,17;
  103:25;152:18;
  183:20,21;184:8,10,
  11
signing (1)
  42:18
signs (5)
  79:8;80:8;100:11,
  13,13
similar (2)
  76:16;94:13
simple (8)
  6:25;31:23;33:4,5,
  5;59:7;60:17;62:5
single (1)
  37:20
single-wide (2)
  38:10;40:5
single-wides (1)
  37:18
sinking (1)
  82:8
Sipes (1)
  171:24
site (2)
  18:11;116:17
sits (1)
  90:25
sitting (1)
  72:9
situations (1)
  127:22
six (20)
  41:18,20;66:8;
  79:5;86:16;110:17;
  160:9,11;171:20;
  173:13;175:10;
  176:1;184:4,15;
  187:15,19,22;188:14;
  190:4;194:2
Six-plus (1)
  13:18
Sixteen (1)
  41:9
six-week (1)
  68:18
Size (5)
  45:2;46:11;52:23;
  94:10;132:17
Sizing (4)
  47:14,16;50:2,16
skeleton (1)
  177:13
skirting (1)
  136:6

Skis (3)
  84:6;178:21;185:6
sleep (1)
  185:12
sleeping (1)
  185:12
slipped (1)
  14:18
slow (1)
  129:22
slower (1)
  69:25
small (7)
  31:10;165:5;173:3,
  7,8,10;187:20
smaller (1)
  171:2
Smallwood (2)
  132:7;153:11
smart (3)
  33:13;57:11;
  153:24
Smith (2)
  64:7;143:9
smooth (1)
  110:15
Sneedville (2)
  11:3;12:6
Snipes (1)
  171:24
social (4)
  8:10;102:22;
  138:17;139:6
Solar (140)
  16:9;18:7,24;19:2,
  13;22:20;24:2,8,11,
  13,21;25:1,1,10,11,
  12,19;27:2,8,10;
  28:20;30:22;31:1;
  34:2,3;37:19;43:2,21,
  22;45:2;47:14;52:22;
  53:13,20;54:2;59:10;
  60:14,15;70:15;72:6;
  73:8,14,16;75:5,14;
  76:3,13;77:13;78:24;
  79:18;80:10,11,15;
  81:6,7,7,15,17,22,23,
  24;83:4,17,18,19;
  85:5;88:13;91:14;
  95:16;98:15;100:16,
  17;101:2,11;106:22,
  22;111:7;114:2,3;
  115:13;116:19;
  117:4,21,22;120:1,5;
  127:25;128:16,23;
  130:22;131:13,21;
  137:11,17;138:11,14,
  17;139:8;140:14,21;
  141:2,3,24;142:9;
  143:12;144:11;
  146:12;148:16,17;
  149:20;150:12,22;
  151:13;152:15;

155:2,10,22;156:3,9;
  157:8;158:3,4,8;
  161:2,15,24;165:3;
  166:11,20;169:23;
  170:3;171:13;172:4;
  173:3;174:19;
  177:21,25;184:18;
  187:14;197:1
S-O-L-A-R (1)
  25:1
SolarEdge (11)
  157:19,19,20,20;
  159:4;162:20,22,22;
  163:16,18,20
Solartime (1)
  14:13
sold (46)
  16:6,7;22:20,21,
  24;26:12;39:8;67:10;
  69:2,4,15;70:12,16;
  79:6,22,22;80:6;
  82:13,14;91:8;94:21;
  132:15;134:19;
  139:2;147:24;
  156:10;167:22,23;
  168:1,4,14,21,23,25;
  182:16;184:1;188:2,
  7,11,12,12;189:12;
  190:16,20;194:16,19
somebody (2)
  58:19;130:17
somebody's (1)
  125:19
someone (6)
  38:4;77:23;127:16;
  133:6;134:5;178:6
sometimes (8)
  17:8,10,23,24;
  41:2;74:11;101:16,
  17
son (2)
  134:18;194:2
son's (1)
  134:18
soon (3)
  80:11;81:4;123:8
sorry (1)
  26:13
sort (11)
  7:18;10:9;14:9;
  20:9,25;25:21;37:14;
  136:6;149:1;150:21;
  166:25
sounds (6)
  25:4;41:12;141:8;
  169:21;170:11;180:2
sourced (1)
  92:18
South (1)
  155:6
Southeast (1)
  167:6
Southern (2)

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

114:8,9
speak (3)
  7:3;115:17;133:24
speaking (2)
  7:12;125:15
special (2)
  12:24;127:1
specialist (2)
  54:22,24
specific (1)
  30:7
specifically (3)
  28:16;50:9;174:20
specifications (1)
  155:23
specify (1)
  197:1
specs (1)
  162:21
speech (1)
  15:3
spell (1)
  6:10
spelled (2)
  79:12;122:1
spend (7)
  83:1,2,2;97:17;
  99:2,8;113:18
spending (14)
  30:15;57:18;59:13;
  61:1;83:18,19,21;
  98:25;99:15;101:2;
  123:11;165:18;
  170:11;181:22
spent (7)
  33:18;57:23;60:21;
  112:19;123:13;
  170:21;178:9
split (1)
  56:3
spoke (6)
  64:10,14;71:1,6;
  89:4;111:3
spoken (2)
  71:3;114:14
spot (1)
  151:21
Springs (1)
  11:8
square (1)
  173:10
SR2020 (1)
  187:6
SR22 (1)
  186:23
Stacy (2)
  121:12,17
staff (2)
  24:17;168:12
stand (1)
  54:15
stands (2)
  54:24;155:18

start (17)
  7:19;44:5,11;57:3,
  4,4,5;60:20;74:3;
  82:10,13;125:19;
  139:23;163:11;
  166:25;178:7;191:4
started (49)
  13:8;14:12;16:17;
  18:18,19;26:11,22;
  27:2;28:20;31:24,25;
  33:16;35:2;42:3,5,
  12;44:5,7;51:21;
  58:15;63:2,3;66:19;
  67:15;107:6;120:6;
  130:24;137:25;
  157:11;162:2,3,18;
  163:16,19;165:3;
  178:12,13,15;182:2,
  4,10,16;183:8,16,19;
  188:16,18;191:5;
  194:7
Starting (1)
  45:2;161:16
start-up (1)
  26:21
state (9)
  5:14;34:7;53:1;
  54:5,6;88:2;130:7,
  18;192:15
stated (2)
  113:1;139:3
statement (5)
  5:19;57:15;89:8;
  140:6;164:25
staterooms (1)
  185:13
states (7)
  8:15;74:24;107:2;
  125:24;130:13;
  172:25;190:13
stating (4)
  6:6;83:9;192:5;
  196:25
stay (6)
  101:19;148:3;
  161:22;165:25;
  168:14;179:14
stayed (3)
  18:12;166:2;180:9
staying (1)
  180:9
step (2)
  100:18,19
stepped (1)
  35:5
steps (2)
  127:12;128:13
stick (1)
  37:10
stick-built (1)
  37:17
still (30)
  9:16;14:21;18:9;

27:19;38:15,18;39:5;
  47:2;69:5,6;70:13,14,
  19;71:24;87:7;88:7;
  97:5;100:9;101:1,4;
  116:6;121:17;
  139:17;142:8;
  176:18,22;180:12;
  190:21;193:7;196:11
stock (1)
  161:20
stop (5)
  7:24;8:23;17:24;
  82:10;161:9
stopped (6)
  41:15;42:3;88:10,
  11,11;177:14
storage (1)
  96:4
store (10)
  96:3,18,21,24;
  97:4;157:2,4,5;162:5,
  14
stored (5)
  68:6;97:3,5;
  161:24;163:3
stores (1)
  13:14
stories (1)
  139:1
storing (1)
  96:9
story (3)
  85:25;134:8;
  191:20
straight (2)
  26:5,6
street (1)
  88:4
structure (4)
  21:1;38:1,6;39:9
struggling (4)
  140:22;143:13;
  171:14,19
student (1)
  187:24
stuff (42)
  8:11,16;9:15;
  12:15,23;14:3;15:3;
  17:24;23:13;33:8;
  44:7;52:10;53:7;
  54:3;63:4;64:11;
  68:16;72:1;74:3;
  84:2;85:8;90:15;
  92:14;108:25;
  110:11;111:19;
  112:15;113:9;
  114:17;134:25;
  142:5;148:11;149:1;
  153:16;156:2;
  157:20;158:13;
  180:20;188:16,21;
  193:24;194:21
subject (1)

92:16
submit (1)
  81:5
submits (2)
  72:7;80:11
submitted (5)
  65:6;104:11,17;
  135:14,15
successful (1)
  67:8
sucks (1)
  124:7
suit (1)
  33:20
sum (1)
  63:12
Sun (3)
  177:17,19,22
S-U-N (1)
  177:19
Sundays (1)
  41:22
Sunlight (3)
  72:5;79:11;116:22
supervisor (1)
  16:19
supports (1)
  144:21
supposed (22)
  32:18;42:9;50:17;
  53:16;60:4;68:15;
  72:14;76:2;80:5;
  86:14;107:7;126:4;
  132:20,25;133:17;
  135:25;136:3,7,14,
  19;141:13;183:17
sure (14)
  7:15,16;29:16;
  52:21;76:22;77:4;
  92:20;95:9;97:25;
  104:20;109:16;
  136:12;163:14;195:3
surgery (1)
  14:25
Susan (4)
  153:11,21;154:12,
  13
suspicious (1)
  146:23
swear (1)
  5:22
switch (4)
  141:15,18,19,20
switched (2)
  157:10;158:19
switches (1)
  141:20
sworn (2)
  5:19;6:2
system (134)
  28:9;38:21;44:14,
  23;45:3,6,9;46:10;
  47:4,8,14;49:15;

50:16,16,25,25;51:3,
  15;52:2,5,12,23;
  53:15;54:21;60:1;
  62:1,2,3,4,5,12;
  65:14,16;66:1,4,...,
  67:13,23;68:12;69:5,
  16,16;70:12,13,25;
  72:14,21;73:19,20;
  79:22,23;80:3,6,24;
  81:8,12,17;86:13,15;
  88:21;90:25;91:5,11,
  15;92:7,12,24;93:8,
  18;94:10,22;95:17,
  20;96:3,24;98:18;
  99:4;104:1;105:7,8,
  15,24;107:2,7,12,18;
  110:17;112:11,18;
  116:15,17;126:22;
  127:11,17;128:3,5,6,
  16,23;131:2,6;
  132:16,17,17,19;
  133:15;134:5,11,19;
  135:21,24,25;136:1,
  4,12;138:23;141:4;
  142:6;143:1,14,20,
  23;146:8,18;147:9,
  16;152:25;153:4;
  156:10,24;158:5;
  162:17;182:17
systems (28)
  44:12;47:10;49:7;
  52:23;60:2;63:2
  70:17;92:8;93:5,
  94:20;110:11;
  111:22;133:12,16;
  136:15,20,23;140:16,
  16;141:13;150:24;
  151:1;152:16;157:9;
  162:8;163:7;183:10;
  184:14
system's (1)
  156:18

**T**

table (1)
  58:6
tactic (1)
  75:14
tagged (2)
  128:3,4
take-over (3)
  16:15,21;85:6
talent (1)
  41:13
talk (24)
  8:24;9:6;18:6;
  28:13;40:19;43:1,2,
  24;59:12;60:18,25;
  61:9;66:3;69:18
  84:17;85:17;11\
  125:16;132:8;
  151:25;163:25;

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

175:15;186:17;
195:25
**talked (17)**
5:20;47:17;56:15,
25;65:25;66:2;69:10;
84:20;122:10,11;
134:3;150:5;163:24;
182:9;189:15,18;
190:23
**talking (14)**
7:5,7;9:14,19;18:4;
41:5;57:4,5;90:15;
95:2;103:1;182:10;
188:13;195:22
**talks (2)**
23:7;144:11
**taught (6)**
30:4,9,10,11,12;
34:11
**tax (17)**
34:5,7;61:6,10,13,
21,24;62:21;63:9,14,
21;64:2;66:3;84:21;
98:20;99:5;164:25
**taxes (3)**
63:11;83:13;
166:13
**TBI (5)**
14:1,20;17:6,17;
29:2
**team (2)**
77:22;120:16
**Tech (8)**
12:13;152:22,23,
24;153:9,12,18,22
**technical (3)**
28:6,17;153:4
**technically (1)**
83:20
**technology (3)**
12:14;157:23,24
**tech-wise (1)**
157:14
**telephone (1)**
23:6
**telling (16)**
23:10,13;45:22;
52:15;61:23;63:19;
72:20;76:3;81:25;
92:23;104:23;133:5;
139:22;176:16;
193:10,20
**tells (5)**
40:9;51:14;52:22;
54:20;98:13
**temperature (3)**
153:1;156:21,23
**ten (3)**
60:13;160:10;
168:17
**Tennessee (43)**
5:8,15;6:9;11:3,7,
8,9,14;12:3,6,13;

13:12;23:2;34:8;
40:13;52:1;69:2;
94:14,18,20,21,22;
95:3,12,13,14,25,25;
129:25;130:4,8,13;
143:1,10;162:13,13;
164:17;167:5;
172:14;186:24;
192:17,20,22
**terminated (1)**
42:21;133:13,20
**termination (1)**
196:23,24,24
**terms (3)**
27:6;66:6;102:21
**Terry (2)**
171:23;172:4
**Tesla (4)**
174:18,22,24;
178:18
**Teslas (4)**
165:19;175:2,8;
176:3
**test (3)**
53:1;136:11,18
**tested (1)**
54:20
**testified (2)**
6:3;45:4
**testify (2)**
9:24;10:3
**testifying (1)**
10:6
**testimony (2)**
5:23;10:6
**texts (1)**
9:13
**therapy (2)**
15:2,3
**thinking (3)**
79:15;96:19;176:6
**third (8)**
49:21;55:12;81:1,
2,23,24;116:20;
124:24
**thorough (1)**
92:2
**thoroughly (1)**
138:15
**though (12)**
9:16;75:19;87:5;
101:1;102:2;108:14;
115:22;116:5;
119:19;128:10;
174:16;190:14
**thought (13)**
7:13;28:2,3;32:22;
45:10;52:10;65:20;
68:20;107:15;
151:19;157:16;
166:11;178:8
**thousand (3)**
106:6;112:13;

196:4
**threatening (1)**
127:20
**three (37)**
22:23;26:23;29:24,
24;41:4,14;71:23;
72:11,13;73:5;74:9;
77:2;79:11;86:17;
93:4,5,6;94:2,4,7;
97:13;120:6;123:5,7;
129:15;134:4,7;
135:20;142:15;
160:12;164:22;
167:15;168:17;
173:13;185:13;
191:13;194:25
**three-day (2)**
75:24;173:23
**three-hour (1)**
56:4
**threw (1)**
32:17
**throughout (3)**
56:4;58:25;167:6
**Thursday (1)**
197:25
**ticket (7)**
64:25;65:4,6,6;
72:7;88:6;134:6
**ticketed (1)**
90:6
**tickets (2)**
64:16;134:4
**tie (1)**
135:24
**tied (1)**
71:7
**tier (1)**
158:4
**till (1)**
184:4
**timely (1)**
181:24
**times (19)**
26:23;82:20;86:17,
18;110:20;112:11,
20;124:14;131:18;
134:4;143:15;
145:18,18,18,20;
146:19;162:7;
172:11;173:2
**time-share (4)**
14:12;15:24;22:22,
24
**time-shares (2)**
16:4;172:7
**Titan (87)**
16:9;18:7,24;19:2;
24:3,11,13;25:10,13,
19;27:2;28:20;30:23;
31:1;43:2,22;53:20;
72:6;73:8,14,16;75:5,
14;76:13;78:25;

79:18;80:10,11,16;
81:7,18,23,24;83:4,
19;91:14;111:7;
114:3,3;115:13;
117:5,21,22;120:1,5;
127:25;130:22;
131:21;137:12,17;
138:11,14,18;139:9;
140:15;142:9;
144:11;146:12;
148:16;149:20;
150:22;151:13;
152:15;155:2,10,22;
156:3,10;157:8;
158:8;161:2,15;
165:3;166:7,17,20;
169:23,23;170:3;
171:13;172:4;173:3;
174:15;177:21;
180:19;187:14;197:1
**Titan/Ideal (1)**
76:3
**Titan's (3)**
81:8;83:18;166:11
**title (2)**
89:25;150:8
**titled (7)**
30:20;43:16;47:14;
58:4;76:11;186:21,
22
**today (22)**
5:18,23;6:20;7:3,
12,20,21;9:23;10:3;
31:23;59:6,12;60:17,
25;70:14,15;150:6;
176:23;183:24;
184:1;185:4;188:15
**Todd (3)**
50:11;149:17,25
**Todd's (3)**
50:18;149:25;
150:1
**together (13)**
18:23;22:21,24;
56:10;77:8;104:21;
123:18;158:6,7;
171:20;176:11;
194:3,13
**told (78)**
17:21;19:9;20:1;
23:6;25:9,21,24,24;
35:13;39:3,19;42:20;
44:11,11,21;45:11;
47:6,7;52:13;61:10,
13;62:25;63:10,10,
14;64:18;66:5;67:11;
69:21;89:15;92:24;
108:3;109:6,9,11,14;
110:23;114:19,24;
119:18;120:13;
121:10;122:12,24;
123:2,5,6;124:22;
126:2,5,7,15;133:22;

