UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| STATE OF TENNESSEE, *ex rel.* JOHNATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER; and COMMONWEALTH OF KENTUCKY, *ex rel.* DANIEL CAMERON, ATTORNEY GENERAL,<br><br>        Plaintiffs,<br><br>v.<br><br>IDEAL HORIZON BENEFITS, LLC d/b/a SOLAR TITAN USA, et al,<br><br>        Defendants. | No. 3:23-cv-46-DCLC-JEM |

**DEFENDANT SARAH KIRKLAND'S PARTIAL OPPOSITION TO ENTRY OF PRELIMINARY INJUNCTION and MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER**

The Plaintiffs in this matter, the Attorneys General of Tennessee and Kentucky (the "Government"), have asked this Court to freeze the assets of Sarah Kirkland, a minority shareholder and employee of the Defendant business. The Government has thrown a wide net in their effort to protect consumers from what they allege are troublesome business practices of Defendant Ideal Horizon Benefits, LLC.

In doing so, they have sought not only to prevent violations of various consumer protection laws—to which Defendant Sarah Kirkland has no objection—but they have also asked this Court to trample the Due Process rights of Ms. Kirkland and seize all of her assets. By including Ms. Kirkland in generalized allegations of wrongdoing by the collective "Solar Titan Defendants," they have obscured from the Court the fact that they have no evidence that Ms. Kirkland has done anything wrong and that there is no basis in law or, more fundamentally, any basis consistent with

1

Constitutional safeguards for the seizure of Ms. Kirkland's assets.  The Government cannot show a risk of irreparable harm; they cannot show a likelihood of success on the merits as to any claims against Ms. Kirkland; and they cannot show a Constitutionally sound basis in law for the seizure of Ms. Kirkland's assets.

**THE EVIDENCE REGARDING MS. KIRKLAND**

The Government has submitted sworn statements of four (4) people, in addition to several exhibits and declarations.  Here is what the bulk of the evidence says with regard to Ms. Kirkland:

Michael Hill: Attorneys with the Tennessee Attorney General's Office took the sworn statement of Michael Hill on Sept. 1, 2023, pursuant to a request for information issued Aug. 22, 2022. (*See* Doc. 10-8, 4:1-5). The transcript is 100 pages in length and, although an index was not provided, it is noted that the name "Sarah Kirkland" appears a total of six (6) times in those 100 pages, while the name "Sarah," standing alone, appears thirteen (13) times, several times merely referring to Ms. Kirkland's son. (*See id*., generally). In speaking of Ms. Kirkland, Mr. Hill has no firsthand knowledge of any allegations in the Complaint and states, in the time he worked at Solar Titan, which was almost a year, he "never had any interactions with . . . Sarah Kirkland" and thinks that he had "three words with Sarah. Which is, good morning, ma'am. And that's pretty much it." (*Id.* 23:1-4; 38:25-39:2; 84:7-10). Mr. Hill was not even certain that Ms. Kirkland was in the ownership group (*id.* at 24:6-7). He simply knew that she was on the operations side of the business (*id.* at 24:21-22), that her son worked for the company (*id.* 70:25-71:1), and that installation was efficient when Ms. Kirkland had been associated with preparing design plans for the company (*id.* 82:4-7). He also understood that Ms. Kirkland was certified with the NABCEP. (*id.* 82:11-15). Mr. Hill, however, does not appear to have any personal knowledge regarding any company or personal spending habits of those having any ownership interest in the company, including Ms.

2

Kirkland. Instead, Mr. Hill's information was all secondhand, indicates that such expenses and conduct were related to others.[1] Put simply, Mr. Hill presents nothing by way of his sworn statement that would indicate that Ms. Kirkland was making any extravagant purchases, let alone anything that could serve as "evidence" warranting the claims and allegations asserted against her as the basis for seizure of her assets.

