# EXHIBIT B

Declaration of John Brandon Stephens, Former Solar Titan CFO, with Attachment

## DECLARATION OF JOHN BRANDON STEPHENS

I, John Brandon Stephens, hereby state that I have personal knowledge of the facts set forth below and the facts contained herein are true to the best of my recollection, except for those facts which are alleged to be upon information and belief, and as to those allegations, I hereby certify I believe the same to be true. If called as a witness, I would competently testify as follows:

1. I am a United States citizen and am over 18 years of age. I reside in Knox County, Tennessee.

2. I am the former Chief Financial Officer for Ideal Horizon Benefits, LLC d/b/a Solar Titan USA ("Solar Titan").

3. I worked for Solar Titan as its Controller from February 2022 until I was promoted to Chief Financial Officer on September 1, 2022. I left the company early in January 2023.

4. When I started working for Solar Titan, it was evident the company suffered from a lack of professional management.

5. Solar Titan did not adequately train its employees. The only employees that received substantial training where on the Sales and Marketing teams. The lack of training for installers and service technicians resulted in improper installations. The majority of the field employees did not have certifications from the suppliers (Generac and Solar Edge).

6. Solar Titan on many occasions installed solar systems without pulling the requisite permits. It was not uncommon for the solar installations to fail multiple inspections.

7. Solar Titan also performed installations without oversight from a licensed electrician and until 2022 without proper state licensing. The company paid electricians to pull permits to pass the electrical and building inspections.

1

8. Solar Titan was also mismanaged from a financial perspective. The company had a fractional Chief Financial Officer, Kevin Parton, that provided very little financial oversight for the company. His job was a figure head to meet with potential investors. Kevin Partin stopped receiving payments from Solar Titan in the summer of 2022. Another example of the mismanagement, during ADP Workforce Now (payroll software) implementation in late 2021 someone provided ADP with the incorrect EIN number. This caused ADP to file payroll tax filings (940/941) under the wrong company. ADP was provided with Solar Titan USA, LLC's EIN number. Solar Titan USA, LLC was administratively dissolved in 2022. Ideal Horizon Benefits, LLC, the Company continued to use two separate Employee Identification Numbers throughout the Company's accounting. The company had several bank accounts at US Bank and Converge (credit card processing for customer payments) setup under the incorrect Federal Employee Identification Number. Most of the accounts with the incorrect Federal Employee Identification Number were closed in the fall of 2022. Also, another example of mismanagement was allowing solar installers to stay in Hilton and other high-end hotels.

9. Solar Titan also did not keep track of their finances in accordance with Generally Accept Accounting Principles (GAAP).

10. When Solar Titan was profitable, profits would be taken out of the Company by Solar Titan's owners: Richard Michael Atnip, and Sarah Kirkland.

11. As a result of Solar Titan's mismanagement, the Company began having cash flow trouble in May 2022. Richard Atnip started putting money back into the company to keep it solvent. The Company had a reduction in force at the end of October 2022 and again in mid-November 2022.

2

12. Solar Titan attempted to sell the company to investors; however, the first investment deal for minority recapitalization fell through (Spring 2022) as soon as the investment company did any due diligence. The second investment (Pineapple Energy) deal fell apart (Fall 2022) because of poor financial performance. Solar Titan was represented by Cypress an Investment Bank located in New York.

13. At the end of December 2022, the company was on the edge of a complete financial collapse with roughly $15,000 in the bank and unable to make payroll. During this time Sarah Kirkland took a personal trip to Las Vegas. While she was vacationing, negotiations were ongoing for the sale of the company.

14. In order to make payroll, Solar Titan sought assistance from another residential solar installer, Texas Solar based out of San Antonio, Texas. The owner of that company, Mike Sardo, and his partner Willard, agreed to a deal which provided money to pay the employees.

15. Upon information and belief, Texas Solar is owned by Mike Sardo.

16. Mr. Sardo, Richard Atnip and Sarah Kirkland have entered into a deal wherein WWWFFII, LLC will help Solar Titan make payroll while Solar Titan winds down its operations. A copy of the agreement between WWWFFII and Solar Titan is attached as Exhibit 1.

