UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TENNESSEE, *ex rel.* JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER, and COMMONWEALTH OF KENTUCKY, *ex rel.* DANIEL CAMERON, ATTORNEY GENERAL, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | 3:23-CV-00046-DCLC-JEM |
| v. | ) ) | |
| IDEAL HORIZON BENEFITS, LLC d/b/a SOLAR TITAN USA, et al., | ) ) ) | |
| Defendants. | ) | |

---

## DEFENDANTS MICHAEL ATNIP AND CRAIG KELLEY'S RENEWED OBJECTION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER APPOINTING A RECEIVER

---

Defendants Michael Atnip ("Atnip") and Craig Kelley ("Kelley", and collectively with Defendant Sarah Kirkland, the "Individual Defendants") hereby OBJECT to the *ex parte* Motion for a Temporary Restraining Order and Order Appointing a Receiver (Doc. 5, the "Motion") filed by Plaintiffs State of Tennessee ("Tennessee") and Commonwealth of Kentucky ("Kentucky", and together with Tennessee, "Plaintiffs").[1] In support thereof, Atnip and Kelley state as follows[2]:

---

[1] In light of this Court's Order [Doc. 49] Granting Kelley and Atnip's Motion for an Extension of Time to Respond to Plaintiffs' TRO [Doc. 38], this Objection is a renewal and replacement Objection to Kelley and Atnip's prior filing [Doc. 46]. And this Court also granted [Doc. 50] Kelley and Atnip's Motion for leave to Exceed the 25-Page Limit [Doc. 45] in their response/objections, due to the length and breadth of Plaintiffs' filings. As such, Kelley and Atnip have prepared this renewed and replacement Objection pursuant to this Court's prior Orders.
[2] In the event that this Court permits discovery as requested by the Individual Defendants, then the Individual Defendants reserve the right to supplement this filing.

## INTRODUCTION AND FACTS

The instant dispute arises out of Plaintiffs' improper and unsubstantiated attempts to hold individuals personally liable for vague and conclusory allegations lodged against a wholly separate and distinct corporate defendant. Defendant Solar Titan USA, LLC, ("Solar Titan") was a rapidly growing full-service provider of residential solar installations, designs, and services, that marketed throughout Tennessee, Kentucky, Georgia, and Alabama. *See* Exhibit F at p. 5. Solar Titan set itself apart from competitors by dedicating in-house resources to all stages of completing solar installations, including both sales and design activities, and by working with both solar consumer finance partners and major suppliers to provide full-service solar installation from start to finish. *See id*.

Defendant Atnip's relation to Solar Titan in the instant case is based solely on his current ownership interest in Solar Titan. Beyond his ownership interest in the company, Atnip has not been involved in its day-to-day activities since the first year of its inception. Atnip Declaration ¶ 3 ("Exhibit A"). Since then, Atnip has been kept at arms-length while Defendant Sarah Kirkland ("Kirkland") has at all times relevant hereto, called the majority of the shots across the board, and has been intimately involved in decisions related to matters including, but not limited to, consumer complaints, solar system performance issues, and employee training—all of which form the basis for a majority of Plaintiffs' claims—while Atnip has remained associated with Solar Titan's operations in name only. *Id*.; *see also* Exhibit F. at p. 7. Atnip's involvement has been so limited that he was unaware of the company's most recent financial difficulties until late June of 2022, the realization of which prompted him to begin reinvesting his own funds back into the company in an effort to alleviate its most recent financial distress. *Id*. ¶¶ 5-8. Since then, Atnip has contributed at least $3,154,454.65 of his and Kelley's money back into the company. *Id*. at ¶ 8.

As it relates to Kelley, the States' claims are even more tenuous. Kelley is not now, nor has he ever been, an owner of Solar Titan. The States argue that Kelley cannot be trusted in light of his eleven-year-old criminal conviction;[3] that he—in conjunction with Atnip and Kirkland—managed Soar Titan and that they "realized healthy profits from their illegal conduct;"[4] and that he, along with Atnip and Kirkland, each "lead a lavish lifestyle". In short, the allege Kelley is a convicted felon from eleven years ago who spent too much of his personal money from legitimate earnings Solar Titan distributed to him.

## A. Solar Titan's Track Record of Success and Growth.

From its inception and through the end of 2021, Solar Titan was an extremely successful and growing company. Exhibit F at p. 5-6. In order to assist Solar Titan in evaluating a potential sale, third-party firm Cohn Reznick performed an audit as produced in a due diligence report (the "Report"), which analyzed the financial position of the company through the third quarter of 2021. Exhibit B. The Report provides for substantial growth of Solar Titan, large profits and net income, and high margins. *Id*. at 28. Specifically, the Report provides that the net income for Solar Titan in 2020 was $1,956,000 and in the first three quarters of 2021 was $6,303,000. *Id*. The draft 2021-year-end financial statements show the same successful company. Exhibit C. The financial statement shows net income of $8,644,759 and year end cash of $2,461,003. *Id*. at 3-4. The Report further shows accounts payable and accrued expenses of less than half the cash on hand at $1,062,354 and long-term debt of only $509,842. *Id*. at 9. Notably, the Report shows Members' equity at the end of 2021 at $4,172,192. *Id*. at 3.

---

[3] *See* Compl. at ¶ 84.
[4] *See* Compl. at ¶ 17.

## B. Solar Titan's Recent Troubles Caused by Generac.

Despite its track record as a highly profitable provider, recent developments caused Solar Titan to experience temporary cash flow issues stemming from situations outside of Solar Titan's control. Exhibit F at p. 6. Like many other similarly situated providers, Solar Titan fell victim to Generac Holdings, LLC's ("Generac") faulty equipment and failure to remediate damage caused by the same. *Id.* Specifically, Solar Titan experienced Generac's negative effects on its business— including the same Generac product failures that caused Pink Energy's forced Chapter 7 Bankruptcy filing—which similarly required Solar Titan to waste resources diverting its installer crews from servicing new customers to service existing system issues caused by Generac product failures. *Id.* As discussed more fully herein, Generac's equipment failures as they relate specifically to the SnapRS device supplied to Solar Titan wreaked havoc on the company's reputation and image, as exhibited by the filing of this instant dispute, which incorrectly attributes Generac's equipment failures to alleged Solar Titan wrongdoings. *Id.*

## C. Efforts to Revitalize the Company.

Atnip and Kelley have continuously reinvested their own funds into the company, while Solar Titan's senior management team ("Management") implemented and controlled corrective action in an effort to remediate the most recent hurdles. Exhibit F at p. 6-7; Exhibit A at ¶¶ 7-8. Despite Plaintiffs' assertions to the contrary, Atnip and Kelley never purchased: (1) a private jet; or (2) a yacht for $1,800,000. Exhibit A at ¶ ¶ 9-10. What they have done, however, is continuously utilize their own assets to reinvest into Solar Titan, including making the decisions to sell both their real property located at 3411 Tooles Bend Rd., Knoxville, TN 37922, and charter fishing boat at a loss in order to reinvest the sale proceeds back into the company. *Id.* at ¶¶ 10-11. Prior to this lawsuit, Solar Titan's day-to-day revitalization efforts were spearheaded by its

Management, including Defendant Kirkland, who most recently served as the company's CEO relying upon her experiences based in business development, hiring, scheduling, team building, sales, and procurement. Exhibit F at p. 7. Although neither Atnip nor Kelley serve on the senior management team, Kirkland is supported by five (5) additional team members, including a controller, general manager, marketing and advertising manager, director of sales and training, and a technical operations manager who assisted in the day-to-day operations. *Id*.

Despite Plaintiffs' contentions that Solar Titan has employed unfair and deceptive practices in relation to its sales and marketing initiative, the company made its initial name for itself by taking advantage of the explosive demand for solar installation services driven by decreasing costs, tax incentives, improved technologies, and the prevalence of climate-related power shutdowns— without the use of unfair or deceptive practices.

