

MOSAIC

**MOSAIC PROGRAM**
**PARTICIPATION AGREEMENT**

**TABLE OF CONTENTS**

| SECTION | | HEADING | PAGE |
|---|---|---|---|
| 1. | | PROGRAM ADMINISTRATION AND PARTICIPATION | 3 |
| | 1.1 | Program Administration | 3 |
| | 1.2 | Participant Authorization | 3 |
| | 1.3 | Program Terms; Ownership | 3 |
| | 1.4 | Modifications | 3 |
| | 1.5 | Non-Exclusivity; Customer Communications | 4 |
| 2. | | PARTICIPANT RESPONSIBILITIES | 4 |
| | 2.1 | Financing Applications | 4 |
| | 2.2 | Eligible Products; Liens | 4 |
| | 2.3 | Subcontractors | 4 |
| | 2.4 | Insurance Requirements | 4 |
| | 2.5 | Compliance with Program Documents and Applicable Laws | 5 |
| | 2.6 | Required Notifications | 5 |
| 3. | | MARKETING AND PROMOTION | 5 |
| | 3.1 | Marketing and Promotion of the Program | 5 |
| | 3.2 | Publicity | 6 |
| 4. | | TRAINING | 6 |
| | 4.1 | Participant Agents | 6 |
| | 4.2 | Resellers | 6 |
| 5. | | PARTICIPANT REPRESENTATIONS AND WARRANTIES | 6 |
| | 5.1 | Corporate Matters | 6 |
| | 5.2 | Program Matters | 6 |
| 6. | | RECORDS; AUDIT RIGHTS | 7 |
| | 6.1 | Maintenance of and Access to Records | 7 |
| | 6.2 | Audits | 7 |
| | 6.3 | Financial Statements | 7 |
| 7. | | INTELLECTUAL PROPERTY | 7 |
| | 7.1 | Intellectual Property Rights | 7 |



|   |      |                                                          |     |
|---|------|----------------------------------------------------------|-----|
|   | 7.2  | Portal Usage                                             | 7   |
|   | 7.3  | Limited Scope Trademark License                          | 8   |
| 8.  |    | TERM AND TERMINATION                                     | 8   |
|   | 8.1  | Term                                                     | 8   |
|   | 8.2  | Termination; Effect of Termination                       | 8   |
|   | 8.3  | Suspension of Agreement                                  | 8   |
| 9.  |    | INDEMNIFICATION                                          | 8   |
|   | 9.1  | Indemnification by Participant                           | 8   |
|   | 9.2  | Indemnification by Program Administrator                 | 9   |
|   | 9.3  | Indemnity Procedure                                      | 9   |
| 10. |    | GOVERNING LAW; DISPUTE RESOLUTION                        | 10  |
|   | 10.1 | Governing Law                                            | 10  |
|   | 10.2 | Arbitration                                              | 10  |
|   | 10.3 | LIMITATION OF LIABILITY                                  | 10  |
| 11. |    | CONFIDENTIALITY; INFORMATION SECURITY                    | 10  |
|   | 11.1 | Protection of Confidential Information                   | 10  |
|   | 11.2 | Customer Information Privacy Policy                      | 11  |
|   | 11.3 | Information Security Policies and Procedures             | 11  |
|   | 11.4 | Security Incidents                                       | 11  |
|   | 11.5 | Audits of Information Security Policies and Procedures   | 11  |
| 12. |    | MISCELLANEOUS                                            | 11  |
|   | 12.1 | Assignment                                               | 11  |
|   | 12.2 | Notices                                                  | 11  |
|   | 12.3 | Consent to Electronic Communications                     | 12  |
|   | 12.4 | Third-Party Beneficiaries                                | 12  |
|   | 12.5 | Survival                                                 | 12  |
|   | 12.6 | Headings                                                 | 12  |
|   | 12.7 | No Agency                                                | 12  |
|   | 12.8 | Complete Agreement; Conflicts                            | 12  |
|   | 12.9 | Electronic Signatures                                    | 133 |
|   | 12.10| Severability                                             | 13  |
|   | 12.11| Ambiguities; Consultation with Counsel                   | 13  |

Mosaic Program Participation Agreement (v 2021.12)



## MOSAIC PROGRAM
## PARTICIPATION AGREEMENT

*Last updated December 7, 2021*

This Mosaic Participation Agreement (this "**Agreement**") is entered into between Solar Mosaic LLC, a Delaware limited liability company (successor in interest to Solar Mosaic, Inc.), as administrator of the Mosaic Loan Program (the "**Loan Program**") and Modern Home LLC, a Delaware limited liability company, as administrator of the Mosaic Lease Program (the "**Lease Program**", and together with the Loan Program, the "**Mosaic Program**"), of the first part (collectively, "**Program Administrator**"), and the Person named as Participant in the Participant Application, of the second part ("**Participant**"). Capitalized terms used herein shall have the meanings given to such terms in Exhibit A and the rules of construction set forth therein shall apply hereto. Participation in the Mosaic Program constitutes Participant's agreement to the terms and conditions of this Agreement, as may be modified, revised, amended, or amended and restated from time to time by Program Administrator in accordance with Section 1.4.

1. **PROGRAM ADMINISTRATION AND PARTICIPATION**

   1.1. Program Administration. Program Administrator manages a network of merchants, distributors, equipment manufacturers, installers and contractors that participate in the Mosaic Program and provides administrative, technical and ministerial services to Financing Providers participating in the Mosaic Program. Program Administrator enters into this Agreement under delegated authority in its role as Program Administrator for Financing Providers participating in the Mosaic Program, and all references to actions of Program Administrator herein shall be construed as actions by Program Administrator acting on behalf of and under the direction and control of the Financing Providers.

   1.2. Participant Authorization. Participant desires to participate in the Mosaic Program to allow its Customers to obtain Loans or Leases from a Financing Provider to lease or finance the purchase of Eligible Products, as applicable. By participating in the Mosaic Program, Participant shall be authorized to (a) promote the Mosaic Program in the Territory and (b) facilitate the submission of Financing Applications, in each case subject to the terms and conditions of the Mosaic Program Documents.

   1.3. Mosaic Program Terms; Ownership. Program Administrator has the sole discretion to (a) determine the terms and conditions of any Financing Application, Financing Agreement, Financing Product and (b) establish policies and procedures related to the promotion, application and/or funding of Financing Products, as applicable. Nothing in this Agreement requires a Financing Provider to take any action with respect to a Financing Product, including accepting a Financing Application or approving a Customer for a Financing Product. This Agreement gives neither Participant nor its Affiliates any ownership rights in any aspect of the Mosaic Program. Participant acknowledges and agrees that each Financing Provider shall own (i) its respective Financing Products, (ii) the corresponding Financing Application and (iii) all Customer Information that such Financing Provider receives in connection with the Financing Application and/or Financing Product.

