UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| STATE OF TENNESSEE, *ex rel.* JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER, and COMMONWEALTH OF KENTUCKY, *ex rel.* DANIEL CAMERON, ATTORNEY GENERAL<br><br>　　Plaintiffs,<br><br>vs.<br><br>IDEAL HORIZON BENEFITS, LLC d/b/a SOLAR TITAN USA, *et al.*<br><br>　　Defendants. | 3:23-CV-00046-DCLC-JEM |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS ATNIP AND KELLEY'S MARCH 13, 2023 JOINT EMERGENCY MOTION TO MODIFY ASSET FREEZE**

The State of Tennessee ("Tennessee") and Commonwealth of Kentucky ("Kentucky") (collectively, "Plaintiffs") respectfully submit this Memorandum in opposition to Defendant Atnip's ("Mr. Atnip") and Defendant Kelley's ("Mr. Kelley") (collectively, "Defendants") Joint Motion to Modify the Asset Freeze in which Defendants argue that unfreezing "approximately $2,400,000 from frozen assets" is a *reasonable and necessary expense*. Defendants allege that the expense is *necessary and reasonable* because it will purportedly preserve Defendants' interest in a Florida beach home, located at 2924 Sand Pine Road, Miramar Beach, Florida 32550 ("the Property"). However, Defendants have not met their burden of demonstrating that unfreezing an additional $2,400,000 is a reasonable and necessary expense.

Defendants' proposal is far too uncertain to justify their request to this Court to unfreeze $2,400,000 in frozen assets. Defendants have purported that the expense is reasonable in part because it will result in more funds available for consumer restitution. Although Plaintiffs share

1

the view that the assets currently subject to the asset freeze rightfully belong to the hundreds of consumers victimized by Defendants' unlawful conduct, Defendants have failed to provide sufficient evidence to support a finding that the supposed gain from this transaction outweighs the potential for loss. Though Defendants argue that an eventual sale of the Property would ultimately result in a net gain of $2,100,000, they do not provide evidence sufficient to show the value of the Property with any reasonable degree of certainty and misrepresent the potential net gain from sale of the Property.

Further, this Court should not be convinced that the expenditure is necessary to preserve any more than Defendants' $100,000 earnest money deposit. Defendants have not proven that they will not ultimately recoup their investment if they are not the party to sell the Property. To be clear, Plaintiffs are not opposed to unfreezing assets if doing so would create a benefit for consumers; however, absent a clear showing that consumers will benefit from this asset freeze modification and that the requested asset freeze modification is reasonable and necessary, Plaintiffs must oppose Defendants' proposal. For these reasons, Plaintiffs ask that Defendants requested asset freeze modification be denied.

## BACKGROUND

On February 28, 2023, this Court entered an Order ("the Preliminary Injunction Order") (Doc. No. 78), essentially converting its February 7, 2023 Opinion and Order ("the TRO") (Doc. No. 21) into a preliminary injunction. The Preliminary Injunction Order found that Plaintiffs were likely to succeed on most of their claims against Defendants and on showing Defendants are individually liable. Because Plaintiffs are likely to succeed against Defendants, this Court ordered, among other things, that Defendants' assets should remain frozen during the pendency of this case to ensure that this Court can effectuate relief to harmed consumers to the best of its ability.

Soon after the Preliminary Injunction Order, counsel for Defendants approached Plaintiffs to propose an agreed modification of the asset freeze that included: (1) $15,000 for Defendants' living expenses, (2) $10,000 for emergency repairs to Defendants' rental properties, (3) approximately $15,000 for payments for Defendants' various unsecured liabilities; (4) $350,000 for attorneys' fees, (5) and $65,000 to the builder of the Property. Plaintiffs and Defendants began negotiating terms of a potential agreed asset freeze modification. Later, however, Defendants increased the requested modification amount related to the Property to $345,000, stating that an unnamed partner had backed out of the transaction.[1] J and K Development Partners, LLC ("Seller") owns the Property and is currently building a home on it. (Doc. No. 96-1, 96-2, 96-3). According to the contract between Defendants and Seller, Defendants are required to pay various milestone payments to Seller during construction, the last of which is to be paid once Seller provides Defendants with a copy of the Walton County Certificate of Occupancy ("Walton County CO") for the Property. (Doc. No. 96-3 at 5199).

