UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TENNESSEE, *ex rel.* JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER, and COMMONWEALTH OF KENTUCKY, *ex rel.* DANIEL CAMERON, ATTORNEY GENERAL, | ) ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | 3:23-CV-00046-DCLC-JEM |
| v. | ) ) | |
| IDEAL HORIZON BENEFITS, LLC, d/b/a SOLAR TITAN USA, *et al.*, | ) ) ) ) | |
| *Defendants.* | ) | |

## MOTION TO ENFORCE LEASE AGREEMENT AND TO ALLOW SHOWINGS

Comes now, Volunteer Ventures, LLC ("Volunteer Ventures"), intervenor in this action, and files this Motion to Enforce Lease Agreement and to Allow Showings. The Court should grant this motion because doing so will:

- put an end to what is essentially a judicially sanctioned taking of Volunteer Ventures' property by Solar Titan's court-appointed Receiver, who has been occupying the premises while flouting the company's rent obligations (even as he seeks to pay himself with company money), bringing a dog onto the premises in violation of the lease agreement, not securing insurance on the property, and refusing to provide Volunteer Ventures reasonable access to its own property;

- acknowledge and protect the property interests and contract rights to which Solar Titan and Volunteer Ventures agreed;

- provide a means by which Solar Titan may find a way out of its lease obligations to Volunteer Ventures given that Solar Titan no longer conducts business at the premises and will not have assets to cover its obligations in the future; and

- allow Volunteer Ventures to find alternate beneficial use for its commercial property.

1

In support of the points above, Volunteer Ventures states as follows:

1. Solar Titan USA ("Solar Titan") signed a five-year lease agreement with Volunteer Ventures on or about February 19, 2021, for the use of a commercial building owned by Volunteer Ventures and located at 10306 Yellow Pine Lane, Knoxville, Tennessee. (The lease agreement is attached to this motion as "Exhibit 1.")

2. The lease began April 1, 2021, and is slated to run until March 31, 2026.

3. Solar Titan is obligated to pay Volunteer Ventures $8,700.00 per month for the first three years of the lease, $9,483.00 per month for years four and five, and $10,336.00 for the sixth and final year, plus $960.00 each month for triple net lease expenses.

4. Solar Titan, having ceased to do any business at the building, sought to execute a Lease Termination Agreement on February 1, 2023, but Solar Titan's check for the termination fee was returned for insufficient funds, thus leaving the lease agreement in full force and effect. (The null Lease Termination Agreement and a copy of Solar Titan's returned check are attached to this motion as "Exhibit 2" and "Exhibit 3," respectively.)

5. Since being appointed to take control of Solar Titan's assets, the Court's Receiver began occupying Volunteer Ventures' property, changed the locks to the property, has refused to provide a key to Volunteer Ventures, has not provided Volunteer Ventures with reasonable access to its property, has failed to maintain contractually required insurance on the property, and has brought a dog onto the property in violation of the lease agreement.

6. The Receiver has no agreement with Volunteer Ventures to occupy or use the property, but (presumably) has done so based on Solar Titan's lease agreement.

7. While continuing to occupy the property, the Receiver has refused to pay Volunteer Ventures any rent due under the lease agreement.

8. At the same time, the Receiver has sought to pay himself and his attorney out of Solar Titan's assets (Doc. 99), which Volunteer Ventures acknowledges is provided for in the Court's order appointing the Receiver (Doc. 21), however if the Receiver considers that occupying Volunteer Ventures' property is necessary to carry out his receivership duties, there is no basis to impose the cost of that occupation—*i.e.*, rent payments due—on Volunteer Ventures.

9. By withholding rent payments, the Receiver, *acting with the Court's sanction*, is forcing Volunteer Ventures to shoulder Solar Titan's outstanding rent, which in effect converts Volunteer Ventures into a creditor of Solar Titan's liability.

10. Solar Titan is in default under the lease and currently owes Volunteer Ventures $21,261.00. A current itemization of CAM and rent owed is attached hereto as "Exhibit 4."

11. The amount of Volunteer Ventures' coerced credit to Solar Titan owing to the Receiver's presumptuous rent-free occupancy of the property will continue to increase unless either the Receiver pays Solar Titan's promised rent and late fees or Volunteer Ventures is able to secure a replacement tenant.

12. In order to secure a replacement tenant, Volunteer Ventures must have access to its property that is the subject of the lease agreement between it and Solar Titan.

13. Volunteer Ventures, aware of the implications of this proceeding and hoping to avoid having to unnecessarily bear substantial economic loss, has sought to gain access to its property for the purpose of showing it to prospective replacement tenants.

14. Despite Volunteer Ventures' repeated efforts to cooperate with the Receiver, the Receiver did not allow Volunteer Ventures any access to the property (a violation of the lease agreement) until after Volunteer Ventures moved to intervene in this action.

15. The Receiver still has not provided a key to the locks he changed at the property.

16. Presently, the Receiver is imposing unreasonable limits on Volunteer Ventures' ability to show the property to prospective tenants, including by restricting showings to certain days of the week and by canceling a showing on the day for which it was set.

17. Due to these unreasonable limits, Volunteer Ventures has already lost two prospective replacement tenants.

18. The Receiver has indicated that he intends to continue occupying Volunteer Ventures' property until July of this year, piling up the time and money the Receiver intends to take advantage of Volunteer Ventures.

19. Volunteer Ventures suggests that it would be much more efficient, and harmless to all parties, for the Receiver to simply provide Volunteer Ventures with a key to its property and for Volunteer Ventures to give the Receiver 24-hour notice before showing the property to a prospective tenant.

20. The lease agreement also required Solar Titan to secure and maintain both liability and Rural Metro insurance on the leased premises.

21. Solar Titan, by way of the Receiver, is not in compliance with its obligation to maintain liability and Rural Metro insurance, and thereby has exposed Volunteer Ventures to substantial risk, including, for example, damage to or destruction of Volunteer Ventures' property.

22. If Solar Titan lacks assets to afford the required liability and Rural Metro insurance, that is yet another consideration supporting the relief Volunteer Ventures requests in this motion.

23. Furthermore, Volunteer Ventures has discovered that the Receiver is keeping a dog in the office in violation of the rules and regulations in the lease.

