UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| STATE OF TENNESSEE, *ex rel.* JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER, and COMMONWEALTH OF KENTUCKY, *ex rel.* DANIEL CAMERON, ATTORNEY GENERAL, <br><br> Plaintiffs, <br><br> v. <br><br> IDEAL HORIZON BENEFITS, LLC d/b/a SOLAR TITAN USA, *et al.*, <br><br> Defendants. | 3:23-CV-00046-DCLC-JEM |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the pending motions of Defendants Sarah Kirkland, Michael Atnip, and Craig Kelley (collectively, "the Individual Defendants") to modify the asset freeze portion of the Preliminary Injunction [Doc. 78]. Each of the pending motions are fully briefed and ripe for review. For the reasons stated herein, Kirkland's Motion to Modify Preliminary Injunction Asset Freeze [Doc. 95] is **GRANTED IN PART AND DENIED IN PART**, Atnip and Kelley's Motion to Modify Order and Unfreeze Personal Assets to Avoid Dissipation of Assets, or Alternatively, Require Plaintiffs to Provide Security [Doc. 96] is **DENIED**, and Atnip and Kelley's Emergency Motion to Modify Order and Release Assets to Pay Living and Legal Expenses [Doc. 101] is **DENIED**.

I.     BACKGROUND

Plaintiffs State of Tennessee and Commonwealth of Kentucky by and through their respective Attorneys General initiated this civil enforcement action against Ideal Horizon Benefits,

1

LLC d/b/a Solar Titan USA ("Solar Titan") and the Individual Defendants alleging violations of various federal and state consumer protection laws. On February 7, 2023, the Court issued a Temporary Restraining Order ("TRO") temporarily enjoining the Defendants' allegedly unfair and deceptive acts and practices and granting other ancillary relief, including a freeze of Solar Titan's and the Individual Defendants' assets [Doc. 21]. On February 28, 2023, the Court converted the TRO into a Preliminary Injunction [Doc. 78] and continued the asset freeze, with certain modifications to the freeze of Kirkland's assets consistent with the Agreed Order approved and entered by the Court on February 27, 2023 [Doc. 75].

In relevant part, the Preliminary Injunction prohibits the Individual Defendants from "[t]ransferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of" all assets existing at the time of issuance of the Order or, under certain limited circumstances, assets obtained after issuance of the Order [Doc. 78, § II(A)]. However, the Court excluded certain accounts owned by Kirkland, in whole or in part, in accordance with the Agreed Order [Doc. 75][1] and directed the court-appointed receiver, Richard Ray ("the Receiver") to distribute $3,500 per month to Atnip and Kelley for reasonable housing and other living expenses [Doc. 78, § X(S)(1)].[2] The Court expressly permitted Atnip and Kelley to move to adjust this amount for good cause shown [*Id*. at § X(T)].

---

[1] These accounts include "(1) Defendant Kirkland's ORNL FCU Account ending in 8490 (2) Defendant Kirkland's US Bank Account ending in 9484 (3) Defendant Kirkland's First Horizon Bank Account ending in 7814 (4) Defendant Kirkland's US Bank Account ending in 4611" [Doc. 78, § II(F); *See* Doc. 75, pg. 2].

[2] Kirkland agreed to forego the monthly disbursement of $3,500 in exchange for monthly disbursements from a portion of her personal assets, which were unfrozen and deposited into an IOLTA account held for her benefit by her counsel [*See* Doc. 75].

2

The Individual Defendants now seek to modify the asset freeze portion of the Preliminary Injunction. In particular, Kirkland requests two corrective modifications regarding the effective date of the asset freeze and the list of bank accounts which are exempt from the freeze, along with a modification allowing her to sell a piece of residential property she currently owns [Doc. 95, pgs. 1–2]. Similarly, Atnip and Kelley move to modify the asset freeze to allow them to purchase a piece of residential property [Doc. 96] and to unfreeze their cash and liquid investments to pay legal fees and expenses and living and investment property expenses [Doc. 101]. With the exception of the corrective modifications requested by Kirkland, Plaintiffs oppose the Individual Defendants' requests [Docs. 103, 119, 125].

