# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| *ex rel*. JONATHAN SKRMETTI, | ) | |
| ATTORNEY GENERAL and REPORTER, | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| COMMONWEALTH OF KENTUCKY, | ) | |
| *ex rel*. DANIEL CAMERON, | ) | |
| ATTORNEY GENERAL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| IDEAL HORIZON BENEFITS, LLC d/b/a | ) | |
| SOLAR TITAN USA, *a Tennessee Limited* | ) | |
| *Liability Company*, | ) | |
| | ) | |
| CRAIG KELLEY, RICHARD ATNIP, | ) | |
| and SARAH KIRKLAND, *individually* | ) | |
| *and as officers of Solar Titan USA*, | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| SOLAR MOSAIC, LLC d/b/a MOSAIC, | ) | **3:23-CV-00046-DCLC-JEM** |
| *a California Limited Liability Company*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| SOLAR TITAN CHARTERS, LLC d/b/a | ) | |
| TITAN CHARTERS, *a Florida Limited* | ) | |
| *Liability Company*, | ) | |
| | ) | |
| Relief Defendant. | ) | |

---

## SECOND AMENDED CIVIL ENFORCEMENT COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, RECEIVERSHIP, AND OTHER EQUITABLE AND STATUTORY RELIEF

---

1.      Plaintiffs, State of Tennessee, by and through Jonathan Skrmetti, its Attorney General and Reporter ("Tennessee"), and the Commonwealth of Kentucky, by and through Daniel Cameron, its Attorney General ("Kentucky") (collectively, "Plaintiffs"), bring this civil law enforcement proceeding pursuant to their enforcement powers under state and federal law to bring an immediate stop to the pervasive and ongoing deceptive and unfair business practices committed by Defendants in the operation of their residential solar photovoltaic system ("solar system") sales, installation, and lending businesses.

2.      The Plaintiffs bring this action pursuant to 12 U.S.C §§ 5552, and 5565(b) of the Consumer Financial Protection Act of 2010 ("CFPA"), and 15 U.S.C. § 45b(e) of the Consumer Review Fairness Act ("CRFA"). The Plaintiffs also bring this action pursuant to the CFPA, 12 U.S.C. § 5536(a)(1)(A), which authorizes the Plaintiffs to bring actions for violations of other Federal consumer financial laws set forth in the CFPA, including the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*. ("TILA").

3.      Tennessee also brings this action pursuant to Tennessee Code Annotated § 47-18-108 of the Tennessee Consumer Protection Act of 1977 ("TCPA") and other state consumer protection laws.

4.      Kentucky also brings this action pursuant to Kentucky Revised Statutes Annotated § 367.190 of the Kentucky Consumer Protection Act ("KCPA") and other state consumer protection laws.

5.      The Plaintiffs bring this action to seek a temporary restraining order, the appointment of a temporary and permanent receiver over Defendant Ideal Horizon Benefits, LLC d/b/a Solar Titan USA ("Solar Titan"), preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, refund of monies paid, disgorgement of ill-gotten gains, civil

1

penalties, attorney fees, and other equitable and statutory relief for Defendants' violations of federal and state consumer protection laws governing unfair and deceptive business practices and consumer financing.

6.     The Plaintiffs also bring this action against Solar Mosaic, LLC d/b/a Solar Mosaic ("Mosaic") to seek preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, refund of monies paid, disgorgement of ill-gotten gains, civil penalties, attorney fees, and other equitable and statutory relief for Mosaic's violations of federal and state consumer protection laws governing unfair and deceptive business practices and consumer financing.

7.     Due to the exigent nature of these proceedings, the Plaintiffs determined that it was not feasible to notify the Consumer Financial Protection Bureau ("CFPB") about this action prior to filing. Since filing the Complaint, Plaintiffs have provided the requisite notice that they brought CFPA and TILA claims to the CFPB shortly after initiating this action in accordance with 12 U.S.C. § 5552(b)(1)(B) and 15 U.S.C. § 1640(e).

8.     Due to the exigent nature of these proceedings, Plaintiffs determined that it was not feasible to notify the Federal Trade Commission ("FTC") about this action prior to filing. Since filing the Complaint, Plaintiffs have provided the requisite notice that they brought CRFA claims to the FTC shortly after initiating this action in accordance with 15 U.S.C. § 45b(e)(2).

9.     Pursuant to TENN. CODE ANN. § 47-18-108(a)(2), Attorney General Skrmetti has determined that the purposes of the TCPA would be substantially impaired by delay in instituting legal proceedings and thus has not provided Defendants with ten days' notice of Tennessee's intention to initiate legal proceedings against them when this action was filed.

2

## I. NATURE OF THE CASE

10.     Since 2019, Defendants Solar Titan, Craig Kelley ("Kelley"), Richard Atnip ("Atnip"), and Sarah Kirkland ("Kirkland") (collectively, "Solar Titan Defendants"), individually and together, have managed and operated a Knoxville, Tennessee-based solar system sales and installation business. Using online advertisements through social media platforms like Facebook, Instagram, YouTube, and the company's website, the Solar Titan Defendants promise 50-90% energy bill savings if consumers purchase the systems Solar Titan sells. Transactions for these systems occur at consumers' homes. During these sales pitches, Solar Titan sales representatives mislead consumers about the potential energy savings these systems offer and other potential savings, incentives, and discounts, such as tax credits or "energy buyback" programs.[1] The below image is taken directly from Solar Titan's marketing materials:



---

[1] An "energy buyback" is when an electric utility provider (commonly referred to as a local power company or "LPC") buys any excess solar power created by the consumer's solar system.

11.     The Solar Titan Defendants have marketed and sold these systems as "turnkey," requiring the buyer to take no additional steps beyond agreeing to purchase the system. In theory, this "turnkey" service covers not only the costs of the solar system equipment but also the labor costs for installation, coordination of permitting and inspections with the inspectors and local power companies ("LPCs"), and assistance securing financing through a third-party finance company, like Mosaic. Solar Titan representatives also tout that their company has one of the fastest timelines in the country for installations, claiming its installation crews will complete any given installation in just four to six weeks. The below image is taken directly from Solar Titan marketing materials:



12.     Contrary to Solar Titan's representatives' claims, many consumers eventually learn that they do not qualify for a tax credit, Tennessee consumers cannot participate in a buyback program, and "turnkey" instead means substandard (and sometimes dangerous) solar systems, delayed installations, failed inspections, shoddy workmanship, and unexpectedly pricey monthly loan payments. Due to Solar Titan's incompetence, many consumers are forced to work directly

with their LPC and/or Homeowners Association ("HOA") in order to get approval for these installations.

13.     Solar Titan relies on Mosaic as its primary consumer lending partner. Mosaic allows Solar Titan, as its agent and/or service provider, to solicit its loan customers and help consumers apply for loans. Mosaic also authorizes Solar Titan to help consumers consummate their loans without providing effective TILA disclosures during the sales process that would inform consumers of their total repayment obligation to Mosaic.

14.     Mosaic misrepresents the qualities and characteristics of its financial services to consumers.

15.     For example, every Mosaic loan financing a Solar Titan sale includes a spike in the consumer's monthly payment after 18 months if the consumer fails to make payments equal to 26%-30% of their total loan balance. This is approximately the amount the Federal Tax Credit[2] would be for consumers who actually qualify. On its website, Mosaic promotes this loan structure as a way to give consumers the "CHOICE to take advantage of the Federal Solar Investment Tax Credit," as if that "CHOICE" is available to every consumer. The below image is taken directly from Mosaic's website:



_____

[2] Consumers who purchase a residential solar system may be eligible to receive a nonrefundable tax credit equal to 26%-30% of the cost of the purchased solar system (hereinafter, "the Federal Tax Credit). The Federal Tax Credit is derived from the Energy Savings Act of 2005 and is codified in the IRS tax code at 26 U.S.C. § 25D(g).

16.     Mosaic also disregards its status as a holder of consumer credit contracts, misleading consumers to think they are still fully indebted to Mosaic even if the sale was procured through unfair, deceptive, false, or misleading marketing and sales practices.

17.     Solar Titan and Mosaic also routinely ignore cancellation requests made within the time period for consumers' statutory right to rescind. Many of these cancellation requests occurred when, after signing these installation and financing agreements, consumers learned about the hundreds of online complaints against Solar Titan, the company's "F" rating with the Better Business Bureau, and the negative media resulting from the company's unfair and deceptive business practices.

18.     Kelley, Atnip, and Kirkland, having realized healthy profits from their illegal conduct, have used their ill-gotten gains to purchase or lease expensive items such as luxury vehicles, multi-million-dollar homes, large boats, and even a jet airplane. They have also used this money to launch a new business endeavor, Solar Titan Charters, LLC d/b/a Titan Charters ("Titan Charters"). Titan Charters allegedly rents lodging and recreational fishing boats in Destin, Florida, a popular vacation destination.

## II.  JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 to enforce the CFPA, TILA, and CRFA (collectively, the "Federal Law Claims").

20.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to enforce the TCPA, KCPA, and other state statutory claims (collectively, the "State Law Claims"). The State Law Claims are so related to the Federal Law Claims that they form part of the same case or controversy under Article III of the United States Constitution.

6

21.     Venue is proper in this Court pursuant to 12 U.S.C. § 5564(f) because Defendants are located, reside, and/or do business in this district. Venue is further proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because, as set forth in this Complaint, this district is where a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred, and a substantial part of the property that is the subject of this action is situated.

## III. THE PARTIES

### A. PLAINTIFFS

22.     Jonathan Skrmetti, Attorney General and Reporter of the State of Tennessee, is the chief law enforcement officer of the State of Tennessee and may exercise such authority as the public interest requires and may file suits necessary for the enforcement of the law and public protection. The Attorney General is also empowered by the Federal Law Claims, the Tennessee State Law Claims, and his common law authority to bring an action in the name of Tennessee to enforce these laws and protect the public.

23.     Daniel Cameron, Attorney General of the Commonwealth of Kentucky, is the chief law enforcement officer of the Commonwealth and may exercise such authority as the public interest requires and may file suits necessary for the enforcement of the law and public protection. The Attorney General is authorized to appear for the Commonwealth and commence an action on its behalf before all "courts, tribunals, or commissions in or out of the state, and attend to all litigation and legal business in or out of the state required of the office by law, or in which the Commonwealth has an interest[.]" KY. REV. STAT. § 15.020(3). The Attorney General is also empowered by the Federal Law Claims, the Kentucky State Law Claims, and his common law authority to bring an action in the name of Kentucky to enforce these laws and protect the public.

### B. INDIVIDUAL DEFENDANTS

24.     Kelley is a Tennessee resident and one of the founders of Solar Titan and Titan Charters.

25.     At all times relevant to this Complaint, acting alone or in concert with others, Kelley formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In connection with the matters alleged herein, Kelley transacts or has transacted business in this district. Upon information and belief, Kelley resides at 12500 Limerick Lane, Knoxville, Tennessee 37934.

26.     Atnip is a Tennessee resident and one of the founders of Solar Titan and Titan Charters. Atnip is listed as Solar Titan's registered agent on its original Articles of Organization, which he signed as a managing member. Atnip has a 90% ownership interest in Solar Titan. According to Solar Titan, Mr. Atnip serves in a general advisory role for Solar Titan, and Kelley reports to Atnip. Atnip is also listed as an authorized managing member on Titan Charters's Articles of Organization.

27.     At all times relevant to this Complaint, acting alone or in concert with others, Atnip formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In connection with the matters alleged herein, Atnip transacts or has transacted business in this district. Upon information and belief, Atnip resides at 12500 Limerick Lane, Knoxville, Tennessee 37934.

28.     Kirkland is a resident of the state of Tennessee. Kirkland is listed as Solar Titan's President on a Change of Mailing Address form filed with the Tennessee Secretary of State on January 11, 2022. She is also listed as the company's CEO on Solar Titan's Application for Registration of Assumed Limited Liability Company form, filed on January 17, 2022. Kirkland

has a 10% ownership interest in Solar Titan. Kirkland is also listed as an authorized managing member in Titan Charters's Articles of Organization.

29.    At all times relevant to this Complaint, acting alone or in concert with others, Kirkland formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. In connection with the matters alleged herein, Kirkland transacts or has transacted business in this district.

30.    Upon information and belief, Kirkland resides at 822 Fox Road, Knoxville, Tennessee 37922.

## C. CORPORATE DEFENDANTS

31.    Upon information and belief, in 2019, Kelley, Kirkland, and Atnip launched Solar Titan USA, LLC.

32.    On January 17, 2022, Solar Titan USA, LLC was dissolved and reorganized under the name Ideal Horizon Benefits, LLC d/b/a Solar Titan USA.

33.    Ideal Horizon Benefits, LLC d/b/a Solar Titan USA's registered agent is Registered Agent Solutions, Inc. Service upon the Registered Agent can be effectuated at 992 Davidson Drive, Suite B, Nashville, Tennessee 37205-1051.

34.    For purposes of this lawsuit, Plaintiffs will use the term "Solar Titan" to refer to both Solar Titan USA, LLC (and any potential successors) and Ideal Horizon Benefits, LLC d/b/a Solar Titan USA. Upon information and belief, the principals, operations, and assets of the companies are one and the same.

35.    Solar Titan is a limited liability company organized under the laws of Tennessee.

36.    Upon information and belief, Solar Titan conducts business in Tennessee, Kentucky, Georgia, Alabama, North Carolina, and South Carolina. Solar Titan Defendants has

9

engaged in the same unlawful conduct described throughout this Complaint in every state where it conducts business. Upon information and belief Mosaic engaged in the same unlawful conduct described throughout this Complaint in Tennessee, Kentucky, Georgia, Alabama, and South Carolina.

37.     Mosaic is a limited liability company organized under the laws of the state of Delaware.

38.     Mosaic is a nationwide firm that specializes in consumer financing for residential home improvement projects. Mosaic underwrites and funds thousands of consumer loans each year and has entered into agreements with dozens of residential solar system installers, including Solar Titan, to finance their solar system sales.

39.     Mosaic primarily operates out of Oakland, California. Its Principal Office Address is 601 12th Street, Suite 325, Oakland, CA 94607.

40.     Mosaic's registered agent is CT Corporation System. Service upon the Registered Agent can be effectuated at 28 Liberty Street, New York, New York 10005.

**D.  RELIEF DEFENDANT**

41.     Titan Charters is a limited liability company organized under the laws of the State of Florida and headquartered in Tennessee.

42.     Titan Charters's website says it provides deep sea fishing, bay fishing, and cruise boat charters for individuals and groups in Destin, Florida.

43.     On Titan Charters's Articles of Organization, which were filed on February 25, 2021, the company lists its principal office address and mailing address as 11205 Outlet Drive, Knoxville, Tennessee, 37932, the same address used for Solar Titan.

10

44.     Kirkland and Atnip are also listed as Authorized Managing Members on Titan Charters's Articles of Organization. Thus, Kirkland and Atnip have full control over both companies.

45.     Titan Charters's Registered Agent is Swart Baumruk & Company, LLP. Service upon the Registered Agent can be effectuated at 1101 Miranda Lane, Kissimmee, Florida, 34741.

46.     The Solar Titan Defendants used funds from Solar Titan to launch Titan Charters.

## IV. GENERAL FACTUAL ALLEGATIONS

47.     Solar Titan markets and sells solar systems to Tennessee and Kentucky homeowners through online advertisements, lead generation, telemarketing, and door-to-door sales.

48.     These solar system installations are priced well above the average cost of a residential solar system.

49.     Solar Titan charges consumers anywhere from $20,000-$100,000 for its residential solar systems.

50.     Because most Solar Titan customers cannot afford to pay such high prices upfront, Solar Titan sales representatives sign consumers up for financing through Solar Titan's primary lending partner, Mosaic.

51.     Mosaic then funds the contract, transmitting payment directly to Solar Titan for the sales price.

52.     To induce consumers to purchase these high-priced systems, Solar Titan drastically exaggerates the amount of electric utility bill savings consumers will experience.

11

53. Solar Titan representatives also claim that consumers will start experiencing those significant savings on their bills well before they are obligated to start making monthly payments to the finance company.

54. Because Solar Titan's installation process is heavily flawed, the systems are often not operational until months after the consumer has started receiving bills from Mosaic. Thus, consumers experience no savings for those months but instead have the added expense of the Mosaic loan payment.

55. If a Solar Titan customer is lucky enough to have their solar system installed and made operational, these systems rarely, if ever, perform as promised.

56. Solar Titan installers are often inexperienced and lack proper training. They also lack appropriate oversight from licensed professionals.

57. Solar Titan also has difficulty retaining qualified individuals because the company is routinely late with payroll and refuses to pay its employees as promised.

58. As a result, many installations fail the inspections and/or cause damage to the consumer's home.

59. Solar Titan not only misrepresents to consumers the benefits of the system, the timeliness of its installations, and the quality of its products and services, but also holds the funds Mosaic pays on the consumers' behalf.

60. Solar Titan and Mosaic also misrepresent or omit material information about the qualities of Mosaic's products and services when financing Solar Titan's solar system sales.

61. Once a consumer signs an installation agreement and signs up for financing, Solar Titan immediately submits paperwork to Mosaic so that funds will be disbursed to Solar Titan before the consumer's three-day statutory right of rescission has expired.

62.     If a consumer properly cancels the contract within the three-day statutory period, Solar Titan seeks to avoid returning the funds to Mosaic by routinely deceiving consumers, claiming they have not properly canceled the contract. After misleading the consumer, Solar Titan keeps the consumer locked in and retains the money that Mosaic paid to fund the contract.

63.     Solar Titan often also relies on the falsehood that a consumer did not properly cancel their contract (*e.g.*, asserting that the consumer did not send the cancellation notice to the proper address) to then insist that the consumer pay Solar Titan the same amount that Mosaic has already paid to Solar Titan to fund the contract. Having collected the loan funding twice, it can repay Mosaic and still pocket revenue from the sale when Mosaic actually honors the consumer's cancellation.

64.     Other times, Solar Titan just tells consumers that it has canceled the contract when it has not and keeps the funds, such that Mosaic continues to expect payment from the consumer. Mosaic, even when it knows that a consumer properly canceled their contract with Solar Titan, often continues to bind the consumer to pay Mosaic. Mosaic, instead of cancelling the Mosaic Agreement when consumers showed them that they had already cancelled the Solar Titan Agreement, required that Solar Titan confirm that the consumer properly cancelled the Solar Titan Agreement.

65.     Mosaic often directed consumers in this situation to contact Solar Titan when Solar Titan had not confirmed the consumer had cancelled the Solar Titan Agreement. Consumers from each state where Solar Titan conducted business had to get approval from Solar Titan's executives, employees, and officers making decisions about honoring cancellations from Solar Titan's headquarters in Knoxville, Tennessee. Upon information and belief, when Mosaic instructed consumers to contact Solar Titan about their cancellations, Mosaic knew that the

13

consumers would be communicating with executives, employees, and officers in Solar Titan's headquarters based in Knoxville, Tennessee.

66.     Kelley and Kirkland have told Solar Titan employees not to cancel contracts even when consumers have properly exercised their three-day right to rescind their contract.

67.     Atnip, the signatory for the bank accounts, knew or should have known that Solar Titan is not properly canceling contracts for consumers who have properly exercised their three-day right to rescind their contract.

68.     Kelley, Atnip, and Kirkland are using the funds from these canceled contracts to pay their own personal expenses.

69.     Kelley, Atnip, and Kirkland lead a lavish lifestyle that includes several multi-million-dollar homes, yachts, a private jet, and luxury vehicles.

70.     Kelley, Atnip, and Kirkland have used the ill-gotten gains from Solar Titan to pay for Titan Charters's "business expenses," such as boats and beachfront property.

71.     Despite being aware of the large volume and egregious nature of consumer complaints against Solar Titan, Mosaic continued to conduct business with the company by funding Solar Titan's installations up until it finally terminated its partnership with Solar Titan around late 2022. When discussing consumer complaints, Mosaic representatives communicated with Solar Titan's staff based in Knoxville, Tennessee, regardless of where the affected consumer resided. This partnership has allowed Mosaic to reap enormous profits while facing no consequences for its participation in this harmful and unlawful business scheme.

72.     Mosaic is liable for Solar Titan's misrepresentations and material omissions about Mosaic's financial products and services.

14

73.     Mosaic knows or should know about Solar Titan's misrepresentations and material omissions about Mosaic's financial products and services.

74.     Despite knowing about Solar Titan's misrepresentations and material omissions about Mosaic's financial products and services, Mosaic fails to correct them.

75.     Mosaic is liable for failing to correct Solar Titan's misrepresentations and material omissions about Mosaic's financial products and services when Mosaic knows or should know about Solar Titan's misrepresentations and material omissions.

76.     Mosaic also failed to disclose important information to consumers about its products and services, including that Mosaic starts paying Solar Titan proceeds of a consumer's loan before the consumer's three-day right of rescission period expires. Mosaic also failed to disclose to consumers that Mosaic fully funds Solar Titan's solar system sales before Solar Titan has fully installed the systems (such that the system is operating as promised).

77.     Loans for Solar Titan systems typically carry terms of 20-25 years and add thousands of dollars in finance charges. Financing often doubles the cost of the system itself.

78.     Mosaic facilitates Solar Titan's unfair and deceptive business practices, as the company knows or should know that Solar Titan requests the first portion of loan funding before consumers' statutory three-day right of cancellation period expires.

79.     Mosaic's payment schedule to Solar Titan also incentivizes Solar Titan's failure to deliver functional solar systems to consumers. Despite consumers' complaints about their system not working, Mosaic pays Solar Titan the last portion of the loan funding regardless of whether Solar Titan has fulfilled its sales promise of providing an operational solar system.

80.     Instead, Mosaic fully funds consumers' contracts as soon as "glass is on the roof," which is an industry term that means some components of the system have been installed (namely,

the panels), regardless of whether the system has been turned on or commissioned by the LPC so it can generate power for the consumer.

81.     Rather than using a consumer's loan funds to complete the solar system installation, Solar Titan focuses on procuring new customers and signing them up for loan agreements with Mosaic; meanwhile, the consumer is obligated to continue making monthly payments to the financing company, despite not having received what he's paying for.

82.     Defendants' unlawful business practices have harmed hundreds of consumers throughout the Southeast. Plaintiffs respectfully bring this suit in an effort to avoid future harm to the public and mitigate the damage caused by Defendants' illegal conduct.

## V.  SPECIFIC FACTUAL ALLEGATIONS

### A.  THE RESIDENTIAL SOLAR INDUSTRY

83.     Solar industry operators install solar systems as part of general residential and commercial contracting services.

84.     Heavy advertising that emphasizes tax incentives has caused a swell of consumer-level demand for solar system installations.

85.     According to the United States Department of Energy, over the last 20 years, the cumulative capacity of residential solar power installed in the U.S. has increased by more than 500%.[3] In the last decade, the industry has also seen an average annual revenue growth of 42% across the United States.[4]

86.     Increased consumer-level demand has attracted many new providers of residential solar systems to enter the market.

---

[3] G. Barbose, A.J. Satchwell, *Benefits and costs of a utility-ownership business model for residential rooftop solar photovoltaics.*, Nat Energy 5, 750–758 (2020).
[4] Al Bari Shahool, *Sunny days: The residential market is anticipated to create strong demand for solar installations*, IBISWorld Industry Report OD4494, pg. 12 (2022).

87. These new entrants are often eager to close as many sales as possible, sometimes by adopting high-pressure, misleading sales tactics.

88. To make matters worse, most consumers finance the costs of their solar system and its installation with long-term, high-interest-rate loans. The total cost of these loans is often hidden from the consumer.

89. As more consumers purchase residential solar systems, federal and state consumer protection agencies are experiencing an uptick in consumer complaints. Since 2016, state and federal agencies have brought many investigations and enforcement actions against companies engaging in unfair and deceptive marketing and sales practices for solar systems. There have also been numerous warnings by law enforcement agencies, consumer watchdog organizations, and LPCs across the country about the deceptive and predatory practices of many solar system installers and their lending partners.

90. These investigations and lawsuits have not deterred the Solar Titan Defendants, whose business model is built upon misrepresentations to consumers about savings on their energy bills, the availability of tax credits, and the capabilities and functionality of the systems themselves.

## B. SOLAR TITAN

91. Solar Titan is one of the thousands of new residential solar system operators founded in the last five years.

92. Upon information and belief, Solar Titan was founded in 2019 and has been managed and/or operated by Kelley, Atnip, and Kirkland since its founding.

93. Prior to starting Solar Titan, in December 2012, Kelley was convicted of wire fraud (18 U.S.C. § 1323) in the United States District Court, District of Nevada.

94.      Kelley's sentence for this crime included, among other things, a five-year probation term and the payment of restitution to Merrill Lynch in the amount of $195,000.

95.      Because of Kelley's criminal history, Atnip and Kirkland did not want Kelley's name on the company documents.

96.      Atnip, Kirkland, and Kelley knew that Kelley's status as a felon convicted of federal wire fraud could preclude Kelley from operating a business reliant on consumer loans because lenders could be unwilling to work with someone with a history of financial crimes.

97.      Atnip, who is married to Kelley, agreed to sign all of the company documents and act as a managing member of the business, concealing Kelley's role in managing and operating the business.

98.      Although Atnip originally handled significant administrative tasks for the business, Kelley and Kirkland persuaded Atnip to disengage from the operations. However, Atnip continued to control Solar Titan's finances as the signatory on most company documents and continued to oversee many functions of Solar Titan's business, including responding to consumer complaints, licensing, and funding Solar Titan sales.

99.      Atnip has continuously misrepresented to various Secretaries of State and Solar Titan's business partners (including the consumer lenders) that he was the company's primary operational manager.

100.     Kelley and Kirkland oversaw the day-to-day operations of the business.

101.     In an effort to conceal Kelley's role in the business, Kelley impersonates Atnip on the phone in conversations with Solar Titan's lending partners.

102.     Upon information and belief, Kelley's impersonation of Atnip has been done with Atnip's knowledge and consent.

18

103.     While Solar Titan, on paper, is owned by Atnip and Kirkland, Kelley routinely represents himself to consumers as the company's owner, president, and/or CEO.

104.     Kelley has intentionally misled business partners and creditors by failing to disclose his position as the company's primary operational manager.

### C. THE SOLAR TITAN SALES PROCESS

105.     Solar Titan uses social media platforms to advertise its solar systems. These advertisements prompt consumers to provide their contact information. Solar Titan customer service representatives then call the consumers and schedule in-home meetings where representatives give a sales presentation.

106.     To promote confidence in the company, Solar Titan falsely suggests through its advertisements and sales materials that it partners with various solar energy professionals in the industry.

107.     For example, for several months, Solar Titan represented itself on its website as a partner of the Solar Energy Industries Association ("SEIA").

108.     The SEIA is a national trade organization made up of solar system installers and other parties with the goal of self-governance and improving consumer experiences.

109.     Solar Titan has never been a member of the SEIA and has never otherwise partnered with the SEIA.

110.      The SEIA issued the Solar Titan Defendants a cease-and-desist notice demanding that Solar Titan stop making the false statement that the company was a SEIA partner.

111.     Another example of Solar Titan falsely claiming to partner with solar energy professionals is Solar Titan touting that the company is partnered with the North American Board of Certified Energy Practitioners ("NABCEP").

19

112. Solar Titan is not partnered with NABCEP, though it has one employee, Kirkland, who is NABCEP-certified.

113. However, Solar Titan proudly boasts on its website that it is a NABCEP partner. The below image was taken directly from Solar Titan's website:



114. According to NABCEP's website, NABCEP certifications "offer the public a high degree of protection because practitioners have to voluntarily meet standards and qualifications and pass an exam."

115. Indeed, NABCEP certification requires certified professionals to abide by its Code of Ethics and Standards of Conduct to maintain certification. These standards include obligations by the certificate holder to, among other things:

• Deal with all clients, consumers, and other professionals and professional organizations fairly and in a timely manner;

• Provide safe and quality services to clients and consumers;

• Engage in moral and ethical business practices, including accurate and truthful representations concerning professional information and system performance expectations.

116. As detailed below, Solar Titan violates nearly every ethical obligation imposed upon NABCEP certificate holders.

117. Solar Titan sales representatives also mislead consumers about the qualities and characteristics of the solar system and installation services they are selling to consumers.

20

118.     For instance, during the presentation, the sales representative makes a pitch to the consumer that the money they would pay for the system is money that consumers would pay "anyway" towards their electricity bill. This is known as the "anyway money" sales pitch.

119.     Sales representatives use a sheet that purports to calculate the "anyway money" consumers could be spending on a solar system instead of their monthly electric bill. This misleads many consumers to believe they will, on average, pay the same amount each month for their solar system as it would cost to pay their electricity bill. The pitch suggests to consumers that instead of paying their electric bill, they will only need to pay the company that funds their solar system purchase the amount they were paying toward their monthly electric bill, as if the solar system will eliminate their electric bill. A copy of the "anyway money" calculation sheet is reproduced on the next page:

Name_____                          Date:_____

# ANYWAY MONEY

15 Years $ _____ Monthly Bill _____

30 Years $ _____ Monthly Bill _____

$_____ Prior 12 Month Avg Bill (If Available)          Average Monthly Kwh Usage _____

| Preferred | Suggested Smart Plans | Premier |
|---|---|---|
| **Up to 50% Annual Offset Consumption** <br> <u>without Battery</u> | | **Up to 90% Annual Offset Consumption** <br> <u>with Battery</u> |
| _____ | KW Size | _____ |
| _____ | Cost | _____ |
| _____ | 26 % Federal Tax Credit <br> Refer to Energy.gov | _____ |
| _____ | Cost after tax credit | _____ |
| _____ | **With Tax Credit** <br> (1st 18 Months ) | _____ |
| _____ | **Without Tax Credit** <br> (After 18 Months) | _____ |
| _____ | Homeowner's Signature | _____ |
| _____ <br> **Print Name**          **Date** | | _____ <br> **Print Name**          **Date** |

## Which option works best for you to start off with Today?

*We suggest system sizes based on annual average consumption to start producing your own power. We recommend starting with the size system that is financially manageable for you

** All production estimates are based on annual averages; variances will occur with panel placement option and weather patterns

**What is a Tax Credit? Refer to Energy.gov**

22

120.     During the sales pitch, Solar Titan sales representatives also review the consumers' electric bills to determine their average monthly usage and costs. They typically suggest that they will choose a solar system size that will, at the very least, cut their electrical bill in half.  And they often promise consumers that these solar systems will almost completely eliminate their monthly electric bill.

121.     These are the same representations that Solar Titan makes to consumers on its website, stating that consumers can "Become a Power Producer and Save 50-90% off your Monthly Electric Bill."  One such advertisement is reproduced below:



122.     However, Solar Titan sales representatives routinely overstate the amount of energy the solar system will produce, and the amount electrical providers will pay to buy back any

23

surplus energy the solar system produces, thus exaggerating the amount of energy bill savings consumers will realize from purchasing a Solar Titan system.

123. Sales representatives also mislead consumers into thinking that the overall cost of the system will be reduced by 26% from a Federal Tax Credit.

124. Sales representatives regularly omit material information about eligibility requirements for the Federal Tax Credit; for example, consumers may not qualify for the Federal Tax Credit if they do not have a tax liability in the year of purchase or may only qualify for a lesser credit than the amount Solar Titan representatives described. Moreover, the consumer can only receive a maximum tax credit in the amount of their tax liability. Even if a consumer is eligible to claim the Federal Tax Credit, the nonrefundable credit can only be claimed once; therefore, if a consumer's tax liability the year the system was purchased is less than the tax credit they are entitled to, the consumer will not receive the full tax credit amount represented by Solar Titan employees that year.

125. Additionally, many sales representatives emphasize a total purchase price that assumes the consumer received the Federal Tax Credit, suggesting that it is available to them regardless of whether the consumer qualifies for it.

126. Solar Titan sales representatives also tell consumers that they will get buyback discounts and discounts from the Tennessee Valley Authority ("TVA"), even though many consumers do not qualify for such discounts.

127. Solar Titan also claims it will coordinate everything for the consumer once the consumer has signed on the dotted line. This includes helping consumers procure financing, the labor for installing the solar system, having the electric company and any other governing body inspect the systems and getting them connected so that they are generating power. When selling

24

the system, the representatives promise that Solar Titan is a full-service turnkey operation. The below is taken directly from Solar Titan marketing materials:



128.    Yet many consumers have complained that Solar Titan goes weeks and sometimes months without even attempting to secure the proper permits or schedule an inspection. Many consumers report having to pull their own permits, get their own approvals, and schedule their own inspections to get their solar systems operational.

129.    The materials that Solar Titan gives consumers falsely boast that due to Solar Titan's "efficiencies," Solar Titan completes installations much faster than the purported six-to-nine-month national average. The below is taken directly from Solar Titan's marketing materials:



130.    Solar Titan representatives also misrepresent to consumers that it would take six to eight weeks or, at most, eight to twelve weeks for their solar system to be operational. Because of Solar Titan's inefficiencies, including its substandard installation practices and failure to coordinate with the LPCs as promised, the company rarely meets this timeline for installations.

25

131.     For consumers who cannot afford to pay Solar Titan out of pocket, Solar Titan assures them they will only pay the finance company once the installation is complete. Solar Titan sales representatives fail to explain that by "complete," they only mean the solar panels are on top of the homeowner's roof, not that the system is connected and operational.

132.     Solar Titan representatives also deceive consumers about the qualities and characteristics of the battery they sell consumers as an additional component to the solar system.

133.     Solar Titan uses Generac Power Systems, Inc. ("Generac") as the company's primary battery supplier. Solar Titan purchases batteries from Generac and sells them to consumers.

134.     Solar Titan makes a large profit from selling Generac batteries, and they add about $20,000 to the price of a Solar Titan solar system.

135.     Solar Titan tells consumers that adding a battery to their system will give them access to a power source during a power outage.  Although such batteries do store excess energy when installed properly, Solar Titan's substandard installation practices mean that consumers frequently cannot access the stored energy in the battery during a power outage.

136.     Another example of Solar Titan's misrepresentations is that the company tells consumers that they will experience greater energy savings if they purchase a battery because they can "use stored power at night to reduce nighttime energy demands from the grid."

137.     However, batteries do not increase the production of the solar system and only store energy that the solar systems have produced beyond the consumers' usage. Thus, if the consumer's solar systems produce less energy than the consumer uses, there will be no energy stored in the battery.

138.     Solar Titan sales representatives also do not disclose the amount of energy consumers lose when transferring energy to and from the battery.  Most consumers lose 10% of the energy they produce from their system when it is transferred to the battery and lose an additional 10% when it is transferred from the battery.

139.     When promoting the sale of batteries, Solar Titan suggests that consumers who lack a proper location inside their house to install it should place the battery outside instead. Solar Titan representatives fail to mention that Generac batteries will not function when subjected to external temperatures below 41 degrees Fahrenheit. Thus, the Generac batteries Solar Titan sells to consumers often will malfunction for several months out of the year.

140.     Solar Titan offers sales tax breaks, but only if the consumer agrees to purchase the system when the sales representative is making the pitch.

141.     Upon information and belief, Solar Titan makes up discounts to try to close the sale.  The company sometimes offers consumers what it calls a "Veteran's Discount," but the amount of the discount that it grants to each veteran who requests it is arbitrary.

142.     Solar Titan uses the "Veteran's Discount" and its emphasis on being a "Veteran-Owned Company" to target veterans and their families.

143.     After closing a sale, the Solar Titan sales representative has the consumer sign an agreement (the "Solar Titan Agreement") wherein the consumer agrees to pay Solar Titan for the system and installation services. The Solar Titan Agreement is one page with a front and back.

144.     The front page of the Solar Titan Agreement lists the purchase price for system and installation services, the buyer's name and address, the size of the system the consumer is purchasing, what type of roof the consumer has, and where the solar system will be mounted. At the bottom of Solar Titan's Agreement is a space for the consumer and the sales representative to

27

sign.  Importantly, a notice of the buyer's right to cancel is not included on the front page of the contract or anywhere near the consumer's signature line, as required by law. Instead, that notice is buried in small print between several other contract terms on the back.

145.    The back of this adhesion contract contains many important contractual terms, including terms about warranties, the arbitration clause, the right to cancel notice, and a term prohibiting the consumer from posting negative online reviews about the company.

146.    The contractual terms printed on the back of the contract are written in eight-point font with no spacing and half-inch margins. A copy of the back page of the Solar Titan Agreement is reproduced on the next page:

10 year workmanship warranty 10-Year Limited Workmanship and Installation Warranty. Ideal Horizon Benefits, LLC/ Solar Titan USA warrants that the System will be constructed and installed in a good workmanlike manner according to the standards of care and diligence generally practiced by solar engineering, construction, and installation companies when installing residential photovoltaic solar power systems of a similar size and type as the System in the geographic region where your Property is located, and pursuant to (i) good engineering design practices, (ii) manufacturer's instructions, (iii) applicable law (including local codes and standards), (iv) required governmental approvals and permits, and (v) applicable requirements of the local utility. This 10-Year Limited Workmanship and Installation Warranty will extend for a period of ten (10) years from the date installation of the System is completed by Ideal Horizon Benefits, LLC.".

5 Year Roof Warranty with no Radius 5-Year Limited Roofing Penetration Warranty. Ideal Horizon Benefits, LLC/ Solar Titan USA warrants your roof against damage and water infiltration at each roofing penetration made by Ideal Horizon Benefits, LLC/ Solar Titan USA in connection with the installation of the System and the surrounding area of each such penetration (collectively, the "Covered Roof Areas"). Ideal Horizon Benefits, LLC/ Solar Titan USA will repair damage to your roof and repair or compensate You for actual physical damage to your property resulting from any water infiltration in the event of failure or defects in the Covered Roof Areas. Customer understands that any
modifications not performed by The Ideal Horizon Benefits/ Solar Titan USA or Authorized agent will render all warranties null and void.
Proposal Requirements

Regulation Z disclosure: "The first monthly payment on the loan is due approximately 60 days after installation. The calculation of the monthly payments for the first 18 months following installation (which includes the first 17 payments) (the "Initial Period") assumes that you will pay down the loan during the Initial Period by 26%. If you make aggregate principal payments in such amount during the Initial Period, your monthly payments following the Initial Period will remain the same as during the Initial Period. If during the Initial Period you elect to pay principal in an amount that is less than 26% of your loan amount, your monthly payment beginning upon conclusion of the Initial Period and throughout the rest of the term of the Loan will be increased to amortize the full principal loan balance (which would be greater than the originally assumed amount) over a period which is effectively 18 months shorter. Conversely, if you pay down greater than 26% of the principal balance during the Initial Period, your monthly payments following the conclusion of the Initial Period will be reduced to reflect the payment of a lesser principal balance than originally assumed for the balance of the term. Please carefully review the details of your loan, including the payment amounts, provided in your loan agreement." Tax Credit Disclosure: As the purchaser and owner of a solar photovoltaic system, you may qualify for certain federal, state, local or other rebates, tax credits or incentives (collectively, "Incentives"). If you have any questions as to whether and when you qualify for any Incentives and the amount of such Incentives, please consult and discuss with your personal tax or financial advisor. [Installers] make no representation, warranty or guaranty as to the availability or amount of such Incentives.
The buyer(s) listed above hereby jointly and severally agree to purchase the goods and/or services listed, in accordance with the prices and terms described on the front and reverse side of this agreement. Buyer(s) have requested that such goods or services be installed or provided at the buyer(s) address listed on the front side of this agreement. Ideal Horizon Benefits, LLC/Solar Titan USA hereby agrees to install or cause to be installed the goods or services listed in the agreement, at the buyer(s) address listed on the front side of this agreement. The buyer(s) agrees to pay the cost of goods and service purchased as described herein. The buyer(s) accept such financing agreement for the purchase as is contained on separate financing documents. Buyer(s) agrees to allow reasonable access to the property in the area on which is contracted, and the work will be performed, including access to all electrical outlets as may be required by the contractor. Manufacturer warrants function and reliability of the solar panels. Installation contractor warrants all labor and specific penetration points for 60 months. There are no implied warrants other than those stated in writing by the manufacturer of the goods provided. In the event that the owner fails to provide payment as required upon completion of the installation of the panels, Ideal Horizon Benefits, LLC/ Solar Titan USA has the right to remove panels. In the case of this transaction being a cash or financed transaction, Ideal Horizon Benefits, LLC/ Solar Titan USA has all rights to remedy payment in full as well as all additional means available under state law. Final payment shall be made the day of completion if a cash transaction. Financed agreements must be signed off via email or verbally confirmed on the same day as the installation with the given financing company. The owner shall provide Ideal Horizon Benefits, LLC/ Solar Titan USA a written description of work believed by owner to be defective or incomplete within 24 hours of completion, Ideal Horizon Benefits, LLC will repair or correct or complete the work included in their written description if deemed appropriate.

Buyer(s) agree to pay any expenses incurred by Ideal Horizon Benefits, LLC/ Solar Titan USA to collect any unpaid balance including attorney's fees. The Buyer(s) have the right to cancel this agreement by midnight on the third business day following the date on the front of this agreement, written cancellation by email to info@theidealhorizon.com or, by U.S. Certified mail, addressed to Ideal Horizon Benefits, LLC/ Solar Titan USA are the only two forms of accepted notification. The request for financing with the finance company will be made by Ideal
Horizon Benefits, LLC/ Solar Titan USA following the receipt of this request within the agreed upon and given timeframe.
If financing terms have been approved, materials ordered, and buyer(s) attempt to cancel subsequent to midnight of the third business day after the date of the arrangement, and Ideal Horizon Benefits, LLC/ Solar Titan USA agrees to accept such late cancellation, then buyer(s) agrees to pay Ideal Horizon Benefits, LLC/ Solar Titan USA a cancellation fee equal to 30% of the purchase price to offset a portion of materials, labor and administrative costs.
If buyer(s) are in default of the Agreement, Buyer(s) agrees to pay Ideal Horizon Benefits, LLC's/ Solar Titan USA's attorney fees equal as otherwise allowed by law. Buyer also agrees to pay any other costs or expenses of repossession, collection, or realization on a security including court costs, to any extent not prohibited by law. If financing is involved with this purchase agreement and buyer does not complete the purchase, the loan and documents will be adjusted to thirty percent of purchase price as agreed within the terms and conditions of the cancellation of this agreement. The buyer(s) agree to sign the new loan documents with this adjusted amount.
Arbitration of Disputes: Ideal Horizon Benefits, LLC/ Solar Titan USA and buyer(s) agrees that any and all disputes, claims, or controversies, arising under or relating to the contract and any related documents, loans, security instruments, accounts, including by way of example and not as a limitation: (I) the relationships and the transaction arising from this contract; (II) The terms of this contract; (III) the validity of this contract or the validity or enforceability of this arbitration agreement, shall be subject to binding arbitration to be determined by one arbitrator, in accordance with and pursuant to the then prevailing rules and procedures of commercial rules of the American Arbitration Association, to be held and arbitrated in a judicial district in which the buyer resides. The buyer agree that they will not assert a claim on the behalf of, or as a member of, a group or class period the findings of the arbitrator and any award or finding of the arbitration will be specifically enforceable under the prevailing law of any court having jurisdiction. Notice of the demand for arbitration will be filed by the party asserting the claim with the other to the contract and with the American arbitration Association. Any arbitration proceeding brought under this contract, and any award, finding or verdict of or from such proceeding shall remain confidential between the parties and shall not be made public. Both buyers and Ideal Horizon Benefits, LLC are hereby agreeing to use arbitration, rather than litigation or some other means of dispute resolution, to address their grievances or alleged grievances. By entering into this contract and this arbitration provision, both parties are giving up their constitutional right to have any dispute decided in a court of law before a jury, instead are accepting the use of arbitration, other than set forth immediately.
The buyers agree that Ideal Horizon Benefits LLC/ Solar Titan USA may utilize photographs of property and installation on social media and in promotional advertising. Buyer(s) grant Ideal Horizon Benefits, LLC/ Solar Titan USA the right to place signage on the property during the installation process. Buyer agrees not to use any form of social media to express their opinion that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits. Breaching acceptance of this clause by buyer can and will deem monetary compensation benefits to Ideal Horizon Benefits, LLC/ Solar Titan USA. Buyer's clearly understands that standard solar systems do not include a battery backup or generator unless specifically added and written in detailed notes.
Any previously existing electrical code violations that require additional labor to be compliant will be covered by the homeowner not Ideal Horizon Benefits, LLC/ Solar Titan UAS. Rebates and incentives: Ideal Horizon Benefits, LLC/ Solar Titan USA and buyer(s) agree that any rebates tax credits and power company incentives are not guaranteed by Ideal Horizon Benefits, LLC/ Solar Titan USA all items known to exist to the best of our knowledge will be presented but it is the responsibility of the buyer(s) to ensure incentives are available and they will qualify. There are qualifications for all programs and if the buyer(s) do not qualify or if the item is unavailable at the time of application, Ideal Horizon Benefits, LLC/ Solar Titan USA will not be held liable. All examples and recommendations by energy sales consultants are explicitly deemed as an example and figures. There are many variables and usage, weather patterns, electricity company programs, etc. Buyer(s) in no capacity shall hold Ideal Horizon Benefits, LLC/ Solar Titan USA liable for actual production of the system or expectation. Delay/ Unknown conditions: Events beyond the control of the contractor, such as power company delays, homeowner Association delays, acts of nature, labor strikes, act of God, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, general shortage of labor, equipment, materials or supplies in the open market, failure of transportation, lock out, action of labor unions, condemnation, requisition, order of government or civil or naval authorities, pandemics, inclement weather, terrorism, buyer(s) inability to qualify for or obtaining financing, or other events resulting and delays in performance of this agreement do not constitute abandonment or a breach by Ideal Horizons Benefits, LLC/ Solar Titan USA and are not included in the circulation time frames for performance by Ideal Horizon Benefits, LLC/ Solar Titan USA In the event that Ideal Horizon Benefits, LLC/ Solar Titan USA determines that this agreement cannot be performed as intended by the parties due to incorrect pricing/ measurements, unforeseen structural defects or pre-existing conditions to the buyer's property, Ideal Horizon Benefits, LLC/ Solar Titan USA may cancel this agreement within 90 days of its execution notify the buyer(s) of such cancellation in writing, and return all monies paid by the buyer(s).

29

### D. FINANCING THE LOAN

147.     Most consumers who buy Solar Titan solar systems cannot afford to pay out of pocket the price for the company's solar system and installation services.

148.     Solar Titan, as a seller of solar systems, has business relationships with financing companies to ensure consumers can fund Solar Titan's products and services.

149.     Mosaic is Solar Titan's primary lending partner.

150.     Around late 2019 and early 2020, Solar Titan and Mosaic began a partnership wherein Mosaic would provide financing to Solar Titan's customers for the purchase of solar systems. Solar Titan and Mosaic memorialized their contractual relationship by executing the Mosaic Solar Dealer Agreement ("Merchant Agreement"). In entering into their contractual relationship, Solar Titan and Mosaic envisioned that they would have continuous and wide-reaching contacts that would include sending loan proceeds into Tennessee for every Solar Titan consumer (regardless of where the consumer was located).

151.     The Merchant Agreement allows Solar Titan sales representatives to help consumers apply for loans with Mosaic.

152.     At or around the same time the consumer signs the Solar Titan Agreement, the sales representative helps the consumer apply for financing and leads the consumer through the process of getting approved.

153.     The sales representative completes an online application on behalf of the consumer using an electronic device; this is sometimes a tablet and sometimes just a mobile phone.

154.     The consumer must have an email address to apply for financing with Mosaic.

155.     Solar Titan sales representatives are trained to create an email address on behalf of any consumer that does not have an email address. In such situations, the likelihood the consumer will actually receive any emails from Mosaic is low.

156.     The consumer usually does not receive paper copies of the Mosaic loan paperwork, but only receives them via email.

157.     In order to get approval, the sales representative helps consumers fill in their identifying information and income information online.

158.     Solar Titan trains its sales representatives to inflate the credit applicant's household income section if it is believed the consumer would not be approved based on their actual household income.

159.     Upon information and belief, Kelley has trained or told sales representatives to inflate credit applicants' income so that Solar Titan's finance partners will approve the consumer's application for a loan.

160.     The Solar Titan sales representative informs the consumer if they are approved for a loan with Mosaic during the sales presentation.

161.     After learning that the loan amount is approved, some sales representatives have consumers sign the loan agreement with Mosaic ("Mosaic Agreement") on the spot. The Mosaic Agreement includes TILA financial disclosures, which show the annual percentage interest rate ("interest rate"), finance charge, amount financed, total amount of payments, and number of payments.

162.     The sales representative controls access to the tablet, phone, or computer that has the screen with the TILA disclosures, and sales representatives often have consumers sign the loan terms with Mosaic before consumers have a chance to review the disclosures.

31

163.     Other times, the sales representative leaves the consumer's home before financing is finalized with Mosaic. In these cases, the sales representative can tell the consumer the interest rate and the monthly payment amount but does not disclose the total amount the consumer will pay on the loan after the interest rate and other charges are applied.

164.     If the sales representative leaves before the consumer signs the Mosaic Agreement, Mosaic emails the consumer to finalize the loan consummation process.

165.     Mosaic representatives also are supposed to perform a "welcome call" with the consumer to review the loan terms, including the finance charge, interest rate, and the total amount of payments. However, if Mosaic actually conducts the "welcome call," Mosaic typically completes this call only after consumers are already bound to the purchase price in the Solar Titan Agreement. Some consumers are also bound to the Mosaic Agreement terms well before Mosaic's "welcome call" because they have already signed it from the sales representative's tablet or phone.

166.     When promoting itself to retail partners like Solar Titan, Mosaic boasts about how easy it is for consumers to get credit approval from the company because of its low stipulation rate. The below image was taken directly from Mosaic's website:



167.     Boasting its "low stip rate" is a way for Mosaic to say that it has minimal requirements to approve a consumer's loan application.  For example, as shown above, Mosaic does not look at a consumer's debt-to-income ratio, which is a commonly used indicator of a consumer's ability to repay their loans.

168.     Mosaic also looks at the income of every person in the household. Upon information and belief, they consider every household member's income without ensuring that the household member has agreed to accept responsibility for repaying the loan.

169.     The fact that Mosaic has a "low stip rate" as compared to other finance companies is used as a major selling point in Mosaic's marketing to companies like Solar Titan. Solar Titan prefers Mosaic because of its high approval rate for loan applications.

170.     Although Mosaic's website claims to require verifiable income, Solar Titan's practice of routinely inflating consumers' income on their applications suggests that Mosaic does not collect documentation verifying consumers' income..

171.     Mosaic's "low stip rate" and "fast stip approval," along with the fact that Mosaic does not evaluate a consumer's debt-to-income ratio or the product's loan-to-value ratio, is indicative of its lack of due diligence.

172.     Although the majority of Solar Titan consumers need financing to purchase the solar systems, some can pay for the systems by writing a check.

173.     In these instances, Kelley trained Solar Titan sales representatives to take the check to a U.S. Bank location for immediate deposit. Former Solar Titan sales representatives have told the Plaintiffs that they believe such checks are deposited into an individual account (not a Solar Titan account) and that the name on the account is not a name known to be associated with Solar Titan.

### E. MOSAIC

174.    Per the Merchant Agreement, Mosaic agrees to pay Solar Titan the amounts Solar Titan charges consumers for its "turnkey" operation.

175.    Through the parties' partnership, Mosaic authorizes Solar Titan representatives to help consumers fill in Mosaic's credit applications, walk consumers through Mosaic's financing process and requirements, and consummate the transactions that obligate consumers to payment terms under the Mosaic Agreement.

176.    Mosaic requires Solar Titan representatives to go through a training program in order to be able to present Mosaic's loan products to consumers. Upon information and belief, the training program is developed by Mosaic. As provided in the Merchant Agreement, part of Mosaic's training program requires Solar Titan representatives to take and obtain a passing score on Mosaic's "Training Quiz." If the Solar Titan representative does not obtain the passing score, they will not gain access to the Mosaic portal that Solar Titan uses to sign up consumers with loans with Mosaic. Upon information and belief, as part of their initial training with Solar Titan, all newly hired Solar Titan representatives receive the training required by Mosaic at a Solar Titan facility in Knoxville, Tennessee, regardless of where the representative will ultimately perform their job duties.

177.    Solar Titan representatives help Mosaic decide upon a consumer's monthly payment obligation to Mosaic, which they typically set to mirror the amount of that consumer's average electric bill.

178.    Solar Titan and Mosaic try to make the monthly financing payment mimic the consumer's monthly electric utility bill because Solar Titan tells consumers that they will no longer have to pay the electric utility bill once the solar system is installed. Mosaic also suggests that the

34

Mosaic loan payment will replace the consumer's monthly electric utility bill by having the consumers' monthly loan payment mimic the consumer's monthly electric bill payment.

179.     Per the parties' partnership, Solar Titan representatives also direct consumers on the type of loan product Mosaic will use for the consumer. In fact, upon information and belief, Solar Titan only offers one of Mosaic's loan products to consumers—the product Mosaic has referred to as the PowerSwitch Choice loan product. Unlike Mosaic's other solar loan products, the PowerSwitch Choice loan product requires the consumer to make a prepayment(s) within the first eighteen months of the start of the loan in order to avoid re-amortization with a higher monthly payment.

180.     Solar Titan represents that consumers are eligible for a Federal Tax Credit, and Mosaic roughly calculates the prepayment(s) based on the amount the consumer would receive if they were to qualify for that credit. The consumer is instructed that they need to apply the Federal Tax Credit to the loan as prepayment(s) to reduce their overall obligation to Mosaic and prevent their monthly payment from increasing. However, many consumers are not actually eligible for this credit and thus cannot make the prepayment(s) to reduce their loan balance. If a consumer fails to make this prepayment within the first eighteen months of the loan, the consumer's monthly loan payment increases under the terms of the loan agreement. Some examples of the provisions of the Mosaic Agreement explaining this prepayment(s) are reproduced below:

> You acknowledge that in order to avoid an increase in your Monthly Payment, you must make one or more voluntary prepayments equal to approximately **26%** of your Total Loan Amount within 18 months following your Loan Start Date. So long as you are not in default under this Agreement, and provided that you reduce your unpaid Total Loan Amount to the Principal Balance Target by the Re-amortization Date by making sufficient voluntary prepayments, your monthly payment will not increase. If you pay more than **26%** of your Total Loan Amount, your monthly payments will be adjusted to a lower amount. If you do not make any prepayments, or if your prepayments are less than **26%** of your Total Loan Amount, your monthly payments will be adjusted to a higher amount.

**Loan Re-Amortization at Eighteen Months**
Your Loan will automatically re-amortize on the Re-amortization Date stated on the Summary Page. This re-amortization event will take place 18 months after the Loan Start Date. During the re-amortization, the monthly loan payment will be adjusted in a manner to fully repay the Loan by the Maturity Date. Any new adjusted monthly loan payment will become due on the 19th month after the Loan Start Date. You are strongly encouraged to review the monthly loan statements to stay informed about the Re-amortization Date of the Loan and any adjustments to the monthly loan payments. Please note that the re-amortization of the Loan and any adjustments to the monthly loan payment amount assumes you are not in default or in breach of this Loan Agreement.

181. The prepayment(s) is often approximately 26%-30% of the total loan amount. Consumers are told that the Federal Tax Credit for residential solar systems is also 26%-30% of the system's cost.

182. Consumers are signed up with the prepayment loan structure regardless of whether they are likely to qualify for the Federal Tax Credit because Solar Titan largely relies on the promise of a tax credit and lower monthly loan payments as one of its main selling points.

183. The prepayment(s) loan structure further misleads consumers to believe they will qualify for the Federal Tax Credit.

184. In accordance with the Merchant Agreement, Mosaic transmits payments directly to Solar Titan for Solar Titan's solar system sales. Mosaic transmits these payments to Solar Titan in separate installments after Solar Titan performs certain steps or stipulations associated with a given consumer. Solar Titan and Mosaic refer to the stipulations that Solar Titan is supposed to complete as "Milestones."

185. When Mosaic disburses loan proceeds on behalf of a Solar Titan customer, the funds are transmitted by Mosaic to Solar Titan in Tennessee, regardless of where the customer is physically located. At no point are loan disbursements sent directly to consumers. Instead, once Mosaic has directed the funds to Solar Titan in Tennessee, Solar Titan maintains them in a financial institution affiliated with Solar Titan in Tennessee until such time as Solar Titan or its principals decide to use the funds (whether it be for a lawful or unlawful purpose).

36

186.     Further, all files and records related to the financial transaction are processed in and sent from Solar Titan's headquarters in Tennessee.

187.     Upon information and belief, Mosaic directed over $44,927,859.00 in loan funds into Tennessee on behalf of Tennessee residents over the course of its business relationship with Solar Titan.

188.     Upon information and belief, Mosaic directed at least approximately $42,393,073.00 in loan funds into Tennessee on behalf of Kentucky residents over the course of its business relationship with Solar Titan.

189.     Upon information and belief, Mosaic directed at least approximately $3,847,000.00 in loan funds into Tennessee on behalf of Alabama residents over the course of its business relationship with Solar Titan.

190.     Upon information and belief, Mosaic directed at least approximately $15,627,425.00 in loan funds into Tennessee on behalf of Georgia residents over the course of its business relationship with Solar Titan.

191.     Upon information and belief, Mosaic directed at least approximately $36,250.00 in loan funds into Tennessee on behalf of South Carolina residents over the court of its business relationship with Solar Titan.

192.     Similar to Mosaic's low stipulation rate for approving consumers' loan applications, the company's "Milestones" for funding a loan are also less rigorous than those used by other lenders in the residential solar industry.

193.     To complete the first Milestone, Solar Titan informs Mosaic that the consumer has signed the Solar Titan Agreement. Solar Titan also shares a copy of the consumer's signed

Solar Titan Agreement. Once this Milestone has been met, Mosaic transmits the first installment payment to Solar Titan.

194.     Former Solar Titan employees have cautioned Kelley and Kirkland that Solar Titan should not seek funding from Mosaic until a consumer's statutory right of cancellation has expired.

195.     Despite these warnings, Kelley and Kirkland require their employees to get the first round of funding from Mosaic as soon as possible.

196.     In fact, the Solar Titan Defendants have hired employees for the purpose of submitting Solar Titan Agreements to Mosaic and getting its first Milestone payment from Mosaic as soon as possible.

197.     If a consumer signs these agreements after business hours, Solar Titan employees submit these Agreements to Mosaic first thing the next morning. These employees are also expected to work weekends to ensure Solar Titan receives its first installment payments as soon as possible.

198.     Mosaic knows or should know when a consumer's three-day right to cancel has expired because the Solar Titan Agreements are dated. Mosaic routinely funds the solar system sale Solar Titan before the consumer's right of cancellation has expired. When consumers timely exercise their right to cancel, Solar Titan often refuses or delays informing Mosaic about the cancellation in hopes of retaining funds that Mosaic has sent for that consumer.  Despite Mosaic having a copy of the dated Solar Titan Agreement, showing Mosaic that consumers three-day right of rescission period has not expired, Mosaic fails to cancel the Mosaic Agreement when Solar Titan does not report that the consumer has cancelled. As such, Mosaic continues charging those

consumers their monthly loan payments, even when Mosaic knows or should know that they properly cancelled their solar system purchase.

199. For Solar Titan to complete the second Milestone and receive the second loan installment payment from Mosaic, Solar Titan is only required to meet Mosaic's insubstantial installation requirements.

200. Solar Titan's completion of the second Milestone does not require Solar Titan to fully complete the installation such that the system is operational; instead, Mosaic considers the second Milestone complete when the solar panels are placed on a consumer's roof.

201. This Milestone also could trigger the beginning of the consumer's loan repayment obligation. Mosaic requires a consumer to begin repaying the loan fifteen days after Solar Titan reports that the solar panels have been placed on the consumer's roof.

202. Initially, Solar Titan had to complete three Milestones before receiving full funding for a given loan: (1) submit the installation agreement; (2) show the panels are on the roof; and (3) submit the interconnection agreement between the consumer and the consumer's LPC. The interconnection agreement is a prerequisite to a solar system becoming operational.

203. Because Mosaic initially required Solar Titan to show that the installed system had permission to operate from the consumer's LPC, Mosaic knew or should have known that Solar Titan's installation-related shortcomings were delaying its systems actually becoming operational.

204. Despite knowing that Solar Titan frequently failed to get solar systems operational prior to consumers' first loan payments coming due, Mosaic eliminated the requirement that Solar Titan completes the third Milestone before fully the consumer's loan.

39

205.     Rather than requiring Solar Titan to complete all three Milestones, Mosaic began to fully fund the loan after Solar Titan achieved the first two Milestones. In other words, Mosaic disbursed the consumer's loan proceeds to Solar Titan even before the consumer receives an operational solar system.

206.     This incentivized Solar Titan to merely install some components of the solar panels without taking the additional steps to make the system operational.

207.     At one time, Mosaic required Solar Titan to submit photographs showing that the solar panels had been installed on the homeowner's roof, but Mosaic even dropped that requirement, ensuring that Solar Titan only needed to click a button to attest that an installation is complete.

208.     Solar Titan Defendants and Mosaic fail to inform consumers that they may be required to make payments to Mosaic before their systems are operational. Solar Titan represents to consumers in written advertisements and in person that they will experience large savings on their electric bill when they purchase a Solar Titan system.

209.     When Solar Titan fails to fully complete a solar system installation within 120 days of the Solar Titan Agreement being signed, Mosaic is supposed to rescind or "claw back" the disbursements it made to Solar Titan. Mosaic has regularly failed to claw back these payments, creating another incentive for Solar Titan to focus on procuring new customers without completing the installations for consumers the company has already signed up and for whom they have received funding.

210.     Mosaic has reduced the Milestones Solar Titan must complete before receiving loan disbursements because Mosaic makes substantial profits from Solar Titan's sales.

40

211.     Mosaic can, if it chooses, undertake to complete an incomplete installation if the consumer faces significant delays in having their solar system made operational. However, Mosaic often chooses not to complete installations despite knowing that the installations have not been completed.

212.     Over the course of its partnership with Solar Titan, Mosaic became aware of numerous complaints about Solar Titan's unlawful activities from consumers in every state where Solar Titan conducted business, including Kentucky, Tennessee, Alabama, Georgia, South Carolina, and North Carolina. These complaints alleged, *inter alia*, that Solar Titan had misrepresented the anticipated energy savings and financial benefits associated with the purchase of a solar system and that the solar system was not properly installed, or had never been installed. Most or all of Mosaic's discussions with Solar Titan about consumer complaints have occurred with the Solar Titan executives, officers and employees, located in Tennessee.

213.     Despite receiving numerous complaints from Solar Titan customers about inoperable systems, Mosaic rarely, if ever, assists the consumer in making the solar system operational. Instead, Mosaic treats the complaints as a dispute between Solar Titan and the homeowner and continues to demand payment from the consumer.

214.     When consumers have raised the misrepresentations that Solar Titan has made to Mosaic, Mosaic has continued its collection activities. This has included Mosaic disabling consumers' solar systems, which sometimes leads to consumers losing electricity to all or a portion of the residence or other property where the system is installed. When Mosaic disables consumers' solar systems, and they lose electricity to all or a portion of the residence or other property where the system is installed, some consumers suffer injuries like having to replace perishable household goods and medicine, having to pay to repair electronic items that were damaged as a result of

41

losing and regaining power, and being deprived of using portions of their home. Also, many consumers, despite having a defense to repaying Mosaic, are pressured into paying Mosaic anyway to avoid having their system disabled before Solar Titan or another third party can fix the issues with the system.

### F.  MOSAIC ENGAGED SOLAR TITAN TO ACT AS ITS AGENT

215.    While Mosaic engaged in its own unlawful conduct, Mosaic is also liable for Solar Titan's conduct that harmed consumers because Mosaic and Solar Titan engaged in an ongoing agency relationship by both actual agency and agency by ratification.

216.    A principal is liable for its agent's acts when the acts fall within the scope of an actual agency relationship. An actual agency relationship is one wherein the principal authorizes the agent to act for the principal's benefit but, at the same time, retains the right to control the agent's conduct. When determining whether an actual agency relationship exists, courts should examine the conduct of, and relationship between, the involved parties.

217.    Under both Tennessee and Kentucky law, proof that a principal had an implied or actual right to control the agent's conduct establishes an agency relationship.

218.    At all relevant times, Mosaic engaged Solar Titan to act as its agent to sell and market its loan products.

219.    To this end, Solar Titan acted as Mosaic's actual agent in soliciting, applying, and executing loan agreements for Mosaic.

220.    Mosaic controlled various aspects of how Solar Titan worked on its behalf and had the authority to control Solar Titan regarding the same.

221.    On or around June 2020, Mosaic and Solar Titan entered into a contractual relationship whereby Mosaic would provide financing to Solar Titan's customers for the purchase

42

of solar systems. Solar Titan and Mosaic memorialized their contractual relationship by executing the Merchant Agreement. From that point, Solar Titan and Mosaic maintained an ongoing relationship by which Solar Titan sales representatives would market, promote, and sell Mosaic's loan products while applying for those products for consumers in the consumers' homes.

222. Mosaic's Participant Agreement, which is incorporated in the Merchant Agreement (the "Agreement"), gave Mosaic the ability to utilize Solar Titan Sales Representatives to sell their loan products and direct how sales representatives presented and sold Mosaic financing to consumers.

223. To this end, the Agreement gave Mosaic control over nearly every aspect of Solar Titan's promoting, sale, and use of Mosaic's loan products.

224. According to the Agreement, Solar Titan could not make any oral or written "marketing, promotional, and advertising materials and communications referencing" Mosaic without Mosaic's prior approval.

225. Further, Mosaic had access to Solar Titan's financial records and required Solar Titan to notify Mosaic in writing promptly after any customer inquiry or complaint regarding Mosaic. Mosaic made disbursements directly to Solar Titan for each borrower's loan, rather than to the borrower. When Mosaic disbursed payments to Solar Titan, borrowers were unaware of the stipulations for Mosaic's Milestone payment to Solar Titan. Mosaic does not independently verify with consumers that Solar met Mosaic's stipulations for that Milestone payment.

226. Per Mosaic's Participant Agreement, Mosaic had the sole authority to "establish policies and procedures related to the promotion, application, and/or funding" of its products.

227. The Agreement also mandated that Solar Titan comply with the Mosaic Program Documents, which Mosaic created. The Agreement broadly defines Mosaic Program Documents

43

as "this Agreement, each Mosaic Program Addendum, each Mosaic Supplement (if applicable), and any other policies, procedures, or instructions communicated" by Mosaic to Solar Titan.

228.    Mosaic retained the right to "add new Mosaic Program Documents" at any time. Mosaic also retained the right to "modify the terms of [the Agreement] or any other Mosaic Program Document" at any time.

229.    Mosaic also retained the right make changes to any of its Financing Product documentation at any time.

230.    Mosaic also maintained significant control over Solar Titan's training of its employees. Mosaic mandated that Solar Titan train its staff on multiple aspects of Mosaic's products through a mandatory "Training Program.". Mosaic directed and controlled this training by specifying what the Training Program must include. According to the Agreement, Mosaic required Solar Titan to train its sales representatives on "the terms and conditions of the Mosaic Program, the Marketing Requirements, Applicable Laws and other standards . . . ."

231.    Mosaic also directed Solar Titan's training of employees regarding its own policies, requiring Solar Titan to "implement, update, revise and disseminate its policies, procedures, systems, internal controls, and training materials as reasonably necessary to ensure that its Training Program includes appropriate training and oversight of [sales representatives] that have consumer contract or compliance responsibilities."

232.    To ensure compliance with these training requirements, the Agreement demanded that Mosaic be given access to Solar Titan's "sales meetings, marketing events, and other business development meetings" to evaluate Solar Titan's "implementation of the Training Program." Once a sales representative was trained, Mosaic required the sales representative to "obtain a passing

44

score on any Mosaic Program training test or quiz in order to gain access to the Portal and participate in the Mosaic Program."

233. The same section of the Agreement also obligated Solar Titan to engage in additional training whenever Mosaic made changes to its loan program or "as deemed necessary" by Mosaic in its sole discretion. The Agreement also prohibited Solar Titan from providing resellers access to Mosaic's portal without written consent from Mosaic. In order to obtain consent, Mosaic required Solar Titan to submit "for review and approval a list of proposed Resellers, including full corporate names and addresses."

234. Finally, the Agreement provided that Mosaic was free to suspend Solar Titan's authorization to submit financing applications to Mosaic or execute financing agreements to Mosaic "in its sole discretion, effective upon [Mosaic's] delivery of written notice to [Solar Titan]."

235. Under the circumstances, these actions demonstrate Mosaic's intent to enter into an agency relationship and to maintain significant control over numerous aspects of Solar Titan's business. Thus, Mosaic had the right to control Solar Titan's conduct as it relates to its sales representatives and its promotion, procurement, and sale of Mosaic's loan products.

236. Mosaic knew or should have known of Solar Titan's federal and state consumer protection violations and failed to stop them. Mosaic benefitted from Solar Titan's violations because they induced consumers to agree to purchase the solar systems and use Mosaic for financing. To this end, Solar Titan became Mosaic's agent by ratification.

237. A principal is liable for its agent's acts, even when an actual agency relationship does not exist, if the principal demonstrates an express or implied adoption and confirmation of an

45

otherwise unauthorized act performed by another on the principal's behalf. Intention to ratify is determined by looking to the principal's acts and statements, not by his profession.

238. Approximately 90% of Solar Titan consumers required financing to purchase a solar system.

239. Approximately 75% of Solar Titan consumers who chose to finance their solar system were financed through Mosaic. Thus, Solar Titan relied on Mosaic to finance the purchase of its solar systems and continue its business.

240. Throughout the business relationship, Mosaic received hundreds of complaints directly from Solar Titan consumers that often detailed Solar Titan's sales misrepresentations and other unlawful conduct.

241. For this reason, Mosaic knew, or should have known through reasonable diligence, of Solar Titan's continued unlawful practices, which ultimately induced consumers to purchase the system and finance through Mosaic.

242. Nevertheless, Mosaic did not meaningfully investigate or remedy many of the complaining consumers' issues. Instead, Mosaic enabled Solar Titan to continue to sell its loan products and, naturally, the solar systems themselves, by actively financing new Solar Titan systems despite the hundreds of already aggrieved customers.

243. According to the Agreement, Mosaic dictated the steps or "Milestones" Solar Titan must complete to receive a consumer's loan funds. Although Mosaic's Milestones originally required Solar Titan to demonstrate solar panels were both installed and operational as prerequisites to receiving consumer funds, Mosaic eventually chose to eliminate both requirements for financing Solar Titan systems.

46

244.     Solar Titan also committed unfair, false, misleading, deceptive, and abusive acts while failing to install or otherwise service solar systems funded through Mosaic. Similarly, however, Mosaic allowed Solar Titan's acts to go on by continuing to disburse payments to Solar Titan despite numerous consumer complaints to Mosaic regarding Solar Titan's failure to install systems timely.

245.     Mosaic's continuing to actively engage in a business relationship with Solar Titan and Mosaic's decision to continue disbursing funds to Solar Titan despite the numerous consumer complaints it received directly from Solar Titan customers demonstrates Mosaic's actual intent to ratify Solar Titan's unlawful conduct.

246.     The circumstances may be such that the law will recognize the constructive intent to ratify when none was intended. At minimum, Mosaic's acts demonstrate a constructive intent to ratify Solar Titan's conduct such that it could continue to receive the benefits of Solar Titan's business.

### G. TENNESSEE CONSUMERS

247.     Solar Titan's unfair and deceptive business practices have affected hundreds of consumers.

248.     Solar Titan maintains an 'F' Rating with the Better Business Bureau ("BBB") because of numerous consumer complaints, delayed or non-response to complaints, and overall consumer dissatisfaction with Solar Titan's failure to address issues.

249.     At the commencement of this case, at least 123 consumers have complained to the BBB about Solar Titan. These complaints were from consumers in Tennessee, Kentucky, and the neighboring states where Solar Titan sells solar systems.

250.    Kelley and Kirkland are aware of the pattern of complaints from consumers to the BBB because they met with Tony Binkley, CEO of the BBB of Greater East Tennessee, about the BBB complaint process and the large number of complaints lodged against the Solar Titan. After that meeting, upon Kirkland's request, the BBB started emailing new consumer complaints directly to Kirkland.

251.    As of October 9, 2023, the Tennessee Division of Consumer Affairs ("DCA"), Tennessee's clearinghouse for consumer complaints about unfair or deceptive acts and practices, has received 317 consumer complaints about Solar Titan. Since the commencement of this action, the number of DCA complaints continues to grow.

252.    DCA received 66 consumer complaints about Solar Titan in 2022 alone.

253.    DCA received another 244 consumer complaints from January 1, 2023 through October 9, 2023.

254.    Complaints to DCA typically concern at least one of four issues:

    a.  Solar Titan induced the sale by exaggerating the consumer's energy bill savings;

    b.  Solar Titan failed to install the solar system before the consumer's loan payments began

    c.  Solar Titan's workmanship on the installation is substandard, and thus, the consumer's system failed inspection;

    d.  Solar Titan incorrectly represented that the consumer would be eligible for tax credits to offset the cost of the solar system.

255.    Some consumers even complain that Solar Titan has installed their system without making the consumer's LPC aware that the installation is occurring. For example, Tennessee

48

consumer Billy Graves had a solar system from Solar Titan installed on his house; however, Solar Titan made no attempt to have the LPC install the proper "bi-directional" meter before turning on his system.

256.     Mr. Graves had to call the LPC himself to come out and install the correct meter. Mr. Graves is under the impression that his LPC was unaware that the Solar Titan installation was taking place before it was completed.

257.     Tennessee consumers also complain that Solar Titan sales representatives falsely say consumers are eligible for net metering or "buyback" programs that would further offset the consumer's energy bill each month. In Tennessee, no local utility company offers residential buybacks.  For example, Tennessee consumer Jonathan Snow purchased and financed a Solar Titan solar system because Solar Titan told him that TVA would buy back the excess power produced by his panels.

258.     Mr. Snow, who uses Mosaic as his finance company, had to begin making monthly payments even before his system was operational.

259.     Mr. Snow called Solar Titan and spoke with Kirkland and Kelley. During his conversations with Kirkland and Kelley, they represented themselves as the owners of Solar Titan.

260.     Mr. Snow complained that he was paying for his solar system, which was not operational.

261.     When Mr. Snow complained to Kirkland and Kelley, they said the contract he signed obligates him to start making monthly payments when the panels are "installed," not when the system is operational. Like many consumers, Mr. Snow was not told these things during his sales presentation.

49

262. Once his system became operational, Mr. Snow inquired with Kirkland about what was needed to sign up for the TVA buyback program Solar Titan talked about during the sales presentation.

263. Kirkland told Mr. Snow that signing up for the buyback program was not worth doing because he would have to have a special meter installed on his property.

264. Mr. Snow also complained to Kelley about the many misrepresentations the company made to him and the fact that Solar Titan was not coordinating with the LPC. Mr. Snow told Kelley that he intended to post negative reviews online.

265. In response to Mr. Snow's complaints, Kelley told Mr. Snow he is legally prohibited from posting negative online reviews under the terms of the Solar Titan Agreement.

266. Mr. Snow was surprised to see that his Solar Titan Agreement contained a provision prohibiting him from "[using] any form of social media to express opinions that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits LLC/Solar Titan USA LLC...".

267. Mr. Snow has abstained from posting negative online reviews out of fear of breaching the contract he signed with Solar Titan.

268. Other consumers complain about faulty equipment Solar Titan sells.

269. For example, Knoxville resident Bruce Whitehead paid Solar Titan to include a battery with his solar system because he was told the battery would help keep his refrigerator running even during interruptions in service from the utility company.

270. In fact, the battery Solar Titan convinced Mr. Whitehead to order could not keep his refrigerator running in the event of a power outage.

50

271.     Thus, Solar Titan misled him about the availability of power from the battery when the power grid was down.

272.     Also, the battery that Solar Titan sold Mr. Whitehead does not work when it is colder than 41 degrees Fahrenheit outside.

273.     The fact that the battery would not provide electricity when the grid was down or in cooler temperatures is problematic for Mr. Whitehead, who wanted a reliable power source for the refrigerator where he keeps his diabetic son's medicine.

274.     Although Solar Titan knew or should have known about this limitation of the batteries the company sold Mr. Whitehead, Solar Titan did not disclose that information to him.

275.     Another Tennessee consumer, Ronnie Smith, complains that Solar Titan's solar system installation caused his roof to leak.

276.     Mr. Smith previously complained about the issue to Solar Titan, but Solar Titan refused to fix the leaks.

277.     The Solar Titan Agreement contains a workmanship warranty and a roof warranty, but Solar Titan routinely refuses to honor those warranties.

278.     Mr. Smith, who also uses Mosaic as his finance company, further complains that he was never given a copy of his Mosaic Agreement.

279.     Solar Titan promised Mr. Smith that his electric bill would decrease by over 50%, but Mr. Smith has not seen any significant decrease in his monthly power bill.

280.     Many Tennessee consumers complain that they attempted to cancel their contracts with Solar Titan within the statutory three-day cooling-off period, but Solar Titan has refused to honor their right to cancel. They also complain that Mosaic continues to try to collect from them after they have exercised their right to rescind the sales agreement.

51

281.    On August 27, 2022, pursuant to TENN. CODE ANN. § 47-18-106, the Office of the Tennessee Attorney General conducted an oral examination of Sarah Dorismar, Solar Titan's former Finance and Administration Manager. The Office of the Tennessee Attorney General refers to this investigative oral examination as a Sworn Statement.

282.    A Sworn Statement is given under oath and is subject to the penalties of perjury.

283.    In her Sworn Statement, Ms. Dorismar stated that Solar Titan routinely refused to honor cancellations made within the TCPA, KCPA, and TILA's statutory three-day cooling-off period.

284.    In fact, Kelley and Kirkland only allowed Ms. Dorismar to process three to four cancellations per week, even though Solar Titan had a backlog of over 90 consumers who had properly requested cancellations.

285.    Consumers who did not have their cancellations processed were still billed by Mosaic.

286.    Consumer Charles Ochsner timely sent his cancellation notice to the address specified in the Mosaic Agreement, but both Solar Titan and Mosaic initially refused to honor his cancellation.

287.    Despite canceling the loan in February 2022, Mosaic withdrew money from Mr. Ochsner's bank account in May 2022.

288.    Mr. Ochsner did not even have a solar system installed on his property when Mosaic withdrew the May 2022 payment.

289.    Despite his protests to Mosaic and Solar Titan, Mosaic again withdrew money directly from his bank account in June 2022 and July 2022.

52

290. After three months of complaints from Mr. Ochsner to Mosaic and Solar Titan, Mosaic finally stopped withdrawing money from Mr. Ochsner's bank account.

## H. KENTUCKY CONSUMERS

291. Solar Titan has also used misrepresentations to induce transactions with Kentucky consumers. These misleading and/or false representations include, but are not limited to, the following:

a. exaggerating consumers' energy bill savings if they switch to solar energy,

b. misrepresenting consumers' eligibility for the Federal Tax Credit, and

c. giving incorrect information about how long the installation process will take, and that if they financed the purchase, they are only obligated to make payments to the finance company when the system is operational.

292. For example, one consumer, M.C., agreed to pay $36,000 for his solar system after Solar Titan's sales representative promised he would receive an 85% reduction on his electric bill. However, after the panels were installed, that consumer only saw a reduction in his electric bill of, at most, 20%.

293. Solar Titan also told J.C. and C.C. that they were guaranteed to receive a $6,000 Federal Tax Credit for the solar system that was sold to them for $36,800. However, J.C. and CC received less than $6,000 for their tax credit. Because their loan with Mosaic required a prepayment of $6,000, J.C. and C.C.'s monthly payment increased when Mosaic re-amortized their loan after eighteen months.

294. J.C. and C.C. also asked Mosaic to delay their payment start date

295. because they were scheduled to start making payments in February 2021, but their solar system was not fully installed until April 2022.

53

296. Mosaic refused to push back the start date for their first monthly payment. During the time that they paid Mosaic while seeing no reduction in their monthly electric bill, they paid a combined monthly total of about $400-$500 towards their electrical expenses.

297. Moreover, Solar Titan sold a Generac battery to J.C. and C.C. without disclosing that the battery would not work when the battery reached temperatures below 41 degrees Fahrenheit. Thus, for several months every year, they cannot store energy or use energy previously stored on their batteries.

298. As another example of Solar Titan using false representations regarding consumers' eligibility for Federal Tax Credits, a Solar Titan sales representative guaranteed Kentucky consumer O.E. that she would receive a 26% Federal Tax Credit on her system that she purchased for $30,500. However, O.E. did not qualify at all for the Federal Tax Credit.

299. Additionally, O.E.'s solar system is still inoperable as of January 2023 because Solar Titan has failed to fully complete the installation. O.E. purchased her solar system in July 2021, and her monthly payments to the financing company began in November 2021. By purchasing a solar system from Solar Titan based on the company's false representations, O.E. has doubled her monthly electric expenses. Solar Titan promised O.E. her electric bill would be eliminated, but instead, O.E. is paying double what she was paying for electricity before.

300. When Kentucky consumers B.K. and T.K. attempted to cancel their contract because they received a poorly functioning solar system, Solar Titan told them they are still bound to the contract and are required to pay Solar Titan's sales price for its solar system and "turnkey" services.

54

301.     Solar Titan has made no effort to remedy the problems B.K. and T.K. are experiencing, despite the fact that the Solar Titan Agreement contains a ten-year workmanship warranty and the panels they install contain multiyear product performance warranties.

302.     Solar Titan has done more than inflict financial harm but has also caused consumers to bear the emotional toll stemming from the financial stress. One heartbreaking example is that of S. N., whose seven-year-old daughter overheard her crying when she realized that she would not be able to buy her children Christmas presents because she had no savings left after having to make her monthly solar loan payments on top of her utility bill.

303.     The examples provided above are non-exhaustive illustrations of the harm caused by Solar Titan's and Mosaic's business practices in Kentucky. Since Solar Titan began selling to Kentucky consumers and facilitating Mosaic's loans, the Kentucky Office of the Attorney General (KYOAG) has uncovered more than 400 complaints about Solar Titan's unfair, false, misleading, deceptive, and abusive marketing and sales acts and practices either submitted by consumers directly or uncovered by the KYOAG over the course of its investigation into Solar Titan and Mosaic.

## I.   INSTALLATIONS AND PERMITTING

304.     Consumers are not the only ones who have had problems with the Solar Titan Defendants.

305.     LPCs and inspection authorities have voiced numerous concerns about Solar Titan's business practices and the quality of its work.

306.     As previously mentioned, Solar Titan offers consumers a "turnkey" solar system. This means that Solar Titan agrees to handle all the permits and inspections required to complete the installation and make the system operational.

55

307.   Such a commitment requires Solar Titan to work closely with LPCs when completing these installations and to ensure that all requisite paperwork is provided in a timely fashion.

308.   Though the procedures may vary slightly between LPCs, each LPC has basic requirements and steps that the installer must follow.

309.   For example, in order to get a system approved and operational in Knoxville, Solar Titan must first send the Knoxville Utility Board ("KUB") a drawing of the system, an equipment "cut-sheet," and the model number(s) of the battery and/or equipment to be installed on the consumer's roof.

310.   KUB then reviews these submissions and, if approved, requires submission of an interconnection application.

311.   Because Solar Titan promises to coordinate permitting and inspections with the LPC, the company should facilitate the submission of the interconnection application.

312.   After KUB approves an interconnection application, Solar Titan is then to apply for all requisite permitting.

313.   The permitting application can be done online.

314.   After obtaining permits, Solar Titan can proceed to installation. But before a consumer's system can start working, Solar Titan must arrange for a final safety check with KUB. KUB also verifies that an electrical inspection has been completed and that the system has passed inspection.

315.   If the system passes the electrical inspection and KUB's safety check, a KUB technician installs a bi-directional meter on the consumer's home; after that, the system can be safely turned on.

56

316.     According to KUB, Solar Titan often completes its installations before even notifying KUB that the consumer is having a solar system installed at their house.

317.     When KUB is not notified in advance that an installation is complete, KUB has no opportunity to install a bi-directional meter and thus does not know that the solar system is producing energy.

318.     Bi-directional meters are required so the LPC can see when "back-feeding"[5] is occurring. Without bi-directional meters, KUB electrical staff who are working on the power lines during an outage may be unaware that energy is flowing from a home to the electric grid, putting them at risk of being electrocuted.

319.     Also, without the proper bi-directional meter installed, back-feeding will cause any excess generation from a consumer's solar system to be added to the consumer's bill as consumption. This is because the typical meter cannot properly account for forward and reverse electrical flow and instead counts both forward and reverse flow as the same.

320.     KUB representatives have also expressed concerns over the way Solar Titan treats its consumers.

321.     KUB estimates that it receives complaints from half of Solar Titan customers.

322.     Many of those complaints involve issues like the consumer's difficulty reaching Solar Titan staff, the company's lack of responsiveness, the inexplicable delays in getting paperwork submitted, and the company's failure to complete the installation.

323.     KUB's most common consumer complaint is that the solar system is not producing what was promised by Solar Titan's sales representative.

---

[5] Back-feeding refers to the flow of power from the electrical circuits of a house to the utility lines, rather than in the normal direction from the utility lines to the electrical circuits of the house.

324.    When KUB receives these complaints, they sometimes learn that Solar Titan has falsely blamed the solar system's underperformance on a malfunctioning KUB meter.

325.    TVA representatives have also expressed concerns about Solar Titan installations.

326.    TVA is a U.S. Government Agency and public company created by the U.S. Congress in 1933 to control floods, improve navigation and the living standards for farmers, and produce energy along the Tennessee River and its tributaries.

327.    Today, TVA provides electricity to 153 LPCs across Tennessee and parts of six of the surrounding states.

328.    TVA operates a program known as the Green Connect Quality Contractor Network ("QCN").

329.    The QCN helps consumers find "trustworthy licensed and insured contractors trained to meet TVA's quality guidelines."

330.    In exchange for being a part of the program and agreeing to abide by the program's rules and guidelines, TVA gives installers a one-time $250 payment for each installation.

331.    TVA received so many complaints about Solar Titan from LPCs and consumers that it dropped Solar Titan from its QCN program.

332.    Despite being removed from TVA's QCN program, Solar Titan continued to represent itself as a "TVA partner," prompting TVA to send the Solar Titan Defendants a cease-and-desist letter demanding that the company stop making this misrepresentation.

333.    Middle Tennessee Electric Membership Corporation ("MTE"), Tennessee's largest electric cooperative responsible for providing electricity to more than 750,000 Tennesseans, has also complained about issues with Solar Titan.

334.   Like KUB, MTE requires the submission of drawings and an interconnection application before the solar system installation can begin. Like KUB, MTE often sees Solar Titan installations being performed without these prerequisites being completed.

335.   Tim Suddoth, MTE's Distributed Energy Resources ("DER") and Energy Services Supervisor, reports that MTE has received multiple complaints from Solar Titan customers.

336.   These complaints include concerns about significant delays in system installation and making the system operational, systems not generating at the levels represented to consumers, the installations causing the consumers' roofs to leak, and a general lack of communication.

337.   Mr. Suddoth estimates that 60-70% of Solar Titan customers call him to report issues. Mr. Suddoth says Solar Titan does not meaningfully communicate with its consumers and passes them from person to person.

338.   Mr. Suddoth has also noted significant problems with the installations themselves, including: (i) systems being installed without written MTE approval or without approval from the local Authority Having Jurisdiction, (ii) the use of poor-quality conduits, roof anchors, and unused attachments left on the roofs, and (iii) the use of other subquality materials that are not likely to last the 25+ year lifespan of the system.

339.   MTE has even discovered several electrical disconnects[6] wired incorrectly in ways that create a risk of electrocution.

340.   Perhaps most egregiously, MTE detected "reverse rotation" of Solar Titan solar systems before the system had been commissioned and passed the required safety test. In other words, systems were back-feeding electricity onto the grid without the LPC's knowledge. Unknown reverse rotation poses a significant safety risk to anyone working on the electrical grid.

---

[6] An electrical disconnect is a safety device used to easily shut off power in case of emergencies.

59

341.    Solar Titan's use of unqualified installation personnel poses a risk to the homeowner and the installers themselves.

342.    Mr. Suddoth notes that, in addition to the potential for electrical shock, Solar Titan's use of unqualified installation personnel and its failure to abide by industry standards increases the risk of damage to the consumer's home and the increased danger of onsite fires or damage to MTE equipment.

343.    During a Sworn Statement of Shawna Helton, Solar Titan's former Vice President of Sales, Ms. Helton said that a Solar Titan installer shocked herself after drilling into a "live" breaker box.

344.    Ms. Helton believes this employee was not properly trained and had no prior experience working on electrical components.

345.    Mr. Suddoth has been frustrated by his interactions with Solar Titan employees. He notes that Solar Titan's installers "do not have the proper tools or the knowledge to answer questions [that] MTE or customers have. They generally do not know how to troubleshoot issues… Solar Titan USA employees display little knowledge of how the systems function and seem to be equally as frustrated, oftentimes complaining of no clear direction (they just show up), lack of training, lack of organization, and lots of blame on equipment or other employees not onsite."

346.    Mr. Suddoth also notes that "Solar Titan USA's drawing packages do not include the person who is designing the systems along with their qualifications. Most contractors will provide their license number and professional certifications (NABCEP #, engineering license, etc.) on their drawings."

347.    Solar Titan does not include this information on its drawings because they are done by wholly unqualified individuals.

60

348.    According to Ms. Helton, the person Solar Titan put in charge of creating and submitting drawings to LPCs is Kirkland's son, Matt Kirkland.

349.    During a Sworn Statement of Mike Hill, a former Solar Titan sales and training manager, Mr. Hill said that Matt Kirkland's title at Solar Titan has been "Design Engineer." Mr. Hill believes this title does not reflect Matt Kirkland's actual qualifications and that Solar Titan uses that title "to make it sound fancy and more professional than it was."

350.    In reality, Matt Kirkland is not an engineer and maintains no qualifications for creating and submitting Solar Titan's drawing packages.

351.    Despite this, some Solar Titan drawing packages have been submitted to LPCs with a cover page that said, "Engineered by Matt K."

352.    Mr. Suddoth has also had difficulties with Solar Titan's Technical Operations Officer, Dale Roden.

353.    Upon information and belief, Mr. Roden has been in charge of training installers and overseeing Solar Titan's installations.

354.    Mr. Suddoth describes Mr. Roden as "confrontational and unwilling to help with problem-solving."

355.    In short, LPCs and other electrical providers have had continuous problems with Solar Titan's approach to installation. Solar Titan relies upon inexperienced personnel and ignores the procedural requirements and industry standards put in place to ensure the safety of the public and every person involved in the installation process. This corner-cutting has resulted in actual, physical harm in the form of damage to property and injuries to its workers.

61

356. Per Tennessee Public Chapter 177, the Tennessee State Fire Marshal's Office ("SFMO") requires that all equipment delivering electricity to the point of interconnection with a power grid be inspected by a state-certified inspector before it can be made operational.

357. Michael Morelli, the SFMO's Director of Electrical, Residential, and Marina Sections, oversees permitting and inspections for solar systems installed within SFMO's jurisdiction.

358. Mr. Morelli states that his experiences with Solar Titan have raised serious concerns.

359. Mr. Morelli reports that Solar Titan installations fail inspection at an unusually high rate.

360. A failed inspection is indicative of a failure to follow proper procedures and applicable electrical code sections. This increases the potential for electrical shock, fire, and the loss of life.

361. Mr. Morelli also notes that the inspectors he oversees have complained about the training and experience of Solar Titan's installers and the quality of their work.

362. Again, using unqualified and/or poorly trained installers increases the likelihood that something could go wrong and poses an additional health and safety risk, on top of the normal health and safety risks associated with electric work by qualified professionals.

363. Like their Tennessee counterparts, Kentucky electric providers frequently experience issues with Solar Titan failing to obtain proper permits or having qualified personnel present during the installation.

364. Kentucky utility providers also report a pattern of Solar Titan installed solar systems repeatedly failing safety inspections due to shoddy workmanship.

365. As in Tennessee, there have been multiple instances of Solar Titan connecting a solar system to the main power grid without authorization in Kentucky, thereby creating a serious and unacceptable risk to life and property.

366. As described by Stephen Miller, the Manager of Operational Services for Warren Rural Electric Cooperative Corporation ("WRECC") in Bowling Green, Kentucky, WRECC has encountered numerous problems in regard to Solar Titan installations.

367. These problems include having solar system installations being connected to the electric grid before the system has passed inspection and is commissioned by the LPC.

368. According to Mr. Miller, when a system is connected to the grid before going through the commissioning process, "there is an increased risk of injury and/or death to property occupants, electric utility line workers, and other personnel who service the grid."

369. If Solar Titan is allowed to continue operating in this manner and posing these types of substantial risks to the health and safety of consumers and LPC employees, damage to property and injuries to people will continue to occur.

370. Beyond not getting the proper permits to conduct installations, Solar Titan does not maintain the proper licenses required to conduct home improvement contracting work.

371. Under the current Tennessee Home Improvement Contractors Act (TENN. CODE ANN. § 62-6-501, *et seq.*), Solar Titan is required to have a home improvement contractor license to perform these types of home improvement services.

372. Solar Titan also did not maintain the proper license under the Tennessee Contractor's License Act of 1994 (TENN. CODE ANN. § 62-6-101, *et seq.*).

63

373. Solar Titan was engaging in home improvement contractor and/or residential contractor services before obtaining the applicable required license under either Tenn. Code Ann. § 62-6-501, *et seq* et seq or Tenn. Code Ann. § 62-6-101, *et seq.*

374. Solar Titan has also failed to maintain ethe proper amount of liability insurance and has not posted the legally required bond needed to conduct home improvement services and electrical contracting work for the license. Tenn. Comp. R. & Reg. 0680-01.

## J. ILL-GOTTEN GAINS

375. As described above, rather than waiting until a consumer's statutory right to cancel the Solar Titan Agreement has expired, Solar Titan immediately submits the Solar Titan Agreement to Mosaic the day the consumer signs. If the consumer signs the Solar Titan Agreement after business hours, Solar Titan submits the Solar Titan Agreement the very next morning. This allows Solar Titan to get the first portion of the consumer's loan disbursement from Mosaic.

376. Former Solar Titan employees like Ms. Helton and Ms. Dorismar have provided sworn statements to Tennessee and explained they have concerns about the company using consumer funds, including those from canceled contracts, to pay for expenses unrelated to the solar system the consumer purchased from the company. Ms. Helton talked about Solar Titan "floating the books" when the company decided to submit a consumer's Solar Titan Agreement to Mosaic immediately after the consumer signed.

377. Ms. Dorismar stated that she suggested for years that Solar Titan wait the three-day cooling-off period before submitting the Solar Agreement to Mosaic. She said whenever she suggested this, she was told Solar Titan could not wait for the cooling-off period to expire because waiting would cause a "cash flow" issue.

64

378.     Although Mosaic knows when consumers have signed the Solar Titan Agreement, and thus when the consumers' three-day cooling-off period expires, Mosaic transmits the first payment to Solar Titan before the cooling-off period expires.

379.     Solar Titan routinely receives funding from Mosaic before the consumer's statutory right to cancellation period has lapsed and often refuses to let consumers who have exercised their rescission rights out of the contract so it can keep the funds from Mosaic.

380.     Instead of letting consumers exercise their right to rescind, Solar Titan often falsely tells consumers that they failed to properly exercise their right of rescission.

381.     For many consumers who have exercised their three-day right to cancel, Solar Titan demands that they pay 30% of the contract amount before it releases them from the Solar Titan Agreement.

382.     For consumers who cannot afford to pay 30% of the contract amount, Solar Titan stops the installation process, but Solar Titan still accepts and retains payments from Mosaic on the sale. This is made easier by the fact that Mosaic has reduced the Milestones Solar Titan must complete to fully fund the sale.

383.     Starting at the end of 2021, Solar Titan stopped paying its sales representatives as agreed and began changing the commission pay schedule without notice. As a result, many of Solar Titan's experienced sales staff left the company, and Solar Titan continues to have a revolving door for sales representatives who leave after learning that Solar Titan will not consistently pay them their earned commission.

384.     Considering the many consumers who have purchased systems but complain that the installation has never been completed, it seems that Solar Titan is also not using the funds it receives from sales to complete its installations and pay installation crews.

65

385.    Even when a consumer informs Mosaic that they have told Solar Titan to cancel the contract within the three-day cooling-off period, Mosaic often will only release the consumer from the Mosaic Agreement when Solar Titan confirms that it has canceled the contract. Until Mosaic releases a consumer from the Mosaic Agreement, Solar Titan retains the funds that Mosaic has transmitted to Solar Titan for a given sale.

386.    Eventually, Solar Titan may agree to release a consumer who exercised their three-day right of cancellation from the contract, but this often happens several months after the consumer first attempts to exercise their right to cancel; Solar Titan likely delays this process so that it can procure funding from new sales before canceling the prior sale.

387.    When Solar Titan is notified of a consumer's intent to cancel, the company ceases all installation efforts; however, the company often does not notify Mosaic of the cancellation and attempts to keep the loan funds already disbursed by Mosaic.

388.    In other words, Solar Titan retains consumer loan funds even when it is not taking steps to complete the installation process.

389.    Upon information and belief, these ill-gotten funds are being diverted to support the lavish lifestyle of the individually named Defendants.

390.    Prior to their work at Solar Titan, Atnip and Kelley had very little income and resources. Kelley worked as a sales representative for another solar system company that was not paying well. Kelley had few other options because of his felony wire fraud conviction. Atnip, Kelley's long-time romantic partner and husband, also lacked income. Kelley and Atnip had so little money that they had to borrow money from friends and family to relocate from Las Vegas, where they resided while Kelley was first placed on probation, to Knoxville, Tennessee.

66

391.    Atnip and/or Kelley used the proceeds from Solar Titan's unlawful sales practices to purchase a 9,959 square foot, eight-bedroom, and nine-bathroom house located at 3411 Tooles Bend Road, Knoxville, TN, 37922, for approximately $8,650,000 in April 2022.

392.    Just seven months later, on November 15, 2022, Kelley and Atnip sold the Tooles Bend Road property to the Clarity Light 24 Trust for $9,995,000.

393.    Clarity Light 24 Trust was created just five days before the sale of the home from Kelley and Atnip to Clarity Light 24 Trust.

394.    Based on the circumstances surrounding the November 15, 2022, sale of the Tooles Bend Road property, it is unclear whether this was an arm's length transaction.

395.    The individual Solar Titan Defendants used the profits from Solar Titan's unlawful sales practices to purchase or lease a private jet that Atnip took to flaunt to his family and to purchase, either in Solar Titan's name or in their own individual names, at least eight Tesla vehicles between 2020-2022. As set out above, Solar Titan routinely failed to pay its sales staff or complete its installations during the period when the individual Solar Titan Defendants were making these extravagant purchases.

396.    The Solar Titan Defendants used the profits from Solar Titan's illegal sales to launch Titan Charters.

## VI.    VIOLATIONS OF THE LAW

### COUNT 1
### THE CONSUMER FINANCIAL PROTECTION ACT
### 12 U.S.C. §§ 5531, 5552, and 5565
### (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

397.    Plaintiffs re-allege and incorporate by reference all prior paragraphs and all paragraphs in Counts II, III, IV, V, VI, and VII of this Complaint.

67

398.    State Attorneys General are empowered by the CFPA to bring civil enforcement lawsuits for violations of the statute committed by "covered persons."  12 U.S.C. §§ 5552 and 5565(b).

399.    Mosaic is a "covered person" under 12 U.S.C. § 5481(6)(A) because it offers or provides consumer financial products or services to consumers to use primarily for personal, family, or household purposes. The service Mosaic offered or provided constitutes a "financial product or service" because it is "extending credit and servicing loans, including acquiring, purchasing, selling, broking and other extensions of credit." 12 U.S.C. § 5481(15)(A)(i).

400.    Solar Titan Defendants are "related persons" under the CFPA because they act either as Mosaic's agents or independent contractors who knowingly or recklessly participate in Mosaic's unfair, deceptive, and abusive practices. 12 U.S.C. § 5481(25)(C).  As "related persons," Solar Titan Defendants should be treated as "covered persons" under the CFPA. 12 U.S.C. § 5481(25)(B).

401.    Solar Titan processes transactions relating to consumer financial products or services and is a "service provider" under 12 U.S.C. § 5481(26) because Solar Titan provides a material service to a covered person (Mosaic) in connection with the offering or the provision of financial products or services.

402.    The CFPA prohibits covered persons from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

403.    The CFPA defines an "unfair" act or practice as, *inter alia*, one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers," where that "substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c).

68

404.     The CFPA defines an "abusive" act or practice as, *inter alia*, one that: (1) "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or (2) takes unreasonable advantage of -- (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interest of the consumer." 12 U.S.C. § 5531(d).

405.     At all relevant times, Solar Titan Defendants act as Mosaic's direct agent and within the scope of Mosaic's agency relationship when Solar Titan offers or provides loans to consumers who need financing from Mosaic to purchase their solar systems.

406.     Alternatively, at all relevant times, Solar Titan Defendants have been Mosaic's agents by ratification when Solar Titan offers or provides loans to consumers who need financing from Mosaic to purchase their solar systems.

407.     At all relevant times, Mosaic and the Solar Titan Defendants act individually and jointly in committing all unfair, deceptive, and abusive acts and practices when offering and providing loans to Solar Titan customers who need financing from Mosaic to purchase their solar systems.

408.     Mosaic knows—or should know—that Solar Titan engages in unfair, deceptive, and abusive acts and practices when offering and providing loans to Solar Titan customers who need financing from Mosaic to pay Solar Titan for its solar systems.

409.     Despite the fact that Mosaic knows or should know that Solar Titan Defendants have engaged in such unlawful conduct, Mosaic nevertheless facilitates the commission of those

69

unlawful acts. Mosaic intends to and encourages, facilitates, or assists in the commission of unlawful acts and thereby aids and abets Solar Titan Defendants in the unlawful conduct.

410. At all times relevant to this Complaint, Mosaic has had sufficient information from Solar Titan, consumer complaints, and media outlets to know or be on notice that Solar Titan Defendants were selling solar systems and installation services to consumers that lacked the qualities that Solar Titan Defendants represented they had.

411. For example, Mosaic knew or should have known Solar Titan Defendants told consumers they would experience larger energy savings than they would actually realize, misled consumers about their eligibility for certain credits and promotions that would reduce the amount financed, and misrepresented that the consumers' financing payments would only begin after the solar systems were installed and functioning.

412. Mosaic and Solar Titan Defendants have engaged in a conspiracy and common course of conduct, the purpose of which is and was to engage in the unfair, deceptive, and abusive acts and practices alleged in this Complaint. The conspiracy and common course of conduct has continued to the commencement of this action.

413. Mosaic and Solar Titan Defendants have agreed to provide financial products as part of their conspiracy to use unlawful sales acts and practices to sell solar systems and installation services or to aid and abet such sales because convenient access to financial products with certain loan structures, including discounts, delayed payment increases that assume receipt of tax credits, and other promotions, help facilitate the sale of these solar systems and Mosaic's financial products and services.

414. Solar Titan's solar systems and installation services did not have the qualities, benefits, and characteristics they were presented to have. Mosaic and Solar Titan Defendants have

70

used Mosaic's financial products and services to sell Solar Titan's products and services that lack the promised qualities, benefits, and characteristics.

415. Defendant Mosaic's agreements include a notice stating that consumers can cancel their financial services and products by providing a cancellation notice within three days of consumers signing their agreement for their financial services and products.

416. However, Defendants have failed to honor consumers' cancellations when they provided the requisite notice despite the fact that consumers met contractual and/or legal requirements under Tennessee and Kentucky law to cancel their agreements.

417. Mosaic stating that it would cancel financial services and products for consumers who exercise their three-day right to rescind their agreement, while failing to actually cancel those products and services when consumers attempted to exercise that right, constitutes a deceptive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

418. Mosaic's deception leads consumers to sign loan agreements believing they can rescind them within their three-day right of rescission period when they cannot. Consumers are harmed when they remain financially obligated to pay on their loans or are told they are still financially obligated to pay on their loans and continue to transmit payments to Mosaic after they have attempted to cancel their loan with Mosaic.

419. Mosaic's failure to cancel the loans of consumers who have properly exercised their right to rescind their contract is also an unfair act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

420. Consumers suffer from substantial injuries as a result of Mosaic's failure to cancel the loan they properly canceled when they remain financially obligated to pay on their loans or are

told they are still financially obligated to pay on their loans and continue to transmit payments to Mosaic.

421. At the point of sale of the solar system and Mosaic's financial products, Mosaic and Solar Titan Defendants' failure to meaningfully disclose (and/or their concealment of) the fact that Mosaic will not honor consumers' three-day right of rescission period unless Solar Titan agrees that the consumers have properly canceled their Solar Titan Agreement, is an abusive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

422. When consumers purchase a solar system from Solar Titan, they agree to Mosaic's financing because they cannot afford to pay for the full cost of the solar system upfront.

423. Those consumers thus agree to the financing at the same time that they agree to purchase a system from Solar Titan. They then sign two separate agreements, one with Mosaic and another with Solar Titan. Each agreement has its own notice of rescission with different instructions on canceling the applicable agreement.

424. At the point of sale, consumers are unaware that Mosaic will not honor consumers' cancellation of the Mosaic Agreement if they cancel their system through Solar Titan and Solar Titan claims they did not properly cancel the Solar Titan agreement. Instead, because the consumers agree to finance and purchase the solar system through the exact same sales representative, consumers think that as long as they cancel their Solar Titan Agreement, Mosaic will likewise cancel the Mosaic Agreement.

425. Mosaic's reliance on the Solar Titan sales representative who fails to explain or actively conceals the fact that Mosaic will often only cancel a consumer's Agreement with Mosaic when Solar Titan confirms consumers have properly cancelled their Solar Titan Agreement interferes with a consumer's understanding of how to cancel their Mosaic Agreement.

72

426. Many consumers thus unknowingly miss their purported cancellation window with Mosaic. Mosaic requires those consumers who then properly cancel their Solar Titan Agreement to keep paying Mosaic even if they have no solar system or have an inoperable system Solar Titan has refused to retrieve.

427. Mosaic and Solar Titan Defendants' failure to disclose (and/or their concealment of) the fact that Mosaic will transfer the full purchase price to Solar Titan before Solar Titan has fully completed its installation services constitutes a deceptive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

428. The fact that Mosaic will transfer the full purchase price to Solar Titan is material to consumers who often do not pay for home improvement contract services in full before the project is complete.

429. A substantial number of consumers would not agree to accept financing from Mosaic if they knew using Mosaic for financing meant that Solar Titan would be fully paid before completing the solar system installation project. Had they known Mosaic was paying Solar Titan in full in advance, some consumers would have elected not to incur the expense of purchasing the solar system and financing it through Mosaic.

430. Further, as a result of Mosaic's act or practice of fully disbursing the promised loan proceeds to Solar Titan, Solar Titan was incentivized not to complete the solar system installation and often did not complete the system installation, leaving consumers to have to pay their full monthly electric bill on top of their monthly loan payment.

431. Mosaic's act or practice of fully disbursing loan proceeds to Solar Titan for the purchase price of the solar system before Solar Titan has fully completed the solar system

73

installation unbeknownst to consumers also constitutes an abusive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

432.    Because consumers are not told Solar Titan is paid in full by Mosaic before it fully completes the solar system installation, Mosaic and Solar Titan Defendants materially interfere with consumers' ability to understand Mosaic's disbursement of the loan funds to Solar Titan. Mosaic's policy or practice regarding disbursement of loan funds to Solar Titan is a term and condition of the Mosaic Agreement.

433.    At the point of sale, many consumers are unaware that Solar Titan has less of a financial incentive to complete the installation because Mosaic pays Solar Titan well in advance of Solar Titan completing the installation project.

434.    Had consumers known Mosaic was paying Solar Titan in full in advance, a substantial number of consumers would have elected not to incur the expense of purchasing the solar system and financing it through Mosaic.

435.    Further, as a result of Mosaic's act or practice of fully disbursing the promised loan proceeds to Solar Titan, Solar Titan was incentivized not to complete the solar system installation and often did not complete the system installation, leaving consumers to have to pay their full monthly electric bill on top of their monthly loan payment.

436.    Mosaic and Solar Titan Defendants' act or practice of indicating to consumers that they would still be responsible for their Mosaic loan, even when Solar Titan violated state and federal consumer protection law during the sale of the solar system, constitutes a deceptive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

437.    Mosaic incorporated the FTC Holder Rule Notice into its agreements with Mosaic, which states that "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT

74

TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER."

438.    Any indication from Defendants that the consumer would still be liable for the loan regardless of whether Solar Titan Defendants violated state and federal consumer protection law misled consumers who thought they had to keep making their loan payments to Mosaic and thus kept making their loan payments to Mosaic.

439.    Mosaic's act or practice of holding consumers responsible for their Mosaic loan, even when Solar Titan violated state and federal consumer protection law during the sale of the solar system, also constitutes an unfair act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

440.    Mosaic requiring consumers to continue to make loan payments even when Solar Titan violated state and federal consumer protection laws during the sale of the solar systems caused consumers to suffer from the substantial injury of having to pay monthly loan payments to Mosaic.

441.    Further, those consumers who Mosaic has incorrectly determined to have defaulted on their payment obligations suffer economic harm from Mosaic's collection activities for those accounts.

442.    Mosaic has no legitimate competitive interest in failing to honor consumers' defenses to repayment despite its incorporation of the FTC Holder Rule notice in the Mosaic Agreement. There are also no benefits to the consumers who keep paying Mosaic or suffer from Mosaic's collection activities for loans consumers are not required to pay.

443. Mosaic and Solar Titan Defendants' act or practice of making consumers believe that they would still be responsible for their Mosaic loan, even when Solar Titan Defendants violated state and federal consumer protection law during the sale of the solar system, also constitutes an abusive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

444. Many consumers are unaware that they are not liable for the loans, and/or maintain defenses against repaying those loans, despite Mosaic and Solar Titan Defendants' claims that Mosaic has the ability to collect on the loans.

445. Thus, they keep paying Mosaic and/or endure the economic harm of Mosaic's collection activities for loans consumers are not required to pay.

446. At the point of sale of Mosaic's financial products and services, Mosaic and Solar Titan Defendants failed to ensure that consumers understood the total amount they would owe Mosaic under the Mosaic agreement.

447. Mosaic and Solar Titan Defendants' failure to disclose the total amount consumers would have to repay Mosaic at the time that consumers agree to finance the purchase of the solar system and installation services constitutes a deceptive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

448. Because consumers do not know the total amount they have to repay to Mosaic at the point of sale of Mosaic's loans, consumers are misled to believe that they are saving more money by switching to solar energy and financing their loan through Mosaic than they are actually saving.

449. Further, because many consumers are unaware of their total repayment obligation to Mosaic until after the three-day rescission window has closed, those consumers often are deprived of their right to rescind the Mosaic Agreement and Solar Titan agreement. Those

76

consumers suffer from having to continue to pay Mosaic for the total amount of the loan. Additionally, many consumers would not have purchased the solar system and agreed to Mosaic's financing had they known at the point of sale they would be spending more than they would be saving by purchasing and financing their solar system because their total amount repayment obligation is so high.

450.     Mosaic and Solar Titan Defendants' failure to disclose the total amount consumers would have to repay Mosaic at the time that consumers agree to finance the purchase of the solar system and installation services also constitutes an unfair act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

451.     Consumers lack the necessary information and expertise at the point of sale to calculate their total repayment obligation to Mosaic at the point of sale.

452.     Because consumers do not know the total sum of the payments they will owe Mosaic, consumers suffer the substantial injury of paying Mosaic more than they will save by purchasing a solar system from Solar Titan and financing their purchase through Mosaic.

453.     Consumers who would have exercised their three-day rescission right had they known the total amount they owed to Mosaic, but who did not timely learn about their total repayment obligation to Mosaic, consequently suffer by remaining indebted on the Mosaic loan.

454.     Consumers do not benefit by being confused or uninformed about their total repayment obligation, and Mosaic and Solar Titan Defendants have no legitimate competitive interest in failing to clearly and meaningfully inform consumers of their total repayment obligation at the point of sale.

455.     Additionally, a substantial number of consumers would not have purchased the solar system and agreed to Mosaic's financing had they known at the point of sale they would be

77

spending more than they would be saving because their total amount repayment obligation is so high.

456.     Mosaic's usage of the online merchant portal and tablet to explain and provide information about consumers' total repayment obligation, and Mosaic's failure to properly train Solar Titan sales representatives on reviewing the total repayment obligation information provided through the merchant portal with consumers, constitutes an abusive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

457.     Solar Titan sales representatives regularly failed to review Mosaic's financial disclosures with consumers before they agreed to accept the Mosaic Agreement repayment terms.

458.     Mosaic's process of providing consumers the information about its loan conditions and terms through the merchant portal on the Solar Titan sales representatives' tablet, combined with poorly trained sales representatives, interfered with consumers' ability to review and understand the terms and conditions of the loans before they agreed to purchase the solar system and use Mosaic for financing.

459.     As a result of Mosaic's acts and practice of providing financial disclosures through poorly trained Solar Titan sales representatives and their devices, consumers often unknowingly agreed to pay Mosaic more than they would save when purchasing their solar system and using Mosaic for financing.

460.     Mosaic and Solar Titan Defendants also engaged in the deceptive act or practice of failing to meaningfully and clearly disclose (and/or concealing) that Solar Titan would be unlikely to fulfill the promised timeline for completing its solar system installations and that payments to Mosaic would likely be due to Mosaic well before the solar system is operational; such acts and practices violated the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

461. Mosaic and Solar Titan Defendants' failure to disclose (and/or their concealment of) the fact that Solar Titan regularly fails to meet its installation timelines results in consumers paying Mosaic well before their systems are operational and generating any savings, which is material to consumers who think they will save money when they purchase a solar system from Solar Titan and finance that purchase through Mosaic.

462. Instead of saving money, consumers have increased monthly expenses that they often cannot afford to pay, often resulting in them falling behind on payments to other third parties they are required to pay or falling behind on paying Mosaic and consequently suffering from collection activities.

463. Mosaic and Solar Titan Defendants' failure to meaningfully and clearly disclose to consumers that Mosaic pays Solar Titan nearly the entire amount of the sale of the system and that Mosaic requires consumers to pay Mosaic, often for several months, before the system is operational and performing as promised, also constitutes an abusive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

464. The information Mosaic and Solar Titan Defendants withhold about consumers likely having to pay Mosaic before the system is operational and performing as promised (thus increasing their monthly electrical expenses) is material to consumers who believe that they will save money by purchasing a Solar Titan solar system.

465. The Solar Titan Defendants' emphasis on the supposed savings that consumers will experience when switching to solar energy also materially interferes with consumers' ability to understand the terms of the Mosaic Agreement.

466. Mosaic paying Solar Titan for nearly the entire amount of the sale of the solar system and requiring consumers to pay Mosaic, often for several months, before the system is

operational and performing as promised, constitutes an unfair act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

467.     Paying Solar Titan for the full amount Mosaic agreed to advance to Solar Titan on behalf of consumers created an unnecessary risk for consumers who then were much less likely to have a completed solar system installation and often did not have an operational system before their monthly payments to Mosaic began.

468.     Because consumers were never informed that Solar Titan would be fully paid or nearly fully paid when "glass was on the roof" instead of when the systems were operational, they could not avoid the substantial injury of having to start making payments to Solar Titan before their system was operational.

469.     The substantial consumer injury that Mosaic's acts and practices cause or are likely to cause is not substantially outweighed by any countervailing benefits to consumers or competition.

470.     Consumers do not benefit from Mosaic advancing all or nearly all of the funds to pay for the sale of the system before their installation project is complete and their systems are operational.

471.     The harm to consumers of having to start making monthly payments to Mosaic before their solar system is operational and performing as promised is not outweighed by any legitimate benefits to competition.

472.     Mosaic and Solar Titan Defendants misleading consumers about qualifying for the Federal Tax Credit and being able to use the Federal Tax credit to pay 26%-30% of the solar system purchase price to Mosaic within the first 18 months of the Loan Start date (thereby preventing the loan from re-amortizing and increasing consumers' monthly payment to Mosaic and finance

charges) constitutes a deceptive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

473. Despite Mosaic and Solar Titan Defendants telling consumers they could use the Federal Tax credit to pay the 26% -30% prepayment to Mosaic, many consumers did not qualify for the Federal Tax Credit and thus could not use it to pay the 26%-30% prepayment to Mosaic and prevent the loan from re-amortizing and increasing consumers' monthly payment to Mosaic and increased finance charges.

474. Mosaic and Solar Titan Defendants' failure to meaningfully inform consumers about the qualifications for the Federal Tax Credit or give them an opportunity to consult with a tax practitioner about their eligibility for the Tax Credit before the sale of the system or consummation of the loan also constitutes an unfair act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

475. Solar Titan Defendants, through their marketing and sales pitch, and Mosaic, through its loan structure, have misled consumers who are not knowledgeable about the basic requirements for a Federal Tax Credit (including requirements that the consumer has a tax liability in the present year to which the credit can be applied) to expect that they can use that credit to make the lump sum payment to Mosaic.

476. Consumers rely on Mosaic and Solar Titan Defendants to explain the benefits and consequences of Solar Titan's pitch about the Tax Credit being an additional "discount" and savings for those who purchase Solar Titan solar systems.

477. Consumers also rely on Mosaic and Solar Titan Defendants to understand the benefits and consequences of agreeing to choose Mosaic's financing option that requires a lump

sum payment near the beginning of the loan that is approximately the same amount as the Federal Tax Credit would be if they qualified.

478. Mosaic and Solar Titan Defendants' acts or practices relating to the advertising and marketing of the Federal Tax Credit in relation to the sale and offering of the solar systems and loans cause or are likely to cause substantial consumer injury for consumers who are ineligible for the Federal Tax Credit.

479. Most consumers who are ineligible for the Federal Tax Credit will either be unable to make the lump sum payment to Mosaic during the short time frame Mosaic requires or will struggle to make that payment.

480. When those consumers do not make the lump sum payment, it creates additional costs for the consumer under the terms of the loan because the total interest a consumer will pay for their loan and their monthly payment increases.

481. The substantial consumer injury that Mosaic and Solar Titan Defendants' act or practice causes or is likely to cause is not substantially outweighed by countervailing benefits to consumers or competition.

482. Consumers who are ineligible for the tax credit do not benefit from being unaware that they are ineligible for the credit. Instead, they find themselves having to pay more than they would if they did qualify for the credit under the terms of the loan, or they have to find some way to pay Mosaic the lump sum.

483. Mosaic and Solar Titan Defendants could allow consumers to meet with a tax professional prior to signing them up for a lump sum payment loan structure or could disclose material conditions about qualifications for the Federal Tax Credit.

484.    Instead, they rush the sales and lending transactions and withhold material information about the sale.

485.    Mosaic and Solar Titan Defendants have no legitimate competitive interest in misleading consumers about their eligibility for the Federal Tax Credit or withholding material information about the qualifications for it.

486.    They also have no legitimate competitive interest in withholding material information from consumers that would allow consumers to better choose  whether to finance with solar system purchase.

487.    Mosaic and Solar Titan Defendants' failure to meaningfully disclose qualifications for the Federal Tax Credit also constitutes an abusive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

488.    The information being withheld about the criteria for Federal Tax Credit eligibility is material for consumers deciding whether they can afford the total costs of the solar system.

489.    Solar Titan Defendants' emphasis on the Federal Tax Credit in marketing and advertising as a discount or additional savings for consumers who purchase a Solar Titan system materially interferes with consumers' ability to understand the total cost of their system.

490.    Mosaic's marketing, advertising, and offering of the loan structure requiring a lump sum payment that is approximately the same amount as the Federal Tax Credit to consumers who are ineligible for the credit materially interferes with those consumers' ability to choose whether to finance their solar system purchase with Mosaic and to determine the total costs of financing the project.

491.    Mosaic's act or practice of allowing Solar Titan to only offer the Mosaic loan product that assumes consumers can make a 26%-30% loan balance prepayment within 18 months

from the Loan Start Date for consumers, instead of informing consumers of all of the Mosaic loan product options, constitutes an abusive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

492. As previously outlined in the Complaint, Mosaic has solar loan products that, unlike the PowerSwitch Choice product, do not assume consumers will have the ability to pay the 26%-30% loan balance prepayment as if they will qualify for the Federal Tax Credit.

493. Further, Mosaic allows consumers to sign up for the PowerSwitch Choice product in a way that makes consumers think this is the only loan product Mosaic offers consumers, suggesting that this is the correct loan product for them because they will qualify for the Federal Tax Credit.

494. For those who are ineligible for the Federal Tax Credit, Solar Titan's offering of only the PowerSwitch Choice product that assumes consumers will have the Federal Tax Credit to pay 26%-30% loan balance prepayment interferes with consumers' understanding that they will not qualify for the Federal Tax Credit. It also takes advantage of those consumers' misunderstanding about their eligibility for the Federal Tax Credit at the point of sale.

495. Consumers reasonably rely on the Solar Titan sales representative to assess the best Mosaic loan product for the consumer because Solar Titan Defendants never suggest that there may be an alternative loan product that consumers should consider in light of the fact that they may not qualify for the Federal Tax Credit. This is especially true because it is partnered with Solar Titan's misrepresentations of consumers' eligibility for the Federal Tax Credit.

496. At the time Mosaic consummates consumer loans, Mosaic fails to provide information or provides unclear information about consumers' "First Payment Date" and misleads them to think their payment will not be due until the system is installed and operational.

84

497. However, regardless of whether consumers' solar systems are fully installed and operational, Mosaic requires them to start making payments to Mosaic. Mosaic includes in its loan summary on the first page of the Mosaic Agreement a "First Payment Date" and provides a date that is approximately three months after the "Loan Start Date" listed on the same page.

498. Mosaic also includes a buried disclaimer in a footnote on the following page stating that the loan "estimated First Payment Date and Factual First Payment Date will be different.".

499. Mosaic further confuses consumers by stating that the "Loan Start Date" listed on the loan summary pages is actually "the date that [Mosaic] first disburses loan proceeds to [Solar Titan]" instead of the "estimated Loan Start Date" which "assumes [Solar Titan] completes installation and the 'Install Completion Disbursement' is made within 180 days from the date [the consumer] prequalifies for a loan."

500. Yet Mosaic provides the consumer with no information about when Mosaic will first disburse loan proceeds to Solar Titan and no clarification that when Mosaic says "installation," they are not referring to a completed installation but merely that "glass is on the roof."

501. The information Mosaic provides about when consumers must make their first payment to Mosaic is, at best, incomplete and, at worst, misleading consumers to think that they will not start paying Mosaic until after their solar system is installed and operational.

502. This is especially true because it is paired with Solar Titan's misrepresentations about completing their solar system installations in as little as four to six weeks or, at most, eight to twelve weeks, and that consumers will not have to pay Mosaic until after the "installation" is complete (without explaining installation just means "glass is on the roof").

85

503.    Mosaic's act or practice of omitting and/or providing misleading information to consumers about when consumers' first monthly payment is due is a deceptive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

504.    Information about consumers' first payment due dates is material to most consumers, but especially to those who the Defendants persuaded that purchasing a solar system would reduce their electric bill by either 50%-90% or completely eliminate it such that they could then just pay Mosaic the money they are saving on electricity.

505.    Mosaic's omission and/or provision of misinformation about when consumers' payments will be due in relation to when the solar system is installed results in consumers agreeing to financing with Mosaic under unclear terms.  Many consumers would not have agreed to obligate themselves to paying Mosaic before the solar system is operating and performing as promised.

506.    Mosaic's act or practice of requiring consumers to pay Mosaic before the solar system is operational and performing as promised, while failing to clearly disclose when consumers' first monthly payment would be due at the time of loan consummation, constitutes an unfair act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

507.    Consumers who have to pay Mosaic before Solar Titan completes the installation of the solar system suffer the substantial injury of having to pay Mosaic as well as their entire electric bill.

508.    It also results in consumers falling behind on their Mosaic monthly payment and accruing additional interest and fees, and/or falling behind on monthly payments to third parties and accruing interest and fees to those third parties because they cannot afford their unexpected increased monthly expenses.

509. These consumers do not benefit from having to pay Mosaic before their system is operational. Any legitimate competitive benefit to Mosaic for requiring consumers to pay Mosaic before the system is operational without providing clear information about when consumers' first payment will be due does not outweigh the harm to consumers who have to pay Mosaic before the solar system is operational and performing as promised.

510. Mosaic's act or practice of requiring consumers to pay Mosaic before the solar system is operational and performing as promised while failing to clearly disclose when consumers' first monthly payment is due at the time of loan consummation also constitutes an abusive act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

511. Mosaic's omissions and/or providing misleading information about when consumers' first payment is due interferes with consumers' understanding of when their first payment is due to Mosaic.

512. This information is material to all consumers but is especially material to consumers who expect to use the purported 50%-90% electric bill savings from the solar system productions to help them pay for the Mosaic loan payment.

513. Mosaic's act or practice of threatening to disable or disabling consumers' solar systems when Mosaic has incorrectly determined the consumers defaulted on their payments constitutes an unfair act or practice in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

514. As previously outlined, via the FTC Holder Rule, consumers have defenses against paying Mosaic when Solar Titan has misled consumers to believe they would have a functioning solar system that would either save them 50%-90% of their electric bill or completely eliminate their electric bill.

515.    Yet even when consumers have these defenses, Mosaic is threatening to disable or disabling their solar systems because Mosaic has incorrectly decided those consumers have defaulted on their accounts.

516.    Mosaic causes substantial injuries to these consumers, who often will pay Mosaic anyway to avoid having their solar system disabled (as well as having to reimburse Mosaic for any expenses relating to them wrongfully disabling their solar systems).

517.    Further, some of the consumers who cannot or will not pay Mosaic end up losing electricity to all or part of their homes when Mosaic disables their system.

518.    Mosaic is also charging all of these consumers for Mosaic's expenses relating to them wrongfully disabling their systems as well.

519.    The CFPA unfairness and deceptive standard is the same as the unfairness and deceptive standard used by the FTC.[7] Tennessee likewise has adopted the FTC's unfairness and deceptive standard when analyzing the legality of business acts and practices.

520.    Therefore, in addition to the conduct described above, any of Mosaic's and Solar Titan's conduct that constitutes unfair and deceptive business acts and practices under Tennessee consumer protection laws relating to the offering or provision of Mosaic's financial products and services also constitutes unfair, deceptive, and abusive acts and practices under the CFPA.[8]

521.    Mosaic's violations of Counts 2, 4, 5, 6 and 7 also constitute unfair, deceptive or abusive acts and practices in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

---

[7] *See* Consumer Financial Protection Bureau, Compliance Bulletin 2022-05: Unfair and Deceptive Acts or Practices That Impede Consumer Reviews, https://files.consumerfinance.gov/f/documents/cfpb_bulletin-2022-05_unfair-deceptive-acts-practices-impede-consumer-reviews.pdf.
[8] TENN. CODE ANN. § 47-18-115; *Tucker v. Sierra Builders*, 180 S.W.3d 109 (Tenn. Ct. App. 2005).

88

522.     Solar Titan Defendants' violations of Counts 4, 5 and 7, to the extent that they involving the selling of Mosaic's financial products and services, also constitute unfair, deceptive, or abusive acts and practices in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

523.     Mosaic is also liable for Solar Titan Defendants' violations of the CFPA by virtue of its actual agency relationship with Solar Titan.

524.     Mosaic is also liable for Solar Titan Defendants' violations of the CFPA because Mosaic knew or should have known of the violations but nevertheless ratified Solar Titan's conduct by failing to meaningfully address the conduct and continuing to benefit from doing business with Solar Titan despite numerous complaints from customers alerting Mosaic to the conduct.

## COUNT 2
## THE TRUTH IN LENDING ACT & REGULATION Z
## 15 U.S.C. §§ 1631, 1635, and 1638; 12 C.F.R. §§ 1026.17 and 1026.23
## (AGAINST MOSAIC)

525.     The Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint.

526.     Section 1036(a)(1)(A) of the CFPA prohibits covered persons from offering or providing consumer financial products or services that are not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

527.     TILA and Regulation Z are each a "Federal consumer financial law." 12 U.S.C. § 5481(14) (defining "Federal consumer financial law" to include "enumerated consumer laws" and "any rule or order prescribed by the Bureau under this title"); 12 U.S.C. § 5481(12)(O) (defining "enumerated consumer law" to include TILA).

528.     At all times relevant to this Complaint, Mosaic has regularly extended consumer credit or offered consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments that is initially payable to Mosaic on the face of the contract, making Mosaic a "creditor" within the meaning of TILA, 15 U.S.C. § 1602(g) and Regulation Z, 12 C.F.R § 1026.2(a)(17).

529.     TILA requires creditors to provide meaningful disclosure of credit terms so that consumers can more readily compare the various credit terms available to them, avoid the uninformed use of credit, and protect consumers against inaccurate and unfair lending practices. 15 U.S.C. § 1601(a).

530.     Under TILA, when a creditor provides written disclosures and an itemization of the amount financed to consumers, it must provide the disclosures to consumers prior to the extension of credit ("financial disclosures"). 15 U.S.C. § 1638(b)(1).

531.     The TILA disclosure that the creditors are required to provide prior to the extension of credit must be "conspicuously segregated from all other terms, data, or information provided in connection with a transaction, including any computations or itemization." 15 U.S.C. § 1638(b)(1).

532.     Because Mosaic is providing the financial disclosures electronically, Mosaic must ensure that the required written financial disclosures are provided in accordance with the requirements of the Electronic Signatures in Global and National Commerce Act ("E-Sign Act"), 15 U.S.C. § 7001, *et seq*. *See* 12 C.F.R. § 1026.19(e).

533.     The E-Sign Act requires that prior to Mosaic providing the financial disclosures electronically, Mosaic follow the E-Sign consent process for consumers to agree to receive those disclosures electronically required by E-Sign. 15 U.S.C. § 7001(c).

90

534. As part of the E-Sign consent process, Mosaic also must ensure that when consumers consent to receive the financial disclosures electronically, they do so "in a manner that reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent." 15 U.S.C. § 7001(c)(1)(C)(ii).

535. Upon information and belief, all of the Mosaic financial disclosures are provided electronically to consumers through the Solar Titan sales representatives at the point of sale. Many consumers are unable to access the Mosaic Agreements that contain financial disclosures from their own devices or Solar Titan's sales representatives' devices prior to Mosaic providing the financial disclosures.

536. Thus, these consumers cannot consent "in a manner that reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent." 15 U.S.C. § 7001(c)(1)(C)(ii).

537. Mosaic has not complied with the E-Sign consent process for consumers to agree to receive electronic financial disclosures and thus has failed to provide the financial disclosures to those consumers.

538. Further, the E-Sign Act does not alter the TILA requirement that Mosaic provide disclosures prior to the consummation of the loan. 15 U.S.C. § 7001(c)(2).

539. Mosaic extends credit to consumers prior to providing the disclosure through its service provider and/or agent, Solar Titan.

540. Per the Merchant Agreement, Mosaic has directed Solar Titan to submit credit applications on its behalf. Solar Titan's participation in the credit extension application process is an integral and necessary part of Mosaic's lending business.

541.     Mosaic has trained and directed Solar Titan to obtain consumers' signatures for the Mosaic Agreement.

542.     At all times relevant to the loan agreement transaction, Solar Titan maintains control of the device consumers use to sign the Mosaic Agreement that contains the financial disclosures in electronic form.

543.     Solar Titan representatives have most consumers sign the Mosaic Agreement electronically before they are able to see the TILA disclosure.

544.     Because of numerous consumer complaints about this issue, Mosaic knows or should know that Solar Titan employees lack the proper training regarding the credit application and loan agreement disclosures that must be made before entering such agreements with consumers.

545.     Those who cannot see their TILA disclosure before consummation have no opportunity to decline the extension of credit from Mosaic if they cannot afford to repay Mosaic or do not want to be obligated to repay Mosaic for the full loan balance.

546.     They do not receive the disclosures beforehand that would inform them of the total costs of the loan, and are consequently injured from having to pay Mosaic more than they understood they would have to pay Mosaic for the finance charges and fees.

547.     Mosaic further failed to comply with the TILA requirement under 15 U.S.C. § 1638(a)(3) to disclose the full "finance charge" to consumers because Mosaic failed to disclose "any charge payable directly or indirectly by the consumer imposed directly or indirectly by the creditor as an incident to or condition of the extension of credit." 12 C.F.R. § 1026.4(a). Any charge includes "points, loan fees, assumption fees, finder's fees, and similar charges." 12 C.F.R. § 1026.4(b)(3).

548. Mosaic charges Solar Titan dealer fees, and Solar Titan increases the price it charges consumers for the solar systems Mosaic funds, passing the fee along to the consumers who have to repay the loan.

549. Consumers who do not use Mosaic for financing are charged a lower price than those consumers who use Mosaic for financing.

550. Prior to disbursing the loan proceeds to Solar Titan, Mosaic withdraws the amount of the dealer fee from consumers' loan proceeds.

551. Mosaic fails to separately disclose its dealer fee, which constitutes a finance charge because Mosaic has "directly or indirectly" imposed the fee that is "directly or indirectly" payable by the consumers in violation of 15 U.S.C. § 1638(a)(3). *See* 12 C.F.R. § 1026.4(a).

552. TILA also requires Mosaic to disclose "the number, amounts, and timing of payments scheduled to repay the obligation." 12 C.F.R. § 1026.18(g).

553. As previously outlined in paragraphs 478-483 of Count 1, Mosaic also failed to comply with the TILA requirement to disclose the "timing of payments scheduled to repay the obligation" in compliance with 12 C.F.R. § 1026.18(g).

## COUNT 3
## THE CONSUMER REVIEW FAIRNESS ACT
## 15 U.S.C § 45b
## (AGAINST THE SOLAR TITAN DEFENDANTS)

554. Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint.

555. The Solar Titan Defendants had full control over drafting the terms and conditions of the Solar Titan Agreement.

556. The Solar Titan Agreement that Solar Titan Defendants offered and provided consumers was only one page.

93

557. The front of the Solar Titan Agreement contained blank spaces for the sales representative to insert information about the solar system size that the consumer was purchasing and the type of mount that Solar Titan would complete during the installation.

558. The terms and conditions were on the back of the page of the Solar Titan Agreement, and those terms and conditions were pre-typed.

559. Consumers were not permitted to negotiate the terms and conditions on the back of the Solar Titan Agreement.

560. As a matter of practice, Solar Titan sales representatives did not even mention or review the terms and conditions on the back of the Solar Titan Agreement. Some consumers have been completely unaware of the terms and conditions provisions on the back of the Solar Titan Agreement.

561. The Solar Titan Agreement constitutes a "form contract" under the Consumer Fairness Review Act because it constitutes a contract with standardized terms that Solar Titan used in the course of selling its solar system and installation services, and the consumer lacked the meaningful opportunity to negotiate the standardized terms. 15 U.S.C. § 45b(a)(3).

562. Although there are multiple iterations of the terms and conditions on the back of the Solar Titan Agreement, most of the Solar Titan Agreements contain a version of the following provision:

> Buyer agrees not to use any form of social media to express their opinions that could be portrayed as negative in the eye of the public towards or about Ideal Horizon Benefits LLC/Solar Titan USA LLC, breaching acceptance of this clause by buyer can and will deem monetary compensation of benefits to Ideal Horizon Benefits LLC/Solar Titan USA LLC through mediation actions.

563. CRFA renders void, and Section 2(c) of the CRFA prohibits the offering of, provisions in form contracts that prohibit or restrict individual consumers' ability to communicate

94

reviews, performance assessments, and similar analyses about a seller's goods, services, or conduct; or that impose a penalty or fee against individual consumers who engage in such communications. 15 U.S.C. §§ 45b(a)(2), 45b(b)(1), and 45b(c).

564.    The language in the Solar Titan Agreement terms and conditions with respect to consumers agreeing not to express opinions on social media that could be portrayed as negative in the eye of the public and the language imposing fees on consumers who express these opinions violates 15 U.S.C. §§ 45b(a)(2), 45b(b)(1), and 45b(c).

565.    Solar Titan Defendants have told consumers planning to post negative reviews that they cannot post those reviews because they have agreed not to post negative reviews about Solar Titan.

566.    The Tennessee Office of Attorney General and Kentucky Office of Attorney General have the authority to bring this action for violations of the CRFA pursuant to 15 U.S.C. § 45b(e)(1).

## COUNT 4
## THE TENNESSEE CONSUMER PROTECTION ACT
### TENN. CODE ANN. § 47-18-104(a) and (b)
### (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

567.    Tennessee re-alleges and incorporates by reference all prior paragraphs and all paragraphs in Counts 5, 6, and 7 of this Complaint.

568.    The TCPA prohibits unfair and deceptive acts and practices in trade or commerce. Tenn. Code Ann. § 47-18-104(a) and (b).

569.    The TCPA, as an explicitly remedial statute, is to be liberally construed and interpreted in accordance with 15 U.S.C. § 45(a)(1) of the Federal Trade Commission Act, the Federal Trade Commission, and the federal courts.

95

570. Solar Titan's sales and installations of residential solar energy systems, as alleged herein, constitute "trade," "commerce," and a "consumer transaction" as defined in Tenn Code Ann. § 47-18-103(24).

571. Pursuant to TENN. CODE ANN. § 47-18-108(a)(1), "[w]henever the attorney general has reason to believe that any person has engaged in . . . any act or practice declared unlawful by this part . . . the attorney general may bring an action in the name of the state against such person to restrain by temporary restraining order . . . the use of such act or practice."

572. Pursuant to TENN. CODE ANN. § 47-18-108(b)(1), "the court may make such orders or render such judgments … to restore to any person who has suffered any ascertainable loss" resulting from violations of the TCPA.

573. Pursuant to TENN. CODE ANN. § 47-18-108(b)(3), the Attorney General may also seek, and this Court may order, a civil penalty of up to $1,000 for each violation of the TCPA.

574. Solar Titan Defendants repeatedly violated the TCPA by engaging in the deceptive and fraudulent acts or practices described in this Complaint, because the acts or practices were likely to mislead consumers acting reasonably under the circumstances and were material to consumers' decision to buy Solar Titan's products or services.

575. By making express and implied material misrepresentations about the capabilities of the solar systems sold by Solar Titan, the Solar Titan Defendants have engaged in deceptive acts or practices that are prohibited by the TCPA.

576. For example, Solar Titan Defendants' representations to consumers that the reduction in their energy bill would roughly equate to their monthly loan obligation was a deceptive act or practice in violation of the TCPA. TENN. CODE ANN. § 47-18-104(a) and (b)(5), (b)(7), (b)(12), and (b)(27).

96

577.    The Solar Titan Defendants' misrepresentations about consumers' eligibility for tax credits or "buybacks" are also violations of the TCPA. TENN. CODE ANN. § 47-18-104(b)(11)-(12), (b)(27).

578.    The Solar Titan Agreement itself contains misrepresentations regarding the warranties being offered to consumers. Solar Titan entered into these contracts knowing it did not intend to honor these warranties. This is a violation of the TCPA. TENN. CODE ANN. § 47-18-104(b)(19), (b)(27).

579.    The Solar Titan Defendants misrepresented that the company would provide "turnkey" installations and complete installs in a timely and workman-like manner.

580.    The Solar Titan Defendants entered into contracts with consumers, knowing that the installations would be unreasonably delayed and performed by unqualified individuals who lacked appropriate supervision and training.

581.    Solar Titan Defendants similarly misrepresented that consumers' energy bills would be reduced by the solar systems before consumers were obligated to pay on their loans when that was not the case. These acts violate the TCPA. TENN. CODE ANN. § 47-18-104(b)(7), (b)(9), (b)(10), (b)(27), and (b)(33).

582.    The Solar Titan Defendants misrepresented that the company and its employees maintained the legally required licensures, certifications, and bonds to complete home improvement contracting and electrical work. This is a violation of the TCPA. TENN. CODE ANN. § 62-6-136(b).

583.    The Solar Titan Defendants also made express and implied material misrepresentations about the company's affiliation with other entities. As described above, Solar

Titan knowingly used the TVA and SEIA logos on its website despite having no relationship with either organization.

584. Solar Titan has never been a SEIA member, and Solar Titan continued to use the TVA logo even after being removed from TVA's Green Connect QCN program.

585. TVA and SEIA had to send Solar Titan cease and desist letters in order to stop these misrepresentations. Again, these misrepresentations constitute violations of the TCPA. TENN. CODE ANN. § 47-18-104(b)(5), (b)(27).

586. Although Plaintiffs are not required to establish intent to prove a claim of deceptive conduct, upon information and belief, the Solar Titan Defendants knew the representations they were making were not true but made these representations anyway to sell more solar systems to unsuspecting consumers.

587. The deceptive representations, omissions, and practices of Solar Titan were likely to affect consumers' decisions to buy Solar Titan's products and services.

588. The Solar Titan Defendants have further repeatedly violated the TCPA by engaging in the unfair acts or practices described in this Complaint because those acts or practices caused or were likely to cause substantial injury to consumers that was not reasonably avoidable and not outweighed by countervailing benefits to consumers or to competition.

589. Solar Titan Defendants' act or practice of ignoring or rejecting consumers' good faith attempts to exercise their three-day right to cancel their contracts was an unfair act or practice in violation of the TCPA. TENN. CODE ANN. § 47-18-104(b)(12), (b)(27).

590. Solar Titan Defendants' act or practice of creating significant delays in installing consumers' solar systems – and, in some cases, failing to install a working system at all – resulting in a significant monthly loan obligation without any corresponding reduction in energy costs,

constitutes an unfair act or practice in violation of the TCPA. TENN. CODE ANN. § 47-18-104(b)(7), (b)(9), (b)(10), and (b)(27).

591.     Solar Titan Defendants' act or practice of failing to disclose to consumers that it would receive all or most of consumers' loan amount when "glass was on the roof" instead of when the systems were operational constitutes an unfair act or practice in violation of the TCPA.

592.     As a result, consumers sustained the substantial injury of significant monthly loan payments for solar systems with little to no reduction in their energy bill, which injury was not substantially outweighed by any benefit to consumers or to competition. TENN. CODE ANN. § 47-18-104(b)(7), (b)(9), (b)(10), (b)(27), and (b)(33).

593.     Solar Titan Defendants' act or practice of failing to meaningfully inform consumers about the qualifications of the Federal Tax Credit or give them an opportunity to consult with a tax practitioner about their eligibility prior to their purchase constitutes an unfair act or practice in violation of the TCPA.

594.     As a result, consumers were required to pay the 25% to 30% prepayment on their loan they reasonably believed would be covered by the Federal Tax Credit, which injury was not substantially outweighed by any benefit to consumers or to competition. TENN. CODE ANN. § 47-18-104(b)(11)-(12), (b)(27).

595.     Kelley, Kirkland, and Atnip are also liable in their individual capacity as a result of these and other actions they took constituting multiple separate violations of the TCPA, including, but not limited to, authorizing, encouraging, and directing Solar Titan employees to use misleading and untrue representations to induce transactions.

99

596.    Kelley, Kirkland, and Atnip helped develop and train sales staff on how to use misleading statements in order to induce transactions. Kelley, Kirkland, and Atnip also trained and encouraged their staff to identify and sell to seniors and other vulnerable groups.

597.    Mosaic and Solar Titan Defendants also violated the TCPA by engaging in deceptive and/or unfair acts or practices for the reasons stated in Count I of this Complaint, which are re-alleged and incorporated as if stated herein.

598.    Mosaic knew or should have known that the Solar Titan Defendants were lying to consumers about the capabilities of the solar systems being sold. Mosaic also knew or should have known the Solar Titan Defendants were not performing installations as represented.

599.    Mosaic chose to continue working with the Solar Titan Defendants anyway and facilitating purchases of these misrepresented solar systems.

600.    Therefore, Mosaic has engaged in unfair and deceptive acts or practices under the TCPA. In particular, Mosaic has violated TENN. CODE ANN. § 47-18-104(a) and (b)(27).

601.    Mosaic is also liable to Tennessee consumers for the Solar Titan Defendants' violations of the TCPA, pursuant to the Holder Rule notice in Mosaic's loan agreements.

602.    Each Mosaic Agreement contains the Holder Rule notice that reads:

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY BY THE DEBTOR HEREUNDER SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

603.    Because Mosaic is subject to all claims that consumers could assert against Solar Titan for Solar Titan's TCPA violations, Mosaic is liable for Solar Titans' TCPA violations.

604.    Mosaic is also liable for Solar Titan's violations of the TCPA by virtue of its direct agency relationship with Solar Titan.

605.     Mosaic is also liable for Solar Titan's violations of the TCPA because Mosaic knew or should have known of those violations but ratified Solar Titan sales representatives' conduct by failing to meaningfully address the conduct and continuing to reap the benefits of doing business with Solar Titan despite numerous complaints from its customers.

606.     All violations of Counts 2, 3, 5, 6 and 7 also constitute unfair, and deceptive acts and practices under the TCPA.

## COUNT 5
## THE KENTUCKY CONSUMER PROTECTION ACT
### KY. REV. STAT. § 367.110, *et seq.* [9]
### (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

607.     Kentucky re-alleges and incorporates by reference all prior paragraphs and all paragraphs in Counts 6 and 7 of this Complaint.

608.     Pursuant to KY. REV. STAT. ("KRS") § 367.170, "[u]nfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

609.     Pursuant to KY. REV. STAT. § 367.190, "[w]henever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by KRS 367.170 to be unlawful, and that proceedings would be in the public interest, he may immediately move in the name of the Commonwealth in a Circuit Court for a restraining order or temporary or permanent injunction to prohibit the use of such method, act or practice."

610.     Pursuant to KY. REV. STAT. § 367.200, "[t]he court may make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been paid out as a result of any practice declared to be unlawful by KRS 367.130 to KRS 367.300…".

---

[9]   As codified, KY. REV. STAT. §§ 367.110 to 367.360 are referred to as the "Consumer Protection Act;" however, as used herein "Kentucky Consumer Protection Act" and "KCPA" refer to all provisions under Kentucky Revised Statutes Title 29, Chapter 367, entitled "Consumer Protection" and codified at KY. REV. STAT. §§ 367.110 to 367.993.

611. Pursuant to KY. REV. STAT. § 367.990(2), if the court finds a person is willfully violating or has willfully violated the KCPA, the Attorney General may recover a civil penalty on behalf of the Commonwealth of "not more than two thousand dollars ($2,000.00) per violation, or where the defendant's conduct is directed at a person aged sixty (60) or older, a civil penalty of not more than ten thousand dollars ($10,000) per violation, if the trier of fact determines that the defendant knew or should have known that the person aged sixty (60) or older is substantially more vulnerable than other members of the public."

612. The Solar Titan Defendants have repeatedly violated the KCPA by engaging in the unfair, false, misleading, or deceptive acts or practices described in this Complaint.

613. By making express material misrepresentations about the capabilities of the solar systems sold by Solar Titan, the Solar Titan Defendants have engaged in unfair, false, misleading, or deceptive acts or practices that are prohibited by the KCPA. For example, Solar Titan's representations to consumers that the reduction in their energy bill would roughly equate to their monthly loan obligation was a deceptive act or practice in violation of the KCPA.

614. The Solar Titan Defendants knew the representations they were making were not true, but made these representations anyway to sell more solar systems to unsuspecting consumers.

615. The Solar Titan Defendants' misrepresentations about consumers' eligibility for tax credits or "buybacks" are also violations of the KCPA.

616. The Solar Titan Installation Agreement itself contains misrepresentations regarding the warranties being offered to consumers. Solar Titan entered into these contracts knowing it did not intend to honor these warranties.

617. The Solar Titan Defendants misrepresented that the company would provide "turnkey" installations and complete installs in a timely and workman-like manner. The Solar

102

Titan Defendants entered into contracts with consumers, knowing that the installs would be delayed and performed by unqualified individuals who lacked appropriate supervision and training. The Solar Titan Defendants similarly misrepresented that consumers' energy bills would be reduced by the solar systems before consumers began fulfilling their loan obligation when that was not the case.

618.    Delays in the installation process were caused by Solar Titan's failure to coordinate with the LPCs as promised.

619.    The Solar Titan Defendants misrepresented that the company and its employees maintained the legally required licensures, certifications, and bonds to complete home improvement contracting and electrical work.

620.    The Solar Titan Defendants also made express material misrepresentations about the company's affiliation with other entities. As described above, Solar Titan knowingly used the TVA and Solar Energy Industries Association (SEIA) logos on its website despite having no relationship with either organization. Solar Titan has never been a SEIA member, and Solar Titan continued to use the TVA logo even after being removed from TVA's Green Connect QCN program.

621.    TVA and SEIA had to send Solar Titan cease and desist letters in order to stop these misrepresentations.

622.    Upon information and belief, the Solar Titan Defendants knew the representations they were making were not true but made these representations anyway to sell more solar systems to unsuspecting consumers.

623. The unfair, false, misleading, or deceptive representations, omissions, and practices of the Solar Titan Defendants were likely to affect consumers' decisions to buy Solar Titan's products and services.

624. The Solar Titan Defendants have further repeatedly violated the KCPA by engaging in the unfair acts or practices described in this Complaint because they caused or were likely to cause substantial injury to consumers that was not reasonably avoidable and not outweighed by countervailing benefits to consumers or to competition.

625. The Solar Titan Defendants' act or practice of creating significant delays in installing consumers' solar systems – and, in some cases, failing to install a working system at all – resulting in a significant monthly loan obligation without any corresponding reduction in energy costs constitutes an unfair, false, misleading, or deceptive act or practice in violation of the KCPA.

626. The Solar Titan Defendant's act or practice of failing to disclose to consumers that it would receive all or most of consumers' loan amount when "glass was on the roof" instead of when the systems were operational constitutes an unfair, false, misleading, or deceptive act or practice in violation of the KCPA. As a result, consumers sustained the substantial injury of significant monthly loan payments for solar systems with little to no reduction in their energy bill, which is not substantially outweighed by any benefit to consumers or to competition.

627. The Solar Titan Defendants' act or practice of failing to meaningfully inform consumers about the qualifications of the Federal Tax Credit or give them an opportunity to consult with a tax practitioner about their eligibility prior to their purchase constitutes an unfair, false, misleading, or deceptive act or practice in violation of the KCPA. As a result, consumers were required to pay the 25% to 30% prepayment on their loan they reasonably believed would be

104

covered by the Credit, which is not substantially outweighed by any benefit to consumers or to competition.

628.     The Solar Titan Defendants knew or should have known that their unfair, false, misleading, or deceptive trade acts or practices were directed at persons aged sixty (60) or older who were substantially more vulnerable than other members of the public. Therefore, the Solar Titan Defendants are subject to a civil penalty of up to ten thousand dollars ($10,000) for each unfair, false, misleading, or deceptive act or practice directed at such persons. KY. REV. STAT. § 367.990(2).

629.     Kelley, Kirkland, and Atnip are also liable in their individual capacity because they actively participated in all of the unlawful conduct detailed herein or were aware of it and did nothing about it. Kelley, Kirkland, and Atnip committed multiple separate violations of the KCPA, including, but not limited to, authorizing, encouraging, and directing Solar Titan employees to use misleading and untrue representations to induce transactions. Kelley, Kirkland, and Atnip helped develop and train sales staff on how to use misleading statements in order to induce transactions. Kelley, Kirkland, and Atnip also trained and encouraged their staff to identify and sell to seniors and other vulnerable groups.

630.     The conduct, practices, and actions described in this Complaint occurred as part of a joint or common enterprise between the Solar Titan Defendants.

631.     Mosaic also violated the KCPA by engaging in unfair, false, misleading, or deceptive acts or practices for the reasons stated in Count I of this Complaint, which are re-alleged and incorporated as if stated herein.

632.     Mosaic knew or should have known that the Solar Titan Defendants were lying to consumers about the capabilities of the solar systems being sold. Mosaic also knew or should have

known that the Solar Titan Defendants were not performing installations as represented. Mosaic chose to work with the Solar Titan Defendants anyway and facilitate purchases of these misrepresented solar power systems. Therefore, Mosaic has engaged in unfair, false, misleading, or deceptive acts or practices under the KCPA.

633.    Mosaic also has an established business practice or policy of failing to honor consumers' rights under state and federal law, including consumers' right of rescission under the Kentucky Home Solicitation Sales Act ("KHSSA"). As discussed below, the KHSSA provides a right of rescission to consumers who execute a "BUYER'S RIGHT TO CANCEL" notice within the time period allowed by the KHSSA. If a sales contract does not contain a "BUYER'S RIGHT TO CANCEL" notice, a consumer may cancel the sales contract "by notifying the seller in any manner and by any means of his intention to cancel." On numerous occasions, consumers have informed Mosaic that they informed Solar Titan of their desire to cancel their Solar Titan Installation Agreement and had done so in a manner that would entitle the consumers to rescission under the KHSSA. Rather than honoring the consumers' cancellation requests, Mosaic continued disbursing the consumers' loan proceeds to Solar Titan. This conduct by Mosaic constituted an unfair, false, misleading, or deceptive act or practice in violation of the KCPA.

634.    Mosaic also has an established business practice or policy of failing to cancel loan agreements even though consumers have properly exercised their right to cancel the agreement under the KHSSA. In many of these instances, consumers have informed Mosaic that they wished to cancel their loan agreement within the time period allowed by the KHSSA. However, rather than immediately cancelling the consumers' loan agreements, Mosaic would first require Solar Titan to release the consumers from the related installation agreements. Mosaic often directed consumers in this situation to contact Solar Titan when Solar Titan had not confirmed the consumer

106

had cancelled the Solar Titan Agreement. Consumers had to get approval from Solar Titan's executives, employees, and officers making decisions about honoring cancellations from Solar Titan's headquarters in Knoxville, Tennessee. Upon information and belief, when Mosaic instructed consumers to contact Solar Titan about their cancellations, Mosaic knew that the consumers would be communicating with executives, employees, and officers in Solar Titan's headquarters based in Knoxville, Tennessee.

635.    If Solar Titan refused to release the consumers from the underlying installation agreements, Mosaic took the position that the consumers remained bound to the loan agreement even though the consumers notified Mosaic of their desire to cancel the loan agreement within the time period and in the manner allowed by the KHSSA. Mosaic's failure to honor consumers' right of rescission constituted an unfair, false, misleading, or deceptive act or practice in violation of the KCPA. Mosaic is also liable to Kentucky consumers for the Solar Titan Defendants' violations of the KCPA pursuant to the "Holder Rule" Notice in their loan agreements. This Holder Rule Notice subjects Mosaic, as the loan holder, to "all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof."

636.    Mosaic is similarly liable for Solar Titan's violations of the KCPA by virtue of its actual agency relationship with Solar Titan.

637.    Mosaic is also liable for Solar Titan's violations of the KCPA because Mosaic knew or should have known of the violations but ratified Solar Titan sales representatives' conduct by failing to meaningfully address the conduct and continuing to do business with Solar Titan despite numerous complaints from customers alerting Mosaic of the conduct.

638.    All of the Solar Titan Defendants' and Mosaic's unfair, false, misleading, or deceptive acts or practices described herein were committed willfully.

107

## COUNT 6
### THE TENNESSEE HOME SOLICITATION SALES ACT
### TENN. CODE ANN. § 47-18-701
### (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

639.    Tennessee re-alleges and incorporates by reference all prior paragraphs and all paragraphs in Count 7 of this Complaint.

640.    Solar Titan is a seller that engages in home solicitation sales as defined by TENN. CODE ANN. § 47-18-702(4).

641.    Mosaic is also a seller that engages in home solicitation sales as defined by TENN. CODE ANN. § 47-18-702(4). Mosaic sells its loan services through Solar Titan's sales representatives, who sell Solar Titan's solar system and installation services and Mosaic's financial products and services at consumers' residences.

642.    The Tennessee Home Solicitation Sales Act requires sellers engaging in home solicitation sales to provide specific disclosures. TENN. CODE ANN. § 47-18-704(a)-(b)(1) states, in relevant part, that home solicitation sales agreements must include a "readily legible statement" on the "**front side** of the receipt or contract, **or immediately above the buyer's signature**, under the conspicuous caption: "BUYER'S RIGHT TO CANCEL."  (Emphasis added).

643.    Per TENN. CODE ANN. § 47-18-704(b)(2), the "BUYER'S RIGHT TO CANCEL" statement must read as follows:

> "If this agreement was solicited at your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before twelve o'clock midnight (12:00) of the third business day after you sign this agreement. The notice must be mailed to: [insert name and mailing address of seller]."

644.    Per TENN. CODE ANN. § 47-18-704(d), "Until the seller has complied with the [aforementioned Home Solicitation Sale notice of rescission requirements], the buyer may cancel

108

the home solicitation sale by notifying the seller in any manner and by any means of the buyer's intention to cancel."

645.    The Solar Titan Agreement does not contain a legally compliant "buyer's right to cancel" notice.

646.    The notice in the Solar Titan Agreement is not on the front page or immediately above the buyer's signature.

647.    The notice is also not placed under a conspicuous caption. Instead, the notice is jammed into the middle of the back page of the contract with no distinction from the rest of the convoluted and confusing contractual terms.

648.    Likewise, the Mosaic Agreement also does not contain a legally compliant "buyer's right to cancel" notice.

649.    The notice in the Mosaic Agreement is not on the front page or immediately above the buyer's signature.

650.    The notice is not placed under the "conspicuous caption" "BUYER'S RIGHT TO CANCEL."

651.    The notice also fails to include the required language in TENN. CODE ANN. § 47-18-704(b)(1).

652.    If a home solicitation sales agreement does not contain a legally compliant "buyer's right to cancel" notice, the buyer may, at any time before the legally compliant notice is provided, "cancel the home solicitation sale by notifying the seller in any manner and by any means of the buyer's intention to cancel." TENN. CODE ANN. § 47-18-704(d).

653. Because Solar Titan Agreements do not contain a legally compliant "buyer's right to cancel" notice, any consumer who has done business with Solar Titan should be allowed to cancel the home solicitation sales agreement at any time.

654. Because Mosaic Agreement do not contain a legally compliant "buyer's right to cancel" notice, any consumer who has done business with Mosaic should be allowed to cancel the home solicitation sales agreement at any time.

655. Further, even if Solar Titan's contracts contained the required language, Solar Titan violated the Tennessee Home Solicitation Sales Act by failing to actually cancel the contracts that consumers properly requested be canceled.

656. Further, even if Mosaic's contracts contained the required language, Mosaic violated the Tennessee Home Solicitation Sales Act by failing to actually cancel the contracts that consumers properly requested be canceled.

657. Failing to cancel these contracts and refund all monies paid pursuant to the contract within ten days after the cancellation is also a violation of the Tennessee Home Solicitation Sales Act. TENN. CODE ANN. § 47-18-705.

658. The cancellation of the Solar Titan Agreement also requires cancellation of the Mosaic Agreement. As provided in TENN. CODE ANN. § 47-18-705(a) "the home solicitation sale" is cancelled along with "any payments made by the buyer and any note or other evidence of indebtedness."

659. As such, even if the Mosaic Agreement included legally compliant "right to cancel" notices, which it does not, the Mosaic Agreement must be cancelled when the Solar Titan Agreement is canceled.

660.    Consumers should be refunded for monies paid to Solar Titan under these unlawful contracts, including those funds that Mosaic advanced to Solar Titan.

661.    With regards to Solar Titan failing to cancel contracts, because Mosaic knew or should have known of the defect in Solar Titan's installation agreement, and because Mosaic facilitated these unlawful transactions, the accompanying financing agreements should also be canceled.

662.    Also, as discussed above, Mosaic is liable to Tennessee consumers for the Solar Titan Defendants' violations of the Tennessee Home Solicitations Sales Act pursuant to the "Holder Rule" Notice in their loan agreements. Mosaic is jointly and severally liable for the Solar Titan Defendants' unlawful contracts.

663.    Mosaic is also liable for Solar Titan's violations of the THSSA by virtue of its agency relationship with Solar Titan.

664.    Mosaic is also liable for Solar Titan's violations of the THSSA because Mosaic knew or should have known that Solar Titan was failing to properly cancel consumer contracts within the applicable time period but continued to do business with Solar Titan and failed to meaningfully investigate consumers' complaints regarding cancellation of Solar Titan contracts.

665.    Kelley, Kirkland, and Atnip are also liable in their individual capacity because all Solar Titan's actions in violation of the Tennessee Home Solicitation Sales Act detailed herein were committed pursuant to their express authorization, direction, and control.

666.    Kelley, Kirkland, and Atnip knew or should have known about Solar Titan's failure to cancel contracts when consumers exercised their three-day right of cancellation.

667.    Furthermore, on information and belief, Kelley, Kirkland, and Atnip have misappropriated funds paid by and on behalf of consumers for personal use. Kelley, Kirkland, and

Atnip should be required to return the misappropriated funds to consumers who exercised their right to cancel their Solar Titan Agreement under the Tennessee Home Solicitation Sales Act.

## COUNT 7
## THE KENTUCKY HOME SOLICITATION SALES ACT
### KY. REV. STAT. § 367.410, *et seq.*
### (AGAINST THE SOLAR TITAN DEFENDANTS AND MOSAIC)

668.    Kentucky re-alleges and incorporates by reference all prior paragraphs of this Complaint.

669.    Solar Titan is a seller that engages in Home Solicitation Sales as defined by KY. REV. STAT. § 367.410.

670.    Mosaic is also a seller that engages in home solicitation sales as defined by KY. REV. STAT. § 367.410. Mosaic sells its loan services through Solar Titan's sales representatives, who sell Solar Titan's solar system and installation services and Mosaic's financial products and services at consumers' residences.

671.    "'Home solicitation sale' means a sale of goods or services, **including consumer loans**, in which the seller or a person acting for him engages in a personal solicitation of the sale at a residence of the buyer and the buyer's agreement or offer to purchase is there given to the seller or a person acting for him." KY. REV. STAT. § 367.410 (emphasis added).

672.    "Except for home solicitation sales on loans in which a security interest is taken in the principal dwelling of the buyer . . . including all other consumer loans, in addition to any right otherwise to revoke an offer, the buyer has the right to cancel a home solicitation sale until midnight of the third business day after the day on which the buyer signs an agreement or offer to purchase which complies with this part." KY. REV. STAT. § 367.420(1).

673.    "For home solicitation sales on loans in which a security interest is taken in the principal dwelling of the buyer, the buyer shall have the right to rescind or cancel the transaction

112

until midnight of the tenth business day following the later of the consummation of the loan transaction or the delivery of the material disclosures required under the Truth in Lending Act, 15 U.S.C. 1601 et seq." KY. REV. STAT. § 367.420(6).

674. "Cancellation occurs when the buyer gives written notice of cancellation to the seller at the address stated in the agreement or offer to purchase." KY. REV. STAT. § 367.420(2).

675. "Notice of cancellation, if given by mail, is given when it is deposited in a mailbox properly addressed and postage prepaid." KY. REV. STAT. § 367.420(3).

676. "Notice of cancellation given by the buyer need not take a particular form and is sufficient if it indicates by any form of written expression the intention of the buyer not to be bound by the home solicitation sale." KY. REV. STAT. § 367.420(4).

677. In a home solicitation sale, "the seller must present to the buyer and obtain his signature to a written agreement or offer to purchase which designates as the date of the transaction the date on which the buyer actually signs and contains a statement of the buyer's rights[.]" KY. REV. STAT. § 367.430(1).[10] The statement of the buyer's rights must "[a]ppear under the conspicuous caption: "BUYER'S RIGHT TO CANCEL," and [r]ead as follows:

> "If this agreement was solicited to your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement. The notice must be mailed to: [address]."

KY. REV. STAT. § 367.430(2).

678. "Until the seller has complied with [KY. REV. STAT. § 367.430] the buyer may cancel the home solicitation by notifying the seller in any manner and by any means of his intention to cancel." KY. REV. STAT. § 367.430(3).

---

[10] KY REV. STAT. § 367.430(1) contains an inapplicable exception for home solicitation sales that occur when "the buyer requests the seller to provide goods or services in an emergency."

113

679. "Within ten (10) days after a home solicitation sale has been canceled or an offer to purchase revoked, the seller must tender to the buyer any payments made by the buyer and any note or other evidence of indebtedness." KY. REV. STAT. § 367.440(1).

680. Until the seller has complied with the obligations imposed by KY REV. STAT. § 367.440, the buyer may retain possession of goods delivered to him by the seller and has a lien on the goods in his possession or control for any recovery to which he is entitled." KY. REV. STAT. § 367.440(3).

681. "If the seller has performed any services pursuant to a home solicitation sale prior to its cancellation, the seller is entitled to no compensation." KY. REV. STAT. § 367.450(3).

682. "Any waiver by the buyer of rights provided in KRS 367.410 to 367.450 is null and void, and will not operate to relieve the seller of any obligation placed upon him by KRS 367.410 to 367.450 or this section." KY. REV. STAT. § 367.460.

683. The Solar Titan Agreements consummating the home solicitation sales do not contain a legally compliant "buyer's right to cancel" notice. The notice is not placed under a conspicuous caption. Instead, the notice is jammed into the middle of the back page of the contract with no distinction from the rest of the convoluted and confusing contractual terms. *See* KY. REV. STAT. § 367.430(1)-(2).

684. Because Solar Titan Agreements do not contain a legally compliant "buyer's right to cancel" notice, any consumers who have done business with Solar Titan should be allowed to cancel the Solar Titan Agreement at any time. *See* KY. REV. STAT. § 367.430(3).

685. Consumers should also be refunded any monies paid to Solar Titan under these unlawful contracts. *See* KY. REV. STAT. § 367.440(1). Said monies are due within ten (10) days of cancellation or revocation by the consumer. *Id.*

114

686.     Solar Titan is not entitled to any compensation for services performed prior to any cancellation by consumers exercising their right to cancel under KY. REV. STAT. §§ 367.410 – 367.460, and any compensation paid should be refunded to the consumers. *See* KY. REV. STAT. § 367.450(3).

687.     Kelley, Kirkland, and Atnip are also liable in their individual capacity because all actions in violation of the Kentucky Home Solicitation Sales Act detailed herein were committed pursuant to their express authorization, direction, and control. Furthermore, on information and belief, Kelley, Kirkland, and Atnip have misappropriated funds paid by and on behalf of consumers for personal use. Kelley, Kirkland, and Atnip should be required to return the misappropriated funds to consumers who exercised their right to cancel their Solar Titan Agreement under the Kentucky Home Solicitation Sales Act.

688.     During the course of the sales transaction, Solar Titan's sales representatives acted as Mosaic's agents. By procuring customers for Mosaic, Solar Titan's sales representatives conducted a home solicitation sale for a consumer loan. *See* KY. REV. STAT. § 367.410.

689.     The Mosaic Agreement also did not contain the "buyer's right to cancel" notice required by KY. REV. STAT. § 367.430(1)-(2). The notice in the Mosaic Agreement does not appear under the conspicuous caption "BUYER'S RIGHT TO CANCEL" as required by KY. REV. STAT. § 367.420(2)(a). The notice also fails to include the language required by KY. REV. STAT. § 367.420(2)(b). Therefore, any consumers who have done business with Mosaic should be allowed to cancel the Mosaic Agreement at any time. *See* KY. REV. STAT. § 367.430(3).

690.     Consumers should also be refunded for monies paid to Mosaic under these unlawful contracts including those funds that Mosaic advanced to Solar Titan. *See* KY. REV. STAT. §

115

367.440(1). Said monies are due within ten (10) days of cancellation or revocation by the consumer. *Id.*

691.    Mosaic is not entitled to any compensation for services performed prior to any cancellation by consumers exercising their right to cancel under KY. REV. STAT. §§ 367.410 – 367.460, and any compensation paid should be refunded to the consumers. *See* KY. REV. STAT. § 367.450(3).

692.    Mosaic is also liable to Kentucky consumers for the Solar Titan Defendants' violations of the Kentucky Home Solicitations Sales Act pursuant to the "Holder Rule" Notice in their loan agreements. Mosaic is jointly and severally liable for the Solar Titan Defendants' unlawful contracts.

693.    Mosaic is also liable for Solar Titan's violations of the KHSSA by virtue of its actual agency relationship with Solar Titan.

694.    Mosaic is liable for Solar Titan's violation of the KHSSA because Mosaic knew or should have known that Solar Titan was failing to properly cancel consumer contracts within the applicable time period but continued to do business with Solar Titan and failed to meaningfully investigate consumers' complaints regarding cancellation of Solar Titan contracts.

## COUNT 8
## UNJUST ENRICHMENT AND
## DISGORGEMENT OF ASSETS OF RELIEF DEFENDANT
## (AGAINST TITAN CHARTERS)

695.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint.

696.    Relief Defendant Titan Charters is believed to have received ill-gotten funds or otherwise benefitted from funds that are the proceeds of the Solar Titan Defendants' unlawful acts and practices. Titan Charters has no legitimate claim to the ill-gotten funds in its possession and

116

will be unjustly enriched if it is not required to disgorge the funds or the value of the benefit it received as a result of the Solar Titan Defendants' unlawful acts and practices.

697. For the reasons stated above, Titan Charters holds the proceeds of Defendants' unlawful acts and practices in a constructive trust for the benefit of injured consumers.

698. Titan Charters should be required to disgorge the ill-gotten funds or the value of the benefit it received as a consequence of the Solar Titan Defendants' unlawful acts and practices.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, State of Tennessee, *ex rel.* Jonathan Skrmetti, and Commonwealth of Kentucky, *ex rel.* Daniel Cameron, pursuant to the authority granted to them under the Federal Law Claims, their respective State Law Claims, and their common law responsibility to promote public protection, request that the Court:

A. Order this Complaint be filed without cost bond as provided by TENN. CODE ANN. §§ 47-18-108(b)(4) and 47-18-116;

B. Order Defendants to appear and answer this Complaint;

C. Enter judgment against each Defendant in favor of Plaintiffs for each violation alleged in this Complaint;

D. Enter a permanent injunction to prevent Defendants' future violations of federal and state law;

E. Award such equitable relief as the Court finds necessary to redress consumer injury resulting from Defendants' violations of the law including, but not limited to, disgorgement of ill-gotten gains;

F. Make such orders or render such judgments as may be necessary to restore to any consumer or other person any ascertainable losses, including statutory and pre-judgment interest,

suffered by reason of the alleged violations of federal and state law;

G. Order rescission or reformation of contracts; refund of moneys or return of real property; restitution; disgorgement or compensation for unjust enrichment; payment of damages or other monetary relief; public notification regarding the violations, including the costs of notification; and equitable injunctive relief as provided for violations of the CFPA. 12 U.S. Code § 5565(2).

H. Order each Defendant to separately pay civil penalties to the State of Tennessee of not more than $1,000 per violation of the TCPA as provided by TENN. CODE ANN. § 47-18-108(b)(3) and Order each Defendant to separately pay civil penalties to the Commonwealth of Kentucky of not more than $2,000 per violation of the KCPA, or $10,000 per violation of the KCPA where Defendants' conduct was directed at a person aged sixty (60) or older and substantially more vulnerable than other members of the public, as provided by KY. REV. STAT. § 367.990(2).

I. Enter judgment against Defendants and in favor of the State of Tennessee for the reasonable costs and expenses of the investigation and prosecution of Defendants' actions, including attorneys' fees, expert and other witness fees, and costs, as provided by FED R. CIV. P. 54(d); TENN. CODE ANN. § 47-18-108(a)(6) and (b)(4), and KY REV. STAT. § 48.005(4);

J. Order that all costs in this case be taxed against Defendants and no costs be taxed against the State of Tennessee and Commonwealth of Kentucky as provided in TENN. CODE ANN. § 47-18-116 and KY. R. CIV. P. 54.04(1);

K. Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to: temporary and preliminary injunctions, an order

freezing assets, the appointment of a receiver, immediate access to Solar Titan's business premises

and records, an accounting of assets, and expedited discovery;

L.	Require the Relief Defendant to disgorge itself of ill-gotten funds received from the

Defendants' unlawful acts and practices; and

M.	Award any and all such further relief as the Court deems just and proper.

Respectfully submitted,


/s/Alicia Daniels-Hill
JONATHAN SKRMETTI
Tennessee Attorney General and Reporter
DAVID MCDOWELL, TN BPR No. 024588
Deputy Attorney General
(Admitted to Practice in Eastern District)
KELLY WALKER, TN BPR No. 039554
Assistant Attorney General
(Admitted *to* Practice in Eastern District)
ALICIA DANIELS-HILL, TN BPR No. 040672
Assistant Attorney General
(Admitted to Practice in Eastern District)
OFFICE OF THE TENNESSEE ATTORNEY GENERAL
Consumer Protection Division
P.O. Box 20207
Nashville, Tennessee 37202
p.	(615) 741-5857 (Walker)
p.	(615) 253-3819 (Daniels-Hill)
e.	kelly.walker@ag.tn.gov
e.	alicia.daniels-hill@ag.tn.gov

Attorneys for Plaintiff
STATE OF TENNESSEE

/s/ Paul Fata
DANIEL CAMERON
Kentucky Attorney General
PHILIP HELERINGER, KY Bar No. 96748
Executive Director of Consumer Protection
(Admitted *Pro Hac Vice*)
PAUL FATA, KY Bar No. 99528
Assistant Attorney General
(Admitted *Pro Hac Vice*)
LYNDSEY ANTOS, KY Bar No. 99971
Assistant Attorney General
(Admitted *Pro Hac Vice*)
OFFICE OF THE KENTUCKY ATTORNEY GENERAL
Office of Consumer Protection
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
p.	(502) 696-5578 (Fata)
p.	(502) 696-5641 (Antos)
e.	paul.fata@ky.gov
e.	lyndsey.antos@ky.gov

Attorneys for Plaintiff
COMMONWEALTH OF KENTUCKY


## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2023, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by operation of the Court's electronic filing system to all parties

119

indicated in the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

 

 

_/s/ Alicia Daniels-Hill_____
Attorney for Plaintiff
STATE OF TENNESSEE