UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TENNESSEE, *ex rel.* JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER, and COMMONWEALTH OF KENTUCKY, *ex rel.* DANIEL CAMERON, ATTORNEY GENERAL, | ) ) ) ) ) ) ) | 3:23-CV-00046-DCLC-JEM |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| IDEAL HORIZON BENEFITS, LLC d/b/a/ SOLAR TITAN USA, et al., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The matter is before the Court on Defendant Mosaic's Motion to Dismiss as to themselves Counts 1, 2, 4, 5, 6, and 7 of the Second Amended Complaint ("SAC"). [Doc. 249]. For the reasons that follow, Defendant's Motion to Dismiss is **DENIED**.

**I.     BACKGROUND**

The Court accepts the following allegations as true for purposes of deciding the Motion to Dismiss. This case is about solar panels and the loans that consumers take to finance them. Defendant Solar Titan is a Tennessee Limited Liability Corporation engaged in the sale and installation of solar panels. [Doc. 241, ¶ 35]. Defendant Solar Mosaic ("Mosaic") is a Delaware Limited Liability Company that specializes in the provision of consumer financing for home improvement projects. [*Id.* at ¶¶ 37–38]. Mosaic serves as the primary lending partner for Solar Titan. [*Id.* at ¶ 50]. Solar Titan markets and sells solar systems to residents of Tennessee and Kentucky, and because the solar systems are often prohibitively expensive, Mosaic finances them

1

for homeowners. [*Id.* at ¶¶ 47–50].

The Complaint alleges that the solar systems at issue rarely lived up to the consumer's expectations. First, during the sales pitch, Solar Titan representatives engage in high-pressure sales tactics and dramatically inflate the consumer's estimated savings from installing a solar system. [*Id.* at ¶ 122]. Then, Solar Titan representatives mislead customers about their eligibility for federal tax credits or TVA benefits, leading them to believe that the systems are cheaper than they actually are. [*Id.* at ¶¶ 123–26]. They also represent that – if the consumer chooses to finance – they will have already started realizing savings on their energy bill before they have to begin repaying Mosaic. [*Id.* at ¶ 53]. And when the consumer agrees to purchase a solar system, they take months to install, often do not function, and rarely – if ever – deliver the promised performance and savings. [*Id.* at ¶¶ 54–59].

The SAC alleges that Mosaic is complicit in this process. Mosaic allegedly exercises significant control over Solar Titan representatives with respect to its loan products. Mosaic trains them, allows them access to their financing portal, and retains access to Solar Titan's internal business information. [*Id.* at ¶¶ 230–35]. Following this training, the Complaint alleges that Solar Titan representatives engage in deceptive financing transactions for their solar panels.

During the financing process, Solar Titan representatives guide the consumer through the loan application process. [*Id.* at ¶ 152]. Those representatives often do not allow consumers a meaningful chance to review the terms, conditions, or mandated disclosures of their loan. [*Id.* at ¶¶ 151–63]. Sometimes, Mosaic's loan disclosures do not appear in the correct place in the contract. [*Id.* at ¶¶ 653]. And still others, Mosaic has Solar Titan representatives create email addresses for customers who do not have them – knowing that the chance of them using the email again is slim to none – for the purpose of sending loan documents to the consumer. [*Id.* at ¶ 155].

When the consumers are dissatisfied with their solar systems, they often complain. [*Id.* at ¶ 240]. Some of those complaints go directly to Solar Titan, others to Mosaic. [*Id.* at ¶ 240, 247–51]. Upon receiving the complaints, Mosaic redirects the consumers to Solar Titan. [*Id.* at ¶ 213]. Meanwhile, they continue to collect money owed on their loan, and continue to sell new loans to new customers [*Id.* at ¶¶ 213, 242]. And when consumers call to exercise their right to cancel the loan agreements, Mosaic refuses to honor the requests. [*Id.* at 416].

Based on this conduct, the Kentucky and Tennessee Attorneys General filed suit on behalf of their citizens. They alleged violations of a litany of consumer protection laws. Relevant here, they alleged against Mosaic violations of the following: the Consumer Financial Protection Act ("CFPA"); the Truth in Lending Act ("TILA"); the Tennessee Consumer Protection Act ("TCPA"); the Kentucky Consumer Protection Act ("KCPA"); the Tennessee Home Solicitation Sales Act ("THSSA"); and the Kentucky Home Solicitation Sales Act ("KHSSA"). Mosaic moves to dismiss all of these claims. [Doc. 249]. In addition to challenging the substance of each under Fed. R. Civ. P. 12(b)(6), Mosaic also moves to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) and for improper venue under Fed. R. Civ. P. 12(b)(3). The matter has been extensively briefed, orally argued before the undersigned, and is now ripe for a decision.

## II.     STANDARD OF REVIEW

### A.  Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires the complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A motion to dismiss under Rule 12(b)(6) requires the Court to construe the complaint in the light

most favorable to the plaintiff, accept its well-pleaded factual allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). But the Court is not required to accept as true legal conclusions or recitals of legal elements. *Iqbal*, 556 U.S. at 678.

### B. Rule 12(b)(2)

The Court may only exercise "personal jurisdiction over a nonresident defendant" if jurisdiction "meets the [forum] state's long-arm statute and constitutional due process requirements." *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005). Tennessee's long-arm statute authorizes Tennessee courts to exercise jurisdiction on "[a]ny basis not inconsistent with the constitution of this state or of the United States." *See* Tenn. Code Ann. §§ 20-2-214(a)(6), 20-2-225(2). "When a state's long-arm statute authorizes the assertion of personal jurisdiction to the limits of federal due process, as does Tennessee's long-arm statute, the issue becomes simply whether the trial court's exercise of personal jurisdiction over the defendant meets due process requirements." *Mfrs. Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 855 (Tenn. Ct. App. 2000); *see also Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003). For personal jurisdiction to comport with due process (1) the non-resident defendant must have "certain minimum contacts" with the forum state that are such that (2) the maintenance of the lawsuit in the state would "not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003).

A plaintiff responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction bears the burden of proving that the court's exercise of personal jurisdiction in the forum state is proper. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). Where – as

here – the court does not conduct an evidentiary hearing on the question of personal jurisdiction, the plaintiff's burden is "relatively slight." *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017). "To defeat dismissal in this context, [the plaintiff] need make only a *prima facie* showing that personal jurisdiction exists." *Id.* To determine whether the plaintiff has made such a showing, the court considers the pleadings and any affidavits submitted by the parties in the light most favorable to the plaintiff. Any conflicts between facts contained in the parties' affidavits must be resolved in the plaintiff's favor. *Neogen Corp.*, 282 F.3d at 887. Dismissal under Rule 12(b)(2) is appropriate only if the specific facts alleged by plaintiff, taken as a whole, fail to state a prima facie case for personal jurisdiction. *Bridgeport*, 327 F.3d at 478.

### C. Rule 12(b)(3)

A plaintiff bears the burden of proving that venue is proper on a Rule 12(b)(3) motion to dismiss. *Gone to the Beach, LLC v. Choicepoint Servs., Inc.*, 434 F. Supp. 2d 534, 536–37 (W.D. Tenn. 2006). In examining whether venue is proper, the court "may examine facts outside the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Id.* If venue is improper, the court may dismiss the case or transfer it to any district where it could have been brought. 28 U.S.C. § 1406(a).

## III. ANALYSIS

### A. Personal Jurisdiction

A court may exercise its power only over a defendant subject to personal jurisdiction in the state where the court sits. "To determine whether personal jurisdiction exists over a defendant, federal courts apply the law of the forum state, subject to the limits of the Due Process Clause of the Fourteenth Amendment." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996) (internal citations omitted). Thus, "the defendant must be amenable to suit under the forum state's

5

long-arm statute and the due process requirements of the Constitution must be met." *Id.* (internal citations and quotations omitted).

Tennessee' long-arm statute authorizes the exercise of jurisdiction "on any basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-225. The Tennessee Supreme Court has interpreted the long-arm statute to authorize the exercise of personal jurisdiction to the full extent allowed under the Constitution of the United States. *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 646 (Tenn. 2009). Thus, the Court's sole inquiry is whether the exercise of personal jurisdiction over Mosaic comports with the Fourteenth Amendment's Due Process Clause.

There are two kinds of personal jurisdiction: general and specific. A court has general jurisdiction over a defendant only when "a defendant is essentially at home" in a state, and that jurisdiction extends to any and all claims brought against a defendant. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). The parties here agree that Mosaic – a Delaware LLC with its principal place of business in California – is not subject to general personal jurisdiction in Tennessee.

That leaves specific jurisdiction. For a court to exercise specific jurisdiction, a defendant must "take some act by which it purposefully avails itself of the privilege of conducting activities within the forum state." *Id.* at 359. The defendant's contacts with the forum state must be by the defendant's choice, and cannot be "random, isolated, or fortuitous." *Id.* at 359. The contacts must show that the defendant intentionally reached out to the forum state, for example, by "exploiting a market in the forum state or entering a contractual relationship centered there." *Id.* at 359 (internal citations and quotations omitted). But the mere existence of those contacts is not sufficient to justify an exercise of specific jurisdiction over a defendant. Rather, the defendant must have

6

sufficient minimum contacts with the forum, and "there must be an affiliation between the forum and the underlying controversy, principally an activity or an occurrence that takes place in the forum state." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 264 (2017).

The Sixth Circuit employs a three-part test – the *Mohasco* test – to analyze whether the exercise of specific jurisdiction comports with the Due Process Clause. *See S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state." *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 670 (6th Cir. 2023) (internal citations and quotations omitted). "Second, the claims must arise out of or relate to the defendant's contacts with the forum." *Id.* "Third, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id.* Each prong of the *Mohasco* test "represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked." *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1303 (6th Cir. 1989).

### 1. Purposeful Availment

Purposeful availment is "the constitutional touchstone of personal jurisdiction." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 550 (6th Cir. 2016). It exists "where the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum state . . . and where the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Id.* (internal quotations and citations omitted) (emphasis in original). Purposeful availment requires a showing that "the defendant deliberately reached out beyond its home – by, for example,

exploiting a market in the forum state or entering into a contractual relationship there." *Ford*, 592 U.S. at 360.

Where "a defendant 'has created 'continuing obligations' between himself and the residents of the forum, he manifestly has availed himself of the privilege of conducting business there.'" *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The mere existence of a contract with a resident of the forum state is not enough to show purposeful availment, but "the presence of certain factors in addition to the contract" constitute purposeful availment. *Safetech*, 503 F.3d at 551. Among these factors are: prior negotiations and contemplated future consequences, the terms of the contract, and the parties' actual course of dealing.

Here, Mosaic purposefully availed itself of doing business in Tennessee. First, Mosaic executed its merchant agreement with Solar Titan, a Tennessee-based company. The agreement gave Mosaic access to Solar Titan representatives to sell their loan products; Mosaic therefore obviously contemplated the continued introduction of its products and services into Tennessee. More importantly, Mosaic's relationship with Solar Titan was not a one-off. Rather, for the duration of the contract, Mosaic had continuous contact with Solar Titan representatives. Mosaic trained them; it transferred loan proceeds to them; and, it worked with them to determine customers' monthly repayment obligations. Mosaic's contacts with Tennessee were not "random, isolated, or fortuitous," but were the product of a carefully contemplated contractual relationship that created continuing obligations and relations with Solar Titan, a Tennessee entity. *Ford*, 592 U.S. at 359.

Mosaic had an extended relationship with Solar Titan. In effect, Mosaic used Solar Titan to target the Tennessee market to sell its loan products. Mosaic reached out beyond the borders of

its home state to conduct business with a company whose principal place of business Mosaic knew to be in Tennessee. Its contacts with Tennessee therefore are not "random, fortuitous, or attenuated, but are the result of deliberate conduct that amounts to purposeful availment." *Safetech*, 503 F.3d at 551.

### 2. Arising From or Relating To

The next prong is whether the claims arise from or relate to the defendant's contact with the forum state. That inquiry is complicated here because two individual State sovereigns pursue the claims on behalf of their respective residents: the Tennessee Attorney General on behalf of Tennessee residents, and the Kentucky Attorney General on behalf of Kentucky residents. Mosaic moved to dismiss for want of personal jurisdiction only the Kentucky Attorney General's claims. So the question for the Court is whether the Kentucky Attorney General's claims – brought on behalf of Kentucky residents – "arise from or relate to" Mosaic's contacts with Tennessee.

Mosaic argues that the Supreme Court's decision in *Bristol-Myers* and the Sixth Circuit's decision in *Canaday* preclude this Court's exercise of specific jurisdiction here. Mosaic relies on those cases to conclude that there are no grounds for this Court to exercise specific jurisdiction over an out-of-state defendant on claims brought by an out-of-state plaintiff for conduct that occurred outside the forum state.

The instructive precedent here is *Ford Motor Company v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021). There, the Supreme Court held that state courts in Minnesota and Montana could exercise specific personal jurisdiction over Ford with respect to products liability claims, even though Ford did not manufacture or sell the vehicles at issue in Minnesota or Montana. *Id.* The court explained that the "arise from or relate to" standard does not require a "strict causal relationship between the defendant's in-state activity and the litigation." *Id.* at 362.

9

Rather, "the first half of [the arise from or relate to standard] asks about causation; but the back half, after the 'or' contemplates that some relationships will support jurisdiction without a causal showing." *Id.* Still, the "relates to" standard incorporates real limits. *Id.* The "essential foundation" of specific jurisdiction is a "strong relationship among the defendant, the forum, and the litigation." *Id.* at 365.

The United States District Court for the Middle District of Tennessee considered a situation like the one here in *Stanley v. Nissan N. Am., Inc.*, No. 3:23-CV-261, 2024 WL 814496 (M.D. Tenn. Feb. 27, 2024) and concluded that it could exercise specific jurisdiction. In *Stanley*, a group of plaintiffs from several states sued Nissan – an auto manufacturer – and Cummins – a manufacturer of engine components – in Tennessee, alleging that the two knowingly sold defective vehicles. *Id.* at *1–5. Nissan was a resident of Tennessee, Cummins a resident of Indiana. *Id.* at *20. Cummins did not sell its engine components direct to consumers; it introduced the purportedly defective parts only through its contacts with Nissan. *Id.* at *20. Cummins moved to dismiss for lack of personal jurisdiction because "none of the plaintiffs live[d] in Tennessee or bought a [defective] vehicle in Tennessee; none of the vehicles is alleged to have failed in Tennessee; [and] no plaintiff sought repairs in Tennessee." *Id.* at *20. Those arguments – like Mosaic's arguments here – were based on Cummins' reading of *Canaday* and *Bristol-Myers*.

The court in *Stanley* concluded that an exercise of specific personal jurisdiction complied with Due Process. The court explained that: "The Constitution requires 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation." *Id.* at *20 (quoting *Ford*, 592 U.S. at 359–60). The court reasoned that "[the] claims against Cummins [arose] from and are related to Cummins' relationship with Nissan in Tennessee" because "it allegedly supplied to

10

Nissan engines that it . . . knew or should have known were defective . . . with knowledge that the [vehicles] carrying the engines . . . would be marketed and sold nationwide." *Id.* at *21. In short: Nissan's presence in Tennessee anchor[ed] Cummins' activities and plaintiffs' claims in this state." *Id.* at *21.

Mosaic is correct that – in a causal sense – Kentucky's claims do not "arise from" their relationship with Tennessee. Those claims arise from their contacts with Kentucky. But as in *Stanley*, Kentucky's claims certainly "relate to" Mosaic's activities in Tennessee. Kentucky residents purchased Mosaic's loan products through interactions with Tennessee-based Solar Titan representatives. [Doc. 241, ¶¶ 50, 150–51]. Mosaic retained significant control and dominion over those representatives: it trained them, maintained access to their financial records, and relied upon them to market and sell its loan products. [Doc. 241, ¶¶ 222–35]. Solar Titan representatives informed purchasers if they were approved for a Mosaic loan and had them complete the loan paperwork. [Doc. 241, ¶¶ 160–61]. When Kentucky consumers sign on for a loan with Mosaic, Mosaic disburses the funds to Solar Titan in Tennessee. [Doc. 241, ¶ 51]. And when Kentucky consumers realized their discontent with Solar Titan's products, Mosaic collaborated with Solar Titan in Tennessee to avoid honoring their cancellation requests. [Doc. 241, ¶¶ 62–65]. Mosaic extended loans of more than $40 million to Kentucky residents. In short, Solar Titan's presence in Tennessee "anchors" Mosaic's "activities and the plaintiffs' claims in this state." *Stanley*, 2024 WL 814496, at *21.

Contrary to Mosaic's assertions, *Canaday v. Anthem Companies, Inc.*, 9 F.4th 392 (6th Cir. 2021) does not preclude an exercise of personal jurisdiction over Mosaic here. In *Canaday*, the Sixth Circuit held that a federal district court in Tennessee could not exercise personal jurisdiction over Anthem, an Indiana-based company, for conduct that occurred in Indiana. *Id.* at

11

397. The Sixth Circuit – relying primarily on *Bristol-Myers Squibb* – reached that conclusion because Anthem did not employ, pay, or shortchange the employees in Tennessee. *Id.* at 397. The facts there were similar to those in *Bristol-Myers*, where the out-of-state plaintiffs' claims had little or no relation to the forum. *Bristol-Myers*, 582 U.S. 255, 265 (2017).

Neither *Canaday* nor *Bristol-Myers* foreclose an exercise of specific jurisdiction here. *Canaday* involved a collective action with non-resident plaintiffs whose claims had nothing to do with Anthem's actions in Tennessee. *Canaday*, 9 F.4th at 397. And the plaintiffs' claims in *Bristol-Myers* had no relation to the forum. *Bristol-Myers*, 582 U.S. at 265. Here, as in *Stanley*, the out-of-state plaintiff's claims result entirely from Mosaic's contacts with the forum state.

Kentucky's claims against Mosaic relate to its conduct in Tennessee. Mosaic made the loans at issue in this case exclusively through Solar Titan representatives. All of the allegations in the Complaint involve Mosaic's relationship with Solar Titan in Tennessee. It can hardly be said, therefore, that Kentucky's allegations against Mosaic do not "arise from or relate to" Mosaic's contacts with Tennessee.

### 3. Reasonableness

The final prong of the personal jurisdiction inquiry is whether "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Mohasco*, 401 F.2d at 381. There is "an inference of reasonableness when the first two [*Mohasco*] prongs are satisfied." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 552 (6th Cir. 2016). To determine whether an exercise of jurisdiction is reasonable, the Court considers factors including: "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *Id.*

12

It is not unreasonable for the Court to exercise personal jurisdiction over Mosaic here. As discussed above, Mosaic deliberately affiliated with Solar Titan, a Tennessee resident. Further, there is no indication that any of the above factors make an exercise of jurisdiction over Mosaic unreasonable. First, there is no undue burden on the Defendant. Mosaic does not – and could not – successfully argue that it is not subject to this Court's personal jurisdiction with respect to the Tennessee claims. Mosaic would have to defend those claims in this forum anyway, and it would likely have to defend the Kentucky claims in Kentucky. Defending both categories of claims in one forum does not impose on Mosaic any undue burden. Second, Tennessee has an interest in regulating Mosaic's provision of loans to solar panel consumers because Mosaic does extensive business in Tennessee. Third, Kentucky has a strong interest in obtaining relief on behalf of its citizens. Kentucky probably could have brought an action in a federal court in Kentucky to obtain this relief, but it chose not to. The Court will not second guess Kentucky's choice of forum; it suffices to say that the Commonwealth of Kentucky has an interest in protecting the interests of its citizens. And fourth, there is no indication that the exercise of jurisdiction here impedes any other state's efficient resolution of these claims. At present, the only other State involved is Kentucky, and they opted to participate in this suit, in this forum.

Because a presumption of reasonableness applies when the first two prongs are met, and because the reasonableness factors weigh in favor of subjecting Mosaic to the Court's specific personal jurisdiction, the Court finds that it is reasonable to exercise personal jurisdiction over Mosaic here.

### 4. Conclusion

Each prong of the *Mohasco* test is met here. The Court is satisfied that there is "a strong relationship among the defendant, the forum, and the litigation." *Ford*, 592 U.S. at 365.

Accordingly, Mosaic's Motion to Dismiss the Kentucky claims for lack of personal jurisdiction is **DENIED**.

### B. Venue

Mosaic next argues that venue is improper in the Eastern District of Tennessee with respect to the Kentucky claims. Mosaic's argument here is twofold: first, venue is generally improper in the Eastern District of Tennessee; and second, the venue is improper under the special venue statutes related to the CFPA and KCPA claims.

#### 1. Venue Generally

28 U.S.C. § 1391(b)(2) provides that "[a] civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated." It is settled precedent in the Sixth Circuit that 28 U.S.C. § 1391 does not confine venue to the singular venue where the most substantial part of the events giving rise to the claims took place. *First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998).

Mosaic would have the Court conclude that venue is improper here because "the action that truly gave rise to claims brought by Kentucky are based on interactions with Kentucky residents, which occurred exclusively in Kentucky." [Doc. 250, pg. 11]. Mosaic's application of § 1391 is improper. There is no requirement that venue lie in the district where "the action that gave rise to the claims" took place. [*Id.*]. Rather, venue is proper in *a judicial district* where a *substantial* part of the events giving rise to the claim took place. As detailed above, Mosaic had extensive contact with Tennessee-based Solar Titan with respect to the loans it issued in Kentucky. Mosaic's relationship with Solar Titan – and therefore its conduct in Tennessee – gave rise to the loans made to Kentucky residents. Tennessee is therefore a proper venue for Kentucky's claims.

14

Because a substantial part of the events giving rise to Kentucky's claims took place in Tennessee, Mosaic's Motion to Dismiss the Kentucky claims for improper venue is **DENIED**.

### 2. Consumer Financial Protection Act, 12 U.S.C. § 5536 and Kentucky Consumer Protection Act, Ky. Rev. Stat. 367.170

Mosaic next contends that Kentucky's CFPA and KCPA claims must be dismissed because each statute contains a specific venue provision that makes venue in the Eastern District of Tennessee improper. The Court will address this argument for each statute in turn.

### a. CFPA Venue

Mosaic avers that venue is not proper in the Eastern District of Tennessee under the CFPA. Specifically, Mosaic argues that the special venue provision in 12 U.S.C. § 5552 restricts an enforcement action brought by a State to a United States District Court located in that state. For the following reasons, the Court disagrees.

It is well settled that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976). But that is not the end of the inquiry. Courts often interpret specific venue statutes to supplement, rather than supplant, general venue statutes. *See Cortez Byrd Chips v. Bill Harbert Constr. Co.*, 529 U.S. 193, 194 (2000) (holding that the venue provisions in the Federal Arbitration Act are permissive and do not displace the general venue statute, 28 U.S.C. § 1391); *Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1409–10 (9th Cir. 1989) (finding that the specific venue provision of the Clayton Act did not preclude application of the general venue statute 28 U.S.C. § 1391(d)). The question is whether the special venue provision is restrictive or permissive. *See Radzanower*, 426 U.S. at 152 (noting that the venue provisions of the National Bank Act were restrictive, and therefore barred application of the broader venue provisions of the Securities Exchange Act). If the special venue provision is restrictive, then venue is proper only according

15

to that provision. If it is permissive, then venue is proper according to either the special venue or the general venue statutes.

Whether the venue provisions of the CFPA are permissive or restrictive is a matter of first impression in the Sixth Circuit. But basic principles of statutory construction and the legislative purpose of the CFPA lead the Court to conclude that the special venue provisions in the CFPA are permissive rather than restrictive. 12 U.S.C. § 5552(a)(1) provides that "the attorney general . . . of any State *may* bring a civil action in the name of such state in any district court of the United States in that state."

First, the Court notes that the word "may" ordinarily connotes discretion, in contrast to the words "shall" or "must" which generally connote a mandate. *See Singh v. Rosen*, 984 F.3d 1142, 1150–51 (6th Cir. 2021) (noting that the word "may" clearly connotes discretion); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (noting that the word "may" implies discretion, while the word "shall" usually connotes a requirement). 12 U.S.C. § 5552(a)(1) uses the permissive "may," indicating that it authorizes – but does not require – a State Attorney General to bring a CFPA enforcement action in a United States District Court in the Attorney General's home state.

Second, the legislative purpose of the CFPA supports reading the special venue provision as permissive. Congress intended to ensure the states' enforcement powers under the CFPA. The venue provision Mosaic challenges is located in a subsection entitled "Preservation of enforcement powers of States." 12 U.S.C. § 5552. And, as one district court noted, reading § 5552 as mandatory would create venue gaps for CFPA enforcement actions brought by the States. *Pennsylvania by Shapiro v. Mariner Fin., LLC*, 711 F. Supp. 3d 463, 479–80 (E.D. Pa. 2024). If the venue provision is restrictive, then it could create situations where a State is unable to bring CFPA enforcement

16

actions because the defendant is not subject to personal jurisdiction in that state. In enacting the CFPA, Congress intended to preserve the enforcement powers of the states. A restrictive reading of § 5552 is inconsistent with that purpose. The special venue provision in the CFPA must therefore be read to supplement, rather than supplant, the general venue statute, 28 U.S.C. § 1391.

Because the plain language of § 5552 indicates that it is a permissive provision, and because that reading comports with Congress' purpose in enacting the CFPA, Mosaic's Motion to Dismiss the CFPA claims for improper venue is **DENIED**.

### b. KCPA Venue

Mosaic next argues that the KCPA claims should be dismissed for improper venue. Mosaic's argument mirrors its argument on the CFPA claims but substitutes for the statute Ky. Rev. Stat. § 367.190. Again, Mosaic contends that the use of the word "may" in the statute restricts proper venue, this time to a Circuit Court in the Commonwealth of Kentucky. Mosaic cites only one authority in support of this contention – confusingly, one that does not interpret the venue provisions of § 367.190 – to conclude that Kentucky employs a "strict reading of the statute in other cases." [Doc. 250, pg. 13].

Ky. Rev. Stat. § 367.190 provides that the Kentucky Attorney General "may immediately move in the name of the Commonwealth in a Circuit Court for a restraining order" to enforce the KCPA. Ky. Rev. Stat. § 446.010(26) provides that the word "may" is permissive. *See also Fox v. Grayson*, 317 S.W.3d 1, 13 (Ky. 2010) ("[T]he word *may* generally signifies something as being permissive in nature in contrast to the word *shall*, which generally signifies something being mandatory.") (emphasis in original).

Again, the plain language of the statute and its purpose doom Mosaic's venue argument. The word "may" generally operates as a grant of discretion or permission; it enables, it does not

restrict. Further, Kentucky enacted the CFPA to provide a "strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services." Ky. Rev. Stat. § 367.120; *see also Com. ex rel. Chandler v. Anthem Ins. Cos., Inc.*, 8 S.W.3d 48, 55 (noting that the General Assembly intended the KCPA to "be a flexible and effective means of combating abusive trade practices."). Reading Ky. Rev. Stat. § 367.190 to cabin the Attorney General's enforcement power to only Circuit Courts of the Commonwealth contradicts the plain meaning of the permissive language of the statute and would otherwise frustrate its purpose. Mosaic's Motion to Dismiss the KCPA claims for improper venue is therefore **DENIED.**

### C. Standing on Behalf of the Residents of Other States

Next, Mosaic argues that the Court should dismiss any claims to the extent that Tennessee or Kentucky assert them on behalf of residents of other states. The SAC alleges that Solar Titan and Mosaic conducted business – and engaged in unlawful activities – in Kentucky, Tennessee, Alabama, Georgia, South Carolina, and North Carolina. [Doc. 241, ¶¶ 36, 212]. Mosaic argues that Tennessee and Kentucky cannot pursue claims on behalf of out-of-state residents.

Kentucky does not argue that it can pursue claims on behalf of out-of-state-residents. [Doc. 261, pg.15 n.11]. Tennessee, on the other hand, argues that it "has an interest in seeking relief for all customers, regardless of their location" because Mosaic joined with a Tennessee-based company to engage in fraudulent practices.[1] Thus, the question for the Court is whether Tennessee

---

[1] The Court notes here that it reads Tennessee's Complaint and argument to mean that it can regulate Mosaic's conduct in Tennessee and afford relief to consumers even if they reside in another state. The Tennessee Attorney General, of course, could not literally sue "on behalf of" the residents of another state – that would be the job of the other state's Attorney General. But, as explained below, it can subject Mosaic and Solar Titan to its regulatory authority for its wrongdoing in Tennessee and offer restitution to customers who suffered from that wrongdoing in other states.

18

can assert claims for violation of the Tennessee CPA on behalf of the residents of other states.

Tenn. Code Ann. § 47-18-114 allows the Tennessee Attorney General to bring any action or proceeding to enforce the TCPA. Tenn. Code Ann. § 47-18-115 provides that the TCPA "being remedial legislation necessary for the protection of the consumers of the State of Tennessee *and elsewhere*, shall be construed to effectuate [its] purposes and intent." Tenn. Code Ann. § 47-18-115 (emphasis added). Tennessee courts have held that "the TCPA is explicitly remedial, and Tennessee courts are therefore required to construe it liberally to protect consumers in Tennessee *and elsewhere*." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005)(emphasis added). Thus, "it is abundantly clear from the text of the Tennessee Consumer Protection Act that the General Assembly intended to outlaw unfair and deceptive trade practices by Tennessee businesses regardless of where the consumers harmed by these practices were located." *State v. New Beginning Credit Ass'n, Inc.*, No. M1999-00461-COA-R3CV, 2006 WL 1472284 at *9 (Tenn. Ct. App. May 25, 2006).

The plain language of the Tenn. Code Ann. § 47-18-115 provides that it extends beyond Tennessee's borders. The proper inquiry is not where the affected consumer resides, but whether the wrongdoing was sufficiently connected with Tennessee to bring it within the state's regulatory purview. *New Beginning Credit Ass'n*, 2006 WL 1472284 at *9. Here, Mosaic's alleged wrongdoing arose from its extensive relationship with Solar Titan, a Tennessee business; it was that relationship that introduced the loans at issue into other state. Those contacts suffice to bring Mosaic within Tennessee's regulatory purview.

Mosaic argues that this Court should not apply *New Beginning Credit Ass'n* here because Mosaic is not a Tennessee company. [Doc. 268, pg. 3–4]. That argument fails, though, because the court in *New Beginning Credit Ass'n* explained: "it is enough to note that . . . [the defendant's]

19

extensive business activities within the state are more than sufficient . . . for the exercise of regulatory jurisdiction." *Id.* The same situation exists here. Mosaic is not a Tennessee company, but its extensive activities within the state suffice to bring it within Tennessee's regulatory authority. Based on the plain language of the TCPA, and its interpretation by Tennessee courts, Mosaic's Motion to Dismiss Tennessee's claims on behalf of out-of-state residents is **DENIED.**

### D. Derivative Liability Under the Holder Rule

Next, Mosaic maintains that Plaintiffs' claims under the CFPA, the TCPA, the KCPA, the THSSA, and the KHSSA should be dismissed because they rely on Plaintiffs' use of the Holder Rule. Mosaic's arguments here are twofold. First, they argue that Plaintiffs cannot use the Holder Rule as a source of derivative liability – that is, they cannot bring an enforcement action based on a violation of the Holder Rule. Second, they argue that Plaintiffs' *parens patriae* powers do not allow Plaintiffs to step into the shoes of consumers and enforce their private contractual rights.

#### 1. Derivative Liability

The Holder Rule, codified in 16 C.F.R. § 433.2, makes it an "unfair or deceptive act" to fail to include in a consumer credit contract: "Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder." In essence, the Holder Rule reallocates the burden and risk of seller misconduct in the sale of goods on consumer credit contracts from the buyer/debtor to the holder of the consumer credit contract. In short, "the Holder Rule allows consumers to assert sale-related claims and defenses against any holder of a consumer contract…." *LaBarre v. Credit Acceptance Corp.*, 175 F.3d 640, 644 (8th Cir. 1999).

Mosaic is correct that the Holder Rule itself cannot create a cause of action, either for

Plaintiffs or for the individual consumers. First, the Holder Rule by its plain text does not *create* any cause of action, it merely allows consumers to exercise *existing* causes of action against the holder of a consumer credit contract. *Id.* The Holder Rule merely declares that failure to include its required language constitutes a deceptive act or practice under the FTC Act. 16 C.F.R. § 433.2. Further, the Sixth Circuit has made clear that "federal regulations cannot themselves create a cause of action; that is a function of the legislature." *Smith v. Dearborn Fin. Servs., Inc.*, 982 F.2d 976, 979 (6th Cir. 1993).

But Plaintiffs assure the Court that they are not attempting to use the Holder Rule as an independent cause of action. [Doc. 261, pg. 56]. Rather, Plaintiffs believe that the Holder Rule applies to the actions they bring on behalf of the residents of their states. [Doc. 261, pg. 56]. Plaintiffs' argument is essentially that consumers have the right to sue Mosaic under the Holder Rule and that as the Attorney Generals for Kentucky and Tennessee they may properly exercise *parens patriae* authority to pursue those claims on behalf of their residents. Therefore, if their residents can use the Holder Rule to assert their claims against Mosaic, so can their respective Attorney Generals.

### 2. *Parens Patriae* Standing

It is clear to the Court that the Holder Rule does not create an independent cause of action. And, of course, Plaintiffs cannot sue under its provisions. Therefore, the inquiry for the Court is whether Kentucky and Tennessee may assert consumers *existing* claims against Mosaic because of the Holder Rule. Put another way, can Kentucky and Tennessee use their *parens patriae* powers to assert claims against Mosaic that the consumers themselves could have asserted?

The doctrine of *parens patriae* – Latin for "parent of the nation" – originated at common law. *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022). In the common law understanding of

21

*parens patriae*, the sovereign (originally the King, then later the states) could step into the shoes of those incapable of defending their own rights. *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019). This concept has since narrowed. Now, "states sometimes purport to sue in a '*parens patriae*' capacity, yet what they are really doing is asserting some injury to their *own* interests separate and apart from their citizens' interests." *Kentucky v. Biden*, 23 F.4th at 598.

Under the modern concept, "[t]o assert *parens patriae* 'the State must articulate an interest apart from the interests of particular private parties . . .[;] the State must be more than a nominal party." *Chapman*, 940 F.3d at 305 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982). "Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement. In such situations, the State is no more than a nominal party." *Id.* (internal citations and quotations omitted). But a state does have a quasi-sovereign interest in "the health and well-being – both physical and economic – of its residents in general." *Id.* (internal citations and quotations omitted). "In determining whether a sufficiently high proportion of the citizenry of a state face harm to their health and well-being to justify standing under *parens patriae*, the best indication is whether the state would, if it could, address the issue through its sovereign law-making powers." *Id.* (internal citations and quotations omitted).

*Chapman* guides the Court here. In *Chapman*, the Sixth Circuit held that Arizona could not assert its *parens patriae* powers on behalf of its residents to object to a settlement that included what Arizona believed was a disproportionate grant of attorney's fees. *Id.* at 303. Arizona argued that it had standing under the doctrine of *parens patriae*. *Id.* at 304. In support of that argument, Arizona maintained that it had sought to regulate attorney's fees through its law-making powers: first through a procedural rule promulgated by the Arizona Supreme Court; second through a

procedural rule, also promulgated by the Arizona Supreme Court; and third through its consumer fraud statute. *Id.* at 306. The Sixth Circuit held that the former two rules were not exercises of Arizona's "law-making" powers because they did not derive from the legislature. *Id.* at 306. The Sixth Circuit further held that Arizona's reliance on its consumer fraud statute "seem[ed] inapt" in that case because "Arizona specifically disclaimed any objection to the proposed settlement on the grounds of fraud or collusion." *Id.* at 306. Still, it recognized that "Arizona's consumer fraud statute . . . is undoubtedly both an exercise of sovereign law-making power and an example of an initiative to protect the economic health and well-being of Arizona citizens." *Id.* at 306. In short, the Sixth Circuit held that while the consumer fraud statute could be the basis for an exercise of *parens patriae* authority, it was inapposite in that case.

The opposite is true here. Kentucky and Tennessee have identified quasi-sovereign interests in the economic well-being of their citizens. Namely, they would like to prevent them from being defrauded. Plaintiffs here are not nominal parties – their interests in preventing fraud and deception within their borders encompass and exceed the interests of the particular residents who were actually defrauded. Finally, both Kentucky and Tennessee have sought to address this issue through extensive legislation. *Id.* at 305. And in contrast to *Chapman*, that legislation deals directly with the alleged wrongdoing here, and is in fact the basis of Plaintiffs' claims. Thus, Plaintiffs' here have shown a quasi-sovereign interest sufficient to allow them to proceed against Mosaic.

It follows, then, that if Plaintiffs have *parens patriae* standing, they may use the Holder Rule to assert the rights of their citizens to the same extent as the citizens themselves. It is true that to assert a *parens patriae* action, a state must assert a "quasi-sovereign interest." *Id.* at 305. But *parens patriae* is a type of standing, not a cause of action. So, while a state must assert a

quasi-sovereign interest to maintain a *parens patriae* action, once it has done so, the state "sue[s] in a representative capacity to vindicate its citizens' interests." *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019) (citations omitted).

The Holder Rule is not an independent cause of action; it is a reallocation of the burden of litigation. It allows consumers to exercise existing causes of action – that would ordinarily be had against a seller – against the holder of a consumer credit contract. It follows then, that when the state sues in a representative capacity, it may assert the same rights as the citizens upon whose behalf the state sues in the first place. Plaintiffs therefore may use the Holder Rule – not as an independent cause of action – but to the extent that the consumers themselves could use it to assert claims against Mosaic.

### 3. Arbitration

Finally on this front, Mosaic argues that if Plaintiffs are allowed to proceed *parens patriae*, they should be forced to arbitrate because Mosaic's loan contracts contained an arbitration provision. Mosaic argues here that if the Court allows Plaintiffs to step into the shoes of the consumers, then Plaintiffs should be bound by the entirety of the contract, and therefore forced to arbitrate as the agreements provide.

The Court is unaware of any Sixth Circuit case addressing whether state attorneys general may be compelled to arbitrate when they proceed *parens patriae*. But the Supreme Court considered a similar question in *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279 (2002). There, the Court held that the EEOC was not bound by an arbitration provision – nor did the arbitration provision limit the EEOC remedies to injunctive relief – when it brought an enforcement action on behalf of a Waffle House employee. *Id.* The court explained that "whenever the EEOC chooses . . . to bring an enforcement action in a particular case, the agency may be seeking to vindicate a

24

public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief." *Id.* at 296.

*Waffle House*'s reasoning applies here. Neither the Kentucky nor the Tennessee Attorney General agreed to arbitrate their claims under the loan agreements because – as in *Waffle House* – they were not parties to the agreement. *See id.* at 294 ("[I]t goes without saying that a contract cannot bind a nonparty."). As discussed above, Tennessee and Kentucky have quasi-sovereign interests in protecting their citizens from fraud. They are more than a nominal party to this action. Thus, while Plaintiffs may be attempting victim specific relief, they also seek to vindicate a public interest. *Id.* at 296. As in *Waffle House*, the arbitration provision does not bind Plaintiffs in their enforcement action.

In sum, Plaintiffs cannot use the Holder Rule as an independent cause of action. But they can proceed in a *parens patriae* action and use the Holder Rule to pursue Mosaic to the extent that the consumers themselves could have. The Tennessee and Kentucky Attorneys General cannot be forced to arbitrate under the loan agreements. On the Holder Rule grounds, Mosaic's Motion to Dismiss is **DENIED**.

### E.  Truth in Lending Act, 15 U.S.C. § 1601, *et seq*.

Mosaic next asserts that the TILA claims should be dismissed for failure to state a claim. Here, Mosaic argues that the claims are time-barred by the relevant statute of limitations, and even if they are not, the claims should be dismissed because Mosaic complied with the TILA. For the reasons that follow, Mosaic's Motion to Dismiss the TILA claims is **DENIED**.

#### 1.  Statute of Limitations

Mosaic contends that the statute of limitations is one year. Were that true, it would bar Plaintiffs' claims for any conduct that occurred prior to February 6, 2022. Mosaic bases this

Case 3:23-cv-00046-DCLC-JEM   Document 291   Filed 09/30/24   Page 25 of 37   PageID #: 8276

argument on the statute of limitations in the TILA itself – 15 U.S.C. § 1640(e) – which provides that an action for violation of the TILA may be commenced within one year of the violation. Plaintiffs counter that the relevant statute of limitations is three years because they brought the claims not under the TILA, but under the CFPA, which has a statute of limitations of three years.

"The statute of limitations is an affirmative defense . . . and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). Thus, a Rule 12(b)(6) motion to dismiss "is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Id.* Dismissing a claim based on the statute of limitations is only appropriate where "the allegations in the complaint affirmatively show that the claim is time-barred." *Id.* Finally, "[b]ecause the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013).

The Court need not decide which statute of limitations applies to the TILA claims here because the complaint does not affirmatively show that the TILA claims are time-barred. Even assuming *arguendo* that the one-year statute of limitations applies, the SAC alleges wrongdoing after February 6, 2022. Specifically, it alleges that Mosaic continued its relationship – and wrongdoing – with Solar Titan until "late 2022." [Doc. 241, ¶71]. Taking that allegation as true, Mosaic's wrongdoing occurred within the period contemplated by the statute of limitations. It is Mosaic's burden to prove that the statute of limitations has run. *Id.* It has not done so, even if the Court accepted its assertion that the one-year statute of limitations applies.

### 2. Compliance with TILA

Aside from the statute of limitations argument, Mosaic argues that the Court should dismiss the TILA claim because Mosaic complied with TILA's requirements. The Court will address each

26

of their arguments in turn.

### a. E-Sign Act

First, Mosaic argues that the Court should dismiss the TILA claims because Mosaic complied with the E-Sign Act. Plaintiffs allege that Mosaic did not comply with the E-Sign Act because "many consumers are unable to access the Mosaic Agreements that contain financial disclosures from their own devices prior to Mosaic providing the financial disclosures." [Doc. 241, ¶ 535]. Mosaic counters that it made the required disclosure – even if only through Solar Titan representatives – before the customers signed the loan agreements. [Doc. 250, pg. 31].

The E-Sign Act provides, in pertinent part, that if a regulation requires a disclosure be made in writing, an electronic form will suffice if: "the consumer consents electronically, or confirms his or her consent electronically, in a manner that reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent. 15 U.S.C. § 7001(c)(1)(C)(ii).

Here, the SAC plainly alleges that the consumers did not provide the required consent. The SAC alleges that the required disclosures are provided exclusively through Solar Titan representatives, and that many consumers are unable to access the disclosures from their own devices or those used by Solar Titan representatives. [Doc. 241, ¶¶ 534–37]. At this stage, the Court is required to take those factual allegations as true. And when taken as true, they constitute a plain violation of the E-Sign Act.

### b. Opportunity to Cure

Mosaic contends next that even if the conduct could be a violation of the E-Sign Act, damages are unavailable. That is so, Mosaic says, because they had a 60-day opportunity to cure any defect in their disclosures. And because Mosaic emailed the disclosures to the customers after

they consummated the transaction, Mosaic believes they cured any and all potential defective disclosures.

The Court need not decide whether the opportunity to cure defects extends to a complete failure to disclose – as is alleged here. The SAC plainly alleges that Solar Titan created email addresses for some consumers with very little chance that they could actually use the email account. [Doc. 241, ¶ 155]. The SAC also alleges that Mosaic and Solar Titan did not make adequate disclosures via Solar Titan sales representatives. [Doc. 241, ¶¶ 534–37]. So, in cases where sales representatives did not make adequate disclosures *and* created an email that in all likelihood would not be used, the consumers never received adequate disclosures.

Mosaic cannot cure one failure to disclose with another failure to disclose. The E-Sign Act requires that consumers consent to the loan terms in a manner that reasonably demonstrates that they can access information in the method that it is to be provided to them. 15 U.S.C. § 7001(c)(1)(C)(ii). If consumers did not reasonably demonstrate their ability to access the information to Solar Titan representatives on Solar Titan's devices – and Solar Titan created for them an email that they knew or should have known the consumers could not use – then the consumers never demonstrated their ability to access the relevant information. Put simply, Mosaic cannot skirt a failure to obtain a demonstration of consent in one manner by failing to obtain a demonstration of consent in a different manner.

### c. Finance Charges

Finally, on the TILA front, Mosaic maintains that Plaintiffs cannot pursue a TILA action against them insofar as the action is based on Mosaic's failure to disclose their use of seller's points. Plaintiffs agree, but contend that the seller's points at issue are actually finance charges which Mosaic must disclose.

28

Regulation Z enacted under TILA provides that finance charges that must be disclosed includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). Regulation Z explicitly excludes seller's points from the definition of a finance charge. 12 C.F.R. § 1026.4(c)(5). Seller's points are "charges imposed by the creditor upon the noncreditor seller of property for providing credit to the buyer or for providing credit on certain terms." CFPB, *Supplement I to Part 1026—Official Interpretations, Comment for 1026.4 - Finance Charge*. Seller's points are excluded from the definition of a finance charge "even if they are passed on to the buyer, for example, in the form of a higher sales price." *Id.* "Buyer's points . . . however, are finance charges." *Id.*

The Sixth Circuit has interpreted these definitions to mean that finance charges are "fees payable by credit consumers, but not by cash customers, in comparable transactions." *Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 327 (6th Cir. 2001). Further, "[a]n increase in the base price . . . that is not charged to a cash customer, but is charged to a credit customer, *solely because he is a credit customer*, triggers TILA's disclosure requirements." *Id.* (emphasis in original).

The parties here disagree on whether the charges were buyer's points or seller's points, and therefore whether they had to be disclosed or not. Plaintiffs' argument essentially rests on Solar Titan's allegedly artificially increasing prices to cover Mosaic's fee. Mosaic points to the staff interpretation of Regulation Z to counter that even if the charges were passed on, it would not constitute buyer's points. But under Sixth Circuit precedent, those charges are buyer's points if they are passed on *only to the credit customer*. *Id.* Thus, an overall price increase for all consumers might be permissible, but an increase for only credit consumers is not.

This leaves the Court with a factual dispute that cannot be resolved at this stage. Plaintiffs

allege that Solar Titan artificially inflated prices for Mosaic consumers. [Doc. 241, ¶ 549]. Mosaic says that Solar Titan did not inflate the prices because the Dealer Agreement provided that Solar Titan would not inflate prices to cover the fees. [Doc. 250, pg. 36]. The Court notes here that a contractual provision prohibiting certain conduct obviously does not make that conduct factually impossible. At this stage, the Court must take Plaintiffs' factual allegations as true. And accepting those allegations as true, Plaintiffs have adequately pled that the fees Solar Titan paid to Mosaic were finance charges that should have been disclosed.

For the foregoing reasons, Mosaic's Motion to Dismiss Plaintiffs' TILA claim is **DENIED**.

### F. Consumer Financial Protection Act, 12 U.S.C. § 5536

Mosaic argues that Plaintiffs' CFPA claim should be dismissed for two reasons. First, because Solar Titan is not Mosaic's agent, and Mosaic cannot be held liable for Solar Titan's conduct in any event because Solar Titan as an entity is without the purview of the CFPA. Second, Plaintiffs failed to allege that Mosaic directly violated the CFPA. Plaintiffs respond that their claims do not hinge on a finding of agency, nor do they attempt to hold Mosaic derivatively liable for Solar Titan's actions. Rather, Plaintiffs say, they adequately pled Mosaic itself violated the CFPA. The Court finds the second issue dispositive at this stage and will accordingly **DENY** Mosaic's Motion to Dismiss the CFPA claim.

The CFPA makes it unlawful for "any covered person or service provider" to "engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536. A "covered person" is one who "engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). An "abusive act or practice" is one that "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d)(1).

The Court need not reach the issue of Mosaic's liability for Solar Titan's conduct because the SAC contains plain allegations of Mosaic's misconduct that must be accepted as true at this stage. As discussed above with respect to the TILA claim, it is plausible that Mosaic materially interfered with consumers' ability to view the disclosures required on their loans. Further, the SAC alleges that Mosaic failed to honor customers' timely cancellation requests. [Doc. 241, ¶ 416]. The SAC also alleges that Mosaic and/or Solar Titan, through poor training and implementation, failed to adequately review disclosures with purchasers of solar systems. [Doc. 241, ¶ 459]. Those allegations, taken as true, would constitute unfair, deceptive, or abusive acts under the CFPA.

Because the SAC adequately pleads that Mosaic is directly liable for violations of the CFPA, the Court need not reach the issue of its purported agency relationship with Solar Titan. The allegations in the SAC suffice to pass a Rule 12(b)(6) motion. Accordingly, Mosaic's Motion to Dismiss the CFPA claim is **DENIED**.

### G. Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104

Mosaic asks the Court to dismiss the TCPA claims. Here, it argues that the TCPA does not apply to lenders. Further, Mosaic rehashes its argument that it cannot be held liable for Solar Titan's misconduct. Plaintiff responds that the TCPA does apply to lenders, and again responds that it can – but does not need to – hold Mosaic liable for Solar Titan's actions.

The TCPA makes it unlawful to engage in "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). An "unfair act or practice" includes "any . . . act or practice which is deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-104(b)(27). Only the Attorney General may enforce Subdivision (27). *Id.* The TCPA expressly requires liberal construction to promote its underlying

31

policies. Tenn. Code Ann. § 47-18-102.

Courts have routinely allowed TCPA actions against lenders. For example, in *Terry v. Cmty. Bank of N. Virginia*, 255 F. Supp. 2d 817, 823 (W.D. Tenn. 2003), the court found that "[p]laintiffs' allegations regarding misrepresentations made during the course of extending loans sufficient to plead a cause of action for violation of the TCPA." Tennessee courts have reached similar conclusions. For instance, in *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 786 (Tenn. Ct. App. 2010), the court applied the TCPA standards to a bank engaged in lending and left as a question of fact whether the bank's actions constituted unfair or deceptive acts. *Id.* ("The dispositive question here is whether the Bank, as a factual matter, engaged in any unfair or deceptive acts.").

The only cases in which the TCPA has been held not to apply to lenders are those cases in which particular transactions did not affect trade or commerce. In *SecurAmerica Bus. Credit v. Southland Transportation Co., LLC*, the court held that *particular loan transactions* were not within the purview of the TCPA because they did not affect the conduct of trade or commerce. *SecurAmerica Bus. Credit v. Southland Transportation Co., LLC*, No. W201500391COAR3CV, 2016 WL 1292087, *7 (Tenn. Ct. App. Apr. 1, 2016). The court did not hold that lenders are not subject to the TCPA; in fact, the case had previously been remanded for factual determinations relevant to a TCPA analysis. *Id.* at *3.

There is no categorical bar to application of the TCPA to lenders, as Mosaic suggests. Rather, the "dispositive question" is whether the lender engaged in any unfair or deceptive act that affects trade or commerce. *Poole*, 337 S.W.3d at 786. That question is one of fact. Therefore, if Plaintiffs have pled that Mosaic committed an unfair act or practice, the Motion to Dismiss must be denied.

32

"A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005). An "unfair act or practice is one that, while not necessarily deceptive, is likely to substantially injure consumers, is not reasonably avoidable by consumers, and is not outweighed by competing benefits to the consumer market." *Id.* at 116–17.

Plaintiffs have pled that Mosaic engaged in unfair or deceptive acts here. Plaintiffs pled that Mosaic failed to honor cancellation requests. [Doc. 241, ¶ 416]. The SAC alleges that Mosaic failed to make adequate disclosures of their loan terms. [Doc. 241, ¶ 459]. Finally, Plaintiffs allege that Mosaic misled consumers about their qualification for federal tax credits.[2] [Doc. 241, ¶ 487–95]. Those facts – taken as true – could constitute unfair or deceptive acts or practices. Finally, in contrast to the niche, sophisticated loans at issue in *SecurAmerica*, the loans here directly affected the sale of consumer goods, directly to consumers. *SecurAmerica,* 2016 WL 1292087, *7.

Here again, the Court need not reach the question of derivative liability, nor agency. Because the TCPA applies to lenders when their transactions affect trade or commerce, and because the SAC contains sufficient allegations of fact to plead a plausible violation of the TCPA, Mosaic's Motion to Dismiss the TCPA claim is **DENIED**.

### H.  Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.170

Mosaic similarly contends that the Court should dismiss the KCPA claims. Its arguments mirror those on the TCPA claim: Mosaic cannot be held derivatively liable, and in any event they

---

[2]    Mosaic argues that they properly and adequately disclosed information regarding tax credit qualification. This is a question of fact, improper for resolution at this stage. Mosaic cannot transform a question of fact into one of law by including in their Motion to Dismiss an exhibit supporting their factual argument.

33

did not violate the KCPA. With respect to the latter, they argue only that they properly disclosed tax credit availability, and that continuing to collect payment on a loan after receiving complaints about the seller of the financed merchandise do not constitute violations of the KCPA. Plaintiffs counter that they have pled sufficient facts to show a KCPA violation, namely that Mosaic refused to honor timely cancellation requests.

The KCPA makes unlawful any "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. § 367.170. Unfair is construed to mean unconscionable. *Id.* The sale of credit is within the purview of the KCPA. *Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776, 792 (W.D. Ky. 2003).

Kentucky has held that failing to honor a buyer's rights constitutes a violation of the KCPA. *Ford Motor Co. v. Mayes*, 575 S.W.2d 480, 485 (Ky. Ct. App. 1978). In *Mayes*, the court held that Ford's refusal to honor a buyer's rights under the UCC – and instead insisting that their only rights were under Ford's warranty policies – violated the KCPA. *Id.* Denying the buyers' their rights at law, and insisting that their only remedy was through Ford, was "unconscionable" under the KCPA. *Id.* The same situation presents itself here. As discussed above, Plaintiffs adequately pled that Mosaic failed to honor requests for cancellation and continued to bill them. [Doc. 241, ¶¶ 285, 416]. Taking these allegations as true, they constitute the same unconscionable practice that the court held unlawful in *Mayes*. *Id.* Plaintiffs adequately pled a violation of the KCPA.

Because Plaintiffs plausibly allege a direct violation of the KCPA by Mosaic, the Court again need not reach the issue of derivative liability. And because of the direct violation, Mosaic's Motion to Dismiss is **DENIED**.

## I. Tennessee Home Solicitation Sales Act, Tenn. Code Ann. § 47-18-704

Mosaic next argues that the THSSA claim should be dismissed. First, they argue that the

34

THSSA does not apply to lenders. Then, they argue that even if the THSSA applies to lenders, they complied with its provisions because they included the THSSA's required cooling-off period disclosures. Plaintiffs respond that the THSSA applies to lenders, and that Mosaic did not comply with the disclosure requirements because the disclosure language was out of place on the loan documents.

The THSSA gives the buyer a three-day right to cancel a contract in a home solicitation sale. Tenn. Code Ann. § 47-18-704. A home solicitation sale is defined as "a consumer sale or lease of goods . . . in which the seller or a person acting for the seller engages in the personal solicitation of the sale or lease at any residence [not his own] and the buyer's agreement or offer to purchase or lease is there given to the seller or the person acting for the seller." Tenn. Code Ann. § 47-18-702.

Mosaic argues that it is not a "seller" within the meaning of the THSSA, presumably because it does not sell solar panels. This argument misses the point. Tenn. Code Ann. § 47-18-702 explicitly contemplates the sale of goods *or services*. Mosaic is a seller of loan services – it need not be a seller of solar panels. And while this issue is one of first impression in Tennessee, other courts have reached the same conclusion. *See, e.g., Reynolds v. D & N Bank*, 792 F. Supp. 1035, 1038–39 (E.D. Mich. 1992). As such, the THSSA applies to Mosaic as a seller of its loan products and services.

That does not end the inquiry. Mosaic contends that even if the Court considers them a seller under the THSSA, the Court should still dismiss the claim because they complied with the notice of cancellation requirement. Tenn. Code Ann. § 47-18-704 requires that, in a home solicitation sale, a written agreement contain on the front side of the receipt or contract, or immediately above the buyer's signature line, a notice of the buyer's right to cancel.

The dispute here is simple. Mosaic says that its agreements contained a compliant signature. Plaintiffs say that the agreements did not contain a compliant signature. [Doc. 241, ¶ 646]. This is quintessentially a factual dispute, and at this stage, the Court must take Plaintiffs' version as true. Thus, the Court assumes for now that Plaintiffs have stated a cognizable claim under the THSSA.[3]

Because the THSSA applies to Mosaic as a seller of loan products and services, and because Plaintiffs adequately pled that Mosaic failed to comply with the notice provisions of the THSSA, Mosaic's Motion to Dismiss the THSSA claim is **DENIED**.

### J. Kentucky Home Solicitation Sales Act, Ky. Rev. Stat. § 367.420

With respect to the KHSSA claim, Mosaic argues only that it provided legally compliant cooling-off notices. Plaintiffs counter that Mosaic's notices were not legally compliant, and in any event, there would remain a factual issue as to whether Mosaic timely honored cancellation requests. [Doc. 241, ¶ 683].

Here, again, there is a factual dispute that the Court must resolve in Plaintiffs' favor at this stage. Mosaic's Motion to Dismiss the KHSSA claim is therefore **DENIED**.

### K. Agency

Next, Mosaic argues that the CFPA, TILA, TCPA, KCPA, THSSA, and KHSSA claims should be dismissed insofar as they depend on an agency relationship between Mosaic and Solar Titan. [Doc. 250, pg. 18–19]. Mosaic maintains that Plaintiffs have not pled sufficient facts to show an agency relationship or agency by ratification. [*Id.* at pg. 18–29]. But, as discussed above

---

[3] Mosaic also argues here that the claim should be dismissed because it would be impossible to calculate damages. Even if that were true, it has nothing to do with whether Plaintiffs have met their pleading burden. *See In re Automotive Parts Antitrust Litig.*, No. 12-MD-2311, 2013 WL 2456612, *18 (E.D. Mich. June 6, 2013).

36

on each individual count, Plaintiffs have pled sufficient facts to show direct liability for all of their claims. Further, "whether an agency relationship exists is a question of fact under the circumstances of the particular case." *Tan v. Wilbur Smith Assocs., Inc.*, No. 2:09-CV-25, 2011 WL 3421320, *4 (E.D. Tenn. Aug. 4, 2011). Therefore, because agency is not dispositive to any of Plaintiffs' claims, and because agency is a question of fact better suited for resolution at summary judgment, Mosaic's Motion to Dismiss insofar as it depends on an agency determination is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, Mosaic's Motion to Dismiss [Doc. 249] is **DENIED.**

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge