UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TENNESSEE, *ex rel.* JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER, and COMMONWEALTH OF KENTUCKY, *ex rel.* RUSSELL COLEMAN, ATTORNEY GENERAL, | ) ) ) ) ) ) ) | 3:23-CV-00046-DCLC-JEM |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| IDEAL HORIZON BENEFITS, LLC d/b/a/ SOLAR TITAN USA, *et al.*, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the motion of Defendants Richard Atnip and Craig Kelley to modify the asset freeze in place here. [Doc. 289]. The matter has been extensively briefed and is now ripe for resolution.

**I.      BACKGROUND**

**A.      Factual Background**

In February 2023, the Attorneys General of Tennessee and Kentucky brought this civil enforcement action against Ideal Horizon Benefits LLC d/b/a Solar Titan ("Solar Titan") and its primary lending partner, Solar Mosaic, LLC ("Mosaic"). [Doc. 3]. Solar Titan sells solar panels to homeowners, and Mosaic finances the purchases for the consumer. [Doc. 241, ¶¶ 47, 38]. The Complaint also named as Defendants Craig Kelley, Richard Atnip, and Sarah Kirkland, Solar

1

Titan's owners and officers.[1] [*Id.*]. Kelley and Atnip founded Solar Titan; Atnip and Kirkland own 90% and 10% of its equity, respectively. [Doc. 241, ¶¶ 24–29].

The Complaint alleges that Defendants violated several federal and state consumer protection laws when they sold solar panels to consumers. [*See id.* ¶¶ 47–82]. In short, Plaintiffs allege that Defendants misrepresented the systems' efficacy and potential savings, installed faulty systems, and engaged in deceptive and unfair practices when consumers wished to cancel their purchases. [*Id.* ¶¶ 52–68].

After they commenced the action, Plaintiffs immediately moved for a temporary restraining order ("TRO") to prevent continued consumer abuses. [Doc. 5]. The Court granted the motion [Doc. 21] and ultimately converted the TRO into a preliminary injunction. [Doc. 78]. The Court later issued an amended preliminary injunction, which remains in effect. [Doc. 159].

The preliminary injunction placed Solar Titan in the hands of a Receiver and froze Kelley and Atnip's assets.[2] [*See id.* § II]. The asset freeze prohibited Kelley and Atnip from "[t]ransferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of" all assets existing at the time of the Order's issuance, and in limited circumstances, assets obtained after the Order's issuance. [*Id.* § II(A), (E)(2)]. It also directed the Receiver to distribute $3,500 per month to Atnip and Kelley for reasonable living expenses. [*Id.* § X(S)(1)]. The Order permitted Atnip and Kelley to move to adjust the amount of the monthly stipend for good cause shown. [*Id.* § X(T)].

---

[1] Plaintiffs have twice amended their Complaint, and the operative pleading is now the Second Amended Complaint. [Doc. 241].
[2] The asset freeze also applied to some of Kirkland's assets, but that portion is not relevant here.

2

**B.     Motion to Modify Asset Freeze [Doc. 289] and Accompanying Briefing**

Defendants Atnip and Kelley have now moved to modify the asset freeze portion of the injunction. [Doc. 289]. They seek a release of funds to pay six expenses: (1) $25,000 to pay their 2023 federal tax liability; (2) $501,724.83 to pay off a home equity line of credit ("HELOC") on their primary residence; (3) $35,321 to pay real estate fees and property taxes; (4) an unspecified amount to continue their monthly stipend; (5) $128,912.34 to pay past-due legal fees; and (6) $250,000 to pay a retainer to counsel for legal fees not yet incurred. [Doc. 289-1, pg. 1]. Plaintiffs oppose each request.

**II.    LEGAL STANDARD**

"The Court has inherent power to modify its own injunctions." *Toledo Area AFL-CIO Council v. Pizza*, 907 F. Supp. 263, 265 (N.D. Ohio 1995). In doing so, "the Court exercises the same discretion it exercised in granting the injunction in the first place."[3] *Id.* Deciding whether to unfreeze assets requires the Court to balance competing interests. On one hand, the Court must be mindful that it imposed the asset freeze to make restitution available to victims if Plaintiffs prevail. *See F.T.C. v. Fed. Check Processing, Inc.*, No. 14-CV-122, 2016 WL 10988581, *1 (W.D.N.Y. Mar. 7, 2016). On the other hand, "it cannot be ignored that this suit was brought to establish Defendants' wrongdoing; the Court cannot assume the wrongdoing" and eliminate Defendants' ability to defend themselves. *Id.* (internal citations and quotations omitted) (cleaned up).

---

[3] The parties do not agree on the standard applicable to this motion. Plaintiffs' response brief attempts to apply a "reasonable and necessary" standard to these requests. They rely on *FTC v. ACRO Servs., LLC*, No. 3:22-cv-00895, 2023 WL 351202 (M.D. Tenn. Jan. 20, 2023) for this standard. As the Court explained in its prior Order addressing a motion to modify the asset freeze, "reasonable and necessary" is not the applicable standard. [Doc. 158, pg. 5 n. 3]. The "reasonable and necessary" standard in *Acro Services* came from the Court's injunction itself. The injunction here contains no such language with respect to requests to modify the asset freeze, and the Court again declines to apply this standard.

## III. ANALYSIS

### A. Tax Liabilities

Defendants first move the Court to unfreeze $25,000 to pay their 2023 tax liability. [Doc. 289-1, pg. 10–11]. In support, Defendants highlight that the Court previously allowed a similar request and argue that failure to pay the taxes will result in financial penalties and increase the amount owed. [*Id.* at 11]. Plaintiffs oppose the request as premature, arguing that the tax liability is only estimated at this point. [Doc. 304, pg. 4]. They also argue that Defendants have not provided sufficient proof that their current income is not enough to pay the taxes without unfreezing assets. [*Id.* at pg. 4–5]. The Receiver also opposes this request. He tells the Court that Defendants' final tax liability will not be known until October 15, 2024, when Solar Titan's return is filed with the IRS. [Doc. 305-1, ¶ 7].

The Court is amenable to unfreezing assets to allow Defendants to pay their outstanding taxes. But first Defendants should submit documentation that states their actual liability. This should not prove burdensome, as October 15, 2024—the date on which the Receiver represented that the tax liability would be known—has long passed. The Court **DENIES WITHOUT PREJUDICE** the motion [Doc. 289] here.

### B. HELOC

Defendants next request a release of $501,724.83 to pay off their HELOC. [Doc. 289-1, pg. 11]. They maintain that this is a "break-even proposition for the Estate" because "[w]hatever amount is paid to pay off the HELOC will free up equity in frozen real estate assets of the Estate" and "[t]his equity can be used for consumer redress" if Plaintiffs prevail. [*Id.*]. Plaintiffs respond that this proposition is too risky because any equity in the home available for redress would require the sale of the home, and its selling price is speculative. [Doc. 304, pg. 7]. Defendants reply that

4

this argument is disingenuous and, if true, "would nullify an entire industry of appraisers." [Doc. 306, pg. 6].

The Court agrees with Plaintiffs. To be sure, allowing Defendants to pay off their HELOC would increase their unencumbered equity in the home, and that equity would be an asset available for potential consumer redress. But before consumers could obtain relief from the home's equity, it would have to be sold. It is true that banks, lenders, and appraisers do not fly blind when assessing a home's value. But it is equally true that short-term fluctuations in the real estate market could substantially affect its resale value at a given point in time.

The Court cannot forecast changes in the real estate market. Exchanging liquid assets for equity in a home that might or might not retain equal value if the home needs to be sold is too speculative of a proposition. The potential harm to consumers far exceeds the benefit that would flow to Defendants' monthly balance sheet. Defendants' motion [Doc. 289] is **DENIED** on this issue.

C.  **Property Taxes and HOA Fees**

Next, Defendants ask the Court to release $35,321 to pay HOA fees and real estate taxes. [Doc. 289-1, pg. 11]. Defendants argue that failure to pay the property taxes or HOA fees could diminish the value of the estate, as foreclosure or penalties could result. [*Id.*]. Plaintiffs oppose the request. They make two main arguments: (1) Defendants have not shown that the request is reasonable and necessary, nor that their current income is insufficient to make the payments themselves; and (2) the request is premature because Defendants provided no evidence of an actual outstanding obligation. [Doc. 304, pg. 5–6].

As the Court explained in its prior Order addressing a motion to modify the asset freeze, the Court's main concern is whether a given request would "thwart the goal of the asset freeze—

5

i.e., maintaining the status quo for prospective consumer redress." [Doc. 158, pg. 7]. Allowing a release of funds to pay property taxes and HOA fees would not flout the purpose of the asset freeze and it would preserve the status quo. If the taxes and fees go unpaid, penalties or foreclosure could result. It best preserves the status quo to ensure that these properties remain unencumbered and available for potential consumer redress. The Court **GRANTS** the motion [Doc. 289] on this front.

**D.     STIPEND**

Defendants move the Court to unfreeze assets to continue their monthly $3,500 stipends when the Receiver can no longer make the payments. [Doc. 289-1, pg. 1]. They argue that this modification is equitable to assist them in their living expenses while their assets are frozen. [Doc. 289, pg. 2]. Plaintiffs oppose the request as premature and unnecessary. They maintain that—at the time of their filing—the Receiver had sufficient funds to continue the payments through March 2025.[4] [Doc. 304, pg. 7]. Plaintiffs also argue that Defendants have not shown that the request is necessary given Kelley's substantial new income. [*Id.* at 8].

Again, the Court notes that the standard does not require Defendants to show that a requested modification is reasonable and necessary. Still, the Court agrees with the spirit of Plaintiffs' arguments. Since the asset freeze, Kelley obtained gainful employment in marketing. He earns a base salary of $125,000. [Doc. 306, pg. 4]. And his average monthly income since the asset freeze is $11,153.12. [*Id.*]. The Court afforded Defendants a stipend in large part to compensate for their lost income. But Kelley substantially replaced that lost income and abrogated to some extent the purpose of the stipend. Without more information, though, the Court cannot say what stipend payment—if any—is appropriate to assist Defendants in their "reasonable housing and other living expenses." [Doc. 159, § X(S)(1)].

---

[4]     At the time of their filing, Defendants disputed that the Receiver had sufficient funds to make the payment through March 2025. [Doc. 306, pg. 8].

6

Case 3:23-cv-00046-DCLC-JEM   Document 342   Filed 06/09/25   Page 6 of 12
PageID #: 9355

It is also unclear whether the Receiver still has available funds to pay the stipend. If he does, a modification of the asset freeze is unnecessary. From the Receiver's Sixteenth Status Report, it appears that he made the payments at least through March 2025. [Doc. 340-1, pg. 4]. The date on which the parties were concerned that the Receiver might run out of funds—March 2025—has passed. Without knowing whether the Receiver can still make the stipend payments, the Court cannot determine whether a modification to the asset freeze is appropriate.

The motion [Doc. 289] is **DENIED WITHOUT PREJUDICE** to pay the stipend. Defendants may renew their motion on this front if they can show that a stipend is necessary to meet their reasonable living expenses or if the Receiver cannot keep making the payment.[5] [*See* Doc. 159, § X(S)(1)]. But any potential unfrozen assets to pay the stipend must be solely to pay reasonable living expenses.

### E. PAST DUE LEGAL FEES

Defendant's penultimate request is that the Court release $128,912.34 to allow Defendants to pay past due legal fees. [Doc. 289, pg. 1]. In their response, Plaintiffs objected to the reasonableness of the amount and argued that they could not formulate a full response without access to Plaintiffs' redacted billing records. [Doc. 304, pg. 12]. Defendants provided 75 pages of redacted billing records in their reply. [*See* Doc. 306-1]. Plaintiffs then requested and received permission to file a sur-reply on the issue.

In their sur-reply, Plaintiffs argued that "Defendants have failed to provide sufficient

---

[5] Given the confusion over the applicable standard, the Court explains that it is not applying a "reasonable and necessary" standard to a request for modification. But the injunction provided that the Receiver would pay a stipend "for the purpose of providing for reasonable housing and other living expenses." [Doc. 159, § X(s)(1)]. So under the Court's injunction, the stipend must be: (1) for paying housing and living expenses; and (2) reasonable. If—with Kelley's new salary—Defendants require no other funds to pay such expenses, then the stipend is not appropriate. Additionally, the amount of expenses must be reasonable. In other words, Defendants cannot replace their lost income and use a continued stipend to inflate their standard of living. If Kelley's salary is not enough to pay Defendants' reasonable living expenses, the Court will entertain a renewed motion accompanied by sufficient supporting documentation.

billing records and other evidence to support their request for $128,913.14 in attorneys' fees." [Doc. 319, pg. 2]. According to Plaintiffs, "almost all of the billing records" that Defendants submitted "are overly redacted or vague to the point that they cannot be objectively evaluated." [*Id.*]. And on those that are not unreasonably vague, Plaintiffs claim that defense counsel billed an unreasonable amount of time for some tasks. [*Id.*]. Finally, Plaintiffs object to defense counsel's use of block billing and the hourly rates charged by some attorneys from Darrow Everett. [*Id.* at 4–6].

Defendants reply that their billing records are neither too vague nor too redacted to provide Plaintiffs an opportunity to evaluate their reasonableness. [Doc. 322, pg. 2, 4]. They also correctly point out that Plaintiffs are not entitled to completely unredacted billing records. [*Id.* at 2–3]. They defend their use of block billing as adequate to describe the tasks of their attorneys and contend that the documentation provided supports the work performed. [*Id.* at 5]. Finally, Defendants argue that the hourly rates charged for their attorneys are reasonable given their experience and skill. [*Id.* at 5–7].

The Court has discretion to unfreeze assets to allow defendants to pay attorneys' fees. *F.T.C. v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1313 (S.D. Fla. 2013). But when frozen assets are less than the amount that would be needed to compensate consumers for their losses, a court can properly decline to modify an asset freeze. *Id.* "Moreover, while parties to litigation generally may spend their resources as they see fit to retain counsel, they may not use their victims' assets to hire counsel to help them retain the fruits of their violations." *F.T.C. v. RCA Credit Servs., LLC*, No. 8:08-CV-2062, 2008 WL 5428039, *4 (M.D. Fla. Dec. 31, 2008).

Defendants previously made a similar request for modification of the asset freeze to pay attorneys' fees. [Doc. 101, pg. 2]. In response to that request, the Court recognized that the asset

8

freeze could make it hard for Defendants to mount a defense. The Court acknowledged that "general principles of equity would require the release of frozen assets to pay reasonable legal and living expenses." [Doc. 158, pg. 10]. Ultimately, the Court denied the request because Defendants failed to provide adequate information and documentation to support it. [*Id.* at 11].

Defendants point to the Court's acknowledgment as support for their instant request. [Doc. 289-1, pg. 12]. They contend that they have now provided enough information for the Court to modify the asset freeze. [*Id.* at 16]. The Court disagrees.

The parties spill considerable ink on whether Defendants' billing records adequately support the amount of their requested fees.[6] These arguments miss the point. Whether Defendants submitted adequate documentation supporting what their attorneys charged for specific work is only part of the inquiry. They must also submit evidence supporting the *reasonableness* of the fees. This is commonly accomplished via an affidavit attesting to the reasonableness of the amounts charged, or via evidence of prevailing market rates.

There is no such evidence before the Court. To be sure, the parties argue the reasonableness of the fees. But argument is not evidence. Without some evidence that the attorneys' fees are reasonable, the Court lacks sufficient information to justify unfreezing assets to pay them.

This conclusion is consistent with the Court's prior opinion. The Court was clear that general principles of equity would ordinarily require unfreezing assets to pay *reasonable* attorneys' fees. [Doc. 158, pg. 10]. The Court is sensitive to Defendants' need to defend themselves. But the Court imposed the asset freeze to ensure the availability of funds for consumer

---

[6] Plaintiffs suggest that the Court should apply the five factors from *F.T.C. v. Johhnson*, No. 210CV02203, 2011 WL 13249477 (D. Nev. June 17, 2011) to determine whether Defendants' request is appropriate. That case, of course, does not bind the Court, but it did address the same issue. But because the Court's prior Order [Doc. 158] requires the fees to be reasonable, and there is no evidence on that front here, the Court leaves the applicability of the *Johnson* factors for another day.

redress should Plaintiffs prevail. It only makes sense, then, to require Defendants to show that their requested attorneys' fees are reasonable. Otherwise, the pool available for consumer redress might be unnecessarily reduced.

The motion [Doc. 289] is **DENIED WITHOUT PREJUDICE** on the issue of past due attorneys' fees. If Defendants renew their motion with evidence that the requested fees are reasonable, the Court will entertain it at the appropriate time.

## F. RETAINER

Defendants' final request is for $250,000 to pay a retainer to counsel. Defendants argue that releasing funds to pay a retainer is more efficient than requiring them to repeatedly move the Court for modification of the asset freeze. [Doc. 289-1, pg. 17]. Plaintiffs oppose the request as premature. They argue that there is no way to determine in advance whether the $250,000 fee will be reasonable for work performed and that Defendants have not shown that the fee is necessary. [Doc. 304, pg. 14–15].

The Court has discretion to unfreeze assets to allow Defendants to pay a legal retainer. *See F.T.C. v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1313 (S.D. Fla. 2013). But, as noted above, the Court must balance the equities at stake. On one hand, the Court is mindful of Defendants' need to defend themselves—they have not yet been found liable for the wrongdoing alleged here. On the other hand, the Court has already found that Plaintiffs are likely to succeed, and the asset freeze ensures that potentially wronged consumers can recover at least some of their money.

With that in mind, Defendants' request is inappropriate. Defendants' main argument is that the retainer would promote expediency and convenience. They maintain that—absent the retainer—"Defendants will have to move the Court for their fees" and "[d]oing this requires the

10

additional time and work of preparing a motion and waiting for the briefing . . . and then [for] the Court to rule on the motion." [Doc. 289-1, pg. 17]. That's not necessarily true, of course. Defendants could hire less expensive counsel that they can afford with Kelley's new salary. In any event, the Court will not subjugate consumers' potential ability to recover their lost money to the expediency of this litigation. If that means Defendants must move repeatedly to modify the asset freeze, so be it.

Nor is the Court persuaded by Defendants' argument that this decision will "require the law firms to be paid months behind the release of their invoices" resulting in their withdrawal from the case. [Doc. 289-1, pg. 17]. True, Defendants' counsel has already moved to withdraw, and it does impede the proceedings to some degree. [Docs. 327, 331]. But the Court imposed the asset freeze to preserve funds for consumer redress. Equity assigns to that consideration more import than to harmonious relations between Defendants and their counsel.

In any event, Defendants have submitted no information to support the requested $250,000. It appears that their past due bills total only $128,912.34. [Doc. 289-1]. It is unclear, then, why the Court would release nearly twice that amount for legal fees that have not yet been incurred. Absent some evidence to support the requested amount, the request is inappropriate.

The motion [Doc. 289] is **DENIED** with insofar as it requests $250,000 for a legal retainer.

## IV. CONCLUSION

For the reasons foregoing, the Motion to Modify Asset Freeze [Doc. 289] is **GRANTED IN PART** and **DENIED IN PART.** It is hereby **ORDERED** that $35,321 is **RELEASED** from Defendants' First Horizon Bank Account, account number ending in 0039. These funds are to be deposited into the DarrowEverett, LLP IOLTA account. Counsel may use these funds *only for* the purpose outlined in this order.

11

**SO ORDERED:**

                                              s/Clifton L. Corker
                                              United States District Judge

12

Case 3:23-cv-00046-DCLC-JEM    Document 342    Filed 06/09/25    Page 12 of 12
PageID #: 9361