135:2;137:15;146:7;
150:12;152:3;154:7;
161:16,23;162:7;
163:2;164:13;168:4;
172:23;176:8,12;
177:14;181:13,14,15;
183:12,13,20;191:6,
8;193:14
**took (9)**
15:9;26:19;66:18;
119:10;143:25;
151:20;166:4;
167:24;186:3
**tool (1)**
12:14
**top (4)**
17:8;39:21;76:12,
14
**total (11)**
26:12;62:4;73:19;
98:20;101:12;102:7,
18;116:10;145:19;
146:20;147:13
**totally (5)**
34:11,14;51:25;
141:5;164:14
**touch (1)**
131:14
**touched (1)**
110:12
**touching (1)**
131:15
**tow (1)**
88:6
**toward (1)**
153:25
**towards (2)**
58:1;89:10
**towed (1)**
88:3
**train (4)**
34:13,15;148:23,
25
**trained (15)**
28:5,16,21;34:11;
52:22,25;61:10,18;
63:7;95:11;111:13;
115:3;135:21;149:4,
7
**training (22)**
28:15,19,24;29:7,9,
19;30:5;31:4,5;
34:20,23;35:1,4,7;
52:19,20;53:15;
54:13;89:21;90:1;
115:3;149:6
**traits (1)**
40:9
**transaction (1)**
120:17
**transcribe (1)**
5:4
**transfer (7)**

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

72:9;141:14,18,19,
20;181:1,4
**transfers (1)**
121:22
**translate (1)**
96:7
**traumatic (1)**
14:1
**travel (1)**
56:7
**traveling (1)**
11:16
**treat (1)**
185:24
**treated (2)**
88:18;172:3
**trickled (1)**
124:2
**tried (2)**
81:21;126:14
**trip (3)**
165:24,25;168:8
**trouble (2)**
115:18,19
**troubles (1)**
71:19
**truck (2)**
88:3;135:20
**true (2)**
63:15;87:3
**trust (2)**
160:4,6
**truth (2)**
134:8;139:22
**truthfully (1)**
9:24
**try (19)**
7:5,6,8;8:6;9:8;
10:8;30:6;35:23;
36:7;38:15,19,20;
56:9;64:22;74:11;
84:23;87:20;141:9;
147:25
**trying (13)**
38:24;71:22,25;
76:20;82:22;110:13;
112:20;142:22,23;
154:1;161:22;
184:22;191:8
**tube (1)**
143:25
**turn (8)**
37:20;104:9;
111:16;128:5,6,7;
135:24;136:4
**turned (10)**
28:9;70:20;116:15;
118:4,7;131:2;136:1,
21;181:11;191:2
**turning (1)**
111:22
**turnkey (2)**
62:15;79:23

**turns (1)**
136:13
**TV (2)**
142:20;188:17
**TVA (6)**
96:2;126:15,22,23;
128:8,16
**twice (3)**
85:20;124:23;
180:5
**two (38)**
18:12;22:15;25:3;
26:17;32:10;34:9;
35:12;70:9;76:15,16,
19;78:11;79:9;84:3;
90:8;92:8;97:14;
102:15;103:13;
119:13;121:23;
129:13,14,15;134:3;
135:20;143:10,24;
146:19,21;164:21;
168:16;170:8;
178:21;185:13;
186:10;188:12;
191:12
**two-thirds (1)**
15:12
**two-way (1)**
127:7
**tying (1)**
104:21
**type (4)**
19:21;36:24;37:1;
116:10
**types (6)**
11:18;30:4;60:9;
174:9,10;175:20
**typical (1)**
66:10
**typing (1)**
53:7

**U**

**under (11)**
5:23;6:15;15:5;
49:16,19;76:2;84:12;
119:25;120:1,1;
156:17
**unemployment (3)**
18:11;192:4;
196:18
**United (1)**
74:24
**unless (4)**
37:21;66:12;
103:19;193:2
**unpadlocked (2)**
137:3,5
**unprofessional (1)**
151:23
**up (118)**
15:14;16:16;17:3,

11,15;21:2;27:25;
28:15;31:18,22;32:1;
34:1;35:4,18;36:7;
38:8;40:2,4,6;43:4,7;
44:15;45:9;47:3,24;
49:23;51:22;53:5,10;
56:5,9,13,23;57:11,
17;60:15,20;61:8;
62:7;63:1;64:23;
65:1;67:1;68:17;
71:8;74:2;79:8,8;
80:7,9;85:25;87:15;
89:1;90:22;91:22;
92:8;95:7;97:4,18;
98:5,7,25;99:8,10;
100:9,12,13;102:7;
103:2,25;106:5;
107:6;110:17;
114:13;119:10;
123:6;124:9,21,23;
130:19;131:10;
133:15;134:8,10,23;
136:20;143:25;
145:15;146:21;
148:21;152:18;
153:16;154:2,9;
155:12,19,20,21;
159:15;160:11;
161:6;162:11;
164:25;168:24;
171:15;177:6,23;
179:20;180:6;
181:10;183:16,17;
184:24;190:7;
191:12,16;192:1;
193:3
**updated (7)**
47:1,6,16;49:6,10;
55:13;97:13
**upfront (2)**
80:25;182:17
**upgraded (1)**
123:24
**upon (1)**
67:7
**upset (4)**
63:15;133:2;153:8;
181:16
**USA (6)**
14:13;25:10;30:23;
31:1;76:13;120:1
**usage (6)**
33:19;45:19,20;
49:15;90:20;91:18
**use (36)**
30:16;31:17;38:17;
45:15;46:9,12;58:1,
21;68:2,2;74:11,15,
17;96:20;103:20;
107:17;116:25;
126:21;127:2,3;
140:12;143:6;158:9,
10,11,11;160:4;

167:18;168:7,8,12;
169:14;180:2,17;
188:20;192:2
**used (32)**
27:5;45:8;46:13;
58:23;61:5;66:17,23;
68:1;74:15;86:18;
94:3;96:22;97:2;
107:13;110:11,16,16,
19,20;111:24;
123:21;124:1,4;
140:6;146:16;
168:10;177:11,12;
178:21,23;180:19;
183:2
**uses (1)**
45:16
**using (14)**
75:22;85:20;97:8;
106:2;137:14,20;
138:13;141:18;
157:8;159:1,2;
162:20;168:3;177:17
**usually (3)**
15:23;101:13;
141:24
**Utilities (1)**
95:22
**utility (1)**
91:16

**V**

**vacation (3)**
11:24;14:11;180:6
**vacationed (1)**
180:7
**vacations (1)**
168:10
**value (1)**
34:4
**value-wise (1)**
194:20
**van (1)**
135:20
**variances (1)**
92:16
**Vegas (3)**
172:13;192:19,20
**vendor (1)**
155:24
**verbal (1)**
27:4
**verbally (2)**
37:2;114:19
**verifies (1)**
100:18
**versa (1)**
78:2
**versus (15)**
31:15;32:25;33:7;
37:19;48:10;84:10;
92:10;96:11;99:1;

125:9;141:17;
159:18,21;160:1;
180:9

**vessel (1)**
179:17
**veteran (7)**
144:16,25;145:4,
13,14;159:16,16
**veterans (3)**
144:12,19,25
**veteran's (1)**
145:9
**via (1)**
58:12
**vice (2)**
24:12;78:2
**Virginia (2)**
8:14;40:14
**visit (1)**
177:10
**voice (1)**
61:15
**Volkswagen (1)**
196:3
**VP (1)**
30:2

**W**

**wage (1)**
15:12
**wait (2)**
7:6,9;87:23,24
**waive (1)**
5:17
**walk (2)**
57:2;105:6
**walked (2)**
14:18;181:11
**walking (1)**
84:14
**walks (1)**
153:16
**wall (2)**
64:23;134:21
**wants (2)**
73:16;101:8
**Warren (6)**
36:6;39:19;89:15,
17;120:7;172:21
**wasting (1)**
38:17
**watt (1)**
145:18
**watts (1)**
152:25
**way (24)**
17:16;23:12;39:7;
82:17;90:24;99:24;
127:5;133:14;14
142:1;150:21;15
153:10;160:17,24,25;
168:15;170:21;

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

172:2;173:17;
178:23;183:20;
185:2,3
**weather (3)**
90:24;92:13,17
**website (2)**
53:12;54:12
**week (29)**
21:24;22:13;23:21;
41:4,5,15,16,18,21,
23;42:4;123:3,5,5,7;
142:15;147:4,5;
155:11,16;168:18;
180:15;190:8,8,25;
191:12,13,21;194:24
**weekday (1)**
74:11
**weekend (2)**
74:10,12
**weekly (1)**
15:12
**weeks (25)**
26:17,18;41:24;
61:5;66:8;69:5;
70:19;110:17,18;
129:13,14,15;143:2,
24;155:15;173:13;
177:1;184:19,20;
187:16,19,22;188:14;
191:13;194:25
**weird (1)**
120:24
**welcome (3)**
100:16;101:11;
192:8
**weren't (5)**
9:18;67:7;119:3;
147:15;168:3
**what's (46)**
5:19;11:4;14:1,10;
16:14;24:10;30:13;
40:3;42:15;43:18;
50:13;53:16;62:15;
65:16;68:3;70:1;
72:18;74:15;76:11;
84:24;93:24,25;
98:23;100:16;
105:18;106:15;
108:8;111:9;116:20;
118:15;127:1,13;
128:13;136:11;
141:13,23;145:4;
157:18;158:11;
162:19;176:7;178:3;
182:17;183:10;
189:25;197:5
**whatsoever (1)**
69:24
**whenever (19)**
5:2;28:16;42:2;
45:4;46:7;49:25;
50:2;67:15;103:25;
126:18;150:20;

151:15,19;152:5;
159:8;171:13;
181:23,24;195:4
**wherever (1)**
24:18
**whip (4)**
131:12,12,14,14
**Whitehead (1)**
133:24
**whole (7)**
5:17;11:14;18:13;
31:25;57:2;63:5;
186:2
**wholesale (2)**
13:15;155:3
**wholesalers (1)**
155:7
**wholesales (1)**
149:6
**who's (3)**
91:14;134:10;
176:15
**WHS (1)**
138:21
**wife (7)**
17:17,18;62:25;
143:11;165:10;
194:1,3
**wings (1)**
194:9
**wire (9)**
72:9;121:21;
124:18,19;125:15;
141:17,24;180:25;
181:3
**wired (1)**
112:9
**wire-in (1)**
141:23
**wiring (6)**
112:8;115:6;
131:11;135:22,22;
136:7
**wise (1)**
150:23
**withdraw (1)**
123:10
**withhold (1)**
27:23
**within (12)**
46:20;56:14;68:20;
71:23;72:11,13;73:5;
77:2;82:5,21;173:22;
176:5
**without (10)**
26:23,24;84:15;
111:20;125:16;
126:10;127:22;
137:12;183:23;190:6
**WITNESS (148)**
5:21;6:2;15:14;
17:10;21:14,24;22:2,
6,10;31:22;32:9,13,

16,20,23;34:21,24;
35:2,8;36:17,22;
39:19;40:1,22;47:24;
48:17,20,24;49:3;
53:9,18,21;56:5;
59:5;62:14;65:1;
70:17;75:25;76:5,24;
77:5,16,21;78:7,19,
22;86:3;89:3;93:12,
24;94:8,15,20;95:4,
14;96:8,16;97:5,11,
21;98:1,10,16;99:18,
22,25;100:4,7,11;
101:6,15,24;102:4,9,
14,19;103:3,7,10,13;
104:25;105:4;
109:10,13;110:6;
119:4;120:15;121:5,
8,21;124:13;130:10;
132:15;133:8;
145:12;146:14;
147:12,17,20;148:21;
152:13;153:23;
156:19;157:2,5;
161:5,11,14;163:9,
13,18;165:4;168:9,
13,22;169:5,12,16,
18;171:4;173:9;
174:12;175:9;176:4,
17;178:14,19,24;
179:3,20;180:22;
184:16;185:8,16,22;
186:9,14;187:8;
189:13;192:11,16,23;
193:1,8,12,15;
194:18;196:10
**witnessed (4)**
108:10,12;139:12;
193:18
**woman (6)**
69:12,14;111:25;
114:1,20;133:2
**women (1)**
153:25
**won (3)**
165:25;168:7,12
**wondering (1)**
180:23
**word (5)**
7:1;85:20;90:23;
110:13;152:10
**wordage (1)**
91:25
**worded (2)**
74:13;92:1
**wording (1)**
92:2
**words (9)**
64:17;106:21;
124:25;181:11,13,14,
21;195:7;197:2
**work (37)**
13:17;15:8,17,18,

21,24;17:1;19:21;
25:4,19;41:1,1,21,24;
43:22;60:10;63:9;
65:23;79:18;89:10;
110:12;112:18;
141:7;143:14,21;
144:22,23;150:24;
151:2;152:16;
156:11,16,20;160:25;
184:22;191:6,7
**worked (15)**
8:15;13:10;24:21,
23,24,25;41:3,25;
42:1;133:12;151:7;
171:20;177:16;
182:16;191:13
**worker's (1)**
15:5
**working (27)**
11:23;14:10,17;
16:12;17:1;25:23;
28:20;51:15;58:15;
65:14,17;66:1;67:14;
69:6;70:14,14,20,20;
107:3;112:20;
127:16,18;139:22;
156:18;158:7;
171:18;197:23
**workings (1)**
95:18
**works (7)**
33:5;51:12;93:19;
95:18;141:3,4,5
**world (3)**
151:3,4,9
**worried (5)**
122:8,12,16,18,19
**worse (1)**
151:16
**worst (1)**
177:25
**worth (4)**
64:12;83:14;158:7;
194:17
**Wow (2)**
41:10;181:9
**write (6)**
85:1,12;86:21;
87:7;180:25;196:13
**writing (1)**
73:6
**written (2)**
63:21;117:10
**wrong (8)**
17:19;51:17;54:7,
9;74:20;75:17;76:4;
177:8
**wrote (7)**
92:13;142:16;
154:10;166:14;
172:9,17,20

21,24;17:1;19:21;
25:4,19;41:1,1,21,24;
43:22;60:10;63:9;
65:23;79:18;89:10;
110:12;112:18;
141:7;143:14,21;
144:22,23;150:24;
151:2;152:16;
156:11,16,20;160:25;
184:22;191:6,7

**Y**

**yacht (3)**
84:4,5;179:14
**year (39)**
5:15;12:18;15:9,
10;28:1;33:18;41:3;
47:2,21;52:2;57:25;
60:21;62:24;63:5;
69:10;70:18;83:24;
97:12;99:10;105:21;
110:11;123:17;
137:17;144:22;
153:6;154:19;
156:12;163:17;
165:16,16,24,25;
170:15;175:21;
180:9,10,11;182:3;
187:9
**years (23)**
13:4,9,18;22:15;
32:10;43:23;46:13;
57:24;58:8,8;59:24;
74:5;82:18;97:17;
98:4,5;99:2,7,13;
119:13;168:17;
180:8;194:2
**yellow (1)**
97:16
**yesterday (1)**
21:25
**you-all (1)**
195:7
**younger (1)**
89:9
**YouTube (1)**
138:21

**Z**

**zero (1)**
42:1

**1**

**1 (5)**
21:18,19;38:13;
117:2,4
**1,000 (1)**
106:3
**1,500 (1)**
173:10
**1,800 (1)**
173:9
**1.62 (2)**
145:17,19
**1.7 (1)**
105:14
**1:00 (1)**
84:19
**1:20 (2)**
21:25;90:12

In Re: Investigation of Ideal Horizon Benefits,
d/b/a Solar Titan USA, Inc.

Sworn Statement of Jason Horton
August 3, 2022

**10 (13)**
14:19;34:4;38:13;
57:24;58:8;59:23;
97:17;98:3;99:2;
123:4,6;145:18;
153:17
**10,000 (9)**
62:5,9;145:18,20;
146:18,18,19;147:8,
25
**10.1 (2)**
105:13,14
**10.81 (1)**
105:14
**100 (1)**
59:8
**10-year (1)**
99:1
**11 (1)**
138:22
**11:52 (2)**
90:9,11
**110 (1)**
98:6
**12 (4)**
16:7;45:14,17,18
**12:00 (1)**
56:2
**120 (1)**
154:10
**15 (8)**
34:4;62:7;99:12;
101:22;149:17;
150:3;155:13,17
**16 (2)**
41:24;61:5
**17 (2)**
41:9;61:5
**18 (3)**
11:25;182:18,19

---

**2**

**2 (2)**
31:20,21
**2- (1)**
182:22
**2,500 (1)**
147:8
**20 (9)**
41:5,8;56:23;58:8;
59:24;98:5;99:7;
155:11;189:2
**20,000 (1)**
132:24
**200 (1)**
182:22
**200-plus (1)**
177:3
**2017 (1)**
14:24
**2018 (4)**
14:2,10,14;16:25

**2019 (5)**
9:14;46:4;65:11;
96:2;162:14
**2020 (7)**
22:14;35:3,5;69:4;
70:13;162:9;168:24
**2021 (4)**
43:6,8;163:14;
185:7
**20-year (1)**
99:1
**21st (1)**
197:24
**22 (1)**
112:22
**23 (2)**
12:2;13:9
**25 (6)**
96:22;146:16,17,
18,20;184:2
**25-plus (1)**
96:24
**26 (10)**
34:5;61:21,25;
62:10,21;63:8,21;
83:10;98:19;119:24
**26th (1)**
22:14
**277 (1)**
98:6
**29th (1)**
197:8
**2nd (1)**
22:2

---

**3**

**3 (4)**
43:12,13,16;147:4
**3- (1)**
175:20
**3/14/77 (1)**
11:5
**3:00 (1)**
56:2
**3:10 (1)**
171:8
**3:22 (1)**
171:9
**3:58 (1)**
198:4
**30 (14)**
29:4;55:24;56:23;
72:21;73:17,18,24;
82:1,4;105:16;
155:11;170:16;
173:23;176:5
**30- (1)**
56:14
**31 (1)**
155:14
**312-256-0998 (1)**
70:3

**37,000 (2)**
98:21;99:4
**370 (2)**
105:10,13
**37721 (1)**
11:9
**3s (1)**
174:18

---

**4**

**4 (23)**
44:16;46:15,16;
47:17;48:15;49:14,
14,14,18,23;92:10,
24;93:6,11;104:24;
105:8,24;147:22,23;
161:13,14;163:6;
182:20
**4,000 (3)**
105:8,9,12
**40 (4)**
154:9,9,16;156:17
**400 (2)**
47:14;177:6
**400,000 (1)**
175:21
**41 (1)**
152:16
**45 (1)**
55:24
**455 (1)**
179:13
**45-minute (2)**
56:14;57:2
**4K (1)**
51:3
**4KW (1)**
105:9

---

**5**

**5 (10)**
26:12,15;42:14;
48:12,13;49:1;57:25;
93:6;97:9;182:20
**5,000 (1)**
147:4
**5.50 (1)**
148:6
**50 (14)**
33:23;90:17,18;
91:4,6,12,15,19,20;
92:8,25;95:1;104:3;
106:6
**50- (1)**
185:10
**50,000 (5)**
98:18,21;99:21,24;
182:19
**50/50 (1)**
101:16
**500 (4)**

**49:24;105:24;**
167:11,11
**50-plus-footer (1)**
179:16
**52 (1)**
123:6
**550 (1)**
106:6
**551 (1)**
105:25

---

**6**

**6 (10)**
59:3,4;92:11;93:2,
6,7;97:9,20,23;
145:18
**6- (1)**
107:8
**6.50 (2)**
145:16,17
**6:00 (1)**
56:2
**60 (8)**
29:4,10,11;61:18;
89:4;91:6;176:5;
178:15
**600 (2)**
49:19;107:17
**60-foot (1)**
185:10
**60s (1)**
155:12
**65 (1)**
147:13
**650 (1)**
37:11
**6509 (1)**
11:8
**699 (1)**
100:14

---

**7**

**7 (2)**
77:15;132:17
**7/23 (1)**
20:6
**70 (3)**
51:6;92:9;176:9
**75 (1)**
184:4

---

**8**

**8 (2)**
165:2;197:14
**80 (2)**
17:22;92:9
**800 (4)**
44:16;49:15;51:4;
107:8
**80-plus (1)**

**82:18**
**865-660-5767 (1)**
172:16

---

**9**

**9 (4)**
96:17,18,24,24
**9:00 (1)**
56:2
**9:50 (1)**
90:9
**90 (15)**
17:23,23;33:23;
90:17,18,22;91:4,13,
15,19,21;93:3;95:1;
111:15;178:15
**94 (2)**
130:3,11
**95 (1)**
130:11
**98 (1)**
12:19
**99 (3)**
140:19,20,21

Craig

I forgot to ask, who's the CEO, CFO and COO

CEO is Craig Kelley
CFO is Michael Atnip
COO is Sarah Kirkland
Regional Director of Sales
Development is Shawna Helton
Office Administrator is Lakea Helton
Appointment Setter is Kay Warren

Installation Director is Nathan Scism

K

Is payroll a week behind?

Yes

I'm gonna send u my resignation letter for u to proof 

Resignation letter

Dear Chris, James, and Jon,

First and foremost I want to thank you for this awesome opportunity to represent your company. It has been

      



EXHIBIT
#1 Jason
Horton
5/3/22 CM

# Anyway Money Pitch

John and Mary, we like to begin every consultation with your current forever plan because every homeowner we've ever talked with always wants to know whether or not investing in solar will pay off, versus what they're currently doing. (Customers will nod or verbalize in agreement)

You shared earlier with me that your average power bill is $200 a month correct? (Write down $200) So simple math tells us that $200 (a month) times 12 (months) out of the year is $2400 per year that you are paying for your electricity, correct? (wait for them to agree)

$$\begin{array}{r} \$200 \\ \underline{\text{X } 12} \\ \mathbf{\$2400} \end{array}$$

So realistically speaking, do you feel that the cost of power is going to go down with time or up with time? (Wait for them to say yes) I agree with you, the Dept of Energy agrees and so does the Federal government. For the last 8 years the national average increase for power bills has been 8.2% EVERY YEAR. But for the sake of the few moments that we have together, let's pretend that it only goes up a modest 5% annually (LOL right?)



**So, if the cost of power ONLY goes up 5% a year you will have spent $30,187 in the next TEN YEARS** (write down times 10 equals their number)

$2400
X12
$2400
X 10
**$30,187**

John and Mary, did you realize you're going to spend OVER THIRTY THOUSAND DOLLARS OVER THE NEXT TEN YEARS KEEPING YOUR LIGHTS ON???? (Wait on their response) WOW….and that's not considering that that's just over the *next ten years*. You shared with me earlier that this is your forever home, y'all look about my age meaning you've got at least 20 more years to go wouldn't you agree? (wait on their affirmation) So that's $30,187 in ten years and in 20 years with the same modest 5% inflation is $79,358. Insane isn't it??? (wait for their response)

$30,187
X 2
**$79,358**

Now let's pause for just a second, obviously this is a sales consultation, Solar Titan would love to earn your business, and sooner rather than later. So I'm going to ask you to buy before I leave your home today. Now (put your hands up in a non aggressive manner) it's not a high pressure consultation. It'll either make sense to you or it won't, you'll either see the benefits or you won't and it'll either be affordable or it won't. (wait for their affirmation) So let's pretend I've asked for

your business and you say, "Shawna I wouldn't use this if you gave it to me!", we shake hands, I drive out your driveway and you never have to look at me again. Just because you chose NOT to buy solar today, (pick up their power bill) are you going to say "Wow honey, that crazy solar person said we are gonna spend an astronomical amount of money on electricity. Let's just shut it off, we don't need it.???? (**WAIT FOR THEIR RESPONSE**)

So there's no way just because you don't invest in solar today you're going to shut off your power??? (**wait again for their responses**) (Hold up their power bill again) So this bill is in no way fashion or form **NEGOTIABLE IN ANY WAY**??? (Wait for their response) That's what we call "*ANYWAY MONEY*" because that's the money that you're going to spend on power *anyways*...regardless of your choice to go solar or not. (**Write out Anyway $$ beside their money commitment**)

All we're asking you to do today is to redirect a little bit of that money you're going to spend ANYWAYS over the next few years into your solar system that you'll OWN AND PRODUCE YOUR OWN POWER versus continuing to RENT your electricity FOREVER and have nothing but a stack of receipts to show for your hard earned money

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 121 of 162   PageID #: 817

# Option Close Pitch

Okay John and Mary, I have a couple of questions for you before I begin customizing some options for you. Based on what you share with me, we'll tailor fit the system that will best fit your family's wants, needs, and desires. (wait on them to acknowledge)

What are your end goals as far as solar is concerned? Some homeowners say, "Shawna if you can just knock out half my bill we'd be happy!" While other homeowners are more optimistic and want to offset 75% to nearly the whole bill...where would you all be on that scale? (Wait for their response)

Great! What I'm going to do is show you a couple of different options...but we can totally customize this for you. We can scale it up or down or do anything in between....it's all about making it work for your family!

(This is where you use your guideline in your Pitch Book...take the average monthly kwh usage from their bill and match it up with the guidelines. Rule of thumb is to give them one option that would offset 50-60 percent of their usage on an annual basis and one that would offset 80-90 percent of their usage on an annual basis. **NOTE: IT IS EXTREMELY IMPORTANT THAT WHEN GOING OVER THEIR OPTIONS YOU USE THE VERBIAGE "ON AN ANNUAL BASIS")**

Underneath your Anyway Money pencil pitch, you'll want to show your two options (this *HAS* to be written out this way for *maximum impact to the homeowner*) From your previous discovery you should have notes that's important when putting together their cost and payment...ie. whether they pay taxes or not, if their roof is metal or shingle, the need for a ground mount, etc. You also need to go

Case 3:23-cv-00046-DCLC-JEM   Document 10-5   Filed 02/06/23   Page 122 of 162   PageID #: 818

*Once you have finished calculating and writing down their recommendations, turn your notepad around, to where both of them can easily view the page.*

Okay John and Mary, based on what you've shared with me, along with the information I've gathered from your power bill I have two recommendations for you. (Start off explaining the smaller system first) On this side we have a 5K system which will offset between 50 to 60 percent of your usage on an annual basis. The way we price our systems is by the kilowatt, our current price per kw is $5 per watt, however, because of your military service we're giving you a 75 cent discount per watt today! That means your pricing is only $4.25 per watt today. So a 5KW system at $4.25 is only twenty-one, two-fifty (when going over pricing you always want to downplay their cost while exaggerating their discounts, and their tax credits), your 26% tax credits come in at five thousand, five hundred and twenty-five dollars, making your net one time lifetime cost to go solar only fifteen, seven twenty-five(Circle their bottom line number) Your payment is only $164.62 and after your tax credits have been applied your payment will only be $121.82 per month.

Now this option is a 8KW system and will offset 85-95 percent of your usage on an annual basis. Same pricing per watt, you're looking at only thirty-four, your tax credits come out to eight thousand, eight hundred and forty dollars making your net lifetime one time cost only twenty-five one sixty (circle their bottom line) Now as you recall John and Mary, you will have spent $30,187 in the next ten years to your power company with a modest 5% inflation renting your power...when you can produce your own power for the same amount of money! **Do you see why so many homeowners say this is just a NO-BRAINER!!** (Wait for their confirmation) The payment on this is only two sixty three and after your tax credits have been applied is only one ninety four and some change. Which one makes the most sense to you all to start off with today? (Shut up and WAIT for their response)

# NON-DISCLOSURE, NON-COMPETITION, AND NON-SOLICITATION AGREEMENT

This Non-Disclosure, Non-Competition, and Non-Solicitation Agreement (hereinafter the "**Agreement**") is made and entered into this _____ day of _____, _____ between Solar Titan USA, LLC, a Tennessee limited liability company (hereinafter referred to as "**Company**"), and _____ (hereinafter referred to as "**Employee**"). Company and Employee may be referred to herein collectively as the "**Parties**" and individually as a "**Party**."

**WHEREAS**, Employee desires to work or continue to work for Company and to perform or continue to perform services for Company; and

**WHEREAS**, Company desires to employ or continue to employ Employee and for Employee to provide or continue to provide services to Company.

**NOW, THEREFORE**, in consideration of the promises, the mutual covenants set forth herein, and other good and valuable consideration, including the employment or continued employment of Employee by Company, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Section 1.**      **At-Will Employment**.  Company hereby agrees to employ or continue to employ Employee and Employee agrees to accept employment or continued employment with Company. The Parties agree that Employee's employment is "at will" and Employee's employment may be terminated at any time by either Party with or without cause and with or without notice. Employee expressly agrees that Employee's employment and/or continued employment and resulting compensation is sufficient and adequate consideration for this Agreement, and Employee acknowledges and understands that entering into this Agreement with Company is a condition of Employee's employment or continued employment with Company. Employee agrees that while employed by Company, Employee will devote Employee's full time and best efforts to Company's business and will not engage in any other business or employment without the prior written approval of Company's President.

**Section 2.**      **Non-Disclosure of Confidential Information**.

(a)      **Access to Confidential Information**. As a result of entering into this Agreement, and as further consideration for Employee's covenants contained herein, Company agrees to provide Employee with access (or continued access) to its Confidential Information (as defined below) to enable Employee to perform services for Company. Employee understands and agrees that but for this Agreement with Company, Employee would not be given access (or continued access) to such Confidential Information.

(b)      **Definition of Confidential Information**. The term "**Confidential Information**" means non-public information, data, and compilations not known outside Company (unless as a result of a breach by Employee or others of any of the obligations imposed by this



Agreement or a similar agreement or legal duty) concerning Company's business, including but not limited to: customer and prospective customer (*i.e.*, prospect) lists; customer and prospective customer contact information; information pertaining to customer and prospective customer goals and strategies; information pertaining to customer and prospective customer sales and purchasing histories and purchasing volume; information and materials used in marketing or presenting the business of Company, including style, format, and content; prices and terms offered to or agreed to by customers for Company's services; information and materials related to determining whether services should be offered or sold to a customer or prospective customer; business proposals and plans and financial and operational information and strategies; Company's financial, capital, and ownership structure, creditors, debtors, and financial data; the terms and conditions of any of Company's contracts or agreements; Company's profit margins; any material or information of whatever nature which provides Company an opportunity to gain an advantage over competitors; the object code and source code to Company's software; Company's technical designs and data dictionaries; any and all other trade secrets, intangible property rights, or other proprietary and confidential information or materials of Company; and any other information that Company marks confidential or communicates to Employee that the information is confidential. Employee acknowledges that such Confidential Information was developed by Company at great time, effort, and expense and is carefully protected by Company because the Confidential Information is a valuable, special, and unique asset of Company.

        (c)    <u>Agreement Not to Use or Disclose Confidential Information</u>.  Employee acknowledges and agrees that all Confidential Information is the exclusive property of Company and shall remain so. Employee covenants and agrees that Employee (i) will maintain the confidentiality of the Confidential Information and (ii) shall not, directly or indirectly, use, disclose, publish, communicate, or make available Confidential Information, or allow it to be used, disclosed, published, or made available, in whole or in part, to anyone, during Employee's employment or any time thereafter, except as such use or disclosure may be required in connection with Employee's good-faith performance of services for Company. Employee understands that this Agreement applies to electronic, digital, and computerized information as well as information in traditional, non-electronic formats.

        (d)    <u>Property of Company</u>.  Employee agrees that Employee has no proprietary interest in Company's Confidential Information and that Employee will not retain any such information that is in written, computerized, electronic, digital, machine readable, model, sample, or other form capable of physical delivery, upon or after the termination of Employee's relationship with Company. Immediately upon termination of Employee's employment for whatever reason, or earlier if requested by Company, Employee shall return to Company all property and Confidential Information of Company, including all copies thereof, in Employee's possession, custody, or control, and Employee shall not retain any copies of Company's Confidential Information and other property, regardless of its form.

        (e)    <u>Permitted Disclosures</u>.  Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid subpoena or order of a court of competent jurisdiction or an authorized

2

government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Employee shall promptly provide written notice of any such order or subpoena to an authorized officer of the Company so as to give the Company an opportunity to object to or quash the disclosure of any Confidential Information.

**Section 3.** **Independent Covenant Not to Disclose Trade Secrets.** In addition to any other covenant and obligation set forth in this Agreement, Employee hereby covenants and agrees to forebear from disclosing any Company trade secret to any third person or entity for so long as such Company trade secret is deemed to be a trade secret of the Company under the Defend Trade Secrets Act of 2016. Employee acknowledges that Employee is hereby notified in accordance with the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1833(b), that, notwithstanding the foregoing nondisclosure obligation, Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Employee acknowledges that Employee is hereby further notified that if Employee files a lawsuit for retaliation by Company for reporting a suspected violation of law, Employee may disclose Company's trade secrets to Employee's attorney and use the trade secret information in the court proceeding but only if Employee files any document containing the trade secret under seal and Employee does not disclose the trade secret except pursuant to court order.

**Section 4.** **Non-Competition Agreement.**

(a) During Employee's employment with Company and for a period of twenty-four (24) months after the separation of Employee's employment with Company (with or without cause and with or without notice, and at the initiation of either Party), Employee shall not, directly or indirectly, separately or in association with others, engage (as an owner, partner, director, officer, employee, consultant, independent contractor, or in any similar capacity) in the Business (as defined below) in the Restricted Area (as defined below), other than in the good-faith performance of services for Company. For purposes of this Agreement, the Parties define the **"Business"** as the installation, design, development, sale, manufacture, license, and/or distribution of solar energy-related products and services, or any other products and services that are competitive to the Company's products or services during Employee's employment with Company. The Parties define the **"Restricted Area"** as a 100-mile radius from any of Company's offices.

(b) Employee expressly acknowledges, stipulates, and agrees that (i) the covenant set forth in Section 4(a) is reasonable in its scope, duration, and geographic area; and (ii) Employee's ability to earn a livelihood is not and will not be impaired by the covenant set forth in Section 4(a). Nothing in Section 4(a) will prohibit Employee from owning less than one percent (1%) of the equity securities of a publicly-traded corporation which competes with Company.

3

**Section 5.**      <u>Non-Solicitation Agreement</u>.

    (a)    <u>Non-Solicitation of Customers and Prospective Customers</u>. During Employee's employment with Company and for a period of twenty-four (24) months after the separation of Employee's employment with Company (with or without cause and with or without notice, and at the initiation of either Party), Employee shall not, on behalf of himself or herself or for the benefit of any other person or entity, directly or indirectly, take any action to cause, solicit, encourage, induce, persuade, recruit, or assist any Customer or Prospective Customer of Company (as defined below) to cease doing any business with Company, refrain from doing any business with Company, decrease their level of business with Company, or do business with any person or entity other than Company that engages in the Business, regardless of whether it is within the Restricted Area or not. For purposes of this <u>Section 5(a)</u>, the term **"Customer or Prospective Customer of Company"** shall mean any person, business, or other entity that was a customer or prospective customer of Company at any time during the last twelve (12) months of Employee's employment and that Employee (A) provided services for or to, or made preparations to provide services for or to, through Employee's work for Company, (B) had contact with, either directly or indirectly, through Employee's work for Company, or (C) received Confidential Information about during Employee's employment with Company.

    (b)    <u>Non-Solicitation of Employees</u>. During Employee's employment with Company and for a period of twenty-four (24) months after the separation of Employee's employment with Company (with or without cause and with or without notice, and at the initiation of either Party), Employee will not, on behalf of himself or herself or for the benefit of any other person or entity, directly or indirectly, (i) take any action to cause, solicit, encourage, induce, persuade, recruit, or assist an Employee of Company (as defined below) to terminate, reduce, or otherwise curtail his or her employment with Company, or (ii) take any action to hire, otherwise engage the services of, or cause or assist another to hire or otherwise engage the services of any Employee of Company. For purposes of this <u>Section 5(b)</u>, the term **"Employee of Company"** shall mean any current Company employee at the time in question, as well as any individual who has been employed by Company at any time within the twelve (12)-month period immediately preceding the separation of Employee's employment with Company.

    **Section 6.**     <u>Reasonableness of Restrictions</u>. Employee acknowledges and agrees that the restrictions set forth in <u>Sections 2, 3, 4, and 5</u> of this Agreement are reasonable in their content, duration, and scope, and will not unreasonably deter Employee from obtaining future employment.

    **Section 7.**     <u>Injunction</u>. Employee recognizes and acknowledges that irreparable injury would be caused to Company by Employee's breach of any covenant contained in <u>Sections 2, 3, 4, and 5</u> of this Agreement, for which Company would have an inadequate remedy at law. Employee therefore agrees that, in the event of any such breach or threatened breach, Company shall be entitled, in addition to any available legal and equitable remedies (including monetary damages), to an injunction to restrain the violation or anticipated violation thereof. Company's rights under

4

this Section 7 shall be in addition to every other remedy (equitable, statutory, legal, or contractual) to which Company may be entitled. No bond need be posted in conjunction with the application for, or issuance of, an injunction (which requirement is hereby specifically and expressly waived by Employee).

Section 8.  **Indemnification**.  Employee shall indemnify Company fully for any cost, liability or harm (including, without limitation, attorneys' fees incurred in connection therewith or in connection with enforcing this indemnity) suffered by Company as a direct or indirect result of Employee's breach or threatened breach of any of the terms of this Agreement or non-fulfillment of any covenant or agreement of Employee made in or pursuant to this Agreement.

Section 9.  **Discoveries and Inventions: Work Made for Hire**. Employee agrees that upon conception and/or development of any idea, discovery, invention, improvement, software, writing, or other material or design that: (A) relates to the Company's business, or (B) relates to or results from any work performed by Employee for the Company, Employee shall assign to the Company the entire right, title, and interest in and to any such idea, discovery, invention, improvement, software, writing, or other material or design. Employee has no obligation to assign any idea, discovery, invention, improvement, software, writing, or other material or design that Employee conceives and/or develops entirely on Employee's own time without using the Company's equipment, supplies, facilities, Confidential Information, or trade secret information, unless the idea, discovery, invention, improvement, software, writing, or other material or design either: (x) relates to the Company's business, or (y) relates to or results from any work performed by Employee for the Company. Employee agrees that any idea, discovery, invention, improvement, software, writing, or other material or design that relates to the Company's business or relates to or results from any work performed by Employee for Company that is conceived or suggested by Employee, either solely or jointly with others, within one year following termination of Employee's employment under this Agreement or any successor agreements will be presumed to have been so made, conceived, or suggested in the course of such employment with the use of the Company's equipment, supplies, facilities, Confidential Information, and/or trade secrets.

In order to determine the rights of Employee and the Company in any idea, discovery, invention, improvement, software, writing, or other material, and to insure the protection of the same, Employee agrees that during Employee's employment, and for one year after termination of Employee's employment under this Agreement or any successor agreements, Employee shall disclose immediately and fully to the Company any idea, discovery, invention, improvement, software, writing or other material or design conceived, made or developed by Employee solely or jointly with others that (A) relates to the Company's business, or (B) relates to or results from any work performed by Employee for the Company. The Company agrees to keep any such disclosures confidential. Employee also agrees to record descriptions of all work in the manner directed by the Company and agrees that all such records and copies, samples, and experimental materials will be the exclusive property of the Company. Employee agrees that at the request of and without charge to the Company, but at the Company's expense, Employee shall execute a written assignment of the idea, discovery, invention, improvement, software, writing or other material or design to the Company that (A) relates to the Company's business, or (B) relates to or results from any work

5

performed by Employee for the Company and shall assign to the Company any application for letters patent or for trademark registration made thereon, and to any common-law or statutory copyright therein; and that Employee will do whatever may be necessary or desirable to enable the Company to secure any patent, trademark, copyright, or other property right therein in the United States and in any foreign country, and any division, renewal, continuation, or continuation in part thereof, or for any reissue of any patent issued thereon. In the event the Company is unable, after reasonable effort, and in any event after ten (10) business days, to secure Employee's signature on a written assignment to the Company of any application for letters patent or to any common-law or statutory copyright or other property right therein, whether because of Employee's physical or mental incapacity or for any other reason whatsoever, Employee irrevocably designates and appoints the Company's President as Employee's attorney-in-fact to act on Employee's behalf to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of such letters patent, copyright, or trademark.

Employee acknowledges that, to the extent permitted by law, all work papers, reports, documentation, drawings, photographs, negatives, tapes and masters therefor, prototypes and other materials (hereinafter, "**Items**"), including without limitation, any and all such items generated and maintained on any form of electronic media, generated by Employee during Employee's employment with the Company and relating to the Company's business will be considered a "work made for hire" and that ownership of any and all copyrights in any and all such items belong to the Company. The item will recognize the Company as the copyright owner, will contain all proper copyright notices, and will be in condition to be registered or otherwise placed in compliance with registration or other statutory requirements throughout the world

Section 10.   **Miscellaneous**.

(a)   WAIVER OF JURY TRIAL. THE PARTIES UNDERSTAND AND AGREE THAT THIS AGREEMENT CONSTITUTES A WAIVER OF THEIR RIGHTS TO A TRIAL BY JURY OF ANY CLAIM ARISING UNDER OR RELATING TO THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THIS WAIVER IS KNOWINGLY, FREELY, AND VOLUNTARILY GIVEN, IS DESIRED BY ALL PARTIES, AND IS IN THE BEST INTERESTS OF ALL PARTIES.

(b)   Tolling of Restrictive Periods. In the event Employee breaches any of the terms of this Agreement, the restrictive periods set forth in Sections 4 and 5 of this Agreement will be tolled during the period(s) of breach. The purpose of this Section 10(b) is to prevent Employee from profiting from Employee's own wrongdoing if Employee violates the Agreement.

(c)   Employment At Will. Nothing herein will alter Employee's status as an employee "at will" who has no definite term of employment and can resign from Company at any time, for any reason, with or without notice, or be discharged by Company at any time, for any reason, with or without notice.

(d)   Disclosure to Subsequent Employers. With respect to any new employment within twenty-four (24) months after Employee's employment with Company ceases for any

6

reason, Employee agrees to disclose the existence of this Agreement to each such employer. Employee authorizes Company to provide a copy of this Agreement to any individual or entity, including but not limited to a new or potential employer of Employee.

(e) <u>Notice of Prior Agreements</u>. Employee covenants that Employee has provided Company copies of all agreements with prior employers prior to entering into this Agreement that contain any non-disclosure, non-competition, or non-solicitation covenant or any covenant related to trade secrets.

(f) <u>Successors; No Assignment by Employee</u>. This Agreement shall be binding upon and shall inure to the benefit of Company and its successors and assigns, and to Employee and his or her permitted successors and assigns. No assignment of this Agreement by Employee shall be valid unless in writing and approved in advance by an authorized officer of Company.

(g) <u>Modification and Waiver</u>. No modification or waiver of any term of this Agreement shall be binding on either Party unless in writing and signed and approved by such Party. Either Party's failure to enforce any provision(s) of this Agreement on one occasion shall not in any way be construed as a waiver of any such provision(s) or any other provision(s) on any other occasion, or to prevent either Party thereafter from enforcing each and every provision of this Agreement.

(h) <u>Governing Law & Choice of Forum</u>. This Agreement is governed by and construed in accordance with the laws of the state of Tennessee, without giving effect to its conflicts of laws principles. The Parties hereto agree that all actions and proceedings arising in connection with this Agreement shall be tried and litigated exclusively in the state court located in, or the federal court in the judicial district and division encompassing, Knox County, Tennessee.

(i) <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. Further, the Parties expressly desire and request that the court making such finding of invalidity or unenforceability modify any invalid provision to the minimum extent necessary to render it enforceable, while maintaining the intent of the Parties (as expressed in writing herein) to the fullest extent possible.

(j) <u>Counterparts; Entire Agreement</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original. A .pdf or other scanned signature shall be deemed an original for all purposes. The terms and conditions of this Agreement supersede any previous oral or written agreement with respect to the subject matter contained herein and may be altered only by another written agreement, signed by the Parties hereto. This Agreement sets forth the entire understanding of the Parties with respect to the subject matter hereof, and no representation, warranty, promise, or agreement whatsoever not expressly contained herein has been made to Employee by Company or any representative, consultant, or agent of Company.

7

(k)    Opportunity to Review. Employee represents and acknowledges that Employee has carefully read and understands all of the provisions of this Agreement, and that Employee is knowingly and voluntarily, without duress, entering into this Agreement.

(l)    Further Assurances. Each Party hereto shall perform such further acts and execute and deliver such further documents as may be reasonably necessary to carry out the provisions of this Agreement.

(m)    Survival of Terms. All provisions of this Agreement that by their terms survive termination of this Agreement for any reason, including without limitation Sections 2, 3, 4, 5, 6, 7, 8, 9, and 10 will survive termination of this Agreement for any reason whatsoever.

*(signature blocks on following page)*

8

**IN WITNESS WHEREOF**, the undersigned Parties have caused this Agreement to be executed by themselves or by their duly authorized representatives as of the day and date first written above.

**COMPANY: SOLAR TITAN USA, LLC**          **EMPLOYEE:** _____

By: _____          By: _____

Print Name: _____          Print Name: _____

Title: _____

9

What Starting Size Solar System to recommend: This is a guideline.

|  |  | 4,25 Roof | 4,50 Ground |
|---|---|---|---|
| 4 KW = 800 kwh and under | | 17,000 165,81 | 18,000 175 |
| 5 KW = 900-1000 kwh | | 21,250 207 | 22,500 219 |
| 6 KW = 1100-1200 kwh | | 25,500 248 | 27,000 263 |
| ✳7 KW = 1300-1400 kwh | | 29,750 290 | 31,500 307 |
| 8 KW = 1500-1700 kwh | | 34,000 331 | 36,000 351 |
| 9 KW = 1800-2000 kwh | | 38,250 373 | 40,500 395 |
| 10 KW= 2100-2300 kwh | | 42,500 414 | 45,000 438 |
| 11 KW = 2400-2600 kwh | | 46,750 455 | 49,500 482 |
| 12 KW = 2700-2900 kwh | | 51,000 497 | 54,000 526 |
| 13 KW = 3000-3200 kwh | | 55,250 538 | 58,500 570 |
| 14 KW = 3300-3500 kwh | | 59,500 580 | 63,000 614 |
| 15 KW = 3600-3800 kwh | | 63,750 621 | 67,500 658 |
| 16 KW = 3900-4100 kwh | | 68000 663 | 72,000 702 |
| 17 KW = 4200- 4400 kwh | | 72,250 704 | 76,500 746 |
| 18 KW= 4500 - 4700 KWh | | 76,500 746 | 81,000 790 |

This is a recommendation ; this is not stuck in stone . If the customer wants to start with a smaller system and add on later due to financing, you can lock in the price per KW of a system for 24 months.

7 KW = 7000 KWH
        X
_____

Generator  16 KW  12,000
Installed  22 KW  15,000

EXHIBIT
#4  from Hosty
8/3/22  CM
PENGAD 800-531-6989

# Solar System Sizing Guideline
# QCell400

600kwh and below= 4KW-10 Panels
700-800kwh=        5KW-14 Panels
900-1000kwh=       6KW-16 Panels
1100-1200kwh=      7KW-18 Panels
1300-1400kwh=      9KW-24 Panels
1500-1600kwh=      10KW-26 Panels
1700-1800kwh=      12KW-30 Panels
1900-2000kwh=      13KW-34 Panels
2100-2300kwh=      14KW-36 Panels
2400-2600kwh=      15KW-38 Panels
2700-2800kwh=      16KW-40 Panels

This is a sizing recommendation for up to 80-90% annual offset of current usage in net metered states. For Tennessee this recommendation in combination with a battery for up to 70-85% annual offset of current usage. If the customer wants to start with a smaller system and add on later you can lock in the price per watt of a system for 24 months. Also, customer can add more battery backup which will add to the offset as well.

***All production calculations are based on <u>annual averages</u>, variances will occur with panel placement options and weather patterns.



## CURRENT LIFETIME PLAN
## (Includes Moderate Annual Increase) TO ELECTRIC COMPANY

| TOTAL $$$ LOST MONTHLY BILL | 10 YEAR LOSS W/ Monthly Bill | 20 YEAR LOSS W/ Monthly Bill |
|---|---|---|
| $110 | $16,603 ($171) | $43,647 ($277) |
| $120 | $18,112 ($186) | $47,615 ($303) |
| $130 | $19,622 ($202) | $51,583 ($328) |
| $140 | $21,131 ($217) | $55,551 ($353) |
| $150 | $22,640 ($232) | $59,519 ($379) |
| $160 | $24,150 ($248) | $63,487 ($404) |
| $170 | $25,659 ($263) | $67,455 ($429) |
| $180 | $27,168 ($279) | $71,422 ($454) |
| $190 | $28,678 ($294) | $75,390 ($480) |
| $200 | $30,187 ($310) | $79,358 ($505) |
| $210 | $31,696 ($325) | $83,326 ($530) |
| $220 | $33,206 ($341) | $87,294 ($555) |
| $230 | $34,715 ($356) | $91,262 ($581) |
| $240 | $36,224 ($372) | $95,230 ($606) |
| $250 | $37,734 ($387) | $99,198 ($631) |
| $260 | $39,243 ($387) | $103,166 ($657) |
| $270 | $40,752 ($403) | $107,134 ($682) |
| $280 | $42,262 ($418) | $111,102 ($707) |
| $290 | $43,771 ($434) | $115,070 ($732) |
| $300 | $45,280 ($449) | $119,037 ($758) |
| $310 | $46,790 ($465) | $123,005 ($783) |
| $320 | $48,299 ($480) | $126,973 ($808) |
| $330 | $49,808 ($496) | $130,941 ($833) |
| $340 | $51,318 ($511) | $134,909 ($859) |
| $350 | $52,827 ($527) | $138,877 ($884) |
| $360 | $54,337 ($542) | $142,845 ($909) |



EXHIBIT
#6 Jason
Horton
8/3/22

PENGAD 800-631-6989

| | | |
|---|---|---|
| $370 | $55,846 ($558) | $146,813 ($934) |
| $380 | $57,355 ($573) | $150,781 ($960) |
| $390 | $58,865 ($589) | $154,749 ($985) |
| $400 | $60,374 ($605) | $158,717 ($1010) |
| $410 | $61,883 ($620) | $162,684 ($1036) |
| $420 | $63,393 ($636) | $166,652 ($1061) |
| $430 | $64,902 ($651) | $170,620 ($1086) |
| $440 | $66,411 ($667) | $174,588 ($1111) |
| $450 | $67,921 ($682) | $178,556 ($1137) |
| $460 | $69,430 ($698) | $182,524 ($1162) |
| $470 | $70,939 ($713) | $186,492 ($1187) |
| $480 | $72,448 ($729) | $190,460 ($1212) |
| $490 | $73,958 ($744) | $194,428 ($1238) |
| $500 | $75,467 ($760) | $198,396 ($1263) |
| $510 | $76,977 ($775) | $202,364 ($1288) |
| $520 | $78,486 ($791) | $206,332 ($1314) |
| $530 | $79,995 ($806) | $210,299 ($1339) |
| $540 | $81,505 ($822) | $214,267 ($1364) |
| $550 | $83,014 ($837) | $218,235 ($1389) |
| $560 | $84,523 ($853) | $222,203 ($1415) |
| $570 | $86,033 ($868) | $226,171 ($1440) |
| $580 | $87,542 ($884) | $230,139 ($1465) |
| $590 | $89,051 ($899) | $234,107 ($1490) |
| $600 | $90,561 ($915) | $238,075 ($1516) |
| $610 | $92,070 ($930) | $242,043 ($1541) |
| $620 | $93,580 ($946) | $246,011 ($1566) |
| $630 | $95,089 ($961) | $249,979 ($1591) |
| $640 | $96,598 ($977) | $253,947 ($1617) |
| $650 | $98,108 ($992) | $257,914 ($1642) |



# Installation Agreement

11205 Outlet Drive Knoxville, TN 37932
2333 Alexandria Drive Lexington, KY 40504
725 Cool Springs Blvd Nashville, TN 37067

865-392-1036



BUYER #1 _____   _____

                                                         Phone                     Date

BUYER #2 _____   _____

                                                          Phone                     Date

| Address | City | County | State | Zip |
|---|---|---|---|---|

| Email #1 | Email #2 |
|---|---|

## Solar PV Package

_____ KW PV System

Fully Installed Solar PV System with Inverter
Panels, Racking, Roof or Ground Mounting
...ware, Electrical Components, Plans & Permits

Hyper Package: $3,995 Value ☐
Energy Boost & Company Monitored System

**Current Roof: Metal or Shingle**

**Mount: Ground or Roof**
*Ground/ Or Metal Roof +$2,000*

Notes:

### Battery
Yes/ No
(Circle)

**Battery Size**

9 kWh 15 kWh other_____
(Circle Purchased Size)

### Generator
Yes/ No
(Circle)

Homeowner has been advised that for optimal production, some trees may need to be trimmed or removed. If needed, this will be the homeowner's responsibility.
_____ Homeowner Initials

**Utility Company**
_____

**Account Number**
_____

**H. O. A. (If applicable)**

Name: _____
Contact: _____
Contact #: _____
Contact Email:

_____

_____

_____

Materials & Installation Total: $ _____

Metal or Ground Surcharge:  $ _____

Total:  $ _____

Deposit: $ _____

Balance Due: $ _____

BUYER #1 _____

BUYER #2 _____

Energy Consultant: _____

EXHIBIT
#7 Jason Horton
8/3/22  CM
PENGAD 800-631-6989

*If Financed, Homeowner agrees to confirm with the finance company of the installation being complete, on the day panels are installed.
**This is a Grid-Tied System. Grid Tied Systems without a battery will shut down solar production during power outages to protect lineman and prevent potential back feed to the grid.

10 year workmanship warranty 10-Year Limited Workmanship and Installation Warranty. Ideal Horizon Benefits, LLC/ Solar Titan USA warrants that the System will be constructed and installed in a good workmanlike manner according to the standards of care and diligence generally practiced by solar engineering, construction, and installation companies when installing residential photovoltaic solar power systems of a similar size and type as the System in the geographic region where your Property is located, and pursuant to (i) good engineering design practices, (ii) manufacturer's instructions, (iii) applicable law (including local codes and standards), (iv) required governmental approvals and permits, and (v) applicable requirements of the local utility. This 10-Year Limited Workmanship and Installation Warranty will extend for a period of ten (10) years from the date installation of the System is completed by Ideal Horizon Benefits, LLC.*.

5 Year Roof Warranty with no Radius 5-Year Limited Roofing Penetration Warranty. Ideal Horizon Benefits, LLC/ Solar Titan USA warrants your roof against damage and water infiltration at each roofing penetration made by Ideal Horizon Benefits, LLC/ Solar Titan USA in connection with the installation of the System and the surrounding area of each such penetration (collectively, the "Covered Roof Areas"). Ideal Horizon Benefits, LLC/ Solar Titan USA will repair damage to your roof and repair or compensate You for actual physical damage to your property resulting from any water infiltration in the event of failure or defects in the Covered Roof Areas. Customer understands that any modifications not performed by The Ideal Horizon Benefits/ Solar Titan USA or Authorized agent will render all warranties null and void.

Proposal Requirements

Regulation Z disclosure: "The first monthly payment on the loan is due approximately 60 days after installation. The calculation of the monthly payments for the first 18 months following installation (which includes the first 17 payments) (the "Initial Period") assumes that you will pay down the loan during the Initial Period by 26%. If you make aggregate principal payments in such amount during the Initial Period, your monthly payments following the Initial Period will remain the same as during the Initial Period. If during the Initial Period you elect to pay principal in any amount that is less than 26% of your loan amount, your monthly payment beginning upon conclusion of the Initial Period and throughout the rest of the term of the Loan will be increased to amortize the full principal loan balance (which would be greater than the originally assumed amount) over a period which is effectively 18 months shorter. Conversely, if you pay down greater than 26% of the principal balance during the Initial Period, your monthly payments following the conclusion of the Initial Period will be reduced to reflect the payment of a lesser principal balance than originally assumed for the balance of the term. Please carefully review the details of your loan, including the payment amounts, provided in your loan agreement." Tax Credit Disclosure: As the purchaser and owner of a solar photovoltaic system, you may qualify for certain federal, state, local or other rebates, tax credits or incentives (collectively, "Incentives"). If you have any questions as to whether and when you qualify for any Incentives and the amount of such Incentives, please consult and discuss with your personal tax or financial advisor. [Installers] make no representation, warranty or guaranty as to the availability or amount of such Incentives.

The buyer(s) listed above hereby jointly and severally agree to purchase the goods and/or services listed, in accordance with the prices and terms described on the front and reverse side of this agreement. Buyer(s) have requested that such goods or services be installed or provided at the buyer(s) address listed on the front side of this agreement. Ideal Horizon Benefits, LLC/Solar Titan USA hereby agrees to install or cause to be installed the goods or services listed in the agreement, at the buyer's address listed on the front side of this agreement. The buyer(s) agrees to pay the cost of goods and service purchased as described herein. The buyer(s) accept such financing agreement for the purchase as is contained on separate financing documents. Buyer(s) agrees to allow reasonable access to the property in the area on which is contracted, and the work will be performed, including access to all electrical outlets as may be required by the contractor. Manufacturer warrants function and reliability of the solar panels. Installation contractor warrants all labor and specific penetration points for 60 months. There are no implied warranties other than those stated in writing by the manufacturer of the goods provided. In the event that the owner fails to provide payment as required upon completion of the installation of the panels, Ideal Horizon Benefits, LLC/ Solar Titan USA has the right to remove panels. In the case of this transaction being a cash or financed transaction, Ideal Horizon Benefits, LLC/ Solar Titan USA has all rights to remedy payment in full as well as all additional means available under state law. Final payment shall be made the day of completion if a cash transaction. Financed agreements must be signed off via email or verbally confirmed on the same day as the installation with the given financing company. The owner shall provide Ideal Horizon Benefits, LLC/ Solar Titan USA a written description of work believed by owner to be defective or incomplete within 24 hours of completion, Ideal Horizon Benefits, LLC will repair or correct or complete the work included in their written description if deemed appropriate.

Buyer(s) agree to pay any expenses incurred by Ideal Horizon Benefits, LLC/ Solar Titan USA to collect any unpaid balance including attorney's fees. The Buyer(s) have the right to cancel this agreement by midnight on the third business day following the date on the front of this agreement, written cancellation by email to info@theidealhorizon.com or, by U.S. Certified mail, addressed to Ideal Horizon Benefits, LLC/ Solar Titan USA are the only two forms of accepted notification. The request for financing with the finance company will be made by Ideal

Horizon Benefits, LLC/ Solar Titan USA following the receipt of this request within the agreed upon and given timeframe.

If financing terms have been approved, materials ordered, and buyer(s) attempt to cancel subsequent to midnight of the third business day after the date of the arrangement, and Ideal Horizon Benefits, LLC/ Solar Titan USA agrees to accept such late cancellation, then buyer(s) agrees to pay Ideal Horizon Benefits, LLC/ Solar Titan USA a cancellation fee equal to 30% of the purchase price to offset a portion of materials, labor and administrative costs.

If buyer(s) are in default of the Agreement, Buyer(s) agrees to pay Ideal Horizon Benefits, LLC's/ Solar Titan USA's attorney fees equal as otherwise allowed by law. Buyer also agrees to pay any other costs or expenses of repossession, collection, or realization on a security including court costs, to any extent not prohibited by law. If financing is involved with this purchase agreement and buyer does not complete the purchase, the loan and documents will be adjusted to thirty percent of purchase price as agreed within the terms and conditions of the cancellation of this agreement. The buyer(s) agree to sign the new loan documents with this adjusted amount.

Arbitration of Disputes: Ideal Horizon Benefits, LLC/ Solar Titan USA and buyer(s) agrees that any and all disputes, claims, or controversies, arising under or relating to the contract and any related documents, loans, security instruments, accounts, including by way of example and not as a limitation: (I) the relationships and the transaction arising from this contract; (II) The terms of this contract; (III) the validity of this contract or the validity of or enforceability of this arbitration agreement, shall be subject to binding arbitration to be determined by one arbitrator, in accordance with and pursuant to the then prevailing rules and procedures of commercial rules of the American Arbitration Association, to be held and arbitrated in a judicial district in which the buyer resides. The buyer agree that they will not assert a claim on the behalf of, or as a member of, a group or class period the findings of the arbitrator and any award or finding of the arbitration will be specifically enforceable under the prevailing law of any court having jurisdiction. Notice of the demand for arbitration will be filed by the party asserting the claim with the other to the contract and with the American arbitration Association. Any arbitration proceeding brought under this contract, and any award, finding or verdict of or from such proceeding shall remain confidential between the parties and shall not be made public. Both buyers and Ideal Horizon Benefits, LLC are hereby agreeing to use arbitration, rather than litigation or some other means of dispute resolution, to address their grievances or alleged grievances. By entering into this contract and this arbitration provision, both parties are giving up their constitutional right to have any dispute decided in a court of law before a jury, instead are accepting the use of arbitration, other than set forth immediately.

The buyers agree that Ideal Horizon Benefits LLC/ Solar Titan USA may utilize photographs of property and installation on social media and in promotional advertising. Buyer(s) grant Ideal Horizon Benefits, LLC/ Solar Titan USA the right to place signage on the property during the installation process. Buyer agrees not to use any form of social media to express their opinion that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits. Breaching acceptance of this clause by buyer can and will deem monetary compensation benefits to Ideal Horizon Benefits, LLC/ Solar Titan USA. Buyer(s) clearly understands that standard solar systems do not include a battery backup or generator unless specifically added and written in detailed notes.

Any previously existing electrical code violations that require additional labor to be compliant will be covered by the homeowner not Ideal Horizon Benefits, LLC/ Solar Titan UAS. Rebates and incentives: Ideal Horizon Benefits, LLC/ Solar Titan USA and buyer(s) agree that any rebates tax credits and power company incentives are not guaranteed by Ideal Horizon Benefits, LLC/ Solar Titan USA all items known to exist to the best of our knowledge will be presented but it is the responsibility of the buyer(s) to ensure incentives are available and they will qualify. There are qualifications for all programs and if the buyer(s) do not qualify or if the item is unavailable at the time of application, Ideal Horizon Benefits, LLC/ Solar Titan USA will not be held liable. All examples and recommendations by energy sales consultants are explicitly deemed as an example and figures. There are many variables and usage, weather patterns, electricity company programs, etc. Buyer(s) in no capacity shall hold Ideal Horizon Benefits, LLC/ Solar Titan USA liable for actual production of the system or expectation. Delay/ Unknown conditions: Events beyond the control of the contractor, such as power company delays, homeowner Association delays, acts of nature, labor strikes, act of God, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, general shortage of labor, equipment, materials or supplies in the open market, failure of transportation, lock out, action of labor unions, condemnation, requisition, order of government or civil or naval authorities, pandemics, inclement weather, terrorism, buyer(s) inability to qualify for or obtaining financing, or other events resulting and delays in performance of this agreement do not constitute abandonment or a breach by Ideal Horizons Benefits, LLC/ Solar Titan USA and are not included in the circulation time frames for performance by Ideal Horizon Benefits, LLC/ Solar Titan USA. In the event that Ideal Horizon Benefits, LLC/ Solar Titan USA determines that this agreement cannot be performed as intended by the parties due to incorrect pricing/ measurements, unforeseen structural defects or pre-existing conditions to the buyer's property, Ideal Horizon Benefits, LLC/ Solar Titan USA may cancel this agreement within 90 days of its execution notify the buyer(s) of such cancellation in writing, and return all monies paid by the buyer(s).



# Installation Agreement



11205 Outlet Drive Knoxville, TN 37932
2333 Alexandria Drive Lexington, KY 40504
725 Cool Springs Blvd Nashville, TN 37067

865-392-1036

BUYER #1 _____  _____  _____

                                                                Phone               Date

BUYER #2 _____  _____  _____

                                                                 Phone               Date

| Address | City | County | State | Zip |
|---|---|---|---|---|

| Email #1 | Email #2 |
|---|---|

## Solar PV Package

_____ KW PV System

Fully installed Solar PV System with Inverter
Panels, Racking, Roof or Ground Mounting
      ware, Electrical Components, Plans & Permits

Hyper Package: $3,995 Value  ☐

Energy Boost & Company Monitored System

### Current Roof: Metal or Shingle

### Mount: Ground or Roof

_Ground/ Or Metal Roof +$2,000_

Notes:

### Battery

Yes/ No
(Circle)

**Battery Size**

9 kWh  15 kWh other_____
(Circle Purchased Size)

Homeowner has been advised that for
optimal production, some trees may
need to be trimmed or removed. If
needed, this will be the homeowner's
responsibility.

_____ Homeowner Initials

### Generator

Yes/ No
(Circle)

### Utility Company

_____

### Account Number

H. O. A. (If applicable)

Name: _____
Contact: _____
Contact #: _____
Contact Email:

_____

_____

_____

Materials & Installation Total: $ _____

Metal or Ground Surcharge:  $ _____

Total: $ _____

Deposit: $ _____

Balance Due: $ _____

BUYER #1 _____

BUYER #2 _____

Energy Consultant: _____

*If Financed, Homeowner agrees to confirm with the finance company of the installation being complete, on the day panels are installed.
**This is a Grid-Tied System. Grid Tied Systems without a battery will shut down solar production during power outages to protect lineman and prevent potential back feed to the grid.

10 year workmanship warranty 10-Year Limited Workmanship and Installation Warranty. Ideal Horizon Benefits, LLC/ Solar Titan USA warrants that the System will be constructed and installed in a good workmanlike manner according to the standards of care and diligence generally practiced by solar engineering, construction, and installation companies when installing residential photovoltaic solar power systems of a similar size and type as the System in the geographic region where your Property is located, and comply with (i) good engineering design practices, (ii) manufacturer's instructions, (iii) applicable law (including local codes and standards), (iv) required governmental approvals and permits, and (v) applicable requirements of the local utility. *This 10-Year Limited Workmanship and Installation Warranty will extend for a period of ten (10) years from the date installation of the System is completed by Ideal Horizon Benefits, LLC.*.

5 Year Roof Warranty with no Ideal Horizon Benefits, LLC/ Solar Titan USA warrants your roof against damage and water infiltration at each roofing penetration made by Ideal Horizon Benefits, LLC/ Solar Titan USA in connection with the installation of the System and the surrounding area of each such penetration (collectively, the "Covered Roof Areas"). Ideal Horizon Benefits, LLC/ Solar Titan USA will repair damage to your roof and repair or compensate You for actual physical damage to your property resulting from any water infiltration in the event of failure or defects in the Covered Roof Areas. Customer understands that any modifications not performed by The Ideal Horizon Benefits/ Solar Titan USA or Authorized agent will render all warranties null and void.

Proposal Requirements

Regulation Z disclosure: "The first monthly payment on the loan is due approximately 60 days after installation. The calculation of the monthly payments for the first 18 months following installation (which includes the first 17 payments) (the "Initial Period") assumes that you will pay down the loan during the Initial Period by 26%. If you make aggregate principal payments in such amount during the Initial Period, your monthly payments following the *Initial Period will remain the same as during the Initial Period*. If during the Initial Period you elect to pay principal in any amount that is less than 26% of your loan amount, your monthly payment beginning upon conclusion of the Initial Period and throughout the rest of the term of the Loan will be increased to amortize the full principal loan balance (which would be greater than the originally assumed amount) over a period which is effectively 18 months shorter. Conversely, *if you pay down greater than 26% of the principal balance during the Initial Period, your monthly payments following the conclusion of the Initial Period will be reduced to reflect the payment of a lesser principal balance than originally assumed for the balance of the term. Please carefully review the details of your loan, including the payment amounts, provided in your loan agreement." Tax Credit Disclosure: As the purchaser and owner of a solar photovoltaic system, you may qualify for certain federal, state, local or other rebates, tax credits or incentives (collectively, "Incentives"). If you have any questions as to whether and when you qualify for any Incentives and the amount of such Incentives, please consult and discuss with your personal tax or financial advisor. [Installers] make no representation, warranty or guaranty as to the availability or amount of such Incentives.*

The buyer(s) listed above hereby jointly and severally agree to purchase the goods and/or services listed, in accordance with the prices and terms described on the front and reverse side of this agreement. Buyer(s) have requested that such goods or services be installed or provided at the buyer(s) address listed on the front side of this agreement. Ideal Horizon Benefits, LLC/Solar Titan USA hereby agrees to install or cause to be installed the goods or services listed in the agreement, at the buyer(s) *address listed on the front side of this agreement. The* buyer(s) agrees to pay the cost of goods and service purchased as described herein. The buyer(s) accept such financing agreement for the purchase as is contained on separate financing documents. Buyer(s) agrees to allow reasonable access to the property in the area on which is contracted, and the work will be performed, including access to all electrical outlets as may be required by the contractor. Manufacturer warrants *function and reliability of the solar panels.* Installation contractor warrants all labor and specific penetration points for 60 months. There are no implied warranties other than those stated in writing by the manufacturer of the goods provided. In the event that the owner fails to provide payment as required upon completion of the installation of the panels, Ideal Horizon Benefits, LLC/ Solar Titan USA has the right to remove panels. In the case of this transaction being a cash or financed transaction, Ideal Horizon Benefits, LLC/ Solar Titan USA has all rights to remedy payment in full as well as all additional means available under state law. Final payment shall be made the day of completion if a cash transaction. Financed agreements must be signed off via email or verbally confirmed on the same day as the installation with the person financing the company. The owner shall provide Ideal Horizon Benefits, LLC/ Solar Titan USA a written description of work believed by owner to be defective or incomplete within 24 hours of completion. Ideal Horizon Benefits, LLC will repair or correct or complete the work included in their written description if deemed appropriate.

Buyer(s) agree to pay any expenses incurred by Ideal Horizon Benefits, LLC/ Solar Titan USA to collect any unpaid balance including attorney's fees. The Buyer(s) have the right to cancel this agreement by midnight on the third business day following the date on the front of this agreement, written cancellation by email to Info@theidealhorizon.com or, by U.S. Certified mail, addressed to Ideal Horizon Benefits, LLC/ Solar Titan USA are the only two forms of accepted notification. The request for financing with the finance company will be made by Ideal Horizon Benefits, LLC/ Solar Titan USA following the receipt of this request within the agreed upon and given timeframe.

If financing terms have been approved, materials ordered, and buyer(s) attempt to cancel subsequent to midnight of the third business day after the date of the arrangement, and Ideal Horizon Benefits, LLC/ Solar Titan USA agrees to accept such late cancellation, then buyer(s) agrees to pay Ideal Horizon Benefits, LLC/ Solar Titan USA a cancellation fee equal to 30% of the purchase price to offset a portion of materials, labor and administrative costs.

If buyer(s) are in default of the Agreement, Buyer(s) agrees to pay Ideal Horizon Benefits, LLC's/ Solar Titan USA's attorney fees equal as otherwise allowed by law. Buyer also agrees to pay any other costs or expenses of repossession, collection, or realization on a security including court costs, to any extent not prohibited by law. If financing is involved with this purchase agreement and buyer does not complete the purchase, the loan and documents will be adjusted to thirty percent of purchase price as agreed within the terms and conditions of the cancellation of this agreement. The buyer(s) agree to sign the new loan documents with this adjusted amount.

Arbitration of Disputes: Ideal Horizon Benefits, LLC/ Solar Titan USA and buyer(s) agree that any and all disputes, claims, or controversies, arising under or relating to the contract and any related documents, loans, security instruments, accounts, including by way of example and not as a limitation: (I) the relationships and the transaction arising from this contract; (II) the terms of this contract; (III) the validity of this contract or the validity or enforceability of this arbitration agreement, shall be subject to binding arbitration to be determined by one arbitrator, in accordance with and pursuant to the then prevailing rules and procedures of commercial rules of the American Arbitration Association, to be held and arbitrated in a judicial district in which the buyer resides. The buyer agree that they will not assert a claim on the behalf of, or as a member of, a group or class period the findings of the arbitrator and any award or finding of the arbitration will be specifically enforceable under the prevailing law of any court having jurisdiction. Notice of the demand for arbitration will be filed by the party asserting the claim with the other to the contract and with the American arbitration Association. Any arbitration proceeding brought under this contract, and any award, finding or verdict of or from such proceeding shall remain confidential between the parties and shall not be made public. Both buyers and Ideal Horizon Benefits, LLC are hereby agreeing to use arbitration, rather than litigation or some other means of dispute resolution, to address their grievances or alleged grievances. By entering into this contract and this arbitration provision, both parties are giving up their constitutional right to have any dispute decided in a court of law before a jury, instead are accepting the use of arbitration, other than set forth immediately.

The buyers agree that Ideal Horizon Benefits LLC/ Solar Titan USA may utilize photographs of property and installation on social media and in promotional advertising. Buyer(s) grant Ideal Horizon Benefits, LLC/ Solar Titan USA the right to place signage on the property during the installation process. Buyer agrees not to use any form of social media to express their opinion that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits. Breaching acceptance of this clause by buyer can and will deem monetary compensation benefits to Ideal Horizon Benefits, LLC/ Solar Titan USA. Buyer(s) clearly understands that standard solar systems do not include a battery backup or generator unless specifically added and written in detailed notes.

Any previously existing electrical code violations that require additional labor to be compliant will be covered by the homeowner not Ideal Horizon Benefits, LLC/ Solar Titan UAS. Rebates and incentives: Ideal Horizon Benefits, LLC/ Solar Titan USA and buyer(s) agree that any rebates tax credits and power company incentives are not guaranteed by Ideal Horizon Benefits, LLC/ Solar Titan USA all items known to exist to the best of our knowledge will be presented but it is the responsibility of the buyer(s) to ensure incentives are available and they will qualify. There are qualifications for all programs and if the buyer(s) do not qualify or if the item is unavailable at the time of application, Ideal Horizon Benefits, LLC/ Solar Titan USA will not be held liable. All examples and recommendations by energy sales consultants are explicitly deemed as an example and figures. There are many variables and usage, weather patterns, electricity company programs, etc. Buyer(s) in no capacity shall hold Ideal Horizon Benefits, LLC/ Solar Titan USA liable for actual production of the system or expectation. Delay/ Unknown conditions: Events beyond the control of the contractor, such as power company delays, homeowner Association delays, acts of nature, labor strikes, act of God, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, general shortage of labor, equipment, materials or supplies in the open market, failure of transportation, lock out, action of labor unions, condemnation, requisition, order of government or civil or naval authorities, pandemics, inclement weather, terrorism, buyer(s) inability to qualify for or obtaining financing, or other events resulting and delays in performance of this agreement do not constitute abandonment or a breach by Ideal Horizon Benefits, LLC/ Solar Titan USA and are not included in the circulation time frames for performance by Ideal Horizon Benefits, LLC/ Solar Titan USA In the event that Ideal Horizon Benefits, LLC/ Solar Titan USA determines that this agreement cannot be performed as intended by the parties due to incorrect pricing/ measurements, unforeseen structural defects or pre-existing conditions to the buyer's property, Ideal Horizon Benefits, LLC/ Solar Titan USA may cancel this agreement within 90 days of its execution notify the buyer(s) of such cancellation in writing, and return all monies paid by the buyer(s).



# Installation Agreement



11205 Outlet Drive Knoxville, TN 37932
2333 Alexandria Drive Lexington, KY 40504
725 Cool Springs Blvd Nashville, TN 37067

865-392-1036

BUYER #1 _____     _____

                                                                 **Phone**                    **Date**

BUYER #2 _____     _____

                                                                  **Phone**                    **Date**

_____     _____   _____   _____   _____

                  **Address**                          **City**        **County**    **State**    **Zip**

_____     _____

                  **Email #1**                                        **Email #2**

### Solar PV Package

_____ **KW PV System**

Fully installed Solar PV System with Inverter
Panels, Racking, Roof or Ground Mounting
~~ware~~, Electrical Components, Plans & Permits

**Hyper Package: $3,995 Value** ☐
Energy Boost & Company Monitored System

### Current Roof: Metal or Shingle

### Mount: Ground or Roof
*Ground/ Or Metal Roof +$2,000*

**Notes:**

**Battery**
Yes/ No
(Circle)

**Battery Size**

**9 kWh 15 kWh other_____**
(Circle Purchased Size)

**Generator**
Yes/ No
(Circle)

Homeowner has been advised that for
optimal production, some trees may
need to be trimmed or removed. If
needed, this will be the homeowner's
responsibility.

_____ Homeowner Initials

**Utility Company**
_____

**Account Number**
_____

**H. O. A. (If applicable)**

Name: _____
Contact: _____
Contact #: _____
Contact Email:

_____

_____

_____

Materials & Installation Total: $ _____

Metal or Ground Surcharge:  $ _____

                Total: $ _____

          Deposit: $ _____

    Balance Due: $ _____

BUYER #1 _____

BUYER #2 _____

Energy Consultant: _____

*__If Financed__, Homeowner agrees to confirm with the finance company of the installation being complete, on the day panels are installed.
**__This is a Grid-Tied System.__ Grid Tied Systems __without a battery__ will shut down solar production during power outages to protect lineman and prevent potential back feed to the grid.

10 year workmanship warranty 10-Year Limited Workmanship and Installation Warranty. Ideal Horizon Benefits, LLC/ Solar Titan USA warrants that the System will be constructed and installed in a good workmanlike manner according to the standards of care and diligence generally practiced by solar engineering, construction, and installation companies when installing residential photovoltaic solar power systems of a similar size and type as the System in the geographic region where your Property is located, and pursuant to (i) good engineering design practices, (ii) manufacturer's instructions, (iii) applicable law (including local codes and standards), (iv) required governmental approvals and permits, and (v) applicable requirements of the local utility. This 10-Year Limited Workmanship and Installation Warranty will extend for a period of ten (10) years from the date installation of the System is completed by Ideal Horizon Benefits, LLC.".

5 Year Roof Warranty with no Radius 5-Year Limited Roofing Penetration Warranty. Ideal Horizon Benefits, LLC/ Solar Titan USA warrants your roof against damage and water infiltration at each roofing penetration made by Ideal Horizon Benefits, LLC/ Solar Titan USA in connection with the installation of the System and the surrounding area of each such penetration (collectively, the "Covered Roof Areas"). Ideal Horizon Benefits, LLC/ Solar Titan USA will repair damage to your roof and repair or compensate You for actual physical damage to your property resulting from any water infiltration in the event of failure or defects in the Covered Roof Areas. Customer understands that any modifications not performed by The Ideal Horizon Benefits/ Solar Titan USA or Authorized agent will render all warranties null and void.

Proposal Requirements

Regulation Z disclosure: "The first monthly payment on the loan is due approximately 60 days after installation. The calculation of the monthly payments for the first 18 months following installation (which includes the first 17 payments) (the "Initial Period") assumes that you will pay down the loan during the Initial Period by 26%. If you make aggregate principal payments in such amount during the Initial Period, your monthly payments following the Initial Period will remain the same as during the Initial Period. If during the Initial Period you elect to pay principal in any amount that is less than 26% of your loan amount, your monthly payment beginning upon conclusion of the Initial Period and throughout the rest of the term of the Loan will be increased to amortize the full principal loan balance (which would be greater than the originally assumed amount) over a period which is effectively 18 months shorter. Conversely, if you pay down greater than 26% of the principal balance during the Initial Period, your monthly payments following the conclusion of the Initial Period will be reduced to reflect the payment of a lesser principal balance than originally assumed for the balance of the term. Please carefully review the details of your loan, including the payment amounts, provided in your loan agreement." Tax Credit Disclosure: As the purchaser and owner of a solar photovoltaic system, you may qualify for certain federal, state, local or other rebates, tax credits or incentives (collectively, "Incentives"). If you have any questions as to whether and when you qualify for any Incentives and the amount of such Incentives, please consult and discuss with your personal tax or financial advisor. [Installers] make no representation, warranty or guaranty as to the availability or amount of such Incentives.

The buyer(s) listed above hereby jointly and severally agree to purchase the goods and/or services listed, in accordance with the prices and terms described on the front and reverse side of this agreement. Buyer(s) have requested that such goods or services be installed at the buyer(s) address listed on the front side of this agreement. Ideal Horizon Benefits, LLC/Solar Titan USA hereby agrees to install or cause to be installed the goods or services listed in the agreement, at the buyer(s) address listed on the front side of this agreement. The buyer(s) agrees to pay the cost of goods and service purchased as described herein. The buyer(s) accept such financing agreement for the purchase as is contained on separate financing documents. Buyer(s) agrees to allow reasonable access to the property in the area on which is contracted, and the work will be performed, including access to all electrical outlets as may be required by the contractor. Manufacturer warrants function and reliability of the solar panels. Installation contractor warrants all labor and specific penetration points for 60 months. There are no implied warrants other than those stated in writing by the manufacturer of the goods provided. In the event that the owner fails to provide payment as required upon completion of the installation of the panels, Ideal Horizon Benefits, LLC/ Solar Titan USA has the right to remove panels. In the case of this transaction being a cash or financed transaction, Ideal Horizon Benefits, LLC/ Solar Titan USA has all rights to remedy payment in full as well as all additional means available under state law. Final payment shall be made the day of completion if a cash transaction. Financed agreements must be signed off via email or verbally when the contractor as the same day as the installation with the given financing company. The owner shall provide Ideal Horizon Benefits, LLC/ Solar Titan USA a written description of work believed by owner to be defective or incomplete within 24 hours of completion, Ideal Horizon Benefits, LLC will repair or correct or complete the work included in their written description if deemed appropriate.

Buyer(s) agree to pay any expenses incurred by Ideal Horizon Benefits, LLC/ Solar Titan USA to collect any unpaid balance including attorney's fees. The Buyer(s) have the right to cancel this agreement by midnight on the third business day following the date on the front of this agreement, written cancellation by email to info@theidealhorizon.com or, by U.S. Certified mail, addressed to Ideal Horizon Benefits, LLC/ Solar Titan USA are the only two forms of accepted notification. The request for financing with the finance company will be made by Ideal Horizon Benefits, LLC/ Solar Titan USA following the receipt of this request within the agreed upon and given timeframe.

If financing terms have been approved, materials ordered, and buyer(s) attempt to cancel subsequent to midnight of the third business day after the date of the arrangement, and Ideal Horizon Benefits, LLC/ Solar Titan USA agrees to accept such late cancellation, then buyer(s) agrees to pay Ideal Horizon Benefits, LLC/ Solar Titan USA a cancellation fee equal to 30% of the purchase price to offset a portion of materials, labor and administrative costs.

If buyer(s) are in default of the Agreement, Buyer(s) agrees to pay Ideal Horizon Benefits, LLC's/ Solar Titan USA's attorney fees equal as otherwise allowed by law. Buyer also agrees to pay any other costs or expenses of repossession, collection, or realization on a security including court costs, to any extent not prohibited by law. If financing is involved with this purchase agreement and buyer does not complete the purchase, the loan and documents will be adjusted to thirty percent of purchase price as agreed within the terms and conditions of the cancellation of this agreement. The buyer(s) agree to sign the new loan documents with this adjusted amount.

Arbitration of Disputes: Ideal Horizon Benefits, LLC/ Solar Titan USA agrees that any and all disputes, claims, or controversies, arising under or relating to the contract and any related documents, loans, security instruments, accounts, including by way of example and not as a limitation: (I) the relationships and the transaction arising from this contract; (II) The terms of this contract; (III) the validity of this contract or the validity or enforceability of this arbitration agreement, shall be subject to binding arbitration to be determined by one arbitrator, in accordance with and pursuant to the then prevailing rules and procedures of commercial rules of the American Arbitration Association, to be held and arbitrated in a judicial district in which the buyer resides. The buyer agree that they will not assert a claim on the behalf of, or as a member of, a group or class period the findings of the arbitrator and any award or finding of the arbitration will be specifically enforceable under the prevailing law of any court having jurisdiction. Notice of the demand for arbitration will be filed by the party asserting the claim with the other to the contract and with the American arbitration Association. Any arbitration proceeding brought under this contract, and any award, finding or verdict of or from such proceeding shall remain confidential between the parties and shall not be made public. Both buyers and Ideal Horizon Benefits, LLC are hereby agreeing to use arbitration, rather than litigation or some other means of dispute resolution, to address their grievances or alleged grievances. By entering into this contract and this arbitration provision, both parties are giving up their constitutional right to have any dispute decided in a court of law before a jury, instead are accepting the use of arbitration, other than set forth immediately.

The buyers agree that Ideal Horizon Benefits LLC/ Solar Titan USA may utilize photographs of property and installation on social media and in promotional advertising. Buyer(s) grant Ideal Horizon Benefits, LLC/ Solar Titan USA the right to place signage on the property during the installation process. Buyer agrees not to use any form of social media to express their opinion that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits. Breaching acceptance of this clause by buyer can and will deem monetary compensation benefits to Ideal Horizon Benefits, LLC/ Solar Titan USA. Buyer(s) clearly understands that standard solar systems do not include a battery backup or generator unless specifically added and written in detailed notes.

Any previously existing electrical code violations that require additional labor to be compliant will be covered by the homeowner not Ideal Horizon Benefits, LLC/ Solar Titan USA. Rebates and incentives: Ideal Horizon Benefits, LLC/ Solar Titan USA and buyer(s) agree that any rebates tax credits and power company incentives are not guaranteed by Ideal Horizon Benefits, LLC/ Solar Titan USA all items known to exist to the best of our knowledge will be presented but it is the responsibility of the buyer(s) to ensure incentives are available and they will qualify. There are qualifications for all programs and if the buyer(s) do not qualify or if the item is unavailable at the time of application, Ideal Horizon Benefits, LLC/ Solar Titan USA will not be held liable. All examples and recommendations by energy sales consultants are explicitly deemed as an example and figures. There are many variables and usage, weather patterns, electricity company programs, etc. Buyer(s) in no capacity shall hold Ideal Horizon Benefits, LLC/ Solar Titan USA liable for actual production of the system or expectation. Delay/ Unknown conditions: Events beyond the control of the contractor, such as power company delays, homeowner Association delays, acts of nature, labor strikes, act of God, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, general shortage of labor, equipment, materials or supplies in the open market, failure of transportation, lock out, action of labor unions, condemnation, requisition, order of government or civil or naval authorities, pandemics, inclement weather, terrorism, buyer(s) inability to qualify for or obtaining financing, or other events resulting and delays in performance of this agreement do not constitute abandonment or a breach by Ideal Horizons Benefits, LLC/ Solar Titan USA and are not included in the circulation time frames for performance by Ideal Horizon Benefits, LLC/ Solar Titan USA. In the event that Ideal Horizon Benefits, LLC/ Solar Titan USA determines that this agreement cannot be performed as intended by the parties due to incorrect pricing/ measurements, unforeseen structural defects or pre-existing conditions to the buyer's property. Ideal Horizon Benefits, LLC/ Solar Titan USA may cancel this agreement within 90 days of its execution notify the buyer(s) of such cancellation in writing, and return all monies paid by the buyer(s).



# Installation Agreement

414 N Peters Rd. Knoxville, TN 37922
2333 Alexandria Drive Lexington, KY 40504
725 Cool Springs Blvd. Nashville, TN 37067
125 Townpark Drive Suite 300, Kennesaw, GA 30144
865-392-1036



BUYER #1 _____     _____   _____

                                        **Phone**                      **Date**

BUYER #2 _____     _____   _____

                                          **Phone**                      **Date**

_____ _____ _____ _____ _____

     **Address**                         **City**        **County**  **State**   **Zip**

_____     _____

      **Email #1**                         **Email #2**

## Solar PV Package     __Battery__    __Generator__     _____

_____ **KW PV System**    Yes/ No    Yes/ No       **Utility Company**
                               (Circle)    (Circle)

Fully installed Solar PV System with Inverter
Panels, Racking, Roof or Ground Mounting    **Battery Size**           _____
Hardware, Electrical Components, Plans & Permits    **9 kWh 15 kWh other____**     **Account Number**
Hyper Package: $3,995 Value ☐        (Circle Purchased Size)
Energy Boost & Monitoring System w/ App

                                          Homeowner has been advised that for
**Current Roof: Metal or Shingle**          optimal production, some trees may
                                           need to be trimmed or removed. If
**Mount: Ground or Roof**                 needed, this will be the homeowner's
_Ground/ Or Metal Roof +$2,000_          responsibility.

**Notes:**                                  _____ Homeowner Initials

Box on right: **H. O. A. (If applicable)**
Name: _____
Contact: _____
Contact #: _____
Contact Email: _____

_____

_____

_____

**Materials & Installation Total: $** _____     BUYER #1 _____

**Metal or Ground Surcharge:**   **$** _____

                **Total: $** _____     BUYER #2 _____

          **Deposit: $** _____

     **Balance Due: $** _____     **Energy Consultant:** _____

*If Financed, Homeowner agrees to confirm with the finance company of the installation being complete, on the day panels are installed.
**This is a Grid-Tied System.** Grid Tied Systems without a battery will shut down solar production during power outages to protect lineman andprevent potential
back feed to the grid.

25 Year manufacturer performance guarantee by Solar Panel Manufacturer.
5 Year Roof Penetration Warranty for Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC roof mount solar installations. 12 Month Service Warranty on installed equipment.
Customer understands that any modifications not performed by The Ideal Horizon Benefits, LLC / Solar Titan USA, LLC or Authorized agent will render all warranties null and void.

Regulation Z disclosure: * The calculation of the monthly payments for the first 18 months following installation (which includes the first 17 payments) (the "Initial Period") assumes that you will pay down the loan during the Initial Period by 26%. If you make aggregate principal payments in such amount during the Initial Period, your monthly payments following the Initial Period will remain the same as during the Initial Period. If during the Initial Period you elect to pay principal in an amount that is less than 26% of your loan amount, your monthly payment beginning upon conclusion of the Initial Period and throughout the rest of the term of the Loan will be increased to amortize the full principal loan balance (which would be greater than the originally assumed amount) over a period which is effectively 18 months shorter. Conversely, if you pay down greater than 26% of the principal balance during the Initial Period, your monthly payments following the conclusion of the Initial Period will be reduced to reflect the payment of a lesser principal balance than originally assumed for the balance of the term. Please carefully review the details of your loan, including the payment amounts, provided in your loan agreement." Tax Credit Disclosure: As the purchaser and owner of a solar photovoltaic system, you may qualify for certain federal, state, local or other rebates, tax credits or incentives (collectively, "Incentives"). Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC does not make any claims on individual tax return qualifications. Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC makes no representation, warranty, or guarantee as to the availability or amount of such Incentives.

The buyer(s) listed above hereby jointly and severally agree to purchase the goods and/or services listed, in accordance with the prices and terms described on the front and reverse side of this agreement. Buyer(s) have requested that such goods or services be installed or provided at the buyer(s) address listed on the front side of this agreement. Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC hereby agrees to install or cause to be installed the goods or services listed in the agreement, at the buyer(s) address listed on the front side of this agreement. The buyer(s) agrees to pay the cost of goods and service purchased as described herein. The buyer(s) accept such financing agreement for the purchase as is contained on separate financing documents. Buyer(s) agrees to allow reasonable access to the property in the area on which is contracted, and the work will be performed, including access to all electrical outlets as may be required by the contractor. Manufacturer warrants function and reliability of the solar panels. Installation contractor warrants all labor and specific penetration points for 60 months. There are no implied warrants other than those stated in writing by the manufacturer of the goods provided. In the event that the owner fails to provide payment as required upon completion of the installation of the panels, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC has the right to remove panels. In the case of this transaction being a cash or financed transaction, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC has all rights to remedy payment in full as well as all additional means available under state law. Final payment shall be made the day of completion if a cash transaction. Financed agreements must be signed off via email or verbally confirmed on the same day as the installation with the given financing company. The owner shall provide Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC a written description of work believed by owner to be defective or incomplete within 24 hours of completion, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC will repair or correct or complete the work included in their written description if deemed appropriate. Buyer's agree to pay any expenses incurred by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC to collect any unpaid balance including attorney's fees.

The Buyer(s) have the right to cancel this agreement by midnight on the third business day following the date on the front of this agreement, written cancellation by email to customercare@solartitanusa.com or, by U.S. Certified mail, addressed to Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC 414 N Peters Rd. Knoxville Tn. 37922, are the only two forms of accepted notification. The request for financing with the finance company will be made by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC following the receipt of this request. If financing terms have been approved, materials ordered, and buyer's attempt to cancel subsequent to midnight of the third business day after the date of the arrangement, and Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC agrees to accept such late cancellation, then buyer(s) agrees to pay Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC a cancellation fee equal to 30% of the purchase price to offset a portion of materials, labor and administrative costs.

If buyer(s) are in default of the Agreement, Buyer(s) agrees to pay Ideal Horizon Benefits, LLC's/ Solar Titan USA, LLC's attorney fees equal as otherwise allowed by law. Buyer also agrees to pay any other costs or expenses of repossession, collection, or realization on a security including court costs, to any extent not prohibited by law. If financing is involved with this purchase agreement and buyer does not complete the purchase, the loan and documents will be adjusted to thirty percent of purchase price as agreed within the terms and conditions of the cancellation of this agreement. The buyer(s) agree to sign the new loan documents with this adjusted amount. Arbitration of Disputes: Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC and buyer(s) agrees that any and all disputes, claims, or controversies, arising under or relating to the contract and any related documents, loans, security instruments, accounts, including by way of example and not as a limitation: (I) the relationships and the transaction arising from this contract; (II) the validity of this contract or the validity or enforceability of this arbitration agreement, shall be subject to binding arbitration to be determined by one arbitrator, in accordance with and pursuant to the then prevailing rules and procedures of commercial rules of the American Arbitration Association, to be held and arbitrated in a judicial district in which the buyer resides. The buyer agree that they will not assert a claim on the behalf of, or as a member of, a group or class period the findings of the arbitrator and any award or finding of the arbitration will be specifically enforceable under the prevailing law of any court having jurisdiction. Notice of the demand for arbitration will be filed by the party asserting the claim with the other to the contract and with the American arbitration Association. Any arbitration proceeding brought under this contract, and any award, finding or verdict of or from such proceeding shall remain confidential between the parties and shall not be made public. Both buyers and Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC are hereby agreeing to use arbitration, rather than litigation or some other means of dispute resolution, to address their grievances or alleged grievances. By entering into this contract and into this arbitration provision, both parties are giving up their constitutional right to have any dispute decided in a court of law before a jury, instead are accepting the use of arbitration, other than set forth immediately. The buyers agree that Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC may utilize photographs of property and installation on social media and in promotional advertising. Buyer(s) grant Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC the right to place signage on the property during the installation process. Buyer agrees not to use any form of social media to express their opinion that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC. Breaching acceptance of this clause by buyer can and will deem monetary compensation benefits to Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC. Buyer(s) clearly understands that standard solar systems do not include a battery backup or generator unless specifically added and written in detailed notes.

Any previously existing electrical code violations that require additional labor to be compliant will be covered by the homeowner not Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC. Rebates and incentives: Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC and buyer(s) agree that any rebates tax credits and power company incentives are not guaranteed by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC all items known to exist to the best of our knowledge will be presented but it is the responsibility of the buyer(s) to ensure incentives are available and they will qualify. There are qualifications for all programs and if the buyer(s) do not qualify or if the item is unavailable at the time of application, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC will not be held liable. All examples and recommendations by energy sales consultants are explicitly deemed as an example and figures. There are many variables and usage, weather patterns, electricity company programs, etc. Buyer(s) in no capacity shall hold Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC liable for actual production of the system or expectation.

Delay/ Unknown conditions: Events beyond the control of the contractor, such as power company delays, homeowner Association delays, acts of nature, labor strikes, act of God, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, general shortage of labor, equipment, materials or supplies in the open market, failure of transportation, lock out, action of labor unions, condemnation, requisition, order of government or civil or naval authorities, pandemics, inclement weather, terrorism, buyer(s) inability to qualify for or obtaining financing, or other events resulting and delays in performance of this agreement do not constitute abandonment or a breach by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC and are not included in the circulation time frames for performance by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC. In the event that Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC determines that this agreement cannot be performed as intended by the parties due to incorrect pricing/ measurements, unforeseen structural defects or pre-existing conditions to the buyer's property, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC may cancel this agreement within 90 days of its execution notify the buyer(s) of such cancellation in writing, and return all monies paid by the buyer(s).



# Installation Agreement

414 N Peters Rd. Knoxville, TN 37922
2333 Alexandria Drive Lexington, KY 40504
725 Cool Springs Blvd. Nashville, TN 37067
125 Townpark Drive Suite 300, Kennesaw, GA 30144
865-392-1036



BUYER #1 _____ _____ _____

                                           **Phone**                      **Date**

BUYER #2 _____ _____ _____

                                           **Phone**                      **Date**

| Address | City | County | State | Zip |
|---|---|---|---|---|

| Email #1 | Email #2 |
|---|---|

## Solar PV Package

_____ KW PV System

Fully installed Solar PV System with Inverter
Panels, Racking, Roof or Ground Mounting
Hardware, Electrical Components, Plans & Permits
Hyper Package: $3,995 Value ☐
Energy Boost & Monitoring System w/ App

**Current Roof: Metal or Shingle**

**Mount: Ground or Roof**
*Ground/ Or Metal Roof +$2,000*

Notes:

## **Battery**

Yes/ No
(Circle)

## **Generator**

Yes/ No
(Circle)

**Battery Size**

9 kWh  15 kWh  other_____
(Circle Purchased Size)

Homeowner has been advised for
optimal production, some trees may
need to be trimmed or removed. If
needed, this will be the homeowner's
responsibility.

_____ Homeowner Initials

_____

**Utility Company**

_____

**Account Number**

_____

H. O. A.  (If applicable)

Name: _____
Contact: _____
Contact #: _____
Contact Email: _____

_____

_____

_____

Materials & Installation Total: $ _____

Metal or Ground Surcharge:  $ _____

Total:  $ _____

Deposit: $ _____

Balance Due: $ _____

BUYER #1 _____

BUYER #2 _____

Energy Consultant: _____

**If Financed, Homeowner agrees to confirm with the finance company of the installation being complete, on the day panels are installed.
**This is a Grid-Tied System.** Grid Tied Systems without a battery will shut down solar production during power outages to protect lineman and prevent potential
back feed to the grid.

25 Year manufacturer performance guarantee by Solar Panel Manufacturer.
5 Year Roof Penetration Warranty for Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC roof mount solar installations. 12 Month Service Warranty on installed equipment.
Customer understands that any modifications not performed by The Ideal Horizon Benefits, LLC / Solar Titan USA, LLC or Authorized agent will render all warranties null and void.

Regulation Z disclosure: " The calculation of the monthly payments for the first 18 months following installation (which includes the first 17 payments) (the "Initial Period") assumes that you will pay down the loan during the Initial Period by 26%. If you make aggregate principal payments in such amount during the Initial Period, your monthly payments following the Initial Period will remain the same as during the Initial Period. If during the Initial Period you elect to pay principal in any amount that is less than 26% of your loan amount, your monthly payment beginning upon conclusion of the Initial Period and throughout the rest of the term of the Loan will be increased to amortize the full principal loan balance (which would be greater than the originally assumed amount) over a period which is effectively 18 months shorter. Conversely, if you pay down greater than 26% of the principal balance during the Initial Period, your monthly payments following the conclusion of the Initial Period will be reduced to reflect the payment of a lesser principal balance than originally assumed for the balance of the term, Please carefully review the details of your loan, including the payment amounts, provided in your loan agreement." Tax Credit Disclosure: As the purchaser and owner of a solar photovoltaic system, you may qualify for certain federal, state, local or other rebates, tax credits or incentives (collectively, "Incentives"). Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC does not make any claims on individual tax return qualifications. Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC makes no representation, warranty, or guarantee as to the availability or amount of such incentives.

The buyer(s) listed above hereby jointly and severally agree to purchase the goods and/or services listed, in accordance with the prices and terms described on the front and reverse side of this agreement. Buyer(s) have requested that such goods or services be installed or provided at the buyer(s) address listed on the front side of this agreement. Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC hereby agrees to install or cause to be installed the goods or services listed in the agreement, at the buyer(s) address listed on the front side of this agreement. The buyer(s) agrees to pay the cost of goods and service purchased as described herein. The buyer(s) accept such financing agreement for the purchase as is contained on separate financing documents. Buyer(s) agrees to allow reasonable access to the property in the area on which is contracted, and the work will be performed, including access to all electrical outlets as may be required by the contractor. Manufacturer warrants function and reliability of the solar panels. Installation contractor warrants all labor and specific penetration points for 60 months. There are no implied warrants other than those stated in writing by the manufacturer of the goods provided. In the event that the owner fails to provide payment as required upon completion of the installation of the panels, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC has the right to remove panels. In the case of this transaction being a cash or financed transaction, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC has all rights to remedy payment in full as well as all additional means available under state law. Final payment shall be made the day of completion if a cash transaction. Financed agreements must be signed off via email or verbally confirmed on the same day as the installation with the given financing company. The owner shall provide Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC a written description of work believed by owner to be defective or incomplete within 24 hours of completion. Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC will repair or correct or complete the work included in their written description if deemed appropriate. Buyer(s) agree to pay any expenses incurred by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC to collect any unpaid balance including attorney's fees.

The Buyer(s) have the right to cancel this agreement by midnight on the third business day following the date on the front of this agreement, written cancellation by email to customercare@solartitanusa.com or, by U.S. Certified mail, addressed to Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC 414 N Peters Rd. Knoxville Tn, 37922, are the only two forms of accepted notification. The request for financing with the finance company will be made by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC following the receipt of this request. If financing terms have been approved, materials ordered, and buyer(s) attempt to cancel subsequent to midnight of the third business day after the date of the arrangement, and Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC agrees to accept such late cancellation, then buyer(s) agrees to pay Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC a cancellation fee equal to 30% of the purchase price to offset a portion of materials, labor and administrative costs.

If buyer(s) are in default of the Agreement, Buyer(s) agrees to pay Ideal Horizon Benefits, LLC's/ Solar Titan USA, LLC's attorney fees equal as otherwise allowed by law. Buyer also agrees to pay any other costs or expenses of repossession, collection, or realization on a security including court costs, to any extent not prohibited by law. If financing is involved with this purchase agreement and buyer does not complete the purchase, the loan and documents will be adjusted to thirty percent of purchase price as agreed within the terms and conditions of the cancellation of this agreement. The buyer(s) agree to sign the new loan documents with this adjusted amount. Arbitration of Disputes: Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC and buyer(s) agrees that any and all disputes, claims, or controversies, arising under or relating to the contract and any related documents, loans, security instruments, accounts, including by way of example and not as a limitation: (I) the relationships and the transaction arising from this contract; (II) The terms of this contract; (III) the validity of this contract or the validity or enforceability of this arbitration agreement, shall be subject to binding arbitration to be determined by one arbitrator, in accordance with and pursuant to the then prevailing rules and procedures of commercial rules of the American Arbitration Association, to be held and arbitrated in a judicial district in which the buyer resides. The buyer agree that they will not assert a claim on the behalf of, or as a member of, a group or class period the findings of the arbitrator and any award or finding of the arbitration will be specifically enforceable under the prevailing law of any court having jurisdiction. Notice of the demand for arbitration will be filed by the party asserting the claim with the other to the contract and with the American arbitration Association. Any arbitration proceeding brought under this contract, and any award, finding or verdict ofor from such proceeding shall remain confidential between the parties and shall not be made public. Both buyers and Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC are hereby agreeing to use arbitration, rather than litigation or some other means of dispute resolution, to address their grievances or alleged grievances. By entering into this contract and this arbitration provision, both partiesare giving up their constitutional right to have any dispute decided in a court of law before a jury, instead seeing to arbitrate, other than set forth immediately. The buyers agree that Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC may utilize photographs of property and installation on social media and in promotional advertising. Buyer(s) grant Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC the right to place signage on the property during the installation process. Buyer agrees not to use any form of social media to express theiropinion that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits. Breaching acceptance of this clause by buyer can and will deem monetary compensation benefits to Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC. Buyer(s) clearly understands that standard solar systems do not include a battery backup or generator unless specifically added and written in detailed notes.

Any previously existing electrical code violations that require additional labor to be compliant will be covered by the homeowner not Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC. Rebatesand incentives: Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC and buyer(s) agree that any rebates tax credits and power company incentives are not guaranteed by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC all items known to exist to the best of our knowledge will be presented but it is the responsibility of the buyer(s) to ensure incentives are available and they will qualify. There are qualifications for all programs and if the buyer(s) do not qualify or if the item is unavailable at the time of application, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC will not be held liable. All examples and recommendations by energy sales consultants are explicitly deemed as an example and figures. There are many variables and usage, weather patterns, electricity company programs, etc. Buyer(s) in no capacity shall hold Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC liable for actual production of the system or expectation.

Delay/ Unknown conditions: Events beyond the control of the contractor, such as power company delays, homeowner Association delays, acts of nature, labor strikes, act of God, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, general shortage of labor, equipment, materials or supplies in the open market, failure of transportation, lock out, action of labor unions, condemnation, requisition, order of government or civil or naval authorities, pandemics, inclement weather, terrorism, buyer(s) inability to qualify for or obtaining financing, or other events resulting and delays in performance of this agreement do not constitute abandonment or a breach by Ideal Horizons Benefits, LLC/ Solar Titan USA, LLC and are not included in the circulation time frames for performance by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC In the event that Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC determines that this agreement cannot be performed as intended by the parties due to incorrect pricing/ measurements, unforeseen structural defects or pre-existing conditions to the buyer's property, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC may cancel this agreement within 90 days of its execution notify the buyer(s) of such cancellation in writing, and return all monies paid by the buyer(s).



# Installation Agreement

414 N Peters Rd. Knoxville, TN 37922
2333 Alexandria Drive Lexington, KY 40504
725 Cool Springs Blvd. Nashville, TN 37067
125 Townpark Drive Suite 300, Kennesaw, GA 30144
865-392-1036



**BUYER #1** _____ _____ _____

                                                     **Phone**                **Date**

**BUYER #2** _____ _____ _____

                                                     **Phone**                **Date**

_____ _____ _____ _____ _____
     **Address**                            **City**       **County**   **State**   **Zip**

_____ _____
     **Email #1**                                       **Email #2**

## Solar PV Package     **Battery**    **Generator**

_____ **KW PV System**

Fully installed Solar PV System with Inverter
Panels, Racking, Roof or Ground Mounting
Hardware, Electrical Components, Plans & Permits

**Hyper Package: $3,995 Value** ☐

Energy Boost & Monitoring System w/ App

### Current Roof: Metal or Shingle

### Mount: Ground or Roof

*Ground/ Or Metal Roof +$2,000*

**Notes:**

**Battery**

Yes/ No
(Circle)

**Battery Size**

**9 kWh 15 kWh** other_____
(Circle Purchased Size)

**Generator**

Yes/ No
(Circle)

**Utility Company**

_____

**Account Number**

_____

Homeowner has been advised that for
optimal production, some trees may
need to be trimmed or removed. If
needed, this will be the homeowner's
responsibility.

_____ Homeowner Initials

**H. O. A. (If applicable)**

Name: _____

Contact: _____

Contact #: _____

Contact Email: _____

_____

_____

_____

**Materials & Installation Total: $** _____      **BUYER #1** _____

**Metal or Ground Surcharge: $** _____

                            **Total: $** _____      **BUYER #2** _____

                         **Deposit: $** _____

                 **Balance Due: $** _____      **Energy Consultant:** _____

*If Financed, Homeowner agrees to confirm with the finance company of the installation being complete, on the day panels are installed.
**This is a Grid-Tied System. Grid Tied Systems without a battery will shut down solar production during power outages to protect lineman and prevent potential
back feed to the grid.

25 Year manufacturer performance guarantee by Solar Panel Manufacturer.
5 Year Roof Penetration Warranty for Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC roof mount solar installations. 12 Month Service Warranty on installed equipment. Customer understands that any modifications not performed by The Ideal Horizon Benefits, LLC / Solar Titan USA, LLC or Authorized agent will render all warranties null and void.

Regulation Z disclosure: * The calculation of the monthly payments for the first 18 months following installation (which includes the first 17 payments) (the "Initial Period") assumes that you will pay down the loan during the Initial Period by 26%. If you make aggregate principal payments in such amount during the Initial Period, your monthly payments following the Initial Period will remain the same as during the Initial Period. If during the Initial Period you elect to pay principal in any amount that is less than 26% of your loan amount, your monthly payment beginning upon conclusion of the Initial Period and throughout the rest of the term of the Loan will be increased to amortize the full principal loan balance (which would be greater than the originally assumed amount) over a period which is effectively 18 months shorter. Conversely,if you pay down greater than 26% of the principal balance during the Initial Period, your monthly payments following the conclusion of the Initial Period will be reduced to reflect the payment of a lesser principal balance than originally assumed for the balance of the term. Please carefully review the details of your loan, including the payment amounts, provided in your loan agreement.* Tax Credit Disclosure: As the purchaser and owner of a solar photovoltaic system, you may qualify for certain federal, state, local or other rebates, tax credits or incentives (collectively, "Incentives"). Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC does not make any claims on individual tax return qualifications. Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC makes no representation, warranty, or guarantee as to the availability or amount of such Incentives.

The buyer(s) listed above hereby jointly and severally agree to purchase the goods and/or services listed, in accordance with the prices and terms described on the front and reverse side of this agreement. Buyer(s) have requested that such goods or services be installed or provided at the buyer(s) address listed on the front side of this agreement. Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC hereby agrees to install or cause to be installed the goods or services listed in the agreement, at the buyer(s) address listed on the front side of this agreement. The buyer(s) agrees to pay the cost of goods and service purchased as described herein. The buyer(s) accept such financing agreement for the purchase as is contained on separate financing documents. Buyer(s) agrees to allow reasonable access to the property in the area on which is contracted, and the work will be performed, including access to all electrical outlets as may be required by the contractor. Manufacturer warrants function and reliability of the solar panels. Installation contractor warrants all labor and specific penetration points for 60 months. There are no implied warrants other than those stated in writing by the manufacturer of the goods provided. In the event that the owner fails to provide payment as required upon completion of the installation of the panels. Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC has the right to remove panels. In the case of this transaction being a cash or financed transaction, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC has all rights to remedy payment in full as well as all additional means available under state law. Final payment shall be made the day of completion if a cash transaction. Financed agreements must be signed off via email or verbally confirmed on the same day as the installation with the given financing company.The owner shall provide Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC a written description of work believed by owner to be defective or incomplete within 24 hours of completion, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC will repair or correct or complete the work included in their written description if deemed appropriate. Buyer(s) agree to pay any expenses incurred by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC to collect any unpaid balance including attorney's fees.

The Buyer(s) have the right to cancel this agreement by midnight on the third business day following the date on the front of this agreement, written cancellation by email to customercare@solartitanusa.com or, by U.S. Certified mail, addressed to Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC 414 N Peters Rd, Knoxville Tn. 37922, are the only two forms of accepted notification. The request for financing with the finance company will be made by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC following the receipt of this request. If financing terms have been approved, materials ordered, and buyer(s) attempt to cancel subsequent to midnight of the third business day after the date of the arrangement, and Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC agrees to accept such late cancellation, then buyer(s) agrees to pay Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC a cancellation fee equal to 30%of the purchase price to offset a portion of materials, labor and administrative costs.

If buyer(s) are in default of the Agreement, Buyer(s) agrees to pay Ideal Horizon Benefits, LLC's/ Solar Titan USA, LLC's attorney fees equal as otherwise allowed by law. Buyer also agrees to pay any other costs or expenses of repossession, collection, or realization on a security including court costs, to any extent not prohibited by law. If financing is involved with this purchase agreement and buyer does not complete the purchase, the loan and documents will be adjusted to thirty percent of purchase price as agreed within the terms and conditions of the cancellation of this agreement. The buyer(s) agree to sign the new loan documents with this adjusted amount. Arbitration of Disputes: Any dispute between Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC and buyer(s) agrees that any and all disputes, claims, or controversies, arising under or relating to the contract and any related documents, loans, security instruments, accounts, including by way of example and not as a limitation: (I) the relationships and the transaction arising from this contract; (II) The terms of this contract; (III) the validity of this contract or the validity or enforceability of this arbitration agreement, shall be subject to binding arbitration to be determined by one arbitrator, in accordance with and pursuant to the then prevailing rules and procedures of commercial rules of the American Arbitration Association, to be held and arbitrated in a judicial district in which the buyer resides. The buyer agree that they will not assert a claim on the behalf of, or as a member of, a group or class period the findings of the arbitrator and any award or finding of the arbitration will be specifically enforceable under the prevailing law of any court having jurisdiction. Notice of the demand for arbitration will be filed by the party asserting the claim with the other to the contract and with the American arbitration Association. Any arbitration proceeding brought under this contract, and any award, finding or verdict obor from such proceeding shall remain confidential between the parties and shall not be made public. Both buyers and Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC are hereby agreeing to use arbitration, rather than litigation or some other means of dispute resolution, to address their grievances or alleged grievances. By entering into this contract and this arbitration provision, both partiesare giving up their constitutional right to have any dispute decided in a court of law before a jury, instead are accepting the use of arbitration, other than set forth immediately. The buyers agree that Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC may utilize photographs of property and installation on social media and in promotional advertising. Buyer(s) grant Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC the right to place signage on the property during the installation process. Buyer agrees not to use any form of social media to express theiropinion that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC. Breaching acceptance of this clause by buyer can and will deem monetary compensation benefits to Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC. Buyer(s) clearly understands that standard solar systems do not include a battery backup or generator unless specifically added and written in detailed notes.

Any previously existing electrical code violations that require additional labor to be compliant will be covered by the homeowner not Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC. Rebatesand incentives: Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC and buyer(s) agree that any rebates tax credits and power company incentives are not guaranteed by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC all items known to exist to the best of our knowledge will be presented but it is the responsibility of the buyer(s) to ensure incentives are available and they will qualify. There are qualifications for all programs and if the buyer(s) do not qualify or if the item is unavailable at the time of application, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC will not be held liable. All examples and recommendations by energy sales consultants are explicitly deemed as an example and figures. There are many variables and usage, weather patterns, electricity company programs, etc. Buyer(s) in no capacity shall hold Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC liable for actual production of the system or expectation.

Delay/ Unknown conditions: Events beyond the control of the contractor, such as power company delays, homeowner Association delays, acts of nature, labor strikes, act of God, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, general shortage of labor, equipment, materials or supplies in the open market, failure of transportation, lock out, action of labor unions, condemnation, requisition, order of government or civil or naval authorities, pandemics, inclement weather, terrorism, buyer(s) inability to qualify for or obtaining financing, or other events resulting and delays in performance of this agreement do not constitute abandonment or a breach by Ideal Horizons Benefits, LLC/ Solar Titan USA, LLC and are not included in the circulation time frames for performance by Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC In the event that Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC determines that this agreement cannot be performed as intended by the parties due to incorrect pricing/ measurements, unforeseen structural defects or pre-existing conditions to the buyer's property, Ideal Horizon Benefits, LLC/ Solar Titan USA, LLC may cancel this agreement within 90 days of its execution notify the buyer(s) of such cancellation in writing, and return all monies paid by the buyer(s).

From: Rebecca Green rebecca.green@solartitanusa.com
Subject: Separation Information from Solar Titan USA
Date: Jul 29, 2022 at 9:10:42 AM
To: jason.horton.sales@gmail.com

Hello Jason,

I have attached for you valuable information pertaining to your recent separation with us. Please read this full email for this information is important.

**Please return any company property immediately, that you may have. If the items are not returned by 08/03/2022, Solar Titan USA may pursue all avenues to recover the equipment, including legal action.**

If you were enrolled with United Health Care. You will receive information in the mail in the next few weeks regarding continuation under COBRA of any health care benefits in which you and your dependents are enrolled.

Please complete and email back to me the Exit interview so we can continue to improve as a company and the No Trespassing Order. The Roddy vending machine information sheet will help you navigate any pending or remaining money that you may have with our vending company.

I have also attached your Separation Notice for your use as well.

To ensure you receive tax documents and other notices from us, please notify us if your address/phone/or email changes. If you have any questions, please contact me.

Sincerely,

Rebecca Green
HR Generalist
Solar Titan USA
414 North Peters Rd
Knoxville, Tennessee 37922
Office : 865-392-1036 ext. 308



SOLAR TITAN
USA

www.solartitanusa.com
www.facebook.com/sunenergytoday



EXHIBIT
Jason
Horton
#8
8/3/22  CM

pdf

Separation Notice.pdf
72 KB



## Solar Titan USA
414 N Peters Rd     Knoxville, Tn 37922
Phone: 865-392-1036
www.solartitanusa.com



# NO TRESPASSING ORDER

To:   Jason Horton
2442 Eagle Trail
Morristown, TN 37813

From : SOLAR TITAN USA

Solar Titan USA, located at 414 N. Peters Rd (including all buildings/entire premises of Solar Titan USA), Knoxville, TN, 37922 is private property. Please be advised that you have no right, either expressed or implied, to be IN or ON the property located at 414 N. Peters Rd, Knoxville TN, 37922 at any time whatsoever and for whatever purpose. This is an official notice not to trespass on any properties belonging to or leased by Solar Titan USA.

If you choose to ignore this warning, the Knoxville Police Department is authorized to arrest and prosecute you under one or more of the following statues:

1. TCA 39-14-405 Criminal Trespass
2. TCA 39-14-406 Aggravated Criminal Trespass
3. Knoxville City Ordinance Code 1962, § 28-603 Criminal Trespass

Reason/Cause for Request:    Termination of Employment

Issued By   Rebecca Green    Date   07/29/2021

Served By   Rebecca G.    Date  07/29/2022

Witnessed by _____ ___ ___ ___ ___ Title ___
Method of Service   VERBAL [ ]   WRITTEN [ ]   CERTIFIED MAIL [ ]   EMAIL [ ✓ ]

Signature of Trespasser _____   _____



TO REQUEST REFUND FOR ANY OUTSTANDING BALANCE
ON YOUR AVANTI MARKET CARD, PLEASE DO THE
FOLLOWING:

1. CALL RODDY VENDING CO- 865-558-3401
2. ASK FOR SHERRY PURDOM
3. PROVIDE YOUR 12 DIDGET AVANTI CARD NUMBER
   (LOCATED ON THE BACK OF YOUR CARD)
4. IDENTIFY THE COMPANY AS **SOLAR TITAN USA**
5. PROVIDE NAME, AND ADDRESS FOR SENDING ANY
   REFUND DUE

*W*

Exit Intervi...Resign.doc
61 KB



## Employer Notification to Employees of the Availability of Unemployment Compensation

Unemployment Insurance (UI) benefits are available to workers who are unemployed and who meet the requirements of state UI eligibility laws. You may file a UI claim in the first week that employment stops or work hours are reduced.

For assistance or more information about filing a UI claim, call 1-844-224-5818 or visit www.jobs4tn.gov.

You will need to provide the state UI agency with the following information in order for the state to process your claim:

1. Your full legal name;
2. Your Social Security Number; and
3. Your authorization to work (if you are not a US Citizen or

resident. To file a UI claim by phone call: (844) 224-5818

To file a UI claim online, visit: www.jobs4tn.gov

If you have questions about the status of your UI claim, you can call the state UI agency at 1-844-224-5818 or email lwd.support@tn.gov.

LB-0489 (Rev. 08-2020)                                                                RDA 0063



STATE OF TENNESSEE
DEPARTMENT OF LABOR AND WORKFORCE DEVELOPMENT
DIVISION OF EMPLOYMENT SECURITY

## SEPARATION NOTICE

1. Employee's Name: Jason_____ Horton_____     2. SSN: 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
   First          Middle Initial     Last

3. Last Employed: From: 07/05/2021 to 07/28/2022   Occupation: Energy Consultant
                       (mm/dd/yyyy)   (mm/dd/yyyy)

4. Where was work performed? Tennessee

5. Reason for Separation: ☐ Lack of Work      ☐ Discharge      ☒ Quit

   If lack of work, indicate if layoff is: ☐ Permanent   ☐ Temporary - Recall Date _____
                                                                                    (mm/dd/yyyy)

   If temporary, report any vacation pay that will be paid. Week Ending Date _____ Amount $ _____
                                                                            (mm/dd/yyyy)

   If layoff is indefinite vacation pay should not be reported.

6. Employee received: ☐ Wages in Lieu of Notice   ☐ Severance Pay

   In the amount of $ _____ for period from _____ to _____
                                                   (mm/dd/yyyy)  (mm/dd/yyyy)

   If other than lack of work, explain the circumstances of this separation:

   Received resignation notice on 07/28/2022. Personal Reasons.

Employer's Name: Solar Titan USA LLC

| Address where additional information may be obtained: | Employer's Telephone Number: |
|---|---|
| 414 North Peters Rd<br>Knoxville, TN 37922 | (865) 392-1036 |
| | Employer's Email Address: |
| | humanresources@solartitanusa.com |

Employer's Account Number: 0894729    *Number shown on State Quarterly Wage Report (LB-0851) and Premium Report (LB-0456)*

I certify that the above worker has been separated from work and the information furnished hereon is true and correct.
**This report has been handed to or mailed to the worker.**

| Signature of Official or Representative of the Employer who has firsthand knowledge of the separation | Title of Person Signing | Date Completed and Released to Employee |
|---|---|---|
| *Rebecca C* | HR Generalist | 07/29/2022<br>(mm/dd/yyyy) |

### NOTICE TO EMPLOYER
Within 24 hours of the time of separation, you are required by Rule 0800-09-01-.02 of the Tennessee Employment Security Law to provide the employee with this document, properly executed, giving the reasons for separation. If you subsequently receive a time sensitive request for separation information for the same information please give complete information in your response.

### NOTICE TO EMPLOYEE
**YOU MAY BE INSTRUCTED TO MAIL OR FAX THE SEPARATION NOTICE TO TENNESSEE CLAIMS OPERATIONS IF YOU FILE A CLAIM FOR UNEMPLOYMENT INSURANCE BENEFITS.**

LB-0489 (Rev. 08-2020)                                          RDA 0063



SOLAR TITAN
USA

# EXIT INTERVIEW _____

1. Why are you leaving your job?

2. Is there anything the new company offers that Solar Titan does not provide?

3. What was most satisfying about your job?

4. What was least satisfying about your job?

5. What training would you have liked or needed that you did not get?

6. What resources/tools that you did not have would have allowed you to be more effective at your job?

7. How could we have enabled you to make full use of your capabilities and potential?

8. What improvements do you think can be made to customer service and relations?

9. What can you say about communications within Solar Titan?

10. Were your job responsibilities/expectations clearly explained and understood?

11. How did you feel about the supervision you received?

12. Would you have changed the expectations that were placed on you?

13. Would you have any recommendations for the company for the future?

14. Would you consider working again for us if the situation were right?

On a scale of 1 (lowest) to 10 (highest), please rate the following:

Benefits Offered          1  2  3  4  5  6  7  8  9  10
Job Satisfaction          1  2  3  4  5  6  7  8  9  10
Training/Development  1  2  3  4  5  6  7  8  9  10

Training/Development 1 2 3 4 5 6 7 8 9 10
Performance Reviews    1  2  3  4  5  6  7  8  9  10
Communication       1  2  3  4  5  6  7  8  9  10
Management      1  2  3  4  5  6  7  8  9  10
Customer Service     1  2  3  4  5  6  7  8  9  10
Working Conditions   1  2  3  4  5  6  7  8  9  10


Other Comments or Suggestions?