Sarah Dorismar: The Tennessee Attorney General's Office took Ms. Dorismar's statement on August 27, 2022. (Doc. 10-6, PageID#: 861). Ms. Dorismar initially joined Solar Titan in 2020, and was later promoted to Finance and Administration Manager, a position she occupied from December 2021 until her resignation in June 2022. *See* (Doc. 10-6, PageID#: 870-75). In stark contrast with Michael Hill, Ms. Dorismar was in regular contact with Ms. Kirkland throughout her tenure with Solar Titan; after all, Ms. Kirkland not only hired Ms. Dorismar, but she also trained and helped supervise her, too. *See* (Doc. 10-6, PageID#: 873-75). But, much like Michael Hill, Ms. Dorismar presents no testimony that would indicate Ms. Kirkland was "leading a lavish lifestyle" or otherwise engaging in conduct which would justify freezing all of her assets. In fact, in her sworn statement, Ms. Dorismar describes troubling conduct by Defendant Craig Kelley, describing him as someone obsessed with processing loans and collecting money as soon as possible, buying multi-million-dollar homes in cash with no financing whatsoever, purchasing Teslas for certain employees like Shawna Helton, and becoming irate when funds subject to the three-day cancellation period described in the Complaint were clawed back by Defendant Solar Mosaic, LLC d/b/a Mosaic ("Mosaic"). *See* (Doc. 10-6, PageID#: 899-900, 905-06, 959, 965-66,

---

[1] (*See,* e.g., *id.* at 83:5-25 wherein such expenses and conducted appear to be attributed to "he" or "they" suggesting Mr. Atnip and Mr. Kelley given the context and properties referenced; 23:8-12, 86:3-15 discussing Craig Kelley purchasing Teslas for members in upper management at Solar Titan; and 90:6-91:14 referencing property in Alabama where Mr. Atnip's family resides and the fact that, although the property may be in Solar Titan's name, it was Mike and Craig's "personal" yacht).

977-78, 1013-17). By contrast, she does not give any indication that Ms. Kirkland was enriching herself with "ill-gotten gains" as Plaintiffs allege in the Complaint. *See* (Doc. 3, PageID#: 17). In other words, her testimony is consistent with that of Michael Hill in that the conduct which might warrant an injunction freezing certain assets was only that of Defendants Kelley and Atnip, *not* Ms. Kirkland.

Jason Horton: Horton voluntarily provided a sworn statement to the Tennessee Attorney General's Office on August 3, 2022. Horton met Defendant Kelley ("Kelley) working at Exploria Resorts in Florida; a time-share business. (Doc. 10-3, 16: 10-18). Kelley recruited him for sales at Solar Titan and he interviewed with Kelley and Ms. Kirkland. (18: 16-10).  Thereafter, Horton was introduced to Defendant Atnip (18: 20-21). Horton says he was the first Solar Titan employee, was initially offered a sales director position but declined it. (18:9-19). Horton also worked with Shawna Helton and Kelley at Exploria. (22:19-250).

Horton was paid straight commission. (p.26). Horton says that in the "eyes" of Kelley, Sarah, and Atnip the solar installation job was complete when the panels "glass" was on the roof, even if it hadn't passed inspection. (27:14-20). Kelley trained the salespeople and there was "very little" training material. (28:13-25). In October 2021, Kelley insisted employees sign non-disclosure, non-solicitation, and non-compete agreements. (42: 9-22; 43:1-20). This was the time Horton says the company was starting to "fall apart." (44:3-6). In November 2019, Kelley and Ms. Kirkland gave Horton a document, "What Starting Size Solar System to Recommended". (46:3-13). Horton says the November 2019 document is not correct. Horton says Kelley created the document. (48:14-25). Ms. Kirkland sent Solar System Sizing Guideline in October, 2021, with updated information. (45:5-22).  In October/November 2021, Horton perceived a change in the company - sales folks weren't getting paid but everyone noticed big ticket purchases by Kelley and

4

Case 3:23-cv-00046-DCLC-JEM   Document 44   Filed 02/13/23   Page 4 of 13   PageID #: 2483

others (84:1-7). In this October 2021 period, Horton says consumer complaints were reaching him. (44:8-25) Kelley told Horton, at first, that everyone qualified for the federal tax credit. (61:20-25). Horton later realized the tax credit didn't apply to everyone. (63:5-25).

Shawna Helton:

The Plaintiffs took a sworn statement from Shawna Helton on October 10, 2022. Ms. Helton began her testimony by testifying that she took from Solar Titan when she left a downloaded version of the company's "Salesforce" CRM database. (8:1-6). She had known Craig Kelley and Sarah Kirkland from a prior company named Solar Choice USA. (12:15-23). After Mr. Kelley started Solar Titan, Ms. Kirkland went to work for him and Ms. Helton joined them later as the head of sales. She was told that Ms. Kirkland was "COO" when she first joined the company. (21:17-24). Ms. Horton had almost no personal knowledge concerning Ms. Kirkland or any of the alleged "bad acts" that the Plaintiffs are complaining about. For example, she "was told" that there were three different spreadsheets for end-of-year payouts. (28:11-22). She "was told" that one of the spreadsheets showed her compensation as $2 million. (28:15-17). Based on this hearsay, "They were embezzling money. That's what I would assume." (28:25-29:1).

Her knowledge about what was happening with the company financially is all based on similar, inadmissible assumptions. For example, she was asked by the Plaintiffs' counsel:

Q. It sounds like they had a lot of money. Why would they have difficulty getting the installs done?

A. Because they were spending it as quick as they were - - as we were making it for them.

Q. Who was?

A. I don't - - between Sarah, Craig, and Mike. I feel like that they were probably drawing profits weekly. Now, this, again, is my perception . . . .

(55:18-56:1).  On the subject of cancelling contracts, she could only report hearsay about what someone else was supposedly told and had no personal knowledge.  (78:13-21).  With respect to Tesla vehicles that various company employees were driving, Ms. Helton "would say that they were writing it all off as a business expense, but I don't know."  (183:19-23).  The only high-priced spending that she attributed to Ms. Kirkland was "a million dollar home on the lake," but without any personal knowledge of the details.[2]  In short, although Ms. Helton seems to have it out for Ms. Kirkland and the other defendants, she had zero personal knowledge of any mis-deeds or illicit gains by Ms. Kirkland.

## ARGUMENT

**I.      The freezing/seizure of Ms. Kirkland's property is not consistent with the law on extraordinary equitable relief, such that the temporary restraining order must be dissolved and a preliminary injunction denied.**

Federal Rule of Civil Procedure 65 provides the procedure that the district court must follow when granting injunctive relief. *First Tech. Safety Sys. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993). The only type of injunctive relief that a district court may issue *ex parte* is a temporary restraining order. Fed. R. Civ. P. 65(b).

Fed. R. Civ. P. 65(b)(1) provides for the issuance of a TRO as follows:

The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

---

[2] (184:2-3).  Mr. Kirkland actually paid about $1.4 million for the house and has a mortgage in excess of $1.2 million.  It was not cash spending, as the Plaintiffs present.

6

"An ex parte temporary restraining order is an extraordinary remedy which will not be granted unless the movant clearly shows that such relief is warranted." *Jarrett v. Snyder*, No. 1:13-cv-139, 2013 U.S. Dist. LEXIS 91349, at \*4-5 (W.D. Mich. Apr. 10, 2013) (quoting *Fort Wayne Women's Health Organization v. Brane*, 734 F.Supp. 849, 850 (N.D. Ind. 1990)). "Ex parte temporary restraining orders are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer. *Id.* (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 439, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974)) other internal citations omitted).

Based on the record before this Court, the Plaintiffs were not entitled to issuance of a TRO freezing all of Ms. Kirkland's assets, and a temporary injunction continuing such a freeze should be denied. In support, it is submitted that the Plaintiffs have sought, and obtained, a TRO that freezes all of Ms. Kirkland's assets, with little to no evidence that the assets seized were even subject to the equitable claim at issue and, therefore, necessary to satisfy a potential judgment. *See Turnkey Offshore Project Servs., LLC v. JAB Energy Sols., LLC*, No. 21-672, 2021 U.S. Dist. LEXIS 149733, at \*17 (E.D. La. Aug. 10, 2021) ("Plaintiff must demonstrate likelihood of success on the merits as to an equitable claim to the funds at issue to fall within the ambit of *Deckert* [*v. Independence Shares Corp.*, 311 U.S. 282 (1940)] and authorize a Rule 65 pre-judgment asset freeze.").

Moreover, neither the Complaint nor the declaration of counsel, as it relates to the allegations against Ms. Kirkland that could serve as the basis for an asset freeze, were based upon personal knowledge sufficient to support a TRO. The allegations in the Complaint are often times

7

based on information and belief and the sworn statements referenced and/or relied on in support

of the extraordinary relief sought are, as it relates to assertions of lavish lifestyles and extravagant

spending, based on rumor and hearsay. The statements Plaintiffs rely on, which are <u>not</u> based

exclusively on personal knowledge, are not sufficient to support the extraordinary remedy of a

TRO. *Jarrett v. Snyder*, No. 1:13-cv-139, 2013 U.S. Dist. LEXIS 91349, at \*6-7 (W.D. Mich. Apr.

10, 2013) ("Where a plaintiff's pleadings contain an amalgamation of statements made on

"information, knowledge and belief," such a combination "provides no basis on which to render

the extraordinary relief of a TRO.") (quoting *Advocacy Organization for Patients and Providers*

*v. Mercy Health Services*, 987 F. Supp. 967, 974, fn. 13 (E.D. Mich. 1997)) and citing *Wells Fargo*

*Advisor, LLC v. Kolhoss*, No. 2:13-cv-190, 2013 U.S. Dist. LEXIS 15997, 2013 WL 486977 at \*2

(D. Nev. Feb. 6, 2013) (affidavit from person lacking personal knowledge cannot establish that the

plaintiffs would suffer immediate and irreparable harm without the requested TRO)).[3]

---

[3] As the Western District of Michigan has summarized:

> Courts apply this strict personal knowledge requirement in granting other relief, such as preliminary injunctions and summary judgment. *See Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.*, 446 F.2d 353, 357 (5th Cir. 1971) ("While we do not rule out the possibility that hearsay may form the basis for, or contribute to, the issuance of a preliminary injunction, the district courts have shown appropriate reluctance to issue such orders where the moving party substantiates his side of a factual dispute on information and belief"). *See also Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) (the "personal knowledge requirement [of Rule 56] prevents statements in affidavits that are based, in part, 'upon information and belief' - instead of only knowledge - from raising genuine issues of fact sufficient to defeat summary judgment"); *Dellacava v. Painters Pension Fund of Westchester and Putnam Counties*, 851 F.2d 22, 27 (2d Cir.1988) (statements in an affidavit made "upon information and belief" have "no probative value and may not be considered in a motion for summary judgment"); *Wuliger v. Eberle*, 414 F.Supp.2d 814, 818 (N.D.Ohio 2006) ("It is axiomatic that affidavit evidence must be based upon personal knowledge. . . Information averred to the best of the affiant's knowledge or belief is insufficient to meet the requirements under [Fed. Rules Civ. Proc. 56(c)(4)]").

*Jarrett v. Snyder*, No. 1:13-cv-139, 2013 U.S. Dist. LEXIS 91349, at \*7-8, n.1 (W.D. Mich. Apr. 10, 2013).

Instead, the Plaintiffs presented the Court with general claims that the "Solar Titan Defendants have a track record of: (1) committing financial crimes; (2) attempting to hide their identities; (3) lying to the Office of the Kentucky Attorney General during this investigation; and (4) concealing or dissipating assets." Doc. 8, PageId 244-45.

By repeatedly lumping Ms. Kirkland together with Defendants Craig Kelley and Richard Atnip and referring to them jointly, the Plaintiffs have given the Court the false impression Ms. Kirkland was guilty of these acts and that, unless the Court entered a temporary restraining order that, among other things, froze all of her assets, she would continue "to engage in unlawful conduct, siphon money away from the business accounts with funds that the company should not retain . . . , willfully destroy[ ] records, and hid[e], liquidat[e], or otherwise dissipat[e] assets. . . ." Doc. 5, PageID#: 107. In support of these serious allegations, the Plaintiffs, through opposing counsel's sworn declaration, state that the "Solar Titan Defendants are quickly dissipating assets likely purchased with ill-gotten gains from the company's illegal business activities," citing for example, the supposed fact that "Defendants Atnip and Kirkland recently sold a home for nearly $10 million in Knoxville."[4] Doc. 8, PageID#: 245. The Plaintiffs' summaries aside, the actual evidence compiled and presented, including that contained in the Complaint[5], fails to support this assertion, at least as it relates to Ms. Kirkland, and no other proof has been elicited from the

---

[4]  This sworn statement is false. Ms. Kirkland has not personally sold any property of the sort, with Defendant Atnip, and the proof reveals that it was Mr. Kelley, not Ms. Kirkland, who was associated with the referenced sale.

[5]  Plaintiffs assert that Kelly, Atnip, and Kirkland are using ill-gotten funds to "purchase or lease expensive items such as luxury vehicles, multi-million-dollar homes, large boats, and even a jet airplane," "pay their own personal expenses," and "lead a lavish lifestyle that includes several multi-million-dollar homes, yachts, a private jet, and luxury vehicles." (Doc. 3, ¶¶17, 64-65). Plaintiffs' evidence, however, fails to reveal Ms. Kirkland's personal involvement in any such transactions.

Plaintiff's' investigation that would warrant Ms. Kirkland's inclusion in the claims that the Solar Titan Defendants were leading a luxurious lifestyle or making extravagant purchases that would necessitate the extraordinary relief the Plaintiffs sought against her or this Court ordered.

Because Plaintiffs equate Ms. Kirkland with Defendants Kelley and Atnip in an effort to justify a blanket freeze of all individual defendants' assets—including her own—instead of narrowly tailoring their request to freeze only those assets in which they claim an equitable interest, Ms. Kirkland requests the Temporary Restraining Order related to the freezing of her assets be dissolved and that any request for a preliminary injunction based on the evidence presented be denied.

## II. It is not consistent with Constitutional Due Process for the Court to put the burden of proof on Ms. Kirkland to show why her own assets should not be seized.

As the caselaw interpreting Rule 65 of the Federal Rules of Civil Procedure makes clear, the party seeking a temporary restraining order or injunction "bear[s] the burden of demonstrating the various factors justifying preliminary injunctive relief, such as the likelihood of irreparable injury to it if an injunction is denied and its likelihood of success on the merits." *Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 441 (1974). Stated differently, "Rule 65 (b) does not place upon the party against whom a temporary restraining order has issued the burden of coming forward and presenting its case against a preliminary injunction." *Id.* at 442. To the contrary, the Rule provides that "in case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time . . . and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if he does not do so, the court shall dissolve the temporary restraining order." *Id.* at 442-43.

Notwithstanding the clear principles set forth under the law, this Court's TRO improperly and impermissibly shifts the burden to Ms. Kirkland and orders her to appear before the Court "to show cause, if there is any, why this Court should not enter a Temporary Injunction" that would, among other things, continue to freeze all of her assets. *See* Doc. 21, PageID#: 2381-82. This language, which Plaintiffs prepared and this Court approved, "perverts the Rule 65 standard for injunctive relief." *Vitolo v. Guzman*, 999 F.3d 353, 367-68 (6th Cir. 2021) (citing *Granny Goose Foods, Inc.* 415 U.S. at 443) ("The burden was on employers to show that they were entitled to a preliminary injunction, *not on the Union to show that they were not*."); *N. Am. Coal Corp. v. Loc. Union 2262, United Mine Workers of Am.*, 497 F.2d 459, 465 (6th Cir. 1974) ("[T]he burden of proof remains upon the party seeking the extraordinary relief [...] until all necessary elements to the issuance of an injunction have been established.")). As a result, Ms. Kirkland requests that the TRO be dissolved and that any request for preliminary injunction be denied.

### III.    The short timelines in the Court's Order to Show Cause are not consistent with Due Process.

As the Fifth Circuit noted under analogous circumstances where "Plaintiffs thrust the defendants into an impossible position insofar as both preparing and presenting an effective response to the motion for preliminary injunction,"

> Two interrelated rights of the defendants are critical to the case: fair notice and an effective opportunity to controvert the facts adduced in support of plaintiffs' motion. Rule 65(a) requires notice. It does not define what "notice" must be. But we know that it implies a hearing. *Miami Beach Federal S. & L. Assn. v. Callander*, 256 F.2d 410 (5th Cir. 1958); *Hawkins v. Board of Control*, 253 F.2d 752 (5th Cir. 1958); *Sims v. Greene*, 161 F.2d 87 (3d Cir. 1947). "Hearing requires a trial of [issues] of fact. Trial of [issues] of fact necessitates an opportunity to present evidence," *Hawkins, supra*, at 753, and not by only one side to the controversy, *Sims, supra*.

11

*Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 356-57 (5th Cir. 1971)[6]

The scenario manufactured by the Plaintiffs, however, has not provided Ms. Kirkland "fair notice" nor "an effective opportunity to controvert the facts adduced in support of plaintiffs' motion." Ms. Kirkland's ability to respond to all issues of fact or law has been impeded, and the proceedings will likely result in a one-sided evidentiary hearing. It is thus asserted that Ms. Kirkland's due process rights have been infringed upon and that any request for a Preliminary Injunction be denied.

## CONCLUSION

For the foregoing reason, the temporary restraining order entered by this Court must be dissolved and the Plaintiffs' request for a preliminary injunction must be denied.

Respectfully submitted,

 /s/ Gregory Brown
Gregory Brown (BPR #027944)
W. Scott Hickerson (BPR #026369)
Hugh B. Ward (BPR #015071)
G. Alan Rawls (BPR #038300)
900 South Gay Street, Suite 2102
Knoxville, TN 37902
P: (865) 521-6527
F: (865) 637-0540
gb@lyblaw.net
wsh@lyblaw.net
hbw@lyblaw.net
gar@lyblaw.net
*Counsel for Defendant Sarah Kirkland*

---

[6] In *Marshall Durbin Farms*, the defendants, much like the Defendants here, were forced, within a few days, to undertake crucial tasks. "They were under the necessity of retaining counsel, locating the numerous persons and investigating the multitude of occurrences alleged in the complaint and separate affidavits, determining if there was evidence to controvert what was said to have occurred, and either procuring affidavits or arranging for live testimony from witnesses." *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 356-57 (5th Cir. 1971).

**CERTIFICATE OF SERVICE**

I hereby certify that on February <u>13</u>, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.


<u>/s/ Gregory Brown</u>


Consideration of a motion for a preliminary injunction does not implicate a final determination of the merits of a lawsuit; instead, an essential concern is preserving the existing state of affairs until the rights of the parties can be fully investigated and fairly determined. *Blount v. Societe Anonyme Du Filtre Chamberland Systeme Pasteur,* 53 F. 98, 101 (6th Cir. 1892). This concern involves the court in weighing the necessity of preserving its power to ultimately and effectively decide the case against the risk that harmful consequences will attend the imposition of preliminary injunctive relief. *See* 11 Charles AL Wright & Arthur R. Miller, *Federal Practice & Procedure,* § 2947 (1973).

Williamson v. White, No. 93-6017, 1994 U.S. App. LEXIS 2944, at *2 (6th Cir. Feb. 17, 1994)