17. Once Solar Titan has completely wound down its operations, Solar Titan will provide some of the remaining assets, including employee, to WWWFFII, LLC.

18. Solar Titan is planning to completely abandon its customers once the Company has sold its remaining assets to WWWFFII, LLC.

19. Solar Titan is then planning to file bankruptcy in an effort to avoid having to fulfill its legal obligations to its customers.

3

20. In short, Solar Titan has been mismanaged and is in bad financial shape. I am worried that Solar Titan customers will not be provided the products and services they have paid for.

I declare under penalty of perjury under the laws of the State of Tennessee and pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed this, the ___13th___ day of ___February___, 2023, in ___Knoxville, TN___ (city/state).

John Brandon Stephens

# Attachment 1

Agreement Between Solar Titan and WWWFFII Signed by Richard M. Atnip

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement (the "Agreement") is made as of December 30, 2022 (the "Effective Date") between Ideal Horizon Benefits, LLC d/b/a Solar Titan USA ("Solar Titan"), a limited liability company organized and existing under the laws of Tennessee, with its principal office located at 10306 Yellow Pine Lane, Knoxville, Tennessee 37992 (the "Principal"), and WWWFF II, LLC, having a principal place of business at 4418 Ocean Drive, Corpus Christi, Texas, 78412 (the "Agency").

### RECITALS

A. Principal is a full service installer of solar panels and desires to appoint Agency for management services for the sale and installation of Principal's products and services (collectively, "Products"), including solar panels, adders, related accessories, and the initial installation and configuration thereof, as provided for in Principal's Sales Agreement (defined below).

B. Agency desires to accept such appointment and to perform all the provisions of this Agreement.

In consideration of the matters described above, and of the mutual benefits and obligations set forth in this Agreement, the parties agree as follows:

1. DURATION.  The term of the relationship created shall be 12 months, beginning as of the Effective Date, unless sooner terminated in accordance with Section 18.  This Agreement may be extended upon mutual agreement of the parties.

2. SERVICES.  Agency agrees to (i) promote sales of Products to prospective customers ("Customers"), (ii) coordinate contracting for such sales on behalf of Principal pursuant to the Sales Agreements, and in doing so, conform with all reasonable rules, regulations and instructions of Principal that are provided to Agency in accordance with Section 19, and (iii) manage to completion the installation of the Products for Customers (collectively, the "Services").  In performing the Services, Agency may employ or assign such personnel as Agency deems appropriate to assist Agency (each a "Sub-Agent").  For purposes hereof, "Sales Agreement" means the form of Product Sales Agreement and/or order form provided to Agency by Principal in connection with this Agreement, as the same may be updated from time to time by Principal upon notice to Agency.

Agency (a) shall not, and shall instruct its Sub-Agents not to: (i) make any misrepresentations regarding the performance of the Products or (ii) make any representations regarding the performance of the Products, including energy savings, that are not provided by or reasonably related to and consistent with those provided by the Principal or the applicable Product manufacturer(s); and (b) shall in all cases ensure that all representations it or any Sub-Agent makes are in accordance with good solar industry practice. Agency shall not, and shall not permit any Sub-Agent to, provide any Customer with any Product warranty that is not expressly set forth in the applicable Sales Agreement or the applicable manufacturer's Product documentation.  Agent shall not allow any of its employees or representatives, or the employees or representatives of its Sub-Agent, to make any verbal representations concerning these matters that are inconsistent with this Section 2.

Principal does not intend to file for bankruptcy protection before completing the installation of Products under currently existing Customer contracts.

3. NONDISCLOSURE.  Each party hereto (as a "Receiving Party") each agree to keep confidential such information as the other party hereto (as a "Disclosing Party") may from time to time impart to the Receiving Party regarding the Disclosing Party's business affairs and customers, including but not limited to the nature of and terms supplied by this Agreement. Each Receiving Party agrees that information about

1

the Disclosing Party's affairs constitutes a trade secret and is competitive and sensitive information. Each Receiving Party will not, in whole or in part, now or at any time, disclose such information unless required by lawful order of a court of competent jurisdiction. Each Receiving Party acknowledges that disclosure of Disclosing Party's affairs will result in irreparable harms to the Disclosing Party. Because an award of damages may not be adequate relief for breach of the agreement not to disclose trade secrets, Principal and Agency agree the party affected by an improper disclosure shall be entitled to injunctive relief. Additionally, Principal agrees that Agency may evaluate its employees for employment, including review of personnel files and other company records.

4. MANAGEMENT FEES.

      A. Agency shall receive a Management Fee (defined below) for each sale of Principal's Products, on the terms set forth herein.

      B. Agency's Management Fee for each such sale pursuant to this Agreement shall be equal to thirty percent (30.0%) of the price of each completed Customer installation (the "Contract Price"), due and payable to Agency within one business day of receipt of such Contract Price by Principal (the "Management Fee"). Management Fees are deemed to be "earned" (referred to as "Earned Fees") when the installation contemplated by the applicable Sales Agreement has been completed and Customer, Customer's agent, Customer's lender, or other person or entity for or on behalf of the Customer (each a "Purchaser") has made settlement in full of the applicable Contract Price. Settlement is deemed to be made in full for purposes of the foregoing upon the earlier of Principal's (or its affiliate's) (a) receipt of the corresponding cash, wire, ACH or similar payment, (b) in the case of payment by check, cashing or clearing of the deposit of the applicable check, (c) in the case of payment by notes or pursuant to an installment payment arrangement, the effective date of Purchaser's obligation to pay under such notes or arrangement, or (d) any combination of the foregoing or other receipt of applicable funds.

Additionally, the parties will negotiate in good faith a mechanism for the funding of $75,000 in working capital to be advanced to the Principal by the Agency with agreed-upon adjustments to future Management Fees paid as a "true-up" to the advanced amount. Upon the Agency's written request the Management Fee procedures outlined in this paragraph shall be transitioned to a lockbox arrangement for the benefit of the Agency, provided that no changes shall be made to the terms of the Management Fee arrangement included herein.

      C. Jobs that are cancelled, terminated, or for any other reason are unable to be completed, regardless of fault, to the extent resulting in a corresponding refund by Principal to the applicable Purchaser, shall cause a proportionate amount of the corresponding advanced or Earned Fees previously paid to Agency in connection therewith to be refunded to Principal by Agency within five business days of cancellation ("Cancellation Fee"). Said Cancellation Fee, at the sole discretion of the Principal, may be delayed by delivery of written notice by Principal to Agency stating that said Cancellation Fee will instead be satisfied through future fees earned. In such case, funds due to Principal will instead be satisfied by reducing future Earned Fees or advanced Earned Fees. Principal may elect, in its sole discretion, to reduce future Earned Fees in whole or in part to facilitate repayment of Cancellation Fee.

      D. Principal and Agency each shall keep the other apprised on a daily basis of all status changes with respect to sales in process, including applicable dates of execution of applicable Sales Agreements, Site Surveys, payments, installations, change orders, cancellations, and other material developments, through a reporting platform acceptable to Principal and Agency.

5. UPFRONT PAYMENT. Upon signing of this Agreement, Agency will make an upfront payment to Principal in the amount of $257,000.

6.  SALES SUBJECT TO MANAGEMENT FEES.  This Agreement shall apply to all sales of Principal's Products where Agency provided a Sales Agreement and the initial Customer lead, as evidenced by the applicable books and records of Agency and Principal.

7.  WHEN FEES CREDITED.

      A. Management Fees shall not be credited to Agency's account on Principal's books until the Management Fee is an Earned Fee.

      B. Agency's account may be charged with the amount of any anticipated Earned Fee previously advanced to Agency or credited to Agency's account for the corresponding amount of the applicable Contract Price that is not settled in full.

8. LIMITATION ON MANAGEMENT FEE CLAIMS.  Agency waives all claims for a Management Fee on a sale of Principal's Products, whether made by Agency or others, if the claim is not made within 2 months after the date that Principal notifies Agency of its receipt of the corresponding Purchaser payment. Agency must make written demand to cure any such claim to Principal prior to taking any other action to perfect its claimed Management Fee.

9.  CONTENTS OF SALES AGREEMENTS.

      A. All Sales Agreements for Principal's Products shall be sent to Principal immediately after being signed by Purchasers.  The Sales Agreements shall contain all conditions and agreements of every nature whatsoever between the parties to the sale, it being agreed that Principal shall not be responsible for promises or conditions not specifically written on the Sales Agreements and agreed to by Principal in writing.  Agency shall not make promises to any customer or third party that are not specifically authorized by Principal, and further, that are not specifically enumerated on the written contract of customer presented to Principal by Agency.

      B. If Principal is compelled, by reason of Agency's violation of these requirements or this Agreement, to make any concessions to customers or incur any expense, the amount of such concession or expense may be charged to Agent's account and recouped by offset or such other measure or remedy as may be expedient for Principal.

10.  ACCEPTANCE OF SALES AGREEMENTS BY PRINCIPAL.  Sales Agreements taken by Agency shall not be binding until accepted by Principal.  Principal reserves the right to reject any Sales Agreement.

11.  COMPROMISE AND COLLECTION OF ACCOUNTS.

      A. Principal shall have full control of and discretion as to the collection, adjustment or compromise of any or all accounts for Principal's Products sold by Agent.

      B. Principal shall determine whether to take a lien on Principal's Products sold by Agency. Principal shall not be liable to Agency for any loss of management fee or other claim, by reason of failure to take such lien, or by reason of any compromise or adjustment of any account or accounts or notes for Products sold by Agency, or any failure for any reason to collect any part of the account or notes.

12.  REMITTALS BY AGENT.  Agency agrees to remit promptly to Principal, in the manner prescribed by the Principal, all money, checks and drafts received by Agency for Principal, including any received for repair parts and supplies sold.  In no event will Agency use any money collected for Principal to defray the

3

DocuSign Envelope ID: FDFC63CD-58C7-47B8-8AD2-9827B37D2C22

expenses of the Agency, or for any other purpose, or deposit the funds in any bank or other financial institution to Agency's own credit.

13. AGENCY'S EXPENSES. All expenses and costs, including but not limited to expenses for traveling, entertainment, office, clerical, office and equipment maintenance, and general selling expenses, that may be incurred by Agency or Principal in connection with this Agreement will be borne wholly by the party incurring such expense or cost, unless otherwise mutually agreed in writing.

14. ACCOUNTING ON TERMINATION.

     A. Neither Agency nor Principal shall be responsible or liable to the other for any outstanding indebtedness of the other, including amounts due from one party to its employees or contractors. Neither party hereto shall pay or be bound to pay any such indebtedness of the other party.

     B. On termination of this Agreement, with respect to all Sales Agreements covered under this Agreement and executed during the term of this Agreement, Principal shall proceed in the manner specified herein as if this Agreement were still in full force and effect, including but not limited to payment of Earned Fees, collection of notes and opening accounts for purchases of Principal's Products, and charging against Agency's account the management fee previously credited on such amounts as applicable.

15. COMPLIANCE WITH LAWS. Each party agrees to comply in all respects with all applicable workers' compensation laws of any applicable state or states, and to pay the premiums and other costs and expenses incident to such coverage.

16. ASSIGNMENT OF AGREEMENT. This Agreement may be assigned by Agency to its designee.

17. MODIFICATION AND TERMINATION. This Agreement and the relationship created by this Agreement may be terminated by Agency (a) for any or no reason by at least thirty (30) days' written notice mailed or delivered to the last known address of the other party or (b) due to material breach of the terms of this Agreement by the other party by at least fifteen (15) days' prior written notice specifying the nature of such breach, provided such termination and notice shall ineffective, null and void if the breach is cured within such fifteen (15) day period. This Agreement covers all agreements between Agency and Principal relating to handling of Principal's Products.

18. NOTICES. Unless expressly provided otherwise, all notices under this Agreement will be in writing and will be deemed to have been duly given if delivered personally or by a nationally recognized courier service, electronically mailed, or mailed by registered or certified mail, return receipt requested, postage prepaid, to the attention of the applicable signatory hereto at the corresponding addresses set forth in this Agreement, or such other individual and / or addresses as a party may designate by written notice conforming with the obligations of this section. Notwithstanding anything to the contrary, any notice of termination shall be effective only if provided by (a) electronic mail as provided for above, and (b) additionally, any of the other methods specified in the preceding sentence.

19. GOVERNING LAW. The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflict of laws principles. The parties agree to submit to the exclusive jurisdiction and venue of the Courts of the State of Texas. The parties expressly waive and forfeit any right they may have to assert any defense of lack of subject matter jurisdiction, improper venue or preferred venue in any action commenced in the courts set forth in this paragraph.

20. LIMITATION OF LIABILITY AND INDEMNITY. EACH PARTY ACKNOWLEDGES AND AGREES THAT PARTIES' RESPECTIVE OBLIGATIONS UNDER THIS AGREEMENT ARE LIMITED. NEITHER PARTY SHALL HAVE ANY RESPONSIBILITY OR LIABILITY FOR CONSEQUENTIAL, SPECIAL, EXEMPLARY OR INCIDENTAL DAMAGES, EVEN IF SUCH PARTY HAS NOTICE OR ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE POSSIBILITY OF SUCH DAMAGES, AND IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR COMPENSATORY DAMAGES FOR ANY AMOUNT MORE THAN $5,000.00.

EACH PARTY (THE "INDEMNIFYING PARTY") WILL INDEMNIFY, DEFEND AND HOLD HARMLESS THE OTHER PARTY, ITS OFFICERS, DIRECTORS, OWNERS, EMPLOYEES, AGENTS, AFFILIATES, SUBSIDIARIES, PARTNERS AND CONTRACTORS FROM AND AGAINST ANY AND ALL CLAIMS, ACTIONS, LIABILITIES, COSTS, LOSSES, JUDGMENTS, SETTLEMENTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) AND INJUNCTIVE RELIEF SOUGHT BY ANY THIRD PARTY ARISING OUT OF ANY SERVICES, WORK, OR ACTIONS OF THE INDEMNIFYING PARTY. NEITHER PARTY SHALL BE RESPONSIBLE FOR THE OTHER PARTY'S ATTORNEY'S FEES.

THE PARTIES WAIVE THEIR RIGHT TO A JURY. ALL CLAIMS, DISPUTES, AND MATTERS IN QUESTION BETWEEN THE PARTIES TO THIS AGREEMENT, ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL BE SUBMITTED TO ARBITRATION IN THE STATE OF TENNESSEE. THE RULES AND PROCEDURES OF SUCH ARBITRATION WILL BE THE CONSTRUCTION INDUSTRY RULES OF THE JUDICIAL ARBITRATION AND MEDIATION SERVICES ("JAMS") UNLESS THE PARTIES MUTUALLY AGREE IN WRITING OTHERWISE. THE DECISION OF THE ARBITRATOR(S) SHALL BE FINAL, CONCLUSIVE AND BINDING UPON THE PARTIES HERETO, AND SHALL BE ENFORCEABLE IN ANY COURT OF COMPETENT JURISDICTION. IN THE EVENT OF A COLLECTION ISSUE FILED BY EITHER PARTY, THEN THE OTHER PARTY SHALL RETAIN THE OPTION TO FILE IMMEDIATELY IN AN APPROPRIATE COURT OR ELECT TO PROCEED WITH ARBITRATION AS PROVIDED FOR HEREINABOVE. EACH PARTY AGREES TO FIRST ATTEND A MEDIATION WITH THE OTHER IN A GOOD FAITH ATTEMPT TO RESOLVE ANY DISPUTES, EXCEPT COLLECTION DISPUTES AS NOTED ABOVE.

The parties have executed this Agreement on the day and year first above written.

**PRINCIPAL:**
**IDEAL HORIZON BENEFITS, LLC**

By: _____
Name: Richard M. ATNiP
Email: michaelatnip@aol.com
michael@subtitleusa.com

**AGENCY:**
**WWWFF II LLC**

By: _____
Name: willard Hammond
Email: willard@acsimgmt.com