### D. Solar Titan's Training Program and Adherence to Local Power Authorities and Regulations.

Solar Titan further set itself apart from competitors through the employ of its proprietary installation training, which resulted in quick and efficient solar system completion and remained ongoing throughout an installer's career in order to ensure that Solar Titan employees stayed current on the most up-to-date technology, equipment, and methods. Exhibit F at p. 31. Solar Titan's training incorporated not only classroom and visual demonstrations, but also hands-on training to equip installers for being in the field. *Id* at p. 33. In addition, Solar Titan took special care to provide extensive and focused training to increasingly reach new customers and continuously improve sales conversion rates. *Id*. at p. 34. Similar to solar installer training, sales employees participated in a training program upon being hired and experienced ongoing training throughout their career with Solar Titan to foster their development and ensure a consistent standard of the highest customer care. *Id*.

Although Plaintiffs lodge baseless contentions by which to allege that Solar Titan failed to comply with controlling authority, Solar Titan worked diligently to ensure that its employees adhered to applicable requirements for different utility companies and were properly licensed at all times. *Id*. at p. 38. For example, Solar Titan continuously maintained its general contractor and electrical contractor licenses, both of which are granted reciprocity in numerous states, thereby minimizing Solar Titan's launch time into new territories. *Id*.

### E. The Current Temporary Restraining Order.

By Order of this Honorable Court, there is a Receiver in place over Solar Titan and the assets of the Individual Defendants have been frozen. Fundamentally missing from Plaintiffs' evidence and Motion is the showing of substantial likelihood of success on the merits as it relates to the Individual Defendants. Rather, the Plaintiffs allege, based on hearsay and rumor from disgruntled former employees and now direct competitors, that the Individual Defendants need to have their assets frozen because they will dissipate their personal assets and are a flight risk. The Plaintiffs' stated reason for the immediate need however, presupposes that the Individual Defendants bear personal liability in any manner, which the Plaintiffs have not shown. And further, as it relates to the Individual Defendants' recent assets sales, the proceeds were reinvested into Solar Titan in an effort to revitalize the flailing company. Defendants who seek to abscond with funds or run a sham company would not reinvest those funds back into their company, yet, this is exactly what Mr. Atnip and Mr. Kelley did. Additionally, Mr. Atnip's and Mr. Kelley's assets are located in Tennessee for the most part. Exhibit A at ¶ 14. All of their real estate is owned in Tennessee, except for one investment property located in Florida that is already under contract for sale. *Id*. at ¶ 14. Further, Mr. Atnip and Mr. Kelley have no personal finances or bank accounts that are not in the U.S. *Id*. at ¶ 15.

## ARGUMENT

A preliminary injunction "is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). "Granting a 'preliminary injunction is an extraordinary remedy reserved only for cases where it is necessary to preserve the status quo until trial.'" *Enchant Christmas Light Maze & Mkt. v. Glowco, LLC*, 958 F.3d 532, 535 (6th Cir. 2020), citing *Hall v. Edgewood Partners Ins. Ctr., Inc*., 878 F.3d 524, 526 (6th Cir. 2017). Despite the Plaintiffs' request, the Plaintiffs dedicated less than a single page of their over fifty-page memorandum arguing why the Individual Defendants should be held personally liable such that the requested extraordinary relief must be granted. Moreover, the Plaintiffs cite to half a sentence of legal authority—from a California case—to support their theory that the Individual Defendants should be held personally liable.

Uniquely, the government Plaintiffs herein, assert they since they seek "public civil enforcement" of U.S. federal and Tennessee and Kentucky state law claims, then this Court need not rely "upon the traditional practices of equity must be "conditioned by the necessities of the public interest which Congress has· sought to protect."[5] Yet, the Plaintiffs wholly ignore how, even if all of the claims against the corporate entity Solar Titan are proven true (which is disputed), the assets of the Individual Defendants must be subject to the prejudgment attachment effectuated by the one-sided and fundamentally unfair injunction.

The Plaintiffs must show and are required to demonstrate a likelihood of success on the merits, that that the balance of the interests tip are in favor of the injunction, and the injunction is in the public interest. *Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1214 (9th Cir.

---

[5] Memo at p. 31.

2019) (holding that in an "ordinary case a showing of irreparable harm is required to obtain injunctive relief, no such showing is required" for governmental statutory relief). The Plaintiffs cannot merely bootstrap 53 pages of arguments against Solar Titan to the Individual Defendants, who are entitled to due process. As explained below, the Individual Defendants are not likely to be found personally liable on the merits of the case, nor have Plaintiffs demonstrated that the balance of interests and the public interest is supported by a temporary injunction freezing Atnip and Kelley's assets.

## I. The Individual Defendants have a Strong Likelihood of Success on the Merits.

Plaintiffs have failed to sufficiently set forth sufficient evidence to establish a strong likelihood of success on the merits as it relates to the Individual Defendants and accordingly are not entitled to the requested injunction. *See Louisiana-Pacific Corporation v. James Hardie Building Products, Inc.*, 2018 WL 3589122 at *2 (M.D. Tenn. 2018) (citing *NE Ohio Coal. For Homeless and Service Employees Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)) (placing burden on party seeking temporary restraining order to establish "strong likelihood of success on the merits"). To be sure, "a preliminary injunction is an extraordinary remedy never awarded as of right," and Plaintiffs have failed to justify how they are entitled to the same. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

### A. The Plaintiffs have failed their burden in establishing individual liability.

Plaintiffs attempt to sustain their baseless contention the Individual Defendants should be personally liable for any of the allegations in the Complaint by setting forth vague and conclusory allegations accompanied by misleading representations of inapplicable case law. Indeed, Plaintiffs

fail to articulate anything beyond two short paragraphs contained in their 53-page memorandum in support of their Motion, which states in relevant part:

> In order to obtain injunctive relief against an individual for a corporation's violations of state and federal consumer protection laws, the Plaintiffs must show that the individual "participated directly in the acts and practices or had the authority to control them." Atnip is the current owner of Solar Titan and has the authority to control all aspects of Solar Titan's operations or winding down process. Even if Atnip has since delegated control of the business, as the majority owner, he still has the authority to control the business.

> Kelley...also [has] the authority to control the company's conduct and have directly participated in the unlawful conduct. Kelley oversees and decides how Solar Titan navigates its partnerships with Solar Titan lenders like Mosaic, determines whether or when Solar Titan honors or refuses to honor three-day cancellations, oversees training for sales staff, and even has met with the BBB about consumer complaints...Plaintiffs have shown that Kelley...and Atnip either had the authority to control or directly participated in Solar Titan's unlawful activity.

Motion at 42-43. Plaintiffs' assertion that injunctive relief against the <u>individuals</u> is warranted as to alleged violations by the <u>company</u>, Solar Titan, of consumer laws is unsupported by their cited caselaw.

### 1. Individual Liability Under Federal Consumer Protection Laws.

Cases interpreting situations in which injunctive relief is one of the available remedies under federal consumer protection laws directly supports the Individual Defendants' position that they cannot be held personally liable, and explicitly contradicts Plaintiffs' representations to the contrary. The Plaintiffs cite the Northern District of California for the proposition that the Plaintiffs only need to establish that the Individual Defendants "participated directly in the acts or practices [of the company] or had authority to control them" in order to obtain personal liability of the Individual Defendants. *Fed. Trade Comm'n v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1080 (N.D. Cal. 2018). However, the Plaintiffs fail to reconcile that the Sixth Circuit has addressed this same issue and provided an additional requirement, wholly absent from Plaintiffs' proof:

To obtain injunctive relief against an individual for a business entity's acts or practices, the FTC must prove the entity violated § 5. The FTC must further show the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control them." Additionally, the FTC <u>must put forth evidence to show that the individual defendant "knew or should have known of the alleged deceptive misrepresentation."</u> Finally, in order to obtain monetary redress from any defendant, "the FTC must proffer evidence tending to show consumers actually relied on the entity's deceptive acts or practices to their detriment."

*F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636 (6th Cir. 2014) (emphasis added and internal citations omitted). Essentially, the Plaintiffs make the argument that merely by Atnip's ownership interest in Solar Titan and Kelley's limited role in Solar Titan, they have personal liability for the company's acts. This is not the law, and if it was the law, the precedent cases would provide that owners are liable for violations of federal consumer protection laws; however, the law provides that the personal liability requires control over the deceptive acts, not merely the company. The Plaintiffs' pleadings are completely devoid of such control over the alleged deceptive acts.

In *FTC v. Swish Marketing*, 2010 WL 653486 at *5 (N.D. Cal. 2010), the court found the Commission's "conclusory" assertions of defendant's relevant authority and knowledge, including that defendant: (1) was the CEO for the corporate defendant; (2) formulated, directed, controlled, had the authority to control, or participated in acts and practices set forth in the Complaint; and (3) knew of the acts through the consumer filed complaints with defendants, the Better Business Bureau, law enforcement agencies, and bank and payday lenders during the relevant time frame, were insufficient to support an inference of the defendant's personal involvement. 2010 WL 653486 at *5-6.

The instant dispute is more similar to the facts as set forth in *Swish Marketing*, and less like those in cases in which the court found sufficient allegations to impose personal liability. For example, in *American Financial*, the court found allegations that the individual defendant: (1) was

the CEO, secretary, FRO, and sole director of the relevant entities; (2) assumed all of the leadership roles in both high-level and day-to-day management of the entities; (3) signed contracts with consumers as "Managing Director"; and (4) acted as a liaison to the BBB in relation to which defendant was advised of consumer complaints and the consumer's confusion caused by the alleged misrepresentations were sufficient to impose personal liability. *See* 324 F. Supp.3d at 1080-81 (contrasting allegations with those contained *Swish Marketing*, where plaintiffs only alleged that the individual defendant was the CEO and that consumers had filed complaints with defendants, Better Business Bureau, and law enforcement); *see also F.T.C. v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997) (finding sufficient allegations to impose personal liability where plaintiffs set forth specific allegations as to defendant's role in conducting and facilitating the fraudulent solicitation which formed the basis for the allegations).

Here, however, Plaintiffs have failed to set forth anything other than conclusory allegations by which to assert that—solely by virtue of his status as the current owner of Solar Titan—Atnip has the authority to control all aspects of Solar Titan's operations despite having delegated control to others. Instead, Plaintiffs have affirmed Atnip's position through their own pleadings that "Atnip does not currently play a substantial management role in the company, and even when Atnip actually was actively involved in Solar Titan's operations, his involvement with the company was limited." *See* Pls.'s Memo at 7. The testimony contained in Plaintiffs' own memorandum further represents that when Atnip was involved, "everything seemed to be on the up-and-up" and that if something was incorrect with payroll, "he would correct it immediately." *Id.*

Likewise, although Plaintiffs paint Kelley as forever tainted by virtue of his eleven-year-old felony, for which Kelley made restitution, they point to nothing, let alone admissible evidence,

that Kelley bears personal liability. The cited facts relating to Kelley's reasons for liability all relate back to the Aug. 27, 2022 sworn statement of Sarah Dorismar. First, the citations to the record do not support Plaintiffs' assertions. At footnotes 209 and 210, the Plaintiffs refer this Court to pages 11 and 13 of the Dorismar deposition. But, a reading of these citations first confirms that Ms. Dorismar has no first-hand knowledge of Kelley's purported wrongdoing. Second, the sworn testimony does not support the assertion.

As it relates to training, Ms. Dorismar testified, "So I didn't really have a lot of training with Craig. I'm not a hundred percent sure what he did, but I do know that if things weren't done fast enough, I would be getting phone calls." Dorismar at 13:10-13. And, as it relates to Mr. Kelley's role in finances, she responded to the inquiry, "So how did you know that Craig had also been handling the financing with the finance companies?" with "Sarah just told me...". But, and devastating to the suggestion that Kelley was the ringleader, Dorismar stated that she developed the financial policies and procedures the Plaintiffs now take issue with. She stated, "So because they were growing, they hired me to kind of take those roles on from them. So there wasn't technically a finance department. So there wasn't any policies and procedures and things like that. So they allowed me to create that -- those policies and things, and as we grew, that department grew. All the departments grew really." Dorismar at 12:20-25 – 13:1.

Further, as it relates to suggestions that Mr. Kelley was involved in remedying the backlog of customer cancellation requests, Ms. Dorismar testified that she lacked personal knowledge as to whether or not Mr. Kelley was involved in the process. Dorismar at 60:2-12. Stated differently, Dorismar is the only factual link upon which the Plaintiffs assert Kelley has personal liability, but her testimony does not support their assertions.

Plaintiffs have not—and cannot—sufficiently allege direct individual involvement of the Individual Defendants in the aforementioned allegations by which to hold them personally liable for the alleged wrongdoings. "Under Tennessee law, a corporate officer is only personally liable for torts in which he or she participated in the wrong," and the same principle is equally applicable to the relevant statutory claims. *Menuskin v. Williams*, 145 F.3d 755, 762 (6th Cir. 1998) (citing *Cooper v. Cordova Sand & Gravel Co.*, 485 S.W.2d 261, 271-72 (Tenn. Ct. App. 1971)).; *see also, e.g.*, *Curtis v. Loether*, 415 U.S. 189, 195 (1974) ("A damages action under the [Fair Housing Act] sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by defendant's wrongful breach."); *Reilly v. Alcan Aluminum Corp.*, No. 98-3566 1999 WL 313879 at *3 (6th Cir. 1999) (recognizing claim brought under age discrimination statute as a tort claim); *Hard Rock Café Licensing Corp. v. Concession Service, Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992) (trademark and copyright infringement treated as analogous to torts); *J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) ("A cause of action for breach of a duty imposed by statute or case law, and not by contract, is a tort action."). Indeed, a plaintiff cannot rely on an individual's status as an officer or director in an effort to render him liable for the acts of his officers or directors unless he knowingly or recklessly participates or assists in the fraud. *Menuskin*, 145 F.3d at 762 (quoting *Citizens Savings & Loan Ass'n v. Fischer*, 214 N.E.2d 612, 615-16 (1996)); *see also Goodman v. UNUM Group*, 2009 WL 10664240 at *3 (W.D. Tenn. 2009) (quoting Tenn. Cod Ann. § 48-16-203(b)) (noting shareholder not personally liable for acts of corporation except when liability is based on shareholder's own acts or conduct).

Here, Plaintiffs base the entirety of their contentions of authority to Atnip's ownership and Dorismar's baseless assertions against Kelley. In *Menuskin*, the court held that in a matter arising

out of the sale of property, appellants failed to establish individual liability against a corporate officer as to claims—including an alleged violation of the TCPA—resulting from misrepresentations made as to the existence of encumbrances. *See* 145 F.3d at 762. There, the court held that even where appellants: (1) pointed to an officer's representations that appellants did not need their own attorneys or title insurance because the company's attorneys would handle the sales contracts and perform a title search; (2) provided proof of the officer's status as Secretary, Treasurer, billpayer, and bookkeeper of the corporation; and (3) signed both a sales contract and warranty deed, such was insufficient to establish that she personally made any affirmative representations to appellants. *See id*. at 762. The allegations set forth in *Menuskin* are not only similar to, but even more substantial than, the facts in the instant dispute, without pointing to any evidence that either Individual Defendant "personally made any affirmative misrepresentations to any of the [Plaintiffs]." Indeed, based on the 6th Circuit's refusal to impose personal liability on an officer who was alleged to have made the exact misrepresentations which caused appellant's harm, it is difficult to justify how Individual Defendants should be held personally liable where Plaintiffs' allegations do not even rise to the level of those rejected in *Menuskin*.

Not only do Plaintiffs fail to meaningfully articulate a likelihood of success on the merits as to Individual Defendants' personal liability, but their own pleadings set forth affirmative representations to the contrary. For example, Plaintiffs' references to the management of Solar Titan's operations include representations that "Atnip currently does not play a substantial management role in the company," and "[former employees] have never actually seen [Atnip] in the company." *See* Pls.'s Memo at 7. To the contrary, Plaintiffs assert that Kirkland is the individual Defendant responsible for hiring and terminating employees, responding to consumer complaints, working with Titan's lending partners, coordinating with local power companies, and

supervising the alleged no cancellation policy, all of which relate to the exact allegations supporting Plaintiffs' underlying actions. *Id*. at 9-10.

Furthermore, the Plaintiffs ignore the Sixth Circuit knowledge requirement for injunctive relief. By ignoring this requirement, the Plaintiffs have put forth no evidence to support that either Individual Defendant had knowledge of the alleged deceptive acts. This is comparable to *F.T.C. v. QT, Inc.*, where the Court held that the company secretary was not personally liable for the acts of the company. 448 F. Supp. 2d 908, 974 (N.D. Ill. 2006), amended on reconsideration in part, 472 F. Supp. 2d 990 (N.D. Ill. 2007), aff'd, 512 F.3d 858 (7th Cir. 2008), and aff'd, 512 F.3d 858 (7th Cir. 2008). The Court made this ruling despite the company secretary having a much greater chance of knowledge than Individual Defendants do in the present matter. The Court found that the secretary worked for the company for fifteen years, had signatory privileges and would look after the office when her superiors were gone. *Id.* The secretary in *QT* was more involved, and the Plaintiffs provided more evidence of knowledge of the secretary in *QT* than the Plaintiffs have provided here against the Individual Defendants, where the Plaintiffs consistently state that Atnip was not involved in the management of Solar Titan and rely upon baseless and evidentiarily flawed Dorismar assertions.

The knowledge element is distinguished in the present matter from cases where knowledge was actually found. In *F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1207 (10th Cir. 2005), the individual held liable for the company's deceptive acts took place in meetings where the deceptive acts were discussed, and in *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 637 (7th Cir. 2005), the individual held liable for the company's deceptive acts sent an email providing that he would continue to form new companies to prevent consumer complaints to the same company. In the present case, the Plaintiffs have provided no information to support either

Individual Defendant had knowledge of the alleged deceptive acts; certainly, there is no evidence of meetings discussing the deceptive acts or emails by either Individual Defendant explaining his strategy to avoid responsibility for the deceptive acts.

### 2. Individual Liability under State Law Claims.

In addition to their failure to adequately allege any personal involvement by the Individual Defendants, Plaintiffs further fall short in their attempt to impose personal liability on the Individual Defendants for Solar Titan's alleged wrongdoings based on the reluctance of courts to pierce the corporate veil. Despite having made 85 pages of allegations in their Complaint and 53 pages of argument in their memorandum of law in support of the requested injunctive relief, Plaintiffs dedicate less than a single page to argue why *any* Individual Defendant should be personally liable, and only *three sentences* as to why Atnip should be.

As to both the Tennessee and Kentucky state law claims, Tennessee state law will apply in determining of whether the corporate veil should be pierced. *See S.E. Texas Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 672 (6th Cir. 2006) (finding that Tennessee courts apply the internal affairs doctrine); *see also Howell Contractors, Inc. v. Berling*, 383 S.W.3d 465, 467 (Ky. App. 2012) (holding "the rights, duties and obligations of an Ohio LLC and its members are governed by Ohio law."). Further, in determining whether federal law or state common law would control the issue of piercing the corporate veil, the Sixth Circuit has held that state common law would control. *AT & T Glob. Info. Sols. Co. v. Union Tank Car Co.*, 29 F. Supp. 2d 857, 865 (S.D. Ohio 1998). Therefore, Tennessee law applies to the analysis of whether or not to hold the Individual Defendants liable for the alleged acts of the entity Solar Titan. *See* Complaint ¶ 34.

"There is a presumption that a corporation is a distinct legal entity, wholly separate and apart from its shareholders, officers, directors, or affiliated corporations." *Edmunds v. Delta Partners,*

*L.L.C.*, 403 S.W.3d 812, 828 (Tenn. App. 2012). Due to this presumption, Tennessee courts only pierce the corporate veil under "extreme circumstances" and the theory will "be applied with great caution and not precipitately." *Id.* at 829. "The ***party wishing to negate the existence of such separate entity has the burden*** of proving facts sufficient to justify piercing the corporate veil." *Id.* (emphasis added).

The Tennessee Supreme Court set forth three <u>required</u> elements to pierce the corporate veil:

> 1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.
>
> 2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.
>
> 3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id. see also Tennessee Racquetball Inv'rs, Ltd. v. Bell*, 709 S.W.2d 617, 622 (Tenn. App. 1986) (holding that the elements apply to individual owners too, and that each element is "required to fix liability"). If the required elements are met, Tennessee Courts also consider what are known as the "Allen factors" to consider whether or not to pierce the corporate veil:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation

to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Edmunds*, 403 S.W.3d at 830.

Throughout the Plaintiffs' pleadings, Plaintiffs have presented a stronger argument for why the Individual Defendants should ***not*** be held personally liable for the acts of Solar Titan as opposed to why they should be personally liable and have failed to meet any of the elements required to pierce the corporate veil as set forth in *Edmunds*. *Edmunds* first requires the Individual Defendants to exercise complete control over Solar Titan's finances and business practices to such an extent that Solar Titan would not have a separate mind, will or existence of its own. Plaintiffs' pleadings allege the exact opposite and establish that Atnip's involvement falls well short of being in complete control over Solar Titan. For example, Plaintiffs allege that (i) "Kelley is running the Company," Pls.'s Memo at p. 4; (ii) "Kelley is clearly the person primarily responsible for the day-to-day operations," *Id.*; (iii) employees testified they were "hired by Kelley," *Id.* at 5; (iv) "Kelley oversees and makes decisions concerning nearly every aspect of Solar Titan's operations," *Id.* at 6; (v) "Atnip currently does not play a substantial management role in the company," *Id.* at 7; (vi) "I've never actually seen [Atnip] in the company." *Id.*; (vii) Kirkland is an "owner and managing member," *Id.* at 9; (viii) Kirkland controlled in "hiring and terminating" employees, *Id.*; (ix) Kirkland controlled "responding to consumer complaints," *Id.*;(x) Kirkland controlled "working with Solar Titan's lending partners," *Id.*; (xi) Kirkland controlled "coordinating with the local power companies," *Id.*; and (xii) Kirkland supervised the alleged no cancellation policy, *Id.* at 10. Thus, the Plaintiffs themselves make it abundantly clear that Mr. Atnip did not exercise the complete dominion and control and therefore fail to establish the first element required to hold Mr. Atnip personally liable.

Further, as it relates to Mr. Kelley, the Plaintiffs assertion that he controlled Solar Titan's finance policies is overstated. All Dorismar, a State witness, testified to was that Mr. Kelley was unhappy about the cancellations, found it hard to believe that there were as many as she claimed, and wondered if anyone was attempting to explain things better to the customers to save the deal. *See e.g.*, Dorismar at 28. In fact, Dorismar even testified that, because she was unhappy with the arrangement, she went against these directions and instead followed the direction of Sarah Kirkland on these matters. Dorismar at 30. Additionally, even if Kelley represented himself as the owner when the company was first formed to former employees Horton or Hill, now direct competitors, this assertion does not rise to the level of being violative of a claimed law thus exposing Kelley to personal liability.

Although Plaintiffs' failure as to the first element is dispositive, even if this Court were to find that Plaintiffs have satisfied the first element, the second provides that the Individual Defendants would have to use their control to directly commit a fraud or wrong. Again, the Plaintiffs pleadings show the exact opposite. The testimony provided by Ms. Helton provides that when Atnip was in control of the policy and business practice that "everything seemed to be on the up-and-up. It was legit. If pay was wrong, he would correct it immediately. The few sales reps that I had at that point in time never – hardly ever had an issue with payment. Again, if it was incorrect, he would correct it." *Id.* at 7. Likewise, the complained of financing policies were created by Dorismar, not Kelley. Required element two is not satisfied either because neither Individual Defendants used their control to commit any wrong. Therefore, Plaintiffs have not met their burden as it relates to the elements necessary to pierce the corporate veil and hold either Individual Defendant personally liable.

Furthermore, the *Allen* factors also weigh in the Individual Defendants' favor. The Plaintiffs have presented no evidence to support that Solar Titan did not collect its capital contributions, that it was grossly undercapitalized at startup, or that the records did not accurately reflect the owners' membership interests in the company. The Complaint makes clear that ownership is not vested in one individual; rather, both Kirkland and Atnip have an ownership interest in Solar Titan, while Kelley has none. Complaint ¶¶ 25 & 27. The Complaint and Tennessee public record also makes clear that the business location is not at the Individual Defendants' residence. Complaint ¶ 26; *see also* Filing Information. This case evidences that the Individual Defendants used separate attorneys from Solar Titan, and the lack of control over the business decisions as previously discussed establishes that Solar Titan was not an instrumentality or business conduit for either Individual Defendant. Although the Plaintiffs allege that the Individual Defendants lacked meaningful assets and financial power prior to starting Solar Titan, there is no evidence that the Individual Defendants opened Solar Titan to transfer existing liability of the Individual Defendants to Solar Titan. Last, the Plaintiffs rely on speculative statements from witnesses without personal knowledge and the Plaintiffs lack particularity in any allegation that would evidence a break in an arm's length relationship between Solar Titan and the Individual Defendants or Titan Charters. For example, the pleadings vaguely provide: (i) "***Upon information and belief***, these ill-gotten funds are being diverted to support the lavish lifestyle of the individually named Defendants," Complaint ¶ 322 (emphasis added); (ii) "***Upon information and belief***, the Solar Titan Defendants used the profits from Solar Titan's illegal sales to launch Titan Charters," *Id.* ¶ 329; (iii) "I ***feel*** that they were probably drawing profits weekly. Now, this, again, is my ***perception***," Pls.'s Memo, at 27 (quoting Helton deposition) (emphasis added).

The Court in *Edmunds* made clear that it is the Plaintiffs' burden to establish that the corporate veil should be pierced, and the Individual Defendants should be held personally liable. 403 S.W.3d at 829. Despite a voluminous one-sided record based on months and months of investigation, the Plaintiffs cited incorrect law, relied upon disgruntled former employees who are now competitors to bolster their facts many of whom lack personal knowledge, and provided less than a single page to support its theory that the Individual Defendants should be personally liable. This clearly did not meet the burden required to hold the Individual Defendants liable and Plaintiffs have not met their threshold burden of establishing a strong likelihood of success on the merits by which to be entitled to the requested injunctive relief.

### 3. Individual Liability through Tainted Assets.

Although the Plaintiffs have not plead the argument, the Individual Defendants anticipate the Plaintiffs will argue that the Individual Defendants are personally liable by possessing tainted assets, or assets that were derived by illegal activity. However, the Plaintiffs have not cited any legal support for this claim that the Individual Defendants' personal assets are subject to claw back or freezing their assets due to a potential claw back.[6] No citation was made likely due to the fact that there is not strict liability on business owners for the alleged violation in the Complaint. Moreover, the claim that ***all*** of the Individual Defendants' assets are tainted is simply not supported by the record.

The Plaintiffs provide that the Tennessee Division of Consumer Affairs received a total of 72 complaints, Compl. ¶ 201, and in exhibit N to the Complaint the Plaintiffs provide that

---

[6] Without citation, it's difficult for the Defendants to cite to appropriate law in defending this claim because the Defendants are not sure if the Plaintiffs will make this claim under Kentucky, Tennessee or Federal law because the Defendants do not believe it is an accurate citation of the law.

Tennessee has received 125 complaints. The Plaintiffs provide that the Kentucky Attorney General received more than 90 consumer complaints; however, exhibit U seems to be missing the declaration to confirm this and is so unworkable that the Defendants could not analyze this assertion. Thus, for this section, the Defendants are working with the assumption, but are not admitting to, that both Attorney General offices received a total of 215 complaints prior to filing the Complaint.

Solar Titan did roughly 2,500 – 3,000 installations since its inception. Exhibit K, Kelley Declaration. Taking the low end, 2,500 installations, with only 215 complaints, means that only 8.6% of the Solar Titan customers filed a complaint. Yet, the Plaintiffs somehow argue without analysis that 100% of the Individual Defendants' assets are derived from ill-gotten gains. This is not even close to the truth.

Each of these complaints are hearsay evidence. The merits of the complaint needs to be fleshed out in its own individual small trial to see if the complaint is merited. For example, the Complaint filed by initials K.S. starting on page 63 of Exhibit N to the Complaint provides:

> The solar system was turned on at the end of May 2022. The panels did not produce much if any power and [I] was still getting high electric bills. I contacted STUSA numerous times and was told it was a Generac problem and that STUSA was working on it. This took several more months. STUSA did send a team to add SNAPS to the panels which was suppose to repair the problem, this was early November 2022.

This complaint was clearly not the fault of Solar Titan or the Individual Defendants. Here, Generac's faulty materials that were installed, and then attempted to be repaired with a new SnapRS system, was what caused the issue with the consumer. Even a complaint based on a right to cancel would have to be tried separately to determine if the customer adequately requested a cancellation within the three-day window.

It also should be noted, as discussed *infra*, No Fraudulent Transfers, the Individual Defendants did not make a fraudulent transfer to claw back the funds due to the company's potential liability. The Plaintiff's position here would be putting strict liability to the Individual Defendants for possessing assets that came from a company who was found liable. However, there is no law to support this type of strict liability to business owners, only 8.6% of the customers filed a complaint (not close to 100% of the assets derived), the complaints are all hearsay evidence, and the Defendants would need to have the chance to challenge the merits of each individual complaint.

**B. Plaintiffs Cannot Establish a Likelihood of Success on the Merits Generally.**

Even if Plaintiffs had adequately shown a strong likelihood of success on the merits as to the imposition of personal liability on the Individual Defendants, they have not—and will remain unable to—establish a strong likelihood of success on the merits to their claims against both Individual Defendants personally, and Solar Titan, generally.

**1. Plaintiffs' Lending Claims.**

**a. Plaintiffs Cannot Show that the Individual Defendants Ever Acted as an Agent for Mosaic.**

In yet another poor attempt to argue claims in direct contravention of Plaintiffs' own proffered evidence, Plaintiffs attempt to impose liability on the Individual Defendants as "agents" of Mosaic. However, pursuant to the express terms contained in the Mosaic Program Participant Agreement, which provides in relevant part that:

> Neither Party is an agent, representative or partner of the other Party, and neither Party nor its Representative shall represent that it is an agent, representative, partner or employee of any other Party…This agreement shall not be interpreted or construed to create an association, joint venture, agency, partnership, franchise, sales representative or employment relationship between the Parties or to impose any partnership obligation or liability upon either Party.

*See* Exhibit D at Section 12.7. "[W]here the pleading incorporates or attaches a document that clearly negates agency, a general allegation of agency fails." *Walker v. Frontier Leasing Corp.*,

2010 WL 122413 at *8 (Tenn. App. 2010). Accordingly, insofar as any claim seeks to impose liability on the Individual Defendants in their capacity as an alleged agents of Mosaic, such claims must fail, and Plaintiffs accordingly cannot show a strong likelihood of success on those claims based on the clear and indisputable language contained in the agreement between Mosaic and Solar Titan.

### b. Consumers Failed to Act Reasonably Under the Circumstances.

As to each of Plaintiffs' claims of unfair and deceptive practices arising out of alleged misrepresentations made by Solar Titan related to consumer loans used to fund the purchase of Solar Titan systems, Plaintiffs have not demonstrated a strong likelihood of success on the merits, because they have not sufficiently shown how a consumer's reliance on the alleged misrepresentations would be reasonable. Plaintiffs allege that the alleged misrepresentations include: (1) claims related to savings resulting from a system purchase; (2) eligibility for the Federal Tax Credit; and (3) misrepresenting payment and cancellation terms. In order to prevail on the merits of unfair and deceptive practice claims, both the state and federal statutory claims require Plaintiffs to show that the practice is "likely to mislead consumers acting reasonably under the circumstances." *See, e.g.*, *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630-31 (6th Cir. 2014) (requiring plaintiffs to establish a "representation likely to mislead customers acting reasonably under the circumstances" to establish liability under the FTCA); *Corder v. Ford Motor Co.*, 2008 WL 2697143 at *1 (6th Cir. 2008) (applying FTCA definition to KCPA); *McCollum v. Peters*, 2015 WL 4485557 at *6 (Tenn. App. 2015) (defining deceptive act or practice as a "material representation, practice or omission likely to mislead…reasonable consumer[s]").

The Mosaic Loan Agreement at issue contains extensive disclaimers and warnings related to consumers' Federal Tax Credit eligibility as well as payment terms. Likewise, Solar Titan's

own materials such as its Energy Consultant Pitchbook and Q&A resources highlight Solar Titan's careful training of its employees related to their sales pitches to prospective customers. For example, the Mosaic Loan Agreement provides in relevant part:

> You may be eligible for a federal solar investment tax credit. You acknowledge that eligibility for this tax credit is not guaranteed order to realize the benefits of the Solar investment tax credit, you must have federal income liability that is at least equal to the value of the credit. We are not financially responsible for your receipt of any such tax credits. We do not provide tax advice and nothing in this Loan Agreement is intended to be used as tax advice. In order to determine your eligibility, for any federal solar investment tax credit, you should make an independent assessment or consult with your independent tax advisors. Additionally, if you are not eligible to receive a federal solar investment tax credit you will not be able to use the proceeds of your tax credit to make a voluntary prepayment as described below.

*See* Exhibit E at p. 2-7 (disclosing requirements to qualify for federal solar investment credit and disclaiming any representations being made as tax advice and further suggesting that consumer should consult with independent tax advisor); *see also* Exhibit F at p. 2 (noting that company utilizes a sales model that focuses on universal benefits excluding the federal tax credit, so that a consistent sales approach can be used for all homeowners); Exhibit G at p. 9 (disclosing production calculations based on annual averages and providing that variances will occur based on placement options and weather patterns).

Based on the facts in the present case, it is inconceivable that consumers who are contemplating such a large purchase would base the entirety of their decision on a tax credit without confirming their eligibility for the same prior to entering into the contract. Similarly, any reasonable consumer would confirm guaranteed savings versus mere puffery in advertisements prior to entering into the relevant contract. *See Daughtery v. Sony Electronics, Inc.*, 2006 WL 197090 at *9 (Tenn. App. 2006) (noting liability for misrepresentation does not arise out of "sales talk" or "puffing"). However, even if this Court finds Plaintiffs have adequately set forth a strong likelihood of success on the merits on the consumer claims, such claims lie solely against Solar

Titan as a distinct legal entity, and cannot be sustained against the Individual Defendants in their individual capacity through either their own personal involvement or as a result of piercing the corporate veil.

    **2.   The Errors in the Contracts do not Render the Solar Titan Agreements Void.**

        **a.   Alleged CFRA Violations do not Justify Freezing the Individual Defendants' Assets.**

In Plaintiffs' Complaint and Brief, they assert that the Solar Titan Defendants violated The Consumer Review Fairness Act of 2016 ("CFRA") by essentially including a non-disparagement provision in the first iteration of Solar Titan's contract. Pl's Br. at 42; Compl. Count 3. This argument fails as to the Individual Defendants for several reasons: (1) the CFRA only provides that the non-disparagement provision is void, not the entire contract; (2) the CFRA does not provide strict liability to the owners of a legal entity and as provided *supra*, Section I.A., the Individual Defendants should not be personally liable for the acts of the company; (3) the Individual Defendants are undisputedly not a party to the contract, (4) the Individual Defendants acted innocently with regard to the non-disparagement provision and (5) the Plaintiffs own proof demonstrates they have no idea how many contracts contained the alleged improper provision.

The CFRA provides in pertinent part, "Except as provided in paragraphs (2) and (3), a **provision of a form contract is void** from the inception of such contract if such provision--
(A) prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication . . . ." 15 U.S.C. § 45b (emphasis added). The CFRA also defines a "covered communication" as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." *Id*.

The CFRA is clear that only the non-disparagement provision in the contract is void, not the entire contract as the Plaintiffs argue. The Plaintiffs are placing themselves in the position of the legislative branch and writing in the law that the CFRA requires contract rescission and refund. Further, there is not a single precedent case to support the Plaintiffs position which is against the plain language of the statute.

Additionally, the CFRA does not provide strict liability for the owners or officers of a company who violate the CFRA. Again, the Plaintiffs are taking liberty with their interpretation of the law, and cite to no authority that would provide the Individual Defendants strictly liable for a violation of the CFRA. As provided *supra*, Section I.A., the Individual Defendants are not personally liable without this strict liability provision. Notably, it cannot be disputed that the Individual Defendants are not a party to the customer contracts between Solar Titan and the customers. Not being parties to the contracts, the Individual Defendants clearly cannot have violated the CFRA directly. *See Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*, 415 F. Supp. 3d 113, 121 (D.D.C. 2019).

Moreover, the Individual Defendants acted innocently regarding the non-disparagement provision. The Solar Titan Defendants had outside counsel review their contracts. Exhibit K ¶ 5. Despite this, counsel did not raise an objection to this provision (or the inconspicuous cancellation-notice provision). Exhibit K ¶ 5. As such, the Solar Titan Defendants went forth and used the attorney-reviewed contract for its sales. Exhibit K ¶ 5. It was not until they learned from the Kentucky Attorney General's Office ("KAGO") that non-disparagement provisions were *potentially* problematic (the only provision the KAGO stated to them was illegal or invalid in Solar Titan's contract) that they had any idea that such a provision could potentially be a legal issue.

Exhibit K ¶ 7.  And, upon learning this, the Solar Titan Defendants struck the identified provision from their contract.  Exhibit K ¶ 7.

Furthermore, the Plaintiffs confirm that there were "multiple iterations of the terms and conditions on the back of the Solar Titan Agreement," stating that "most" (without citation) provided:

> Buyer agrees not to use any form of social media to express their opinions that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits LLC/Solar Titan USA LLC, breaching acceptance of this clause by buyer can and will deem monetary compensation of benefits to Ideal Horizon Benefits LLC/Solar Titan USA LLC through mediation actions.

Compl. para ¶ 389.  This means that, per their own allegations, the Plaintiffs do not know how many violations there could be.  The claim that "most" contracts "contained a version" of this phrase is not supported by a citation in their Complaint or Brief.  *See* Pl's Br. at 42; Compl. Count 3.  And surely the fact that the provision may exist in 1, 5, 15, or 300 out of roughly 2,800 installations—rather than *all*—is not justification enough for the entry of an injunction and an order freezing the Individual Defendants' assets—especially considering the law states that only the provision, and not the entire contract is considered void.  *See* 15 U.S.C. § 45(b)(1) (stating that the "provision of a form contract is void from the inception . . . .").

### b. Solar Titan's Agreements are Valid and Solar Titan did not Violate the Law by Accepting Funds before the Cancellation Window Closed.

Plaintiffs' brief states that "Kentucky law even states that a seller is not entitled to any compensation for services performed before the time for the buyer to exercise the right to cancel has elapsed."  Plaintiffs' Brief at 33 citing Ky. Rev. Stat. § 367.450(3).  But this is not what the law states at all, nor does any failure to include proper notice language nullify the contract.

Section 367.450(3) states "[i]f the seller has performed any services pursuant to a home solicitation sale prior to its cancellation, the seller is entitled to no compensation."  This does not

mean that a seller has no right to receive compensation; rather, it means that if a buyer elects to cancel the contract and return the items he or she received, the seller would then no longer be entitled to the payment and would thus have to return the same.

This makes sense, given that Kentucky does not make a contract void if it fails to include the Notice of Cancellation language (i.e., three-day window). Instead, Kentucky (and TN) both state that in their own nearly identical sections that "[u]ntil the seller has complied with this section the buyer may cancel the home solicitation by notifying the seller in any manner and by any means of his intention to cancel."[7] All this means is that by failing to comply with the statute's notice requirements, the buyer can come back and cancel their contract with the seller at any time, thus requiring the seller to refund the money paid, and buyer having to return the items. See Tenn. Code Ann. § 47-18-705(a) ("Except as provided in this section, within ten (10) days after a home solicitation sale has been cancelled or an offer to purchase revoked the seller must tender to the buyer any payments made by the buyer and any note or other evidence of indebtedness"); Ky. Rev. Stat. § 367.450(1) (discussing return of property to seller); Ky. Rev. Stat. § 367.450(3) (making clear that the seller cannot keep (i.e., is not entitled to) any compensation if a contract is canceled). It does not mean that seller is not entitled to receive payment for services in accordance with terms agreed upon by the buyer and seller.

As such, unless and until such time that a customer of Solar Titan notifies it that the customer desires to cancel the contract, Solar Titan is entitled to the payment that it received pursuant to its agreement with that customer. Thus, though some buyers could be entitled to refunds if this Court finds that Titan Solar failed to provide adequate notice to customers of their

---

[7] The Tennessee statute includes the word "sale" after the term "home solicitation." Otherwise, the Tennessee and Kentucky statutes are identical. *Compare* Ky. Rev. Stat. § 367.430(3) *with* Tenn. Code Ann. § 47-18-704(d).

right to cancel, the vast majority of Defendants' customers (roughly 90%) appear to be satisfied customers who have not sought rescission, see Exhibit K ¶ 8, and any profits gained from sales to these customers would be irrelevant for any damage analysis.

3. **Plaintiffs' Claims as to Misrepresentations Related to the Quality and Standard of Defendants' Solar Systems.**

a. **Plaintiffs Cannot Establish that Solar Titan Defendants are Responsible for the System Deficiencies.**

Regarding Plaintiffs' claims related to alleged misrepresentations of the characteristics of the solar systems sold by Solar Titan, Plaintiffs are unable to demonstrate a strong likelihood of success on the merits, as the overwhelming majority of system failures attributed to Defendants are actually a result of Generac's equipment failures, and not Defendants' own wrongdoings or system deficiencies. *See* Exhibit G at p. 11 (advertising features based on assumption of fully functioning Generac equipment). Beginning in January and February of 2022, Solar Titan began receiving an onslaught of customer complaints related to system production issues, with complaint volume further increasing into March. Exhibit F at p. 5; *see also* Exhibit L at p. 1. Once Solar Titan learned of the production issues, its field service team quickly identified Generac's SnapRS801 rapid shutdown component as the cause of the ongoing issues. Exhibit L at p. 1. As a result of complaints from both Solar Titan and numerous other solar installation companies, Generac designed and engineered the new RS802, which was represented to have been tested with exceptional results increasing both performance and reliability. *Id*. Prior to such complaints, Solar Titan did not receive anywhere close to the volume of complaints caused by Generac's defective product. *Id*.

### b. Plaintiffs Cannot Establish Solar Titan's Alleged Inadequate Training Harmed Consumers.

In addition to inadequately attempting to attribute Generac equipment failures to Solar Titan's systems, Plaintiffs further cannot attribute the same failures to Solar Titan's training of its installers. Beyond a blanket assertion that "Solar Titan installers are often inexperienced and lack proper training. They also lack appropriate oversight from licensed professionals," Plaintiffs fail to present any evidence as to the inadequate training Solar Titan installers allegedly receive and how the same "cause[s] damage" to the consumer's home. *See* Compl. at ¶ 57. However, Defendants employ proprietary installation training, including but not limited to, safety, wire and conduit, inverter, module and optimizers, and electrical component training, which is implemented through both hands-on and classroom education. *See* Exhibit H at 33 (outlining Solar Titan's installation crew training program).

Even if this Court were to conclude that Solar Titan employed inadequate training as to its system installers, Atnip was never involved in the training nor development of the same, and Plaintiffs are unable to establish a strong likelihood of success on the merits of such claims against Atnip individually. Likewise, the assertions against Kelley are equally without support beyond questionable testimony offered by former Solar Titan employees and now competitors.

### 4. Plaintiffs' Remaining Claims.

To the extent there remain outstanding claims contained in Plaintiffs' Complaint in addition to those discussed herein, such claims do not provide Plaintiffs with a right to injunctive relief, and accordingly it is not necessary for the Individual Defendants to address whether they have established a strong likelihood of success on the merits in relation to the same. Injunctive relief is expressly provided for in some, but not all, of Plaintiffs' claims and as such creates a presumption that, had the same legislature wanted the same available remedies for other claims it

would have expressly included the same. *See Collins v. Yellen*, 141 S.Ct. 1761, 1782 (2021) (noting that "[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *see also Obduskey v. McCarthy & Holthus LLP*, 139 S.Ct. 1029, 1037 (2019) (reiterating presumption that statutes do not contain surplusage). Further, and to the extent that this Court finds the remaining claims subject to the requested relief, Plaintiffs have not established actions taken by the Individual Defendants through which to impose personal liability.

## II. The Balance of Interests and Public Interest in Freezing the Individual Defendants' Assets.

### A. Balance of Interests – No Fraudulent Transfers.

For the reasons provided *supra*, Success on the Merits, the Individual Defendants should not be held personally liable; therefore, an asset freeze of the Individual Defendants' assets is not appropriate. The Plaintiffs also have not established that there is a likelihood of success on the merits of its claims against the entity Solar Titan. However, if the Court disagrees, no distributions were made to Atnip (Mr. Kelley does not have an ownership interest in Solar Titan) that would qualify as a fraudulent transfer under relevant law.

Matters of corporate governance, such as piercing the corporate veil and profit distributions, will be governed by Tennessee state law. *See supra*, Corporate Veil. Tenn. Code § 66-3-305 provides that a fraudulent transfer to future creditors requires a showing of "actual intent

to hinder, delay, or defraud any creditor of the debtor . . . ."[8] Here, it is clear that no distribution was made with the intent to defraud a creditor that still does not exist.

Initially, the Plaintiffs have not established that there is a valid future creditor who Solar Titan owes a debt to or a specific transfer that the Plaintiffs believe is fraudulent. A fraudulent transfer, even to a future creditor, must occur within a reasonable time, "as to future creditors the debt must be incurred within a reasonable time after the transfer." *Hicks v. Sovran Bank/Chattanooga*, 812 S.W.2d 296, 301 (Tenn. Ct. App. 1991). There is no documentation provided of a specific transfer to invalidate; therefore, the Plaintiffs cannot establish that the transfer occurred within a reasonable time to when the debt accrued.

Further, when actually digging into Solar Titan's financials, it's clear that the distributions to the Individual Defendants were appropriate. On January 30, 2022, Cohn Reznick performed an audit in a due diligence report to assist Solar Titan evaluate a potential sale (the "Report"). Exhibit B; *see also* Exhibit C. The Report analyzed the company through the third quarter of 2021, but what is evident is that at least as late as January 30, 2022, the Individual Defendants had good reason to believe that Solar Titan was in a strong financial position. The Report provides that Solar Titan was experiencing extreme growth in proceeds, profit, net income, and margins. Report, 28. Specifically, and important to the distributions, net income for the year 2020 was $1,956,000 and through three quarters in 2021 was $6,303,000. *Id.* at 28. Of course, net income is income above and beyond company expenses and liabilities and are appropriate for profit distributions to the owners, especially when you see the growth that Solar Titan experienced. Further, the financial statement from 2021 demonstrates that Solar Titan had Members' equity at the end of 2021 of

---

[8] The other potential avenue for a fraudulent transfer under Tenn. Code § 66-3-305 (debtor did not receive equivalent value) is not applicable to the case at hand because it is not disputed that Mr. Atnip rightfully owns 90% of the Solar Titan.

$4,172,192. Exhibit C. Financial Statement at 3. The financial statement shows that Solar Titan had $8,644,759 in net income for 2021 and had $2,461,003 in cash on hand to pay future liabilities. *Id*. at 3-4. On the liabilities side, the financial statement shows that Solar Titan only had $1,062,354 in accrued expenses and only $509,842 in long-term debt. *Id*. at 9. This 2021 financial statement clearly shows a company in a good financial position that could make distributions to its owners. The Report does not show a company that could not pay its debts as they became due, especially with the noted growth of the company.

The *Citizens & S. Nat. Bank v. Auer* case is comparable to the present matter. 514 F. Supp. 638 (E.D. Tenn. 1981). In *Citizens*, the Defendant "was not in financial difficulty at the time" of the transfer. *Id*. at 640. The Court found that the Defendant had "no actual intent" to hinder his future creditors. *Id*. At the time of the transfer, the Defendant also had enough assets to pay his actual liabilities as they accrued. *Id*. The Court held that these facts were sufficient to support that no fraudulent transfer occurred by the Defendant.

The present case is comparable to *Citizens* because Solar Titan was not in financial difficulty at the time of any significant distribution to Mr. Atnip. *See* Exhibits B and C. Exhibits B and C also demonstrates that Solar Titan had the ability to pay all of its actual debts as they accrued at the time of any distribution to Atnip. Also similar to *Citizens*, there was no actual intent to hinder future creditors. Atnip was not aware of any issues with Solar Titan as the complaints were handled by Kirkland. Memorandum, 9 (Kirkland was responsible for "responding to consumer complaints"). Further, when Atnip became aware, he started selling his assets to put money back into Solar Titan, an act that is the opposite of attempting to hinder creditors. Exhibit A at ¶¶ 6 - 13. Therefore, like *Citizens*, no fraudulent transfers occurred.

Thus far, the Individual Defendants have established that they are not personally liable for the claims of the Plaintiffs. The Plaintiffs have also not brought forth any evidence of a specific transfer that was fraudulent to freeze the Individual Defendants' assets based on potential liability of Solar Titan (which Defendants dispute). Moreover, the actions of the Defendants make evident that no fraudulent transfer occurred generally. This creates no basis to freeze the Individual Defendants' assets.

### B. Balance of Interests – Factor Analysis.

However, if the Court is not persuaded by the Individual Defendants' arguments thus far, the factors weigh in favor of not freezing their assets. "A district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court." *Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015). The purpose in appointing the receiver "is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Id.* In determining whether to appoint a receiver and freeze assets the Courts consider the following factors:

> whether the property at issue is in "imminent danger of ... being lost, concealed, injured, diminished in value, or squandered," whether the defendant engaged in fraudulent conduct, "the inadequacy of the available legal remedies," the lack of less drastic equitable remedies, and the likelihood that the appointment will do more good than harm. District courts also consider whether there is inadequate security for a debt and whether a debtor is insolvent.

*Id.* (internal citations omitted). The Individual Defendants assert that the assets are not at danger of being lost or squandered, the Individual Defendants did not engage in fraudulent conduct, the inadequacy of available legal remedies, and there are less drastic equitable remedies available.

The Individual Defendants' assets are not in imminent danger of being squandered or lost and do not need to be frozen to prevent squandering or the like. The Plaintiffs attempt to paint a

picture of a loose living Wolf of Wallstreet like owner in the Individual Defendants. To paint this picture, the Plaintiffs rely on testimony from disgruntled former employees who own competing businesses. However, this information is simply false. The Plaintiffs rely on statements from Ms. Helton, all of which she clearly has no direct, personal knowledge of, "I <u>feel</u> that they were <u>probably</u> drawing profits weekly. Now, this, again, is my <u>perception</u> . . . ." Memorandum, 27 (emphasis added). Ms. Helton makes it abundantly clear she does not know, and has no actual personal knowledge of the situation. Not only do the witnesses not have personal knowledge, they also are disgruntled former employees who have opened up competitive businesses. Helton has since started Freedom Solar Solutions, LLC. *See* Exhibit L. Another witness relied upon by the Plaintiffs is Jason Horton. He also has started a competing business, Solar 1 USA, LLC. *See* Exhibit J. Despite the Plaintiffs' evidence of squandering assets coming from less than credible sources without actual knowledge, the Plaintiffs did little to no research to confirm the information provided by their key witnesses. The Plaintiffs are simply not correct in saying that the Individual Defendants purchased a private jet. Exhibit A at ¶ 9. Atnip had a jet card to use for business purposes. He also never purchased a $1,800,000 yacht; rather, he purchased a charter fishing boat for $1,400,000 and was forced to sell it under distress for $1,000,000 in order to invest the money back into Solar Titan. *Id*. at ¶ ¶ 10 - 11.

While Atnip did rightfully use distributions from Solar Titan to amass assets, making money is not illegal in itself. When Solar Titan began to struggle, Atnip actually began putting money back into the business to make it succeed, Atnip invested at least $3,154,454.65 back into the business during its struggles. Exhibit A at ¶¶ 7 - 8. The Plaintiffs point out that Atnip recently liquidated a home and argue that means Atnip is a flight risk with his assets; however, the truth is the opposite. Atnip liquidated this home to help put money back into Solar Titan. Exhibit A at ¶

12 - 13. The Plaintiffs could have investigated where the proceeds of these sales were going but chose not to.

Moreover, all of the Individual Defendants' assets are based in East Tennessee except for one property in Florida that the Individual Defendants had under contract to sell prior to the asset freeze. Exhibit A ¶¶ 14 - 15. The Individual Defendants are not sophisticated scammers hiding assets in foreign accounts that are going to disappear without an asset freeze. Rather, the Individual Defendants simply want to continue renting out rental properties and paying for regular living expenses, and now attorney fees. *See* Motion for Release of Assets.

As discussed *supra*, Success on the Merits, the Individual Defendants did not engage in fraudulent conduct. Further, there are less drastic equitable remedies available that also allow for the availability of full legal remedies to the people the Plaintiffs are trying to protect. As also discussed *supra*, Generac is largely responsible for the issues with the consumers' products. To the extent that the Plaintiffs are trying to recoup assets and money for any alleged citizens of their states, Generac should be held responsible. Generac has substantial assets that could make whole any alleged wrong. Moreover, it's a less drastic remedy to freeze Generac assets because Generac was the entity who caused the issues with the consumers. Additionally, holding Generac's assets is less draconian than holding an individual's assets who was not involved in the day-to-day decision making.

Additionally, the potential damages in this matter have been drastically overstated and the Individual Defendants are able to pay those potential damages if the court requires. As provided *supra*, Tainted Assets, the Plaintiffs have only received complaints from 8.6% of the Titan Solar customers. The validity of the hearsay complaints are highly contested by the Defendants; however, even assuming them to be true, the damages here are not the outrageous figures the

Plaintiffs are proposing of freezing all the assets of each Individual Defendant and Titan Solar when only 8.6% of customers complained.

**III. Joinder and Incorporation of Defendant Sarah Kirkland's Response.**

In addition to the reasons set forth above, the Individual Defendants adopt and incorporate herein, the arguments of Defendant Kirkland regarding how the requested relief and order are inconsistent with and violative of constitutional due process, which are found at pages 10-12 of Doc. No. 44.

WHEREFORE, the Defendants Richard Michael Atnip and Craig Kelley respectfully requests this Court DENYING Plaintiffs request for a preliminary Injunction, and for such other relief as is just.

Respectfully submitted,

WRIGHT, CORTESI & GILBREATH

BY: /s/*Stephan R. Wright*
     Stephan R. Wright (#031494)
     2288 Gunbarrel Rd.
     Ste. 154/Box 247
     Chattanooga, TN 37421
     Telephone: (423) 826-6919
     Facsimile: (423) 826-6929
     *swright@wcglegal.com*
     *Attorneys for Craig Kelley*

DARROWEVERETT LLP

BY: /s/ *Samuel C. Blink*
     Samuel C. Blink (#036400)
     Fifth Third Center
     424 Church Street, Suite 2000
     Nashville, TN 37219
     (615) 651-7386
     *sblink@darroweverett.com*
     *Attorneys for Richard Michael Atnip*

BY: /s/ *William C. Killian*
     William C. Killian (#002425)
     801 Broad St., Suite 428
     Chattanooga, TN 37402
     (423) 265-8804
     *billikillian@cawpllc.com*
     *Attorneys for Richard Michael Atnip*

## CERTIFICATE OF SERVICE

I do hereby certify that the forgoing document has been filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

This 23rd day of February, 2023.

BY:     /s/*Stephan R. Wright*