   1.4. Modifications. Program Administrator may add new Mosaic Program Documents or modify the terms of this Agreement or any other Mosaic Program Document by posting such new Mosaic Program Document or updated version thereof on its website, www.joinmosaic.com, or by notifying Participant of such change in accordance with Section 12.2. Participant agrees that it has an ongoing obligation to check the website for any updates or changes to the Mosaic Program Documents. Without limiting the generality of the foregoing, Program Administrator may, at any time and as directed by the Financing Providers, make changes to (a) the Financing Product documentation, including the Financing Application and Financing Agreement, (b) the terms and conditions of a Loan, including the interest rate, maximum amount and term, (c) the terms and conditions of a Lease, including the monthly payment amount and term, (d) the credit standards used to evaluate Financing Applications and (e) other Mosaic Program procedures. Participant's continued participation in the Mosaic Program after the effective date of any such



modification will constitute Participant's acceptance of the modified terms and Participant's agreement to be bound thereby.

1.5. <u>Non-Exclusivity; Customer Communications</u>. Unless otherwise agreed between the Parties and subject to <u>Section 2.1</u>, Participant may present its Customers with financing options from other companies or develop its own financing options in addition to the Mosaic Program. Financing Providers may provide Financing Products to any Person without any restrictions on distribution channels or methods. In addition, nothing in this Agreement shall prohibit either Party from contacting or communicating with such Party's customers regarding other goods or services, in each case in accordance with all Applicable Laws.

2. **PARTICIPANT RESPONSIBILITIES**

2.1. <u>Financing Applications</u>. Participant may invite a Customer to apply for financing through the Mosaic Program (a) by submitting a Mosaic Financing Application or (b) via a custom application created by Participant to enable Customers to apply for financing products from one or more financing providers (a "**Custom Application**"). Any Custom Application and associated disclosures used by Participant must be approved by Program Administrator in advance in writing. Participant shall not knowingly permit any Customer to submit a Financing Application to Financing Providers (i) if such Customer has been previously rejected by any other third-party financing provider with regard to obtaining financing for such Eligible Product; or (ii) using any type of selection criteria that could reasonably be determined to be adverse to Financing Providers, as determined in Program Administrator's sole and absolute discretion. Participant will not use any nonrandom selection criteria in connection with the Mosaic Program without Program Administrator's prior written approval.

2.2. <u>Eligible Products; Liens</u>. Participant will be responsible for the design, delivery, engineering, construction, installation and completion, as applicable, of each Eligible Product for each Customer in the Mosaic Program. Each Eligible Product will be designed, delivered, engineered, constructed, installed and completed, as applicable, in accordance with Prudent Industry Practices. Participant will not permit any lien, charge or encumbrance to exist on any Eligible Product or the applicable Customer's home, and in the event a lien is filed by a Subcontractor, Participant shall cause such lien to be released and shall provide evidence thereof in form and substance reasonably satisfactory to Program Administrator.

2.3. <u>Subcontractors</u>. Participant may use Subcontractors to perform some or all of Participant's obligations under this Agreement, provided that (a) Participant agrees to provide Program Administrator information regarding its Subcontractors within two (2) business days of Program Administrator's request therefor, and (b) Participant shall be solely responsible for the performance of its obligations hereunder and for paying each Subcontractor amounts due to such Subcontractor upon the rates and terms as determined between Participant and such Subcontractor. Participant shall cause all Subcontractors to comply with the terms of this Agreement and Applicable Law, including training requirements, the Marketing Requirements, and all license, bonding and insurance requirements. Participant shall be solely responsible for the employment, control, actions, liability and conduct of Subcontractors. No Subcontractor shall be deemed to be a third-party beneficiary of this Agreement or an agent, employee, contractor, joint venturer or partner of Program Administrator or the Financing Providers.

2.4. <u>Insurance Requirements</u>. Participant shall, at its own cost and expense, procure from an insurance company or companies rated "A VIII" or higher by A.M. Best or otherwise acceptable to Program Administrator, and maintain in full force and effect for the entire term of this Agreement and thereafter for so long as Participant has any obligations with respect to the Mosaic Program, general liability insurance and workers' compensation insurance in such amounts and in such forms as required by Applicable Law. If requested by Program Administrator, (a) Program Administrator and/or the applicable Financing Provider shall be named as additional insureds under each insurance policy maintained by Participant, and (b) Participant shall furnish to Program Administrator certificates of insurance, and the endorsements thereto, evidencing the insurance coverage required pursuant to this <u>Section 2.4</u>. If any required insurance policy is not renewed, Participant shall notify Program Administrator in writing within five (5) business days of such non-renewal.



2.5. Compliance with Mosaic Program Documents and Applicable Laws. Participant will continuously comply, and will cause its Subcontractors to comply, with its obligations under the Mosaic Program Documents and with Applicable Law, including with respect to consumer protection, licensing, data privacy, and data security, during the term of this Agreement.

2.6. Required Notifications. Participant will notify Program Administrator in writing (a) promptly and in no event later than five (5) calendar days following Participant's receipt of notice of (i) any litigation or investigation, demand, inquiry or action by any regulatory body against Participant in connection with a Financing Application, a Financing Product or the Mosaic Program; (ii) any Customer inquiry or complaint (whether directly or through a regulatory body or other Third Party) regarding the Mosaic Program; (iii) any litigation or investigation, demand, inquiry or action by any regulatory body against Participant which, if adversely determined, could reasonably be expected to materially impair Participant's financial solvency or its continued ability to carry out its responsibilities under this Agreement; and (b) immediately if a Customer or Participant has canceled or communicated an intent to cancel a Financing Product or the related Customer Agreement. In the case of each of clause (a)(i) and clause (a)(ii) above, Participant will cooperate with Program Administrator and the Financing Providers in investigating and resolving such matter in a timely manner.

3. **MARKETING AND PROMOTION**

3.1. Marketing and Promotion of the Mosaic Program. Participant will market and promote the Mosaic Program during the term of this Agreement in strict accordance with the requirements of this Section 3 (the "**Marketing Requirements**").

   3.1.1. Any marketing, promotional and advertising materials and communications referencing the Mosaic Program, Financing Products, Program Administrator or a Financing Provider (whether used in Financing Applications or otherwise, and whether in electronic, hard copy format, or oral communications, "**Marketing Materials**") must be approved in writing by Program Administrator in advance of use by Participant. Program Administrator's review shall be limited to representations and statements related to the Mosaic Program and shall not be construed as a review or approval of any advertising or solicitation materials for any other purpose or for compliance with any other provisions of any local, state or federal laws not related to the Mosaic Program. Copies of all Marketing Materials must be retained by Participant for three (3) years from the last date of usage.

   3.1.2. All marketing, advertising, promotion, electronic mail and other digital communication, and telephonic communication by Participant or its agents, employees, affiliates and/or Resellers (as applicable, and collectively, the "**Participant Agents**") relating to the Mosaic Program shall be in compliance with all Applicable Laws (including fair lending and trade practices laws, the Telephone Consumer Protection Act, and the Controlling the Assault of Non-Solicited Pornography and Marketing Act), the Training Program and the Marketing Requirements. Participant shall be responsible for ensuring that no Participant Agent makes any statement or representation, or omission of material information, regarding the Mosaic Program that is false, misleading or deceptive, or engages in any unfair, deceptive, or abusive conduct.

   3.1.3. Participant is prohibited from making any statement regarding the likelihood that a Customer will be approved for a Financing Product.

   3.1.4. All marketing relating to the Mosaic Program shall be in English (except as set forth in the Solar Loan Supplement, if applicable). If a Customer does not speak English well, or at all, such Customer may still apply for a Financing Product. However, Participant may not use a language other than English and must recommend that such Customer involve someone who will be able to translate the Financing Product terms and documents for him or her, including a family member, a friend or any third person whose assistance the Customer is confident will enable him or her to fully understand such Participant communications and Financing Product features and terms.



3.1.5. Participant shall comply with any other requirements related to marketing and promotion of the Mosaic Program communicated by Program Administrator from time to time in accordance with Section 1.4.

3.2. Publicity. The Parties shall jointly agree upon the necessity and content of any press release in connection with the matters contemplated by this Agreement. Any publication, news release or other public announcement by a Party relating to this Agreement shall first be reviewed and consented to in writing by the other Party.

4. **TRAINING**

4.1. Participant Agents. Participant will train all Participant Agents on the terms and conditions of the Mosaic Program, the Marketing Requirements, Applicable Laws and other standards (the **"Training Program"**) and will cause all Participant Agents to complete the Training Program prior to participating in the Mosaic Program. In addition, Participant will implement, update, revise and disseminate its policies, procedures, systems, internal controls, and training materials as reasonably necessary to ensure that its Training Program includes appropriate training and oversight of Participant Agents that have consumer contact or compliance responsibilities. Participant will ensure that all Participant Agents (a) engage in further training when changes are made to the Mosaic Program or Applicable Law or as deemed necessary by Program Administrator, and (b) obtain a passing score on any Mosaic Program training test or quiz in order to gain access to the Portal and participate in the Mosaic Program. Participant will provide Program Administrator with reasonable access to Participant's sales meetings, marketing events, and other business development meetings for the purpose of evaluating Participant's implementation of the Training Program. Program Administrator will provide support to Participant in connection with Participant's Training Program as reasonably requested by Participant.

4.2. Resellers. Resellers may only be provided with access to the Portal with written consent of Program Administrator and following participation in the Training Program. Participant shall submit to Program Administrator for review and approval a list of proposed Resellers, including full corporate names and addresses. Participant shall be responsible for any failure by its Resellers to comply with the terms of this Agreement.

5. **PARTICIPANT REPRESENTATIONS AND WARRANTIES**

Participant hereby represents and warrants to Program Administrator, as of the date hereof and as of the date of each executed Financing Agreement, that:

5.1. Corporate Matters. (a) It is duly organized, validly existing and in good standing under the laws of the state of its formation or incorporation, and has the power and authority to enter into this Agreement and to perform its obligations hereunder; (b) the execution and delivery of this Agreement and the performance of and compliance with the provisions of this Agreement will not conflict with or constitute a breach of or a default under (i) its organizational documents; (ii) any agreement or other obligation by which it is bound; or (iii) any Applicable Law; (c)(i) all actions required to be taken by Participant to make this Agreement effective have been duly and validly taken; (ii) this Agreement has been duly and validly authorized, executed and delivered; and (iii) this Agreement constitutes a legal, valid and binding obligation of Participant, enforceable in accordance with its terms, subject to laws of bankruptcy, insolvency, reorganization, moratorium or other similar laws; and (d) it has the financial capability to carry out and satisfy all of its obligations under this Agreement.

5.2. Mosaic Program Matters. With respect to each Financing Agreement, the related Financing Application, and the related Customer Agreement, (a) each of Participant and any applicable Participant Agent(s) (i) is in compliance with the Mosaic Program Documents, the Customer Agreement and all Applicable Laws governing the same, (ii) possesses all registrations, licenses, permits or authorizations and all bonds and insurance required by any Governmental Authority to carry out its business and to perform its obligations under this Agreement and the applicable Customer Agreement, (iii) is fully experienced and properly qualified and equipped to perform its obligations under this Agreement and the applicable Customer Agreement, (b) to Participant's and its applicable Participant Agent's best knowledge, such Customer satisfies the Qualification Requirements, (c) the applicable Customer has no claim or defense to payment of any amount based upon materials or workmanship or any act or



omission of Participant or any Participant Agent, (d) there are no present or future rights related to the transaction that could give rise to a mechanic's, materialman's or laborer's lien, except to the extent those rights are in favor of Participant, in which event Participant agrees not to assert those rights to the detriment of any Financing Provider, and (e) Participant has not taken any adverse action against a Customer because such Customer is a member of a protected class, as defined by Applicable Law, or because such Customer has chosen to lease an Eligible Product or use credit to finance the purchase of an Eligible Product, nor has Participant engaged in any practice that has or could have an impermissible negative or disparate impact on members of any protected class, including steering Customers to more expensive or less favorable financing options because of the Customers' membership in a protected class.

6. **RECORDS; AUDIT RIGHTS**

6.1. <u>Maintenance of and Access to Records.</u> Participant shall retain accurate and complete written or electronic records relating to its Eligible Product transactions with Customers, including a copy of all Customer Agreements and Marketing Materials provided to the Customers, and a description of products purchased or leased and/or services completed in connection with an Eligible Product. Upon reasonable request, Participant shall provide Program Administrator or any Financing Provider with access to all such records and information for the purpose of determining whether Participant and Participant Agents have complied with this Agreement, to resolve a Customer dispute or respond to an investigation, demand, inquiry or action.

6.2. <u>Audits.</u> Participant will permit Program Administrator to conduct such audits, inspections and examinations (collectively, "**Audits**"), from time to time as are reasonably necessary for Program Administrator, on behalf of the Financing Providers, to ensure compliance with the Mosaic Program Documents and Applicable Laws, which Audits include the right of Program Administrator to directly or indirectly Audit any Eligible Product or corresponding Customer data and documentation. Unless otherwise warranted by specific information received by Program Administrator, Audits shall occur at reasonable intervals during regular business hours and will be subject to as much advance notice as is practicable. Audits may include a review of Customer communications and documents, complaints activity, internal audits, summaries of test results or other equivalent evaluations. Participant authorizes Program Administrator to obtain business credit reports and engage in credit checks from time to time. Subject to reasonable notice by Program Administrator, Participant shall respond to additional information requests and to interviews with Program Administrator, Financing Providers, and their respective Representatives.

6.3. <u>Financial Statements.</u> Participant will provide Program Administrator such financial statements requested by Program Administrator to evaluate and audit the financial condition, operations, or performance of Participant, including, but not limited to, (a) Participant's books and records, (b) federal and state tax returns, and (c) balance sheets and income statements for any annual or quarterly period. Participant covenants that all financial statements delivered to Program Administrator in accordance with the foregoing shall be true and correct.

7. **INTELLECTUAL PROPERTY**

7.1. <u>Intellectual Property Rights.</u> As between the Parties, Program Administrator retains and reserves all rights, title and interest in and to all inventions, works of authorship, patents, copyrights, trade secrets, trademarks, service marks, trade names, know-how, ideas, techniques, concepts, algorithms, data, formats, code, platforms, functionality, interfaces, documents, technology and other intellectual property (collectively, "**Intellectual Property**") related to the Portal and the Mosaic Program. No rights are granted to Participant hereunder other than as expressly set forth herein.

7.2. <u>Portal Usage.</u> During the term of this Agreement, Program Administrator will allow Participant to access the Portal for the exclusive purposes of (a) facilitating the logging and tracking of Customer Information in accordance with the terms and conditions of this Agreement, (b) executing actions strictly necessary for Customers to apply for, process and execute Financing Agreements, (c) sending or receiving notifications or other information related to the Financing Products to or from Customers and (d) uploading or downloading documentation required under this Agreement (all of the aforementioned, "**Permitted Portal Usage**"), in each case in accordance with the Mosaic Program Documents. Participant shall (i) send Program Administrator a written list of individual Participant Agents



requiring access to the Portal ("**Participant Authorized Users**"), including name, title, sales territory and any other information that Program Administrator deems necessary prior to providing such Participant Agents with access to the Portal and (ii) regularly update such list. Program Administrator grants to Participant and Participant Authorized Users solely during the term of this Agreement a limited, non-exclusive license to use the Portal exclusively for the Permitted Portal Usage. Participant will use strict procedures to ensure that Participant Authorized Users do not share login credentials or passwords and use the Portal in compliance with Permitted Portal Usage. Without limiting the generality of the foregoing, Participant will not directly, or indirectly through any Affiliate, agent or other Third Party: (a) sell, lease, license or sublicense the Portal to any Third Party; (b) decompile, disassemble or reverse engineer the Portal, in whole or in part; (c) write or develop any derivative software or any other software program based upon the Portal or any Confidential Information of Program Administrator; (d) use the Portal to provide lending services to third parties, or otherwise use the Portal on a "service bureau" basis; or (e) provide, disclose, divulge or make available to, or permit use of the Portal by, any Third Party. Participant shall only use all data resulting from the use of the Portal and all other Program materials solely to perform its obligations under this Agreement.

7.3. Limited Scope Trademark License. Subject to the Parties' compliance with the terms and conditions of this Agreement, each Party grants to the other a non-exclusive, non-transferable, non-sublicensable right and license during the term of this Agreement to display the grantor's trademarks, servicemarks, trade names and trade dress (collectively for either Party, the "**Marks**") in connection with the Mosaic Program. All uses of the Marks shall inure solely to the benefit of the grantor. Neither Party shall acquire any right, title or interest in the other Party's Marks or any goodwill associated therewith. All rights and title in the Marks are and shall be exclusively owned by the grantor, and any rights not expressly granted therein and thereto are reserved to the grantor. Approval of use of the Marks of either Party shall follow the approval process for Marketing Materials set forth in Section 3.1. The Parties shall not directly or indirectly contest the validity of the Marks of the other Party or the right and title of grantor therein and thereto anywhere in the world.

## 8. TERM AND TERMINATION

8.1. Term. The term of this Agreement commences as of the Effective Date and terminates upon written notice of termination by either Party as set forth in this Section 8.

8.2. Termination; Effect of Termination. Either Party may terminate this Agreement at any time by providing written notice to the other Party. Following the termination of this Agreement pursuant to this Section 8.2, Participant's authorization to promote the Mosaic Program under Section 1.2 and other relevant portions of this Agreement shall immediately terminate, and the Parties shall mutually cooperate to engage in orderly resolution of obligations to Customers under the terms and conditions of any Financing Agreement outstanding upon such termination.

8.3. Suspension of Agreement. Program Administrator may at any time suspend Participant's authorization under Section 1.2, including submissions and/or approvals of Financing Applications and execution of Financing Agreements, in its sole discretion, effective upon Program Administrator's delivery of written notice to Participant.

## 9. INDEMNIFICATION

9.1. Indemnification by Participant. Participant shall fully indemnify and hold harmless Program Administrator, the Financing Providers and their respective Representatives from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, damages and related fees and expenses (including attorneys' fees) of any kind whatsoever (collectively, "**Losses**") incurred by Program Administrator, a Financing Provider or their respective Representatives that are caused by or result from (a) gross negligence, bad faith or willful misconduct of Participant or any of its Representatives in connection with the Mosaic Program, (b) a breach by Participant of its obligations, covenants, representations or warranties contained herein, (c) the failure of Participant or its Representatives to perform their respective obligations or duties owed to a Customer pursuant to any agreement, warranty, guaranty, Applicable Law or otherwise, or (d) infringement or misappropriation by Participant or its Representatives of any Intellectual Property of Program Administrator, a Financing Provider or their respective Representatives or of any Third Party in connection with this Agreement; provided, however, that none of Program Administrator, the



Financing Providers or their respective Representatives shall be entitled to indemnification for any losses hereunder to the extent resulting from such party's own gross negligence, bad faith or willful misconduct.

9.2. <u>Indemnification by Program Administrator</u>. Program Administrator shall fully indemnify and hold harmless Participant and its Representatives against any and all Losses incurred by Participant or its Representatives that are caused by or result from (a) the failure of Program Administrator or its Representatives to comply with Applicable Law, (b) breach of the confidentiality restrictions of this Agreement, or (c) infringement or misappropriation by Program Administrator of Intellectual Property of Participant or of any Third Party in connection with this Agreement; provided, however, that neither Participant nor its Representatives shall be entitled to indemnification for any Losses hereunder to the extent resulting from Participant's or such Representative's own gross negligence, bad faith or willful misconduct.

9.3. <u>Indemnity Procedure</u>.

9.3.1. If a Third Party initiates a claim, demand, dispute, lawsuit or arbitration ("**Third-Party Claim**") against a Party, the Financing Providers or their respective Representatives (the "**Indemnified Party**") with respect to any matter for which the Indemnified Party may make a claim for indemnification against another Party under this Section 9 (the "**Indemnifying Party**"), then the Indemnified Party must promptly notify the Indemnifying Party in writing of the existence of such Third-Party Claim and deliver copies of any documents served on the Indemnified Party with respect to the Third-Party Claim; provided, however, that any failure on the part of an Indemnified Party to so notify an Indemnifying Party shall not limit any of the obligations of the Indemnifying Party under this Section 9 (except to the extent such failure materially prejudices the defense of such proceeding). Such notice of claim shall specify all facts known to the Indemnified Party giving rise to the indemnification right.

9.3.2. Upon receipt of the notice described in Section 9.3.1, the Indemnifying Party shall be entitled to participate in and assume the defense of the Indemnified Party with respect to such claim, with counsel that is selected by and at the expense of the Indemnifying Party and that is reasonably acceptable to the Indemnified Party, provided that: (i) a conflict of interest does not exist or arise between the Indemnifying Party and the Indemnified Party with respect to such Third-Party Claim; (ii) the Indemnifying Party notifies the Indemnified Party in writing within thirty (30) days after receiving notice of a claim pursuant to Section 10.3.1 that the Indemnifying Party agrees to assume the defense of the Indemnified Party with respect to the Third-Party Claim and to indemnify the Indemnified Party from and against the entirety of any Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third-Party Claim; (iii) the Third-Party Claim involves only money damages and does not seek an injunction or other equitable relief; (iv) settlement of, or an adverse judgment with respect to, the Third-Party Claim is not, in the good-faith judgment of the Indemnified Party, likely to establish a precedential custom or practice adverse to the continuing business interests or the reputation of the Indemnified Party; and (v) the Indemnifying Party conducts the defense of the Third-Party Claim actively and diligently; provided, however, that if Program Administrator is the Indemnified Party, Program Administrator may, at its sole option, defend itself from such claim independently of Participant. If the Indemnifying Party does not assume the defense of the Indemnified Party, or if the Indemnified Party elects to defend itself independently in accordance with the preceding sentence, then the Indemnifying Party shall reimburse the reasonable fees and expenses (including attorneys' fees) incurred by the Indemnified Party on a monthly basis for the Indemnified Party's defense by separate counsel selected by the Indemnified Party and reasonably acceptable to the Indemnifying Party; provided, that Indemnifying Party's failure to provide a reasonable objection to the Indemnified Party's choice of counsel within five (5) business days of notice thereof shall be deemed approval of such counsel. The Indemnifying Party shall control the settlement of all claims for which it has assumed the defense; provided, however, that the Indemnifying Party shall not conclude any settlement which requires any action or forbearance from action by an Indemnified Party without the prior approval of the Indemnified Party.



10. **GOVERNING LAW; DISPUTE RESOLUTION**

10.1. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflicts of laws principles.

10.2. Arbitration. Any question, dispute, difference or claim arises out of or relates to this Agreement (a "**Dispute**") that is not resolved within the applicable notice or cure periods provided in this Agreement must be submitted to binding arbitration. The arbitration hearing(s) and all related proceedings shall be conducted in San Francisco County, California and shall be administered by either AAA or JAMS, at the option of the Party (including, for purposes of this provision, any Financing Provider) demanding submission to arbitration. All proceedings by arbitration shall be pursuant to the rules and procedures of the arbitration administrator selected. The submitting Party shall submit such Dispute to arbitration by providing a written demand for arbitration to the other Party. The Parties agree that any arbitrated matter will be handled by a single arbitrator with significant commercial contract resolution experience to be selected mutually by the Parties, or, if the Parties are unable to mutually select an arbitrator, pursuant to Section R-12 of the AAA Commercial Arbitration Rules and Mediation Procedures or Rule 15 of the JAMS Comprehensive Arbitration Rules & Procedures, as applicable. The decision of the arbitrator shall be in writing, final, and binding on the Parties. Any award may be enforced by any Party, as applicable, in a court of competent jurisdiction. The award shall include interest from the date of any damages incurred, and from the date of the award until paid in full, at the rate of the lesser of (a) the rate per annum equal to the rate published by the *Wall Street Journal* as the "prime rate" on the date on which such interest begins to accrue plus one percent (1%) and (b) the maximum rate allowed by Applicable Law. The Parties specifically agree that the Party prevailing in arbitration of any such Dispute shall be awarded its reasonable and documented out-of-pocket attorneys' fees, expert fees, expenses and costs, as incurred in connection with the Dispute, including all reasonable and documented out-of-pocket fees and costs incurred prior to the written demand for arbitration, as arising from the Dispute. Nothing in this Agreement shall preclude any Party from seeking provisional or equitable remedies from a court of appropriate jurisdiction.

10.3. LIMITATION OF LIABILITY. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL PROGRAM ADMINISTRATOR, THE FINANCING PROVIDERS OR THEIR RESPECTIVE REPRESENTATIVES BE LIABLE TO PARTICIPANT OR ANY OTHER PERSON FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, CONTINGENT OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFIT OR ANY OTHER SIMILAR DAMAGE OR LOSS.

11. **CONFIDENTIALITY; INFORMATION SECURITY**

11.1. Protection of Confidential Information.

11.1.1. Participant shall keep confidential and not disclose to any person (except to its Representatives who are engaged in the implementation and execution of the Mosaic Program) all Confidential Information that Participant receives from Program Administrator or from any other source relating to the Mosaic Program and matters that are subject to the terms of this Agreement and shall use, and cause to be used, such information solely for the purposes of the performance of Participant's obligations under this Agreement. Participant shall be liable for any breach by its Representatives of the confidentiality provisions of this Agreement. Without limiting the generality of the foregoing, any and all Customer Information disclosed by Program Administrator in connection with this Agreement will be held by Participant as Confidential Information and Participant will not gather, store, log, use or otherwise retain any Customer Information in any manner and will not disclose, distribute, sell, share, rent or otherwise transfer any Customer Information to any Third Party except as necessary to perform its obligations under this Agreement and the related Customer Agreements and in accordance with Applicable Law.

11.1.2. Program Administrator will keep confidential and not disclose to any person (except to the Financing Providers and its and their Representatives who are engaged in the implementation and execution of the Mosaic Program) all Confidential Information that Program Administrator receives from Participant that is designated confidential by Participant. However, nothing in this Agreement shall limit Program



Administrator's or the Financing Providers' rights to (a) share Confidential Information with third-party service providers in the ordinary course of business for the purposes of administering the Mosaic Program; or (b) share Confidential Information with any potential or actual investors, financing sources, or purchasers of any interest in any Financing Products, subject to customary confidentiality obligations.

11.2. Customer Information Privacy Policy. Each Party shall adopt and maintain a comprehensive privacy policy with respect to its handling of Customer Information and such Party's privacy policy shall be available on such Party's website and shall at all times comply with Applicable Laws.

11.3. Information Security Policies and Procedures. Each of Participant and Program Administrator, on behalf of the Financing Providers, agrees that it has developed, implemented and will maintain at all relevant times contemplated by this Agreement effective information security policies and procedures that include administrative, technical and physical safeguards designed to (a) ensure the security and confidentiality of Customer Information, (b) protect against anticipated threats or hazards to the security or integrity of Customer Information, (c) protect against unauthorized access or use of Customer Information, (d) ensure the proper disposal of Customer Information, and (e) honor requests to delete or not share such information if required to do so by Applicable Law. All personnel handling Customer Information shall be appropriately trained in the implementation of such information security policies and procedures. Each Party shall regularly audit and review its information security policies and procedures and systems to ensure their continued effectiveness and determine whether adjustments are necessary in light of circumstances including changes in technology, customer information systems or threats or hazards to Customer Information.

11.4. Security Incidents. In the event that either Party learns or has reason to believe that (a) Customer Information has been disclosed or accessed by an unauthorized party, (b) such Party's facilities associated with any Customer Information has been accessed by an unauthorized party, or (c) such Customer Information has been lost or misplaced, such Party shall, as soon as reasonably practicable, (i) provide notice of the security incident to the appropriate law enforcement or state agencies and government regulatory authorities in conformity with the notification requirements found in applicable Privacy Laws and (ii) provide written notice thereof to the other Party and shall specify the corrective action that was or will be taken unless a Governmental Authority instructs such Party to refrain from doing so. Each Party shall cooperate with the other Party, and shall pay all related expenses, to provide any notices regarding such unauthorized access to affected applicants and Customers, as the other Party (in the case of Program Administrator, at the direction and control of the Financing Providers), in its sole discretion, deems appropriate.

11.5. Audits of Information Security Policies and Procedures. Upon not less than ten (10) business days' prior notice, Participant will permit Program Administrator (in its own discretion or at the direction and control of the Financing Providers) to review and audit Participant's information security policies, procedures and systems during regular business hours to verify their adequacy for protection of Customer Information.

12. **MISCELLANEOUS**

12.1. Assignment. Participant shall not assign this Agreement without the prior written consent of Program Administrator, except to a successor in interest who purchases all or substantially all of the assets of Participant or in connection with any merger of Participant with another Person, whether or not Participant is the surviving entity from such merger, or any other change in control of Participant; provided, that (a) any such surviving entity assumes all obligations of Participant under this Agreement, and (b) Participant provides prior written notice of such assignment to Program Administrator. Nothing in this Section 12.1 shall limit a Financing Provider's right to assign, in whole or in part, a Financing Product or related documentation. Subject to the foregoing, this Agreement shall be binding on the Parties and on their respective successors, heirs and permitted assigns.

12.2. Notices. Any notice, request, demand or other communication required or permitted under this Agreement shall be in writing and shall be deemed to be properly given by the sender and received by the addressee (a) if personally delivered, on the date of such delivery; (b) if mailed by certified or registered air mail, post prepaid, with a return



receipt requested, three (3) calendar days after deposit in the mail; (c) if sent electronically by email, on the date of such delivery; or (d) with respect to any written notice required to be given by Program Administrator to Participant, if posted to the Portal or to Program Administrator's website in accordance with Section 1.4, on the date of such posting. Except as set forth in clause (d) of the preceding sentence, all notices from Program Administrator to Participant shall be sent to the address in the Participant Application or such other address as Participant may advise Program Administrator in writing. All notices from Participant to Program Administrator shall be sent to the address set forth below or to such other address as Program Administrator may advise Participant in writing.

Solar Mosaic LLC
601 12th Street, Suite 325
Oakland, CA 94607
Attention: Legal Department
E-mail: legalnotices@joinmosaic.com

12.3. Consent to Electronic Communications. Participant authorizes Program Administrator to communicate with Participant Agents by email and text messaging for support and marketing purposes. Standard carrier rates will apply for all text message communications. If Participant Agents no longer wish to receive emails and text messages for marketing purposes, Participant Agents may opt out by following the opt-out instructions for text messages provided in such text messages, or by unsubscribing to email messages using the appropriate link in the email message.

12.4. Third-Party Beneficiaries. Participant acknowledges that Program Administrator has and will enter into agreements with Financing Providers to provide financing under the Mosaic Program and that such Financing Providers will originate, finance and/or own, as applicable, the Financing Products contemplated hereunder. Each Financing Provider shall be a third-party beneficiary of Participant's rights hereunder and shall have the benefit of such rights and the right to enforce (but not to the exclusion of Program Administrator for its own account) such rights with respect to any Financing Product owned and/or financed by such Financing Provider. Except as expressly provided herein, this Agreement shall not create any rights on the part of any Person not a party hereto, whether as a third-party beneficiary or otherwise.

12.5. Survival. Sections 2.4, 2.6, 3.1.1, 6, 7 and 9-12 shall survive termination of this Agreement for any reason.

12.6. Headings. The headings in this Agreement are for convenience and reference only and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

12.7. No Agency. The Parties are independent contractors under this Agreement. Neither Party is an agent, representative or partner of the other Party, and neither Party nor its Representatives shall represent that it is an agent, representative, partner or employee of the other Party. Neither Party shall have any right, power or authority to enter into any agreement of any kind for or on behalf of, incur any obligation or liability of, or otherwise bind, the other Party. This Agreement shall not be interpreted or construed to create an association, joint venture, agency, partnership, franchise, sales representative or employment relationship between the Parties or to impose any partnership obligation or liability upon either Party. Each Party shall bear its own costs and expenses in performing this Agreement.

12.8. Complete Agreement; Conflicts. This Agreement, together with any other applicable Mosaic Program Document (in each case, as may be modified from time to time in accordance with Section 1.4), constitutes the complete and entire agreement between the Parties and supersedes any previous communications, representations or agreements, whether oral or written, with respect to the subject matter hereof. Any agreement previously entered into between the Parties is hereby terminated and shall have no further force and effect, and any Financing Applications submitted, Financing Products Loans originated or other matters arising under or in connection with any such prior agreement shall be governed by the terms of this Agreement. Any agreement subsequently entered into between the Parties will supersede the Mosaic Program Documents only if such agreement specifically states therein that it supersedes this Agreements and is signed by both Parties. In the event of a conflict between the terms of any Mosaic Program Documents, the following order of priority shall apply: (a) the terms of the applicable Mosaic Program Supplement,



if any; (b) the terms of the applicable Mosaic Program Addendum; (c) the terms of this Agreement; and (d) the terms of any other Mosaic Program Document.

12.9. Electronic Signatures. Any signature (including any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record) hereto or any other certificate, agreement or document related to this transaction, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, the California Uniform Electronic Transactions Act, or any similar state law based on the Uniform Electronic Transactions Act, or any similar state law based on the Uniform Electronic Transactions Act, and the Parties hereby waive any objection to the contrary.

12.10. Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provisions had never been contained herein.

12.11. Ambiguities; Consultation with Counsel. The Parties waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document will be construed against the Party drafting such agreement or document. The Parties agree that the language of all parts of this Agreement shall in all cases be construed as a whole, according to their fair meaning, and not strictly for or against any Party as the drafter. The Parties have each consulted with, or had the opportunity to consult with, counsel regarding this Agreement.



## EXHIBIT A

## RULES OF CONSTRUCTION; DEFINITIONS

1. Rules of Construction. As used in this Agreement: (a) unless the context requires otherwise, all references to singular nouns shall apply equally to the plural form and any pronoun shall include the corresponding masculine, feminine and neuter forms; (b) (i) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation" and (ii) the word "or" is not exclusive; (c) any definition of or reference to any agreement, instrument, other document, law, or regulation herein shall be construed as referring to such agreement, instrument, other document, law, or regulation as from time to time amended, supplemented or otherwise modified; (d) any reference herein to any Person shall be construed to include such Person's successors and assigns; and (e) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement.

2. As used in this Agreement, the following capitalized terms have the following meanings:

"**Affiliate**" means, for a specified Person, any Person directly or indirectly controlling, controlled by or under common control with such specified Person. For this definition, "control" with respect to any specified Person means the possession, directly or indirectly, of the power to direct the management and policies of such Person, whether through ownership of at least fifty percent (50%) of the voting securities, by contract, or otherwise.

"**Agreement**" has the meaning set forth in the introductory paragraph.

"**Applicable Laws**" means any applicable statute, law, ordinance, rule, code, regulation, judgment, order, or award of any Governmental Authority, including any term, condition or requirement of any permit, license, certificate, approval, bond, qualification or similar requirement from a Governmental Authority, including the Privacy Laws.

"**Audits**" is defined in Section 6.2.

"**Background Technology**" means all firmware, source code, object code, applications, algorithms, operation instructions, interfaces, documentation, program images and text viewable on the internet, any HTML or XML code relating thereto, and any similar or related technology.

"**Confidential Information**" means records, technology, software, trade secrets, and financial and business information, or data related to a Party's products (including the discovery, invention, research, improvement, development, manufacture, or sale thereof), processes, or general business operations (including sales, costs, profits, pricing methods, organization, employee or customer lists, marketing techniques and materials, development or marketing timetables, strategies and development plans, and process), trade secrets, and any information obtained through access to any information assets or information systems, whether oral or written or communicated via electronic media, disclosed or made available by a disclosing Party or its Representatives to the other Party or its Representatives. Confidential Information shall not include information that (a) is generally available to the public, (b) was known to the receiving Party prior to obtaining the same from the Disclosing Party under no confidentiality obligation; (c) has become publicly known not due to the fault of the Receiving Party subsequent to the receiving Party acquiring the information; or (d) is obtained by the receiving Party from a Third Party who is under no confidentiality obligation to the disclosing Party.

"**Custom Application**" is defined in Section 2.1.

"**Customer**" means a customer of Participant that is considering engaging or has engaged Participant to sell, install or otherwise provide an Eligible Product.

"**Customer Agreement**" means the Purchase Agreement or Installation Agreement, as applicable.

Mosaic Program Participation Agreement (v 2021.12)



"Customer Information" means (a) any information that identifies or can be used to identify an individual either alone or in combination with other readily available data; (b) any other sensitive or personally identifiable information or records in any form (oral, written, graphic, electronic, machine-readable, or otherwise) relating to a Customer, including the name, home address, email address, date of birth, social security number and biometric information of a Customer; and (c) any other data of or regarding a Customer, the use, access or protection of which is regulated under Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et. seq.* and implementing regulations, Interagency Guidelines Establishing Standards For Safeguarding Customer Information and codified at 12 C.F.R. Parts 30, 208, 211, 225, 263, 308, 364, 568, and 570, and 16 C.F.R. Part 314, and other applicable federal, state and local laws, rules, regulations, and orders relating to the privacy and security of personal information of consumers including the California Consumer Privacy Act.

"Dispute" is defined in Section 10.2.

"Eligible Product" means the goods, services (including design, delivery, engineering, permitting, installation, maintenance, building, and monitoring) and/or merchandise that a Customer may purchase from Participant (or a Reseller acting on behalf of Participant) with a Loan made by a Financing Provider or lease from a Financing Provider in connection with the Mosaic Program.

"Financing Application" means a Mosaic Program Application or Custom Application.

"Financing Product" means a Loan or Lease.

"Financing Provider" means each of the banks, credit unions and non-bank lenders, including Program Administrator and its Affiliates, that finance, originate and/or purchase Financing Products individually in the Mosaic Program and/or jointly market and offer the Mosaic Program to consumers to lease or finance the purchase of Eligible Products.

"Governmental Authority" means any court, tribunal, arbitrator, agency, legislative body, commission, official or other instrumentality of any government of any country, or a federal, state, province, county, city or other political subdivision thereof.

"Indemnified Party" is defined in Section 9.3.1.

"Indemnifying Party" is defined in Section 9.3.1.

"Installation Agreement" has the meaning set forth in the Lease Program Addendum.

"Intellectual Property" is defined in Section 7.1.

"Lease" means the lease of one or more Eligible Products by a Financing Provider to a Customer, who is entitled to use the Eligible Products for a specified time in return for periodic payment.

"Lease Agreement" means the agreement entered into between a Financing Provider and a Customer to extend a Lease to such Customer.

"Lease Application" means an application for a Lease, in the form of a Mosaic Program Application or Custom Application, submitted directly by a Customer or, if permitted by Program Administrator with respect to a Custom Application, by Participant following the Customer's submission of such Custom Application.

"Lease Program" has the meaning set forth in the preamble.

"Lease Program Addendum" means the addendum to this Agreement describing certain additional agreements, obligations, and terms applicable to the Lease Program, as available on Program Administrator's website, www.joinmosaic.com.



"**Loan**" means either a secured or unsecured closed-end loan extended by a Financing Provider to a Customer under the related Loan Agreement to purchase an Eligible Product through the Loan Program.

"**Loan Agreement**" means the agreement entered into between a Financing Provider and a Customer to extend a Loan to such Customer for the purchase of an Eligible Product.

"**Loan Program**" has the meaning set forth in the preamble.

"**Loan Program Addendum**" means the addendum to this Agreement describing certain additional agreements, obligations, and terms applicable to the Loan Program, as available on Program Administrator's website, www.joinmosaic.com.

"**Losses**" is defined in Section 9.1.

"**Marketing Materials**" is defined in Section 3.1.1.

"**Marketing Requirements**" is defined in Section 3.1.

"**Marks**" is defined in Section 7.3.

"**Mosaic Program**" has the meaning set forth in the preamble.

"**Mosaic Program Addendum**" means the Loan Program Addendum or Lease Program Addendum, as applicable.

"**Mosaic Program Application**" means an application for a Financing Product in the form provided by the applicable Financing Provider.

"**Mosaic Program Documents**" means this Agreement, each Mosaic Program Addendum, each Mosaic Program Supplement (if applicable), and any other policies, procedures, or instructions communicated by Program Administrator to Participant in accordance with Section 1.4.

"**Mosaic Program Supplement**" means a supplement to a Mosaic Program Addendum applicable to certain Eligible Products that are the subject of a Loan or Lease, as applicable.

"**Participant**" has the meaning set forth in the preamble.

"**Participant Agents**" is defined in Section 3.1.2.

"**Participant Application**" means the application submitted by Participant to Program Administrator to participate in the Mosaic Program.

"**Participant Authorized Users**" is defined in Section 7.2.

"**Party**" means each of Program Administrator and Participant individually, and collectively, Program Administrator and Participant are the "**Parties**."

"**Permitted Portal Usage**" is defined in Section 7.2.

"**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

"**Portal**" means (a) the web application and application programming interface that Program Administrator, on behalf of the Financing Providers, provides to Participant, as modified from time to time, to enable Financing Providers to monitor the Mosaic Program and enable Participant to conduct the activities included under Permitted Portal Usage, and (b) the web or mobile site or smartphone or tablet widget or application, as modified from time to time, that Program Administrator, on



behalf of the Financing Providers, makes available to each Customer to enable such Customer to submit a Financing Application and conduct and monitor activities in connection with his or her Financing Product, including, in each case, the Financing Application, documentation, business logic, administrative tools, user interface and any related Background Technology.

"**Privacy Laws**" means all applicable privacy and data security laws in all relevant jurisdictions and the regulations promulgated thereunder, including the following, in each case, as amended or supplemented: Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et. seq*/Regulation P; Fair Credit Reporting Act/Regulation V; California Financial Information Privacy Act; California Consumer Privacy Act and related regulations; Federal Trade Commission Act; the Telephone Consumer Protection Act; the CAN-SPAM Act of 2003; state data breach and data security Laws (including the New York State Department of Financial Services Cybersecurity Requirements for Financial Services Companies, 23 NYCRR 500); international data protection and security laws, including Directive 95/46/EC of the European Parliament and of the Council and, when effective, the General Data Protection Regulation; and analogous local, state, federal, and international laws relating to the processing, privacy, usage, protection and security of Customer Information.

"**Program Administrator**" has the meaning set forth in the preamble.

"**Prudent Industry Practices**" means those standards of care and diligence normally practiced by equipment manufacturers, distributers, engineers, contractors, and installers, as applicable, in providing goods and/or performing services of a similar nature in the geographic region in which the Eligible Product will be provided and/or performed, and in accordance with good engineering, building and design practices, Applicable Laws (including local codes and standards), any requirements of the Utility, if applicable, and other applicable industry standards.

"**Purchase Agreement**" has the meaning set forth in the Loan Program Addendum.

"**Qualification Requirements**" means (a) the following requirements: the applicable Customer must (i) own a house in the Territory, (ii) have a valid social security number, and (iii) have a valid existing email address or have personally created a valid email address; and (b) with respect to a Loan, the proceeds of which will be used to finance a Solar Energy System, the requirements set forth in clause (a) above and the Solar Energy Qualification Requirements (as defined in the Solar Loan Supplement).

"**Representatives**" means any Affiliates, shareholders, members, managers, directors, officers, employees, agents or representatives of a Person, including Participant Agents, Subcontractors, attorneys, accountants, consultants and financial advisors.

"**Reseller**" means a Subcontractor that performs marketing and sales services in connection with selling Eligible Products and has a contractual agreement with Participant to perform such activities.

"**Solar Energy Systems**" means (i) any residential solar power generation systems, including solar panels or modules, inverters, electricity storage, charging and monitoring equipment (including batteries and automobile charging equipment; provided, that any batteries must be properly wired and installed for charging by the Solar Energy System and not charging by the applicable utility grid), prepaid operations and maintenance agreements and related landscaping, roofing or re-roofing, wiring, electrical system upgrades and any other additional equipment or services related to the installation thereof; and/or (ii) any electricity storage unit on a standalone basis, including wiring, electrical system upgrades and any additional equipment or services related to the installation thereof.

"**Solar Loan Supplement**" means the Mosaic Program Supplement applicable to Solar Energy Systems, available on Program Administrator's website, www.joinmosaic.com.

"**Subcontractor**" means any Third Party directly or indirectly engaged by Participant in connection with the performance or provision of any Eligible Product or the fulfillment, in whole or in part, of any obligation of Participant under the Mosaic Program or a Customer Agreement.

"**Territory**" means the states where the Mosaic Program is offered by Program Administrator on behalf of the



Financing Providers, as identified by Program Administrator in its sole discretion from time to time.

"**Third Party**" means any Person who is not a Party.

"**Third-Party Claim**" is defined in Section 9.3.1.

"**Training Program**" is defined in Section 4.1.

"**Utility**" has the meaning set forth in the Solar Loan Supplement.