In an effort to verify that only $345,000 would be needed to close on the Property as Defendants' counsel previously suggested, Plaintiffs requested that Defendants provide the Purchase Agreement and all subsequent addendums. (Doc. No. 96-1, PageID # 5190–97; Doc. No. 96-2, PageID # 5198; Doc. No. 96-3, PageID # 5199). After reviewing the provided documents, Plaintiffs discovered that the requested $345,000 would only complete the final milestone payment, and that, ultimately, Defendants would need significantly more funds to pay the overall purchase price and obtain title to the Property. When Plaintiffs inquired as to the total amount

---

[1] When asked whether Defendants had any ability to pursue damages as a result of the partner's repudiation, Defendants informed Plaintiffs that the agreement had been made orally, but a written agreement had never been executed and that, as such, the partnership agreement was not enforceable.

3

needed, Defendants finally conceded that they would need significantly more than $345,000 of frozen assets to be released for them to close on the Property. (*See* Exhibit A, Excerpt from Email Communications between Counsel for Defendants Plaintiffs re: Proposed Modification of the Asset Freeze).[2]

Counsel for Defendants informed counsel for Plaintiffs that Defendants plan to "quickly flip" the Property for a substantial profit, and that this profit would be subject to the asset freeze and deposited into escrow or a constructive trust held by the Receiver, Richard Ray. Plaintiffs then inquired about the value of the Property and whether a quick, profitable flip was likely. Counsel for Plaintiffs also began researching the Property on their own and discovered that the fair market value of the Property was potentially far less than what counsel for Defendants had represented. Plaintiffs also discovered that homes in the same area have sat on the market for months at a time; thus, there is a significant risk that the Property at issue would not be sold quickly.

Ultimately, after multiple increases in the amount of money Defendants acknowledged they would need to complete the transaction, after Defendants were unable to provide concrete evidence supporting their assertion that the Property could be quickly flipped for a substantial profit, and as a result of Plaintiffs' conducting our own due diligence, the Parties were unable to

---

[2] Federal Rule of Evidence 408(a) provides that statements made during settlement negotiations about a claim may not be used to prove or disprove the validity of a claim or impeach by prior inconsistent statement or contradiction. Here, however, any statements Plaintiffs rely upon do not relate in any way to Plaintiffs' claims against Defendants, but only relate to modification of assets. Moreover, Plaintiffs are not attempting to use this evidence to show liability or to show that Defendants have made statements inconsistent with, or contradictory to, other statements they have made to the Court regarding the amount of money Defendants require to complete the transaction. Instead, Plaintiffs use the statements to paint a fuller picture of counsels' negotiations to better demonstrate why Plaintiffs did not feel they could responsibly come to an agreement to release funds without court intervention. *See* Fed. R. Civ. P. 408(b) (explaining that a court may consider statements made during settlement negotiations for any purpose not expressly prohibited under Rule 408(a)).

come to an agreement on unfreezing the funds necessary to close on the Property. Defendants then filed the Motion at issue.[3]

## STANDARD FOR ASSET FREEZE MODIFICATION

To preserve the possibility of relief for consumers harmed by Defendants' conduct, this Court exercised its statutory and equitable authority to impose an asset freeze. Just as this Court has authority to issue the asset freeze, it likewise retains the authority to unfreeze those assets when equity requires. *F.T.C v. Fed. Check Processing, Inc.*, No. 14-CV-122S, 2016 WL 10988581, at *1 (W.D.N.Y. Mar. 7, 2016). "Any determination to modify the asset freeze in the governing preliminary injunction order, however, must account for the fact that this ancillary relief was imposed to ensure this Court's ability to fashion an appropriate remedy, such as restitution to the victims, in the event the [Plaintiffs are] successful in [their] prosecution of this action." *Id.*

The equitable factors courts consider when deciding to modify an asset freeze include: (1) "whether Defendant's request to unfreeze assets is reasonable and necessary" and (2) whether a defendant has "establish[ed] that the funds he seeks to release are untainted and there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial." *F.T.C. v. ACRO Servs. LLC*, No. 3:22-cv-00895, 2023 WL 351202, at *5 (M.D. Tenn. Jan. 20, 2023) (citation omitted). A Court should also consider whether it has been presented "with sufficient information to make an appropriate determination as to the balance of

---

[3] Defendants file their Motion as an emergency filing because the "[Certificate of Occupancy] will be issued imminently" (Doc. No. 96, PageID # 5183); however, information provided to Plaintiffs by the Walton County Building Department on March 13, 2023 indicates that the Property still requires a number of inspection certificates and other approvals before a Certificate of Occupancy (CO) inspection can even be scheduled for the business day following the day of the request. (Exhibit B). Even after the CO inspection is scheduled, the CO will not issue until the business day following the inspection if the Property passes inspection. *See id.*

5

equities." *Fed. Check Processing, Inc.*, 2016 WL 10988581, at *1. Ultimately, the decision to unfreeze assets lies within the sole discretion of this Court. *ACRO Servs. LLC*, 2023 WL 351202, at *5.

## ARGUMENT

As a threshold matter, Defendants have not made any colorable attempt to show, or even argue, that the assets they seek to unfreeze are not tainted by their unlawful conduct. *See id.* (explaining that a court should consider "whether a defendant has "establish[ed] that the funds he seeks to release are untainted."). Indeed, in his Deposition on February 24, 2023, Mr. Atnip confirmed that his income and assets were derived from the "profits" of Solar Titan. (*See* Exhibit C, Atnip Deposition Transcript ("Atnip Tr.") at 43:16–19; 65:21–24; 108:3–11)[4]. Similarly, Defendants do not attempt to argue that there are "sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial." *Id.* For these reasons alone, the Court should decline to grant Defendants' Motion.

Defendants have also failed to show that their requested asset freeze modification is reasonable and necessary. In fact, Defendants' request is unreasonable and would put frozen assets at unnecessary risk. As the Court recognized in its Preliminary Injunction Order, the burden is on Defendants to show that any purported expense is reasonable and necessary. (Doc. No. 78, PageID #: 4799 at ¶¶ S–T). Here, Defendants have not met their burden because they have provided, at best, insufficient evidence to support the conclusion that unfreezing nearly $2,400,000 in assets is necessary to prevent a $1,000,000 loss. (Doc. No. 96, PageID# 5183–84). Likewise, Defendants

---

[4] Per Local Rule 5.3, only the relevant excerpts of the deposition are being filed. In hearing on February 27, 2023, the Court requested that the full transcript be filed. Plaintiffs will file the full transcript pursuant to the Court's request after applying necessary redactions.

6

have not shown that the transaction would, as Defendants claim, result in a net gain to the pool of frozen assets of "approximately $1,000,000 - $2,000,000." (Doc No. 96, PageID# 5184).

### A. Defendants Have Not Shown that Default Would Result in a One Million Dollar Loss.

To support their argument that the release of approximately $2,400,000 is necessary in order to close on the Property at issue, Defendants assert that $1,000,000 will be forfeited in the event of default. To calculate this number, Defendants rely on the fact that they have made $100,000 in "deposits" and $900,000 in "milestone and direct payments to the Seller for various upgrades." (Doc. No. 96 PageID # 5183). However, the plain language of the Purchase Agreement and the Second Addendum to the Purchase Agreement suggest that Seller may retain, at most, the $100,000 deposit in the event of default.

Paragraph 15 of the Purchase Agreement outlines the rights of both the Seller and Buyer in the event either party defaults. (Doc. No. 96-1, Page ID #: 5196). Paragraph 15(b) reads:

> **Buyer Default**: If **Buyer** fails to perform this Contract within the time specified, including timely payment of all deposits, **Seller** may choose to retain and collect all deposits paid and agreed to be paid as liquidated damages or to seek specific performance as per Paragraph **16**; and Broker will, upon demand, receive 50% of all deposits paid and agreed to be paid (to be split equally between Brokers) up to the full amount of the brokerage fee.

(Doc. No. 96-1, PageID #: 5196). The Purchase Agreement does not classify any milestone payments made to Seller as "deposits."

The only payment specifically referred to as a "deposit" under the Purchase Agreement is the $25,000 initial deposit. (Doc. No. 96-1, PageID #: 5190). Similarly, in the Second Addendum to the Purchase Agreement, an additional $75,000 is specifically referred to as a "Deposit" (totaling $100,000 worth of deposits under the Purchase Agreement). (Doc. No. 96-3, PageID #: 5199). The same addendum, however, does not similarly refer to or define milestone payments as "deposits." (Doc. No. 96-3, PageID #: 5199). Instead, the addendum refers to the milestone

7

payments as "Escrow Payments and Corresponding Milestones." (Doc. No. 96-3, PageID #: 5199). Thus, the plain language of the Purchase Agreement does not support the assertion that the $900,000 of milestone payments constitute a deposit under the Purchase Agreement.

Equally important is that creditors are currently stayed from "seeking to establish or enforce any claim, right, or interest against . . . the Solar Titan Defendants." (Doc No. 78, PageID # 4802). Indeed, if the Seller seeks to "establish any claim, right, or interest" in the money provided by Defendants for this Property, the Seller must do so by requesting this Court's permission to intervene in this civil enforcement action. In short, the idea that the money already spent by Defendants for this Property would somehow escape the pool of frozen assets subject to this Court's jurisdiction is unsupported by the evidence submitted by Defendants. If, for some reason, the Seller chooses to retain funds that rightfully belong in the pool of frozen assets, pursuant to this Court's Preliminary Injunction Order, this Court could require the Seller to fulfill its legal obligation to return the money to the frozen asset pool. *See* Fed. R. Civ. P. 71.

For this reason, Defendants have not provided sufficient evidence to show that they will lose the entirety of what they have paid under the Purchase Agreement in the event of default, or that they would not otherwise be entitled to recover, at the very least, the remaining $900,000 upon sale of the Property. As such, Defendants have not met their burden of showing how a release of $2,400,000 in frozen assets is necessary to protect against a $1,000,000 loss; at most, the information presented only supports a finding that default could risk the loss of the $100,000 deposit already paid.

    **B. Defendants Have Not Shown that the Proposed Transaction Would Result in a $2.1 Million Dollar Net Increase to the Estate.**

To support their argument that the release of approximately $2,400,000 to close on the Property is reasonable and necessary, Defendants assert that the eventual sale of the Property

8

would result in a net gain of "approximately $1,000,000-$2,000,000." (Doc. No. 96, PageID# 5184). Defendants do not, however, provide sufficient evidence to show that such a net increase can be anticipated with any reasonable certainty because they have not provided sufficient evidence to support the prospective sale price of the Property. Defendants also misrepresent the ultimate net value of the transaction. In other words, Defendants have not provided sufficient information that would allow this Court to make an appropriate determination as to the balance of equities. *Fed. Check Processing, Inc.*, 2016 WL 10988581, at *1.

### 1. *Defendants Have Not Provided Sufficient Evidence to Show the Value of the Property.*

In attempting to show the reasonableness of unfreezing assets, Defendants state, "the release of approximately $2,400,000 from the frozen assets would allow the sale of the Property, under the supervision of the Court and Receiver, for approximately $4,500,000, for a net increase of $2,100,000 in assets available . . . ." (Doc. No. 96, PageID #: 5184 at ¶ 2). Thus, Defendants assert that the Property will sell for at least $4,500,000. (Doc. No. 96, PageID #: 5184 at ¶ 2). However, Defendants do not provide sufficient evidence to support this purported sales price. Defendants have not lined up an actual buyer for the Property, tendered an independent appraisal, or offered anything else that might provide a reasonable basis for such a finding. Instead, Defendants simply ask this Court to trust that the Property will increase in value from the $2,875,000 purchase price to a minimum $4,500,000 sale price as soon as this closing occurs based on: (1) Defendants' assertion that a $4,500,000 to $4,900,000 <u>list price</u> has been determined to be an appropriate price by <u>Seller</u>—an interested party to the transaction (Doc. No. 96, PageID #: 5184 at ¶2), and (2) two "comparable sales" in the same area (Doc. No. 96, PageID #: 5186 at ¶ 1).

Plaintiffs disagree with Defendants that a potential list price $4,500,000 to $4,900,000 is sufficient evidence of the market value or ultimate sale price of the Property. As a threshold matter,

9

Defendants state, without including any citation to a statement or other document, that this purported list price has been determined by a broker. (Doc. No. 96, PageID #: 5184 at ¶ 2). As previously stated, however, Defendants specify that the broker they refer to is the Seller of the Property and, thus, has an interest in Defendants' ability to complete their obligations under the Purchase Agreement.[5] Moreover, Defendants provide no documentation to support their assertion that Defendants and Seller have agreed to a list price of $4,500,000 to $4,900,000; instead, Defendants make the bald assertion and hope that this Court will take them at their word. Finally, regardless of what Defendants represent as a potential list price, there is no guarantee that the home will ultimately sell at list price. Plaintiffs cannot in good faith agree to the release of $2,400,000 in frozen consumer assets without satisfactory evidence ensuring the home's value and likelihood of sale.

Defendants have also failed to provide adequate comparable properties to show the value of the Property. In arguing that the Property would sell for at least $4,500,000, Defendants point this court to two recent property sales in Miramar Beach: (1) 3572 Preserve Drive and (2) 3002 Bay Villas Drive. (Doc. No. 96, PageID #: 5186 at ¶ 1). Neither of these properties are comparable to the Property. Though Defendants provide property assessor records regarding both of these properties, there is nothing in the records to show any of these homes' finishes or other features.

Significantly, a search of 3572 Preserve Drive reveals that, until this most recent sale, the property was an empty lot and there are no photos of the home that now sits at that address. (*See*

---

[5] On March 14, 2023, counsel for Defendants provided Plaintiffs with an additional estimated list price from another broker in the area, dated March 1, 2023. Significantly, though Defendants' Motion represented that it would be appropriate to list the Property for no less than $4,500,000, the new list price range provided shows a minimum list price of $4,300,000. (See Exhibit D). Furthermore, there is insufficient information provided about the broker's qualifications and the basis for his knowledge regarding the specifics of the Property or its value.

Exhibit E, an online listing for 3572 Preserve Drive). Instead, the property assessor records provided by Defendants only show that the home is 5,651 square feet—351 square feet larger than the Property (Doc. No. 96-2. PageID #: 5198)—and sold for $4,056,000 (Doc. No. 96, PageID #: 5186 at ¶ 1), a price nearly $500,000 less than the minimum sales price Defendants assert the Property at issue would likely sell for (Doc. No. 96, PageID #: 5184 at ¶ 2).

The second comparable property provided is similarly insufficient. While not apparent from the property assessor's records submitted by Defendants, the home at 3002 Bay Villas Drive sits directly on the water and, in fact, has private water access, including a private dock. (*See* Exhibit F, an online listing and various accompanying photographs for 3002 Bay Villas Drive). Unlike Defendants' "comparable property" the Property at issue **does not** have water access, a private dock, or even a water view. Plaintiffs' understanding is that the Property is set on the golf course. By all accounts, a home less than 150 square feet smaller than the Property at issue with such an incredible view, private water access, and a private dock cannot be considered a comparable property. Even so, 3002 Bay Villas sold for $4,150,000 (Doc. No. 96, PageID: 5186 at ¶ 1)—$350,000 less than the minimum sales price Defendants utilize in the calculations represented to this Court. (Doc. No. 96, Page ID #: 5184 at ¶ 2). Thus, contrary to Defendants' assertions, these homes are not comparable and, if anything, only show that the Property may well sell for less than Defendants' minimum list price of $4,500,000.

In any event, this Court should not seek to compare the Property to any other purported comparable property because Defendants have not provided sufficient information about the Property to compare it to any other property in the area. Plaintiffs attempted to acquire more specific details regarding the Property to better understand its resale value and whether the purported sales price could be reasonably anticipated. All Plaintiffs were able to learn about the

11

home was that it is 5,300 square feet and cost Defendants $2,875,000. (Doc. No. 96-2, PageID #: 5198). Defendants have not provided any insight into what the home's "upgrades" consist of or any other relevant information about the Property's finishes. Instead, Defendants provided Plaintiffs with four photos of the Property mid-construction (Exhibit G) and an unexecuted Word document purported to be a partnership agreement with the builder in which the proposed list price is $4,695,000 (Exhibit H). Interestingly, that same agreement contemplates a scenario in which the Property sells for only $4,250,000. (Exhibit H at 1). Without more information, it is not possible to corroborate Defendants' assertions that the value of the Property will increase in excess of $1,500,000 immediately after they purchase it for $2,875,000.

In fact, Plaintiffs' research has yielded much different conclusions about a potential fair market value of the Property. For example, according to Realtor.com, a home in the same development, and nearly 1,500 square feet *larger* than the Property, is currently listed for $4,300,000. (*See* Exhibit I, an online listing for 3321 Club Drive Miramar Beach, FL). This home sits on the same golf course and has been on the market for nearly four months. (Exhibit I). Plaintiffs' searches also revealed a home just down the street from the Property that recently went under contract for just $2,995,000. (*See* Exhibit J, an online listing for 2951 Pine Valley Drive, Miramar Beach, FL). According to Realtor.com, this home is only 319 square feet smaller than the Property, underwent a "full renovation" in 2020, is located on the same golf course as the Property, and, according to the home's description and photos, includes various luxury upgrades. (*See* Exhibit J). Significantly, the description also provides that all furnishings were to be included in the sale (*See* Exhibit J). Defendants have not indicated that they have purchased any furnishings for the Property or otherwise intend to sell it furnished. Thus, it appears that other properties would support a lower sale price than Defendants suggest.

12

Finally, when Plaintiffs attempted to obtain more concrete evidence of the Property's value, such as an appraisal or proof of insurance, Defendants did not provide any such evidence. (Doc. No. 96, PageID# 5185). For these reasons, Defendants have not provided sufficient evidence of the value of the Property to support their assertion as to how much the transaction will net and contribute to the pool of frozen assets. Absent this evidence, the risk associated with allowing Defendants to spend $2,400,000 of the frozen assets is simply too great to justify the modification.

### 2. *Defendants Misrepresent the Ultimate Net Value of the Transaction.*

In addition to not providing sufficient evidence of the Property's value, Defendants misrepresent the net value of the transaction by failing to disclose to the Court all of the additional expenses Defendants would need to pay at closing under the Purchase Agreement. Paragraph 5(b) of the Purchase Agreement specifies that Buyers will be responsible for covering various "Buyer Costs" at the time of closing, including: "Sandestins new buyers fee of 0.5%," taxes and recording fees on notes and mortgages, recording fees on the deed and financing statements, loan expenses, lender's title policy, inspections, survey, flood insurance, homeowner's insurance, and hazard insurance. (Doc. No. 96-1, Page ID #: 5191).

Even more, the previously mentioned property listings in the same neighborhood suggest that the neighborhood requires payment of monthly Homeowners Association fees that Defendants would likely have to continue to pay so long as the Property sits on the market. (*See* Exhibit I; Exhibit J). Similarly, the previously mentioned "partnership agreement" contemplates Defendants paying a 2.5% Commission and all closing costs once the Property is resold to a new buyer. (Exhibit H at 1). Thus, additional costs would likely factor into the ultimate cost of the transaction and affect the net value of the transaction to the Estate. Nevertheless, it appears that none of these expenses are accounted for in Defendants' calculation of potential net profit. (Doc. No. 96, PageID

13

#: 5184 at ¶ 2). For these reasons, Defendants have not met their burden of showing how a release of $2,4000,000 of frozen assets is reasonable.[6]

## CONCLUSION

For the foregoing reasons, any benefits of Defendants' proposal are far too uncertain to justify their request to this Court to unfreeze $2,400,000 in frozen assets. The assets currently subject to the asset freeze rightfully belong to the hundreds of consumers victimized by Defendants' unlawful conduct, and Defendants have not provided sufficient evidence to support the idea that the supposed gain from this transaction outweighs the potential loss. While Plaintiffs are not opposed to unfreezing assets if doing so would create a benefit for consumers, without a clear showing that consumers would benefit from this asset freeze modification, or that the requested asset freeze modification is reasonable and necessary, Plaintiffs must oppose Defendants' proposal. For these reasons, Plaintiffs request that Defendants' Motion be denied unless and until Defendants can show with a reasonable degree of certainty that consumers would benefit from such a dramatic modification.

---

[6] Defendants also suggest that Plaintiffs should be required to post a bond in lieu of the asset freeze modification. On its face, this argument contradicts the plain language of the Tennessee Consumer Protection Act (one of the statutory bases for this Court's Preliminary Injunction Order) which states that restraining orders and injunctions "shall be issued without bond." TENN. CODE ANN. § 47-18-108(a)(5).

DATED: March 17, 2023                                    Respectfully submitted,


___/s/Samuel Keen_____                            __/s/Paul Fata_____
SAMUEL KEEN                                              PAUL FATA
(Admitted *Pro Hac Vice*)                                (Admitted *Pro Hac Vice*)
ALICIA DANIELS-HILL                                      LYNDSEY ANTOS
(Admitted *Pro Hac Vice*)                                (Admitted *Pro Hac Vice*)
J. DAVID MCDOWELL
OFFICE OF THE TENNESSEE ATTORNEY GENERAL                 OFFICE OF THE KENTUCKY ATTORNEY GENERAL
P.O. Box 20207                                           1024 Capital Center Drive, Suite 200
Nashville, Tennessee 37202                               Frankfort, Kentucky 40601

Attorneys for Plaintiff                                  Attorneys for Plaintiff
STATE OF TENNESSEE                                       COMMONWEALTH OF KENTUCKY

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated in the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. Copies will be sent to the following parties via U.S. mail, First Class:

Michael Yaghi
Troutman Pepper Hamilton Sanders LLP (Irvine)
5 Park Plaza
Suite 1400
Irvine, California 92614

Shannon Z. Petersen
Sheppard, Mullin, Richter & Hampton LLP
12275 El Camino Real
Suite 100
San Diego, California 92130


/s/ J. David McDowell

Attorney for Plaintiff
STATE OF TENNESSEE