24. Volunteer Ventures has sought to rectify all of the issues described in this motion, but its efforts been met with active resistance or uncooperative inertia on the part of the Receiver.

25. The Court should not allow the Receiver to take actions that have the result of imposing the costs of Solar Titan's misdeeds on Volunteer Ventures.

26. There is no need for the Receiver to administer the winddown of Solar Titan at Volunteer Ventures' property; the Receiver can carry out his duties in a much more cost-effective manner, and without exorbitant external cost against Volunteer Ventures, at a different location.

27. Therefore, Volunteer Ventures files this motion to request that the Court provide it relief in the following forms:

   a. That the lease agreement between Solar Titan and Volunteer Ventures be enforced in full;

   b. That Solar Titan, by way of the Receiver, be ordered to make its promised lease payments to Volunteer Ventures, including all late fees as have been assessed under the terms of the lease agreement;

   c. That Solar Titan, by way of the Receiver, be ordered to secure and maintain both liability and Rural Metro insurance on the property;

   d. That Solar Titan, by way of the Receiver, be ordered to provide Volunteer Ventures with a key to the property;

   e. That Solar Titan, by way of the Receiver, be ordered to allow Volunteer Ventures access to its own property in order to show the property to prospective tenants, provided that Volunteer Ventures shall give notice of 24 hours before the day on which any showings are scheduled;

   f. That the Receiver be ordered to remove any animals being improperly kept on the premises; and

   g. That if the lease agreement between Solar Titan and Volunteer Ventures is not to be enforced in full, the Receiver is to immediately vacate the property.

Respectfully submitted this, the 17th day of March, 2023.

/s/ Benjamin C. Mullins
Benjamin C. Mullins, Esq.  (BPR No. 20924)
Michael A. C. Lee, Esq.  (BPR No. 40127)
**FRANTZ, MCCONNELL & SEYMOUR, LLP**
550 W. Main Street, Suite 500
Knoxville, TN 37902
E-mail: bmullins@fmsllp.com
(865) 546-9321
*Attorney for Volunteer Ventures*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2023, a true and correct copy of the foregoing Motion to Enforce Lease Agreement and to Allow Showings, including all attachments, was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the counsel of record, if such counsel is in the system.

/s/ Benjamin C. Mullins
Benjamin C. Mullins
**FRANTZ, McCONNELL & SEYMOUR, LLP**

S:\WDOX\Clients\4481\000033\MOTIONS\02558356.DOCX

6
Case 3:23-cv-00046-DCLC-JEM   Document 105   Filed 03/17/23   Page 6 of 20   PageID #: 5385

COMMERCIAL
LEASE AGREEMENT

THIS AGREEMENT made this __19__ day of February, 2021, by and between **Volunteer Ventures, LLC**, whose address is 405 Montbrook Lane, Knoxville, Tn 37919, hereinafter called "Lessor" and, **Solar Titan USA**, whose address is 10306 Yellow Pine Lane, Knoxville, Tn 37932 hereinafter called "Lessee". WHEREAS, Lessor is the owner of the Building, hereinafter called "Building", located at **10306 Yellow Pine Lane, Knoxville, Tn 37932.**

WHEREAS, subject to the terms, conditions and limitations contained herein, Lessor agrees to lease to Lessee certain space in such building:

WITNESSETH:

### 1. PREMISES.

Lessor does hereby lease to the Lessee the premises (hereinafter called "Premises") consisting of approximately 14,400 rentable square feet of the Building.

### 2. TERM.

Subject to and upon the conditions set forth herein, this lease shall continue in force for a term of Five (5) years commencing on the 1st day of April, 2021, and terminating on the 31st day of March, 2026. Lessee to notify Lessor six (6) months of the expiration date of the lease of its intent to renew the lease.

### DELIVERY OF POSSESSION/COMMENCEMENT DATE.

Unless otherwise provided herein, rental shall commence on the date Lessor delivers the Premises to Lessee substantially completed. "Substantially completed" shall mean full completion of Lessor's work except for minor incomplete items or deficiencies or punchlist items. Upon delivery of possession of the Premises, Lessee shall have the right to enter upon the Premises to install its furniture, fixtures and equipment. Lessor shall have no liability or responsibility for the loss of, or any damages, to any fixtures, equipment or other property of Lessee so installed or placed in the Premises.

### 4. RENTAL

Lessee shall and hereby agrees to pay to Lessor at Lessor's office or at such place as Lessor may from time to time designate in writing, rental in accordance with the following Gross Rental Schedule.

| Year | Monthly Rent |
|---|---|
| 4-1-21 – 3-31-22 | $ 8,700.00 nnn per month |
| 4-1-22 – 3-31-23 | $ 8,700.00 nnn per month |
| 4-1-23 – 3-31-24 | $ 8,700.00 nnn per month |
| 4-1-24 – 3-31-25 | $ 9,483.00 nnn per month |
| 4-1-25 – 3-31-26 | $ 9,483.00 nnn per month |
| Renewal Option: | |
| 4-1-26 – 3-31-27 | $ 9,483.00 nnn per month |
| 4-1-27 – 3-31-28 | $10,336.00 nnn per month |
| Monthly NNN Expenses | $ 960.00 per month (Additional Monthly Rent) |

Said rental to be paid without demand, on the 1st day of each month and will be late after the (5th) fifth day of each month. In the event the term of this Lease commences on a day other than the first day of a calendar month, then the base rental for the fractional month of the term hereof shall be proportionately reduced.

(A.) The rentals described in Section 4 and Section 5 shall be gross (without deduction, unless so indicated in this Lease Agreement, by way of commissions or other collection expenses) to the Lessor so that this Lease shall yield to the Lessor the full amount of rental and the full amount of installments thereof throughout the lease term or extensions thereof. Rental, and all other sums payable by Lessee hereunder shall be paid without notice or demand (except as expressly provided herein).

(B.) The burden of proof of payment of rent in case of controversy shall be upon the Lessee.

1

**EXHIBIT 1**

(C.) It is expressly agreed that the covenant by the Lessee to make payment of rent when due is independent of any and all other covenants contained in this agreement and the Lessee may not withhold rent for any alleged default by the Lessor.

(D.) If rent is not paid on the date due, Lessor may collect as a late charge ten (10%) percent of the delinquent accounts, plus interest at six (6%) per annum on the delinquent amount.

(E.) Subject to the provisions hereinafter contained with regard to damage by fire or other casualty, Lessor agrees to maintain the parking lot, common areas, and the exterior and structural portions of the Building, unless caused by the act of Lessee, its agents, employees, contractors or invitees, in which case, the same shall be repaired by and at the expense of Lessee. If Lessee fails to make such repairs promptly, Lessor, at its option, may make such repairs and Lessee shall pay Lessor on demand Lessor's actual costs in making such repairs, plus a fee of ten percent (10%) to cover Lessor's overhead.

(F.) Lessee shall be responsible for maintaining, servicing, changing filters and repairing the HVAC system, up to the maximum expense of Five Hundred Dollars ($500.00) in any Lease Year. Further, Lessee shall maintain the non-structural portions of the interior of the Premises (the electrical and plumbing) in good repair and condition and maintain, repair and replace all Lessee improvements to the Premises that are damaged by Lessee, its employees, invitees or agents.

(G.) Lessee shall pay all utility costs associated with its use of the Premises including, without limitation, electricity, water, sewer, gas, telephone, garbage collection, janitorial service, the cost of installing, servicing and maintaining any special or additional inside or outside wiring or lines, meters or sub-meters, transformers, poles, air-conditioning costs, or the cost of any other equipment necessary to increase or determine the amount or type of electricity or power available to the Premises

(H.) Lessor reserves the right to erect, use, connect to, maintain and repair pipes, ducts, conduits, cables, plumbing, vents and wires in, to and through the Premises as and to the extent that Lessor deems necessary or appropriate for the property operation and maintenance of the Building (including the servicing of other Lessees in the Building) and the right at all times to transmit water, heat, air-conditioning and electric current through such pipes, ducts, conduits, cables, plumbing, vents and wires.

## 5. SECURITY DEPOSIT

A security deposit of **$8,700.00** shall be deposited with the Lessor or his Agent for possible damages incurred by Lessee. After Lease ends, and in the event there is no damage to the Premises, Lessee will be refunded the damage deposit.

## 6. LESSOR'S RESPONSIBILITIES.

(A.) Lessor shall not be liable or responsible to Lessee for any inconvenience either to Lessee or Lessee's property or to any other person occasioned by any matter either: (1) which is beyond the control of Lessor, under the Force Majeure provisions of Section 21 below; or (2) which may arise through or in any way connected with repair of any part of the Premises, which are its responsibility, within a reasonable time following notice by Lessee to Lessor of need of same.

(B.) Lessor shall be responsible for maintaining, servicing, changing filters and repairing the HVAC system in amounts exceeding the limits contained in paragraph 4(F) and will be responsible for maintaining the non-structural portions of the interior of the premises (the electrical and plumbing) in good repair and condition to extent such costs exceed the maximum limits set forth in Section 4(F).

## 7. LESSEE'S RESPONSIBILITIES.

Lessee agrees that its employees, invitees and licensees shall:

(A.) Observe the rules and regulations set forth in this Lease Agreement and such further rules and regulations as from time to time may be put in effect by Lessor for the general safety, comfort and convenience of Lessor, occupants and tenants of the building. Any failure by Lessor to enforce any rules and regulations against either Lessee or any other tenant in the Building shall not constitute a waiver thereof. Lessee is not required to comply with any rule or regulation imposed by Lessor unless the rule or regulation applies to and is uniformly enforced against all tenants of the Building.

(B.) Give Lessor, its agents and employees, its mortgagees (including Mortgagee) and any other person or persons authorized by Lessor, including persons who may be interested in renting or buying the Premises or Building, access to the Premises at all reasonable times, without charge or diminution of rent, to enable

2

Lessor and/or the others hereinbefore mentioned to examine the same and/or to make such repairs, additions, and alterations as Lessor may deem advisable without diminution of rent or liability on the part of Lessor unless expressly provided herein.

(C.) Keep the Premises in good order and condition, make all repairs thereto made necessary by acts or omissions of Lessee or its invitees which are not Lessor's obligations pursuant to Section 6 hereof, and commit or permit to be committed no waste on the Premises or the Building whatsoever.

(D.) Upon the termination of this Lease in any manner whatsoever, remove Lessee's goods and effects and those of any other persons claiming under Lessee, and quit and deliver up the Premises to Lessor peaceably and quietly in as good order and condition as the same are now, or hereafter may be improved by Lessor or Lessee, reasonable use and wear and tear thereof and repairs which are Lessor's obligations excepted. All alterations, installations, additions, improvements and floor coverings made and installed for Lessee by Lessor at Lessor's expense shall remain Lessor's property whether movable or not, and Lessee shall be responsible for the maintenance thereof, normal wear and tear excepted, and Lessee shall not remove said property without the written consent of Lessor.

(E.) Not overload, damage or deface the Premises or do any act to bring or keep anything thereon which may make void or voidable any insurance on the Premises or the Building or which may render an increased risk and/or extra premium payable for insurance or violate any codes, ordinances or laws of any governmental body or agency.

(F.) Not make any alternations or additions to the Premises without the written approval of Lessor. At the termination of the lease, Lessee, at Lessee's expense, to remove all such changes, alterations and additions, and leave the leased space in a dust free, clean manner.

(G.) At its own expense, cause to be discharged within ten (10) days of the filing thereof, any mechanic's lien filed against the Premises or the Building for work claimed to have been done for, or materials claimed to have been furnished to Lessee.

(H.) Lessee promises not to create or allow any nuisance to exist on said Premises, and to abate any nuisance, which may arise promptly and free of expense to Lessor.

### 8. REAL ESTATE TAXES, INSURANCE PREMIUMS AND COMMON AREA MAINTENANCE EXPENSES.

Lessee shall remit to Lessor as Additional Rent each month (NNN Expenses), for the cost of Real Estate Taxes, Insurance Premiums and Common Area Maintenance Expenses as hereinafter defined, incurred by the Lessor in connection with the Building.

The term "real estate taxes" shall mean all taxes and assessments (special or otherwise) levied, accrued or assessed during Lessee's occupancy against the building (land, buildings and improvements), , and other taxes arising out of the use and/or occupancy of the Premises imposed by federal, state or local governmental authority or any other taxing authority having jurisdiction over the Building (including expenses directly incurred by Lessor in contesting the validity of, in seeking a reduction in, or seeking to prevent an increase in any such tax(es) or assessment(s), but shall exclude franchise, capital stock, estate or inheritance taxes personal in nature to Lessor.

The term "insurance premiums" shall mean the premiums charged for fire and extended coverage insurance on the improvements constructed and/or installed by the Lessor in the Building and for rent insurance thereon, together with premiums charged for liability insurance on the Common Areas in the Building, and any other reasonable insurance costs incurred in the normal course of business.

The term "common area maintenance expenses" shall mean the total cost and expense incurred in operating, maintaining, cleaning and repairing the Common Areas including, without limitation, maintenance, repair of the parking lot, line painting, lighting, traffic control, if any, sanitary control, removal of snow, the cost of personnel to implement such services and to direct parking and to police the Common Areas, music or other communication systems for the Building and a reasonable sum (not to exceed three (3%) percent of rents collected) to cover the management costs relative to the operation of the Common Areas and the Building. Lessee shall be solely responsible for expenses directly related to its particular use of the Premises and any common area maintenance expenses incurred due to its particular use which are over and above the ordinary course of business for the Building. Notwithstanding anything herein to the contrary, managements costs shall be assessed based upon the Annual Rent payable by Lessee as set forth in the Gross Rental Schedule outlined in Section 4.

3

**Estimation of Taxes, Insurance and Common Area Maintenance Charges:** Lessor may, at its option, estimate for each succeeding calendar year the Lessee's expenses enumerated in Section 4 hereof along with Lessor's management fee. Lessee shall pay with each monthly installment of rent for such succeeding calendar year, one-twelfth (1/12) of the Lessee's expense. Lessor may, at any time and from time to time, revise the amount due as Lessee's expense to cover any increase not previously factored into the annual estimate of Lessee's expense or Lessor's management fee. Upon Lessee's receipt of a revision to Lessee's expenses, Lessee shall pay Lessor, as Additional Rent, the revised amount. Within ninety (90) days after the expiration of such calendar year, the Lessor shall forward to the Lessee an itemized statement showing the Lessees expenses. Lessor's failure to provide an itemized statement within such ninety (90) day period shall in no way excuse Lessee from its obligation to pay its expenses enumerated in Section 4 hereof or constitute a waiver of Lessor's right to bill and collect such expenses from Lessee in accordance with this Section. Should the Lessee's expenses differ from the Lessee's estimated expenses, then, within thirty (30) days after the date of Lessor's itemized statement, either Lessor shall refund to Lessee any amount paid in excess of the Lessee's expenses, or Lessee shall remit to Lessor any amount by which the Lessee's expenses was deficient. Lessee's 2021 estimated expenses for Property Taxes, Building Insurance and Exterior & Lawn Maintenance, will be **$960.00** per month.

Lessor shall maintain complete records respecting real estate taxes, Common Area Maintenance Expenses and insurance premiums. Lessee shall have the right to examine such records upon reasonable prior notice and within 45 days of receiving Lessor's itemized statement of actual expenses during normal business hours at the place where Lessor normally keeps such records. Lessee shall be deemed to have accepted the statement unless Lessee takes exception in writing during that 45-day period. If Lessee takes exception, the matter to which exception is taken will be referred to an independent accountant, whose certification shall be finale and conclusive. Lessee shall pay the reasonable cost of such independent review and certification unless such review and certification determines there was an error to Lessee's detriment.

### 9. DAMAGE TO PREMISES.

In case of damage to the Premises or the Building by fire or other casualty, Lessee shall give immediate notice to Lessor who may thereupon cause the damage to be repaired with reasonable speed at the expense of Lessor subject to delays which may arise by reason of adjustment of loss under insurance policies and for delays beyond the reasonable control of Lessor, and to the extent that the Premises are rendered untenantable, the rental shall proportionately abate, provided, however, to the extent such damage resulted from or was contributed to by the act, fault or neglect of Lessee, Lessee's employees, invitees, licensees, or agents, there shall be no abatement of rent, and Lessee shall be liable to Lessor for all loss and expense suffered or incurred by Lessor as a result of such damage, with any sums due hereunder being payable on demand, and whether Lessor repairs such damage as provided above or exercises its right not to repair or rebuild and to terminate this Lease on account of such damage as provided in the next subsequent sentence. In the event the damage shall be so extensive that Lessor shall decide not to repair or rebuild, this Lease shall, at the option of Lessor, be terminated as of the date of such damage by written notice from Lessor to Lessee, given within ninety (90) days after the date of such damage, and the rent shall be adjusted to the date of such damage and Lessee shall thereupon promptly vacate the Premises.

### 10. LESSEE'S PERSONAL PROPERTY.

All property of Lessee or Lessee's invitees or guests kept or stored on the Premises shall be so kept at the risk of Lessee only and Lessor or Lessor's agents shall not be liable for any damage to property of Lessee nor for the loss of property of Lessee by theft or otherwise.

### 11. CONDEMNATION.

If the whole or substantially the whole of the Building or the Premises shall be lawfully condemned or taken in any manner for any public or quasi-public use or purpose, this Lease and the term and estate hereby granted shall forthwith cease and terminate as of the date of taking possession of such use or purpose. If less than the whole or substantially the whole of the Building or the Premises shall be so condemned or taken, then Lessor (whether or not the Premises be affected) may, at its option, terminate this Lease and the term and estate hereby granted as of the date of the taking of possession for such use or purpose by notifying Lessee in writing of such termination. Upon any such taking or condemnation and the continuing in force of this Lease as to any part of the Premises, the base rental shall be diminished by an amount representing the part of the said rent properly applicable to the portion of the Premises which may be so condemned or taken and Lessor shall, at its expense, proceed with reasonable diligence to repair, alter and restore the remaining part of the building and the Premises to substantially their former condition to the extent that the same may be feasible. Lessor shall be entitled to receive the entire award in any condemnation proceeding, including any award for the value of any unexpired term of this Lease, and Lessee shall have no claim against Lessor or against the proceeds of the condemnation.

4

## 12. ASSIGNMENT, SUBLETTING.

Lessee will not, without first obtaining the written consent of Lessor and the Mortgagee (as defined herein) in each case, sell, assign, mortgage or transfer this Lease in whole or in part, or sublet all or part of the Premises. Such consent shall, if given, be conditioned upon the acceptance by Lessee and its successor, sublessee, assignee, transferee or mortgagee of such terms as the Lessor may in its sole discretion prescribe.

## 13. CANCELLATION OPTIONS:

Lessee may cancel the remainder of the lease after the 36th month and with 6 months prior written notice, by one of the following options:

1. Lessee may notify lessor in writing with 6 months notice and payment of 33.3% of the remaining base rent as a cancelation fee. Such fee to be paid with and in addition to the last month's rent, and Lessee will be fully released from any and all obligations of the Lease.

2. Should Lessee desire to lease another building owned by Lessor then, upon agreeing to lease terms of the new building, Lessor shall fully release Lessee from the 10306 Yellow Pine Lease and shall prorate final rental payments with rent commencement on the new building.

## 14. QUIET ENJOYMENT.

Lessor covenants that upon Lessee's paying the rent and rent adjustments and observing and performing all the terms, covenants and conditions of this Lease on its part to be observed and performed, Lessee may peaceably and quietly enjoy the Premises, subject, nevertheless, to the terms and conditions of this Lease.

## 15. LESSOR ADVANCE TO CURE DEFAULT.

If Lessee shall default in the observance or performance of any term or covenant on its part to be observed or performed under or by virtue of any of the terms and provisions in any section of this Lease, Lessor without being under any obligation to do so and without thereby waiving such default, may remedy such default for the account and at the expense of Lessee, immediately and without notice in case of emergency, or in any other case only provided that Lessee shall fail to remedy such default with all reasonable dispatch under the circumstances after notice as provided in Section 19(A) hereof. If Lessor makes any expenditures or incurs any obligations for the payment of money in connection therewith including, but not limited to, attorneys' fees in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations incurred with interest at the highest legal rate and costs shall be paid to it by Lessee on demand.

## 16. NOTICE TO MORTGAGEE.

It is understood by Lessee that the proceeds of this Lease are to be assigned absolutely by Lessor to the holder of a first mortgage lien on the building and the land upon which it is erected ("Mortgagee"); therefore, in the event of any act or omission by Lessor which would give Lessee the right to terminate this Lease or to claim a partial or total eviction, Lessee will not exercise any such right until: (a) until it has notified in writing the holder of any first mortgage which at the time shall be a lien on the leased premises, if the name and address of such holder shall previously have been furnished by written notice to Lessee, of such act or omission, and (b) until a reasonable period, not exceeding thirty (30) days, for commencing the remedying of such act or omission shall have elapsed following the giving of such notice, and (c) such mortgage holder, with reasonable diligence, shall not have so commenced and continued to remedy such act or omission, or to cause the same to be remedied.

## 17. CERTIFICATE OF LESSEE.

Lessee agrees, at any time, and from time to time, upon not less than fifteen (15) days' prior notice by Lessor, to execute, acknowledge and deliver to Lessor, a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and the dates to which the rent, rent adjustments and other charges have been paid, and stating whether or not to the best knowledge of the signer of such certificate, Lessor is in default in performance of any covenant, agreement, term, provision or condition contained in this Lease and, if so, specifying each such default of which the signer may have knowledge, it being intended that any such statement delivered pursuant hereto may be relied upon by any prospective purchaser or lessee of the Premises or of the Building and the land upon which it is erected, any mortgagee or prospective mortgagee thereof (including Mortgagee), or any prospective assignee of any mortgage thereof. Lessee also agrees to execute and deliver from time to time such similar estoppel certificates as an institutional lender may require with respect to this Lease. If Lessee fails or refuses to furnish such certificate within

5

the time provided, it will be conclusively presumed that this Lease is in full force and effect in accordance with its terms and the Lessor is not in default.

### 18. SUBORDINATION.

This Lease shall be subordinate to any first mortgage now or hereafter placed upon the land and Building on which the Premises form a part and to any and all renewals, replacements and extensions of such first mortgage. Lessor and Lessee covenant and agree that this Lease shall not be subordinated to any mortgage subordinate to such first mortgage. In the event of foreclosure of any such first mortgage, exercise of power of sale thereunder or deed in lieu of foreclosure, Lessee shall attorn to the purchaser of such foreclosure, exercise of power of sale or deed in lieu of foreclosure and recognize such purchaser as the Lessor provided that such purchaser does not disturb Lessee's right to possession so long as Lessee observes and performs all of the terms and conditions of this Lease.

### 19. DEFAULT AND REMEDIES.

(A.) **Events of Default.** The occurrence of any of the events described in Subsections (1) through (9), inclusive, of this Subsection A shall be and constitute an Event of Default under this Agreement.

1. Failure by Lessee to pay on the date due in full any rental or other sum payable hereunder and does not cure for a period of 5 business days after notices thereof by lessor to lessee.

2. Default by Lessee in the observance or performance of any of the terms, covenants, agreements or conditions contained in this Lease, other than as specified in Section (1) of this Subsection A, for a period of thirty (30) days after notice thereof to Lessee by Lessor.

3. Filing by Lessee of a voluntary petition in bankruptcy or a voluntary petition or answer seeking reorganization, arrangement, readjustment of the debts of Lessee or for any other relief under the Bankruptcy Act, as amended, or for any other insolvency act, law, rule or regulation, State or Federal, now or hereafter existing, of or acquiescence in, any such petition or proceeding; the application by Lessee for, or the appointment by Lessee by consent or acquiescence of, a receiver or trustee of Lessee, or for all or a substantial part of the property of Lessee; the making by Lessee of any general assignment for the benefit of creditors of Lessee; or the inability of Lessee or the admission of Lessee of the inability thereof to pay the debts of Lessee as such mature.

4. The filing of any involuntary petition against Lessee in bankruptcy or seeking reorganization, arrangement, readjustment of the debts of Lessee or for any other relief under the Bankruptcy Act, as amended, or under any other insolvency act, law, rule or regulation, State or Federal, now or hereafter existing, or the involuntary appointment of a receiver or trustee of Lessee or for all or a substantial part of the property of Lessee; or the issuance of attachment, execution or other similar process against any substantial part of the property of Lessee and the continuation of any such for a period of ninety (90) days undismissed, unbonded, or undischarged.

5. The insolvency of Lessee.

6. The Premises or Lessee's interest therein are levied upon or attached under process against Lessee and not satisfied or dissolved within thirty (30) days after notice from Lessor to Lessee to obtain satisfaction thereof.

7. The assignment, subletting or mortgaging of the Premises without the prior written consent of Lessor.

8. Any construction, changes or alterations on the Premises without the prior written consent of Lessor.

9. The attachment of all or substantially all of the assets of the Lessee.

(B.) **Remedies.** Whenever any Event of Default shall have happened and be subsisting, Lessor may, to the extent permitted by law, take any one or more of the remedial steps described in Section (1) through (4), inclusive, of this Subsection B, subject, however, to the rights, title and interest of any mortgagee.

1. Lessor may at its option, declare all installments of basic rent as adjusted at the time of default payable under Section 4 of this Lease for the remainder of the lease term to be

6

2.  Lessor may re-enter and take possession of the Premises and improvements without terminating this Lease, and sublease in their entirety the same for the account of Lessee, holding Lessee liable for the difference in the rent and other amounts actually paid by such sublessee in such subleasing and the rents and other amounts payable by Lessee hereunder.

3.  Lessor may terminate the lease term, exclude Lessee from possession of the Premises and improvements and will use Lessor's best efforts to lease the same to another for the account of the Lessee, holding Lessee liable for the rent and other amounts payable by Lessee hereunder.

4.  Lessor may take whatever action at law or in equity may appear necessary or desirable to collect the rent and other amounts then due and thereafter to become due or to enforce performance and observance of any obligation, agreement or covenant of Lessee under this Agreement, and in connection with such actions to recover any or all damages to Lessor for Lessee's violation or breach of this Lease.

**Application of Funds.** If any statute or rule of law shall validly limit the amount of any liquidated final damages described in Subsection B of this Section 19 to less than the amount agreed upon, Lessor shall be entitled to the maximum amount allowable under such statute or rule of law. In the event Lessor elects to proceed under the authority of Subsection B(2), or B(4) of Subsection B of this Section 19, Lessor shall make reasonable effort to collect rentals from sublessees or new lessees of the entire Premises or portions thereof reserving, however, within Lessor's own discretion, the right to determine the method of collection and the extent to which enforcement of collection of delinquent rents shall be prosecuted, and Lessor shall not be accountable for money other than actually received by Lessor from the Premises and Lessor shall not be liable for failure to collect rents. All rents, and all other income derived from operation of the improvements by Lessor, to the extent such are not paid and applied by any sublessee or new lessee of the Premises, shall be applied, first, to the payment and accrual of taxes; second, to the payment of all sums of money due and owing from time to time under any mortgage and any other permitted encumbrance upon the Premises superior to the interests of Lessor; third, to the cost of operating the Premises and improvements; fourth, to the cost of administration and collection of rents by Lessor; and fifth, to the payment of rent due and owing Lessor hereunder. Lessee shall be liable to Lessor for the deficiency, if any between Lessee's rent hereunder, and that applied by Lessor to said rents in the manner hereby authorized. No action taken pursuant to Subsection B of this Section 19 (including repossession of the Premises or termination of the lease term) shall relieve Lessee from Lessee's obligations pursuant to Section 4 of this Lease and Section B(1) of this Section 19, all of which shall survive any such action, and Lessor may take whatever action at law or in equity as may appear necessary and desirable to collect the rent and other amounts then due and thereafter to become due and/or to enforce the performance and observance of any obligation, agreement or covenant of Lessee hereunder. Lessor shall not collect rent from two (2) Lessees for the same term as defined herein.

(A.) **No Remedy Exclusive.** No remedy herein conferred upon or reserved to either party is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative, and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.

(B.) **Agreement to Pay Attorney's Fees and Expenses.** In the event Lessee should default under any of the provisions of this Agreement and Lessor should employ attorneys or incur other expenses for the collection of rent or the enforcement or performance or observance of any obligation or agreement on the part of Lessee herein contained, Lessee agrees that it will on demand therefor pay to Lessor the reasonable fee of such attorneys and such other expenses so incurred by Lessor.

(C.) **Lessor Default.** In the event of default by Lessor under this Lease, Lessee may give Lessor written notice specifying such Lessor default. Lessor shall have thirty (30) days in which to cure any such Lessor Default; provided, however, that if the nature of the Lessor Default is such that more than thirty (30) days are required for its cure, then Lessor shall not be in default if Lessor commences to cure within said thirty (30) days and thereafter diligently prosecutes the same to completion. In the event that Lessor shall remain in default following its said right to cure, then Lessee may cure such Lessor Default on behalf of Lessor by doing such necessary work and/or making the necessary payments, and billing Lessor for the reasonable cost thereof, which Lessor agrees to pay to Lessee within thirty (30) days of receipt of Lessee's demand therefore and reasonable evidence of the cost of the same. Notwithstanding the foregoing, under no circumstances whatsoever may Lessee withhold, deduct or set off any amounts claimed to be owing

7

hereunder by Lessor from any rent or any other charges due and payable to Lessor under this Lease.

## 20. DISPUTES.

If any dispute shall arise as to any amount of money to be paid by one party to the other party under this Lease, the party against whom the obligation to pay money is asserted shall have the right to make payment "under protest", and such payment shall not be regarded as a voluntary payment, and there shall survive the right on the part of said party to institute suit for the recovery of such sum. If it shall be adjudged that there is no legal obligation on the part of the said party to pay such sum or any part thereof, said party shall be entitled to recover such sum(s), or so much thereof as it was not legally required to pay under this Lease, together at the rate of ten percent (10%) per annum.

## 21. FORCE MAJEURE.

For the purposes of any of the provisions of this Agreement, and during the term or any extension hereof, neither Lessor nor Lessee, as the case may be, nor any successor in interest, shall be considered in breach of, or default in, the obligations thereof with respect to this Lease (except for the payment of rent on Lessee's part to be performed) in the event of enforced delay in the performance of or inability to perform such obligations due to unforeseeable causes beyond the control and without the fault of negligence thereof, including, but not restricted to, acts of God, acts of the public enemy, acts of the Federal, State or local Government, acts of the other party, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of the contractor or subcontractors due to such causes; it being the purpose and intent of this Section 21 that in the event of the occurrences of any such enforced delay, the time or times for performance of the obligations of Lessor or Lessee, as the case may be, with respect to this Lease shall be extended for the period of the enforced delay; provided, that the party seeking the benefit of the provisions of this Section 21 shall be obligated to remedy a failure to perform caused by force majeure in a diligent manner in order to avail themselves of this form of relief.

## 22. ENVIRONMENTAL

Lessor represents to the best of his knowledge that the premises do not contain hazardous materials and indemnifies Lessee against claims or damage arising out of pre-existing environmental contamination of the premises. For purposes of this Lease, "Hazardous Material" means and includes any hazardous, toxic or dangerous waste, substance or material defined as such in (or for purposes of) the Comprehensive Environmental Response, Compensation and Liability Act, any so-called "Superfund" or "Superlien" law, or any other federal, state of local statute, law, ordinance, code, rule, regulation, order or decree regulating or relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance, or material, as now or any time hereafter in effect.

The Lessee agrees that upon termination of the Lease Agreement or any extension, thereof, that he will return the premises to the Lessor free of any "Hazardous Materials" and the Lessee will indemnify the Lessor against claims or damages arising from the Lessee's use of the premises.

## 23. PURPOSE, USE, ALTERNATIONS, ETC.

(A.) The Premises are to be used for the purpose of a <u>Solar Company</u>, and related functions as permitted by the zoning per Knox County, Tennessee, and all other agencies with regulatory authority regarding the property. Use for any other purpose shall constitute a breach of this agreement.

(B.) The Lessee further covenants that the Premises shall during the term of this lense be used only for lawful and moral purposes, and no part of the Premises shall be used in any manner whatsoever in violation of the laws of the United States, State of Tennessee, or the ordinances and laws of the County of Knox.

(C.) Lessee agrees to maintain a going business on the Premises throughout the full term of the lease or any extension thereof.

(D.) Lessee agrees not to display any signs or any other advertising material either outside the Premises, or which may be visible from outside the Premises without the written consent of Lessor.

## 24. INSURANCE AND DAMAGES.

(A.) Lessee shall obtain and maintain appropriate amounts of insurance on leasehold improvements and contents owned or under the responsibility of Lessee, such insurance shall be for the joint benefit of the Lessor and Lessee, shall name Lessor as an additional insured, and shall provide that Lessor shall be given at least ten (10) days advance written notice in the event of cancellation. Lessee will furnish Lessor proof

8

of such insurance.

(B.) Lessee agrees to carry at its own expense both public liability and property damage insurance with minimum limits for the commercial liability insurance for personal injury (including death) for each person of $500,000 and of $1,000,000 for each occurrence, and or property damage insurance a single limit of not less than $1,000,000 for each occurrence; such insurance shall be for the joint benefit of the Lessor and the Lessee, shall name Lessor as an additional insured; and shall provide that Lessor shall be given at least ten (10) days advance written notice in the event of cancellation. Lessee will furnish Lessor proof of such insurance. Lessee shall be permitted to self insure for all or any of the minimum requirements so indicated in this Lease Agreement.

(C.) Irrespective of said insurance, the Lessee shall indemnify and save the Lessor free and harmless from any and all claims, actions, damages, expenses (including without limitation reasonable attorneys' fees) and liability whatsoever arising out of or in any way connected with injury (including death) or property damage to any person, firm, corporation or other entity, including the Lessor, arising directly or indirectly from Lessee's negligence or willful misconduct in the use or occupancy of said Premises or any part thereof by Lessee, its agents sub-lessees, assigns, contractors, employees or invitees. Lessee agrees that it will not cause or permit any use or vacation of the premises which will cause the insurance costs of any other party, including Lessor and other lessees adjacent to the Premises, to increase, or said insurance will be invalidated. Should such occur, Lessor is empowered to obtain such insurance on behalf of Lessee and charge its costs to Lessee.

(D.) Each of Lessor and Lessee hereby release the other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property caused by fire or any of the extended coverage or supplementary contract casualties even if such fire or casualty shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible; provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage covered by releasor's property insurance and occurring during such times as the releasor's said insurance policy shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair such policy or prejudice the right of the releasor to recover thereunder. Each of Lessor and Lessee agrees that it will request its insurance carriers to include in its policies such a clause or endorsement.

(E.) Lessee agrees not to use the Premises in any fashion, which will endanger the Premises or cause the likelihood of any casualty occurring to be unusually high.

## 25. TAXES.

The Lessee shall reimburse Lessor for real estate taxes as detailed in Section 8. Lessee's base year for determining real estate property taxes will be 2021.

## 26. TRANSFER OF LESSOR'S RIGHTS.

Lessor shall have the right to transfer and assign, in whole or in part, all and every feature of its rights and obligations hereunder and in the building and property referred to herein. Such transfers or assignments may be made either to a corporation, partnership, trust company, individual or group of individuals, and, howsoever made, are to be in all things respected and recognized by Lessee and upon assumption of Lessor's obligations hereunder by said transferees or assignee, the Lessor immediately prior to said transfer or assignment shall be relieved of all further liabilities and obligations hereunder.

## 27. AMENDMENT TO LEASES.

This agreement may not be altered, changed or amended, except by an instrument in writing, signed by both parties hereto.

## 28. NOTICES.

All notices or communications which this instrument requires or permits to be given shall be in writing and shall be mailed or delivered to the respective addresses at the addresses set forth below, and to such other address as may be designated in writing by either party. When notice is by mail, it shall be sent certified with postage prepaid and shall be complete upon its deposit in the U.S. mail.

9

To Lessor as follows:

Volunteer Ventures, LLC
405 Montbrook Lane
Knoxville, Tn 37919

To Lessee as follows:

Solar Titan USA
10306 Yellow Pine Lane
Knoxville, Tn 37932

29. MISCELLANEOUS.

This Lease contains the entire contract between the parties and may be amended only by written agreement signed by Lessor and Lessee. This Lease shall inure to the benefit of and shall be binding upon Lessor, Lessee and their respective heirs, legatees, legal representatives, successors and assigns, subject to all the terms, conditions and contingencies set forth. The laws of the State of Tennessee shall govern this Lease. If any provision of this Lease were invalid or unenforceable by any court of competent jurisdiction, such holding shall not operate to invalidate any other provision hereof.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals in triplicate the day and year first above written.

LESSOR: VOLUNTEER VENTURES, LLC

By: _____

Date: 2/19/21

LESSEE: SOLAR TITAN USA

By: _____

Date: 02/19/221

## GUARANTY

IN CONSIDERATION of the execution and delivery of the attached lease by and between VOLUNTEER VENTURES, LLC, as Lessor, and SOLAR TITAN USA, as Lessee, the undersigned, Sarah Kirkland ("Guarantor"), hereby personally guarantees to Lessor, its successors and assigns, the payment of the Rent (including additional rent and all other charges) reserved in the within Lease and the performance by Lessee of its covenants and agreements therein contained. Guarantor hereby expressly waives notice of all defaults, and hereby waives all surety ship defenses. Guarantor agrees that the waiver of any rights by Lessor against Lessee arising out of defaults by Lessee, shall not in any way modify or release the obligations of Guarantor.

This Guaranty, the Lease and all amendments and modifications thereto, if any, except as set forth in the Lease or in any such amendment or modification, shall be binding upon the Guarantor. This Guaranty shall inure to the benefit of the Lessor, and its heirs, legal representatives, successors and assigns; and shall be binding on the Guarantor and his heirs, successors and assigns.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed this the 19 day of February, 2021.

_____
Sarah Kirkland, Guarantor

10

## EXHIBIT A

### RULES AND REGULATIONS

1. No signs, placards, pictures, advertisements, names or notices shall be displayed on any part of the outside or inside of the premises without the written consent of Lessor.

2. Lessee shall not operate any machinery or apparatus other than usual small business machines. A business machine of any unusual size, weight, energy requirements, noise, or climate control shall not be used without the prior written consent of Lessor.

3. No article deemed hazardous because of flammability and no explosives shall be brought into the building.

4. No additional locks shall be placed upon doors or premises without written consent of Lessor; nor shall Lessee change locks without prior written consent of Lessor. If Lessee changes locks, Lessee shall provide new keys to Lessor immediately. Upon termination of Lease, the Lessee shall surrender to Lessor all keys to premises.

5. Window coverings other than those that may be provided by Lessor, either inside or outside may only be installed with Lessor's written consent.

6. Lessee shall not attempt or cause to be attempted any additional plumbing or electrical work including telephone wiring without the prior written consent of Lessor.

7. The sidewalks, entrances, lobbies, corridors and stairways of the project shall not be obstructed or used for storage or for any purpose other than ingress and egress.

8. Lessee shall not make or permit any noise or odor that is objectionable to other occupants or tenants of this or any adjoining premises to emanate from premises and shall not create or maintain a nuisance thereon. Lessee shall not disturb, solicit or canvass any occupant of building and shall not do any act tending to injure the reputation of the building.

9. Lessee agrees that all personal property brought into the building and/or premises shall be at the risk of the Lessee. Lessor shall not be liable for theft thereof or any other loss of or damages thereto occasioned from any act of co-tenants, or other occupants of the building or any other person.

10. Under no circumstance is Lessee to keep any pet on the Premises (domestic or otherwise). If any animal is discovered to be on the premises, Lessor reserves the right to cancel said Lease Agreement at any time without further notice. Lessee will be considered to be in default of the Lease Agreement and Lessor will take the necessary legal action to proceed with eviction, unless such pet is required for handicap assistance.

11. Lessor reserves the right to make such other and further reasonable rules and regulations as in its judgment may from time to time be necessary for the safety, care and cleanliness of the building and premises, and for the preservation of good order therein, and any such other or further rules and regulations shall be binding upon the parties.

11

TERMINATION OF LEASE AGREEMENT
10306 YELLOW PINE LANE
KNOXVILLE, TN 37932
February 1, 2023

This Lease Termination Agreement is entered into this the 1st day of February, 2023, between Volunteer Ventures, LLC, Lessor, and Solar Titan, USA, Lessee, for the property located at 10306 Yellow Pine Lane, Knoxville, Tn 37932, Lease dated February 19, 2021.

The Lessee, Sarah Kirkland with Solar Titan, USA, wishes to terminate the Lease at 10306 Yellow Pine Lane, Knoxville, Tn 37932. All monies paid thus far to Lessor by Lessee to be applied to the termination fee. Property to be left in broom clean order. Lessee agrees that Lessor can market and show the property.

VOLUNTEER VENTURES, LLC

By: _____
Date: 2-7-23

SOLAR TITAN, USA

By: _____
Date: 2-7-23

**EXHIBIT 2**

## Home Federal Bank
c/o Customer Service
515 Market St
Knoxville, TN 37902

Feb 03, 2023

THE FOLLOWING DEPOSITED ITEM(S) WAS RETURNED AND CHARGED TO YOUR ACCOUNT FOR
THE REASON INDICATED. PLEASE DIRECT ANY INQUIRIES TO OUR CUSTOMER SERVICE
DEPARTMENT.  BE SURE TO DEDUCT ALL AMOUNTS LISTED FROM YOUR CHECK REGISTER.

| MAKER | AMOUNT | RETURN REASON |
|---|---|---|
| SOLAR TITAN USA | 9,660.00 | Insufficient Funds |
| TOTAL: | 9,660.00 | |
| TOTAL FEE CHARGED: | 9.00 | |

| VOLUNTEER VENTURES LLC | DEMAND DEPOSIT ACCOUNT | 866327 |
|---|---|---|
| 405 MONTBROOK LN | OFFICER | 100 |
| KNOXVILLE TN 37919 | | |



\*264271390\*
02/03/2023
5250003542928

This is a LEGAL COPY of your check. You can use it the same way you would use the original check.

RETURN REASON (A)
NOT SUFFICIENT FUNDS

**Home Federal Bank of TN**

**EXHIBIT 3**

Solar Titans USA
10306 Yellow Pine Lane
Knoxville, TN

$ 9,660.00 – February 2023 Rent & CAM
$        9.00 – Bank fee charged for NSF
$    966.00 – February 2023 late charge
**$10,635.00  - Total due for February 2023**

$ 9,660.00 – March 2023 Rent & CAM
$    966.00 – March 2023 late charge
**$10,626.00  - Total due for March 2023**

**Total due for February and March 2023:  $21,261.00**

**EXHIBIT 4**