## II.     LEGAL STANDARD

"The Court has inherent power to modify its own injunctions." *Toledo Area AFL-CIO Council v. Pizza*, 907 F. Supp. 263, 265 (N.D. Ohio 1995). In doing so, "the Court exercises the same discretion it exercised in granting the injunction in the first place." *Id*. Moreover, "[a]s a corollary to the rules of law permitting a district court to grant a preliminary asset freeze, a district court may release or lower the amount of assets frozen." *Fed. Trade Comm'n v. Washington Data Res., Inc.*, No. 8:09-CV-2309, 2010 WL 11507704, at *3 (M.D. Fla. Jan. 15, 2010); *see Fed. Trade Comm'n v. Fed. Check Processing, Inc.*, No. 14-CV-122S, 2016 WL 10988581, at *1 (W.D.N.Y. Mar. 7, 2016) ("Just as this Court has the authority to freeze assets in a civil enforcement action, it also has the discretion to 'unfreeze those assets when equity requires.'"). Yet, "[a]ny determination to modify the asset freeze . . . must account for the fact that this ancillary relief was imposed to ensure this Court's ability to fashion an appropriate remedy, such as restitution to [consumers], in the event the [Plaintiffs are] successful in [their] prosecution of this action." *Fed. Check Processing, Inc.*, 2016 WL 10988581, at *1.

### III. ANALYSIS

#### A. Corrective Modifications

Kirkland seeks to modify Section II of the Preliminary Injunction (1) to clarify that the assets affected by the freeze include only those assets in existence at the time of the issuance of the TRO, rather than the current language, which states "as of the time of issuance of this Order" [Doc. 78, § II(E)] and (2) to add two additional bank accounts to the list of exempted assets in Section II(F)—one of which the parties inadvertently omitted from the proposed Agreed Order and the other which Kirkland opened solely to deposit the $10,000 one-time withdrawal authorized by the Court prior to entry of the Preliminary Injunction [Doc. 63]. Considering the lack of opposition by Plaintiffs and the reasonableness of Kirkland's requested modifications, her motion [Doc. 95] is well-taken and **GRANTED** to the extent she seeks to clarify the effective date of the asset freeze and the accounts which are exempt from the asset freeze. A separate Amended Preliminary Injunction reflecting the requested modifications shall enter.

#### B. Sale of Kirkland's Residential Property

In addition to the foregoing, Kirkland seeks to modify the asset freeze to allow her to sell a piece of residential property located on Cedar Croft Circle in Knoxville, Tennessee ("the Cedar Croft home"), which she purchased in 2021 for the benefit of her stepson [Doc. 107, ¶¶ 9, 11]. Specifically, Kirkland asserts her stepson agreed to make the monthly mortgage payments, put "sweat equity" into the property, and eventually purchase the home when he was able [*Id*. at ¶ 12]. Kirkland asserts her stepson fulfilled his end of the bargain and received approval for a loan to purchase the Cedar Croft home [*Id*. at ¶¶ 13, 14]. Thereafter, on November 9, 2022, the two entered into a purchase and sale agreement, under which the stepson agreed to purchase the Cedar Croft home for $317,000 and Kirkland agreed to gift $47,550 of equity and pay $9,450 in closing

4

costs [*Id*. at ¶ 15].  While the closing date for the sale was initially set for November 30, 2022, it was delayed and is now tentatively set for April 28, 2023 [*Id*. at ¶¶ 16, 17].  Due to the asset freeze, however, Kirkland cannot complete the sale and requests that the Court modify the asset freeze to allow the sale of the property to go through [Doc. 95, pg. 7].

Plaintiffs oppose Kirkland's request and assert that she has failed to show a basis in equity for the transfer of the Cedar Croft home to her stepson [Doc. 119, pg. 5].[3]  The home, Plaintiffs argue, "should be preserved for the consumers" rather than dissipated [*Id*.].  Plaintiffs assert the proposed sale would result in dissipation due, in part, to the equity gift of $47,550 [*Id*.].  Additionally, Plaintiffs note that Kirkland has failed to produce any evidence that $317,000 is fair market value for the home [*Id*. at pg. 4].  Kirkland contends she is not seeking to dissipate an asset, "but rather preserve the value of that asset while at the same time allowing her to transfer title in the property as she contracted to do in 2021" [Doc. 133, pg. 3].  Moreover, she asserts the fair market value is $250,000—the initial purchase price—because "[t]he contract that [she] is asking the Court to allow her to honor is that regarding the 2021 transaction, the transaction she entered into with her stepson when she purchased the property for his benefit and agreed to transfer the title to him after he was able to obtain the proper financing" [*Id*.].

---

[3]  Plaintiffs also assert Kirkland has failed to show that the transfer is "reasonable and necessary" [Doc. 119, pg. 4].  In advancing this argument and similar arguments in response to Atnip and Kelley's motions, Plaintiffs rely on a case in the Middle District of Tennessee in which the defendant was required to show that his request to unfreeze certain assets was "for 'reasonable and necessary expenses.'" *Fed. Trade Comm'n v. ACRO Servs. LLC*, No. 3:22-CV-00895, 2023 WL 351202, at *4 (M.D. Tenn. Jan. 20, 2023).  The injunction in that specific case, however, expressly permitted the individual defendants "to request the release of frozen funds for 'reasonable and necessary expenses, including reasonable amounts to pay for services of counsel.'" *Id*. at *3.  The injunction in this action does not include such language.  Therefore, the Court declines to apply the "reasonable and necessary" standard to the Individual Defendants' requests.

5

To the extent Kirkland and her stepson memorialized the terms of their arrangement when she purchased the Cedar Croft home in 2021, she has not provided evidence of any such agreement for the Court's consideration. Thus, Kirkland's arguments based on an apparent legal obligation to honor any binding agreement are immaterial at this time. Rather, the Court's sole concern in determining whether to modify the asset freeze to permit the sale of the Cedar Croft home is whether the sale would leave sufficient assets for consumer redress in the event Plaintiffs prevail in this action. Upon review of the terms of the proposed sale, the available assets would be reduced by, at least, $57,000, and possibly more depending on the fair market value of the home.[4] Although Kirkland asserts that she is merely seeking to recoup the money she paid out of pocket when she initially purchased the Cedar Croft home, whether she would personally suffer a loss as a result of the sale is irrelevant to the Court's determination of whether to modify the asset freeze. The focus, rather, is on availability of assets for prospective consumer redress. Based on the record currently before the Court, Kirkland has failed to show that the sale would leave sufficient funds for that purpose. Accordingly, her motion [Doc. 95] is **DENIED** as it relates to modifying the asset freeze to permit the proposed sale of the Cedar Croft home.

### C. Purchase of Residential Property

Atnip and Kelley seek a modification similar to that requested by Kirkland, but at a much greater magnitude. That is, they request the release of $2,400,000 from their frozen assets to purchase a home in Miramar Beach, Florida, which they intend to immediately list for sale [Doc. 96, pg. 3]. Because neither Atnip nor Kelley dispute that all funds received from the sale of the property would be subject to the Preliminary Injunction and asset freeze, they argue the release of

---

[4] $57,000 includes the gift of equity and credit for closing costs, as provided in the tentative settlement statement [Doc. 107-3].

the requested funds would result in an increase of assets available for consumer redress in the event Plaintiffs prevail on their claims in this action [*Id*.]. Plaintiffs represent that they are not opposed to unfreezing assets if doing so would create a benefit for consumers [Doc. 103, pg. 2]. Nonetheless, they take the position that Atnip and Kelley have failed to show that the supposed gain from this purchase and sale would outweigh the potential for loss [*Id*.].

By way of background, Atnip contracted with J and K Development Partners, LLC ("J&K" or "Seller") on April 11, 2021 for the construction and purchase of a home at 2924 Sand Pine Road in Miramar Beach, Florida ("the Sand Pine home") [Doc. 96-1]. Pursuant to the contract and the addendums thereto, Atnip agreed to purchase the Sand Pine home for $2,875,000 [Doc. 96-2], which includes $100,000 in earnest money deposits and a total of $765,000 in escrow payments, each due at certain milestones during the construction process [Doc. 96-3]. Atnip asserts that all terms of the contract have been completed except the final milestone payment of $280,000, which was presumably due no later than March 27, 2023, [*See* Doc. 108-1], and, of course, closing and satisfaction of the balance of the purchase price—$2,120,00. These amounts make up the $2,400,000 which Atnip and Kelley request to be released from their frozen funds.[5]

As explained previously with respect to Kirkland's request, the Court's primary focus in determining whether to modify the asset freeze to permit Atnip and Kelly to purchase the Sand Pine home is whether the purchase would thwart the goal of the asset freeze—i.e., maintaining the status quo for prospective consumer redress. In this situation, as Atnip and Kelley suggest, the purchase and subsequent sale of the Sand Pine home could actually increase the assets available

---

[5]  In their reply to Plaintiffs' response in opposition, Atnip and Kelley advise that J&K is now claiming a final upgrade payment of $182,935.115 in addition to the final milestone payment and purchase price, bringing the total funds necessary to close on the Sand Pine home to over $2.5 million [Doc. 108].

7

to consumers. Based on the Seller's proposed listing price and recent sale prices of four purportedly comparable homes near the Sand Pine home, Atnip and Kelley assert that the property would likely sell for at least $4,500,000, thereby "enhanc[ing] the current value of the assets by over $2,100,000" [Doc. 96, pgs. 4–5]. On the other hand, as Plaintiffs recognize, the purchase and sale could result in a significant loss to the tune of millions. Plaintiffs assert that their own research of the market revealed that the fair market value for the Sand Pine home is likely far less than $4,500,000 and that homes in the same area have sat on the market for months at a time [Doc. 103, pg. 4]. Thus, they contend the risks associated with unfreezing approximately $2,400,000 in assets is "too great to justify" [*Id*. at pg. 13].

Upon consideration of the foregoing, the Court finds that the requested modification of the asset freeze releasing $2,400,000 is not appropriate. Although Atnip and Kelley are adamant that they can "flip" the Sand Pine home for a substantial profit, which would then be added to the assets available for consumer redress, they do not provide sufficient evidence to support this assertion. Specifically, they have failed to offer reliable support for the claim that the home will actually sell at or above the list price of $4,500,000 and their net gain calculations do not account for various expenses associated with the sale.[6] Atnip and Kelley also fail to show that, in the event the Sand Pine home transaction resulted in a loss, there would be sufficient assets remaining for prospective consumer redress.

---

[6] Plaintiffs additionally contend that Atnip and Kelley have misrepresented the ultimate net value of the transaction because they failed to disclose all of the additional expenses they would have to pay at closing [Doc. 103, pg. 13]. These expenses include a new buyers fee of 0.5%, taxes and recording fees on notes and mortgages, recording fees on the deed and financing statements, loan expenses, lender's title policy, inspections, survey, flood insurance, homeowner's insurance, and hazard insurance [Doc. 96-1, pg. 2]. Plaintiffs further suggest that Atnip and Kelley have failed to account for the monthly HOA fees that would be due while the property sits on the market, a 2.5% commission, and closing costs for the sale to a new buyer [Doc. 103-8, pg. 2].

As an alternative to their request for a modification of the asset freeze, Atnip and Kelley assert that the Court must require Plaintiffs to post security, pursuant to Fed.R.Civ.P. 65(c), in an amount "not less than $2,500,000" [Doc. 96, pg. 7]. However, as Plaintiffs point out, they are not required to post a bond in this action. *See* Tenn. Code Ann. § 47-18-108 ("orders and injunctions to restrain and prevent violations of [the Tennessee Consumer Protection Act] . . . shall be issued without bond."); 15 U.S.C. § 53(b) (In suits brought to enjoin acts or practices which violate the Federal Trade Commission Act, "a temporary restraining order or a preliminary injunction may be granted without bond"). Thus, Atnip and Kelley's alternative request is unfounded.

Finally, Atnip and Kelley request, in the event the Court does not authorize the release of funds to close on the sale of the Sand Pine home, that the Court enter an order confirming that their interest in the Sand Pine home is subject to the Preliminary Injunction and asset freeze such that it may not be sold, transferred, encumbered, or otherwise disposed of absent further order of the Court [Doc. 108, pg. 4]. Based on the information provided in support of the instant motion, however, the Court is not in a position to declare what, if any, interest Atnip and Kelley have in the Sand Pine home. To the extent they do have an interest in the property, the Preliminary Injunction language speaks for itself such that an additional Court order is unnecessary. Accordingly, for the foregoing reasons, Atnip and Kelley's motion [Doc. 96] is **DENIED**.

### D. Reasonable Living Expenses and Legal Fees

Atnip and Kelley also request a modification of the asset freeze to pay their living expenses and legal fees [Doc. 101]. Specifically, they request that all of their cash and liquid investments be released from the asset freeze or, in the alternative, that $375,000 of their cash assets be released to be deposited into an IOLTA for payment of legal fees and $15,000 per month for living and investment property expenses, including $30,000 for the months of February and March [*Id*. at pg.

9

11].[7] Plaintiffs oppose Atnip and Kelley's requests, arguing that they have provided no specific justification for a blanket unfreezing of their cash assets and have failed to support their alternative request for attorneys' fees and living expenses [Doc. 125].

The Court has discretion to grant or deny a request to unfreeze assets for living expenses or attorneys' fees. *F.T.C. v. IAB Mktg. Assocs.*, LP, 972 F. Supp. 2d 1307, 1313 (S.D. Fla. 2013). With respect to the request for attorneys' fees, the Court recognizes the need for representation and the hardships presented by being unable to pay for such representation due to the asset freeze. As for living expenses, the Court is likewise aware that the Individual Defendants may need funds from their frozen accounts for necessities such as mortgage payments, groceries, etc. However, Atnip and Kelley do not provide enough information for the Court to determine the propriety of the requested release of funds. The requested unfreezing of *all* of their cash assets is certainly unjustified in light of the record. The Receiver has estimated the consumer claims in this action may exceed $4,000,000 [Doc. 101, pg. 3]. Atnip and Kelley assert that they have "substantial assets greater than the potential damages" but they provide no support for that assertion [*Id*.]. Simply put, Atnip and Kelley have failed to provide sufficient evidence to justify the unfreezing of *all* of their cash assets.

They have likewise failed to provide sufficient support for the alternative request for certain amounts for legal fees and living expenses. While the Court agrees that general principles of equity would require the release of frozen assets to pay reasonable legal and living expenses, Atnip and Kelley simply ask for a seemingly arbitrary amount ($375,000) for attorneys' fees without any justification for that specific amount. As Plaintiffs point out, Atnip and Kelley do not "even

---

[7] The Receiver has since provided the monthly payments of $3,500 to Atnip and Kelley as directed by the Preliminary Injunction for the months of February and March [Doc. 110], a combined total of $14,000 [*See* Doc. 148-1, pg. 3].

specify what portion of this figure represents fees that have already been incurred versus an allocation for future attorneys' fees" [Doc. 125, pg. 6]. Similarly, Atnip and Kelley list their monthly expenses, which total $14,641, but they do not provide any documentation or support to confirm those expenses and, admittedly, the reasonableness of some of the listed expenses are questionable [*See* Doc. 101, pg. 8]. Without more information, it is impossible for the Court to balance the equities to determine whether or how much funds should be released for living expenses and legal fees. Thus, Atnip and Kelley's motion [Doc. 101] is **DENIED**.

## IV. Conclusion

For the reasons provided herein, it is hereby **ORDERED**:

1. Defendant Sarah Kirkland's Motion to Modify Preliminary Injunction Asset Freeze [Doc. 95] is **GRANTED IN PART AND DENIED IN PART**;

2. Defendants Michael Atnip and Craig Kelley's Motion to Modify Order and Unfreeze Personal Assets [Doc. 96] is **DENIED**; and

3. Defendants Michael Atnip and Craig Kelley's Emergency Motion to Modify Order and Release Assets to Pay Living and Legal Expenses [Doc. 101] is **DENIED**.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge